1              IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF ARIZONA

3
     UNITED STATES OF AMERICA,           )
4                                        )
                 Plaintiff,              )
5                                        )
                                         )
6    vs.                                 )    CR-09-2343-TUC-FRZ
                                         )
7                                        )
     YURIS BONILLA-GUIZAR and            )
8    CARLOS ARMANDO CALIXTRO-BUSTAMANTE, )
                                         )
9            Defendants.                 )    Tucson, Arizona
     ──────────────────────────────────  )    October 18, 2010
10

11             BEFORE HONORABLE FRANK R. ZAPATA
                 UNITED STATES DISTRICT JUDGE
12                     405 W. CONGRESS
                   TUCSON, ARIZONA 85701
13

14                      MOTIONS HEARING

15

16              A P P E A R A N C E S

17   ON BEHALF OF THE GOVERNMENT:        MS. KRISTEN KELLY
                                         ASST. U.S. ATTORNEY
18
                                         MR. JOHN EVANS
19                                       ASST. U.S. ATTORNEY

20   ON BEHALF OF DEFT. CALIXTRO-BUSTAMANTE:  MR. JESUS ROMO
                                              ATTORNEY AT LAW
21
     ON BEHALF OF DEFT. BONILLA-GUIZAR:   MR. PETER HORMEL
22                                        ATTORNEY AT LAW

23                 CHRIS WALLACE, RPR, CRR
                  405 W. CONGRESS, SUITE 1500
24                 TUCSON, ARIZONA 85701
                       (520)205-4268
25
          Proceedings prepared by computerized realtime translation.

I N D E X

EVIDENCE ON BEHALF OF THE GOVERNMENT

Page

Testimony of JEFFREY ELLIS
    DIRECT EXAMINATION BY MS. KELLY......................... 3
    CROSS EXAMINATION BY MR. HORMEL........................ 30
    CROSS EXAMINATION BY MR. ROMO.......................... 55
    REDIRECT EXAMINATION BY MS. KELLY...................... 62

Testimony of ELAINE WOOTON
    DIRECT EXAMINATION BY MS. KELLY......................... 64
    CROSS EXAMINATION BY MR. HORMEL........................ 84
    CROSS EXAMINATION BY MR. ROMO.......................... 92

```
 1                       P R O C E E D I N G S
 2               THE COURT:  The record will reflect the presence of
 3       counsel and defendant.
 4               We will call Mr. Ellis back to the stand.
 5                           GEOFFREY ELLIS,
 6       called as a witness for and on behalf of the government, having
 7       been previously duly sworn, was examined and testified as
 8       follows:
 9               THE COURT:  Mr. Ellis, you were previously sworn.
10               Do you understand you are still under oath?
11               THE WITNESS:  Yes, sir.
12               THE COURT:  Please be seated and proceed.
13                       DIRECT EXAMINATION
14       BY MS. KELLY:
15          Q    Have you testified before as an expert in federal
16       court on the issue of human smuggling organizations?
17          A    No, ma'am.
18          Q    We were touching on your qualifications a moment ago,
19       I guess right before lunch, and you had indicated that you also
20       served as an ambassador; you talked about El Salvador.
21               When you serve as an ambassador, what type of thing
22       are you talking about?
23          A    Well, specifically I am a representative of Human
24       Smuggling and Trafficking Unit.  And basically what happens in
25       the scenario like that is within ICE foreign operations fall
```

1   under the purview of the Office of International Affairs, so we

2   will often be invited as material experts or experts on a

3   specific subject, and in this case El Salvador -- they were

4   looking specifically for information about human smuggling and

5   trafficking.

6        The basis of those are basically to kind of take the

7   American model to our foreign partners as an example of good

8   law enforcement.  So most of my presentation dealt with how we

9   investigate some of the legal hurdles that we have learned to

10  overcome, technical matters, such as wiretaps and search

11  warrants.  It could be a wide range of things, but basically, I

12  think, to wrap it up in a nutshell, is to expose our foreign

13  partners to an American model of good law enforcement.

14       Q    In instances like that when you are working as an

15  ambassador, or on other occasions when you are called upon to

16  give lectures, do you testify about the organizations, human

17  smuggling organizations?

18       A    Yes.  Quite a bit of what I said earlier in my

19  testimony is how organizations are structured, how they

20  communicate, how they move money, all of those are going to be

21  covered in a thorough presentation.

22       You understand, sometimes I have time constraints and

23  can only cover so much material, but my two trips to El

24  Salvador, for example, I get two days, so I can cover an awful

25  wide berth of materials, but all of what you mentioned would

1       certainly be covered.

2            Q     And also you do internal seminars or lectures to

3       other individuals within ICE?

4            A     Absolutely.  Absolutely.

5                  We may go to the field.  We may go to a field office,

6       if a field officer requests it; agents are brought in for

7       symposiums and seminars and conferences, training sessions.

8                  We also have, similar to me going to a foreign

9       nation, foreign delegations are always coming to Washington

10      D.C.  And, for example, several weeks ago I made a presentation

11      to a delegation from 13 nations from Central America and South

12      America.

13                 So, yeah, all of those are going to be within my

14      purview as a program manager.

15           Q     And that particular presentation, did you do that at

16      the request of the government?

17           A     Absolutely.  The foreign delegation comes in at the

18      behest -- at the Department of State, and then works solely

19      with the Department of Homeland Security.  So in a given day, I

20      would make a presentation, the FBI, for example, DEA, whatever

21      that delegation is looking for.  They would lay the criteria

22      for what they want.

23                 ICE's mission spectrum is too big, so they have to

24      focus in on a specific area.

25           Q     We have walked through your training and experience

1     as it relates to pollo lists, and I placed before you Exhibit

2     14 and number 15.

3          A    Yes, ma'am.

4          Q    Do you recognize those?

5          A    Yes, I do.

6               MS. KELLY:  Just for the record, they have been

7     previously showed to defense counsel.  They have a copy of

8     them.

9               BY MS. KELLY:

10         Q    What do you recognize these as?

11         A    These were documents that were seized during the

12    search warrant in the immediate investigation and subsequently

13    analyzed by myself and my co-case agent at the time, and

14    recognized by the agency as smuggling ledgers or pollo lists.

15         Q    Let's turn specifically to Exhibit 14.

16              Is that the one that starts with 70 sheets?

17         A    Yes, ma'am.

18         Q    Now, what you are looking at here --

19              MS. KELLY:  And, Your Honor, just for everybody's --

20    to put it on the board?

21              THE COURT:  Very well.

22              BY MS. KELLY:

23         Q    So it is Exhibit 14.

24              Have you had a chance to look at the hard copy of it;

25    the actual evidence copy of it that is not a paper -- it is

1     paper clipped together?

2          A    Yes.

3               Have I looked at the original?

4          Q    Yes.

5          A    Yes.

6          Q    What does it look like?

7          A    It is a notebook.  Typical to any kind of notebook

8     that a school child or you would use in school.

9               One is spiral bound and one might be more of a hard

10    binding, I can't remember that, but a typical school notebook.

11         Q    And on the front page of this, it says, "70 sheets of

12    wide ruled ledger, wide-ruled paper"?

13         A    Yes.

14         Q    Were there 70 sheets in this particular notebook?

15         A    No, there was -- more than 50 percent of it was, in

16    fact, missing.

17         Q    Based on your training and experience, are there

18    reasons why pages may be missing?

19         A    Yes.

20              MR. HORMEL:  Objection, Your Honor.

21              THE COURT:  Overruled.

22              BY MS. KELLY:

23         Q    What are those reasons?

24         A    Well, these are, in a way -- I would argue they were

25    in somewhat of a living document.

1    I think as a page was used, it might have names and

2 numbers and destination lists that might be of value to a

3 driver, for example, so the page would be excised from the

4 document.

5    I couldn't really hypothesize many more reasons than

6 something like that, but I think that's consistent.  I don't

7 think my experience shows that a book like this is going to

8 retain the same amount of pages that it had in its original

9 form.

10  Q Do you recall where exactly both of these notebooks

11 were found?

12  A They were certainly found in one of the --

13    MR. ROMO:  Because this testimony, Judge, will be

14 repeated at trial, a lot of things like foundation and things

15 of this nature, that I am not objecting to at this time.  Do

16 you want me to make the record in case we do that?

17    Because what I plan to do is simply object at the end

18 about everything that I found objectionable

19    THE COURT:  I find at this point what we are doing

20 here is determining whether or not Mr. Ellis is qualified to be

21 an expert in the area he is being proffered for, and that would

22 be in the area of alien smuggling organizations and in the

23 overall field of alien smuggling, and that's what is on going

24 at this point.

25    The factual statements he is making now may or may

1    not fall within the purview of his -- or opinions he is giving

2    now may or may not fall within what is appropriate for him to

3    testify to.

4            But at this point, all I am looking for, is Mr. Ellis

5    qualified as an expert witness in the area of alien smuggling?

6            And, secondly, as an expert in that field, does he

7    have knowledge that would be helpful to a jury to understand

8    the evidence and to determine facts and issues in this case

9    from his testimony?

10           That's really the area that we are doing here today,

11   but you may proceed.

12           So, Mr. Romo, if you object, the likelihood is that

13   your objection is going to be overruled because that is not

14   what I am looking for this morning, but if you want to object,

15   you may.

16           MR. ROMO:  Thank you.

17           MS. KELLY:  I can refocus the examination.  I thought

18   we were speaking about his examination on pollo lists.  Let me

19   step back and talk about how many human smuggling

20   organizations.

21           THE COURT:  If that is all he is going to testify to,

22   that's fine.  If you are going to call upon him to testify on

23   alien smuggling organizations or alien smuggling generally,

24   obviously you need to do that.  But if all he is going to

25   testify to is the fact that documents were found in that home,

1    that he had experience with those documents, and his experience

2    is that these documents are used in transportation and

3    harboring of illegal aliens and documents are for the purpose

4    of keeping track of who was there, how much they were charged

5    and paid, who was involved in the group, I think you covered

6    that area already, but that's up to you.  This is your

7    witness.

8              MS. KELLY:  Thank you, Your Honor.

9              BY MS. KELLY:

10   Q    Let's go ahead and take a step back.  I want to talk

11   about human smuggling organizations and the entity that is the

12   human smuggling organization.

13              You talked before about how you would analogize the

14   organization to having like a spider web association.

15   A    Yes.  If you were doing a kind of a plotting or a

16   graphical representation of this organization, I think it would

17   look -- it would be a mess.  It would be a jumble of

18   organizational links.  It would not be a real clean dynamic.

19   Q    Based on your training and experience, how do

20   individuals who want to be smuggled into the United States come

21   into contact with these organizations?

22   A    Well, that is really not a problem.

23              Within the environment, which would -- whether we are

24   talking about Mexico, Central America or any number of

25   countries abroad, there is a strong -- I don't necessarily want

1    to say organization, but there is a strong strata of what we

2    would refer to as solicitors that are -- they are the first

3    contact that somebody is going to be -- they are the first

4    contact that somebody is going to make to start their travel

5    abroad.  It eventually circumvents our immigration laws.

6         Q    Where does that first contact happen generally?

7         A    Outside of the United States.  So it can happen --

8    let's utilize Mexico, for example.

9              It can be within the interior or somebody might

10   travel to a border zone or border area to make their first

11   contact.

12             They exist within the entire nation, so finding that

13   first person to make that link with a smuggling organization is

14   not a large hurdle.

15        Q    And the individual with whom the organization has

16   contracted or works with that makes that first contact, are

17   they the same individuals that necessarily run a stash house or

18   the human smuggling house in the United States?

19        A    No, absolutely not.

20             As I stated in my previous testimony, I think,

21   especially the data of the last few years is very reflective of

22   more of a system of subcontractors, if you will, that operate

23   their area of expertise.  And there is a loose affiliation,

24   there is a commonality of cause and they are all in it for the

25   financial motivation, but they are not necessarily in the same

1    organization under the strictest of terms.

2         Q    And you mentioned that they have a commonality of

3    cause and that -- what is the reason why they are not all --

4    the individual who does the first initial intake at the border

5    is not the same individual that runs the stash house?

6              Is there a reason for that?

7         A    Well, I don't mean to say in some cases that it

8    isn't, depending on the strength and the age and the solvency

9    of an organization, it might well be.

10             In the case where it is kind of the subcontractors

11   helping each other, I think you would have to kind of talk to

12   the commodity at hand.

13             Again, using as an example narcotics or marijuana,

14   anywhere along the pipeline of movement of that narcotic, that

15   narcotic has an inherent value; it's worth X amount of dollars

16   anywhere it is.

17             The aliens, the smuggled alien, unless it gets to

18   that drop house and the phone call is made, and the money is

19   wired, there is no real value.

20             Until that happens, you don't really have -- you

21   aren't getting towards the profit of the enterprise.  So when I

22   say oh -- what were my words?

23             The common cause or the common mission, it's just

24   this idea of -- we kind of view at headquarters as a pipeline,

25   conduit, and everybody has to work their specific mission along

1     that conduit until that money is received, and then everybody

2     can get their cut of the pie.

3              Like I said, this is all done, of course, with a

4     financial motivation.

5        Q    Based on the trainings that you have gone to, the

6     training that you have given and the over a hundred-plus cases

7     that you have worked on in the field, does all of that

8     experience substantiate or support what you are saying here?

9        A    Yes.

10       Q    So we talked about the initial person that makes

11    contact.

12             Is that necessarily the same person that picks an

13    individual up and drives them to a stash house within the

14    United States?

15       A    No, that could just be as easy as a cell phone call.

16    Again, that cohort or that associate to forward along the

17    pipeline.

18       Q    And again, just so we understood, is there a reason

19    why all these individuals are kept separate or why it's not the

20    same person who is doing the whole job?

21       A    Well, again, I think I would be theorizing at that

22    point.  There are some organizations that are broadly

23    structured that handle the body all the way from the foreign

24    origination point to the ultimate point of destination.

25             In the case of or subcontractors or specialists, they

1    may just not have the organizational strength to broaden their

2    scope.

3            Like I say, I could not -- I think it would be

4    conjecture for me to figure out why they are conjectured that

5    way.

6        Q    I want to talk about how individuals are brought over

7    the border and eventually to a house.

8            Is the transporting in a car one of the ways in which

9    they are transported?

10       A    Smuggled in a car in that -- I think your inference

11   is between ports of entry, yes?

12       Q    Correct.

13       A    That is probably the bread and butter mode -- not

14   with a car, the car would usually happen once inside the United

15   States.  Foot traffic or smuggled foot traffic between ports of

16   entry on the southwest border is certainly the most common

17   method of circumventing the immigration laws of the United

18   States.

19       Q    And based on your training and experience, what

20   modes -- how are people concealed within those cars?

21       A    Well, again, the car being once the body has come

22   into the United States; they may be secreted in a number of

23   fashions:  In the trunk, specialized vehicles, vehicles with

24   concealed compartments, the back of a pickup truck under a

25   tarp.  Any of these have been utilized and will continue to be

1    utilized.

2           Of course we have seen some outrageous methods where

3    somebody who might utilize a vehicle to smuggle an alien might

4    literally put a child on top of an engine block or a child on

5    an engine block on a blanket.  That is a hazardous form, but we

6    have seen everything.

7         Q    When individuals, based upon your training and

8    experience, when individuals first make contact with someone

9    who is going to smuggle them over, generally speaking, do they

10   have to pay up front?

11          Do they pay first?

12        A    No.

13        Q    And is that supported by the exposure you have had

14   with all of these cases you have worked with?

15        A    It is supported by my experience in the southwest.

16          Now, as a program manager at headquarters where I see

17   Chinese smuggling coming into the -- New York City or smuggling

18   through the Caribbean basin, that particular question I think

19   would have to be answered in a little bit more different terms.

20          A Chinese smuggling organization that might have an

21   ultimate fee of over $40,000, yes, there are those situations

22   more likely than not of an up-front fee.

23          But the standard, again, bread and butter smuggling,

24   if you will, in the southwest area, there is no financial up

25   front.  The financial happens at the back end.

1     Q    So it sounds like the situation can be distinguished

2    based upon the origination of where the individual is going to

3    be smuggled is coming from.  If the person is Chinese, they

4    might have different expectations of payment than if they are

5    coming from somewhere in Mexico?

6     A    Well, absolutely.  I couldn't overstate it enough

7    that depending on where you are from -- I mean, a good example

8    would be if you are what the Department of Homeland Security

9    classifies as a special interest alien from a country that

10   supports terrorism, that is going to be a dynamically different

11   pay structure and smuggling strata than we would see on the

12   southwest border.  So, yes, the origination point, the alienage

13   and citizenship of the person, those are all factors into how

14   that organization works.

15    Q    So if somebody is not going to pay up front, how are

16   they going to pay?

17    A    Well, again, using the typical southwest conspiracy,

18   the payment happens within the United States.  It really

19   defines why or the existence of what we call "drop houses" or

20   "stash houses."

21         You could argue that with today's transportation

22   abilities, you could effectively take somebody pretty far into

23   the United States without the use of a drop house, but the

24   reason drop houses and stash houses are so crucial to the

25   smuggling timeline dynamic is that that where the organization

1    is going to receive the money, and that is usually --

2    historically, you know, it was a money remittance type

3    organization like Western Union.

4          Now, I will say that has changed in the last several

5    years.  Money remittance laws and regulations and law

6    enforcement scrutiny has slowed that down quite a bit.

7    Organizations are finding other methods of receiving payment.

8          Q    What sort of other methods of receiving payment?

9          A    One that we see is something that we call kind of

10   "micro transactions" whereas they may, in fact, establish a

11   bank account and have somebody direct wire money into a bank

12   account; versus, like I said, five years ago it would have been

13   $1500 was wired by Western Union to Nogales, Arizona, and a

14   component of the organization -- their task was to pick up

15   money at the Western Union; that was their sole operational

16   intent.

17         Like I said, that has changed a little bit.  I don't

18   mean to say to the court that it stopped entirely, but like I

19   said, the money action has changed a little bit in the last

20   several years.

21         Q    Inevitability, if you don't pay up front, is it

22   always the case that you end up at a stash house?

23         A    Well, always is -- that's a pretty black and white

24   term.  I don't know that I would say "always," but it is my

25   experience that there isn't going to be a financial gain and

1    yet -- that the organization -- the organization is not going

2    to come out on top of that particular type of scheme.

3            So my experience has shown that somewhere -- now, it

4    might be a short stay at a stash house or a drop house, but

5    there is going to be some stop of the transporter so that the

6    money can come in.

7        Q    And is it at that stop where individuals, more often

8    than not, give over family's information, contact phone

9    numbers, et cetera?

10       A    Yes, it can happen there.  I suspect that it's there

11   where it happens more often than not.

12           I suspect that in some situations, the organization

13   probably has the contact information for who is going to send

14   the money earlier in the transport.  They may have that

15   information when that alien is still in Mexico, for example.

16           But, yes, I would say based on my experience, the

17   disclosure of that information probably happens more times than

18   not at the drop house.

19       Q    And you mentioned your experience, so that opinion of

20   yours is by your training experience and the lectures you have

21   given and again to --

22       A    Yes, ma'am.

23       Q    Who eventually, most of the time, is going to be

24   paid?

25           Is it the individual who is actually driving you over

1       the border or who is it that you give that payment to?

2            A    No.  My experience has shown that drivers -- I am

3       using that as kind of a broad term -- maybe the person that

4       drives the alien to the border or continues to transport after

5       entering the United States -- they are usually pretty far down

6       on the organizational strata.  They will not be the person that

7       receives the money.

8                 In most cases an organization will have a money

9       person, if you will, or somebody that is tasked with that

10      specific role.  They could be considered a deputy or a close

11      associate of the organizational leadership.  But they are

12      usually not the leadership and certainly not the driver.  So it

13      is usually somebody, as I said, has been specifically tasked

14      with that role of picking up and being entrusted with money.

15           Q    And that particular opinion, is that predicated on

16      all the 14 years of experience you have had in this field as

17      well as the lectures you give and have given?

18           A    Yes, ma'am.

19           Q    You had mentioned when we were talking about pollo

20      lists, you typically see figures in the area of $1500.

21                If someone is given a numerical amount as the amount

22      that they are going to have to pay to be transported or

23      smuggled into the United States, based on your training and

24      experience, does that amount always stay the same throughout

25      their entire transportation until they arrive at their final

1     destination?

2          A     Yes.  I think in general terms, yes.

3          Q     The phenomenon of organizations that might hold

4     somebody for additional monies or basically exercise extortion

5     over the individual to get more than the agreed upon price,

6     that's relatively a new phenomenon and not consistent with the

7     15 years of experience you have had.

8               The generalization is that if the agreed upon

9     smuggling fee is $1500, that will affect the person all the way

10    to their destination?

11         A     And there is no change in that.  So that would

12    stay -- that does stay pretty consistent.

13         Q     Based on your training and experience, are there

14    situations when that first amount is increased?

15         A     Yes.

16         Q     When is that?

17         A     Well, as I said, there is a recent phenomenon where

18    and law enforcement is aware of it -- we don't necessarily have

19    solid data or statistics on it, a lot of it is anecdotal, if

20    you will, but there does seem to be an increase in extortion

21    type situations and in hostage taking, where for one reason or

22    another, the organization feels there is additional commodity

23    value to be had, and they will use a variety of techniques to

24    try to extort additional monies.

25         Q     In your current capacity, have you reviewed

1     situations like that in the field?

2          A    Yes, ma'am.

3          Q    Have you lectured on it?

4          A    Yes, ma'am.

5          Q    And have you witnessed and sat through lectures on

6     it?

7          A    Yes, ma'am.

8          Q    Are those talks that are given by authorities within

9     the government?

10         A    Yes.  Or -- government, meaning the federal

11    government; they may be state law enforcement agencies, in a

12    state like Arizona, that has a state entities -- for example,

13    Pima County has a very robust crimes unit.  They may be the

14    first on -- they may be the first law enforcement that has

15    exposure to this type of criminal activity.

16              So, as I said, the state data is coming from a number

17    of sources, even government and GAO, non governmental

18    organizations.

19         Q    Based on your training and experience, what are some

20    factors that could cause an individual smuggling fee to be

21    increased?

22         A    Well, it could be based greed; or could be an

23    organization that hasn't had the profit margins that they have

24    desired or require to continue their operation.  And in some

25    ways we feel it is connected, again, to the commodity value of

1    aliens, the larger scale.

2              The department and the government has never had more

3    boots on hot ground, if you will, on the southern border than

4    it does right now, and increased law enforcement pressure and

5    increased stress of that, we feel, is certainly going to have

6    an effect on organizations and their increased bravado or

7    bravely to extort some more money.  They just might not be

8    getting the bodies through they would have if -- they would

9    have some years ago.  So per head they have to make more of a

10   profit margin.

11        Q    I want to talk about conditions within a stash house

12   or human drop houses.

13             Based on your training and experience, have you come

14   into contact with these types of operations?

15        A    Numerous -- many, many times.

16        Q    By "many," how many are we talking about?

17        A    Again, as a combination of being the case agent,

18   accompanying other agents within the office over 15 years, I

19   have certainly gone into hundreds -- multiple hundreds of drop

20   houses.

21        Q    Do you keep current on the literature in the field?

22        A    Yes, ma'am.  Part of my responsibilities as a

23   national program manager is oversight, which means I don't have

24   direct command control.  I would not presume to tell an office

25   what to do, but I certainly look at what they have done --

them -- it is usually done by me reading reports from the
field.

    Q    In the course of your duties, do you lecture on the
subject to other law enforcement officers; the subject of
conditions within -- inside a human stash house?

    A    Absolutely.

    Q    Do you find that bars are kept on windows?

    A    In some cases.

    Q    Why?

    A    Again, at that point, especially if the money is en
route or going to be coming a short amount of time, that body
now has value.  And I hate to use crass terms, but if that body
was to go out the window and run down the street, that
organization has just lost a significant piece of the profit
margin.

    Q    Are there situations when individuals have their
clothes taken from them?

    A    Yes.

    Q    And based on your training and experience, why is
that?

    A    Well, it could be several reasons.

    Depending on the time of the year and the
environment, it may be a way of controlling the individual from
fleeing; it may not have the ability or they may not have the
bars on the windows like you mentioned, but by controlling

1    somebody's clothing and footwear, you could certainly control

2    their ability to flee.

3              And then some -- in some situation we see it as kind

4    of part of the degradation process and this idea of they may be

5    extorting more money and one way to kind of knock the will

6    power of the individuals down, to kind of put them in that

7    situation where they have stripped their clothes, they are

8    embarrassed; could be any number of those or a combination of

9    those reasons.

10        Q    Based on your training and experience, are there

11   situations when individuals are threatened, their lives are

12   threatened, they are threatened?

13        A    Yes.

14        Q    And based on your training and experience, what is

15   the purpose of that?

16        A    I would say in the vast majority of those cases,

17   unless it was just a perverted masochistic goal, it was again

18   to put that person in a situation where the organization could

19   extort a higher than agreed upon fee.

20              In most cases, if the person has paid the agreed upon

21   fee, there would be little reason to engage in that kind of

22   activity.

23              Like I said, unless there was just kind of a base

24   perverted reason for doing it; but in most cases it is to

25   install fear in the individual and to pay the additional fee or

1      suffer the consequences.

2          Q    And based on your training and experience, how are

3      family members contacted in order to get payment?

4          A    Telephonically.  The overwhelming majority of the

5      situations, the contact is made by a phone number that is

6      provided by the smuggled alien to a friend, family member or

7      associate and the negotiation occurs telephonically.

8          Q    And based on your training and experience, are there

9      certain things that are said during those phone calls in order

10     to try to make sure that payment is given?

11         A    Yes.

12         Q    What sort of things?

13         A    I think it is those typical kind of comments that may

14     be said in a situation where you are trying to make that

15     individual, that family member or associate, make them fear for

16     their loved one's life.

17              We have been involved in situations where you know

18     they are told we are going to hurt your family member, we are

19     going to kill your family member, we are going to maim your

20     family member.  And, again, it all boils down to install fear

21     and put that individual in a mindset where they are going to do

22     what they have to do to find some additional assets and monies

23     to send the smuggler in hoping of getting their loved ones

24     free.

25         Q    Based on your training and experience, how do these

1    conditions affect the individual that is smuggled and being

2    held inside the house, specifically?

3            Do they often try to flee?

4        A    In some cases, yeah.

5            We have certainly had situations where they have

6    successfully fled and they have been able to contact law

7    enforcement and law enforcement was able to act on that

8    information.

9            In some cases, no.  As the organization is effective,

10   they have the -- they have installed fear or they have used

11   restraining devices such as bars on windows, locks on the

12   doors, and in some situations, you know, the individuals are

13   locked in rooms or quarters within the drop house.

14           And some of the more exaggerated situations they are

15   handcuffed or duct taped to a chair; so fleeing is, in numerous

16   situations, not an option.

17       Q    Based on your training and experience, does the

18   geography or remoteness of a particular stash house affect

19   whether or not somebody held within it feels like they could

20   flee?

21       A    I think absolutely.  If in the context the individual

22   even has an idea of where they are, keep in mind some of the --

23   in the large number of the situations, the alien is arriving at

24   night; they may be under a tarp in the back of a truck, they

25   may not really have a strong context of really where they are

1    geographically.  But I think in those situations if they do or

2    they have been told, you are out in the middle of nowhere, we

3    will take your shoes, we will take your clothes, we are

4    surrounded by cactus, you are going to kill yourself if you try

5    to run, I think -- yes, I think that is a reasonable stress

6    they can put on that individual to keep them at that drop

7    house.

8        Q    Based on your training and experience, do human

9    smuggling operations also take individual's identification or

10   paperwork that they might have on them?

11       A    Well, yes.  That is pretty common.  They are going to

12   control the situation.  So, yes, it is very common for them to

13   control documents, traveling documents.

14            They are going to want to know how much money -- is

15   the person carrying large amounts of money.

16            They are certainly going to want to have an idea what

17   that person has and sell those documents.

18       Q    And when an individual pays, you had mentioned before

19   when we were talking about the pollo lists, you had mentioned

20   Western Union.

21            Is that the primary means by which family pay?

22       A    I hate to boil it down to one company specifically by

23   name.  I think money remitters in the like of Western Union,

24   MoneyGram, there are some foreign-based organizations,

25   Mexico-based companies that are money remitters.  I think in

1       the context of that family of money wiring services, yes, that

2       was, like I said, for many years the real foundation or real

3       backbone of alien smuggling fees being paid.

4           Q    And after payment has been made by a family member,

5       what happens to these individuals who are held within a stash

6       house?

7           A    In most situations, history has shown that that

8       individual is going to be further transported along the

9       pipeline or along the conduit to Raleigh, North Carolina or

10      Seattle, Washington, wherever their desired destination point

11      is.

12          Q    Based on your training and experience, is it the

13      individual that runs the house or lives in the house that

14      typically drives the person held to their final destination, or

15      is it somebody else?

16          A    I'm sorry.  Could you repeat the question?

17          Q    Based on your training and experience, who drives the

18      person, after they paid, from the stash house to their final

19      destination?

20          A    Without attempting to sound sarcastic, the driver.

21               An organization is going to have a number of drivers

22      that are tasked with this task.  It is not the organizational

23      leadership; it is not the person that picks up the money.

24      Again -- there may be certain criteria for that.  For example,

25      right now in Southern Arizona, we see organizations that are

1     desired and utilizing drivers that are Caucasian and non

2     Hispanic, and the theory being that it may evade scrutiny from

3     law enforcement.  So that driver is pretty much an individual

4     within the organization that has that tasking.

5          Q     As part of your job right now, do you sort of look at

6     these cases from a big picture standpoint?

7                I guess what I am saying, you are staffed in D.C.; is

8     that correct?

9          A     Yes, ma'am.

10         Q     Are you kind of taking a role of studying the overall

11    trends and theories and happenings within human smuggling

12    organizations?

13         A     Yes.  I would like to qualify that, though.

14               To the ability we can.  You must understand with

15    human smuggling, a good example of my inability to do what you

16    are saying, that certainly is what we desire to do.  We

17    certainly want to be able to do that.  We want to be in a

18    position to do trend analysis and to -- based on good

19    information and good data and good trend analysis, utilize

20    surge operations, and that is certainly where we are attempting

21    to go.

22               One road block to that is ICE is a standalone agency

23    and we have the special agents that handle smuggling

24    investigations and CVP is a stand-alone agency that is really

25    the interdiction arm of the department.  Both have huge human

```
 1      smuggling data sets.
 2              I guess I would just say to the court that we still
 3      have a way to go for that intelligence to be commingled.
 4              MS. KELLY:  May I have one moment, Your Honor?
 5              THE COURT:  Yes, you may.
 6              MS. KELLY:  I don't have any other questions for this
 7      witness, Your Honor.
 8              THE COURT:   Mr. Hormel, questions.
 9                  CROSS EXAMINATION
10      BY MR. HORMEL:
11          Q    Mr. Ellis, is it?
12          A    Yes, sir.
13          Q    You say that you are now stationed in Washington
14      D.C.?
15          A    Yes, sir.
16          Q    And how long have you been out there in D.C.?
17          A    I entered on duty in March of this year.
18          Q    So since March of 2010.
19              Now, you mentioned that you were originally the case
20      agent on this particular case?
21          A    Yes, sir.
22          Q    So you went to the scene during this particular
23      investigation?
24          A    At a certain point; yes, sir.
25          Q    And what point was that?
```

1     A    It was at the execution of the search warrant and the
2  rescue.
3     Q    So you were there the same date that the arrest took
4  place?
5     A    Yes, sir.
6     Q    And you went through this particular trailer
7  yourself?
8     A    I went through several trailers that day.
9     Q    So you not only have -- you are looking to testify
10  about what happened that day, and then extrapolate that out
11  into general theories about what happened in smuggling.
12          Is that how I understand your testimony?
13     A    I'm not sure what the question is.
14          I guess I think that would be a fair representation
15  of what has occurred.  I don't know that I am attempting to do
16  anything other than answer the questions.
17     Q    Well, I understand that it is the attorneys that ask
18  the questions, but in this particular case, you are not only
19  coming in to offer opinions, you are coming in to offer
20  fact-based testimony?
21     A    I think that is fair; yes, sir.
22     Q    Now, you mentioned that prior to going off to
23  Washington, you were a field agent; is that right?
24     A    Yes, sir.
25     Q    And you were the supervisor of your group there?

```
 1          A     No, at that time I was what we refer to as a
 2     journeyman agent or senior special agent.
 3          Q     And then you were transferred from this position of
 4     special agent to D.C. to become a political guy, some sort
 5     of --
 6          A     I was promoted to the rank of national program
 7     manager.
 8          Q     That was before having any supervisory experience at
 9     all?
10          A     No, that is not true.
11                I have had numerous incidents of supervisory
12     experience.  I was just never promoted in the field to the rank
13     of a supervisor.
14          Q     So you have never held the position of supervisor
15     prior to this particular job that you secured in March of this
16     year?
17          A     I have been an acting supervisor in the past.
18          Q     Acting supervisor?
19          A     Yes.
20          Q     So you have been promoted or you haven't?
21          A     I have been promoted to my current role, but as a
22     field agent I was an acting supervisor on numerous occasions.
23          Q     Which means on particular investigations they said,
24     you are the supervisor today?
25          A     No, I think more often it is under a certain time
```

```
 1      context.  For the next six months before we can bring in
 2      somebody permanently, your experience is going to merit you as
 3      the acting supervisor.
 4           Q    Please list for the court all occasions, including
 5      dates, in which you were an acting supervisor for any
 6      organization?
 7           A    I couldn't possibly answer that without referring to
 8      calendars and notes.
 9                I mean, that's -- yet that is a reasonable -- there
10      is no ability for me to answer that question.
11           Q    This is not something that would be documented in
12      your personnel file?
13           A    No.  The only time it would be documented in your
14      personnel file is if you were -- I apologize, I forgot the
15      term.
16                Basically if you were field promoted for that time I
17      was raised -- my GS rank was raised.  For example, in Tucson I
18      was a 13 -- the terminology I am looking at temporary
19      promotion.  If I was given a temporary promotion in the field,
20      that would be represented in my personnel file, but if I was
21      told by my special agent in charge, Geoff, you are going to be
22      the acting supervisor for the next three months, that would not
23      be documented.
24           Q    So there is no way to verify what you are stating
25      today?
```

```
 1          A    I think if you were to conduct interviews of my
 2     commanding staff of the last 15 years, I think they would
 3     verify what I am saying.
 4          Q    There is no documentary record of it at all?
 5               MS. KELLY:  I object.  Asked and answered.
 6               THE COURT:  Overruled.
 7               THE WITNESS:  In the sense that -- I may have it
 8     documented in a calendar or something like that, but I think in
 9     the context of what you are really asking, formal documentation
10     such as found in a personnel file, no.
11               BY MR. HORMEL:
12          Q    So this promotion that you got to D.C., did that
13     change you from a 13 to a what?
14          A    To a 14.
15          Q    That one was an official promotion.  If we look in
16     your personnel file, we will find that?
17          A    Absolutely.
18          Q    And now your duties out there are to go to other
19     countries and to host the representatives of other countries?
20          A    That is just a small percentage of my duties.
21          Q    And what are the rest of your duties?
22          A    It would be such things as congressional taskings
23     information out of my agency; agency taskings for specific
24     projects.
25          Q    Let's back up for a second.
```

1          So Congress wants information.  You are going to be

2      in charge of putting together whatever statistical sets you

3      have available?

4      A    I don't know that I would be in charge, but I would

5      be asked to prove a specific piece of information to the

6      tasking at hand.

7      Q    So if you are not doing it, then what is your

8      involvement with it?

9      A    Again, as I said, if the tasking is broad, any number

10     of program managers at headquarters may have a piece of the

11     pie, so I don't -- I am not presuming, say, that -- that I

12     individually would answer the entirety of the tasking.

13     Q    How many of you are there as program managers in that

14     building there?

15     A    For the entire agency?

16     Q    Yes.

17     A    I would not presume a guess.

18     Q    So you don't know how many people are of that level

19     in the department?  So what you are saying there is a lot of

20     you?

21     A    I could give you some round numbers for my unit or my

22     division, but with eleven floors and with six divisions, guess

23     at how many national program managers, it would just be that, a

24     guess.

25     Q    Okay.  Now, you haven't been handling any

1      investigations since March of this year?

2          A    Correct.  And, to be honest, a short time before

3      March, a certain point -- I am taking leave.  I'm going on

4      house-hunting trips, so probably by the middle of February, I

5      pretty much have severed myself from the investigation.

6          Q    And prior to middle of February, you have already

7      been working on this change, change from --

8          A    Absolutely.

9          Q    When did you receive the promotion?

10              When did that become news?

11         A    In terms of when was I announced prior to my entering

12     on duty --

13         Q    When did you find out?

14         A    -- I would have to say it was probably eight to ten

15     months prior to entering on duty.

16         Q    So fair to say sometime in the summer of '09, maybe

17     spring, summer of '09, somewhere around there?

18         A    I think that is a ballpark; a safe ballpark.

19         Q    And at that point you began to prepare for your

20     impending change to Washington D.C.?

21         A    Yes.

22         Q    And then this investigation occurred during that

23     transitionary period?

24         A    Yes.

25         Q    Now, you mentioned that the -- call it a phenomenon

1    of extortive behavior -- you said that was relatively new.

2         Define new?

3    A    I would say, again, probably within the last five

4    years, I believe the data will show an increased level of that

5    type of activity.

6    Q    When you are talking about the data, what are you

7    talking about?

8    A    The actual investigations, and it might be

9    represented by investigations opened, indictments, convictions.

10        We use various levels of enforcement statistics at

11   head quarters, but I would think the best representation would

12   be investigations opened.

13   Q    Now, when it comes to the statistic of investigations

14   opened and whatever other data you are doing in D.C., when

15   does -- what access does a fellow like me have to that stuff?

16   A    Well, I think in terms of a specific investigation, I

17   think you have access to the data that is governed under the

18   Rules of Disclosure.

19        In terms of broader range data, I would presume to

20   think that you would have access as anybody else would, under

21   Freedom of Information.

22   Q    So if I went to you, and I said, look, you have these

23   theories and your opinions you are giving in court and you are

24   basing them on some data that you have, do you have a ring

25   binder you refer to?  Or is there a manual or something that

you could share with us, or is it just data?

    A    Well, the bulk of our data is within a computer system.  ICE has a common data system, commonly referred to as TECS, and within the system -- it is not only our statistical engine, it is also our case management system, so that really is the foundation of our numbers.

    Q    Now, you are not a data analyst?

    A    I'm sorry?

    Q    You are not a data analyst by trade, are you?

    A    No.

    Q    So you are not like the guy on the TV, CI analyst that put all this together and come up with these magical things.

    That is not your job?

    A    No, sir.

    Q    So you are relying on somebody else to synthesize this data for you?

    A    Well, I think there are scenarios where I think at headquarters -- our office of intelligence would be the engine behind what you are talking about.  But there are certainly circumstances where my unit or my division is also -- and I think you used a good word "mind data" -- all special agents are, to a degree, intelligence collectors.  We don't operate in a vacuum of intelligence, so we are certainly looking for trends and factors that may help the larger strategy of alien

1     smuggling.

2          Q     But you can't refer me to any sort of existing

3     synthesis of data that exists now, I would say, the war and

4     peace of alien smuggling data that has been compiled by

5     somebody.  That doesn't exist, does it?

6               There is no book out, no manual, no ring binder,

7     there is no synthesized set of theories based on numbers that

8     doesn't exist?

9          A     I think -- there certainly are manuals for the

10    investigation and enforcement of alien smuggling.

11              I think what you are referring to is kind of at an

12    end of the day report that kind of encapsulates all this.

13              I would think for me to safely answer that, I think

14    you would have to say what you are actually looking for

15    specifically.

16              I mean, we do certainly publish and make available

17    certain data in enforcement stats to the public regarding our

18    war on alien smuggling.  So I think -- it is hard for me to

19    answer your question based on -- I am not sure specifically

20    what you would be looking for.

21         Q     That's fine.  Your answer is fine.

22              In coming here today and in responding to the

23    government's questions regarding some of the ideas that you

24    presented to the court today, you can't refer us to any

25    publication; can you?

1       A      That corroborates my testimony?

2       Q      Yes.

3       A      I certainly -- I couldn't quote you a -- for example,

4    a journal article that would corroborate me, but I could

5    certainly tell the court that if we looked at such things as

6    GAO reports, the general accounting office, that have been

7    reported in the last ten years, talks about -- that

8    specifically examine alien smuggling and the law enforcement

9    effort on that, I think you would find a lot of my testimony

10   corroborated by those reports.

11      Q      Make me a citation right now?

12      A      Again, the best I could do are those GAO reports that

13   specifically address alien smuggling.  They are readily

14   available on the Internet, they are open source documentation,

15   and some of them are specifically entitled in reference to

16   alien smuggling.  And within those there are often very good

17   agency-based conversations of alien smuggling organizations as

18   I have given testimony today.

19      Q      So all of the -- so what you are saying then is that

20   the conclusions that you are giving, the opinions you are

21   giving are readily verifiable by public data in GAO reports

22   over the Internet?

23      A      I don't know that I have given conclusions today, I

24   have given --

25      Q      Opinions?

1          A     I have given my observations; I have given my

2     experience; I don't think that I have brought under that

3     testimony into giving wide sweeping analysis of the alien

4     smuggling phenomenon in the United States, but in terms of such

5     things as how alien smuggling is structured and some of my

6     earlier testimony, I think I could find supporting

7     documentation that corroborates my testimony.

8          Q     But you did not do that prior to beginning your

9     testimony?

10               You didn't look that stuff up?

11         A     Well, I have been utilizing it in my role as a

12    national program manager and it has been part of my ongoing

13    training.

14         Q     Is the answer, then, that you didn't look it up?

15               You did not verify with any documentation, you just

16    gave your opinions based on your training and experience?

17         A     No, counselor, what I am saying is that I have -- if

18    you are asking me, have I read those reports from beginning to

19    end?  Yes, I have.

20               Do I have them in my briefcase for this specific

21    hearing?  No, I do not.

22         Q     Now, you mentioned a web -- a spider web, was, I

23    think, in the description you used when you talked about a

24    descriptor for alien smuggling organization.

25               Is that -- did I remember that correctly?

```
1         A     Yes.
2         Q     Is it analogous to ICE CBC, perhaps, share
3    information as well as they could.
4               Your organization and the Border Patrol are separate
5    entities, right?
6         A     Yes.
7         Q     Now, you do not always act in tandem, correct?
8         A     Correct.
9               MS. KELLY:  I object to relevance to this line of
10   questioning.
11              THE COURT:  Overruled.
12              BY MR. HORMEL:
13        Q     You are not responsible for things that happen in the
14   Border Patrol, are you?
15        A     No, sir.
16        Q     Now, when two different organizations do something
17   jointly, they don't become one, correct?
18        A     In the sense, do we suddenly share titles?  No.
19              But when something is done jointly, especially under
20   the umbrella of the department, we do actually act as a common
21   mission, yes.
22        Q     You mentioned a word that I found interesting.  You
23   mentioned the "commodity."  You are talking about an
24   individual; some people refer to them as pollos and other
25   people refer to them as smuggled aliens.
```

1           In your mind, in analyzing the business of smuggling,

2      that person has become a commodity, correct?

3           A      Correct.

4           Q      And that person then becomes worth a certain range of

5      identifiable dollars?

6           A      Yes.

7           Q      Now, you mentioned, also, this spider association of

8      different groups.

9                 Is it not true now, especially since these trends

10     apparently have been changing somewhat over the last five

11     years, that there are groups of individuals who solicit it and

12     then approach other organizations with sales of these

13     commodities, and the groups of pollos are thereby transferred

14     from one group to the other, more or less as a straight sell,

15     like a bundling of stocks, a derivative, if you will?

16                Isn't that something that is occurring?

17          A      Yes, I think that is a fair assessment.

18          Q      So you have one group of folks that say we will get

19     you across for 1500 bucks.  At that point they aren't telling

20     them, for example, how the hotdogs get made and then they sell

21     them up the line and they are done, right?

22                Isn't that one thing that is occurring right now?

23          A      That could happen, yes.

24          Q      And as far as this particular case is concerned, you

25     don't know how the individuals who are in this case, individual

that was located at the residence, at the trailer when you went
to visit with the SWAT team in September of last year -- you
don't know how it came to be in the organizational scheme of
things, whether or not this was what commodity that had been
sold as a derivative or someone who had been moved up through
one sole chain of command.

         You don't know that, do you?

    A    Well, not in the sense that I -- I would probably
have to defer that question to the investigator at hand.

         In my absence and my being severed from the
investigation, I would not presume to know what the
investigative findings over the last eight months have been.

    Q    Assume for the moment they didn't catch anybody that
was involved in the soliciting of this particular individual,
can you tell from the ledgers that have been presented to you
how that might work?

         You mentioned these were a window into the
organization of smuggling, so they ought to tell us, right?

    A    Well, it might be a very acute -- when you use the
term a vision or peering through the window, might be a very
acute analysis, and I don't know that these ledgers could point
us to a solicitor in Mexico, for example, but they certainly
have an inherent value to the investigation.

    Q    But my question to you is:  You have looked at these
ledgers, right?

1          A     Yes.

2          Q     And you have examined them in as much detail as you

3     possibly could?

4          A     Yes.

5          Q     There is information in there and presumably there

6     would be investigative leads, perhaps?

7          A     Yes.

8          Q     And you would want to follow up on any type of

9     investigative leads found in a document?

10         A     Yes.

11         Q     If there were investigative leads into a separately

12    run organization in Northern Mexico, you would want to know

13    about it, right?

14         A     It would be a word-wide endeavor to investigate that,

15    yes.

16         Q     In other words, since you cannot testify about it

17    today, am I correct in assuming you weren't able to examine

18    such data out of the ledgers we have today?

19         A     Again, I am not intimate enough with the

20    investigative finding over the last eight months to answer that

21    question.

22         Q     You can't do it, though.  You don't know it.

23               You can't tell us, I looked at the ledgers?

24         A     Correct.

25         Q     As far as you know, you are giving opinions about an

1   organization at this point that you are having to defer to

2   outside agents because you don't have enough information from

3   the investigation?

4        A    If we are talking about the specific organization at

5   hand, the organization of your clients, yes, that is my

6   testimony.

7        Q    So being that there are two possibilities in the way

8   people are moved up; one would be through a coordinated chain

9   involving one organization or something that is split off into

10  more, let's say, hermetically sealed time cells, one after the

11  other, we don't know today which one of those was operational

12  in this particular case?

13       A    I do not know, correct.

14       Q    So how can we give opinions as to whether this was

15  extortive behavior when you don't know even what the original

16  price was?

17            You are assuming there was a raise in price, correct?

18            That's what the assumption was?

19       A    I am not making that supposition in this case.  I am

20  not -- it was not my testimony that all hostage taking or all

21  violence within a drop house was linked to extortive behavior.

22  In some situations it is and in many situations it is, but in

23  this situation I'm not -- I was not drawing that conclusion at

24  all.

25       Q    But you mentioned things about the purpose of threats

1      and the purpose of certain things was to -- I think you said

2      instill fear in the persons who where held in the house?

3          A      Correct.  But the testimony, as I was saying, was in

4      the broader context of organizations.  I just want to make the

5      point.  It was not specifically talking about the organization

6      of your client.

7          Q      Presuming he was a member of one, correct?

8              Now, you have looked through ledgers again.  Is there

9      any indication, just from the substance of the words that are

10     written in there, is there any indication that he is some sort

11     of member of something?

12         A      There are indicators that tie your client to the

13     ledgers, and in my opinion, subsequently to an alien smuggling

14     organization; yes, there are.

15         Q      Which are?

16         A      His name.

17         Q      His name is mentioned in there?

18         A      Yes.  And, of course, I get to -- I'm operating in

19     the context that they were found during the search warrant at a

20     trailer.  These were not found on the sidewalk.

21         Q      But there is nothing in there that in any way

22     describes anybody's role?

23         A      Ledgers of this nature are not going to layout the

24     command structure of the organization by title.  This not an

25     exercise of X marks the spot and here is the buried treasure.

1          My testimony is that the data, as it is laid out in

2     these ledgers, represents certain activity.

3          In terms of very specific links to who was what role

4     in the organization, I think that is in the broader context of

5     the investigation.

6     Q    Now, when you go down to El Salvador to give a

7     presentation, what language do you give that in?

8     A    English predominantly.  I speak very little Spanish,

9     and I use it just in a polite fashion, but they provide

10    realtime translators.

11    Q    So you wouldn't feel comfortable giving a

12    presentation on a statistical background or organizational

13    background of smuggling organizations -- you wouldn't feel

14    comfortable doing that in Spanish?

15    A    No, sir.

16    Q    Would it be fair to say you lack the vocabulary in

17    Spanish to deal with the specific items involved?

18    A    I think it will be fair to say I lack the fluency in

19    Spanish to be comfortable with that endeavor.

20    Q    You mentioned you were an agent 14 years I think you

21    were on the job out here?

22    A    Approximately, give or take.  Give or take some

23    months, but approximately that amount of time in Tucson

24    specifically within very few duty offices.

25    Q    Where else were you stationed?

1      A     My first duty post coming out of the academy was
2   Honolulu Airport.
3      Q     So for all those years you were out here in the field
4   investigating -- was it for the entire 14 years you were
5   investigating alien smuggling?
6      A     No, certainly not.  There were -- I have a broad
7   spectrum of investigative cases:  Document fraud, benefit
8   fraud, criminal aliens, fugitives, joint terrorism task force,
9   supporting other task force operations.
10     Q     That sounds like a lot of things.
11           So then the alien smuggling organization work that
12   you did was probably a minor component of your job?
13     A     No, I wouldn't say that.
14           At certain points in my career the entire Tucson
15   suboffice was designated an alien smuggling office and we were
16   expected to basically carry nothing but an alien smuggling case
17   load.  So I think it is ebb and flow over my career, but alien
18   smuggling is historically one of the crown jewels of the INS
19   and currently ICE, so I would never certainly relegate it to
20   being minor.
21     Q     So when you were doing your investigations here as a
22   special agent and as a field agent, I assume from time to time
23   you would interview individuals who may or may not have been
24   involved directly with such illegal activity?
25     A     Yes, sir.

1      Q      And you had to interview them in English with an

2      interpreter?

3      A      Depends on what language the suspect spoke.

4      Q      Presuming the suspect spoke only Spanish, was a

5      monolingual Spanish speaker, how would you have communicated

6      with such an individual?

7      A      May have been myself initially for basic kind of

8      investigative probative type questions, but at a certain point,

9      for example, if I was going to do a recorded interview, I would

10     utilize a fluent speaker within the agency as -- I will utilize

11     their assistance, of course.

12     Q      So just to not cloud this train of thought:  You were

13     able to become, in the government's eyes, an expert on alien

14     smuggling without really being able to speak to actual alien

15     smugglers in their own language, correct?

16     A      Yes.

17     Q      You mentioned legal hurdles that one has to overcome,

18     and this was something that you were lecturing or informing

19     foreign government's about how to overcome certain legal

20     hurdles.

21     I suppose that Mr. Romo and I are such legal hurdles.

22     Is that what we are referring to or what are we talking about?

23     A      Absolutely not.  I certainly don't presume that

24     defense counsel is in any way a hurdle.

25     When I go to a place like El Salvador and present a

1       presentation, these are not to Salvadoran or foreign civilians,

2       these are law enforcement officers or what is commonly referred

3       to as an "oficial", which is Spanish for a district attorney or

4       a prosecutor.

5               And I mean, we may be talking about the hurdles, for

6       example, of going up on a wire or such, the financial hurdles,

7       the hurdles associated with minimization; the hurdles

8       associated with manpower.

9       Q    Hold on for a -- what's a minimization?

10              What are we talking about?

11      A    In terms of a Title III wire intercept, minimization

12      would be when you are up on a wire and you are listening to an

13      intercept and somebody is talking about something other than

14      criminal activity, you would minimize that wire; you would stop

15      recording.

16      Q    Speaking of wires, you are aware of a consensually

17      made monitor phone call in this case?

18      A    Yes.

19      Q    Did you participate in that?

20      A    No, not in a sense I was on the line, no.

21      Q    Did you participate in any of the organizational or

22      the preparatory?

23      A    Yes, it was one of the primary case agents,

24      absolutely.

25      Q    Now, you mentioned there was this desire to instill

1    fear in people and to make them fear for their loved one's

2    lives.  You have heard the recording in this case, right?

3         A    Yes.

4         Q    A couple of minutes long.  It's not long.

5         A    Well, what exactly are we talking about?

6         Q    The monitored phone call in this case.

7         A    Okay, yes.

8         Q    There was nothing threatening or otherwise demeaning

9    or what was the word?  Knocking someone's will power down about

10   that particular conversation, was there?

11        A    To be honest with you, sir, I have not heard that

12   tape in probably over ten months.  I will not be able to answer

13   that question adequately.

14        Q    Assuming for the moment that there was nothing like

15   that on that particular conversation, you can't draw the

16   conclusion that these people have been degraded and knocked

17   down based on that, can you?

18             MS. KELLY:  I object to speculation.

19             MR. HORMEL:  Is that what we are doing here?

20             THE COURT:  No.  He may answer the question.

21             THE WITNESS:  I think if we were very narrowly

22   looking at that one conversation, if, in fact, it was in the

23   absence of those things that you discussed, no, I don't think

24   that it would necessarily lead to that conclusion.

25             BY MR. HORMEL:

1      Q     Now, we mentioned something about the different

2   organizations that are working in this field now, right?

3           And you acknowledged that organizations nowadays,

4   often semigroups of persons to one another, maybe their job is

5   to just gather them together and they are done and sell them

6   down the line, right?

7           And isn't it true that once an organization has sold

8   a group, one expects payment for them whether they arrive or

9   not?

10      A     Well, yes, there is going to be a negotiation.

11           Like I said, in the context of -- as I said, when I

12   explained it in terms of this being a loose association of

13   conspirators and cohorts and subcontractors, if you will, yes,

14   that subcontractor is certainly going to have to be paid by the

15   driving organization.  The organization that is going to get

16   the major payment of the $1500, that organization, like you

17   said, might have just specialized in getting the body across

18   the border.

19           They are going to want a piece -- they are going to

20   want a payment, absolutely.

21      Q     They don't care whether the people make it to the

22   final destination; they want their money?

23           They give a hundred dollars to the next guy, they

24   want 50 bucks per head?

25      A     I think that is fair.  I won't presume to know

1     whether they care or not.

2         Q    And as far as you know, then, whoever gets that group

3     has to pay them?

4         A    That's correct.

5         Q    So at that point they don't have a common cause any

6     more?

7         A    Well, if you sever the involvement of that initial

8     group at that point, I suppose they don't care at that point.

9     They have achieved their financial reward.  But if you go

10    earlier in the timeline, yeah, I think there was a common goal

11    of making some money by moving the alien further along the

12    pipeline.

13        Q    Right.  But your purpose, when describing this to the

14    government, you said they all need to wait until the final

15    destination to get paid, right?

16             That was the point, the common cause point that was

17    made, we all have to wait until we get to Denver, or Minnesota,

18    or Chicago, and at that point everyone will be happy because

19    they get paid?

20        A    I understand what -- the point counsel is trying to

21    make, I think that is in the context of the organization that

22    has broader abilities to -- the organization is much broader

23    and the body is -- whether it is the coming in or transport or

24    the drop house operation, that -- in that scenario, yes, that

25    might be a common organization.

1              In the context of subcontractors and, you know, one

2     organization kind of assisting with the bodies that are being

3     moved by another organization, I think the financial dynamic

4     changes, and in that case you are right.  Your example of:

5     Hey, I am going to give you this load and I want 50 bucks a

6     head, I think that is a very good example.

7          Q    And wouldn't it be fair to say that the trend

8     nowadays is that this is increasingly the model rather than

9     having an overarching organization?

10         A    Yes, I think that is fair to say.

11             My experience in this arena is that, yes, I think it

12    is much more, as I said, the spider web, the loose

13    associations.

14                 MR. HORMEL:  I have nothing further, Your Honor.

15                 THE COURT:  Mr. Romo?

16                 MR. ROMO:  I have some questions, but I was going to

17    ask if we could have a break.

18                 THE COURT:  Stand at recess for 15 minutes.

19                  (Brief recess taken)

20                 THE COURT:  The record will reflect the presence of

21    counsel and the defendants.

22                 You may proceed.

23                 Mr. Romo, you may proceed.

24                             CROSS EXAMINATION

25    BY MR. ROMO:

1          Q     Mr. Ellis, good afternoon, sir.

2          A     Good afternoon, sir.

3          Q     This is the first time you have been an expert; is

4     that correct?

5          A     Yes.

6          Q     And you know that an expert is someone who has a

7     particular knowledge or skill; is that correct, sir?

8          A     I think that's part definition of expertise, yes.

9          Q     And also an expert is one who seeks to express an

10    unbiased opinion; is that correct, sir?

11         A     I think generally, yes.

12         Q     Well, that would be your case, isn't it?

13               Or are you biased towards the government; in favor of

14    the government?

15         A     I think in the context of my testimony today, I have

16    given unbiased testimony, and I don't know how a federal agent

17    cannot be biased to the government or prosecution.  I guess

18    that is where my hesitation comes from, but I think in terms of

19    my testimony today, it was unbiased.

20         Q     It would be difficult, wouldn't it, to be unbiased?

21         A     There is a degree of difficulty that -- I appreciate

22    the counselor's point, yes, I can.

23         Q     It is a conflict, isn't it?

24               On the one hand you are supposed to provide an expert

25    opinion that would be based solely on situations that would not

1    show your stake in the case; and on the other one, you are an

2    agent of the United States, correct?

3        A    Well, I think there were several questions there, but

4    to the latter part, yes, I think that is a fair analysis of the

5    situation.

6            I would contend that -- I don't know that I would use

7    the word "conflict."

8        Q    Well, do you have a stake on the outcome of the case?

9            Do you feel that it is important that the outcome of

10    the case be favorable to the United States?

11        A    Well, certainly -- yes.  Certainly to the prosecution

12    at point.  I think we are kind of intermingling my position as

13    a material expert versus an ICE agent and possibly the

14    originating agent in this particular investigation.

15            Again, I think in the context of -- if you are

16    looking for an expert on alien smuggling from ICE, that agent

17    is certainly, on the flip side of the coin, going to be

18    interested in successful prosecutions.

19        Q    In general?

20        A    In general, yes.

21        Q    But not in particular?

22        A    I'm really not sure of counselor's point.

23        Q    All right, sir.

24            Now, you testified that you have been an agent in the

25    Tucson sector; is that correct?

1        A    We refer to it as a sector, but the legacy INS was a

2   district -- it was the District of Arizona of which Tucson was

3   a suboffice of the district office in Phoenix, and under the

4   ICE structure, we are a Special Agent in Charge, also Phoenix

5   and Tucson is a Deputy SAC.

6        Q    Did you work out of Tucson or Phoenix?

7        A    I have always worked in Tucson proper.

8        Q    And you testified about the pyramid with regard to

9   narcotics, and the spider web with regard to smuggling, right?

10        A    Yes.

11        Q    And would you tell the court, are you an expert in

12   narcotics?

13        A    No.

14        Q    And so that is, as you call it, theorizing,

15   conjecture?

16        A    Well, I think counselor needs to ask more specific

17   questions.

18             In terms of have I had experience in training and

19   on-the-job law enforcement that was in the arena of narcotics,

20   does ICE, within the Tucson structure have -- do I work with

21   peers that have extensive narcotics --

22        Q    You can ask the questions of yourself, sir, but I am

23   asking some questions very specifically.

24             Are you an expert in narcotics?

25        A    No.

1          Q     Thank you.

2                Now, you testified that there were reasons why there

3     were the spider web -- once again talking about the spider web

4     analysis, smuggling human beings; you testified that they

5     worked separately sometimes, that is, that they specialize in

6     different areas, correct?

7          A     Yes.

8          Q     And you also say that you were theorizing with

9     respect to that.

10               Do you recall saying that?

11         A     Well, I think I was utilizing that as -- I don't

12    necessarily want to use the word theorizing, or I don't think

13    it is theory.  I think it's -- that's my interpretation of 15

14    years of experience.

15         Q     You also say conjecture after theorizing.

16               Do you recall that?

17         A     I remember using the word, yes, honestly remember in

18    terms of, you know, the exact context.

19         Q     And also when you testified about extortion, do you

20    recall testifying about extortion?

21         A     Yes.

22         Q     You said there was no solid data.

23               Do you recall that?

24         A     Yes.

25         Q     And was it not anecdotal what data you were speaking,

1   anecdotal?

2        A       Anecdotal, yes.

3        Q       And of course you know what that means?

4        A       Yes.

5        Q       And it means that what you are doing is simply

6   guessing that that is, indeed, something -- one of the possible

7   outcomes or reasons according to the data that you have; is

8   that correct?

9        A       I don't know that that would be my definition of

10  anecdotal.  I think anecdotal is more defined as that

11  information that is outside the ability to measure by

12  statistical analysis.

13              Anecdotal information, such as the information found

14  in a record, would be construed anecdotal evidence.

15       Q       And then you talked about greed reasons and you

16  speculated about what the reasons would be for charging so much

17  money; is that correct?

18       A       Yes.

19       Q       And those are essentially opinions based on your

20  suppositions -- you don't have any actual data, right?

21       A       No, ICE does not have solid data on smuggling fees.

22       Q       Okay.  And with regard to the conditions in a home

23  where clothes are taken from someone, are you -- you testified

24  about.

25              Are you aware of that?

1          A     Yes, sir.

2          Q     And in how many cases, and would you tell the court,

3     what cases you participated where you found that?

4          A     So would the particular question be how many has it

5     been and in what cases?

6          Q     That you participate.

7          A     Well, I would say in my last few years in Tucson, I

8     saw that on several occasions, probably less than six actual

9     cases.  I mean, a lot of times myself or my group was not -- we

10    were not the case agents, we were purely showing up in a

11    supportive role, so I would not be able to give the court a

12    case name, but --

13         Q     And a lot of the things that you have stated, you are

14    unable to give the court either the specific data or pieces or

15    specific book, or in this situation, the case.

16         Is that correct, sir, on having the information?

17         A     I think if I had a little time and I went back to the

18    office and talked with some of the other agencies and did an

19    analysis of the case management system, I could probably grind

20    down to some of that information.

21         Q     And when were you told that you were going to be an

22    expert?

23         A     When was I told I was going to be an expert?

24         We have had -- I have had several conversations over

25    the last few months with the prosecutor's office.

1          Q     More than three months ago?

2          A     Yes.

3          Q     And did you have enough time to prepare for this

4     testimony?

5          A     Yes.

6          Q     It is true, isn't it, that on the particular date you

7     entered the mobile home where the material witness was present,

8     correct?

9          A     I entered at a certain point, yes.

10         Q     And you witnessed him?

11         A     I did not witness the victim until after he had been

12    taken out of the mobile home.

13              MR. ROMO:  I have some other questions not specific

14    to the issues regarding the individual testimony.

15              THE COURT:  What is that?

16              MR. ROMO:  Not as to his qualifications.

17              They are all the questions I have.

18              THE COURT:  All right.

19                       REDIRECT EXAMINATION

20    BY MS. KELLY:

21         Q     Sir, you testified here today based on your training

22    and experience?

23         A     Yes, ma'am.

24         Q     And have you done so without focus on the facts of

25    this particular case but rather based upon your experience and

1        your training taken together?

2             A    Yes, ma'am.

3             Q    What is the common objective of alien transporters

4        and stash house operators?

5             A    Financial gain as -- it is the same motivator that we

6        find in almost all criminal activity is to make a buck.

7                  MS. KELLY:  No further questions.

8                  THE COURT:  Thank you.

9                  Thank you, sir.  You may be excused.

10                 Do you wish to argue?

11                 MS. KELLY:  We can call our next witness.

12                 THE COURT:  Very well.

13                 MS. KELLY:  Unless the court would rather us argue

14       first.

15                 Your Honor, the government calls Elaine Wooton, and

16       she's just outside.

17                 What I am intending to do with her is she has

18       submitted two reports that detail her findings, so what I

19       wanted to do is go through her qualifications and then talk

20       briefly about those reports.

21                 THE COURT:  Very well.

22                              ELAINE WOOTON,

23       called as a witness for and on behalf of the Government, having

24       been first duly sworn, was examined and testified as follows:

25                 THE COURT:  Please take a seat and tell us your

1    complete name and spell your last name for the record, please.

2              THE WITNESS:  My name is Elaine Wooton, W-O-O-T-O-N.

3              THE COURT:  You may proceed.

4                        DIRECT EXAMINATION

5    BY MS. KELLY:

6         Q    Where do you work?

7         A    I work for the Department of Homeland Security,

8    Immigration and Customs Enforcement, Forensic Document

9    Laboratory, which is in McLean, Virginia.

10        Q    What do you do there?

11        A    I am a forensic document examiner.

12        Q    What does a forensic document examiner do?

13        A    Another phrase we use for what we do is questioned

14   document examiner because what we really try to do is answer

15   questions about documents.  The question might be whether a

16   document is genuine or counterfeit, whether it has been

17   altered, questions sometimes is about handwriting, whether

18   multiple documents are written by the same person or different

19   people; we look at typewriting, computer printing, anything you

20   can think of that is a document and try to resolve the

21   questions.

22             We have lots and lots of really cool instruments we

23   use to do our exams.  I used some of them when I looked at this

24   stuff in this case.

25             We issue reports of our findings regularly and when

1    we need to we testify to those findings.

2        Q    How much of your daily activity or daily duties is

3    actually comparing handwriting samples?

4        A    Probably about half.  We are the laboratory that also

5    looks at passports for the U.S. government, so we do a lot of

6    passport authentication, also.

7        Q    What is your formal training or what education do you

8    have to do what you do?

9        A    I have a master's degree in forensic science, which

10   was a good base in comparative examinations, but more

11   importantly I completed a two and a half year apprenticeship at

12   the laboratory where I work, and that covered all different

13   aspects of document examination, but really the main part of it

14   is handwriting because it's the hardest part.

15        I belong to one professional organization but I

16   attend the meetings of several professional organizations.  We

17   do work shops on handwriting, it is a continuing process just

18   constantly trying to stay up to date on what is going on.

19        Q    Do you keep current on the research and literature in

20   the field of forensic document examination?

21        A    Yes, by going to different conferences and reviewing

22   journals and books.  It doesn't work if you don't stay up to

23   date.

24        Q    At these conference have you been called on to

25   present information or present reports on forensic document

1    examination?

2         A    Yes, earlier on in my career I did a lot of research

3    on handwriting, specifically the kinds of features that develop

4    in people's handwriting when they're from different countries,

5    so what we found was that you might find a really unusual thing

6    in somebody's handwriting and if you looked at other people

7    from the same country lots of people from that country did

8    that.  I did the research on that.  Lately my research has been

9    on security features for civil documents.

10        Q    Approximately how many cases have you worked on as a

11   forensic document examiner?

12        A    I don't count, but we estimate, I've estimated three

13   or 400 cases a year and I have been doing the work since 1992,

14   so that would be in the thousands of cases.

15        Q    Have you been called upon before to testify in

16   federal court as a forensic document examiner?

17        A    Yes, I have.  I don't think it's listed on my current

18   CV because they had us take it off but I have testified I

19   believe in 18 different federal courts.

20        Q    On those 18 occasions were you qualified as an

21   expert?

22        A    Sometimes handwriting, sometimes authentication of

23   documents, but yes, each time I was qualified to testify.

24        Q    Were you working at the forensic document laboratory

25   this past year, both in August and in October?

1          A      Yes.

2          Q      And did you issue two separate reports in relation to

3     this case, one was dated August 23rd and the other October 5th?

4          A      Yes, I did.

5                 MS. KELLY:  May I approach, Your Honor?

6                 THE COURT:  Yes, you  may.

7                 BY MS. KELLY:

8          Q      I'm showing you what has been --

9          A      These are my reports.

10         Q      I will put them on the overhead.  I have showed you

11    what has been marked as Exhibit 1.

12                The date on the top is August 23rd, 2010.  Is this

13    your report?

14         A      Yes, it is.

15         Q      Were you requested by Agent David Schlagel to do an

16    analysis?

17         A      Yes, I was.

18         Q      What did you compare?

19         A      The evidence submitted in this submission included

20    two sets of handwriting exemplars, a set from each of the two

21    individuals, and another -- we listed as 2.3 but it is actually

22    two different notebooks with questioned handwriting inside, so

23    I compared the two sets of known writing exemplars to the

24    questioned material in the notebooks and I also did some

25    additional examinations in the notebook.

1      Q     When you examine the notebooks, did you have the

2   tangible notebooks?

3      A     Yes.

4      Q     You had the actual physical originals there?

5      A     That's correct.

6      Q     When you made those comparisons, did you come up with

7   any findings?

8      A     I did, yes.  I went through sort of a typical process

9   we go through when we examine handwriting.  The first step that

10  I personally take, we can do it in different orders, but there

11  is a basic set of things that we do, you can look at the known

12  writing first and then at the questioned or look at the

13  questioned and then the known.

14          Personally I look at the questioned writing first to

15  see whether there is enough there to continue, because if there

16  isn't, I might as well stop, and then I also look at the

17  questioned material to see whether there is enough

18  individualizing features, enough unusual features for the

19  handwriting that I think I will be able to do a good

20  comparison.

21          That's what I did in this case.  I looked at the

22  questioned material, which is the two ledger books, and there

23  was plenty of writing, and a lot of it definitely had

24  individualizing features, which means there is enough there to

25  relate it to a specific writer.

1              I did find when I looked at the ledger books that

2      they are not all written by the same person, they are multiple

3      writers; however, the vast majority of the writing is similar

4      enough for me to believe that it's all one writer, so almost

5      all of it is a single writer and some sections there are other

6      writers.

7          Q    Let's focus specifically on what you have marked as

8      2.1.  You had a chance to analyze that?

9          A    Correct.

10         Q    Did you make any comparisons between that handwriting

11     exemplar and the two ledgers that you had?

12         A    Yes, I did.  I should back up and explain what I saw

13     in the notebooks was handwriting.  Handwriting is what gets on

14     a piece of paper when somebody sort of unconsciously decides to

15     put material on a piece of paper, the signal goes from the

16     brain to the hand to the paper; they are not thinking about

17     individual letters, they are just putting down what they are

18     thinking.

19             The questioned material was written.  When I went and

20     looked at the 2.1 exemplars I found something very different,

21     which is 21 pages of material that is drawn, very carefully,

22     slowly, deliberately executed with sort of -- I've been

23     troubling for the right way to describe this, but letter forms

24     that should be made with a very simple continuous movement are

25     being made unnecessarily complicated, so the letter A is being

1    made by making a complete circle and then making a vertical

2    line next to it instead of just writing the letter A.

3           So what I found when I looked at the 2.1 exemplars is

4    that they are drawn, not written, and when I looked at the

5    questioned material, the vast majority of the questioned

6    material which seems to be the same right writer, the material

7    was written, not drawn, and based on that I really couldn't

8    compare the two because they were really significantly

9    different in the manner of execution.

10   Q    You said that 2.1, the letters, letters and the forms

11   were being made unnecessarily complicated.

12          How can you tell that when you are looking at

13   writing?

14   A    Well, what happens when somebody is writing, someone

15   has been writing a long time or has experience, they try to

16   make it faster, try to make it more efficient, so a letter like

17   an A will be made with just one quick movement, so you kind of

18   make the curve and the tail or maybe you make a complete circle

19   until it is a tail, but one movement.  What I found in the

20   exemplars is that for all the letters sort of like an A, the B,

21   the D, they were all made by making a complete circle, picking

22   up the pen, stopping, the writing movement, picking up the pen

23   and making a separate vertical line.  It's funny that I say

24   unnecessarily complicated, it is just too many steps.  The

25   fastest way is kind of complicated, but fluid and natural, and

1     the other way is unnatural.

2         Q    And based on your training and experience, is that

3     type of unnatural writing normal?

4         A    It can be, and that is the issue here is that if the

5     questioned writing was also slowly, deliberately made with the

6     same kind of letter forms, then those would be habits of the

7     writer and we could continue on, so it can be, it is rare.  The

8     whole point of writing is that you get down on paper what you

9     want to get down as quickly as possible, so it's not -- it's

10    not a logical way to be writing, but there are times when it

11    ends up happening that people write like that.

12              The issue here is that the two sets of materials are

13    executed in completely a different way, one is written and one

14    is drawn, and the one that is drawn incorporates letter forms

15    that aren't in the questioned materials, so they can't really

16    be compared.

17        Q    I am going to place on the board Exhibit Number 6.

18             Did you prepare this?

19        A    Yes, I did.

20        Q    And is this illustrative of what you are talking

21    about?

22        A    Yes, it certainly is.

23        Q    Can you explain it to us?

24        A    The top line is from one of the ledger books.  I

25    think it's page 3 -- 4 of one of the books, so the top line is

1    a series of numerals, and at the bottom we have specific

2    examples taken from the exemplars, and I tried to sort of put

3    them in order, so first we have the three's, the three's in the

4    line that says 2.1, you can see what we call tremor in

5    handwriting examination, which means that the pen is moving

6    slow enough so that the natural tremulous nature of the human

7    body body makes the line kind of wobble a little bit, so you

8    can see that in the threes.

9          The next one that is really significant is the

10   eights, where on the top line, the eight is one single movement

11   starting at the top, going down to the bottom, making the bowl

12   at the bottom and then going back to the top and crossing over,

13   so it is one continuous movement nicely, rapidly executed.

14         The eight down at the bottom from the ledger are made

15   by making two separate circles.

16         The same thing going on with the nines in the third

17   line where you can see on the top line that the nine is made by

18   making sort of a C, and then a vertical stroke down, nice and

19   rapid, and in the exemplars the nines are complete circle,

20   slowly executed, deliberate circle, and then the pen comes off

21   the paper, moves over and makes a vertical stroke down.

22         Next is the number one where in the ledgers, in this

23   the number at the top, the number one is just a one, it's very

24   simple, very quick, very rapid; it's the way people typically

25   write a one if they're writing quickly, and then in the

1    exemplars we have the more intricate three component one with a

2    horizontal stroke at the top and a vertical stroke to the base

3    at the bottom.  I included the two's in that final bottom right

4    because those are tremulous, you can see, specifically the

5    horizontal strokes going off to the right are tremulous.

6         Q    Are you referring to these?

7         A    That's correct.  And certainly they look -- their

8    manner of execution is not like the two that is in the top

9    numerals, and in fact the manner of execution of all of the

10   numerals that are listed with 2.1, the feel of that is very

11   different than the feel of the numbers across the top.

12        Q    I am going to place one more exhibit on the board,

13   Exhibit 7.  Did you create this as well?

14        A    Yes.

15        Q    What does it show?

16        A    It shows at the top a word from the ledger, I believe

17   from the second or third page, it is pretty easy to spot

18   because it is red, the word Nogales and from the exemplars,

19   there are two samples of the word Nogales, and you can see very

20   clearly the difference in the G and the A, where in the ledger

21   entry the G is very nice, single movement, fast formation, the

22   A is made again by making a C and then a tail going down.  And

23   in the exemplars, you have that completely independent circle,

24   lift up the pen and make the completing movements for both the

25   G and the A.

1      Q     So at the time did you rule out Bonilla as being the

2      person that could have authored the ledger?

3      A     No.

4      Q     How is that the case?

5      A     I can't make any assessment.  I don't know from the

6      drawn exemplars whether or not he is capable of making the

7      writing in the ledger.

8      Q     So what did you do?

9      A     Stopped.

10     Q     Did you request additional information?

11     A     I did.  I called the case agent and indicated that

12     based on the exemplars, there is no way we could tell if the

13     exemplars reflected Mr. Bonilla's true writing ability and that

14     we would need some other kind of writing, normal course of

15     business writing, to see whether he was capable of writing at a

16     higher level.

17     Q     And did you get that?

18     A     Yes, I did.

19     Q     On October 5th of this year, did you author a second

20     report?

21     A     I did.

22     Q     And is this the October 5th?

23     A     That is the second report.

24     Q     This is Exhibit 2, it is on the board.

25           What were your conclusions as it relates to 2.1 and

1    Bonilla's writing?

2         A     What I did in this examination was that I compared

3    the two sets of known writings, so I had the exemplars and the

4    normal course of business writing.  What is important about the

5    normal course of business writings is that they cover a pretty

6    good span of time, so we have two from '87, one from '03, and

7    one from '06, and most important we have -- we have a signature

8    and a date entry that is from after the exemplars were

9    performed.  That is key because without that there is no way

10   that I could know whether or not his writing had changed from

11   2006, and that the exemplars accurately reflect his current

12   writing.

13              So what I did is I compared the two sets of known

14   writing, I assessed the five new items, the five new items

15   included five -- I call them signatures here, but they're

16   really just his handwritten name, so I had five of his

17   signatures and three date entries, and I assessed those and

18   found that they were quite fluidly, naturally executed, using

19   those sort of speeded up letter forms, fast motion letter forms

20   that you would expect to see in handwriting.  That is what I

21   found in the we will call course of business writing, the 3.1

22   and 4.1 text, so what I found was that based on my assessment

23   of the normal course of business material that the person who

24   had prepared those, who is described to me as Mr. Bonilla is

25   capable of writing text as opposed to drawing text, so he is

1    capable of having written the material that is drawn in

2    exemplars.  I have no idea why he did not write it, why he drew

3    it.

4        Q    So the five pieces of normal, course of business

5    writing that you requested and received, what did they tell you

6    about the exemplar that he sat down and drew?

7        A    What they tell me is that he is -- he is capable of

8    having written the material as opposed to having drawn it.

9    They are drawn based on looking at his course of business

10   material.  I see no evidence that he couldn't have written the

11   material as opposed to drawing it.  I don't know why he drew

12   all of those exemplars, he could have written them in a much

13   more rapid manner, using those faster, more abbreviated letter

14   forms, but for some reason he didn't.

15       Q    And just so we are all on the same page, explain for

16   me what draw means again.

17       A    Draw is a slow, deliberate execution.  If you think

18   about it, when little kids first start to write, what they do

19   is they have either somebody else write something or they are

20   looking at a picture of a letter, and they copy it, they draw

21   it, and as they get more and more experienced they send a

22   signal from their brain to their hand and the letter appears on

23   the page, so the difference between -- drawing is like copying

24   either from a model or from a picture in your head, writing is

25   when you are just thinking about the content, not thinking

1   about the letters, drawing is when you're thinking about how to

2   form each letter.

3        Q    I am going to place something on the overhead,

4   Government's Exhibit 9.

5             Did you put together this illustration?

6        A    Yes, I did.

7        Q    And what does it show?

8        A    These are the signatures from four of the course of

9   business documents.  These are the documents from the A file,

10  so there are actually five signatures, and again they are

11  signatures but they are just handwritten versions of the name,

12  hand printed versions of the name, and these are much more

13  rapidly executed than the exemplars, and I just point out the

14  A's, which are made in that much more rapid fashion where you

15  have sort of a C form with a little tail added to the end as

16  opposed to the circle with the vertical line.

17            Also, the capital letter B is made with a single --

18  we call it a single motion, you can see it's switching

19  direction, but the pen doesn't stop moving, so there is a

20  vertical strike down and goes up and forms the two bowls on the

21  B, very rapidly executed, and then there is this habit of

22  combining letters together that you see in the first name your

23  [EUS], where you've got the U and R, sometimes combined into

24  each other, and the A and R at the end of the name where they

25  are sometimes joined together, so much more rapidly, much more

1    naturally executed.

2            Another example of a letter done quickly and simply

3    is the G where it is basically like a number six with a little

4    bit of a retrace along the horizontal.

5            So these are the kinds of letters that are rapidly

6    made, naturally made, and what you'd expect from someone who is

7    writing their name.

8        Q    Place on the board Exhibit 10.

9            Did you put together this as well?

10       A    Yes, I did.

11           The two items on the top are actually the same item.

12   The signature that appeared on this exhibit called 4.1, which

13   is the detention center document, the names were in a different

14   order than the names that I was looking at, so I reordered

15   them, so that -- they're actually the same writing put in

16   different order so I could kind of look at them straight up and

17   down.

18           So the bottom with the yellow background, those are

19   three instances of the name your Yuris Bonilla-Guizar from the

20   exemplars.

21           Those are what I describe as slowly executed, slowly

22   deliberately executed with these letter forms that are made

23   with separate movements, so you see the letter A which is the

24   circle with the vertical; you see the capital letter G in the

25   bottom two, which is made of a C motion and two different

1    strokes a vertical and horizontal.  Interestingly on the top

2    one and took me a while to process this is what I was looking

3    at, on the top one that letter G is actually the letter G that

4    we see typically in Mr. Bonilla's other signatures, so

5    sometimes on rare occasions in the exemplars we see some letter

6    forms that look like his writing, but there is not enough of

7    them to say it is the same writing, we only know it is the same

8    writing because it was collected from the same person.

9         So basically what I found here between the previous

10   chart and this chart is that the signatures with the blue

11   background, which are the course of business signatures, are

12   fluidly executed using much more natural letter forms and the

13   exemplar versions are slowly executed using these letter forms

14   that are much more deliberate.

15   Q    Are there any parts of his other writings, his normal

16   course of business writings, that match the ledger?

17   A    That match the ledger?  The only course of business

18   writing we have -- we have the six signatures and three date

19   entries.  The three date entries are limited, it's a limited

20   quantity, and so it doesn't encompass his range of variations,

21   we can't compare those to the ledgers.

22        There's one instance in the ledger where the name

23   Yuris Bonilla-Guizar appears; however, it has been overwritten,

24   which is really complicated for handwriting examiners, because

25   we can't tell whether somebody else wrote the name and then he

over wrote it and made it look more like his, or whether it was

his name originally and somebody else overwrote it, or whether

he over wrote his own name.  So we can't tell what handwriting

features are there,  so I can't compare to that instance in the

ledger.

          To really answer your question between this name and

the limited date entries, there isn't comparable text to

compare the known material, the known course of business

material with the ledgers.  Can't do that.

Q    Did you note any distortions in the exemplars we were

given, any handwriting distortions?

A    Yes, not in my first report, but in my second report

because I was comparing the two sets of known writing, I was

able to conclude that the two different sets of writing are

prepared with a very different manner of execution, different

speed, different letter forms, and in the remark section of my

report, I do describe that those are things that are typically

changed when somebody disguises their writing, but also that

they are sometimes changed for other reasons, and we use the

term distortion, so sometimes handwriting is distorted for

other reasons.  I described a little while ago about a child

learning to write for the first time, somebody who suffered a

stroke and would need to relearn how to write might from then

on draw text as opposed to writing.

          There are circumstances where writing will be

1    distorted and permanently distorted.  Tend to be pretty life

2    changing events.

3           The handwriting text that talks about distortion also

4    talk about things like if you had to write on a high counter.

5    Now, obviously that wasn't going on here.  These exemplars were

6    taken at a table with regular writing instruments.  There is

7    other literature that talks about distortion because you are in

8    a moving vehicle, things like that, we know those aren't the

9    reasons this writing is distorted.

10          The problem is I can't tell by looking at these

11   pieces of paper with the handwriting why this writing is drawn

12   as opposed to written.  There is no way to forensically

13   determine that.  It could be because of a deliberate decision

14   to slow down and draw the writing; it could be because of a

15   misinterpretation that maybe somebody was supposed to be

16   drawing the text; it could be because of an injury.

17          There are things that could explain it.  I don't

18   know, forensically I can't tell that.  All I know is that based

19   on the fact that in September of 2010, the Bonilla -- Yuris

20   Bonilla-Guizar's signature and date on the detention document

21   are rapidly, fluidly executed with these nice fast letter

22   forms, that there is no reason for me to believe that six weeks

23   earlier that the writer couldn't have written these exemplars

24   as opposed to drawing them.

25      Q    I want to talk brief my about -- put back on the

1    board Exhibit 1, which was your report from August 23rd, and

2    you had made some notations as well in your report about

3    Calixtro's handwriting or the 2.2 exemplar.

4              Did you analyze that exemplar 2.2 and compare it to

5    the two ledgers we have been speaking?

6         A    Yes, I certainly did, yes.

7         Q    What conclusions, if any, did you come to?

8         A    There was a small portion and attached to my report

9    there's an illustration of what portion of the ledgers this

10   paragraph relates to.  There is a small portion that was

11   uniform unto itself, and when I went to the known writing, the

12   2.2 exemplar writing, I find that very similar individual

13   handwriting features were present in those exemplars.  The

14   problem is it's not a sufficient comparable text for a

15   definitive finding, but I did not find anything different about

16   the writings, and I found numerous similarities about the

17   writings, and that results in this conclusion that indications

18   that the exhibit 2.2 exemplar author made that specified text,

19   in the ledgers.

20        Q    And you speak specifically about the ledgers on

21   page 2 and page 3 of the red notebook?

22        A    That's correct.

23        Q    And that there are parts of that text on page 2 and

24   page 3 which match?

25        A    Right, that have sufficient similar handwriting

 1    features to warrant an indications finding, that means that

 2    there is good evidence that it is the same writer, but I don't

 3    have exactly the same writing to compare, and there is not

 4    enough of it -- remember the first thing I talked about was

 5    looking at my questioned writing to see if there was enough.

 6    That is the limitation here that there is not enough comparable

 7    material for a definitive finding, but for what is there, the

 8    handwriting habits are the same with no significant

 9    differences, there just isn't enough for a stronger finding.

10         Q    But there is a finding?

11         A    There is a finding, indications that the person may

12    have made the limited amount of text described.

13              MS. KELLY:  May I have a moment, Your Honor?

14              THE COURT:  Yes, you may.

15              (Pause.)

16              MS. KELLY:  May I approach the witness for one moment

17    to have her look at -- I just want to see if I have the

18    illustration she is referring to.  There is an illustration

19    that goes with what she is talking about.

20              Your Honor, I'm placing on the board what's been

21    marked as Exhibit 19.

22              BY MS. KELLY:

23         Q    Did you generate or put these letters, words together

24    onto this particular page?

25         A    Yes, that's correct.

1              When I went through the ledger book at the beginning

2      I grouped it by who I thought were the separate authors, this

3      is one section that I grouped together saying these are similar

4      enough that I think they are a single author.

5          Q     Where do these writings come from?  From the ledger?

6          A     They come from the ledger.

7          Q     Are these the ones that come from the red book on

8      page 2 and page 3 that you're talking about?

9          A     Yes, and it's in my report.  It says, see attached

10     chart, and this is the chart I was referring to.

11         Q     What about this illustrates how you had a finding

12     that there were similar characters as 2.2?

13         A     Well, the purpose of this chart wasn't to illustrate

14     that, it was just to let you guys know which writing I was

15     talking about, but really if you -- I can't do it because I

16     don't have them here to do it, but if you were -- there is an

17     instance in the exemplars where the term "Baraquias (ph) Vargas

18     Moreno", those terms, those words are in there, and they are

19     very, very similar in appearance.

20              So really kind of nice handwriting habits for this

21     writer.

22              MS. KELLY:  No further questions.

23              THE COURT:  Mr. Hormel.

24                          CROSS EXAMINATION

25     BY MR. HORMEL:

1          Q     Good afternoon, ma'am.

2          A     Good afternoon.

3          Q     I represent Mr. Bonilla.  Probably guessed that by

4     now.

5                Anyway, you wrote a couple of reports in which you

6     documented your findings.

7          A     Yes.

8          Q     And in neither one were you able to make a conclusory

9     finding that Mr. Bonilla wrote anything in any of the ledgers?

10         A     That's correct.

11         Q     What you were able to state was that you feel that

12    there is some sort of problem in the way he generated the

13    samples that were given on the 5th of August?  The exemplars

14    that he gave?

15         A     I don't know if there was some sort of problem, there

16    is distortion in the writing, yes.

17         Q     Now, the -- I am trying to find this one particular

18    one here.

19               Did you take any of those with you?

20               Now, you mentioned that there are lots of different

21    reasons why in your opinion a person might distort handwriting,

22    you mentioned stroke, other big events, writing in the car,

23    writing on something that's high up.

24               Do you think that fear and anxiety might be one

25    reason?

1          A     I anticipated this question, and I anticipated saying

2     you would need a brain chemist.

3              Generally, when you have anxiety or fear, the

4     response is that -- and this is not my expertise -- your body

5     body releases chemicals, right -- fight or flight -- and then

6     it's done releasing them, it does not release them for three

7     and a half hours straight, you don't have enough to do that.

8     So while I would absolutely agree fear, apprehension,

9     nervousness, if you were walking in a bank about to do a bank

10    robbery and you wrote the note you were apprehensive that would

11    change your writing, but over the course of three hours of

12    sitting and writing, I don't know, and again that is why I

13    thought I would need to say you need a brain chemist.  I have

14    no idea what the brain would do over three hours.

15         Q     So you can't rule it out, in other words, because you

16    are not a brain chemist; you are a forensic document examiner?

17         A     That's why I came with the answer.

18         Q     You are not a neuroscientist.  The government is

19    driving that he is faking it, that's the point, he is writing

20    like this is because he wants his writing to look different.

21    That is the point, is it not?  That is what they are trying to

22    get, right?

23              It doesn't logically make sense if you are trying to

24    disguise your handwriting and trying to make it look different

25    than it would otherwise would look.

1          A     Correct.

2          Q     Your idea is I am going to make my handwriting look

3     like someone else's so they don't think that is mine.  This

4     isn't rocket science.  I am going to refer you to Exhibit 10

5     here.

6                Is there anyway we could shrink that so we could see

7     the whole thing?

8                You got a signature that you guys extract from CCA up

9     there and then you have some that were done back on August 5th.

10               Now, they don't look all that different, the slant is

11    the same, right, the basic things look pretty much the same.

12    If you were trying to disguise your writing, you wouldn't make

13    it look more or less the same, would you?

14         A     Well, I disagree that it looks the same, because as a

15    handwriting expert when I drove up to this, when I drove up to

16    these exemplars what I said was there are so many significant

17    differences in these exemplars from what when I was looking at

18    the ledgers, I would say there is something going on here.

19               There are very significant changes in the handwriting

20    habits between the course of business signatures and the

21    exemplars.  This use of complete different letter forms, much,

22    much slower execution, those are either deliberate choices or

23    features caused by some extraneous thing, we don't know what it

24    is.  I will tell you they're sufficient enough to say that it

25    is a different writing or to say no conclusion.  I can't say

these are the same writer except that we know they are the same writer, so there isn't enough similar in these -- you are looking at them saying they look similar, but I am telling you as a writing examiner they can't be identified from the same person.

What we do in handwriting examination is we look for fundamental differences.  The consistent use of the different A, B, D forms for 21 pages with no slip up, no slip up.

So we know it is the same writer, so we know he wrote this, and we know he has a different A form.  For 21 pages he is using a completely different A, B and D form than he usually uses.

That is a fundamental difference that would preclude me from saying they are the same writer, even though I know they are the same writer, okay, so it is not what you think. It is not that they looks similar, are they made in a similar way.

Q    I guess my question was, and I appreciate your answer and thank you for explaining that to us.

My question is more one of basic common sense:  If you are trying to describe -- if you were trying to I guess disguise your handwriting, would you not make a bigger effort to make it look fundamentally different?  Wouldn't that be the idea?

A    Well --

1          Q     You're asking for a significant level of
2     sophistication from someone to say if I change A, B and D, they
3     are not going to figure this out, if I change A, B and D, I am
4     going to stump that expert out of D.C., I am going to get them,
5     and for somebody with a third-grade education coming out of
6     northern Mexico that is probably not readily available.  Just
7     changing those three letters, right, you are saying from a
8     forensic point of view, correct me if I am wrong -- the
9     significant differences between the A, B and D and the creation
10    of the these exemplars is enough to say okay, as a forensic
11    document examiner, I can't make the conclusion that they are
12    the same?
13              MS. KELLY:  I object to compound question and
14    speculation.
15              MR. HORMEL:  I am asking her to defend her
16    testimony.
17              THE COURT:  Overruled.  She may answer if she
18    understood the questions.
19              BY MR. HORMEL:
20         Q    Do you want me to rephrase it?  Let me rephrase it.
21              I do that.  I get ahead of myself and talk too fast.
22              You mentioned earlier that there were enough
23    significant differences between the exemplars and what you call
24    the course of business samples that you can't make an
25    identification.

1        A     Except that I know it is the same, right.

2        Q     Forensically, if you -- other than the extraneous

3    information that has been given to you since telling you that

4    it is the same person, if you were given these blind, you would

5    have to say as a forensic expert I can't make a conclusion?

6        A     Right, or that there is some indication that they are

7    different, right.

8        Q     And that is based on the differences in the A, B and

9    D?

10       A     No, I gave the A, B, and D as examples; the N, the L,

11    the numeral forms.

12       Q     But in the bottom one those are all the same?

13       A     No, the N in the bottom one -- no actually the N in

14    the very bottom signature -- the very bottom name entry is not

15    like the Ns in the course of business.  It's similar in that it

16    is lower case, but not executed in the same way, but made in a

17    different way.  We have the use of the capital letter L in the

18    top two yellow ones; we have the more complex or multiple

19    stroke version of letter G in the bottom two; we have a

20    different R form and I have been really trying to figure out

21    how to describe this in words, and it's kind of tough, but

22    basically the R in the exemplars, the R is leaning over to the

23    right and in the course of business, the R tends to lean over

24    to the left, not consistently, but it does.  It has a different

25    way of being executed.

```
 1              The B has a different way of being executed.  This is
 2    important in this one that you have up here right now, because
 3    in the older course of business names, the B is written in the
 4    nice fast, like I've been describing, the speed letters, with a
 5    single movement.  But in this one, which is prepared after the
 6    exemplars, then we have this more vertical line and then -- we
 7    have the B now reflected in normal course of business that was
 8    introduced in exemplars, but didn't exist for the earlier
 9    course of business signatures.
10         Q    So if you want to direct your attention to Exhibit 9,
11    you're looking at the B that has the loop on it, right?
12         A    Right.
13         Q    And now it does not have a loop on it anymore?
14         A    Not just that, but it's a line, pick up the pen and
15    make the bowl.  So it's actually seems to have incorporated
16    that B into the signature at some point.
17         Q    So that is not a distortion that is unique to the
18    exemplars then?
19         A    He used the new B for 21 consecutive pages in a
20    three-hour setting, and for whatever reason when it was time
21    for him to write his name again, he used the new B.  That is
22    all I know.
23         Q    You can't say with any certainty where since 2006
24    this new B came from?  It could have happened before?
25         A    It could have happened before.
```

1       Q     And like you said you are not a brain scientist or

2   neurologist, some other sort of cutting edge genetic biochemist

3   who can tell us what was going on on the 5th of August when he

4   created those exemplars, correct?

5       A     Absolutely.

6       Q     So ultimately we are left with no conclusions at all?

7       A     My conclusion was very simple that based on the fact

8   that in September of 2010 he was able to perform a rapidly

9   executed name entry and date entry using more speedy letter

10  forms and numeral forms, that six weeks later he should have

11  been capable of performing writing as opposed to drawing.

12  That's my conclusion.

13      Q     Should have been able to?

14      A     And did not for whatever reason.

15            MR. HORMEL:  No further questions.

16            THE COURT:  Mr. Romo, any questions.

17            MR. ROMO:  Yes, sir.

18                         CROSS EXAMINATION

19  BY MR. ROMO:

20      Q     Good afternoon, ma'am.

21      A     Good afternoon.

22      Q     You are a forensic scientist, correct?

23      A     Correct.

24      Q     Handwriting expert.  And as a scientist, you are

25  supposed to give us information that would conform to some

1   scientific form; is that correct?  That is, when you come in
2   and you testify to give us information, that the basis of that
3   information is some scientific finding.
4        A    That's correct, although in handwriting, in addition
5   to just doing A, B, C examinations, we are called upon to offer
6   our opinion based on the observations we have made.
7        Q    But that observation and that opinion is based on
8   your scientific knowledge.
9             It's like if you take somebody's fingerprints, you
10  compare the fingerprints, you compare the different form of the
11  fingerprint, you examine them and then you make a conclusion
12  based on that.  You do the same with handwriting, correct?
13       A    It is a little bit more complicated, and actually --
14  I don't recall which federal court this was, but there is a
15  federal court, I believe, in the northeast that the conclusion
16  of the court was that handwriting experts were to be considered
17  like harbor pilots, that we can guide the ships from one place
18  to the other, we can't exactly describe how we do it, there
19  isn't a chart that shows how we do it, but we have been doing
20  it for so long and based on repeated instances of handwriting
21  examination that the courts have decided that it is okay for us
22  to come in like harbor pilots and try to guide the process to a
23  certain set of information.  So it's a little different than
24  straight science and the courts have described it as such.
25       Q    But not as far as magic?

1          A     No, no magic today.

2          Q     So when you are a pilot, you try to get your ship to

3     port?

4          A     That's the goal.

5          Q     Not close to port, because you might direct it to the

6     rocks?

7          A     That's correct.

8          Q     So when you make a conclusion, your conclusion

9     regarding Mr. Calixtro, for instance, is that the handwriting

10     is similar, right?

11          A     The conclusion -- yes, that there are indications.

12          Q     And we showed you Exhibit 19 -- can you see it?  You

13     say, "It is similar, but I can't say with a sufficient -- I

14     don't have sufficient information to make a definitive

15     finding," right?

16          A     That is not exactly what I said.

17          Q     It is exactly what you said.  "Not sufficient for a

18     definitive finding," and there is a court reporter here?

19          A     It is not sufficient, but not because it is merely

20     similar, it is not sufficient because there isn't enough

21     comparable text for the comparison.  So for the text that is

22     here, the handwriting habits are consistent with no fundamental

23     differences, but there is not sufficient comparable text for a

24     definitive finding.

25          Q     So when you talk about the handwriting of Mr.

```
 1          Calixtro, you can't say with certitude that this is Mr.
 2          Calixtro's handwriting, correct?
 3               A    Correct, the finding is there are indications that he
 4          may have written it.
 5               Q    So you are off shore, in my comparison a moment ago,
 6          that is you can't -- for instance, you have a distinctive
 7          handwriting, correct?
 8               A    Correct.
 9               Q    And there are many people in the world who would have
10          similar handwriting to yours, correct?
11               A    When there is a limited quantity of writing, yes.
12               Q    Okay.  So you needed more writing in order to make a
13          definitive finding?
14               A    That's correct.
15               Q    And you never got that?
16               A    I did not get that.
17               Q    So you can't testify with certitude that this
18          handwriting is definitely my client's handwriting?
19               A    That's correct.
20                    MR. ROMO:  That's all the questions I have.
21                    THE COURT:  Any redirect?
22                    MS. KELLY:  Nothing further.
23                    THE COURT:  Thank you, ma'am, you may step down.
24                    Counsel, if you wish to argue, I will see you
25          tomorrow morning at 10:30 to argue this case.
```

1          MR. ROMO:  I have to be in Florence tomorrow, I
2     remember I had a court hearing, actually I have two.
3          THE COURT:  Well, do you wish to waive your right to
4     argue?
5          MR. ROMO:  Not at all, Judge.  I can advise the
6     Florence court that I have to be here, and that this will take
7     precedence.
8          THE COURT:  You will need to do that because we need
9     to get a decision on these matters.  We have the trial coming
10    up on Tuesday and I have, of course, a calendar that is filled
11    up.  I have hearings from 8:30 tomorrow morning until 10:00 and
12    assume I will be done by 10:30.
13          We can do it tomorrow afternoon?
14          MR. ROMO:  Tomorrow afternoon.
15          THE COURT:  We can do it tomorrow afternoon at 2:00
16          MR. ROMO:  I can't, Judge .
17          I have a hearing at 11:00 and one at 1:00.
18          MR. ROMO:  If I have to, I will be here, but
19    Wednesday I am here all day.
20          MR. HORMEL:  Wednesday, I'm in all day.
21          THE COURT:  10:30.
22          MR. HORMEL:  I will be ordering a transcript of this.
23          Will the court authorize that at this time for CJA
24    purposes?
25          THE COURT:  Yes.

C E R T I F I C A T E

         I Chris Wallace, certify that I took the shorthand
notes in the foregoing matter; that the same was transcribed
under my direction; that the preceding pages of 96 typewritten
matter are a true, accurate and complete transcript of all the
matters adduced, to the best of my skill and ability.


                                    s/Chris Wallace
                          _____
                          CHRIS WALLACE, RPR, CRR


Dated: October 31, 2011