1

1    IN THE UNITED STATES DISTRICT COURT

2    DISTRICT OF ARIZONA

3

4    UNITED STATES OF AMERICA,        )
                                      )    CR 09-2343-TUC-FRZ
5              Plaintiff,             )
     vs.                              )
6                                     )    September 20, 2010
     YURIS BONILLA-GUIZAR and         )    Tucson, Arizona
7    CARLOS ARMANDO CALIXTRO-         )
     BUSTAMANTE,                      )
8                                     )
               Defendants.            )

9

10                        MOTION HEARING

11

12        BEFORE:  HONORABLE FRANK R. ZAPATA
             UNITED STATES DISTRICT JUDGE
13          405 W. CONGRESS, COURTROOM 5-A
                TUCSON, ARIZONA 85701

14

15              A P P E A R A N C E S

16        FOR THE GOVERNMENT:  MS. KRISTEN KELLY and MR. JOHN
     EVANS, ASSISTANT UNITED STATES ATTORNEYS.

17
          FOR DEFENDANT BONILLA-GUIZAR:  MR. PETER HORMEL,
18   ATTORNEY AT LAW.

19        FOR DEFENDANT CALIXTRO-BUSTAMANTE:  MR. JESUS ROMO
     VEJAR, ATTORNEY AT LAW.

20
          THE INTERPRETERS:  MR. CLARK FEASTER and MR. DEREK
21   SULLY.

22                   Dianne Davenport
              405 W. Congress, Suite 1500
23               Tucson, Arizona 85701
                    (520)205-4266

24

25     Proceedings prepared by computerized realtime translation

1       P R O C E E D I N G S

2              (Call to order of court, 10:15 a.m.)

3              THE CLERK:  Criminal case 09-2343, United States of

4   America versus Yuris Bonilla-Guizar and Carlos Armando Calixtro-

5   Bustamante, on for motion hearing.

6              MS. KELLY:  Good morning, Your Honor.  Kristen Kelly

7   and John Evans on behalf of the United States.

8              THE COURT:  Good morning, counsel.

9              MR. HORMEL:  Good morning.  Peter Hormel for

10  Mr. Bonilla.  He appears in custody, assisted by the interpreter.

11             THE COURT:  Good morning.

12             MR. ROMO VEJAR:  Good morning, Your Honor.  Jesus

13  Romo on behalf of Mr. Calixtro, who is also present, in custody, Your

14  Honor.

15             THE COURT:  Good morning.

16             This is the time set for motions in limine and other

17  motions pending before the court.

18             The first motion in limine we will take up will be the

19  government's motion in limine to use a video of the SWAT -- the police

20  SWAT team apparently effectuating or assisting in the arrest of the

21  defendants in this case.

22             Ms. Kelly, this is document number 101.

23             MS. KELLY:  Thank you, Your Honor.

24             May I approach the podium?

25             THE COURT:  Yes, please.

3

1        MS. KELLY:  Your Honor, what the government intends

2    to do is to be able to show about eight minutes of what is a two-hour

3    video.  Those eight minutes pertain specifically to the execution of the

4    search warrant upon the residence at 9950.

5        The residence itself is a compound.  It's a large area

6    with a number of trailers.  And what the video shows is how -- you

7    know, the condition of those trailers, who was outside, who was not

8    outside, and how the agents operated the search warrant by going to

9    each trailer specifically and then rescuing the hostages.

10        We know in this case there were two hostages that were

11   rescued.  They were rescued from the first trailer they went to.

12        The real relevance of this particular video in and of itself

13   is it's the best evidence to illustrate to the jury what the property

14   looked like, how the SWAT operation was conducted.

15        We will have the lieutenant who was in charge of the

16   SWAT operation come in and testify, lay foundation for what

17   happened.

18        But for the jury to really understand a procedure like

19   this, it's something that's unique, it's something that is not within the

20   common everyday understanding of people in our community, so for

21   them to be able to -- not even just hear about it and hear about it

22   through the words of the person that was in charge of it, but to see

23   the brief eight minutes which show the deliberateness with which the

24   search warrant was executed, in the government's mind is highly

25   probative and relevant for this jury to understand how they executed

4

1   it, how they went to each trailer, where the hostages were rescued

2   from, and how they maintained the security of the rest of the area and

3   also, you know, who were in other trailers.

4          It's important that, you know, people were inside and

5   not outside and the video shows that.

6          Defense counsel mentions in their motion in response

7   because you can't see resistance it's somehow not probative or

8   relevant.  And, you know, obviously the video doesn't show exactly

9   what's happening inside the trailers, but what's happening outside the

10  trailers during those eight minutes is highly relevant to how the search

11  was conducted.

12         THE COURT:  Well, what element of proof that you need

13  here is covered by that?  I'm having trouble determining how does

14  that prove any elements of your superseding indictment in this case?

15         I mean, the fact is you are going to have witnesses that

16  are going to testify that they were in fact being held hostage, you're

17  going to have witnesses that are going to testify that it was these

18  individuals that held them hostage, you're going to have witnesses

19  that are going to testify about what went on inside the trailer.

20         I'm having trouble trying to figure out what it is in that

21  SWAT exercise that proves any of your elements.

22         MS. KELLY:  Your Honor, it's the government's position

23  that it substantiates what the material witnesses -- the victims in this

24  case are going to testify to.  They are going to testify that they were

25  seized, they were intentionally detained and they were detained within

1    a particular trailer, specifically at the point where SWAT came in and

2    was able to free them.

3                So what we have with this video is an illustration that

4    indeed they were detained and seized within that particular trailer.

5    The video shows that there aren't people walking around the outside of

6    the trailer.  It shows the layout of the compound.  It shows the

7    remoteness of the property which is also very probative of the issue of

8    their seizure and their detention.

9                And it shows also the nature of how efficiently and

10   effectively BORTAC, which is the unit that went in to free them, did

11   their job.

12               THE COURT:  I don't think there's any issue as to

13   whether or not the people that made the arrest were qualified to do

14   what they do.  Nor is there any issue as to how the warrant was

15   executed.  There is no search issue that the jury is dealing with.  The

16   issue regarding whether people were walking around or not may have

17   some probative value.

18               But I'm just -- you know, the way that the SWAT team

19   operates, clearly it may be of interest -- of passing interest to people

20   who have never seen that, but I'm, you know -- the evidence has to

21   be relevant to the issues that we are dealing with here.

22               And it may be somewhat relevant that people are being

23   held hostage and that people are not walking about freely in that area.

24   That may be relevant.  It may be relevant that they are being held

25   hostage in a place that's isolated and away from other parts of the city

1    or the town where this happened.

2              But I'm still having problems with that.

3              MS. KELLY:  Your Honor, I think at some point during

4    the proceeding we may also take up the issue of whether or not

5    defense is arguing the effectiveness of BORTAC and their procedures.

6              There's been disclosures made to us of photographs

7    which defense may or may not intend to use, but their defense

8    disclosure seems to be to the government what they are, you know,

9    drawing into question is the effectiveness of that SWAT operation.

10             So to probably put that on the back burner for right now

11   but to recognize that that particular issue might be something we take

12   up later.

13             Just to hit directly the two issues that the government

14   sees as the most important and probative with this video, the first is

15   the fact that they were intentionally seized and detained.

16             Their detention in that trailer and the remoteness of that

17   trailer is something that's highly probative for the jury to understand

18   to really get not only just a verbal explanation of that but also to see it

19   through their own eyes.

20             And the realtime video in and of itself, you know, is very

21   good evidence that allows the jury to understand in realtime what the

22   situation was, not only what the search was about, but how the

23   victims were potentially feeling and what their thoughts were given

24   where they were located and the circumstances of how remote that

25   particular location is.

1    You know, it's also important to understand, you know,

2    and be able to see who was in what trailer.  The number of people that

3    were in the trailer the two material witnesses were held hostage in is

4    also probative.  You can see those people being taken out of the

5    trailer.

6    THE COURT:  Thank you.  Let me hear from counsel for

7    the defendant.

8    MR. HORMEL:  Well, the original rationale, Your Honor,

9    for the introduction of this video was -- to quote from their pleading:

10   It's relevant to show the jury what was necessary to obtain the safe

11   release of Julio Cesar Lopez and JJFL-C.  Today the rationale changed

12   a little bit to showing the remoteness and certain people that may or

13   may not have come out of a certain trailer.

14   Your Honor, the video is taken from a helicopter which is

15   obviously high up off the ground.  The figures are tiny, little.  You

16   can't tell who's who.  You can see who the SWAT people are because

17   they are in gear.  But other than that, you really can't tell anything.

18   As we stated in our response, and I think the court has

19   noticed, this evidence really isn't probative of any particular element

20   in the case.  It doesn't go to show anything other than they decided it

21   was necessary beforehand.

22   Therefore, it is irrelevant evidence and under the rules

23   of evidence, Rule 402, it is our position that it is irrelevant and not

24   admissible.

25   THE COURT:  Thank you.

1          Well, I'll need to see that video, whatever the

2     government intends to introduce, before I rule on that motion.  That

3     motion will be taken under advisement.  The government will provide

4     the court a copy of that video so I can look at it before I make my

5     ruling on that.  So this is under advisement.

6          Let's take up the issue -- this is the issue regarding

7     404(b) material.  This is document 103.

8          Ms. Kelly, if you could address exactly what it is that you

9     are intending to offer and for what purpose -- or, Mr. Evans, if you

10    could come forward, please, sir.

11          MR. EVANS:  Thank you very much, Your Honor.

12          103 talks about the "pollo" list.  We have three -- first of

13    all, the motion lays out the "pollo" list is very much part of an

14    operation to smuggle humans into the United States.  It lists the

15    contact phone numbers, the names of the people who are going to be

16    contacted, and then it writes out the dollar amounts as to how much

17    these people are -- have to pay before they are released or completed

18    the transaction of the human smuggling operation.

19          In order to get it in, it needs to be authenticated where

20    did you find it.  Secondly, an expert explain it and, third, it is -- these

21    comments, whether we identify who wrote them or not, is our

22    co-conspirator statements.

23          In the various cases cited by the government, you'll see

24    that "pollo" lists have formed the basis for prosecution of human

25    smuggling operations and we believe that in this operation the "pollo"

1    list found in the trailer where the hostages were found, which includes

2    a reference to at least one of our victims, the phone numbers to be

3    called, the dollar amount, we believe are very relevant to proving the

4    larger conspiracy that's involved in this particular operation.

5               THE COURT:  In this case as I understand it, one of

6    the -- at least one of the material witnesses wrote some of the

7    information contained in that list.  Is that correct?

8               MR. EVANS:  That is our understanding, Your Honor.

9    The female, at the direction of one of the defendants, was told to write

10   certain material down, three lines, we believe in the book.

11              She's identified the three lines she wrote.  And it was

12   based upon one of the defendants -- the exact circumstances we're not

13   sure.  It appears one of the defendants was busy on the phone and he

14   ordered her to write down this information.

15              THE COURT:  This list was seized pursuant to the arrest

16   of the individuals in that home?

17              MR. EVANS:  Yes, Your Honor.

18              THE COURT:  And you'll have testimony that it was

19   found at the time of the arrest in the home?

20              MR. EVANS:  Yes, Your Honor.  And we'll have pictures

21   of the location they were found in when they were seized.  We believe

22   we'll have testimony from both the victims as to their awareness of

23   how the notebooks were being used.  The exact details we're not sure

24   yet.

25              THE COURT:  Thank you.

1    MR. EVANS:  Thank you, Your Honor.

2    THE COURT:  Counsel.

3    MR. HORMEL:  First, I think it's important not to conflict

4 a statement of a co-conspirator with a 404(b) act of a co-conspirator.

5    The government suggests in its pleading that any act of

6 a co-conspirator can be attributed to our clients pursuant to 404(b).  I

7 don't think there's any legal support for that.

8    Furthermore, it sort of begs the question, if the only

9 person who is identified to have written in the document is the

10 material witness, is the government suggesting that that person is

11 actually a co-conspirator and therefore trying to boot strap the

12 admissibility of this evidence that way?

13    Because otherwise there really is no authentication at

14 all.  Just because they found it there doesn't mean that necessarily it

15 was used or created by our clients.

16    This is especially true in situations where the

17 government has gone to great lengths to prove that our clients wrote

18 in there and have been unable to do so.

19    They took samples from our clients that were sent to a

20 laboratory that is run by the government and they were not able to

21 link the handwriting in the documents to our clients.

22    The best they could do, I believe, was a report that said

23 my client wrote deliberately when he was asked to give his sample.  It

24 should be noted my client is a person with a third grade education.

25 It's not particularly surprising.

1    Now, unless they can be authenticated, they can't come

2 in just because they were found there.  Now, this may be different had

3 the government not gone to such great lengths to show who wrote in

4 there and then the ultimate conclusion was that the only person who

5 wrote in there was their own witness.

6    So, Your Honor, at this point I would say that these

7 notebooks are not admissible, at least against our clients.  Perhaps if

8 they wish to amend the charges to include their witness, perhaps then

9 they would be.

10    Thank you.

11    THE COURT:  Well, if their witness, who is named as a

12 material witness in this case, testifies that in fact either one of your

13 clients or another person who was involved in the conspiracy

14 instructed her to write in there, doesn't that come in as part of this

15 conspiracy?

16    MR. HORMEL:  Well, that would depend, Your Honor.  I

17 mean, the court would have to evaluate that foundation-type

18 testimony to see if it's sufficient.  At this point I don't think it's been

19 established.

20    THE COURT:  They don't have to establish it at this

21 point, but I think that if they can establish what they have just said

22 they could, seems to me that those statements would come in.

23    Obviously this is a conspiracy.  And they are -- acts,

24 statements made by other co-conspirators can in fact be used against

25 these conspirators, if these are the alleged conspirators, if they

1   occurred as part of the conspiracy and in furtherance of the

2   conspiracy.

3          Clearly keeping a list of potential clients and phone

4   numbers of the relatives to contact for them to send the money, that

5   seems to me relevant to the conspiracy.

6          MR. HORMEL:  The problem is, Your Honor, we're

7   dealing with a pretty nebulous set of facts here.  We have these lists

8   of alleged clients and alleged phone numbers.  And then we have

9   some statements by a material witness that other people wrote in

10  there, but the problem is that nothing of this has been substantiated.

11         Quite to the contrary, the efforts to substantiate the

12  links between these items and our clients has failed.  Therefore, it's

13  not the situation where you have a pretty obvious conspiracy where

14  there is people involved and this person is doing that or this person is

15  doing that.

16         This is sort of like saying, there's a conspiracy out there,

17  there must be, because there are these lists.  There must be because

18  there are witnesses saying this.  We can't link it to these people, but

19  there's a conspiracy.  We think there's a conspiracy because that's

20  what we think.  However, the evidence that we have doesn't actually

21  show that because we can't make the connection.

22         THE COURT:  Well, the witnesses, if they testify

23  according to what the government has said, will link your clients to the

24  conspiracy and will link your clients to that list from which calls were

25  being made.  They may not be able to prove it at all.  Certainly that's

1    where it is.

2             In terms of the tests that prove that your clients -- or at

3    least eliminated your clients from being someone who wrote in those

4    or at least can't be identified as someone who wrote in those, that just

5    goes to the weight of the -- to be given to that piece of evidence.

6             I mean, you clearly are free to cross-examine whomever

7    on those issues including the government's expert which I assume the

8    government is not going to call now since he's no help to them.

9             I think it goes more to weight than to admissibility, if

10   the government is able to lay foundation of all those matters.  We are

11   going to see what happens at trial.  They're saying it's admissible if

12   they can lay proper foundation.  If not, it's not going to get in.

13             MR. ROMO VEJAR:  Your Honor, may I be heard?

14             THE COURT:  Yes.

15             MR. ROMO VEJAR:  Judge, of concern to me, Judge, the

16   fact that, as I believe Mr. Evans just stated, they intend to present an

17   expert witness to corroborate these allegations.  I think that that

18   would be a way to boot strap their allegations and to through

19   speculation simply -- it is one thing to present the facts before the

20   court and before the jury and another altogether to say, well, this is

21   certainly the modus operandi and therefore these people are guilty.

22   That's my experience, and that's what I hear the experts generally

23   speak of.

24             I think that would be highly prejudicial to the case and I

25   don't think it would be relevant to these proceedings, Your Honor.

1      THE COURT:  Thank you.

2      Let me hear, Mr. Evans, regarding experts about these

3   lists and modus operandi and so forth.

4      MR. EVANS:  Yes, Your Honor.

5      We propose to use an expert who will be qualified as

6   someone very much involved in investigation and interception of

7   human smuggling organizations.

8      He'll describe the importance of a "pollo" list, how the

9   initial information is gotten, why the information is kept.

10     Also, Your Honor, I want to clarify that we do, based

11  upon what the handwriting expert says, plan on calling the

12  handwriting expert because it's not as simple as Mr. Hormel would

13  have the court believe.

14     The expert will add a great deal to exactly how

15  Mr. Bonilla's exemplars appeared being not his natural handwriting

16  and probably not written with his natural hand.

17     THE COURT:  Okay.  I'm going to hear those experts

18  before trial starts.  I'm not ever in favor, contrary to the Ninth Circuit,

19  but I'm bound by the law, that there's an expert for everything, an

20  expert to say this 500 pounds of marijuana is a load that's a

21  commercial load and clearly the person that's carrying it could not

22  possibly be an innocent person.

23     I realize that those cases are out there in the circuit and

24  those types of -- this type of expert has probably been approved.  I

25  want to hear the expert themselves.  You need to bring in your

1   handwriting expert.  If he's not going to testify about handwriting, now

2   he's testifying about someone dissimulating some manner and not

3   doing what they are supposed to do, that takes him a little bit out of

4   his field.

5          A handwriting expert can come in and say, "I can't

6   compare this to this.  I can compare this to to this.  In my opinion

7   they are the same thing."

8          Now you've got -- by bringing a handwriting expert that

9   is going to say, well, that's not the way the guy writes and he's faking

10  it and therefore didn't give us a good exemplar, I want to hear what

11  expertise he has to give that kind of an opinion.

12         We're going to have to set another hearing.  And I want

13  to hear the experts that you're going to present to see whether or not

14  in fact under Kumho and Daubert they do qualify as experts and they

15  may testify.

16         MR. EVANS:  Yes, Your Honor.

17         THE COURT:  We'll set a hearing prior to the trial on

18  those issues.

19         As to the objection to the introduction of the "pollo" list

20  as it's called here, the court finds that it is admissible; again,

21  assuming that the proper foundation can be laid.

22         The court finds that it is relevant evidence in a

23  conspiracy to take hostages and that involved with aliens and alien

24  smuggling.  It's probative value outweighs any unfair prejudice to the

25  defendants.

1          So the objection to the introduction of that document, if

2    proper foundation can be laid, is overruled.

3          We will, as I said, set another hearing so I can review

4    the testimony of the expert dealing with that, the handwriting

5    exemplars, and also the expert that the government is now proposing

6    for -- to show the modus operandi of alien smuggling and so forth.

7          So that's the ruling of the court.  That's on document

8    103, the objection by counsel to the introduction of that document.

9          Next we'll go on to document 104 which is the

10    government's motion -- I'm sorry -- it is the objection -- I'm sorry.

11    It's the government's motion to introduce testimony of telephone calls

12    received by Karen Hayes and objections to that by the defense.

13          You may proceed.

14          MR. EVANS:  Thank you, Your Honor.

15          Obviously Karen Hayes is a major witness in this case.

16    She's the one who receives the first couple phone calls from

17    someone -- from some unknown persons that starts the whole set of

18    events that culminate in the SWAT takedown on September 24.

19          We have a number of phone calls.  Only one of them

20    was monitored and recorded.

21          What the state is proposing is that Ms. Hayes talk to the

22    jury about each one of those phone calls that she received.  Some of

23    them are a mixture of an unidentified person and her husband and

24    sometimes it may just be an unidentified person saying, "Where's the

25    money?" and the instructions she's been given about where the money

1   should go and how it should be transmitted.

2              We will have testimony from the victim, her husband,

3   who was there often when the phone calls started and then he was put

4   on.

5              As the court can see from the monitored phone call,

6   there's an unidentified person and then the husband saying what was

7   going to happen and what he needed to do and then Ms. Hayes talking

8   about what efforts she's doing to raise the money.

9              The defense raises the idea that they -- we only had one

10  monitored phone call and therefore why should we get in all the rest,

11  but it's like in any other situation where you've got phone calls,

12  sometimes you may or may not have a recording but you have the

13  witness who had them.

14             They can test the credibility of that witness based upon

15  her taking the stand.  And we believe that, one, it's relevant because

16  it's all part and parcel of how they are going to get the money.  Two,

17  her memory of what was said can be tested.  And, three, no matter

18  who's on the phone, the acts being done are in furtherance of this

19  conspiracy.  They need to get money.  They are holding her husband

20  until the money is paid.

21             Therefore, we would like all her conversations regarding

22  all the phone calls she has to be admitted.

23             THE COURT:  Have her recollections of what she

24  remembers, the phone calls when they occurred, what was the

25  substance of the conversations as she has recalled it, been recorded at

1    some point, been made into a police report, into a prosecution report,

2    a thing of that nature?

3                MR. EVANS:  She has been interviewed.  There's a

4    transcript of that interview that has been disclosed.

5                THE COURT:  And in that you have approximate dates of

6    when these phone calls came in from her recollection and so forth?

7                MR. EVANS:  She talks about the phone calls, but

8    actually we have better records than that.  We have the cell phone

9    records of the phone numbers of the phones used by the

10   co-conspirators to call all these people and we have the exact date and

11   time of every call that is between those phone numbers and Ms.

12   Hayes' phone.

13               THE COURT:  Thank you.

14               MR. EVANS:  Thank you, Your Honor.

15               THE COURT:  Counsel.

16               MR. HORMEL:  Your Honor, they may have cell phone

17   records, but they have never disclosed:  On X date I was called by and

18   I received the call from these people and they asked for this

19   specifically and they made these specific threats and they said this

20   specific stuff.  It's all been very general.  Nothing has been linked.

21   There have been no efforts to link the cell phone records to actual

22   phone calls or to actual people.

23               The people that they claim are making these threats and

24   things like that have never been identified.

25               It's interesting to note, Your Honor, that the transcript

1    that is submitted of the actual recorded phone call contains no threats

2    at all.  It is a very generic phone call.

3             You know, if it involves alien smuggling, maybe it does,

4    maybe it doesn't.  It certainly doesn't involve hostage taking and

5    certainly doesn't involve anything the government is trying to prove or

6    a large part of what the government is trying to prove in this case.

7             The government again went to great lengths to attempt

8    to link our clients to the voices on that tape that they had, were

9    unable to do so.  That remains an unknown individual.

10            So I think the court's question about the actual

11   disclosure and the actual details and the actual foundation of each of

12   these alleged phone calls is pointed and -- was on point, I should say.

13            Because although the interview with Karen Hayes does

14   mention that she claims that she had received earlier phone calls,

15   nobody ever tries to pin her down and go:  Okay, when was the first

16   time you got a call and what did they tell you exactly and how did that

17   differ from the second time you got called?

18            No one tried to pin down one, two, three home phones

19   were there, nothing like that.

20            We are left with again a sort of generalization.  And the

21   actual specific evidence that we have doesn't reflect what they're

22   saying that the generalized nonrecorded nebulous evidence says.

23   What they actually have doesn't approach that.  And that's pretty clear

24   from the evidence that is submitted to the court, Your Honor.

25            In order to get the statement of a co-conspirator into

1    court, you need to -- the government needs to prove the participation

2    in the conspiracy.  We cited case law in our response, or I did, to show

3    that the government has a pretty high burden to meet there.  They

4    have none of this evidence.

5           They can show that certain phone calls were made, but

6    other than that, they can't really show anything that's required under

7    the case law.

8           I'm referring the court to page 3 of my objection.  There

9    under United States v. Castaneda and then some other cases cited by

10   that court out of the Ninth Circuit, Silverman and Liera, which I think

11   in the cases cited in Castaneda, the mother of the alleged -- of the

12   defendant who was allegedly a participant in the conspiracy at least

13   was identified in that case, at least they knew who that person was,

14   and they were able to lay some foundation in that sense.

15          In this case they don't have any idea who's talking.

16   They have no idea -- even if that person did say what Ms. Hayes said,

17   they have no way to link them to our clients.  So the foundational

18   nexus that is required by the law and the rules of evidence have not

19   been established.

20          Nor has there been sufficient disclosure made of what

21   exactly Ms. Hayes would say about each particular call.  And there has

22   been no attempt made to link which call referred to what conversation

23   or what specifics were supposedly contained in each of those phone

24   calls.

25          So, Your Honor, I think pursuant to our objection to their

1   notice of that evidence, we would ask the court to preclude that.

2           THE COURT:  Thank you.

3           Mr. Evans.

4           MR. EVANS:  The case law is fairly clear that we never

5   have to identify who is actually on the phone.  The government

6   believes that the victims will testify regarding who was on the phone,

7   who was the English speaker, or the one with enough English to be

8   able to communicate with the various victims and their families.

9           But the bottom line is, on Ninth Circuit law is, if the

10  conversation happens during the period of the conspiracy, if by the

11  content of the call itself as reported to the court it's in furtherance of

12  the conspiracy, then it comes in whether or not we identify who's

13  actually talking on the phone.

14          So although the government believes that there will be

15  substantial evidence as to who is actually making the phone call,

16  that's not necessary in order for Ms. Hayes to report the conversations

17  she's had.

18          The defense asks for something that doesn't exist which

19  is a much better interview of Karen Hayes.  And if and when that

20  actually happens and a report of the interview is done, it will be

21  disclosed.

22          But, Your Honor, this woman's activities and what she

23  heard, what she said are key to the operation of the conspiracy and

24  their efforts to collect for services rendered.

25          It should be admitted.

1          Thank you.

2          THE COURT:  Thank you.

3          Well, at this point the objection is overruled.

4          The court finds that obviously the conversations that Ms.

5    Hayes is going to testify to are conversations related to this ongoing

6    conspiracy and that the conversations regarding monies to be sent for

7    one person -- one or more persons, whatever it is, to be delivered to

8    the place where the conspirators had agreed to deliver people once

9    this sum of money was paid is in furtherance of the conspiracy.

10          And the court finds that this is relevant evidence to the

11   issue of harboring aliens.

12          Also, the court finds that it is evidence which has

13   probative value which outweighs any prejudicial nature to the

14   defendant.

15          So at this point the court will overrule the objection and

16   find that the testimony of Karen Hayes as to conversations she had

17   with what appear to be co-conspirators -- and, of course, that goes to

18   whether or not the jury wishes to believe they were co-conspirators

19   involved in this case, but that's an issue, I think, for

20   cross-examination and an issue that goes to the weight again of the

21   evidence rather than to its admissibility.

22          So the objection is overruled.

23          MR. ROMO VEJAR:  Your Honor, just a point of

24   clarification.

25          THE COURT:  Yes.

1       MR. ROMO VEJAR:  Judge, there are several things that

2  were stated.  And I assume Your Honor will wait to hear the testimony

3  to see if the proper foundation is laid as to these conversations.

4       For instance, my client never had a telephone and none

5  of those phones that were seized belonged to him.

6       At some point the government has an obligation of

7  establishing where they picked up these phones and to whom they

8  belong.  I think that goes to the laying of the foundation before this

9  testimony is presented.

10      THE COURT:  Well, the issue here -- if in fact we were

11 talking about just these phone calls, then clearly there would be a very

12 different issue as to their admissibility.

13      But we do -- and you have to understand, as I

14 understand it from how this case has progressed, you've got two

15 witnesses who are actually in that house and are going to identify

16 people who were involved in this conspiracy, at least in their own view

17 that these people were involved in the harboring of illegal aliens, and I

18 believe one of these people actually speaks to the -- to Ms. Hayes

19 during one of these phone calls.

20      So clearly they have to tie your client to -- not to the

21 specific phone call but to the overall evidence of a conspiracy and that

22 at the time this conspiracy is ongoing that your client is a member of

23 this conspiracy and therefore any acts in furtherance of that conspiracy

24 also fall upon him.

25      And I'm looking at a case that's got two witnesses inside

1   the house there that are going to identify your clients as part of this

2   conspiracy.  So once that's established or at least testified to, then it

3   becomes the job for the jury to decide whether or not they'll believe

4   that evidence.

5            MR. ROMO VEJAR:  I agree with that, Your Honor.

6   However, I'm just talking about this lady who never saw anybody.

7   She just was speaking on the phone with unidentified individuals.  And

8   she is saying, well, somebody spoke in English.  We only have one

9   person who is accused who speaks English and therefore it has to be

10   him.

11            And that's the kind of foundation that I'm worried about,

12   Judge, that if it's not properly laid, we essentially are presenting guilt

13   by association essentially.

14            THE COURT:  Well, those matters will all be tested at

15   trial when she testifies.  Those are matters that her testimony will be

16   subjected to cross-examination on.  She had no idea obviously who

17   she was talking to and those matters are matters for the jury to sort

18   out once she has been subjected to cross-examination.

19            I think I can't deny her ability to testify because in fact

20   this is testimony that relates to this, if her testimony is to be believed

21   that it relates to this conspiracy, and if the other people's testimony is

22   to be believed that your clients were members of that conspiracy, and

23   once those things are testified to, it will come in.

24            Now, again, it's up to the jury to decide whether or not

25   any of that is true, but that's the state of the evidence at this point.

1    MR. ROMO VEJAR:  Thank you, Your Honor.

2    THE COURT:  Thank you.

3    So the objection is -- or the motion in limine -- the

4  objection to the testimony of Karen Hayes presented, motion in limine

5  document 104, is overruled.  The objection is overruled.  That

6  testimony will be admitted of course subject to the government being

7  able to lay proper foundation for her testimony.

8    The next thing I believe -- at least that's the last thing I

9  have is the motion in limine regarding misplaced or destroyed

10  evidence.

11    There's now been filed an objection to that along with a

12  motion to dismiss based on that, on the loss of that evidence.

13    Who's going to address that, Ms. Kelly or Mr. Evans?

14    MR. EVANS:  Yes, Your Honor.

15    Thank you, Your Honor.

16    To say the least, we wish we didn't even have to file this

17  motion but we did.  I think our motion lays out very clearly the record

18  as to what happened to the weapons, the desire of the case agents

19  and the prosecution regarding what we wanted done with the

20  weapons, and sometimes government bureaucracies don't do what you

21  want them to do and these weapons were destroyed.

22    The defense cites a case upon which they are asking

23  that this case be dismissed with prejudice.

24    And I think it's an excellent example of our situation

25  where secondary evidence of the weapons that were seized, which will

1  be the photographs of where they were located, secondly the

2  photographs of the weapons when they were secured in their evidence

3  box, those photographs were used by the ATF agent to do the

4  LexisNexis part of this case.

5  There's going to be a fingerprint witness who will say no

6  fingerprints were found on these weapons and explain why it's very

7  difficult to find fingerprints on weapons of this nature.

8  The defense cites the case of United States v. Cooper

9  which is a Ninth Circuit case where it did uphold a dismissal of the

10  case when the government lost evidence.

11  This is a very different situation brought in Cooper.  The

12  issue was:  Was a lab put together for the purposes of producing

13  meth?  And prior to the government -- once it seized the chemical

14  equipment, they were on notice from the very first day from the

15  defense attorneys and the defendants that they wanted this chemical

16  equipment saved.

17  In particular there was a vessel that was supposed to be

18  used for legitimate purposes and the government was claiming that,

19  no, it was going to be -- this particular vessel was going to be used to

20  create meth.

21  Well, there was all sorts of notice to the government,

22  don't destroy this.  The government, inadvertent or otherwise, seeing

23  that this was hazardous material, destroyed it using their procedures

24  for dealing with laboratory equipment that was believed to be related

25  to the manufacture of meth.

1           In this particular case we had no notice that anything

2    related to this, these guns, are exculpatory at all.  The defense hasn't

3    filed motions to have their own fingerprint expert to look at them.

4    And, in a sense, the loss of these weapons is kind of a boon to the

5    defense.

6           THE COURT:  Why would they ask for them to be

7    examined if your fingerprint expert already said their fingerprint is not

8    on it?

9           MR. EVANS:  Well, that is absolutely right.  But it's

10   mentioned there that the lack of having the weapons -- he mentions in

11   his response failure to have these weapons doesn't let them examine

12   them for whatever reasons they may want.

13          And our position is these weapons are not clearly

14   exculpatory evidence upon which the defense has given, prior to the

15   bureaucratic snafu in this case, that these were necessary for their

16   clear -- it was -- clearly exculpatory nature of these guns were clearly

17   exculpatory --

18          THE COURT:  This is a little bit different.  You are talking

19   about a case where they have destroyed a substance that is dangerous

20   and needs to be destroyed --

21          MR. EVANS:  Right.

22          THE COURT:  -- or problematic.  Here you have weapons

23   and firearms.  There's nothing inherently dangerous about those

24   matters when they are in the hands of the police.

25          MR. EVANS:  I absolutely agree.

1    THE COURT:  Here these individuals are defending

2  against charges of possessing a specific firearm during and in relation

3  to a crime of violence.  And that firearm is gone now.  That specific

4  firearm apparently no longer exists.

5    So how do they test that -- how do they defend against

6  that charge when they never had the ability to have that firearm or to

7  look at it or to check it or to have somebody else check it?

8    MR. EVANS:  Well, the weapon has been checked, Your

9  Honor.

10    THE COURT:  By the police for their own purposes.  You

11  have two sides to a lawsuit here.  The police are checking for their

12  purposes.  They are not checking and looking for exculpatory evidence

13  for these people here.  They are looking to nail their case down.  That

14  is why they are looking at it.  Now they have destroyed it --

15    MR. EVANS:  Right.

16    THE COURT:  -- before these people could take a look at

17  it and decide, hey, there is some issue here.  Whether there is or not,

18  I don't know.  They are gone.

19    MR. EVANS:  That's right.

20    THE COURT:  They don't know because they are gone.

21    MR. EVANS:  Right.  And we'll have to listen to what

22  exculpatory nature they believe the lack of the weapon -- the lack of

23  the weapon leads to anything that's exculpatory.  I'm sure in their

24  imagination there will be something.

25    But the bottom line is, Your Honor, this was not done in

1    bad faith.  It was done through bureaucratic snafus.  And we believe

2    our secondary evidence, that the weapons found in the location of

3    where the hostages were found, that the testimony regarding the

4    victims how those weapons were used would all be relevant and the

5    photographs should be sufficient.

6              Thank you.

7              THE COURT:  Counsel.

8              MR. HORMEL:  Well, Your Honor, we've been dealing

9    with this case little by little over the months.  The gun charges were

10   not fleshed out in the original indictment.  They came in later.  We've

11   been dealing with the slow trickle of disclosure in this case since the

12   beginning.

13             It's interesting that the government now wishes to

14   blame us somehow because it decided to destroy the evidence.

15   Somehow it's now incumbent upon us to demonstrate how these items

16   were exculpatory when they were in their possession and destroyed by

17   them.

18             The first thing is the court is quite right.  There was a

19   report issued, and I cited it in my motion, that stated no usable

20   fingerprints were found on the weapons.  And that was disclosed at

21   some point during the pendency of this matter.

22             However, there are other items relating to these

23   weapons, specifically a laser sight which was supposedly in operation

24   on this and was supposedly used by my client in the course of the

25   conspiracy.  We'll never know whether that laser sight was on the

1   weapon or operational or anything like that.

2   This is something that we were hoping to look at the

3   least at trial.  It's something that would have been extremely

4   probative of whether or not what these people are saying about my

5   client is true.

6   Your Honor, let's not lose sight of the fact, not only has

7   my client been charged with using a weapon in furtherance of a crime

8   of violence, he's been charged with possessing a weapon as an

9   undocumented person in this country.

10   And now, all of a sudden, I mean, this is -- the basic

11   element of that offense is the actual weapon.  That basic element has

12   been, through the volitional act of the government, destroyed.

13   Now, the government seeks to make some sort of a

14   distinction between what happens due to bureaucratic snafus and the

15   desires or wishes of the agents in charge or the prosecutors in charge.

16   However, the case law does not draw such a distinction.

17   The case law makes the government responsible for its actions, not

18   some of the government's employees and not others.  If the

19   government does something, the government is responsible for it.

20   In this case, given the history of this case and given the

21   way that the indictments have been developed and the way that the

22   original indictments happened, compared to the second and then third

23   superseding -- first, second and third superseding indictments, the

24   guns have slowly become more important in the case.  And now

25   suddenly via a pleading we learn those guns have been destroyed.

1    I don't think there's any rationale for the admissibility of
2  the guns of the secondary evidence.  I think at this point the court --
3  we ought to look at what sort of -- this is obviously a violation of --
4  you know, one shouldn't destroy evidence in a case.  The question is:
5  What do we do about it afterwards?
6    I think at the very least we need to probe what the
7  procedures were that led to the destruction of evidence, what e-mails
8  were passed back and forth, what procedures they actually used to
9  destroy evidence.  None of this has been disclosed, Your Honor.
10    I don't know what the lab does when it decides or an
11  evidence person decides what to do.  My instinct would be, if there is
12  evidence held for trial, it's held for trial.  That seems to be the basic
13  protocol.
14    In order to get around that, something -- some positive
15  step has to be taken.  Someone decides, you know, rather than
16  preserving this evidence for trial, we are going to take this particular
17  evidence and destroy it.
18    Given the way that this case has developed, one cannot
19  help be extremely suspicious why this occurred.  We believe that there
20  are two things:
21    Perhaps there were actually fingerprints on the weapons
22  that we needed to see.  Or perhaps this laser sight did not actually
23  function.  Or maybe it wasn't there or maybe it was not operational.
24    And because it is -- these weapons are central, not only
25  to two of the substantive charges as actual elements, they are also,

1   you know, ancillary to the other ones, the hostage taking cases, this is

2   critical evidence, Your Honor.

3              Just to come in and say, this photo that we took, we are

4   going to say this happened here and therefore that's good enough,

5   Your Honor, that does not comport with due process under Youngblood

6   or Cooper, and I think, Your Honor, at this point it's a pretty egregious

7   violation.

8              Thank you.

9              THE COURT:  Thank you.

10              Mr. Evans.

11              MR. EVANS:  I'll be right there.

12              Well, now we know.  Your Honor, you have a number of

13   ways to deal with this.

14              The government's position is that there has -- we have

15   to have done something in bad faith under Youngblood where we

16   destroyed something that was very apparent provided exculpatory

17   evidence.

18              There is no showing of bad faith.  The affidavit of Jeff

19   Ellis lays out exactly what he did, what he thought was going to

20   happen and what obviously didn't happen.

21              The larger issue is what's the jury going to be told about

22   the fact that the government destroyed the weapon that the two

23   victims are going to talk about being in the hands of the defendants,

24   the laser sight being -- and there are pictures of the laser sight -- the

25   laser sight being shone on their bodies as part of the effort to say, you

1   know, you better pay us up or this weapon will be used.

2           And the defense has suggested one instruction regarding

3   lost and mislaid if the government's explanation of why the weapons

4   were destroyed is inadequate.  I believe the government has explained

5   what happened.

6           But we could do some instruction explaining what

7   happened and some presumption -- or how the jury is to handle the

8   fact that they can't look at and otherwise examine the original weapon

9   itself.

10          But I do not believe -- the government does not believe

11  that dismissal of this matter with prejudice is an appropriate sanction

12  and there are other ways to deal with it.

13          THE COURT:  Well, you know, I'm bothered by the

14  fact -- and I'm looking at your original indictment.  The original

15  indictment had nothing about weapons.  You had the harboring of

16  aliens and so forth and placing the aliens in danger and threatening

17  the aliens and so forth.

18          Then the superseding indictment adds these weapons

19  counts.  That's the ones I'm concerned about.

20          What I see here is that there can be testimony by the

21  witnesses that they were threatened by firearms.  Because it's not any

22  specific firearm.  They were threatened by firearms.  They saw

23  firearms.  They can testify to that if that's what they saw.

24          They can also say that they saw a laser light, laser

25  aiming device.  Usually it is a pinpoint of red light that shows up.

1    They can say they saw that.  If they were there and subjected to that,

2    they can testify to that.

3              I think that even the agent can testify that they found

4    firearms when they came in, that a firearm or firearms were found.

5              The problem I have is with your counts 2, 4, 6, 9 and

6    10, when they are specifically accused of an offense that requires

7    proof of a specific firearm.  They have never seen that firearm since

8    this happened.  And they have had no ability to do anything with that

9    firearm because of the government's actions.

10             And clearly you've got an issue regarding whether that

11   comports with due process.  That there is -- not just like these

12   weapons are secondary evidence of what went on in the hostage

13   taking and so forth.  There were weapons there.  We know that.  It can

14   be any weapon, any generic weapon that the government can elicit

15   information from.

16             But when it comes down to the very specific weapons,

17   down to the serial numbers of a very specific weapon, then I think

18   you've got a problem.  You've got a problem there.

19             MR. EVANS:  We do have photographs that show the

20   specific serial numbers of the weapons that were seized on September

21   24th.  So we show the -- we have photographs of the weapons in

22   place.  We have photographs of the weapons as put in the evidence

23   bag.

24             THE COURT:  I tell you what, I'm not inclined to let you

25   use photographs of those weapons in this trial.  The weapons are the

1    evidence in this case.  These people have no ability to test those

2    photographs of those weapons that were allegedly found and are now

3    destroyed and gone.

4              So I'm not at all convinced that the government should

5    now be allowed to come in with photographs after they've destroyed

6    the actual evidence and say, here they are and, by the way, you can't

7    test any of this, you can't really test the photograph because the

8    subject of the photograph is gone, and you can't test the subject of the

9    photograph because it's gone.  We destroyed it before you ever got a

10   chance to have your attorneys have a chance to look at them and

11   experts to look at them if there was any necessity for that.

12             I'm having a lot of problems with the specific counts

13   where these specific photographs -- these specific weapons are

14   mentioned.  And I'm having problems allowing the government to say,

15   hey, okay, we made a mistake, sorry, too bad, you don't get to see the

16   real weapons, neither will the jury.  We'll just tell them what it was

17   and here are the photographs.

18             I find that to be a denial of due process, especially in

19   those counts where they are charged specifically with a very specific

20   firearm, ammunition, whatever.  I'm having some real issues with

21   that.

22             So we may need to revisit that.  I'm still thinking what

23   the -- obviously there has to be some action taken from -- by the

24   court given this -- and it's pretty egregious.

25             I'm concerned also that they are charged with firearm

1    offenses and the weapons disappear after the initial indictment had no

2    mention of firearms.  That's problematic for the government.  That

3    requires a lot of explanation from the government.  Explanation which

4    I haven't heard this morning.

5               MR. EVANS:  Correct.  Well, Your Honor, you have

6    suggested that we would have a hearing hopefully a couple weeks

7    before the trial where we would bring in the expert regarding the

8    "pollo" list.  He's also the person -- the case agent who was

9    responsible for the handling of these weapons.  He could testify

10   regarding that.  And we will bring in the handwriting expert at the

11   same time to testify to the court.

12              THE COURT:  Well, at this point I've got some grave

13   concerns about Counts 2, 4, 6, 9 and 10.  But I'm not at this point

14   going to dismiss those counts.

15              As I stated previously, I think the witnesses can testify

16   that there were weapons there in terms of counts 1, 3, 5, 7 and 8 as

17   they relate to those offenses.  The police can testify that they found

18   weapons.

19              At this point, because of the government's destruction of

20   evidence, I'm not going to dismiss the case with prejudice as

21   requested by counsel.  I am going to preclude the government from

22   using any photographs of those weapons.  Any secondary evidence of

23   those weapons will not be admitted.

24              You will have your agents testify.  So that's an issue -- if

25   you've got some other issue to -- way to get around that or some

1    other suggestion, you can file that before we have the next hearing.

2              But at this point my ruling is that the government's

3    dismissal -- I'm sorry -- the government's destruction of critical

4    evidence in this case is a violation of due process, especially since the

5    defendants are initially placed on notice they are charged with

6    offenses that do not carry -- that do not require any proof of any

7    specific weapon being used, and then they're reindicted and charged at

8    that point with five counts that specifically talk about the weapons

9    that have now been destroyed.

10             And I think that it's -- the only thing the court can do is

11   to preclude the use of any secondary evidence such as photographs,

12   which again the defendants have no ability to test as to their value,

13   their evidentiary value, they're authenticity or anything else because

14   they don't have the original to compare it to, the original being those

15   weapons that were destroyed.

16             At this point I'm going to deny the defendant's motion to

17   dismiss this case with prejudice.

18             I'm going to preclude the government from using any of

19   the secondary evidence regarding the existence of those weapons

20   other than the testimony of witnesses who saw them, and they can

21   testify they were there, they saw them, but that's it.

22             MR. EVANS:  I would ask the court, if the gun charges

23   and the weapons charges were dismissed, would the secondary

24   evidence of the weapons as they were found in the location be

25   admissible to bolster the testimony of the material witnesses?

1      THE COURT:  Well, I don't know.  I would have to review

2  that, if that were the case.

3      It would seem to me that you take out the issue of any

4  specific weapon being there.  The fact is you've got a generic weapon

5  and here's a photo of it.  So that somewhat alleviates the prejudice to

6  the defendant by the destruction of those weapons.

7      But I think we need to flush that out.  At this point, just

8  talking from the top of my head, I think that it may cure at least that

9  problem as to the secondary evidence.

10      At this point the only ruling I can give you is that based

11  on what's required to prove those elements, those offenses charged in

12  2, 4, 6, 9 and 10, Counts 2, 4, 6, 9 and 10, that I'm not going to allow

13  any evidence regarding photographs or other testimony regarding

14  these specific weapons.

15      But there will be allowed testimony generally about

16  weapons being there because I believe that that would be appropriate

17  given the fact that if the agents went in there and found weapons,

18  they can say, "We found weapons in the house."  If the aliens saw

19  weapons, they can say, "We saw weapons.  They were pointed at us,"

20  whatever.

21      Also, testimony regarding the fact that they saw this

22  laser sight, or whatever it was that was pointing at them, that's

23  admissible because they did see that.

24      MR. EVANS:  We had some other motions that we

25  thought were pending in front of the court.  The court has indicated

1    this was the last one.

2              THE COURT:  These are the only ones I thought I had

3    not ruled on.  What other motions do you have?

4              MR. EVANS:  We have ECF 100 which is the 404(b)

5    regarding the sexual assault.

6              THE COURT:  I'm sorry?

7              MR. EVANS:  ECF 100 which is the 404(b) regarding the

8    sexual assault evidence and co-conspirator statements.

9              THE COURT:  That is ECF 100.  That is one document?

10             MR. EVANS:  Yes, Your Honor.  Just for the record, the

11   response is 113.  Our reply is 129.

12             THE COURT:  Okay.

13             MR. EVANS:  We have -- we believe we have pending

14   ECF 100 which is the government's motion regarding criminal record.

15             THE COURT:  Wait a second.  ECF 100.

16             MR. EVANS:  102.

17             THE COURT:  So this is ECF 102.

18             MR. EVANS:  The response is 112.  And our reply is 128.

19             And then ECF 127, the defense filed a motion to compel

20   release of the "pollo" -- the notebooks that had the "pollo" list in

21   them.  We have worked out a stipulation.  So we'll advise the court

22   when we've entered the stipulation regarding the release so they can

23   do an independent expert examination.

24             THE COURT:  Very well.

25             MR. EVANS:  So we just need another hearing date for

1    those.

2              THE COURT:  Unfortunately, that did not make it to my

3    file.  I don't have those.  I wouldn't be able to go forward without

4    reading all of those matters.

5              MR. EVANS:  That's fine.

6              THE COURT:  What we'll do is let's pick a date to deal

7    with the expert witness matters.

8              Was there something else, Mr. Evans?

9              MR. EVANS:  No.  Ms. Kelly was just pointing out that

10   she hadn't heard me talk about ECF 112.

11             THE COURT:  Yes, you did.  What we have pending then

12   are the group ECFs, 100 with responses and replies, 113, 129.  ECF

13   102, with responses and replies, 112, 128.  And ECF 127 which is

14   apparently going to be dealt with by way of stipulation.

15             MR. EVANS:  Yes, Your Honor.

16             THE COURT:  Now, I've got two dates.

17             I've got Monday, October 4, at 9:00 or 10:30 in the

18   morning.  I think if the experts are coming in and we'll require some

19   testimony, it's -- probably we are going to need it later, at the end of

20   the calendar.  So it would have to be 10:30 so we can have the rest of

21   the morning and afternoon if necessary.

22             Or October 18.  October 18 puts us, what, two weeks

23   before trial?

24             MR. HORMEL:  One week.

25             THE COURT:  One week before trial.

1            MR. EVANS:  We will have to contact the people we are

2    going to be flying in, Your Honor.  If we could have both dates and try

3    to get back to the court.

4            THE COURT:  If you can do that within a day or two.

5    October 4 at 10:30 and October 18 at 10:30 will be available.

6            Counsel, problems with either one of those dates?

7            MR. HORMEL:  For us the 18th would be better.

8            MR. ROMO VEJAR:  Likewise.

9            THE COURT:  Mr. Evans.

10           MR. EVANS:  We would like it sooner than later.

11           THE COURT:  If you can get it here sooner, we will do it

12   sooner.  Keep us -- keep in touch and let us know so we can make

13   sure we have that scheduled.

14           MR. EVANS:  Thank you very much.

15           THE COURT:  Thank you.  Stand at recess.

16           (The proceedings concluded at 11:25 a.m.)

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                              C E R T I F I C A T E

8

9

10

11          I, Dianne Davenport, certify that the foregoing is a correct

12    transcript from the record of proceedings in the above-entitled matter.

13

14

15

16

17    /s/  Dianne Davenport                    November 16, 2011

18

19

20

21

22

23

24

25