1   IN THE UNITED STATES DISTRICT COURT

2   DISTRICT OF ARIZONA

3

4   UNITED STATES OF AMERICA,        )
                                     )   CR 09-2343-TUC-FRZ
              Plaintiff,             )
5   vs.                             )
                                     )   October 19, 2010
6   YURIS BONILLA-GUIZAR and        )   Tucson, Arizona
    CARLOS ARMANDO CALIXTRO-        )
7   BUSTAMANTE,                     )
                                     )
8             Defendants.           )

9

10   MOTION HEARING

11
     BEFORE:  HONORABLE FRANK R. ZAPATA
12   UNITED STATES DISTRICT JUDGE
     405 W. CONGRESS, COURTROOM 5-A
13   TUCSON, ARIZONA 85701

14   A P P E A R A N C E S

15       FOR THE GOVERNMENT:  MS. KRISTEN KELLY and MR. JOHN
     EVANS, ASSISTANT UNITED STATES ATTORNEYS.
16
         FOR DEFENDANT BONILLA-GUIZAR:  MR. PETER HORMEL,
17   ATTORNEY AT LAW.

18       FOR DEFENDANT CALIXTRO-BUSTAMANTE:  MR. JESUS ROMO
     VEJAR, ATTORNEY AT LAW.
19
         THE INTERPRETERS:  MR. JUAN RADILLO and MR. PATRICK
20   O'CONNOR.

21
     Dianne Davenport
22   405 W. Congress, Suite 1500
     Tucson, Arizona 85701
23   (520)205-4266

24
     Proceedings prepared by computerized realtime translation
25

1          P R O C E E D I N G S

2          (Call to order of court, 10:35 a.m.)

3          THE CLERK:  Criminal case 09-2343, United States of

4    America versus Yuris Bonilla-Guizar and Carlos Armando

5    Calixtro-Bustamante, on for motion hearing.

6          Counsel, please state your appearance.

7          MS. KELLY:  Good morning, Your Honor.  Kristen Kelly

8    and John Evans on behalf of the United States.

9          THE COURT:  Good morning.

10          MR. HORMEL:  Good morning, Your Honor.  Peter Hormel

11    for Mr. Bonilla.  He appears in custody, assisted by the court's

12    interpreter.

13          THE COURT:  Good morning.

14          MR. ROMO VEJAR:  Good morning, Your Honor.  Jesus

15    Romo on behalf of Mr. Calixtro-Bustamante, who is present, in

16    custody.

17          THE COURT:  This is the time set for argument.

18          Yesterday the court heard the testimony of the proposed

19    expert witnesses Jeff Ellis and Elaine Wooten.  Today, we will -- I will

20    hear argument from counsel as to their -- there's objections by the

21    defense to their qualification as expert witnesses.

22          MR. ROMO VEJAR:  Sir, I do have a request for

23    clarification, if I may, on one of your rulings from yesterday.

24          THE COURT:  Very well.

25          MR. ROMO VEJAR:  Your Honor, this is the matter of the

1    fingerprints, sir.

2            Apparently the government took some fingerprints of the

3    pistol -- or of the two pistols and they found no prints of my client or

4    of Mr. Bonilla, neither one of them.  I believe, Judge, we can bring that

5    out.

6            Now, the government believes that if we bring it out,

7    they then need an expert to show that it is not unusual for the pistols

8    not to have fingerprints.  And there is where the matter of the

9    identification of the pistols come in.

10           Now, they cannot bring him in, Judge, because of the

11   wrongdoing because of what they did, the destruction of the evidence,

12   but that shouldn't and I don't believe it does.  And I'm not sure that

13   you ruled on that, Judge.

14           THE COURT:  How are you going to -- who are you going

15   to have testify that there are no fingerprints on those guns?

16           MR. ROMO VEJAR:  Well, Judge, there is someone here

17   who did the -- who took the fingerprints.  And it wasn't anybody from

18   Washington who took the fingerprints.

19           THE COURT:  I'm talking about fingerprints off the guns.

20           MR. ROMO VEJAR:  Off the guns, yes, sir.

21           THE COURT:  So are you going to call that person?  How

22   is that person going to identify the guns that they took the fingerprints

23   from?  That's the issue where we are at.

24           If you want to stipulate that this person took fingerprints

25   from guns found in the house, then that's fine.  That can be used if the

4

1    government wishes to stipulate with you as to that, without going

2    further into which -- the identification of the guns in particular.

3         But the government can also then call its witness to

4    testify that they took -- that if fingerprints were not found from the

5    guns taken from the house of the individuals who were there in the

6    house, then there is reasons for that.

7         They can bring in an expert witness to rebut what you

8    want to put forth, that you have a witness who says there weren't any

9    fingerprints.

10        MR. ROMO VEJAR:  What I wanted to do, Judge, and I

11   want to make sure that I do not violate your ruling, is to ask like the

12   case agent if fingerprints were taken from my client and if any of

13   those fingerprints to his knowledge were found on the weapons.

14        THE COURT:  The case agent is not a fingerprint

15   expert.

16        MR. ROMO VEJAR:  No, he's not, but he has knowledge.

17        THE COURT:  It's hearsay.

18        MR. ROMO VEJAR:  Well, I think that would -- well, if

19   that would be your ruling, Judge, that would be it.

20        THE COURT:  It is hearsay because the only way he can

21   testify is because he got a report from somebody else that says there

22   are no fingerprints on that gun.

23        MR. ROMO VEJAR:  But he will testify to a lot of things

24   that are hearsay, Judge, based on the information that he receives as

25   the case agent.

1          THE COURT:  I'm sure he will.  I'm sure that's going to

2   be objected to by the government and that's going to be sustained.  If

3   you want -- the only way you can get where you want to go is to

4   stipulate that the fingerprints were taken from weapons found in the

5   house and that these individuals' fingerprints were not on those guns.

6          The government can then rebut that by putting on their

7   expert to say oftentimes on firearms for whatever reasons fingerprints

8   aren't found.  And they don't have to go through the process of dealing

9   with an objection from you or from co-counsel that there's no

10  foundation for that person to make that determination because the

11  foundation is stipulated to by your wanting to question somebody

12  about that specific firearm found in the house.

13         So that's where you are.

14         MR. ROMO VEJAR:  All right.  All right.  Thank you,

15  Judge.

16         THE COURT:  I think it's -- at this time is -- Ms. Kelly,

17  are you going to argue for the government or Mr. Evans?

18         MS. KELLY:  Yes, Your Honor.

19         THE COURT:  Please go forward and make your

20  statement regarding the qualifications and why these witnesses should

21  be allowed to testify as expert witnesses.

22         MS. KELLY:  Thank you, Your Honor.

23         Based on the testimony yesterday, the government at

24  this point is going to be offering to the court both Ms. Wooten, Elaine

25  Wooten, forensic document examiner, and Jeff Ellis, Senior Special

1   Agent with ICE, as experts in the noticed areas.

2            Mr. Ellis, as he testified yesterday, has engaged over the

3   last 14 years in hundreds of investigations into alien smuggling

4   operations.  His current post right now is the national program

5   manager for human smuggling and transportation trafficking in D.C.

6   He not only speaks on the subject, but he readily talked yesterday

7   about the lectures and such that he has gone to on it in terms of

8   remaining current in the field.

9            So the government based upon the testimony that came

10  out yesterday offers Mr. Ellis based on his credentials that came out

11  yesterday as an expert on human smuggling organizations.

12           We went into yesterday in the testimony the areas with

13  which we are going to be exploring before the jury in terms of his

14  testimony, his opinions and such.

15           THE COURT:  Now, yesterday in the testimony, it came

16  out he had some involvement with this case at its inception.  The

17  testimony -- as I understand it, the testimony you are proposing for

18  this individual is that he would testify generally about the operation of

19  alien smuggling organizations, the structure of the organizations, the

20  roles that different people play in the organizations, how money is

21  collected, how people are moved from place to place, how stash

22  houses are used.  Generally what we consider to be the overall

23  structure and operation of an alien smuggling organization.

24           Is that where we are going here?

25           MS. KELLY:  That's correct.

1        THE COURT:  Thank you.

2        MS. KELLY:  As to Ms. Wooten, she testified yesterday

3   that she had testified before as an expert in federal court 18 times.

4   And we will offer her testimony, her expert opinions as she rendered

5   yesterday, the findings that she made in regards to analyzing the

6   handwriting exemplars from Calixtro and Bonilla.

7        Her credentials are very well established.  We went

8   through her resume, her training, her experience, et cetera, and the

9   fact that she commonly testifies in federal court in similar situations.

10        The findings she made, she made to a reasonable degree

11   of certainty.  In terms of the findings that she made for Calixtro, she

12   indicated that she made them to a reasonable degree of certainty.

13   And to Bonilla the fact that he was drawing, it wasn't typical

14   handwriting, it was drawing, it was slow and it was deliberate.

15        That's the testimony that the government intends to

16   offer in these particular areas as we explored.

17        Thank you.

18        THE COURT:  Thank you.

19        Mr. Hormel.

20        MR. HORMEL:  Your Honor, I will begin with the

21   proposed testimony of Mr. Ellis.

22        It was sort of hard to discern exactly what he was going

23   to be saying about alien smuggling organizations other than I

24   remember some testimony about a spider web and loose

25   subcontracting-type arrangements.

1    What stood out was his attempts to paint a picture of

2 instilling fear and some very dark and ominous opinions about threats

3 and things like that.

4    Now, I assume the government wants to bring those

5 things out.  I think those would be highly inappropriate and

6 speculative.  That being said, it's hard to imagine an individual less

7 appropriate to be an expert in a particular case.

8    First, and the court has touched on this, this is an

9 individual who has some interest in this particular case personally.

10 This is an individual who was in charge of the investigation.  He was

11 the case agent on the case in its inception.  He investigated it.  He

12 went to the scene.

13    He was responsible, as case agents are, through

14 February of this year.  This case originated in September of '09.  He

15 said until the middle of February of '10, he was still on duty in Arizona.

16 And presumably that duty included shepherding the cases for which he

17 was the case agent including this one.

18    Now, if somebody is the case agent for a case, they're

19 professionalism rests on the proper investigation on certain matters,

20 rests on whether or not a conviction is obtained, rests upon a

21 perception of professionalism regarding what took place there.

22    To have him turn around and give opinions relative to

23 organizations that may or may not have played a role in that particular

24 investigation cannot be seen as anything but self-serving.  It's

25 absolutely inappropriate.

1    That being said, I don't think he's qualified.  This is an

2    individual who a few months ago got a promotion to a desk job in

3    Washington, D.C., who prior to that was a pretty regular special agent.

4    What the government is asking the court to do is to

5    accept a regular case agent as an expert.  That means that all case

6    agents, special agents that are out there, and there is hundreds of

7    these guys, are qualified to give opinions as experts.  That is simply

8    not the standard.

9    An expert is somebody who has specialized knowledge.

10   This individual could not cite to a single set of data.  He could not cite

11   to anything other than his GAO reports.  He couldn't give us any

12   background in literature, study, statistics or data set relating to case

13   management that supported his opinions other than generalized

14   references to his training and experience.

15   Your Honor, that's not qualification to be an expert.  I

16   can give those opinions based on my training and experience as an

17   attorney handling these cases for years.  I doubt that anyone would

18   agree that I'm qualified to get up there and give these opinions or

19   make these statements.

20   So given the confluence of his involvement in the case,

21   which would give him obvious motive, an expert is not supposed to

22   have motive or any -- he admitted that he had bias in favor of the

23   government.  An expert is supposed to at least have a somewhat

24   objective view.  They can't have a personal stake in it.  So that would

25   be the first part.

1    The second part, he has never been recognized as an

2  expert prior to this case.  This would be his first one.  And given that

3  he didn't prepare for it in any way, I don't think the court can just

4  sanction that and say that's fine.  You don't have to prepare for this.

5  You don't have to actually do any of the things that normally experts

6  would be able to provide and to state and to put on the record and

7  refer to regarding the CV.

8    You know, giving talks in Central America relative to

9  exporting of good law enforcement model, Your Honor, that doesn't

10  qualify someone as an expert.  It just doesn't.

11    So I would ask the court to preclude his testimony in

12  that he give opinion.  I think this individual as far as his role goes in

13  investigating the case, whatever, then he's a fact witness.  That's to

14  be expected.  He was the case agent at some point in this case.  All

15  right.  But as far as anything beyond that, Your Honor, I would ask the

16  court to preclude that testimony.

17    Now, Ms. Wooten was on the stand and really failed to

18  give any conclusions of any kind regarding where these handwritings

19  came from.

20    Regarding my client, the only thing that she could say

21  was that he drew handwriting rather than writing it.  She was not able

22  to give a reason.  Okay.  I assume the government will argue it's

23  because he was faking it.

24    Your Honor, that conclusion really can't be drawn and

25  she said that can't be drawn.  She says, "I'm not a neuroscientist.  I

1  cannot make an opinion.  I cannot speculate as to why this particular

2  handwriting is different than that."

3            I would point out, Your Honor, I just found this out right

4  now, my client informed me that -- if the court remembers, a large

5  part of her testimony was based on a signature that Mr. Bonilla had

6  given some time in September of this year, postexemplar taking, that

7  was authorized by the court.

8            Now, the circumstances of this -- the obtaining of this

9  signature are extremely dubious.  Apparently a CO at the prison went

10  to my client and said, "Here, you need to sign this."  He hadn't

11  requested anything.  It was allegedly for some work-related

12  assignment, he hadn't asked for that, never materialized.

13            What happened here is the government went to the CO

14  and says, "We need a signature from this guy," because it's after the

15  exemplars.  I wasn't informed.  Court wasn't informed.  Nobody knew

16  about it and it was done surreptitiously and absolutely inappropriately.

17            For this expert to base an opinion based on that, I find

18  very troubling indeed.  And given that she wasn't able to give any

19  conclusions, we have to look at the rule of evidence that states that

20  expert testimony is to be given when it can aid the jury in

21  understanding a certain portion of the case.

22            Now, in this case the testimony that she is going to give

23  isn't going to be able to help in any way.  It's just going to cloud the

24  matter.  It doesn't reach any conclusions.  It makes some -- you know,

25  some soft science arguments about differences in handwriting based

1    on drawing versus writing, but it doesn't give us any information about

2    who wrote the ledgers.

3         That's the issue:  Who wrote the ledgers?  We don't

4    know that because she can't say it.

5         And given that a large portion of her testimony has been

6    taken -- or a somewhat substantial portion of her testimony is reliant

7    on evidence that was obtained from my client under extremely

8    troubling circumstances -- I mean, if they were going to take an extra

9    sample from him, I needed to know about that.  If some CO was going

10   to go there and get his signature and send it back to the lab, I needed

11   to know about that.

12        I was given the opportunity to be present for the last

13   taking of the exemplars.  I was there.  I should have been allowed to

14   be there for this one.  My client had never been informed this was a

15   process of taking evidence.  That should have been authorized by the

16   court by motion like it was the first time.  It's the taking of evidence

17   that potentially incriminates -- it's a violation of his Fifth Amendment

18   rights.  They can't base testimony on that.

19        So I'm troubled by that.  I would ask the court for those

20   reasons to preclude both of the witnesses.

21        THE COURT:  Thank you.

22        Mr. Romo.

23        MR. ROMO VEJAR:  Well, first, on Mr. Ellis, it appears,

24   Your Honor, that the entire argument on Mr. Ellis was based on his

25   premise, which later I think was destroyed, that this was a broad

1  ability organization.  He said that broad ability organizations did this,

2  this, this.  He said a lot of things.

3  For instance, he said that the broad ability organizations

4  had different specialties.  They had drivers.  They had people who

5  were recruiters.  They had stash houses.  And there were drivers that

6  would take them other places.  And people who would go and charge

7  and then make payments.  And that these were things where there

8  was a commonality of interests.

9  At the end, Judge, he agreed that this was not a broad

10  ability organization.  So I don't think that his testimony should be

11  included, Judge, because he speaks -- essentially what he will come in

12  and do is give to the jury an appearance of something that we have

13  not here.  We've got a couple of people who are accused of having one

14  person in a home and threatening that person for money.

15  You have absolutely no evidence that they recruited

16  other people, that they had other experts -- or people whose expertise

17  was to bring them up, charge the other persons, call the other persons

18  and things of that nature.

19  By his own words, Your Honor, he said that with regard

20  to the extortion, for instance, there was no solid data.  It was

21  anecdotal.  He said that there was greed and, again, this commonality

22  of values.

23  When asked about the clothes, Judge, and whether or

24  not he had participated -- and how he knew that people's clothes were

25  taken, he said there were six cases that he participated in.  But when

1   he was asked to specifically point out to a single case -- and, mind

2   you, your Honor, this gentleman has been gone for only six, seven

3   months from this jurisdiction, where he worked here in Tucson, so he

4   would remember one case, Ramirez or Gomez or whomever, but give

5   us one defendant, nothing, no papers.

6           When asked by Mr. Hormel repeatedly for different

7   documentation, he said he couldn't remember.  He didn't have any.

8   There were no thesis, no documentation, no treatises, no body of

9   knowledge whatever, Judge.  He could not point out to anything.

10          When asked again, Your Honor, about these matters of

11  the commonality of purpose and the separation of these entities, he

12  said, and you can check the transcript, Judge, I'm sure you remember,

13  Judge, he said, "I am theorizing."  This is an opinion that really

14  amounts to conjecture.  Those were his own words, Judge.  I'm not

15  making those up.

16          And finally when I cross-examined him, he said that he

17  was not an expert on money payments.  He specifically said that.

18          So how can he come in and testify as to all these things

19  that he guesses?

20          Remember, Judge, there's a final thing about the bias.

21  He knows because he was the case agent exactly what the facts are in

22  this particular case.  And when asked directly, "Can you unbiasedly

23  give your opinion without favoring the government?" he said, "No, I

24  couldn't.  I don't think I could."  Judge, that's for you to judge, Your

25  Honor.

1    So for all those reasons, Judge, I don't think that

2    Mr. Ellis is qualified to testify in this case.

3    I think what he would do is come in and essentially say

4    some very prejudicial things about what my client he believes has

5    done and make the jury believe exactly that because he's an expert,

6    he was in Washington, he has gone to El Salvador, 13 different people

7    have come to see him through the Department of State.  He sounds

8    like he's someone who really knows whether or not my client is a

9    criminal.  And I think that would be the impression that they would

10   take and that would be very unfair, Judge, because it really is not

11   representative of what he knows and what he is.

12   He is not an expert of someone who has high skills or

13   great knowledge of a particular field other than the high skills and

14   great knowledge that everybody that works in the criminal area in this

15   particular area of Arizona has.  We all have the same body of

16   knowledge because we deal with these matters on a daily basis.

17   As for Ms. Wooten, Your Honor, now, the standard,

18   Judge, is whether or not it is my client's handwriting, Mr. Calixtro's, to

19   a reasonable degree of certainty.  That's the standard, Judge.  And I

20   think that to allow Ms. Wooten to testify would make a mockery of

21   that standard.

22   What will she say, Judge?  I think that the most she

23   could say to a reasonable degree of certainty is the handwriting is

24   similar.

25   And, Judge, it is like saying a forensic expert on

1   fingerprints or on blood or on DNA would come in and say, yes, to a

2   reasonable degree of certainty the DNA that we found is similar but

3   not with certainty, Judge.  That is the problem with her testimony.

4           She said -- Judge, I'm quoting from her testimony

5   yesterday with regard to Mr. Calixtro, and I'm putting that in quotes,

6   "I could not rule the handwriting in or out."  That's what she said,

7   Judge.  And she further said that there is -- she didn't have sufficient

8   material in brackets for a definitive finding.

9           So can she say once -- when she has already said she

10  didn't have enough information and she has already said that she

11  could not rule in or out the handwriting because there was not

12  sufficient materials to make a definitive finding, can she then say that

13  this is the handwriting of my client?

14          THE COURT:  She hasn't said that, Mr. Romo.  She can't

15  say that.  What she said was all she can say to a reasonable degree of

16  certainty that it was similar.

17          MR. ROMO VEJAR:  But, Judge, when you have an expert

18  come in and say, "It's similar," everybody is similar, Judge.  It's like

19  saying that my client's face features are similar to many other people's

20  face features.  That doesn't mean it's his.

21          Anyway, Judge, I believe, Your Honor, that that

22  standard -- that lowers the standard so that anybody can come in.

23          Your Honor, if the government had a forensic expert on

24  DNA, you would not allow the forensic expert to testify to simply say

25  that, "Yeah, well, I think it was like 50 percent, because there were

1  similarities between the blood of Mr. Calixtro and the blood that we

2  found at the scene of the crime.  I can say with a reasonable degree of

3  certainty that this is similar.  It's a 50 percent chance that it is."

4          I think Your Honor would rule it out because it would be

5  much too prejudicial.  It is no different here, Judge.

6          When an expert comes in, the jury doesn't know this is

7  not the same as a DNA expert.  This is as close to an art rather than a

8  scientific forensic expert.

9          But when she comes in, she comes in with all the

10  authority of an expert telling them that because there are similarities

11  now my client -- it's surely the handwriting.  That puts that seed in

12  their minds, Judge, and I think that is unfair as well.

13          That's all, Your Honor.  Thank you.

14          THE COURT:  Ms. Kelly.

15          MS. KELLY:  Thank you, Your Honor.

16          THE COURT:  Address first this issue about the writing

17  exemplar that was taken apparently surreptitiously according to

18  Mr. Hormel.  How did that come about?  And how does the government

19  have some involvement in having a CO go down there and have him

20  sign, not tell him what it's for and not contact the court or his lawyer?

21          MS. KELLY:  I think that's a good question, Your Honor.

22          What I know and can tell Your Honor today is that we

23  requested business record documents through our primary case agent,

24  Dave Slagle, who got them from the jail.  What I would need to further

25  understand is the process by which they were obtained.

1            I know there was some issue about the signature, the

2  name that he was writing in his documentation.  I can't talk to you

3  right now without talking to the agent about how exactly that was

4  fixed, if that then directed the jail to go and collect his actual

5  signature.

6            But what I would like to do is be able to confer with the

7  case agent and let the court know how that did --

8            THE COURT:  You are going to need to do that.  If in

9  fact, as Mr. Hormel tells this story, that is what happened, you have

10  some serious problems there with that witness, with that process.

11            MS. KELLY:  So how best would you like me to get that

12  information to you?

13            THE COURT:  Whatever way you are going to get that

14  information, I think we have to have another hearing on this again

15  once that information comes through because that is very troubling,

16  that process is very troubling.

17            MS. KELLY:  Let me talk to him about it and get that

18  information.  Should we set up a time to talk about it here in court?

19            THE COURT:  I don't know.  What have we got on

20  Monday?

21            MR. HORMEL:  My Monday is not too bad, Your Honor.  I

22  have a 9:30 hearing and that is about all.

23            THE COURT:  Mr. Romo?

24            MR. ROMO VEJAR:  I'll check it out, Judge, right now.

25  Should be free, Your Honor, because we have a trial the next day.

1          THE COURT:  Ms. Kelly, Mr. Evans.  It would probably be

2    about this time at the end if I have a Monday calendar.  I'm not sure

3    what I have got on Monday.

4          THE CLERK:  You have a Monday calendar.

5          THE COURT:  What is the 9:30?  It's not a motion

6    hearing is it?

7          THE CLERK:  It is a sentencing.

8          THE COURT:  We would be able to set it at -- why don't

9    we set it at 10:30 on Monday to go over this particular part of this

10   hearing, the issue about the signature that Mr. Hormel is alleging was

11   taken without telling the defendant they were taking a handwriting

12   exemplar from him and without telling counsel or the court this was

13   going to happen.  We will do that Monday at 10:30.

14          You may go on with your argument regarding your

15   witnesses.

16          MS. KELLY:  Thank you, Your Honor.

17          As to the handwriting analysis testimony that's going to

18   come in with regard to Mr. Calixtro, what Ms. Wooten is going to

19   testify to is that she has made -- the handwriting was similar and

20   that's her finding.

21          What we do know from Ms. Wooten's testimony

22   yesterday is that in fact most people don't have similar handwriting.

23   She even went further to say, if you look at Mr. Bonilla's writing from

24   the exemplar and other writings, all the ones they have dated to 1987,

25   it is dissimilar.

1      Mr. Romo indicates that all sorts of people have similar

2  handwritings and therefore this isn't a probative finding.  I think the

3  testimony that came out yesterday goes right to the contrary and

4  indicates that this indeed is a finding that she can give to a reasonable

5  degree of certainty.

6      Any sort of analysis or cross-examination on it goes to

7  the weight of it, not its admissibility.

8      In terms of Ms. Wooten's testimony as to Mr. Bonilla and

9  the findings she has made, those findings are probative for the jury

10  and they bear upon his consciousness of guilt.  They bear upon his

11  culpability.  And she has made those findings to a reasonable degree

12  of scientific certainty.

13      With that we would be offering it to the court as well.

14      Mr. Ellis has over the course of 14 years acquired

15  specialized training, specialized experience in the area of human

16  smuggling and trafficking organizations.  It is that knowledge that will

17  indeed assist the jury in making a fact determination in this particular

18  case.

19      It is not uncommon for specialized experts, specialized

20  investigators to come in and to testify based upon their extensive

21  training and experience in a particular field.  And it isn't always the

22  case that any expert would be a blind expert or an expert that isn't

23  well versed with the facts.

24      In fact in most cases, experts who have not been part of

25  the case are given all the case materials to review and then they come

1    in and render opinions as such.

2              So with that, you know, his expert opinion is going to be

3    offered, as we talked about previously, in terms of generalities, Your

4    Honor, in terms of what his training and experience has lended him to

5    understand the organization and the entities that are human

6    smuggling operations.  But his, you know, expert opinion is such that

7    it would be common.

8              Any question defense counsel has as to his bias, again

9    that goes to the weight and not its admissibility.

10             So with that, Your Honor, the government feels that it

11   has made a showing under 703 that both of these experts have

12   probative findings and opinions that should be given to the jury.

13             Thank you.

14             THE COURT:  Thank you.

15             Well, as to -- I will look at Mr. Ellis first.

16             Mr. Ellis is not an expert that is speaking on scientific

17   matters that require having read treatises or made studies and so

18   forth.  He's testifying about the overall structure and operation of an

19   alien smuggling organization and over 14 years of experience which he

20   said led him to be involved in more than 100 -- less than a thousand,

21   he said hundreds of cases, certainly dealing specifically with alien

22   smuggling and alien smuggling organizations.  That certainly would

23   give rise to a specialized knowledge in that particular area for him.

24             The idea is?  Can we all be experts in that area to some

25   degree?  We probably can.  As a judge sitting and listening to these

1  cases year after year, as a lawyer representing people in these cases,

2  for me for 20 years, yeah, I probably could.  Somebody could make an

3  attempt to establish me, as they could with Mr. Hormel and could with

4  Mr. Romo.

5        But the idea is that it's not information that is being

6  imparted to other experts.  It's information that is being imparted to a

7  jury who presumably knows nothing about alien smuggling and alien

8  smuggling organizations.

9        And clearly he has sufficient knowledge and experience

10  and training in this area to be able to impart knowledge to them about

11  these organizations that certainly is going to assist the jury -- an

12  uninformed jury about these matters, impart information to them that

13  will help them understand the evidence and help them determine a

14  fact at issue here.

15        I find that based upon his experience -- and it doesn't

16  have to be a supervisor.  As a matter of fact, my belief is that a

17  supervisor has less on the ground contact with these groups than an

18  agent out there in the field.

19        If he had been an agent for a year, all right, two years,

20  all right, we might have some argument there.  But 14 years doing

21  this very thing, I think, and given his testimony, he does have

22  specialized knowledge that would assist the trier of fact in this case.

23        I think that his specialized knowledge arises from having

24  sufficient facts and data upon which to base that.  His own experiences

25  out there in the field, and his opinions, I think, are reliable based on

1   that information.

2           So I find that Mr. Ellis would be an expert in that area.

3           Now, I'm not a fan, have never been, of the fact that the

4   Ninth Circuit has decided, and have other circuits, that there's a need

5   in cases like these, and drug cases, for expert testimony.  But that's

6   their decision.  The people that can impart this information are

7   necessarily agents who are involved in this work.

8           Does an agent who works for the government and has

9   worked for the government, in his case over 14 years, in other agents'

10  cases longer than that, who appears here as an expert witness have a

11  bias in favor of the government?  Absolutely and definitely.

12          The problem is that no one -- I have yet to see an agent

13  who comes in here and is willing to admit that.  At least in Mr. Ellis'

14  case, he admitted that.  There is -- he has some bias towards the

15  government.

16          But the testimony that he's giving is, to the best of his

17  ability, unbiased and based on information that he received over the

18  course of his experience.

19          I think those are matters that the defense will have to

20  test and that the jury is going to have to examine.  And the jury, of

21  course, will be instructed that they can judge this testimony like any

22  other testimony; that they can accept it, they can reject it, they can

23  give it as much weight as they think it deserves considering the

24  witness' education and experience.

25          With Mr. Ellis they may decide this is a street agent so I

1   don't believe he's got enough experience and I'm not going to accept

2   it.

3            So all these are matters that will be brought up and

4   tested in cross-examination.  But, generally speaking, under the rules,

5   under 702 and 703, he does qualify as an expert in this particular

6   area.

7            The court will allow him to testify as an expert witness.

8   The objections of counsel will be noted.

9            Now, Ms. Wooten, there's no question but she is a

10  scientific-type expert and she is qualified as that.  She's got the

11  education.  She's got the experience.  She's done, I don't know, how

12  many thousands of these examinations.

13           So she is an expert.  She is qualified to testify.  And in

14  terms of handwriting, clearly most people don't have any experience

15  with or knowledge about handwriting comparisons that does require

16  some expert testimony.  And it's obvious that her testimony would

17  assist the trier of fact to understand the evidence and to determine

18  facts in issue in this case.

19           I do find that she has sufficient education, training,

20  experience to act as an expert witness as to both defendants.

21           In this case I am concerned about the issue regarding

22  surreptitiously taking an exemplar and then basing an opinion on that

23  exemplar.  So that's an issue that is still out there.

24           I'm saying she is a qualified expert.  I'm withholding any

25  decisions as to whether or not she is going to be able to testify at least

1   in the case relating to Mr. Bonilla at this point.  That's a matter we will

2   decide after I hear what the government has to say on Monday about

3   how this all came about.

4           The objections to the testimony -- to these -- qualifying

5   these persons as experts in their particular fields is overruled and

6   denied.  They will be, provided the matters are clarified on Monday,

7   able to testify, at least as to Ms. Wooten.  As to Mr. Ellis, the court

8   finds he's clearly an expert as defined in the law of this circuit.

9           Anything further at this time?

10          MR. HORMEL:  Your Honor, just regarding Mr. Ellis'

11  testimony, if we could sort of frame the parameters of what his

12  permissible testimony is going to be.

13          If it's going to be about the structure of alien smuggling

14  organizations, how much the government is going to be allowed to

15  drum -- to beat the drum of fear and intimidation for which he has no

16  evidence.

17          THE COURT:  I didn't -- as to that specific issue, I did

18  not see that he had much to offer.  So that's an issue that we are

19  going to have to see when we get into trial as to how that goes I

20  think.

21          Because at this point he -- I have qualified him as an

22  expert as to the overall structure and organization and operation of an

23  alien smuggling organization.  That's where we are.  Whether or not

24  the government attempts to push it beyond that could create some

25  problems.

1        MR. HORMEL:  There's a further issue, Your Honor, that

2   has remained somewhat unresolved is the co-conspirator statements

3   that were going to be subject to foundation.

4        Obviously this witness that we have heard, now the

5   court has qualified him, readily admitted that, you know, in cases

6   where groups of persons as commodities are sold one to another, there

7   is no commonality of purpose.  Therefore, you don't have a conspiracy

8   among different groups.

9        THE COURT:  He's wrong and I will tell you why.  If

10  there is an organization moving people from Douglas -- Agua Prieta,

11  Sonora or Nogales, Sonora to the United States and they hire people to

12  recruit people for them for those acts, that is part of the conspiracy.

13       Because this conspiracy can go out and hire people and bring

14  people into their conspiracy such as in a marijuana conspiracy.

15       If a marijuana conspiracy has to move marijuana from Nogales

16  to Kansas City and they go out and hire, which they often do, people

17  who have trucking companies and they agree to do that, they're only

18  going to take it to -- they are only taking this stuff to Kansas City,

19  they don't care what happens to it after that, but at that point that

20  group was part of that conspiracy.  And the fact that they withdraw

21  from that conspiracy once they get their money doesn't change

22  anything.

23       If they are indicted, they are indicted as part of that

24  conspiracy because they were at this point in time conspirators

25  involved in that conspiracy.

1        So that's the same situation you have got with recruiters

2  in Mexico, with guides in Mexico, with people who pick up people at

3  the border and bring them into Rio Rico or Tucson to stash houses,

4  that's all part and parcel of the conspiracy.

5        MR. HORMEL:  Your Honor, I would agree, but for the

6  fact that I don't think that the idea that they were hired is the lynchpin

7  of that theory.  I don't believe that's what's going on.

8        You have an independent group that is rounding up

9  persons and then sort of the way -- they would go market and find a

10  buyer for them.  They are not operating together.  They have not been

11  hired.  They have not previously been asked to recruit this group of

12  persons.  They have done that on their own.

13        Then they subsequently, independently and without any

14  direction whatsoever find buyers for the commodity as described by

15  Mr. Ellis that they have collected.  At that point they are in different

16  organizations.  They are not working together.  They are not working

17  at the behest of anybody.  Therefore, they are not conspiring together.

18        THE COURT:  When they are turning people over to this

19  group to be transported into the United States, they are part of that

20  conspiracy at that point.  They are producing or giving people or

21  bringing people to a conspiracy to bring into the United States.  That

22  act is part of that conspiracy.

23        They may not be there in that conspiracy for more than

24  what that business transaction took place, but they are still part of the

25  conspiracy.

1          It's no different than a grower in Mexico selling his

2    marijuana to a broker down there who then brings it to the border.

3    That grower is part of that conspiracy.  You may never catch him.  You

4    can't catch the broker because nobody has any information on him.

5          But that chain starts for this conspiracy when these

6    people are brought into the conspiracy when, as he called it, the

7    commodity is brought into the conspiracy.  These people down there,

8    the recruiters, are bringing people into this conspiracy.  They are

9    bringing in the product to the conspiracy.

10          And then from there it moves to guides that bring them

11    across the border.  From guides it moves to transporters, drivers that

12    drive them into the United States.  From there it moves to the stash

13    house operators.  From there it moves to other points where they are

14    delivered to their ultimate destination.

15          But you can't compartmentalize and say, okay, hey,

16    these are independent contractors.  They are not conspirators.  They

17    are conspirators because they are working with this conspiracy,

18    whether they expect payment first, second, third, last, whatever, they

19    are part of this conspiracy because they are the people who are

20    providing the people to the conspirators who are involved in the

21    business of transporting these individuals.

22          So to me they are part of the conspiracy.

23          MR. ROMO VEJAR:  I would like to address another

24    problem that I see.

25          This expert Ellis will testify that to his knowledge there

1  are what they call "pollo" lists that are used in the smuggling of
2  human beings.
3  Would you allow him to testify that this list -- I believe
4  it's 1 and 2 are pollo lists.  Because that goes to the ultimate issue
5  before the jury, Your Honor.  And I don't think that is admissible.
6  THE COURT:  Well, I don't see how he's going to testify
7  to this particular list.  He's going to testify that there are ledgers kept
8  by conspirators that are used in their business and that's what he's
9  going to testify to.  Then I assume you're going to have people come
10  in with this list.  I don't think you will be able to show him that list and
11  say, okay, this is one of those ledgers.
12  MR. ROMO VEJAR:  That is what I'm worried about.
13  THE COURT:  I don't think you are going to get there.
14  Do you think that, Ms. Kelly?
15  MS. KELLY:  I guess I'm trying to wrap my head around
16  what the problem or complication would be with that.
17  You know, generally as we have talked about, the
18  government isn't intending to have him speak specifically on the facts
19  of this particular case.  However, the ledgers in and of themselves is
20  something that I think is distinctly different because it can be taken
21  separate and apart from the case.
22  You can look at the ledger and he can testify as to
23  whether or not these -- this particular ledger looks like other ledgers
24  he has seen, whether or not it contains what appears to be similar
25  information as is typically listed in ledgers and whether or not he has

1    an opinion as to whether or not this is in fact a ledger.

2            That is where we were going yesterday during our

3    testimony.  And we stopped --

4            THE COURT:  I tell you what, you find me a case that

5    allows me -- you to do that and you can do it.  You find a Ninth Circuit

6    case that says a witness can come in and look at a document he has

7    never seen and decide this is a ledger.  If he has seen it before and

8    now he's testifying as a fact witness, then you have more problems.

9    He's not going to be a fact witness and an expert witness in this case.

10           You do some research.  If you can find a case that says

11   that, then your problem is solved.  If not, we are going to have some

12   problems.

13           MS. KELLY:  We also have for -- Your Honor, you had

14   requested the monitored call and the exemplars we had taken to be

15   able to listen to in camera.  We had those prepared to give you.

16           In addition I wanted to kind of keep you abreast of a

17   couple of issues that I hope we don't have to involve the court in.

18           Defense counsel has provided a list of about 12 separate

19   civilian witnesses.  We have asked and requested on numerous

20   occasions for the identifying information as well as the contents.

21           I'm hoping this week we can get that from defense

22   counsel.  If not, however, there will be a motion filed and perhaps we

23   can address it on Monday.

24           In addition, if their expert -- my understanding is that --

25   we had talked yesterday about the extent of their expert witness'

1    testimony.

2              I'm understanding from Mr. Hormel that they might be

3    offering that expert to talk about human smuggling organizations as

4    well.  If that's the case, we would ask that there be disclosure given to

5    us so we can know in advance and litigate any potential issues that

6    may be in issue

7              THE COURT:  Very well.

8              MR. HORMEL:  Your Honor, I haven't noticed any

9    smuggling witness at this time.

10             THE COURT:  Well, you are running out of time.  If you

11   don't do it --

12             MR. ROMO VEJAR:  We are trying to get one.

13             THE COURT:  Then I don't know how we are going to

14   allow time for you to give your -- the matters that you have to

15   disclose for your expert, and then if there's an objection to it, how we

16   are going to have time to hold a hearing on it.

17             At some point here, you're definitely going to be out of

18   time.  And it will be untimely and not allowed.

19             MR. HORMEL:  Fair enough, Your Honor.

20             THE COURT:  Very well.  Anything further?

21             What you just handed me here is the matter dealing

22   with the -- the only thing we had pending that I was supposed to get

23   was the matter dealing with the A file and the criminal record.

24             MR. EVANS:  Yes, Your Honor.  We hope to have both of

25   those sealed envelopes to you by the end of the day.

1          THE COURT:  What you gave me here, these monitored
2    calls, what was that?
3          MR. EVANS:  Your Honor, at the time you allowed the
4    state -- the government to take the voice exemplars, you said you
5    would want to review the calls to determine whether or not they were
6    too prejudicial for the jury to hear.
7          And therefore --
8          THE COURT:  That was the testimony of Ms. Hayes?
9          MR. EVANS:  That was -- actually, that was before.  It's
10   ECF, I think, 108 or 109 where we moved to have the exemplars
11   taken.  You ordered that we have them done by Friday.
12         And as part of that litany, you said that before the jury
13   heard them, you would review them to determine whether or not they
14   were -- the voice exemplars were too prejudicial to be admissible.
15         THE COURT:  Okay.  All right.  We are talking about the
16   voice exemplars.
17         MR. EVANS:  Yes, Your Honor.
18         THE COURT:  I'm sorry.  I was off somewhere else.  Very
19   well.
20         Anything further, counsel?
21         MR. ROMO VEJAR:  No, Your Honor.
22         MR. HORMEL:  No, Your Honor.
23         THE COURT:  Thank you.  We will see you Monday at
24   10:30.
25         (The proceedings concluded at 11:30 a.m.)

1

2

3

4

5

6

7                              C E R T I F I C A T E

8

9

10

11            I, Dianne Davenport, certify that the foregoing is a correct

12    transcript from the record of proceedings in the above-entitled matter.

13

14

15

16

17    /s/  Dianne Davenport                    November 16, 2011

18

19

20

21

22

23

24

25