IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

UNITED STATES OF AMERICA, ) CR 09-2343-TUC-FRZ
Plaintiff, )
vs. ) October 25, 2010 Tucson, Arizona
YURIS BONILLA-GUIZAR and CARLOS ARMANDO CALIXTRO-BUSTAMANTE, )
Defendants. )

MOTION HEARING

BEFORE: HONORABLE FRANK R. ZAPATA
UNITED STATES DISTRICT JUDGE
405 W. CONGRESS, COURTROOM 5-A
TUCSON, ARIZONA 85701

A P P E A R A N C E S

FOR THE GOVERNMENT: MS. KRISTEN KELLY and MR. JOHN EVANS, ASSISTANT UNITED STATES ATTORNEYS.

FOR DEFENDANT BONILLA-GUIZAR: MR. PETER HORMEL, ATTORNEY AT LAW.

FOR DEFENDANT CALIXTRO-BUSTAMANTE: MR. JESUS ROMO VEJAR, ATTORNEY AT LAW.

THE INTERPRETERS: MS. MIRTHA NEBEKER and MR. CLARK FEASTER.

Dianne Davenport
405 W. Congress, Suite 1500
Tucson, Arizona 85701
(520)205-4266

Proceedings prepared by computerized realtime translation

P R O C E E D I N G S

(Call to order of court, 10:35 a.m.)

THE CLERK: Criminal case 09-2343, United States of America versus Yuris Bonilla-Guizar and Carlos Armando Calixtro-Bustamante, on for motion hearing.

Counsel, please state your appearance.

MS. KELLY: Good morning. Kristen Kelly and John Evans on behalf of the United States.

THE COURT: Good morning.

MR. HORMEL: Good morning. Peter Hormel for Mr. Bonilla-Guizar, who appears in custody, assisted by the court's interpreter.

THE COURT: Good morning.

MR. ROMO VEJAR: Good morning, Your Honor. Jesus Romo on behalf of Mr. Carlos Calixtro, who is present, in custody.

THE COURT: Good morning.

As we are winding up the last round of hearings here, the issue came up regarding the taking of a handwriting exemplar by the -- of Mr. Bonilla-Guizar outside of the process that the court had set on motion of the government over objection of defendant to have these handwriting exemplars taken.

Apparently at least the allegation was that they were taken without notice to the court or to the defendant and done so by an officer at the Federal Correctional Center.

At that time, Ms. Kelly, you stated you didn't have full

information as to how that took place. Counsel has now filed a motion to dismiss the indictment in this case alleging that it took place by the case agent calling a person down there and having them obtain the signature of the defendant.

Ms. Kelly, if you could -- do you wish to make a proffer regarding how that issue came about, what the process was, or do you wish to call a witness regarding that? Whichever way you wish to proceed.

MS. KELLY: I'll make a proffer if that is okay with Your Honor.

Just so Your Honor knows, at this point the government does not intend to use that 9-23 signature as part of Wooten's testimony or any part of the proceedings.

In terms of how it was collected, our case agent discovered that documents at CCA did not have the defendant's legal name. It had an alias, the name of Borilla, which is a name not known to the court. He had signed documents in CCA under the name Borilla.

So upon learning this, the agent asked someone at CCA to correct their records. And if it was indeed corrected, to forward a copy on to him of his correct legal name.

So although the government does believe that CCA did collect that signature for their own business purposes, we don't know for certain what their motivation was in collecting it. And so therefore we are not intending to use it for our analysis or any part of this case.

THE COURT: Well, your expert relied quite heavily on that in her testimony, my recollection, on that signature.

MS. KELLY: I have spoken to her about it. She can take that out of her testimony.

Her findings are that he wrote well before, he wrote normally, rapidly as an individual who can write can. And that when he sat down to do the exemplar, that he drew, that it was slow and it was deliberate.

She has been forwarded the signatures -- his Borilla signatures to look at, has not done so yet. But materially her findings are still the same. He was able to write and wrote rapidly previously. And that when he sat down to do his exemplars, he drew and it was slow and deliberate.

THE COURT: Very well. Let me hear from Mr. Hormel.

MR. HORMEL: Well, Your Honor, what we stated --

THE COURT: Mr. Hormel --

MR. HORMEL: I'm sorry. I apologize.

What we stated and feared on October 19, last week, was that this signature had been obtained illegally. And that was confirmed. I cited in my motion -- I quoted from Special Agent Slagle's report. This was not information that came from my client anymore. My client alerted me to this on that date and I raised it with the court immediately.

However, in my pleading on page 4, going on to page 5, are three paragraphs, indented, quoted verbatim from the report that

show very clearly that the government wanted a recent signature. They wanted it for the purposes of using it in their analysis.

When they got documents back from CCA, those weren't the right ones because there had been this issue about the name.

Now I know -- I avow to the court this Borilla has been on the record. The government refers to it as an alias. I'm not sure it's an alias.

When they have paperwork, they are made to sign it based on what the paperwork is. And for a year he had been going under that name there. Then all of a sudden it changed.

It only changed because the government asked them to change it and the government asked them to change it because they needed it changed for the purposes of their analysis.

And it's very clear from the report of investigation that the agent contacted the correctional officers and said it's the wrong name, we need the right name, go get us a right name. They went and got the right name and then they forward the right name to the document examiner.

The trail couldn't be any clearer. The misconduct couldn't be any clearer. This was an issue that was litigated in-depth and in detail before this very court. When the government first asked for exemplars, I objected.

The court knows and mentioned it already, I had issues with the way the proposal was for taking the exemplars. That was all argued, hashed out. The reason was -- the reasons were clear from

my other motion.

We sat down and had this period of time in a controlled environment here on the fourth floor where the expert fellow -- or the trained guy from the postal inspector's office came and took some samples and wrote a report.

Nevertheless, the government feels that it's okay to go send somebody to CCA and take further samples after the fact because they need it for their analysis.

You can't unring the fact that the examiner has now looked at these and has relied, as the court knows, on those signatures because they are more recent. They were the bookend, so to speak, on the prior writing and the subsequent writing. You can't do it without it.

Your Honor, I guess the only thing that is missing we don't know what role the actual prosecutor's office had in this. I'm not sure that anyone is mentioned. I don't know whether Agent Slagle was directed to do this by the prosecutor's office or whether he undertook this conduct on his own initiative.

I don't think it matters terribly in the context of the legal framework as the government's responsible for it one way or the other because it is something that is undertaken by their agent involving federal inmates that are in custody.

The most egregious thing. You have an inmate. This is a person who doesn't have any ability to refuse what the guards are telling him to do. He has no way to contact his lawyer. He has no

way to let his lawyer know what's happening.

Yet, using the power that they have over him, they extract evidence from him that they plan to use and do use in the case against him. They then provide that information to the government's expert and the government's expert uses that evidence to conduct an analysis and then to deliver damaging and incriminating testimony against my client.

It's really -- this case has had a pattern of difficult problems and I've outlined some of those in the motion. This has been -- it appears to be getting worse at this point.

As I said in my motion, it's hard enough to undertake defense work. And then when you throw misconduct into the mix, it gets well nigh impossible.

I think sanctions are absolutely in order in this case and I would ask the court to take action and to dismiss this matter.

THE COURT: Thank you.

Ms. Kelly.

MR. EVANS: Your Honor, I'll respond.

THE COURT: Thank you, Mr. Evans.

MR. EVANS: If CCA got the signature because they were correcting -- I mean, he has presented to this court his last name is Bonilla. If CCA did that so that their records reflected what the court was doing, that's their -- based upon what the agent said, this is his real name, this is his legal name, then there is the issue of: Is this their business routine?

We are not going to litigate that. I think as a business routine, we could use that signature. However, we are not going to litigate because we don't know the circumstances under which CCA actually got it and whether they wanted to do it for their business purposes or keep the name as it existed.

The larger question is we are not going to use it and our expert who can still testify.

The issue becomes whether or not --

THE COURT: You in a sense are going to use it because your expert relied on that in making the determinations that she made.

Now she is going to say I'm going to take that out of the mix here and now I'm going to make my determination without this?

MR. EVANS: Yes.

THE COURT: After she has already seen a signature, my recollection was, she relied heavily on that particular signature to reach the conclusions that she reached about the fact that very recently obviously he's writing normally and now she believes that he is drawing apparently. I don't know if that is a term of art within their -- that he was drawing letters rather than writing. She has used it already as part of her work.

MR. EVANS: You're right, Your Honor. She's informed Ms. Kelly that she's able to take that out and will still be able to testify that what she saw was drawing, that the previous signatures back from '87 were a normal signature.

The issue becomes whether or not indeed this matter should be dismissed with prejudice. I think the supreme court in Gilbert v. California really resolved that issue in terms of Justice Stewart saying that the issue -- even taking of an exemplar where the person is not represented, it is an issue for cross-examination, but it is just an objective piece of evidence out there.

THE COURT: Well, we go a little bit beyond they're just unrepresented. We go beyond going outside the order of the court. I ruled on those motions, granted the motion to take exemplars in a certain way.

MR. EVANS: Yes, you did.

THE COURT: For the government to come back because they are not satisfied with what they got and go to an agency, ask that they get signatures that they can use as part of their process, then I think that's as serious a problem as the Fifth and Sixth Amendent objections that defense has raised in this case, if not more so.

Here we have a process already established where a motion is filed, objections to the motion are filed, hearing is held, the court orders a certain process to be done and that process is circumvented.

MR. EVANS: We disagree in terms of the process being circumvented in that the only thing that was asked of CCA: This is his accurate name. You don't have it. If you need it, by your business routine, have his accurate name on the various records.

THE COURT: Why is that in any way of interest to this

agent or the government, that CCA correct their records?

If CCA is insisting on going forward -- I mean, this person was indicted. At some point he had to go before a magistrate judge and admit that was his -- what his true name was.

MR. EVANS: Right.

THE COURT: I don't understand why now it would be necessary for an agent, when we are almost at trial, to have to advise CCA to change their -- if they want to, change their records. And, by the way, that record just happens to benefit where we are going with this thing because our expert needs that signature.

MR. EVANS: Correct.

THE COURT: I don't see this just as an issue of an agent telling CCA, hey, you have a problem with your records. You may want to correct it. That is not what that was about here. I'm not buying it.

What it was about here is you needed a signature with what was purported to be his true name and that was obtained outside of the process the court set for getting exemplars -- handwriting exemplars in this case.

MR. EVANS: Your Honor, we are not going to use it. Ms. Elaine Wooten is not going to use it for purposes of her testimony.

THE COURT: Well, she's already made her -- we had this hearing specifically so I could hear these experts as to what they are testifying to and so forth. She's made her determination that he is

drawing based in large part on that signature. That was a large part of the basis of her decision.

Now for the expert to come back and tell me, oh, well, we are not going to worry about that signature, we will rely on something else, that is problematic.

The more problematic part here is that there was an act here that circumvented the court's orders on how this matter was going to proceed. There's no other way I can explain that to myself certainly hearing what happened here.

And I just find that explanation that the agent is just telling CCA, "Your records are incorrect, you might want to correct them," as not -- quite frankly, not credible. That is where we are this morning.

Well, this is what is going to happen. The court doesn't find that there is any basis to dismiss these charges against Mr. Bonilla-Guizar with prejudice based on what has happened here.

The court does find that the process employed by the government in this case to obtain a signature for purposes of handwriting analysis does violate the Fifth and Sixth Amendments because there was no allowance of the court to review those matters to see if that was an acceptable process. There was no information to counsel that was going to happen and, further, that the court finds that the process employed here circumvented the orders and the processes set up by the court.

In this case your expert will not be allowed to testify

about any of her conclusions as to Mr. Bonilla-Guizar. That is the finding of the court. And that is the sanction imposed at this point. The motion to dismiss is denied.

Other than -- one other matter that we had. I'm not exactly sure where we ended up on this other case. I'm sure it's going to come up. The issue regarding 404(b) material in this case. This is document number 100.

I don't know, Mr. Evans, or, Ms. Kelly, if you wish to respond to that.

Part of the primary problem with that is the issue regarding the testimony of the witness who is no longer going to testify about having been sexually assaulted. I'm assuming that issue is not coming in. You are not trying to bring that in since she's not going to be a witness?

MS. KELLY: That's correct.

THE COURT: The next issue we had -- I think we did speak of that. As to that, that motion, that part of the 404(b) motion is denied as moot. That will not be admitted.

The other part was issues raised by the defense as to statements made by the actual witness who will testify about what this witness saw in terms of other people being held there, the way people were being treated and so forth.

To clarify the record, that witness may testify about everything that he saw there while he was being held there. There will be, as I previously cautioned, no questions about other hostages,

other victims, other names of that nature, even other aliens, because we don't even know that these people are aliens because we don't have that information. We know he's an alien from his testimony. The jury certainly can make the assumption if he is an alien everybody else is. He will be allowed.

I don't know if we clarified that sufficiently. I don't want to get into a fight in trial over this. That witness may testify about everything that he saw while he was being held, while he was being brought in, negotiations he held with other people who recruited, who brought him into the United States, and what went on at the time that he was in that home.

That's the ruling, counsel, for the defense. That part of the motion in limine -- or the notice of 404(b), if that is 404(b), or 402, then that will be admitted.

The other thing is that counsel referred to the redacted copy of the indictment as a third superseding indictment. I don't think there's been a third superseding indictment. Counsel redacted the indictment to include only the three counts that were still applicable to these defendants. Seems to me that was in an effort to preclude any further prejudice to the defendants.

And my intent had been to use that three-count indictment that was basically a redacted indictment showing only the counts that they are on trial for.

Mr. Hormel, do you have any objection to the court using that because I do read the indictment and those count numbers

to the jury.

MR. HORMEL: I don't have any objection to the way the court reads the numbering, no.

THE COURT: You don't have any objection to what they have filed? Because, also, I send a copy of the indictment to the jury. If I'm going to send a copy, it would probably be that redacted copy rather than the one that has all the counts that brings in all the prejudicial material which you objected to.

MR. HORMEL: Of course we would object to any of that -- those previous counts that have been dismissed being presented to the jury. I don't have a problem with the redaction, no.

THE COURT: Very well.

Then, Mr. Romo, any objections to that, using that redacted copy of the indictment?

MR. ROMO VEJAR: No, Your Honor.

THE COURT: Very well. Thank you.

We are set to start tomorrow morning at 9:30.

Ms. Kelly.

MS. KELLY: Your Honor, the government this morning filed a motion to preclude defense witnesses. We spoke briefly about this last week.

MR. HORMEL: I don't have that.

THE COURT: I didn't get a copy of that.

MR. ROMO VEJAR: Neither did I.

MR. HORMEL: It's a large chunk of paperwork.

MS. KELLY: What it attaches is all the communication we have had back and forth over the past series of six months regarding witnesses.

THE COURT: Let me take a break of ten minutes. I'll have my staff print that for me and I'll take a look at it.

MR. EVANS: Your Honor, if you are going to take a break, you have the DVD of the SWAT and then --

THE COURT: That was returned or should have been returned to your staff this morning.

MR. EVANS: Then you have the DVDs of the voice exemplars?

THE COURT: Right. I've got that entire packet. I'll put that on the record. I have that entire packet here.

For the record, I'm returning that to you to preserve in case there is an appeal regarding those issues. This is the entire in camera review packet with the DVDs.

MR. EVANS: Thank you, Your Honor. Then you just need to tell us whether or not we can use them.

THE COURT: There was -- these are the -- I'm getting crossed here. These are the voice exemplars, right? We have not discussed that. We need to do that. I was just thinking about the -- what I was thinking about is issuing an order regarding the motion for disclosure. The motion for disclosure of the A file was denied and I think you should have got that in that record. We'll discuss the exemplars in just a few minutes.

I'm sorry. I overlooked that. I will need about ten minutes to read through that.

And did you see that, Mr. Romo?

MR. ROMO VEJAR: No, Judge. I think -- I said that I believe that copies will be made of this new motion, Judge. I don't have a copy.

Judge, I just want to touch on the issue of the A file. I didn't know, but apparently you ruled that it would not be shown to us. There is one problem with that, Judge. I don't know how to handle it at trial.

It is my understanding that this gentleman, the witness, was deported once and I don't know if that is in the A file.

THE COURT: I thought that was matters that you received in discovery. What I was saying -- isn't that true? You received his prior criminal history in discovery and you have also received, I guess, the information about his deportations?

MR. ROMO VEJAR: Actually, no. There is no deportation shown. It is only that he some how went back, but not showing the actual process. It makes a big difference, Judge. If he was deported and he came back, he has an illegal reentry which he wouldn't have otherwise. And I don't know if he was deported or if it was a voluntary departure or none of those.

THE COURT: In reading that A file, I assumed that those matters had been disclosed as part of the normal course of disclosure. Those were not disclosed, prior record?

MR. EVANS: His prior record, since there were no criminal convictions, were not disclosed. And the A file for Yasmin was completely disclosed. That is what we briefly talked about in one of those motions. The A file regarding Julio Lopez-Trujillo had never been disclosed because there weren't disclosable materials in there.

MR. ROMO VEJAR: Your Honor --

THE COURT: Well, the criminal -- the part of the convictions, I can't see in any way that those can be used in cross-examination of this individual, but I think that the deportations -- the fact -- the fact that he has or has not been previously deported is an issue that I think can be raised by counsel.

MR. ROMO VEJAR: Also, Your Honor, if he was ever, besides that deportation, picked up, arrested, sent back.

THE COURT: No. You are going too far there. It is just whether or not he was deported from this country for the reason you say. If he was deported then obviously -- and he faces a possible charge of illegal reentry after deportation, a felony charge, then that becomes an issue. But beyond that, other arrests where he's VRed, that just does not become an issue in that case.

MR. ROMO VEJAR: But it's relevant, Your Honor, only to the extent this gentleman has experience in coming into the U.S. through different means. And I don't know how many times he has come in. I suppose we can get that in cross-examination.

THE COURT: I suppose you could by asking him if he has ever come in before. There would be no objection to that. I think

the issue -- if he has one or more formal deportations, then I think that does become relevant in terms of his cross-examination, in terms of his credibility, because now he is facing a serious felony offense if he's back in the country again illegally following deportation.

So that has to be disclosed and he can be questioned about that.

The other issues regarding the offenses with which he was charged, some were dismissed. Others, they are misdemeanors, and they can't be used in cross-examination.

MR. HORMEL: May I add something, Your Honor?

My understanding is that there may be a misdemeanor paraphernalia conviction among those. That was my understanding from the very limited disclosure that was given. It was sort of a printout we got, a portion of a page, in the many pages of disclosure. It was my reading of that, that there was a paraphernalia conviction among those misdemeanor convictions.

Now, I don't know whether that is true or not. That is why we want to look at the A file. Also, as does the deportation, even though it may have been a misdemeanor, it has serious ramifications for possible petitions to immigrate. And, therefore, it has a serious effect on this individual's status as an immigrant or as a person who is seeking legal entry into the United States.

Other misdemeanors don't, but paraphernalia is a drug offense under the immigration laws, an extremely important and vital item, and we ought to know -- we ought to be informed whether or not

he has one of those convictions and we ought to be informed and we ought to be allowed to cross-examine on this particular item.

THE COURT: No, because we are back to this very speculative area that you are getting into that he is going to come in here and lie because at some point he's going to apply for status in this country.

And that's just -- we don't know that at this point, if that is going to happen. Obviously that is not part of what he's been promised or anything that he's been promised regarding that. So it's just speculation.

But the issue Mr. Romo raises is not speculation. A person who's deported and comes back into the country illegally faces a felony charge for illegal reentry after deportation. And that certainly is something that would go to his credibility. That's something that it's not speculative. It is the reality of it.

The issues you wish to delve into go far beyond anything that has come to fruition at this point or any suggestion that is going to happen.

I considered your motion last time you raised it and I considered that and looked at the statutes and rules and didn't see anything that would allow that misdemeanor paraphernalia, if that is what it is, into evidence at this point.

Mr. Evans.

MR. EVANS: Your Honor, just for clarification now, since there are no deportations in the A file, we have nothing to disclose.

THE COURT: Then there you have it. There are no deportations. I didn't recall that I saw them or didn't see them. But that's unfortunately where we are at this point.

MR. HORMEL: Just to clarify then, when we are cross-examining this individual, obviously the defense is going to want to get into his knowledge of his illegal status as much as we can. I don't want to fall afoul of the court's rulings here.

But I'm going to obviously have an interest in delving into this individual's motivations given the testimony he's giving. We are allowed to do that. Witness motivation and bias are obviously fair game and his previous run-ins with the immigration authorities. Obviously he's had them. We don't know what they are because we were not disclosed this information.

Obviously there must be some VRs, but I'm not sure what they are. He's obviously aware he's here illegally. And he's obviously been here before because he's got this girlfriend and now they're getting married.

How far can we get into that, Judge? I mean, is there some -- I mean, does the court want me to go for it and wait for an objection?

THE COURT: Well, you can, of course, ask him about his status here as far as being here legally or illegally. You can ask him if he has made other entries into the United States. He's going to respond to those. That's where you are going to go. That's not really -- whether he's here illegally or not illegally is not going to be

an issue. Obviously he will testify that he is. And obviously he wouldn't have been at this house had he not been. Those issues you can get into.

But, you know, in terms of going back and going into VRs and the process for that and why he was VRed and all that, that's extraneous. It's not of any moment here in this case.

As far as I can see, there have been no promises to this individual. He's not being prosecuted. So perhaps there's an unstated situation that he's not going to be prosecuted. Of course, you can ask him, "Are you going to be prosecuted for your entry into this country?"

MR. HORMEL: My understanding is the government will have sent him a letter or his counsel a letter that he won't be prosecuted for his illegal entry.

THE COURT: That I don't know. If that's the situation, then the government needs to disclose that because that's a promise as part of his cooperation.

MR. HORMEL: When I have represented material witnesses in the past --

THE COURT: If there is such a statement, that needs to be disclosed. The government needs to make sure that if that letter is out there that is disclosed to counsel.

MR. HORMEL: That would have been done by Mr. Sharda because he was the original prosecutor on the case.

THE COURT: It should be in the court file. I would think that you would keep a copy of that.

You better review your file, Ms. Kelly and Mr. Evans.

MR. HORMEL: I apologize. That begs the question then about the testimony of Mr. Goldman.

THE COURT: I still don't know how you are going to get there with Mr. Goldman.

MR. HORMEL: Can we wait and see until we are through with Mr. Trujillo-Lopez and see -- or Lopez-Trujillo and see if we have gotten the door open wide enough to get Goldman on the stand?

THE COURT: I suppose so. At this point I don't see you are going to get there, but it might happen.

Very well. Let me take a minute to look at this and we will reconvene, let's say, at 11:15. Stand at recess.

(A recess was taken.)

THE COURT: The record will reflect the presence of counsel and the defendants.

Ms. Kelly, were you going to argue your motion to preclude defense witnesses? Okay.

MS. KELLY: Yes, Your Honor. Thank you.

Your Honor, there have been three particular witnesses that have been named and stated with specificity in terms of content. One is Edlin Yucari Tinoco. They gave the address, content, et cetera. An investigator, Alex Vazquez. And, of course, the individual, Mr. Goldberg (sic), who may or may not be testifying in regards to an expert opinion on immigration.

The motion that we filed pertains to a number of other

witnesses which defense counsel and I have had numerous conversations about over the months as I've been trying to get from them content of their testimony as well as any information about them that we could use to find out more information about them.

We started having discussions back in late May. And I sent them letters over time. There just has been nothing forthcoming and nothing came in last week.

The motion that I filed has to do with a motion to preclude Maria Pina Urias, Maria Delia Francisco, as well as Armando Rascon, Jose Jesus Rascon Espinoza de Rascon, Luz Estela Espinoza de Rascon, Beatriz Eugenia Pina, Mercedes Arredondo, Teodoro Pina, as well as Yasmin Rascon Espinoza.

So the court knows a number of those people were found in the trailer when BORTAC went in and executed the search warrant. Those individuals were not interviewed. It was identified quickly at the scene who the individuals were who were the captors, who had detained our material witness, the victim in this case. Those people, of course, went off for further interviews. These people are not.

So any content of their conversations that defense counsel may be wanting to talk about, we don't know what that would be. Observations they may have had, we don't know what those are.

And defense counsel has stated they are going to describe their living condition. We don't know what that is. We don't have any specificity as to their disclosure. And, moreover, you know, we can't even sit here and talk about whether or not their testimony is

cumulative because we don't know what their testimony is.

Thank you.

THE COURT: Thank you.

Mr. Romo.

MR. ROMO VEJAR: Yes, Your Honor.

Judge, first of all, there was correspondence with previous counsel which was beginning -- and it is part of the documents that were given to you -- in February of 2010. In my response, which was done on the same day, I believe, February 5th of 2007, I provided a list of the witnesses that I believed were important and relevant to this case.

Other than that there was nothing except a single piece of correspondence from Ms. Kelly in October; October 25, 2010, in which she again rehashes the same things I had already told Munish. And that's why there was no further answer to that.

Then there is no other correspondence until this weekend when they said, "Well, you didn't respond to Ms. Kelly. Therefore, none of those witnesses will testify." And I said, "Incorrect. All of the witnesses that I disclosed to the United States many moons ago will testify." And that's it, Judge.

Again, Your Honor, what we are talking about here are my client's girlfriend and I disclosed all of the information; her name, date of birth, Social Security number and address. They are claiming I didn't give them a telephone number. Well, I didn't give a telephone number because that kept changing. I don't know her telephone

number at this point.

Yasmin Rascon Espinoza is the second witness.

I'm going over here, Judge, to this. Page 5 would be the first series of e-mails. It is page 1 at the bottom, Your Honor. At the top it says, "Trial," in handwriting.

Yasmin Rascon Espinoza we provided everything as well, Your Honor. She's one of these ladies who was in a contiguous trailer to the area and lived in that trailer but actually present and arrested at the site.

Furthermore, my understanding is that Mr. Hormel later also disclosed the information to Ms. Kelly. So that information has been on this particular witness provided at least three times.

Then there is -- that young lady's mother who is Luz Estela Espinoza Rascon who was living, like I said, in a contiguous trailer. We don't have a Social Security number for her, Judge.

Then Jose Jesus Rascon Espinoza, he also lived at the same trailer, Judge. Not only was he present, arrested, and taken in by the government, so they should have all the information necessary to make a determination, he was kept in custody for over two weeks, Judge, by -- I think it was close to two months by the government.

So all the information, they have it, Judge.

Then there is Francisco, Maria Delia and Armando Rascon. They said I did not provide the last name. It is right there, Judge. And the address. I have never interviewed those witnesses, Judge. I don't even know if we are going to present them.

We did provide their names because they were relevant because of their observations in that small compound that you saw from the information provided to you on the helicopter film that they have, Judge.

And then there is Beatriz Eugenia Pina and her young son. We provided all that information as well to them, Judge, all the information that was available to us at the time. They have the address provided to them. There is no telephone number or Social Security because there is none that I could have, Judge. That's the only reason I didn't give it to them.

I did tell them in that letter what they will testify about. The setup of the trailer. That is important, Judge. There has been plenty of testimony as to what kind of security it had, what kind of bars it had within the trailer, whether or not there was ingress and egress to the compound and the trailer. All that testimony is relevant and important. And I did provide that information to the government, Judge.

That's it, Judge. I think that information has been provided. In some cases twice. And twice by both counsel. And twice by me certainly.

And I think, Judge, that if there was a problem, it should have been brought up to this court at least a week ago rather than on the eve of trial when we barely got this motion by Ms. Kelly.

That's all, Your Honor.

THE COURT: Mr. Hormel.

MR. HORMEL: Just a couple of things, Your Honor. Let me grab everything here.

I will address Ms. Rascon first. Yasmin Rascon is a witness that I'm interested in calling. On July 7th I sent a letter to Ms. Kelly, that is not attached to the motion, in which I wrote -- at that time I didn't know her name because it had been blacked out in the disclosure.

You have to understand that most of these folks are in the police reports. Their information is in the police reports. They were at the scene. There are photographs of these people disclosed to the defense by the government.

I know it's the government's position based on their disclosure agreement that whatever is in the disclosure we are responsible for. That is notice of theirs to us. So presumably if they wanted to use Ms. Rascon, they would refer to the police report and say there you go. They would refer to the disclosure and say disclosed. Thank you very much.

Now, I wrote the letter on July 7th saying the following:

Primarily there's the young lady depicted in the purple T-shirt with long black -- primarily there's the young lady depicted in the purple T-shirt with long black hair in an unnumbered photograph disclosed by the government whose name is Yasmin but whose further biographical data was blacked out by your office for our copies of the disclosure. As a resident of the neighboring trailer, she will testify as to the noncoercive nature of the living arrangement on the premises

as well as to the relationship of your alleged victim, JJFL-C, with the Calixtro family.

Obviously that portion of the testimony is no longer relevant because that witness will not testify.

Then on August 12 they wrote another e-mail, which is not -- which is not attached to the pleading filed by the government, which said:

Ms. Kelly, as stated in my prior correspondence, the young woman Yasmin will testify as a witness. Although you probably know this already, her biographical data is as follows: Yasmin Rascon, date of birth and the Social Security number.

As you know, she will testify as to the noncustodian nature of the arrangement in the trailer and what she knew about the situation there. As this witness was interviewed at the scene of the arrest and well known to the government, I expect you have all the information you need about her testimony.

It may be there will be other witnesses.

I never -- you know, that was the end of that correspondence, Your Honor.

So as far as I'm concerned, Yasmin Rascon has -- I don't know how many times we can tell them she is going to say the people weren't being kept there against their will. That is what she is going to say. It's not particularly complicated testimony. She's going to say she lived nearby. In fact it was within just a few feet. She had contact with the folks that were there. She was there a lot. They

know all of this. It's disingenious to say they don't.

As far as the other witnesses, I included those by reference in a letter to the government stating that I intended to use their testimony as well as far as -- insofar as what they say is not covered by Mr. Romo in his direct examination.

I believe that the information that Mr. Romo disclosed to them is more than sufficient to apprise them of what they are going to say. We can't predict with complete accuracy what the witness is going to say. We don't have transcripts in advance. All the biographical information was given.

They knew already where these people resided because they had seen them and arrested most of them and had them in custody for a short period of time. So it's not like these persons are unknown, Your Honor. These are persons who were always part of the investigation that was initiated by the government itself.

It seems a little bit -- they are trying to use their disclosure agreement as a sword, Your Honor, as part of their trial strategy. I don't think that's appropriate. We have a Sixth Amendment right to present a defense and that should not be under these circumstances, Your Honor, something that is trifled with.

We have provided a fair amount of disclosure to the government; some of which -- important parts of which have not been provided in the government's motion.

Thank you.

THE COURT: Thank you.

MS. KELLY: Your Honor, the 7-7 e-mail that Mr. Hormel discussed was missed in my review preparing this motion. However, I think part of why it may have been because there wasn't a name stated as to who the individual was who would be testifying.

With that said it sounds like what they want to call Yasmin Rascon to testify about is the noncoercive living arrangements, she lived nearby, within a few feet, and she was there frequently.

My understanding then from what they're stating in terms of disclosure is that her testimony won't go any further into conversations had, specificity about conversations or statements that people made, or any other, you know, details beyond the very generic statement that Mr. Hormel stated. He said it was noncoercive and general testimony and that was as specific as the testimony would be.

So if that's what they are saying, and that is the extent of it, then the government doesn't have any objection to those vague generalities but would to any other specifics about the nature of her testimony.

As it relates to Mr. Romo and the disclosure that he has made to the government, the government has tried numerous times in talking to him to get more detail than the e-mail that is attached as attachment A to the motion we filed.

As we look at statement A, he talks about the girlfriend, Maria Pina, his client's girlfriend. And he states some very vague nonspecific statements; testify about her relationship with Calixtro and about living with him. She's going to describe the situation at the

address where the search took place.

Well, what situation? What specifically is she going to talk about? What did she see? Did she see any of the victims there? The victim in particular, Julio?

She's going to describe her relationship with, it says, "your two victims." At this point I would assume it's just Julio. What relationship? What are the details of that, the specifics? Did they have a conversation?

I mean, we just don't have any details about what she's going to testify about. That's what I've been trying to get from defense counsel over time and why I raised the question again last week here thinking he would be able to comply with the letter we had written and come up with some more details.

He then states Yasmin Rascon Espinoza's name, but there's no details, nothing, what she is going to testify to.

What we go back to is what Mr. Hormel disclosed. We don't have anything about what Mr. Romo intends to use her for.

Luz Estela Espinoza.

We go to number 4. Jose Jesus Rascon Espinoza de Rascon. He states an address and makes some very vague generalities. Observations of the home. Where Calixtro and Yasmin lived.

What about the home? What observations? What details? What information? How does that individual know of that information? Did he ever go there before? We don't know.

About how the victims were treated. Freedom of movement. Nothing specific. How were they treated? How was there movement infringed or not infringed?

I don't know if Mr. Romo has interviewed these people and knows of these details or hasn't gotten there yet. The government certainly has a right to know here the day before trial and we have tried to work with him to obtain this information, but it hasn't been forthcoming.

In addition, Francisco, Maria Delia and Armando Rascon, the same. They lived where Calixtro was, this trailer. A statement about their observations. Again, the government's left wondering what observations because we don't have any details.

The list goes on and the issues are still the same. Vague statements about observations, no specificity as to what observations. And freedom of movement but no specificity as to what freedom of movement is infringed or not infringed.

So with that, Your Honor, we are really at a loss, and you know, the government has just as much of a right to understand pursuant to the agreement that we made with defense counsel what their witnesses who they intend to call are going to testify.

Here we are 24 hours out from trial and we have no information. So we would again echo or motion to preclude those witnesses based on the complete failure of any disclosure for what they are going to testify about.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Romo.

MR. ROMO VEJAR: Your Honor, we provided the information that we thought was necessary for the government to then, with all the resources they have, if they wanted, go and interview these witness. I assume that is what they wanted the information for and investigate the witnesses as well.

As far as I'm concerned, there has been no effort whatsoever to interview any of these witnesses. Now to come the eve of trial -- and I don't know exactly what they are going to say, I don't know what freedom of movement is, and demand that we construe every word and everything, I think it's unfair, Judge.

I don't think that the agreement that we signed -- this is the first time, Judge, that the agreement has been used in this manner during the entire time that I've been practicing in federal court. I haven't had any problems with any witness with the lack of details and specificity as I provided to them.

THE COURT: Thank you.

The court finds that there was an agreement to -- for disclosure entered into by both counsel in this case on behalf of their clients.

The court finds disclosure as to Maria Pina Urias does -- the agreement -- the disclosure minimally meets that agreement and that person will be allowed to be called as a witness. They will not be precluded.

Yasmin J. Rascon Espinoza, also the information provided as to her minimally meets the requirements of the agreement and she will be able to testify.

Luz Estela Espinoza Rascon, I cannot find there is any disclosure that minimally meets the requirements under the agreement. That person will be precluded.

Luz Estela Espinoza Rascon will be precluded based on the failure of defense to comply with the agreement to give information regarding witnesses as part of their disclosure agreement with the government.

Jose Jesus Rascon Espinoza, let's see, that -- the information as to these folks is -- it's all lumped together here. It's very difficult to tell who's going to say what. Yasmin -- it's a little bit clear as to her. Jose is the individual apparently that was arrested by the border patrol as -- who never made the search as part of this.

Clearly they had access to him, knew who he was, and given the minimal disclosure, then he will be allowed to testify.

Francisco, Maria Delia and Armando Rascon, the court did not find there has been any disclosure that would minimally meet the requirements of the agreement so they will be precluded.

Beatriz Eugenia Pina, apparently the mother of the -- there's been disclosure that will minimally meet the requirements. She will be allowed to testify.

The juvenile apparently with the T and P initials, same address as Beatriz, there's no information provided as to that person

and they will be precluded from testifying, whoever that person is. T blacked out name, P blacked out the rest of the name.

Mercedes Arredondo, again, there is no information that would minimally qualify or meet the requirements of the disclosure agreement. That person is precluded from testifying.

That's the rule of the court as to the witnesses who will or will not be allowed to testify based on the agreement between the parties, the disclosure agreement. Some meet those requirements and those that I stated do not.

In terms of the witnesses that Mr. Hormel specifically is calling as witnesses himself, Edlin Yucari Tinoco, Alex Vazquez and Mr. Goldman, Mr. Goldman it's questionable whether or not there will be basis to introduce his testimony. The other two individuals -- all three individuals I think they've met the requirement on those.

So those are the rulings as to the government's motion to preclude witnesses. Granted in part, denied in part.

The next issue we have is the issue regarding the voice exemplars.

Mr. Evans, that was your matter. I did review that, but I do have some questions about it. If you would please come forward.

How did the government propose to use the exemplars? What's your -- how will you employ them in this trial?

MR. EVANS: Your Honor, the proposal of the government is that they would -- we would introduce through a witness that these voice exemplars were taken, they would be

introduced as an exhibit, then we would just leave it up to the jury to decide whether or not they recognize these voices in the monitored phone call which is the only sample of the co-conspirators' statements that we have.

At this point unless -- we may change about whether to have Karen Lopez hear these exemplars. We have not had her listen to them yet to see if she recognizes any of these voices because she had a number of phone calls with a number of co-conspirators. We haven't decided whether that is -- primarily it would be introducing evidence. And the jury, if they wanted to, could listen to it to make their own decision.

THE COURT: This is the woman that is the wife of your witness?

MR. EVANS: Yes, Your Honor.

THE COURT: In your testimony your witness is going to testify that a certain person -- as to that, he's going to testify as to his part of that conversation that was tape-recorded, the monitored call?

MR. EVANS: Yes, Your Honor. He will testify as to his portion who was there, who he saw speaking.

On the monitored phone call, as the court may have heard, there's the initial person that answered the phone. Then our victim gets on the phone. And then an English speaker gets on the phone. He will identify who the initial English speaker was.

In subsequent phone calls, which are not recorded, the victim is brought there every time to talk to his wife and he will, to the

best of his knowledge, identify who was talking and who wasn't talking.

The issue would be whether or not we had Karen look to these exemplars and say whether she identified any of those voices as ones she heard.

THE COURT: Very well. Let me hear from Mr. Hormel first.

MR. HORMEL: Well, Your Honor, if we want to talk about late disclosure, let's talk about the fact that they haven't even asked these people to listen to these recordings yet. We don't know whether there are going to be identifications made.

This is sandbagging to the degree that is absolutely -- we are here on the day before trial and they are proposing to present testimony that hasn't even -- they don't even know what the answers are going to be.

They are going to have witnesses listen to things and make possible identifications. Those identifications needed to have been done already even to consider them at this point. I mean, what's going on here is extremely prejudicial.

You are going to put a witness on the stand, put them under pressure and go, "Do you recognize this voice?" We don't know what they are going to say. They haven't made any statements. The government has had a year with these individuals to attempt to make these identifications.

We don't have any RORs, any information at all as to

what they are going to say. We don't know what the identifications are going to be. We don't know who will identify -- what speaker will identify what exemplar.

These exemplars were taken in the beginning of August. They have had plenty of time to establish these identifications. They can't on the eve of trial come in and say, okay, well, we haven't done this, but we will go ahead and do it in trial. That's trial by ambush.

That's not what -- you know, at a bare minimum, 14 days ahead of trial by the agreement that we have had -- we've had to live with. They ought to be able to live with us as well. They cannot at this point come in and ask to present things that are unknown at this point. These are unknowns.

And so any ID that may or may not have been made or may be made in court should not be allowed because it hasn't been disclosed. It hasn't been done, disclosed. The work hasn't been done.

Your Honor, I referenced this is my motion earlier. It's extremely difficult to prepare a case of this nature anyway. Once this stuff starts happening and we don't even know what's going on, it's like stumbling around in a house where the electricity has been cut off at night. We bump into things and here and now we are going to hurt.

At the very least, we need to know what's going on. What the government is proposing, the testimony, is unknown. It's an unknown and therefore should not be allowed.

THE COURT: Mr. Romo.

MR. ROMO VEJAR: Additionally, Your Honor, with regard

to these voice exemplars, they are very suggestive, Judge. We don't have three or four voice exemplars of three or four different people in addition to my client. We have a single one in English. A single one with broken English. Then we are saying, "Well, do you think that's the one?"

It is the same as if we were showing photographs, to show a single photograph and say, "Do you believe that's the defendant?" It's the same thing with the exemplars.

If they were going to do something that was going to be admissible and scientifically good, Your Honor, they should have done more.

I think it is very, very suggestive and very prejudicial.

That's all, Your Honor.

MR. HORMEL: I would incorporate those remarks by reference.

MR. EVANS: When I began my remarks, I said primarily it's for the jury to decide. And that's really what is there. The fact that we haven't attempted to influence our witnesses at all, ask them, "Do you recognize any of these voices?" to put any pressure on or to say, "I do," or, "I don't."

The decision whether we use them or not hasn't been made yet because it's a strategic issue. We would like to present them to the jury to listen to this and also listen to the monitored phone call is the larger picture and there is no -- as the court recognizes, there is no scientific methodology for voice exemplars that

has met the standards of Daubert.

Therefore, it's what you hear. And --

THE COURT: Well, I can see you introducing those exemplars, but I'm having trouble at this late date with somebody coming in and making an identification to the jury that it was this person.

MR. EVANS: Then we won't do it.

THE COURT: I think it's too late in the process to do that, to disclose witness X will identify this defendant as being on that tape.

I don't have a problem with those being played as part of the monitored phone call and let the jury decide whether or not they can tell.

Of course, counsel can cross-examine as to the process that they came about; where in fact it sounds like somebody is whispering off -- not on the phone call itself. You can hear the person whispering, telling the defendants what to say, say this and that and the other. They can go into that whole process.

And that goes, I think, to the weight that the jury could give that evidence, not to its admissibility.

So the monitored phone calls will be admitted to be played to the jury -- I'm sorry. Voice exemplars will be admitted to be played to the jury. The court finds they are relevant. Their probative value is not outweighed by any undue prejudice to the defendants.

The defendant -- counsel for the government will not be

able to elicit from any witness at that -- this late date identifying one of the two defendants being the person on that phone call.

MR. EVANS: Two other matters that came up during the hearing.

One is regarding Mr. Hormel's request for the standard letter that went to the witness saying, "We are not going to prosecute you." We have looked through our file. We can't find it.

The attorney for the material witness can't find it either in her file. Although, it would seem it is the course of conduct of our office to do that. The fact it hasn't been disclosed is somewhat problematic. If we find it, we will disclose it immediately.

The second issue is that I need to advise counsel that Julio Cesar Lopez-Trujillo was brought down. We went through his testimony. An ROR was done. It was prepared over the weekend. And it will be disclosed sometime today. It just got done.

THE COURT: Very well. Thank you.

MR. ROMO VEJAR: Judge, may we be heard on those things?

THE COURT: You may be heard.

MR. ROMO VEJAR: Well, Your Honor, with regard to the letter, Judge, attorney for the witnesses is here. I'm sure she's got the letter because that's what we do. We get a letter. Probably malpractice not to do that. It's a matter of finding out.

With regard to the late disclosure, Judge, I think that should be inadmissible, Your Honor. We cannot at the eve of trial, in

any trial, but especially of a trial of this nature, be waiting for the last and latest disclosure to be made. We had disclosure done within the last three days, three or four disclosures done by the government.

To say, well, we are less than 24 hours from proceeding to trial and we are going to send some further disclosure and that should be admissible, I think it should not be, Your Honor. I think it is in violation of the agreement and certainly unfair and prejudicial to the defense.

That's all, Your Honor.

THE COURT: Thank you. Your objections are overruled.

In terms of the -- counsel for the government will need to check with counsel again for the defense. It's possible that for whatever reason that letter was not sent if it's not in either file. Generally there is a practice that this type of an agreement be made.

If that was the practice and that was communicated to the defendant, which one would assume it was, then that has to be disclosed to the jury that in fact there was that agreement made.

Although, there's nothing to memorialize it at this point for reasons unknown to anybody, that needs to be disclosed through the witness if necessary. If not, then by calling his attorney to testify that in fact there is an agreement that he would not be prosecuted, which is the standard agreement if he agreed to testify. He would not be prosecuted for his involvement in this case, his illegal entry or reentry whichever it is.

So you have to work that out somehow either by

subpoenaing his lawyer or by exacting that or extracting that statement, information from the defendant himself -- I'm sorry -- from the witness himself.

That's where we are. We will start jury selection at 9:30 tomorrow morning.

Anything further?

MR. EVANS: No, Your Honor.

MR. HORMEL: No, Your Honor.

THE COURT: Thank you then. See you tomorrow at 9:30.

(The proceedings concluded at 11:55 a.m.)

C E R T I F I C A T E

I, Dianne Davenport, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Dianne Davenport                November 16, 2011