1

1    IN THE UNITED STATES DISTRICT COURT

2    DISTRICT OF ARIZONA

3

4    UNITED STATES OF AMERICA,        )
                                      )    CR 09-2343-TUC-FRZ
5              Plaintiff,             )
     vs.                             )
6                                     )    October 27, 2010
     YURIS BONILLA-GUIZAR and         )    Tucson, Arizona
7    CARLOS ARMANDO CALIXTRO-         )
     BUSTAMANTE,                      )
8                                     )
               Defendants.           )
9

10                    JURY TRIAL - DAY 2

11

12           BEFORE:  HONORABLE FRANK R. ZAPATA
                UNITED STATES DISTRICT JUDGE
13              405 W. CONGRESS, COURTROOM 5-A
                   TUCSON, ARIZONA 85701

14

15                  A P P E A R A N C E S

16        FOR THE GOVERNMENT:  MS. KRISTEN KELLY and MR. JOHN
     EVANS, ASSISTANT UNITED STATES ATTORNEYS.
17
          FOR DEFENDANT BONILLA-GUIZAR:  MR. PETER HORMEL,
18   ATTORNEY AT LAW.

19        FOR DEFENDANT CALIXTRO-BUSTAMANTE:  MR. JESUS ROMO
     VEJAR, ATTORNEY AT LAW.
20
          THE INTERPRETERS:  MR. DEREK SULLY, MR. JUAN CARLOS
21   CORDOVA and MS. BEATRIZ SENOR.

22
                       Dianne Davenport
23                  405 W. Congress, Suite 1500
                      Tucson, Arizona 85701
24                       (520)205-4266

25        Proceedings prepared by computerized realtime translation

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WITNESS INDEX

WITNESS                                                              PAGE

MICHAEL GUERRERO

Direct Examination by Mr. Evans                                       19
Cross-Examination by Mr. Hormel                                       22
Cross-Examination by Mr. Romo Vejar                                   23

JULIO CESAR LOPEZ-TRUJILLO (Filed separately)

EXHIBIT INDEX

EXHIBIT                                        OFFERED RECEIVED

53                                                21          21
54                                                21          21

MISCELLANEOUS

PROCEEDING                                                           PAGE

Pretrial Matters                                                      3
Government's Opening Statement                                        5
Defendant Bonilla-Guizar's Opening Statement                         14
Defendant Calixtro-Bustamante's Opening Statement                    16

1               P R O C E E D I N G S

2               (Call to order of court, 9:50 a.m.)

3               THE COURT:  The record will reflect the presence of

4       counsel and the defendants, the absence of the jury.

5               Before we bring in the jury to start our opening

6       statements this morning, I want to make a change on a ruling that I

7       made yesterday.

8               The ruling dealt with whether or not the agent or agents

9       that found the document that has been referred to as a ledger could

10      refer to it as a ledger.  My ruling went too far by saying they could

11      not.  With the proper foundation by the agents, they may refer to that

12      document as a ledger.  That part of my ruling is amended.

13              If we could have the jury.

14              (The jury was seated.)

15              THE COURT:  The record will now reflect the presence of

16      the jury, counsel and defendants.

17              Good morning, ladies and gentlemen of the jury.

18              We didn't quite hit our mark.  We were running a little

19      bit over with the hearings that I had.  As you know, as I told you

20      yesterday, I have a number of hearings that take place before we

21      start.

22              It's not the lawyers' fault.  It's my fault.  I'm running

23      late.  This morning I had five hearings starting at 8:30 before we got

24      to the trial.

25              In reference to those things, I'm going to advise you of

4

1    one thing.  Nothing that I may say or do at any time when this trial is

2    ongoing should be taken by you as any suggestion as to what verdict

3    you should return because that's a matter entirely up to you.

4             The reason I tell you that is two weeks ago we were in

5    trial.  I have a lot of cases that are constantly changing and setting for

6    hearings and so forth.  I'm looking at that computer over here where I

7    get that information.

8             And one of the jurors said that I was shaking my head as

9    though saying no to something that somebody was saying.  I was

10   looking at my computer screen.  It had nothing to do with that.

11   Therefore, if you see me shaking my head, it has nothing to do with

12   this case or nodding, whatever I'm doing.

13            It's because I'm seeing something come up on my

14   computer screen about a case that is being continued or changed and

15   I'm either agreeing with it or not.  And it has nothing to do with what

16   is going on in this case.

17            The decision as to the verdict is entirely for you to

18   decide and nothing I may say or do while I'm sitting here is intended

19   to influence you nor should you take it as intending to influence you in

20   any way.

21            We are going to start now with -- the trial will now

22   begin.

23            First, the government will make an opening statement

24   which is simply an outline to help you understand the evidence as it

25   comes in.

1          Next, the defendants' attorneys may, but do not have to,

2    make an opening statement.

3          Opening statements are neither evidence nor arguments.

4          Then the government will present its witnesses and

5    counsel for the defendants may cross-examine them.

6          Following the government's case, the defendants may, if

7    they wish, present witnesses whom the government may

8    cross-examine.

9          After all the evidence is in, the attorneys will present

10   their closing arguments to summarize and interpret the evidence for

11   you.  The court will instruct you on the law.  After that you will retire

12   to deliberate on your verdicts.

13         So our first step will be to start with the opening

14   statements.

15         Ms. Kelly, are you going to make the opening

16   statement?

17         MS. KELLY:  Yes, Your Honor.

18         "This isn't a joke.  If you don't get us the money, we are

19   going to blow your head off."

20         Those were the words of the defendant, Carlos Calixtro.

21   He and his codefendant, Yuris Bonilla, were enranged.  They were

22   enranged because of Julio.  Julio, a man that they had held captive,

23   held hostage, for over three days, he didn't have any money.  The

24   defendants had demanded from him $2,300.  Julio and his family

25   didn't have any money.

1     The defendant Bonilla stood, he pointed a semiautomatic

2 handgun at Julio's chest.  That handgun was fitted with a laser so

3 when it pointed at something, what it pointed at showed a red dot.

4 Julio looked down and he could see on his chest that red dot.  That's

5 when the defendant Calixtro said those words I just told you.

6     "This isn't a joke.  If you don't get us the money, we're

7 going to blow your head off."

8     I want to take you back in time, back to two weeks

9 before this incident.

10     Julio lived and worked here in the United States.  He

11 lived in Mayer, Arizona with his girlfriend, Karen.  Julio worked at a

12 tire company.  And Karen was a school bus driver.  Julio lived and

13 worked here in the United States, but he was here illegally.  He was a

14 citizen of Mexico.

15     In early September 2009, the authorities found out that

16 he was here illegally.  So Julio agreed to return to Mexico.  He boarded

17 a bus in Mayer and he went back to Nogales; Nogales, Mexico.  He got

18 there and he lived with some friends for a few days.  He was going to

19 get a job and start working.

20     That's when he met a man by the name of El Pelon he

21 met through some friends of friends.  El Pelon was a taxicab driver

22 down in Nogales, Mexico.  El Pelon told him that he knew some

23 friends, some people who could smuggle him back into the United

24 States.

25     El Pelon befriended him and told Julio that the two of

1    them were actually from the same remote part of southern Mexico.

2    And he said, "For you I have a special deal."  He says, "Typically it

3    costs $1,500 to be smuggled back into the United States and you have

4    to pay right when you get there.  But for you, Julio, for you I have a

5    special deal."  Or so El Pelon told Julio in Mexico.

6            So El Pelon drove Julio to a house in Nogales, Mexico,

7    told him to go inside.  He said, "You're in good hands."  Inside Julio

8    met up with other individuals who were going to be smuggled into the

9    United States.  And within a couple of days Julio was hiking through

10   the mountains in Nogales, Mexico.

11           There were five men.  Five men being led by two guides.

12   Two men from that house were guiding them through the mountains.

13   And for four days they hiked and they hid.  Then they made it into the

14   United States.

15           As they approached a road, a car was there.  And there

16   was a man that Julio came to know as Flaco.  That is what he was

17   called, skinny guy.  He was the driver.

18           And Julio was directed into the back of that car.  Flaco

19   drove.  As they drove north to Tucson, Flaco kept directing Julio, "Get

20   down, get down."  He would tell the other men in the back of the car,

21   "Get down, get down."

22           And then they came to a stop at a gas station just

23   outside of Tucson.  It was at that gas station that Julio for the first

24   time saw the defendant Bonilla.  The car pulled up, Bonilla got out.  He

25   approached the driver's side window of the car that Flaco was driving,

1   the car that Julio was in.  Bonilla said to Flaco, "Follow me."  And Flaco

2   did as he was told.  In the car Flaco was driving, he followed Bonilla,

3   the defendant, driving his car.

4              They drove to a trailer.  Once they arrived at that trailer

5   inside of a trailer park, Flaco and Bonilla ordered the men out of the

6   back.  They told them to look at the ground, walk straight ahead.

7   Once they got into the trailer, Julio was directed into a room.  He was

8   directed into that room along with the men that he had been smuggled

9   over the border with.

10             When he got into that room, that bedroom, he realized

11  they weren't alone in that room.  Because inside that room there were

12  also two men.  Two men that were there before Julio arrived with the

13  men he was smuggled with.  And those two men that sat in that room,

14  they were naked.  All they had on were their underwear.

15             That's when Julio saw the defendant Bonilla again.  He

16  showed up in the doorway of that room.  That room that Julio was kept

17  in didn't have a door.  It had bars on the windows.  And the defendant

18  Bonilla walked into the doorway and he pulled out of his pants a gun,

19  semiautomatic gun, black and gray.  And he pointed it one by one at

20  each of the men.  And one by one each of the men had a red dot light

21  up on their chest.  The men were told they couldn't leave and that

22  night Julio didn't sleep.

23             The next morning one by one those men in that room

24  were taken out of the room and into the living room.  You're going to

25  hear about this trailer.  It's very small.  So the bedroom that the men

1   are held in is right adjacent to the living room.

2   And one by one Julio could hear as those men were told

3   they had to call their families and they had to get money for their

4   release.  And then Julio was taken out of the room and into the living

5   room and he was told to make the same call, that he had to demand

6   $2,300 from his relative for his release.

7   So he picked up the phone and he called Karen.  Karen,

8   his girlfriend, was in Mayer, Arizona.  She didn't know Julio had

9   arranged to be smuggled back into the United States.  She didn't know

10  Julio was in the United States.  Julio got on the phone with her and he

11  apologized.  He knew that she didn't have any money.  He knew that

12  he didn't have any money.

13  One by one over the next couple of days the men were

14  taken out of the room and directed to make calls.  The defendant

15  Bonilla and the defendant Calixtro had guns.  They pointed those guns

16  at Julio and they threatened that he was going to be killed if he didn't

17  get the money.  Then Julio was sent back to his room.

18  Thankfully Karen, Julio's girlfriend, she's a United States

19  citizen.  So when she started receiving these calls from Julio, she

20  picked up the phone and called the police.  The police connected Karen

21  with ICE, Immigration and Customs Enforcement.  They directed Karen

22  to drive down from Mayer, Arizona to Phoenix.  Karen did.  She met

23  with an agent, Special Agent Michael Guerrero.

24  His job, his assignment is to record what's called a

25  monitored phone call.  The purpose of that call is to get on the phone

1    the person that's being held hostage and have the family member talk

2    to that person.  They are trying to establish proof of life to make sure

3    that the hostage is in fact alive, to make sure that the hostage is in

4    fact being held against their will, threatened.

5                So you will hear that monitored phone call.  They

6    recorded that call.

7                Over the next couple of days, the situation inside that

8    trailer changed.  The defendants grew increasingly angry, less patient,

9    and the situation became intense.

10               After that monitored phone call happened, ICE agents

11   here in Tucson were dispatched.  What they had done is they

12   contacted the phone company.  They contacted Sprint.  And Sprint,

13   using their special software, can identify within about ten feet the

14   location of where that phone was, the phone that Julio was speaking

15   on to Karen.  And they identified that location, 9950 South Oak

16   Canyon Lane.

17               It's a trailer park on the southeast side of town.  It's

18   southeast of the airport.  It's adjacent to a huge desert area.

19               And Special Agent David Slagle was sent out to that

20   trailer park.  His job was to take a look around.  He didn't see anybody

21   walking around.  But what he did see on that lot, that particular area,

22   was a compound of five trailers.  And he was able to identify the one

23   that he thought Julio was probably in because of the GPS coordinates

24   he was given from Sprint.  He took that information and he brought it

25   back to a special SWAT team.  It's a federal SWAT team called

1    BORTAC.  You're going to hear from them.

2             As the hours of that day progressed from the late

3    afternoon into the early evening, the situation inside the trailer

4    became more intense.  The defendants were becoming suspicious.

5             They knew that Karen, the woman that Julio had been

6    speaking with on the phone and that they had been speaking with on

7    the phone, you'll hear their voice, you'll hear Calixtro's voice in that

8    one monitored call, they knew that woman was a white woman and

9    they also knew that they hadn't received the money.

10             And at that point, Julio was the only person remaining

11   who they hadn't been given money for.  The only person they still had

12   captive.  So they were becoming suspicious.

13             They took from Julio his clothes.  And they threatened to

14   kill him again.  They gave him the phone and ordered him to call

15   Karen.

16             Karen, after talking to Julio, now knowing that his

17   clothes had been taken and that he felt, based on the defendants'

18   threats and the guns, that they were just about to kill him, she called

19   the police and the police went in.

20             You're going to see it.

21             First you're going to hear from the commander of that

22   BORTAC unit.  You're going to hear from commander Sean Coldiron.

23   He's going to tell you about the mission.  He's going to tell you about

24   how his men armed with night vision goggles descended upon the

25   compound and went into the trailer.

1          You're going to see how they used two flash bangs.

2    Flash bangs produce a flash and a bang.  And what they do is they are

3    basically a loud, bright noisemaker that makes everybody around

4    them just freeze and stop.  You'll see those flash bangs.  And then you

5    will see the SWAT team go in.

6          Members went to the right of the trailer and members

7    went to the left.  The agents that went to the left found Julio

8    immediately in that room, the room where he had been held for over

9    three days.  He was in his underwear.

10         Those that went to the right, they found the defendant

11   Bonilla and his women.  There were also children in that trailer, two of

12   Calixtro's children, two children under the age of five.

13         The agents rescued Julio.  They brought him out.  And

14   the agents arrested Bonilla.  You will hear that the women and the

15   children were initially detained at the scene, but after interviewing

16   Julio, those women and children were released.

17         ICE agents went into the trailer.  They found the two

18   guns, that black and silver gun with the laser light on it and another

19   semiautomatic handgun, black gun, both hidden in the trailer.  They

20   found the ammunition for those guns.

21         And they also found a ledger.  You will see it.  That

22   ledger had names, it had phone numbers and it had numerical

23   amounts.

24         You will hear from an expert in this area who will talk to

25   you about how those ledgers are records that are kept by these

1   smuggling organizations.  They are kept to detail the money that has

2   come in, the money that's going to go to pay El Pelon, to pay Flaco, to

3   pay the guides who guided Julio through the mountains, to pay the

4   defendants Bonilla and Calixtro.

5              For over three days, Julio was held hostage inside that

6   trailer.  The defendants threatened to kill him if he didn't produce

7   $2,300.

8              The evidence in this case is going to come from that

9   witness stand.

10             The defendants are charged with three crimes.

11             The first is taking Julio hostage.  The government will

12  prove to you that Julio was seized.  He was detained in that trailer.

13  That he was threatened.  That they were going to kill him.  That the

14  purpose for the defendants doing that was to make somebody pay for

15  his release.

16             The defendants are also charged with conspiracy to

17  commit hostage taking.  It's a separate crime.

18             And what that means is that the defendants together, or

19  with somebody else, agreed to commit the crime of hostage taking, to

20  seize and detain Julio, to threaten to kill him and get somebody to pay

21  for his release.

22             Lastly, the defendants are charged with harboring Julio.

23             And the government will prove to you that Julio Cesar

24  Lopez-Trujillo is in fact not legally present, was not legally present in

25  the United States.  He didn't have permission to be here.  The

1    defendants knew that and they concealed him for the purpose of

2    making sure he wasn't found.  When they did that, they jeopardized

3    his life.

4         The evidence will come from the witness stand.

5         And at the close of this case, the government will ask

6    you to find the defendants guilty on all counts because, based on the

7    evidence that will come from this witness stand, as sure as you are all

8    sitting here today, they are.

9         Thank you.

10        THE COURT:  Mr. Hormel.

11        MR. HORMEL:  Good morning, ladies and gentlemen.

12        September 24, 2009 a battalion of armed and armored

13   men stormed a single wide trailer south of town.  We are talking about

14   a group that included a helicopter.  There's an armored vehicle with a

15   turret, more like a tank.

16        We are talking about an eight-man hostage rescue team,

17   a six-man perimeter team, five-man second tier team.  Something

18   called a PMO team that provides what's called realtime intelligence.

19   We're talking about something called a PHA team.

20        All of these descending on this neighborhood south of

21   Tucson.  By my count in the neighborhood of 25 or 26 men, armed and

22   armored gear, and they stormed a couple of single wide trailers.

23        In addition to Yuris Bonilla and Julio Lopez, the person

24   that the government referred to, they successfully took into custody

25   four women, a teenaged boy, two infants and three other guys.

1    Now, we're going to spend the next few days listening as
2    the government tries to justify all of this.  And what you will find is
3    that all of the evidence of all of these horrible things that they say
4    happened is going to come from people who were inside of that trailer
5    or from Ms. Hayes, who was apparently in Mayer or in Phoenix,
6    Arizona.

7    When the government got there and when this battalion
8    of armed fellows showed up at the trailer, there was only one person
9    at that trailer.  You know, you heard reference to six or seven different
10   people being smuggled in all of this, different things that supposedly
11   happened.  We only know of one.  And that's the person that was
12   found when they got there.

13   They mentioned a monitored phone call.  You heard a
14   quotation at the beginning of the government's opening statement,
15   but the monitored phone call contains no threats.  That is why you
16   didn't hear anyone say anything about threats.  The only phone call
17   they have doesn't contain any threats.

18   Now, the next few days the government has got to try to
19   convince you of everything that they just promised you that they will
20   be able to show about what happened in that trailer beforehand.

21   And they are absolutely right.  That evidence will come
22   from that witness stand right there.  And I ask you to pay close
23   attention.

24   The government has made serious promises to you
25   today.  They have told you about some very egregious conduct they

1   think they can prove.  I'm going to ask you to pay close attention to

2   what the witnesses say, what their motives might be, what their

3   biases might be, what their level of involvement was, what they

4   actually saw and what they actually participated in.

5            There will be other witnesses that come in and give

6   opinions from the government.  There will be other witnesses that

7   come and state what they think.  Please compare that to what you

8   hear about what actually happened.  Please compare that to what we

9   know about what happened.

10           And for your attention and for your diligence in coming

11   down here, I will thank you in advance.  I will keep it brief this

12   morning so we can get started.

13           Thank you.

14           THE COURT:  Mr. Romo.

15           MR. ROMO VEJAR:  Thank you, Your Honor.

16           Ladies and gentlemen of the jury, good morning.  My

17   name is Jesus Romo.  I represent Mr. Carlos Calixtro, who is sitting at

18   the end of the table here.

19           Now, you are charged by the court and by the

20   constitution to do a solemn duty, a very important one.  Other than

21   serving in the armed forces of the United States, I cannot think of a

22   single more important duty than to serve as a juror.

23           Your job is to process and discern the truth.  And we are

24   here to help you do that.  The government is here to help you do that.

25   They must abide by that.

1       And I think it is very important that as you are

2   attempting to do that, that you are not suddenly surprised by the

3   testimony of people who come over and give you their opinions that

4   may not amount to factual circumstances.

5       Or as the people that were at the trailer, there were

6   some bombs that were suddenly thrown and the impact of the bomb

7   was such that they were stunned and couldn't move.  The purpose of

8   that was for the police to come in and do their job.

9       Well, we don't want you to be stunned by anything.  We

10  want you to keep a cool and discerning mind so that you are able to

11  sort out the facts and to keep an open mind and give the defendants

12  the benefit of the doubt.

13      You are charged by the constitution and by the court

14  with that.  You are told at the very beginning that my client is

15  presumed innocent.  And that presumption is as if you were sitting,

16  let's say, with your sister someplace and someone came over and said

17  that -- or your brother and said that there was a stolen wallet and they

18  looked at your sister as if she were the guilty party at that place.

19      You would indeed presume that your sister didn't do it.

20  And that is the kind of presumption that you must keep while you are

21  hearing the evidence in this case.  And that presumption must be kept

22  throughout the case.

23      It is, as the court has told you, the government who is

24  charged and who has the burden of proving each and every element of

25  this case.  They must give you and prove those elements with facts,

1    not with opinions, not with conjecture, not with similarities, but with

2    factual circumstances, with definite factual circumstances.  And that

3    must be done, that proof, beyond a reasonable doubt.

4           And I think that is very important because we all have

5    the tendency to have our own prejudices of daily life come over and

6    take over the circumstances of judging the facts.  And we must put

7    those aside.

8           This is not a policy case.  This is not the circumstances

9    where you are going to decide what goes on at the border or what

10   must be done with immigration.  Rather, it is the circumstances of

11   discerning factual circumstances so that you can reach a judgment.

12          I will not give you the facts right now as the government

13   has done.  Rather, I would wait for you to hear those facts.  And as

14   you hear those facts to try to, as I said, keep an open mind.  And

15   remember that my client is here trying to rely on the constitution that

16   we have in this country and you are here to give us your best process

17   in keeping up with that constitution.

18          We want to thank you.  And I'm going to have only two

19   opportunities to address you, right now and at the end of the trial.

20          I want to thank you again for being here and that is all.

21          Thank you, Your Honor.

22          THE COURT:  Would you call your first witness, please.

23          MR. EVANS:  Michael Guerrero.  I will see if he's out in

24   the hall.

25          MICHAEL GUERRERO, GOVERNMENT WITNESS, SWORN

1    THE CLERK:  State your full name and spell your last

2 name for the record.

3    THE WITNESS:  Special Agent Michael Guerrero.  Spelled

4 G-u-e-r-r-e-r-o.

5    DIRECT EXAMINATION

6 BY MR. EVANS:

7 Q.    Mr. Guerrero, what's your occupation?

8 A.    I'm a special agent with Homeland Security, ICE.

9 Q.    And where is your duty station?

10 A.    Phoenix, Arizona.

11 Q.    As part of your assignment in Phoenix with the Immigration and

12 Customs Enforcement unit, are you involved in the investigation of

13 hostage situations?

14 A.    Yes, sir.

15 Q.    And is one of your responsibilities doing monitored phone calls?

16 A.    Yes.

17 Q.    Can you tell the jury what the procedure is for a monitored

18 phone call?

19 A.    The reporting party will come into the office.  We will give them

20 a digital voice recorder.  They will then dial the number that has been

21 provided by the reporting party and we'll record the call.

22 Q.    Do you give them any instructions as to what they should say or

23 not say?

24 A.    Yes, sir.

25 Q.    And what do you tell them?

1    A.    We tell them specifically to not say she's with agents at the

2    time, to ask what will be done if the money isn't paid at the specified

3    time.

4    Q.    And what are the two main purposes of these kind of phone

5    calls?

6    A.    To see if there's any credible threats of violence or if it's just

7    another extortion call.

8    Q.    "Another extortion call," what's that?

9    A.    Sometimes what happens with these cases, somebody from the

10   side in Mexico says they have your family member when they really

11   don't and they force the family to pay money for the family member

12   they have never held.

13   Q.    Okay.  So on September 23 did you meet a woman by the name

14   of Karen Hayes?

15   A.    Yes, sir.

16   Q.    And did you go through the procedure by which a monitored

17   phone call was done?

18   A.    Yes.

19          MR. EVANS:  May I approach the witness, Your Honor?

20          THE COURT:  Yes.

21   BY MR. EVANS:

22   Q.    I show you what has been marked as Government's Exhibit 54

23   and Government's Exhibit 53.  Please look at both of those and I will

24   ask you some questions.

25          First of all, would you describe for the jury what each

1    one of those exhibits is?

2    A.    One exhibit is a CD marked, "Monitored phone call."  Exhibit 53

3    is the transcript of the actual phone call.

4    Q.    The CD -- that particular CD, you've had an opportunity to listen

5    to it?

6    A.    Yes, sir.

7    Q.    Does it accurately depict the conversation that you had -- that

8    you observed on September 23rd involving Karen Hayes?

9    A.    Yes, sir.

10   Q.    Exhibit 53, the transcript, does it substantially accurately depict

11   the phone call, the conversations in the phone call?

12   A.    Yes.

13                  MR. EVANS:  Move 53 and 54 into evidence, Your

14   Honor.

15                  THE COURT:  Any objection?

16                  MR. HORMEL:  No, Your Honor.

17                  MR. ROMO VEJAR:  No, Your Honor.

18                  THE COURT:  53 and 54 shall be admitted.

19   BY MR. EVANS:

20   Q.    After this phone call, what's the next step for you?

21   A.    After the phone call, through electronic surveillance we try to

22   find out where the phone is actually located at.  And then if it's located

23   in another office, we pass on the information to the following office.

24   Q.    Did you have any further contact with Karen Hayes?

25   A.    No, sir.

1   Q.    If she received phone calls -- subsequent phone calls from the

2   people involved in that phone call -- in that monitored phone call, you

3   didn't have any -- you didn't have any resources with her to record

4   every one of those conversations?

5   A.    No, sir.

6   Q.    Why?

7   A.    It's just hard.  We can't be out there all the time with them with

8   so many cases coming in.

9                    MR. EVANS:  No further questions.

10                    THE COURT:  Any cross, Mr. Hormel?

11                          CROSS-EXAMINATION

12  BY MR. HORMEL:

13  Q.    Agent Guerrero, good morning.

14  A.    Good morning, sir.

15  Q.    You didn't spend any time in Tucson in this case?

16  A.    No, sir.

17  Q.    You didn't actually speak to anybody who was otherwise involved

18  in the case other than Karen Hayes?

19  A.    No. sir.

20  Q.    And that transcript that you have there that you say is accurate

21  doesn't contain any threats, does it?

22  A.    May I look at it?

23  Q.    Of course.

24  A.    It has Cesar saying if they don't pay the money he's thinking

25  maybe they will kill him.

1  Q.    Those words are coming from Cesar?

2  A.    Yes, sir.

3  Q.    Now, from the people that you were monitoring, there are no

4  threats.  Isn't that correct?

5  A.    That's correct, sir.

6              MR. HORMEL:  Nothing further.  Thank you.

7              THE COURT:  Mr. Romo, any cross?

8              MR. ROMO VEJAR:  Yes, sir.

9                    CROSS-EXAMINATION

10 BY MR. ROMO VEJAR:

11 Q.    Good morning, Agent Guerrero.

12 A.    Good morning, sir.

13 Q.    It is true, isn't it, sir, that you have never met or spoken with

14 my client?

15 A.    No, sir.

16 Q.    It is true, isn't it?

17 A.    Yes.  I've never met him, yes, sir.

18 Q.    And it is also true that the involvement that you have in this

19 case is limited to meeting with the wife of Cesar.  Is that correct?

20 A.    That is true.

21 Q.    All right.  And that was done in Phoenix.  Is that correct, sir?

22 A.    Yes, sir.

23 Q.    And that limited involvement concerned only you being present

24 while she made a phone call and you monitored that phone call?

25 A.    Yes, that's correct.

1    Q.    Is that correct?

2    A.    Yes.

3    Q.    And taped that phone call?

4    A.    Yes.

5    Q.    Is that right, sir?

6    A.    Yes.

7              MR. ROMO VEJAR:  No further questions, Your Honor.

8              THE COURT:  Any redirect, Mr. Evans?

9              MR. EVANS:  No, Your Honor.  May this witness be

10   excused?

11             THE COURT:  Yes, he may.  Sir, you may be excused.

12             MS. KELLY:  May we approach for one moment?

13             THE COURT:  Yes.

14             (At sidebar.)

15             MS. KELLY:  Two things.

16             First, the government would invoke the rule.  I don't

17   know if the defense has any witnesses present in the courtroom.  We

18   want to invoke the rule

19             THE COURT:  Very well.

20             MR. ROMO VEJAR:  We don't have any witnesses.

21             MR. HORMEL:  The fellow that is sitting there is an

22   observer.

23             THE COURT:  You wish to invoke the rule.  Call all your

24   witnesses in.

25             MS. KELLY:  Secondly, Your Honor, Julio is our next

1   witness.  And because of all of the family members and such that have

2   been outside the courtroom, we have him being brought over from a

3   secured location.

4          So it's going to take a couple minutes, five minutes.

5   Perhaps what we can do is take a quick break to have him brought in.

6          THE COURT:  We will invoke the rule.  Get everybody in.

7   Have him start coming this way.

8          MR. ROMO VEJAR:  We don't have anybody.

9          THE COURT:  As your witnesses come in, tell them the

10   rule has been invoked, stay out of the courtroom, not to discuss their

11   testimony.

12          MR. HORMEL:  My witnesses have been advised.

13          MR. EVANS:  We don't have any witnesses waiting

14   because -- they won't be here until about 1:30 in the afternoon.  We

15   will advise them then.

16          I have another question.  Do you have multiple copies of

17   53 in your folder?

18          THE COURT:  No.  I returned everything.

19          MR. EVANS:  Thank you.

20          MS. KELLY:  Can they do a brief stretch break, it should

21   be four minutes, just so they don't have to wait here, a brief break

22   stretch?

23          THE COURT:  No.  By the time we get everybody out and

24   in, it is five minutes.  So we will wait.

25          (In open court.)

1          THE COURT:  Call your next witness.

2          MS. KELLY:  At this point the government calls Julio

3   Cesar Lopez-Trujillo.  He's on his way in.

4          THE COURT:  Very well.

5          MS. KELLY:  It appears it will still be a minute, Your

6   Honor.

7          THE COURT:  Very well.

8          MS. KELLY:  Your Honor, I'm sorry for the delay.  It's

9   still going to be another minute.

10         THE COURT:  That's fine.

11         MS. KELLY:  Your Honor, may we approach?

12         THE COURT:  Yes.

13         (At sidebar.)

14         MS. KELLY:  The marshals have been making sure he's

15  safe.  They've been with him.  I can only assume there has been some

16  delay with that.  I'm asking maybe we take a break for a couple of

17  minutes.  The marshals outside aren't sure what is going on.

18         THE COURT:  Generally when you have a witness like

19  that, the witness comes into the witness room that is used only for the

20  government witnesses separate from the defense witness room.

21  Obviously they have a lot of officers.  They can sit with the witness.

22  We are in federal court.

23         As you can see the only person here is that old man

24  sitting here for the defendants, certainly not a threat to anybody.

25         MS. KELLY:  Yesterday there was a lot of the family

1    member's in the hallway and there was issues making sure he was
2    safe.
3                      MR. HORMEL:  There were two young ladies.  That is
4    all.
5                      THE COURT:  The fact is we have ways of dealing with
6    that by having one of the agents come in and sit with him in the
7    witness room there which are separate.  There is one for each side.  I
8    suppose we have to take a break at this point.
9                      MS. KELLY:  Thank you.
10                     (In open court.)
11                     THE COURT:  Ladies and gentlemen, we are going to
12   take a brief break until this next witness gets here.  We'll stand at
13   recess for maybe five or ten minutes.
14                     Thank you.  Stand at recess.
15                     (A recess was taken.)
16                     THE COURT:  The record will reflect the presence of the
17   jury, counsel and the defendants.
18                     MS. KELLY:  We have called our second witness which is
19   Julio Cesar Lopez-Trujillo.
20                     (The testimony of Julio Cesar Lopez-Trujillo is filed
21   separately.)
22   / / /
23   / / /
24   / / /
25   / / /

1
2
3
4
5
6
7                    C E R T I F I C A T E
8
9
10
11        I, Dianne Davenport, certify that the foregoing is a correct
12    transcript from the record of proceedings in the above-entitled matter.
13
14
15
16
17    /s/  Dianne Davenport                    November 16, 2011
18
19
20
21
22
23
24
25