1    IN THE UNITED STATES DISTRICT COURT

2    DISTRICT OF ARIZONA

3

4    UNITED STATES OF AMERICA,                    )
                                                  )    CR 09-2343-TUC-FRZ
5                        Plaintiff,               )
     vs.                                          )
6                                                 )    October 28, 2010
     YURIS BONILLA-GUIZAR and                     )    Tucson, Arizona
7    CARLOS ARMANDO CALIXTRO-                     )
     BUSTAMANTE,                                  )
8                                                 )
                     Defendants.                  )
9

10                       JURY TRIAL - DAY 3

11

12            BEFORE:  HONORABLE FRANK R. ZAPATA
                  UNITED STATES DISTRICT JUDGE
13             405 W. CONGRESS, COURTROOM 5-A
                     TUCSON, ARIZONA 85701

14

15                    A P P E A R A N C E S

16        FOR THE GOVERNMENT:  MS. KRISTEN KELLY and MR. JOHN
     EVANS, ASSISTANT UNITED STATES ATTORNEYS.

17

18        FOR DEFENDANT BONILLA-GUIZAR:  MR. PETER HORMEL,
     ATTORNEY AT LAW.

19        FOR DEFENDANT CALIXTRO-BUSTAMANTE:  MR. JESUS ROMO
     VEJAR, ATTORNEY AT LAW.

20

21        THE INTERPRETERS:  MR. RON ZELLON and MR. DEREK SULLY.

22                      Dianne Davenport
                   405 W. Congress, Suite 1500
23                    Tucson, Arizona 85701
                         (520)205-4266

24

25        Proceedings prepared by computerized realtime translation

1                              WITNESS INDEX

2    WITNESS                                              PAGE

3    ERIC TYRELL

4    Direct Examination by Mr. Evans                        5
     Cross-Examination by Mr. Hormel                       11
5
     JULIO CESAR LOPEZ-TRUJILLO (Filed separately)
6
     RODNEY O'HARA
7
     Direct Examination by Ms. Kelly                       13
8    Cross-Examination by Mr. Hormel                       18

9    KAREN HAYES LOPEZ

10   Direct Examination by Mr. Evans                       20
     Cross-Examination by Mr. Hormel                       38
11   Cross-Examination by Mr. Romo                         47
     Redirect Examination by Mr. Evans                     55
12   Recross-Examination by Mr. Romo                       56

13                             EXHIBIT INDEX

14   EXHIBIT                               OFFERED RECEIVED

15   31                                      15       15
16   58                                       6        6
     59                                       6        6
17   87                                      16       17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2        (Call to order of court, 10:10 a.m.)

3        THE COURT:  The record will reflect the presence of

4   counsel and the defendants and the absence of the jury.

5        MS. KELLY:  Defense counsel had indicated yesterday,

6   Mr. Hormel, that he had a few more questions of Julio this morning.  I

7   just want to get an idea so we have all of our witnesses perfectly

8   timed and ready to go on about how much longer they think

9   cross-examination may be.

10        THE COURT:  Well, Mr. Hormel, how much longer do you

11   think you will be with this witness?

12        MR. HORMEL:  Well, Your Honor, I don't think it would

13   have taken quite as long as it did yesterday had the witness

14   remembered anything.  And it became arduous.  I don't know what

15   frame of mind he will appear today.

16        We have arrived at the point basically we are here in

17   Tucson.  We have to go through the materials relative to the time that

18   he spent in the house.  That's probably going to take a little bit of

19   time, especially considering the way he testified yesterday.

20        Then Mr. Romo has an opportunity to cross-examine as

21   well.  I expect that will take quite some time.  I can't predict that.

22   The government prepared their witness.  They know better than I how

23   he will respond.

24        MR. ROMO VEJAR:  Counsel did ask me yesterday how

25   long it would take and I said I don't know.  I really don't know.

4

1          THE COURT:  Counsel, obviously there is your answer.

2   Nobody knows.

3          Mr. Evans.

4          MR. EVANS:  Your Honor, with permission of counsel, we

5   are going to start with the custodian of records for Sprint for about ten

6   minutes and then to bring Mr. Lopez back on the stand.

7          THE COURT:  Very well.  We'll call one witness out of

8   order.

9          MR. EVANS:  Thank you very much, Your Honor.

10          THE COURT:  Get the jury, please.

11          (The jury was seated.)

12          THE COURT:  Good morning, ladies and gentlemen of

13   the jury.

14          The record will now reflect the presence of the jury,

15   counsel and the defendant.

16          Ladies and gentlemen of the jury, there's a witness that

17   is going to be called out of order because he needs to be somewhere

18   else out of state.

19          If you would call your witness, Mr. Evans.

20          MR. EVANS:  Thank you very much, Your Honor.  Eric

21   Tyrell.

22          ERIC TYRELL, GOVERNMENT WITNESS, SWORN

23          THE CLERK:  State your full name and spell your last

24   name for the record.

25          THE WITNESS:  Eric Tyrell.  T-y-r-e-l-l.

DIRECT EXAMINATION

1

BY MR. EVANS:

2

3   Q.    Mr. Tyrell, you're employed by whom?

4   A.    I work for Sprint Nextel Communications.

5   Q.    As part of your job duty, you go around the country performing

6 as -- testifying as a custodian of records for the Sprint Nextel

7 Corporation?

8   A.    Correct.

9   Q.    On your desk in front of you are Government's Exhibits 58 and

10 59.  Let's start with Government's Exhibit 58.

11   A.    Okay.

12   Q.    Do you see those?

13   A.    I do.

14   Q.    And how many pages of records do you have?

15   A.    This is nine pages of records.

16   Q.    And these records relate to the phone number 520-203-5831?

17   A.    Correct.

18   Q.    And were those records created by the computer system

19 controlled by Sprint Nextel?

20   A.    Yes.

21   Q.    And they report the events and acts actually at the moment they

22 come into existence, correct?

23   A.    Correct.

24   Q.    And it's part of the regular practice of Sprint Corporation to make

25 such records?

1    A.    Yes, it is.

2    Q.    And these records are kept in the ordinary course of regular

3    conducted business activities at Sprint, correct?

4    A.    Yes.

5              MR. EVANS:  I move 58 into evidence.

6              THE COURT:  Any objection?

7              MR. HORMEL:  No objection.

8              MR. ROMO VEJAR:  No objection.

9              THE COURT:  58 is admitted.

10   BY MR. EVANS:

11   Q.    59 are similar records for the same number?

12   A.    Correct.

13   Q.    How many pages?

14   A.    This looks like -- there is six pages and then there's a blank

15   page at the back.  Six pages of actual records.

16   Q.    And in terms of these records, the questions I asked you as to

17   203-5831, you would have the same answer as to 282-8698, correct?

18   A.    Correct.

19              MR. EVANS:  Move 59 into evidence.

20              MR. HORMEL:  No objection.

21              MR. ROMO VEJAR:  No objection.

22              THE COURT:  59 is admitted.

23              MR. EVANS:  If we could publish to the jury, Your Honor.

24              THE COURT:  Yes, may be published.

25   BY MR. EVANS:

1   Q.    Just so the jury understands what the columns of this record are,

2   first of all, across the top it says, "PTN," and has a phone number?

3   A.    Correct.

4   Q.    What does that mean?

5   A.    This is the telephone number that this report is run on.  So all

6   the information on this report pertains to the telephone number that's

7   in the header of this page and also subsequent pages of this particular

8   exhibit.

9   Q.    Then we have a series of columns.  Would you go on each

10   column and describe what that data means?

11   A.    The very first column, "Customer PTN," that's the telephone

12   number of the customer.  So, again, the far left column that telephone

13   number is the same as the telephone number at the top of the page.

14   So tells us who we ran the report on.

15           The date is just that, the day, month and year that

16   these calls took place on the network.

17           The call initiation time is the time that the call first

18   started or first connected onto the network.  This obviously is in hour,

19   minute, second, and then it gives the a.m. or p.m. next to that, the

20   duration.  And then in quotes you can see it says, "SEC."  This is

21   seconds.  This duration is reflected in the amount of seconds that the

22   call was utilizing the network.

23           The type, this tells us whether it is inbound or outbound.

24   Those are the two options in this field.  Inbound is a call that came

25   into our subscriber from someone else.  An outbound call would be a

1   call made from this telephone number to another party.

2           The next three columns, forward, 911 and international,

3   all have the same option either, yes or no.

4           Forwarded, yes, typically means that it is routed into

5   voice mail.  That means an inbound call came into the subscriber's

6   number and then was not answered and went into the voice mail

7   system.  It would populate a yes.

8           911 is just -- was this some type of 911 or emergency

9   services number.  You are not billed for a call to emergency services.

10          International call, this would be some type of call that is

11  typically an international call that's going to ensue different charges.

12  There's different charges for making long distance calls internationally.

13          So then we have "Called PTN."  This is the number that's

14  being called.

15          So if we just look at the very first line as an example, we

16  see that it's the same number as what the report's run on.  It's an

17  inbound call so that who is being called is our subscriber's number that

18  this report is run on.  So it's the recipient of the call.  Then the calling

19  PTN, the last column reflects the initiator, who initiated that call or

20  made that call.

21          So, like I said, if we just use this very first line as an

22  example, it's an inbound call from the number in the far right-hand

23  side, the calling number field, and they called into our subscriber,

24  which is the called number in that field next to it.  It would be

25  reversed for an outbound call.  The initiator in an outbound call would

1    be our subscriber's number.  The recipient would be a different

2    telephone number.

3    Q.    Just within the first page, we are looking at blanks regarding

4    called PTN and calling PTN.  How does that happen?

5    A.    Sometimes we are unable to capture the data that goes across

6    the network.  An example would be if a call was routing through a

7    different telephone company's network.  Sometimes we're unable to

8    capture that information from them.  So we just show, because we

9    didn't get any information, as a blank field on this document.

10              Sometimes if there's no connection made, you know,

11   there's an attempt but it never routed through the network, the

12   network doesn't know how to log anything because nothing actually

13   went through to another recipient.

14   Q.    And, for example, on that first page, there's under "Duration" a

15   zero.  And that is one of the situations where you didn't capture the

16   data, correct?

17   A.    Correct.

18   Q.    All right.  Moving on from those records, does your company also

19   provide a service whereby you can locate the phone used by a

20   particular person?

21   A.    Yes.

22   Q.    And could you describe to the jury how that happens?

23   A.    Well, we have -- within our legal compliance department, we

24   respond to legal demands and we also deal with 911 centers and

25   exigent situations from law enforcement.

1    So if we get a law enforcement agent that calls in, fills

2    out our paperwork for an exigent situation, they can get what we call a

3    location-based -- essentially it's a ping of a phone.  So in realtime we

4    go out and we ask the network to say find this phone for us.  And then

5    it searches for that phone on the network and then we can ping that

6    phone to determine what cell site it's utilizing and maybe even its

7    location in relation to those cell sites.

8    Q.    Do you also -- are you also able to provide the GPS coordinates

9    for a phone?

10   A.    We provide the latitude and longitude coordinates in a situation

11   like that.

12   Q.    On your desk is Exhibit 57.  You said that there is exigent

13   circumstances for law enforcement.  Exhibit 57 are a series of court

14   orders, correct, related to this particular incident?

15   A.    Correct.

16   Q.    And that is the order upon which Sprint can provide the data?

17   A.    Yeah.  Except in an exigent situation, there's usually an

18   immediate need to get that and maybe not the time to get the actual

19   legal demand.  For this kind of information, it has to be something

20   signed by a judge, court order, search warrant.

21   So in an exigent situation, the law enforcement agent

22   says there's something very serious, we need to get this information

23   right now and then at a later date we'll follow up with the -- once we

24   can get the judge to sign off on the demand, we'll get that back to

25   you.  So that's how our exigent process typically works.

1    MR. EVANS:  Thank you.  No further questions.

2    THE COURT:  Mr. Hormel, any questions?

3                    CROSS-EXAMINATION

4    BY MR. HORMEL:

5    Q.    Your pinging process doesn't allow you to look inside buildings,

6    does it?

7    A.    I mean, it's just searching for that handset and, you know -- it's

8    an algorithm determining the distance from the signal from the cell

9    site.  It can't look into a building as far as --

10   Q.    It's not like a giant eye in the sky or something like that?

11   A.    No.

12            MR. HORMEL:  Thank you.  No more questions.

13            THE COURT:  Mr. Romo?

14            MR. ROMO VEJAR:  No questions.

15            THE COURT:  May this witness be excused?

16            MR. EVANS:  Yes, Your Honor.  No redirect.

17            THE COURT:  If we could have Mr. Lopez-Trujillo back.

18            (The testimony of Julio Cesar Lopez-Trujillo was

19   previously transcribed.)

20            THE COURT:  Call your next witness, please.

21            MS. KELLY:  Your Honor, the government calls Air

22   Interdiction Agent Rodney O'Hara.

23            MR. ROMO VEJAR:  Your Honor, may we approach?

24            THE COURT:  Yes.

25            (At sidebar.)

1    MR. ROMO VEJAR:  Judge, we might want to recall this

2    witness, Judge, for our presentation.  So I don't want him to

3    disappear.

4    THE COURT:  Well, he's been excused at this point.

5    MR. ROMO VEJAR:  Well, he's right outside, Judge.  I

6    just think that we might want to recall him after our testimony has

7    been presented.  We can just advise his lawyer.

8    THE COURT:  Well --

9    MR. ROMO VEJAR:  You want me to tell you in front of

10   the jury, Your Honor?

11   THE COURT:  No, no.

12   MR. ROMO VEJAR:  The lawyer is right there, Judge.

13   THE COURT:  Well, I guess we will call him back and tell

14   him he's subject to recall.  You will have to tell him he's subject to

15   recall -- call him to say he's subject to recall.  You will have to get him

16   back here.

17   (In open court.)

18   THE COURT:  If you could call Mr. Lopez-Trujillo back.

19   MR. EVANS:  He went upstairs, Your Honor.  I'll have to

20   make some phone calls.

21   THE COURT:  Very well.  Do that and then call your next

22   witness.

23   RODNEY O'HARA, GOVERNMENT WITNESS, SWORN

24   THE CLERK:  Please state your full name and spell your

25   last name for the record.

1    THE WITNESS:  Rodney Newell Mason O'Hara.

2    O-h-a-r-a.

3    DIRECT EXAMINATION

4    BY MS. KELLY:

5    Q.    Good afternoon, sir.

6    A.    Good afternoon.

7    Q.    Would you please introduce yourself to the ladies and gentlemen

8    of the jury.

9    A.    My name is Rodney O'Hara.

10   Q.    What do you do for a living?

11   A.    I'm an air interdiction agent.

12   Q.    What does that mean?

13   A.    For the most part, I fly helicopters for the office of air and

14   marine under Customs and Border Protection.

15   Q.    It might be easier if you speak directly into the mic.  You work

16   for Customs and Border Protection flying helicopters?

17   A.    Yes.

18   Q.    How long have you been doing that?

19   A.    I started in 2008.

20   Q.    And did you fly before you started with them in 2008?

21   A.    I did.

22   Q.    Where did you fly?

23   A.    I started flying civilian in 2001 and then I got picked up by the

24   National Guard to fly Apaches in I think it was 2004.

25   Q.    As part of your duties with Customs and Border Protection, do

1   you provide air assistance to missions that may be going on on the

2   ground?

3   A.      Yes.

4   Q.      How do you do that?

5   A.      Either we do it visually, just without any camera or binoculars,

6   we do it looking out the window, if it's like a chase going on, we just

7   show up on.  If it's something where we know ahead of time, we bring

8   in aircraft with a camera or binoculars.

9   Q.      In a situation where you would be providing air support for, say,

10  a BORTAC mission, would you bring cameras for that?

11  A.      Yes.

12  Q.      So if you bring a camera, what does that mean?

13  A.      It's a camera that is mounted underneath the helicopter that

14  provides a feed to a video screen inside the cockpit.  And the cameras

15  we typically use are capable of a day TV which would be like you see

16  on normal TV.  You also have a fluoro looking red image.  You can fuse

17  that image with a low light camera so you have both.

18  Q.      So the cameras have night vision capability?

19  A.      It's not really -- when you say "night vision," I'm thinking of like

20  amplification of the light which is like a night vision goggle.  It does

21  not have that.  It's these infrared images, heat signatures.  And it

22  also -- the low light camera, I'm not sure exactly how that works.

23  Q.      The camera that you have on the helicopter that you fly, does it

24  record?

25  A.      Yes, it does.

1    Q.    On September 24 of 2009, were you on duty?

2    A.    I was.

3    Q.    And at approximately 7:30 p.m., were you dispatched within the

4    area of 9950 South Oak Canyon Lane?

5    A.    Yes, ma'am.

6    Q.    I'm going to place on the board Government's Exhibit 31.  Do

7    you recognize this image?

8    A.    Yes, ma'am.

9    Q.    And what is it?

10   A.    It's the general vicinity around where we were flying that night.

11   Q.    Generally where is it?

12   A.    It's about a mile or two south of the Tucson airport.

13   Q.    And is it directly south or is it southeast or southwest?

14   A.    I think it's pretty much due south.

15              MS. KELLY:  Your Honor, the government is going to

16   move to admit and publish Exhibit 31.

17              THE COURT:  Any objection?

18              MR. ROMO VEJAR:  No objection.

19              MR. HORMEL:  No, Your Honor.

20              THE COURT:  31 is admitted and may be published.

21   BY MS. KELLY:

22   Q.    In looking at that particular aerial photograph, can you see the

23   generally location where 9950 South Oak Canyon Lane is?

24   A.    Yes, ma'am.

25   Q.    And can you point to it.

1   MS. KELLY:  The witness has illustrated three separate

2   arrows in the middle to the left of the exhibit.

3   May I approach?

4   THE COURT:  You may.

5   BY MS. KELLY:

6   Q.   I'm showing you what's been previously marked as Exhibit

7   Number 87.  Have you seen that?

8   A.   No.

9   Q.   Have you seen the footage on that?

10  A.   Yes.

11  Q.   Did you see it --

12  A.   Yes, I've seen this.  I've seen the footage played.

13  Q.   What is on that DVD?

14  A.   It's some of the video footage we took that night observing the

15  takedown of the house -- the property, the multiple trailers.

16  Q.   You said, "It's some of the video footage."  Is it the entire

17  footage?

18  A.   No.

19  MS. KELLY:  Your Honor, the government is going to

20  admit Exhibit Number 87.

21  THE COURT:  Any objection other than those previously

22  made?

23  MR. HORMEL:  No, Your Honor.

24  MR. ROMO VEJAR:  Judge, may I voir dire the witness

25  quickly?

1        THE COURT:  You may.

2    BY MR. ROMO VEJAR:

3    Q.    Good afternoon, sir.

4    A.    Good afternoon, sir.

5    Q.    You stated that there is footage on that disk.  Is that correct?

6    A.    I believe so, yes, sir.

7    Q.    And was it taken by you or someone else while in the helicopter?

8    A.    I was the camera operator recording this footage.

9    Q.    You were the one that operated the camera while you were also

10   piloting?

11   A.    I was not piloting.  There was another pilot on board operating

12   the aircraft.

13   Q.    Thank God.  You looked at the footage.  And what you saw is

14   representative of some edited version of the entirety of the footage.

15   Is that correct?

16   A.    It's a portion of the footage that we took, yes, sir.

17        MR. ROMO VEJAR:  No further questions, Your Honor.

18   No objection.

19        THE COURT:  Very well.  What was the exhibit number?

20        MS. KELLY:  87.

21        THE COURT:  87 is admitted and may be published.

22        MS. KELLY:  With that, Your Honor, I don't have any

23   questions and we are going to publish it later with another witness.

24                              / / /

25                              / / /

CROSS-EXAMINATION

BY MR. HORMEL:

Q.    Sir, are you a pilot as well or were you just working for the air interdiction unit?

A.    I'm a pilot as well.

Q.    Sometimes you fly.  Sometimes you operate the camera?

A.    Yes.

Q.    Were there two of you in the helicopter that night?

A.    Yes.

Q.    And you remember watching all of the goings-on on the ground?

A.    Yes, sir.

Q.    So you recall the operation that occurred that night?

A.    Yes, sir.

Q.    And about how many folks did the United States government have on the ground that day?  Do you remember?

A.    I don't remember.  I remember seeing probably 10 to 15 cars roll in.  I don't remember how many agents.

Q.    Do you remember seeing what is called a BearCat?

A.    I do not.

Q.    Do you know what that is?

A.    I'm not sure, no, sir.

Q.    So you couldn't tell me today how many folks were involved in that operation?  You can't tell me that?

A.    Not off my memory.

Q.    Do you remember seeing those folks were armored?

1   A.   I believe we zoomed in.  I can tell they were in their tactical

2   gear.

3   Q.   Tactical being helmets, vests, all that kind of stuff?

4   A.   I would think so, yes, sir.

5   Q.   Now, you have a military background?

6   A.   Yes, sir.

7   Q.   Is that how you learned how to do operations like this?

8   A.   Operations like the camera operations?

9   Q.   No.  Like -- I mean -- camera operations I assume, correct me if

10  I am wrong, anybody can do, anyone can learn, I suppose?

11  A.   Yes.

12  Q.   The actual takedown and the air interdiction and all involved is

13  more of a military-style operation, correct?

14  A.   I would -- I would think the military does do it, yes.  But it's not

15  limited to military.

16              MR. HORMEL:  Nothing further.

17              THE COURT:  Mr. Romo, any further questions?

18              MR. ROMO VEJAR:  No, sir.  No questions.

19              THE COURT:  Thank you.

20              Thank you, sir.  You may be excused

21              Would you call your next witness.

22              MR. EVANS:  Mr. Lopez-Trujillo is here.

23              THE COURT:  If you would have him come forward,

24  please.

25              Mr. Lopez-Trujillo, if you would come forward to the

1    podium, please.

2              Mr. Lopez-Trujillo, I previously excused you from being a

3    witness in this case.  In fact you are subject to being recalled as a

4    witness at some later time.  So you have to stay available to be a

5    witness if you are called later in this trial.

6              Do you understand that?

7              MR. LOPEZ-TRUJILLO:  Yes.

8              THE COURT:  The lawyers will get in touch with your

9    lawyer to make the arrangements as to when you need to be back or

10   where you need to be.

11             Do you understand that?

12             THE WITNESS:  Yes.

13             THE COURT:  Thank you.  That's all.

14        KAREN HAYES LOPEZ, GOVERNMENT WITNESS, SWORN

15             THE CLERK:  Please state your full name and spell your

16   last name for the record.

17             THE WITNESS:  Karen Ann Lopez.  L-o-p-e-z.

18                        DIRECT EXAMINATION

19   BY MR. EVANS:

20   Q.    Good morning -- or good afternoon.

21   A.    Good afternoon.

22   Q.    Could you tell us -- give us -- the jury a history -- well, first of

23   all, let's start off with your name is Karen Lopez?

24   A.    Yes.

25   Q.    You also have been presented to this jury as Karen Hayes?

1   A.    My maiden name, yes.

2   Q.    Tell us a little bit about yourself.

3   A.    I'm a 52-year-old woman.  I'm on Social Security disability.  I

4   worked for a school district in my county for 13 years.  And what I did

5   was special ed.  And handicapped special needs driving kind of trashed

6   my back so I finally got disability.  And currently I'm working as a

7   library assistant.  I have two grown children.

8   Q.    How old are they?

9   A.    30 and 32.

10   Q.    Do they live around anywhere near you?

11   A.    Yes, in the area, yeah.

12   Q.    This case involves a man by the name of Julio Cesar

13   Lopez-Trujillo.  Can you tell the jury how you became acquainted with

14   the man?

15   A.    He was a friend of my daughter's.  I don't know.  I had known

16   him about six months before -- approximately six months before I

17   really got to talking to him and watching movies and visiting.

18   Q.    And over that period of time, did you develop a relationship?

19   A.    Just friends until like July '07.  And then he moved in with me.

20   Q.    And that was a step up in your relationship?

21   A.    Yes.

22   Q.    And after July of '07, you and he continued to live -- it's your

23   house?

24   A.    Yes.

25   Q.    And at a certain point, did you take steps to formalize your

1  relationship?

2  A.    We lived together for a few months.  We got married in

3  November in about 2008 in our church just in the eyes of God.  It

4  wasn't legal.

5  Q.    Why did you think you wanted to do that?

6  A.    Just living together wasn't -- didn't seem right.  We wanted to

7  get married, wanted to feel like a married couple.

8  Q.    Now, Julio, the jury has seen him.  His primary language is

9  Spanish, isn't it?

10  A.    Yes.

11  Q.    And how is your Spanish?

12  A.    Not real good.

13  Q.    But getting better, right?

14  A.    Yes.  We speak Spanish-English to each other.

15  Q.    You say you work part-time at the local library?

16  A.    Uh-huh, yes.

17  Q.    And how many days a week do you work?

18  A.    It depends.  Usually four days, but usually four days a week,

19  about three hours a day, four hours a day.

20  Q.    For the last year, has Julio been working?

21  A.    No.  Side jobs.  Just little side jobs like weeding a yard here or

22  there, but nothing really.

23  Q.    Taking you back to September of 2009, at a certain point in

24  time, did you become aware that Mr. Lopez had been deported?

25  A.    Yes.

1   Q.   He had been voluntarily returned?

2   A.   Yes.

3   Q.   What was your first contact with him after he had been

4   voluntarily returned to Mexico?

5   A.   He called me on -- I believe it was the next day.  He left on the

6   7th of September.  And I believe he talked to me on the 8th like in the

7   afternoon.

8   Q.   He called you from Mexico?

9   A.   Yes.

10   Q.   And did you and he make some plans regarding what your future

11   was going to be?

12   A.   I took his paperwork to him, birth certificate, voter registration.

13   It was just copies.  He needed to get an ID for Nogales so he could go

14   to work.

15   Q.   And you say you took it to him.  Where did you take it?

16   A.   I took it to Nogales, Mexico.

17   Q.   Where did you meet him in Nogales, Mexico?

18   A.   At the border.

19   Q.   Right at the border?

20   A.   As I entered in, yeah.

21   Q.   Then you and he spent part of the day, all day?  How much time

22   did you spend together on that day?

23   A.   The whole day and night.  I left the next morning.

24   Q.   And where did you spend the night?

25   A.   At a house in Mexico, a little house in Nogales.

1    Q.    Did you bring him any money?

2    A.    I brought him $100.

3    Q.    By the time you were ready to leave, did you and Mr. Lopez have

4    any -- develop a plan for your immediate future?  What was going to

5    happen or what did you want to have happen?

6    A.    It was kind of scary.  He needed to get a job in Mexico.  So I

7    don't know.  I was going to work on paperwork in the United States to

8    get him here legally, but I thought he was going to get a job and work

9    down there for a while.

10    Q.    So at some point in time, did you become aware that plan didn't

11    come through and something else happened?

12    A.    Yeah, yes.

13    Q.    How did you find that out?

14    A.    I got a phone call from him one night saying he was in the U.S.

15    in Tucson.

16    Q.    Do you remember approximately what date that was?

17    A.    September 22nd.

18    Q.    Now, you don't have a landline, correct?  You have a cell phone?

19    A.    Cell phone.

20    Q.    I'm going to show you what has been previously marked and

21    admitted as Exhibit 58.  And we will go to page 9.  Can you see that?

22    A.    Yes.

23    Q.    Can you read it?

24    A.    Yes.

25    Q.    Do you recognize your phone number on that line?

1    A.    Yes.

2    Q.    You don't presently have that phone number, right?

3    A.    No.

4    Q.    So what phone number are we looking at?

5    A.    928-710-9358.

6    Q.    Okay.  So we are talking about this line right here, correct?

7    A.    Yes.

8    Q.    This indicates the 5831 number was calling you.  You were the

9    number called.  And it's at 7:42:47 p.m. on the 22nd of September.

10   Do you believe this is probably the first call you received?

11   A.    Yes.  I can't see the time.  Is this okay?

12   Q.    Sorry.  How's that?

13   A.    I can't see all the phone numbers.

14   Q.    Let me see if we can --

15   A.    There you go, yes.

16               MR. ROMO VEJAR:  What page is that, Counsel?

17               MR. EVANS:  Page 9.

18   BY MR. EVANS:

19   Q.    So you get a phone call at about 7:45 at night?

20   A.    Yes.

21   Q.    On September 22nd.  What happens?

22   A.    I was shocked.  I started crying.  I told him, "No, what are you

23   doing?"  And he told me that he needed money.

24   Q.    How much money?

25   A.    $2,300.

1   Q.    Did he tell you where he was?

2   A.    He said Tucson in a place where he had to stay until he got the

3   money to leave.

4   Q.    $2,300, what did that represent to you?

5   A.    Too much money.  I don't have that kind of money.

6   Q.    Do you have any savings?

7   A.    No, no.

8   Q.    What do you own?

9   A.    I just own my house and my car.

10   Q.    So the first call which is approximately 428 seconds, besides

11   crying and talking to Mr. Lopez, did you talk to anybody else that day?

12   A.    Yes, I did.

13   Q.    During this phone call or a subsequent phone call?

14   A.    I don't believe it was this phone call.  I believe it was --

15   Q.    The next one?

16   A.    The next one.

17   Q.    I'll show you -- all right.  We have another phone call at

18   7:54:42?

19   A.    Yes.

20   Q.    That's your phone number?

21   A.    Yes.

22   Q.    Do you remember what happened in that second phone call?

23   A.    I believe another man called me back and was speaking Spanish

24   to me and I didn't understand him.  So my husband, Julio, got back on

25   the phone.

1    Q.    And what was said this time?

2    A.    That my husband was kind of pleading with me to try to find

3    money so he could be released.

4    Q.    And it was $2,300?

5    A.    Yes.

6    Q.    After this second phone call, when it's over, the evening of the

7    22nd of September, you have already said you have been crying, what

8    do you do?

9    A.    I was scared for him.  I didn't sleep.  I don't know.  There was

10    nothing I could do.  I couldn't help him.  There was nothing I could do.

11    I called my pastor.

12    Q.    Who is that?

13    A.    For prayer.  Glen Hoag, my pastor.  And I called Julio's pastor for

14    prayer and to see if he had any money by any chance.  There's no

15    way.  Nobody had any money.

16                    And then I called -- actually, I went to my town and

17    went to the sheriff's department.  And the sheriff's department gave

18    me the number for the Tucson Police Department.  And the Tucson

19    Police Department gave me the number for border patrol which in turn

20    I was transferred back up to Phoenix to an agent named Melissa.

21    Q.    This is all in one day?

22    A.    Yeah -- night.

23    Q.    One night.  On the 22nd?

24    A.    Yes.

25    Q.    When you talked to Melissa, were you given instructions on what

1   to do next?

2   A.     Just to wait.

3   Q.     Okay.  So you have this -- you make these calls on the 22nd.

4   Melissa says wait.  You are not sleeping.  So we are now starting on

5   the 23rd.  Do you get more phone calls?

6   A.     Yes.

7   Q.     I show you what has been marked and admitted as

8   Government's Exhibit 59 page 5.  So we are here on the 23rd.  Do you

9   see that?

10   A.     Yes.

11   Q.     Once again you get a call from another phone number.  By the

12   way, were you keeping track of the phone numbers that were calling

13   you?

14   A.     Not at that time, no.  Yes, I did scribble down two phone

15   numbers.

16   Q.     But --

17   A.     That were on my cell phone.

18   Q.     So your cell phone would capture the phone numbers calling

19   you?

20   A.     Yes.

21   Q.     Starting the morning of the 23rd, you get another phone call.

22   Describe for the jury what you remember about that phone call.

23   A.     My husband was just pleading with me, kind of crying.  He

24   needed money.  But he didn't know that I had called border patrol or

25   homeland security.  So I couldn't tell him anything.  I just kept

1    keeping his hopes up that I could get the money somehow or that I

2    would keep looking.

3    Q.    Did anyone talk to -- anyone besides your husband talk to you

4    on the morning of the 23rd at this call that you remember?

5    A.    Not that I remember.

6    Q.    Did you get another call on the 23rd?  You got several actually,

7    didn't you?

8    A.    I believe it was the other phone number.

9    Q.    Yes.  5:00 in the evening.  So you get a call 8:00 in the

10   morning.  Melissa told you to wait.

11                   MR. HORMEL:  Objection, Your Honor.

12                   THE COURT:  What's the objection?

13                   MR. HORMEL:  I don't know what Melissa said or where

14   that's coming from.  That's not in evidence.

15                   MR. EVANS:  Yes, it is.

16                   THE COURT:  She testified that she had been told to

17   wait.  Ask your question.

18   BY MR. EVANS:

19   Q.    Just setting the scenario.  Have you heard from anyone on the

20   23rd between 8:00 in the morning and this next call which is at 5:17

21   in the evening to tell you what was going to happen as far as border

22   patrol or anybody else?

23   A.    I had a phone call from Agent Jeff Ellis.

24   Q.    You can't tell me what Jeff Ellis says.  You did have contact with

25   him?

1    A.    Yes.

2    Q.    Then you get this call at 5:00 in the evening on the 23rd.  Would

3    you tell the jury to the best of your knowledge what happened during

4    that phone call?

5    A.    My husband was still pleading with me for -- to get the money.

6    And he asked me to -- he was grasping to ask his friend in Mayer if he

7    had the money.  And I was just playing along.  You know, I just kept

8    telling him that I would ask people.

9    Q.    Did anyone else get on the phone besides your husband on this

10   call that you remember?

11   A.    Not that I recall, no.

12   Q.    So let's move on to the 24th.  On the 24th had you and Mr. Ellis

13   developed a plan?

14   A.    I was asked to go to Phoenix on the 24th to meet with a couple

15   of agents to record a phone call between my husband and myself.

16   Q.    So you drove from where you live to Phoenix to an office of

17   the --

18   A.    Homeland security.

19   Q.    Homeland security.  You met an agent by the name of Michael

20   Guerrero?

21   A.    Yes.

22   Q.    As you were driving to this, what the jury has heard, monitored

23   phone call, did you have any contact with -- or a call from your

24   husband or a number associated with your husband?

25   A.    Yes.  I believe I didn't answer the phone call.

1   Q.   So the record shown here on page 6 of zero seconds at --

2   A.   Yes.

3   Q.   -- 10:07, that would be that phone call?

4   A.   Yes.

5   Q.   So tell us about the monitored phone call.

6   A.   So I wait for my husband to call me.  I had the gear set up to

7   monitor the phone call and --

8   Q.   Didn't you call him?

9   A.   Yeah.  I called him back, I believe.

10  Q.   Let me show you an outbound -- here we go.  A call at 10:10 on

11  the morning of the 24th.  You are calling from your cell phone?

12  A.   Yes.

13  Q.   You have the equipment that was given to you by homeland

14  security to record the call?

15  A.   Yes.

16  Q.   You are in an office at the Department of Homeland Security?

17  A.   Yes.

18  Q.   There are two agents there?

19  A.   Yes.

20  Q.   And they have given you instructions on what to do?

21  A.   Yes.

22  Q.   So you make the call?

23  A.   Yes.

24  Q.   And the jury has heard that call.  After you make the call, what

25  are you told to do?

1          MR. HORMEL:  Objection, hearsay.

2          MR. EVANS:  I'll rephrase the question.

3          THE COURT:  Thank you.

4    BY MR. EVANS:

5    Q.    After the monitored call, what do you do?

6    A.    I waited around the homeland security office for at least an hour

7    more to see if he would call back, but there was no call back.  So I

8    went home.  I started to go home.

9    Q.    And while you were going home, what happened?

10   A.    I got a phone call while I was driving.

11   Q.    At 1:30 in the afternoon?

12   A.    Yes.

13   Q.    Tell us about that phone call.

14   A.    My husband was getting very nervous needing money.  He was

15   getting very scared.  I knew that -- well, I don't know.  I thought he

16   would die.  I don't know.  It was scary.  So --

17   Q.    During this phone call did you talk to anyone other than your

18   husband?

19   A.    Yes, yes.

20   Q.    What did that person say?

21   A.    A man that spoke English told me that if I had been in contact

22   with the police that Cesar, my husband, would pay the consequences.

23   Q.    Now, is this the same person who spoke English in the monitored

24   phone call?

25   A.    Yes.

1   Q.      What was your reaction to that?

2   A.      I just -- I don't know honestly.  I don't know.  I was in shock.

3   My husband was going to die I thought.

4   Q.      Okay.  So you get -- you got back to Mayer eventually?

5   A.      Yes.

6   Q.      Was it a very hard job?

7   A.      Yeah, yes.

8   Q.      So then do you have other phone calls?

9   A.      Yes.  I believe my husband called me back again not too long

10  after I got home.  I don't know exactly what time I got home.

11  Q.      And tell us about that conversation.

12  A.      Actually, the conversation I had coming home, I told the other

13  man that, please, please, I will go get a payday loan for my car.  You

14  know, I'm trying to get money.  At least I can get that much.

15          Then when I got home, my husband was asking me if I

16  got ahold of our friend.  I said yes, I got ahold of our friend in Mayer,

17  but his brother had the money and -- but his brother wasn't in Tucson.

18  His friend was in Tucson.  And I was trying to appease my husband.

19  Q.      When you talk about -- you were talking about someone who has

20  a brother who has a friend in Tucson who might be able to pay this

21  money, what were you trying to do?

22  A.      Set it up to where the ICE officer could get a location on my

23  husband or see him or get him in Tucson.

24  Q.      Continuing in the afternoon of the 24th, there's a call at 2:34

25  p.m.  Do you remember anything about this particular call?

1    A.    Yes.  My husband called.  I talked to another man, a man that

2    spoke a little English.  I'm not exactly sure of what entailed, but I was

3    told that if the police were involved, they would make -- if the people

4    met with the friend of the brother of the friend in Tucson to give the

5    money, if something went wrong, my husband was about five minutes

6    away, that they would shoot him in the head.  He would die.

7    Q.    Are you reporting the results of the phone calls to Jeff Ellis?

8    A.    Yes, every time.

9    Q.    We have another call at 3:32 in the afternoon.  Any distinct

10   memory of this particular phone call?

11   A.    I can't actually -- I don't honestly know exactly.

12   Q.    Then there's another call -- let's go back.  Yeah.  Okay.  At 4:18

13   it looks like you call the number.  You call them?

14   A.    Yes.

15   Q.    Can you tell us why?

16   A.    The agent, Melissa, asked me to call to see if Cesar was okay,

17   my husband, Julio Cesar.

18   Q.    So you called.  And when you called, just talk about the routine.

19   You call.  And they have heard the monitored phone call.  Every time

20   you call would someone who spoke only Spanish answer the phone?

21   A.    No.  Well, yeah, yes, I believe so, yeah.  I can't tell for sure.

22   Q.    I understand that.  I understand that.  But did you eventually

23   talk to your husband?

24   A.    Yes.

25   Q.    He said he was all right, but how did he sound?

1  A.     Scared, nervous, kind of crying again, but more his voice was

2  real shaky.  I'm not sure if that was the call that he said that they took

3  his clothes away from him or not.

4  Q.     But at some point he told you that they had taken his clothes

5  away from him?

6  A.     Yes.

7  Q.     Did he explain why?

8  A.     No.  He didn't say why.  He just said they took his clothes.

9  Q.     Okay.  5:48, still on the 24th.

10  A.     I believe that was the last phone call I had with him.  I'm not

11  exactly sure.  He was very nervous.  He thought he was going to die.

12  Q.     Did you talk to anybody other than your husband?

13  A.     I don't know.  I don't know.

14  Q.     By this time would it be fair to say that you were really upset?

15  A.     Yes.

16  Q.     And you are reporting all this to Jeff Ellis, correct?

17  A.     Yes, yes.

18  Q.     Every conversation?

19  A.     Yes.

20  Q.     The call you had at 5:48:05 of 66 seconds, did you -- describe

21  the best you can your impression of your husband's -- well, just -- how

22  did your husband come across to you at that point?

23                  MR. HORMEL:  I object to speculation, Your Honor.

24                  THE COURT:  Sustained.

25  BY MR. EVANS:

1    Q.    You previously testified he appeared scared, correct?

2    A.    Yes.

3    Q.    And how did you get that?

4             MR. HORMEL:  I object to any testimony about the other

5    individual's state of mind, Your Honor.

6             MR. ROMO VEJAR:  Asked and answered.

7             THE COURT:  The witness can describe the voice, things

8    of that nature, but she can't give an opinion as to the state of the

9    mind of the particular witness -- or the particular individual.

10    BY MR. EVANS:

11    Q.    So describe his voice.

12    A.    His voice was shaky, not controlled, crying.  Apparently -- well,

13    he told me they called him crybaby.

14    Q.    Did you talk to anyone other than your husband in this last

15    phone call?

16    A.    I can't remember.  I don't remember.

17    Q.    So at 5:48 this is your last phone call you had on the 24th with

18    your husband?

19    A.    I believe so.

20    Q.    When was the next time you were able to talk to your husband?

21    A.    About 1:00 or 2:00 in the morning on the 25th after he had

22    been rescued.

23    Q.    At some point on the 25th or thereafter, did you come down and

24    take him back to your home?

25    A.    No, not on the 25th.

1   Q.    Okay.  When did he -- you two get reunited again?

2   A.    I'm not sure.  It was a Monday.  Maybe it was the 28th of

3  September.  It was the Monday following.

4   Q.    He's lived with you ever since?

5   A.    Yes.

6   Q.    Since that date have you and he been given any benefits like

7  visas or anything for his testimony and your testimony today?

8   A.    No.

9   Q.    We have heard testimony that you may have gone to Catholic

10  Social Services to investigate about gaining a visa or some method of

11  getting permanent status for your husband?

12   A.    Yes, an I-130, which is a spouse filing for her husband.

13   Q.    So you are investigating that?

14   A.    Yes.

15   Q.    Have you had any contact with anyone associated with this

16  incident since the 24th of September?

17   A.    Well, I've talked to --

18   Q.    I'm talking about the people who were holding your husband.

19   A.    No.

20   Q.    There's been a great deal of discussion about the $2,300 and

21  that you and your husband just didn't have the money.  Can you

22  explain to the jury your financial circumstances.

23   A.    I'm poor.  I don't have any money.  I own my house and my car.

24  I work a little bit and I am on disability.

25   Q.    Do you owe any money on your car?

1    A.    No.

2    Q.    How old a car is it?

3    A.    18 years.  It's a '92.

4    Q.    And how long have you had your house?

5    A.    Since 1982.

6    Q.    Do you have it free and clear?

7    A.    Yes.

8    Q.    Did you ever consider about borrowing any money against either

9    of those to --

10   A.    No.

11   Q.    Why not?

12   A.    Well, in the first place, my house is a single wide mobile.  It has

13   no value.  No.  There's no way I could.  I couldn't do it.

14   Q.    And it was never your plan when you first heard he was in

15   Nogales that he would try to get back here illegally?

16   A.    No.

17              MR. EVANS:  No further questions.

18              THE COURT:  Mr. Hormel.

19                        CROSS-EXAMINATION

20   BY MR. HORMEL:

21   Q.    Good afternoon, ma'am.

22   A.    Hi.

23   Q.    Hi.  I'm just going to ask you a few questions.  I'm going to try

24   to keep it as brief as I can about some of the things that happened.

25              My name is Peter Hormel.  I'm obviously a defense

1    lawyer.  This is part of the process.  But just a few things.

2            You mentioned that you had been friends -- now, before

3    we start, when you were together with your husband, do -- which

4    name do you use to call him?

5    A.    Cesar.

6    Q.    Because you have been referring to him as Julio before.

7    A.    For legal purposes apparently.

8    Q.    You mentioned that you had gotten to be friends with him.  And

9    at some point in July of 2007, he began to live with you?

10   A.    Yes.

11   Q.    And then you guys went to the church to be married in

12   November of 2008?

13   A.    The church I attended, yes.

14   Q.    Now, you also mentioned something about pastors.  Does he go

15   to a different church than you?

16   A.    We had a pastor coming to our church that spoke Spanish,

17   Hispanic pastor.

18   Q.    So that's the one you were referring to?

19   A.    Uh-huh.

20   Q.    Now, have you lived your whole life in Mayer?

21   A.    No.

22   Q.    But you have lived there since at least 1982?

23   A.    Yes.

24   Q.    Have you ever lived anywhere near the border?

25   A.    No.

1   Q.    I am not trying to find out where you live or that detail.  I want

2   to know -- you mentioned you spoke a little bit of Spanish?

3   A.    Uh-huh.

4   Q.    Okay.  Have you ever had to deal with immigration issues prior

5   to getting to know Mr. Lopez?

6   A.    No.

7   Q.    And have you ever had to -- have you ever known any people

8   who are in the United States -- have you ever known them -- well, like

9   friends or perhaps a husband or someone that had been

10   undocumented, had you known that before?

11   A.    My daughter's husband.

12   Q.    Okay.  And you have two daughters?

13   A.    No.

14   Q.    One daughter?

15   A.    One daughter and one son.

16   Q.    Is your daughter still married?

17   A.    Yes.

18   Q.    And so was that sort of how you got to know Mr. Lopez?

19   A.    Yeah, through my daughter.

20   Q.    Through your daughter and maybe the husband as well?

21   A.    Uh-huh, yes.

22   Q.    Did you know anything about the mechanics of how people get

23   across the border when they don't have papers?

24   A.    No.

25   Q.    That's not something you would know, right?

1    A.    No.

2    Q.    It's just not something you are typically involved with up in

3    Mayer?

4    A.    No.

5    Q.    Mayer is in the vicinity -- it's in Yavapai County, right?

6    A.    Yes.

7    Q.    How long -- you drove down to Nogales that one time, right?

8    A.    Yes.

9    Q.    And how long did it take you to drive down there?

10   A.    Four and a half hours.

11   Q.    And was that the first time you had ever been to Nogales?

12   A.    Yes.

13   Q.    Is that the last time you will be in Nogales?

14   A.    Yes.

15   Q.    And you spent the day there with Mr. Lopez?

16   A.    Yes.

17   Q.    Then you spent the night with him as well at somebody's house?

18   A.    Yes.

19   Q.    Do you remember whose house that was?

20   A.    A man named Sinue (phonetic).

21   Q.    Did you get to know him at all?  Did you talk to him?

22   A.    Not much.  It was the Mexican independence week coming up

23   and they all went to a carnival.  So no.

24   Q.    You just spent the time with your husband?

25   A.    Yes.

1   Q.    Did you ever meet a guy -- a bald guy?

2   A.    A what?

3   Q.    Bald fellow down there while you were in that house hanging out

4   with him.  Was there a bald man that came to see him or talk to him?

5   A.    No.

6   Q.    Did you spend any time talking with the persons whose house

7   you guys were staying in?

8   A.    The woman, Sinue's wife or girlfriend, I don't know, just a little

9   bit, not very much.

10   Q.    And while you were down there, you didn't have any discussions

11   about Mr. Lopez coming back across the border?

12   A.    No.

13   Q.    You talked a little bit about the fact that you brought him some

14   documents, some photocopies?

15   A.    No.  His original birth certificate and then photocopies of other

16   things.

17   Q.    Okay.  Did you -- you gave those to him at that time?

18   A.    Yes.

19   Q.    And you gave him $100 as well?

20   A.    Yes.

21   Q.    Your expectation at that point was that he would take his

22   documents and his money and he would try to establish himself as

23   best he could in Nogales for the time being?

24   A.    Yes.

25   Q.    Did he ever tell you he thought he might go back to Veracruz?

1   A.   He didn't know what to do.  He was stuck in Nogales.  Honestly,

2   he had no money to go home on.  He would have to get a job.  So it

3   was just undecided what was happening.

4   Q.   Did he talk much about visiting his kids?

5   A.   He always talks about seeing his kids.  Not any different than

6   any other time, no.

7   Q.   So during the time -- you've known him since 2007.  In that

8   time how many times has he gone back to visit his kids?

9   A.   Since I've known him, one time.

10  Q.   One time?

11  A.   Since I've known him.

12  Q.   When was that about?

13  A.   December.  I'm not sure.

14  Q.   Which year?

15  A.   '07 -- no, '06.

16  Q.   '06.  That was before you were dating?

17  A.   I don't remember.  No.  It was '07.

18  Q.   And did you talk at all about how he came back?

19  A.   No.  I came back -- I went with him.  I was stuck in Mexico for

20  five months with his parents.  I stayed with his parents.

21  Q.   Then you came back at some point?

22  A.   Uh-huh.

23  Q.   So you didn't see how he then crossed?

24  A.   No.

25  Q.   So you guys split up?

1   A.   Yes.

2   Q.   And you never talked about it?

3   A.   No.

4   Q.   But you knew at that point that he didn't have any legal means

5   of crossing?

6   A.   No, he didn't.

7   Q.   And is it fair to say that is not something you really wanted to

8   know about at the time?

9   A.   I had no interest knowing about anything like that.  I had to

10   come home for health issues.  My bank card got eaten down there and

11   I was actually stuck.

12   Q.   So you had to figure out a way to come back.  Did he stay or did

13   he come back -- you stayed after he came back?

14   A.   I went to Agua Prieta and caught a van home -- well, to Phoenix.

15   Then I got home.

16   Q.   Was he still in Veracruz then?

17   A.   He came with me to the border.  The intentions were that he

18   was going to go back home.  He told his kids he was coming back.

19   And he was just going with me up there.  It's quite scary, a white

20   woman by herself.

21   Q.   And did you -- so he was going to go back to Veracruz then, but

22   instead he found a way to get across the border?

23   A.   He found a way, yes.  I don't know how.

24   Q.   You never talked about it again?

25   A.   After he came here, yeah, but I didn't know how.

1    Q.    Now --

2    A.    He had no money.

3    Q.    Did you ever -- so at some point you must have realized that in

4    order to come across the border, it costs money to make arrangements

5    to cross the border if you don't have papers?

6    A.    I learned, yes.  I learned about that.

7    Q.    Now, did you learn about that while you were down there

8    bringing him his paperwork?

9    A.    No.

10   Q.    All right.  So at that time, why then would he not have just come

11   back?

12   A.    Rephrase that.

13   Q.    You know what, it is sort of speculative.  I'm going to skip that

14   question.

15                    Now, you then came home in September of 2009, right,

16   after you have dropped off the paperwork?

17   A.    Yes, the next day after.

18   Q.    And you went about your life normally, right?

19   A.    Well, actually normally was with him at that time.  So I was

20   without him.  Yes, I went on, yeah.

21   Q.    And you expected to hear news about how he was doing in

22   Nogales and what progress he might have made?

23   A.    He would call me pretty much every other day, if not every day.

24   It wasn't every day but every other day.

25   Q.    And then suddenly you get this call from Tucson?

1  A.    Yeah, I got a call.  I hadn't talked to him for about four days.  So

2  I didn't know what had happened.  I was getting kind of concerned.

3  Q.    Then you got this call from him in Tucson?

4  A.    Yes.

5  Q.    Now, you said -- and when the government asked you -- I want

6  to make sure we have the dates right.  The 22nd of September you

7  got your first call from him.  Remember you went through the other --

8  the other attorney went through the pages with the -- and then you

9  that very same evening got in touch with the authorities?

10  A.    Yes.

11  Q.    And you started out in Mayer and you worked your way down

12  until you finally got to the border patrol or the ICE agents?

13  A.    Yes.

14  Q.    Okay.  That was all that same evening on the 22nd?

15  A.    Yes.

16  Q.    On that evening on the 22nd, you had not spoken with anybody

17  but your husband?

18  A.    Yes.  Another man called and spoke Spanish to me but I didn't

19  understand.  So my husband got on the phone.

20  Q.    So all the information you had on the 22nd came from your

21  husband?

22  A.    Yes.

23  Q.    At this point you believe he had incurred -- or there was some

24  issue about paying some money?

25  A.    Yes.

1   Q.   And is it fair to say you were upset by that?

2   A.   Yes.

3   Q.   And also when the government said -- when they asked you

4   about perhaps borrowing some money or doing like that, you never

5   considered doing that?

6   A.   No, no.

7   Q.   In your mind that was not something that you were going to

8   participate in?

9   A.   No.

10  Q.   And rather than do that, you were going to call the authorities

11  and figure out a different way to handle it?

12  A.   It was the only thing I could do.

13  Q.   Okay.

14  A.   Call the authorities.

15  Q.   Yeah.

16              MR. HORMEL:  I don't have any other questions.  Thank

17  you very much.

18              THE COURT:  Mr. Romo.

19              MR. ROMO VEJAR:  Yes, sir.

20                       CROSS-EXAMINATION

21  BY MR. ROMO VEJAR:

22  Q.   Good afternoon, Ms. Lopez.  I'm Jesus Romo.  I represent one of

23  the accused here.

24  A.   Hi.

25  Q.   My understanding, ma'am, is that you met your husband about

1    four years ago.  Is that correct?

2    A.    Yes.

3    Q.    And it would have been about 2006 or 2007?

4    A.    2006, about in December, like New Year's Eve.  He came over to

5    my house with another person, another lady.

6    Q.    And before then he was friends with your daughter.  Is that

7    right?

8    A.    Yes.

9    Q.    And your daughter at the time was not married or was she?

10   A.    No, not at that time.

11   Q.    All right.  She later married.  Is that right?

12   A.    Yes.

13   Q.    And then you started seeing him in a more formal way.  Is that

14   correct?

15   A.    In about June.  He moved in with me in July of '07.

16   Q.    July '07 is when he moved in with you?

17   A.    Yes.

18   Q.    And then if I understand correctly, you went with him to Mexico,

19   is that right, in December of that year?

20   A.    '07.

21   Q.    You stayed there for five months.  Is that what I heard?

22   A.    Yes.

23   Q.    While you were there, were you two working or was he working?

24   A.    Not at this time, no.

25   Q.    No.  So during those five months, you two were just getting to

1  know each other?

2  A.    I had already known him a little bit, for like six months -- five,

3  six months.  Then we went to Mexico.  I met his family.

4  Q.    Well, were you living together during that time?  What I mean,

5  were you living together as boyfriend, girlfriend, having relations?

6  A.    In Mexico?

7  Q.    Yes, ma'am.

8  A.    Yes.

9  Q.    So those five months you represented yourselves as a couple?

10  A.    Yes.

11  Q.    While you were down there?

12  A.    Yes.

13  Q.    Is that right?  All right.  And when you went down there, did you

14  find out whether or not he had gone back there to visit with his

15  children before?

16  A.    No, I don't know.

17  Q.    You didn't know whether or not he had visited with his children?

18  A.    Before that?

19  Q.    Before that.

20  A.    I don't know.

21  Q.    You don't know?

22  A.    I don't know anything before he was with me.  I don't know.

23  Q.    Did you two talk about his family situation down there?

24  A.    When?

25  Q.    While you were together beginning in 2006.

1   A.   In 2007 when I was with him?

2   Q.   Yes.  You started living together in July of 2007.  Is that correct,

3   ma'am?

4   A.   Yes.

5   Q.   And during that period of time, until you married in November of

6   the following year in the church, you were together as a couple.  Is

7   that correct?

8   A.   Yes.

9   Q.   And during that time before you went to Mexico and while you

10   were in Mexico and spending five months over there, did you two talk

11   about his family in Mexico?

12   A.   We were living with them, yes.

13   Q.   Did you talk about his previous wife or girlfriend?

14   A.   The mother of his children.

15   Q.   Did you ever meet her?

16   A.   No.  She doesn't live there.

17   Q.   And the children, you met the children?

18   A.   Yes.

19   Q.   And did he tell you that -- anything about his daughter?

20   A.   I was living with them.

21   Q.   Did he say anything peculiar about her, about the relationship?

22   A.   His daughter?

23   Q.   Between him and his daughter.

24   A.   No.

25   Q.   Now, you said that you married in November of the year

1    following.  Is that correct, ma'am?

2    A.    In '08.

3    Q.    In '08.  But you also stated that you married in the church?

4    A.    Yes, in '09.

5    Q.    I'm sorry?

6    A.    Legally in '09.

7    Q.    Legally in '09?

8    A.    Yes.

9    Q.    In '08 you just married how?

10   A.    In '08?

11   Q.    Yes.

12   A.    In our church.

13   Q.    Uh-huh.

14   A.    Uh-huh.  His pastor married us.

15   Q.    Did you have a license to marry?

16   A.    It was not legal.  It was in the eyes of God or "Dios."

17   Q.    "Dios" meaning God?

18   A.    Yes.

19   Q.    So you married him without a license.  That's what you are

20   saying?

21   A.    Yes.

22   Q.    And then you married him with a license?

23   A.    Yes.

24   Q.    When?

25   A.    In October '09.

1    Q.    After this incident.  Is that correct?

2    A.    Yes.

3    Q.    And it was then that you applied for the I-213 that you

4    mentioned to the jury?

5    A.    The I-130.

6    Q.    I beg your pardon.  Is that correct?

7    A.    We had the paperwork there.  I don't have the money for it.  It's

8    in the process.

9    Q.    And that process is through whom?

10   A.    Through a charitable organization.

11   Q.    Through the Catholic services in Phoenix?

12   A.    Yes.

13   Q.    But it was after you married legally that you started that

14   process?

15   A.    Yes.

16   Q.    Now, you said that when you were coming back from Mexico, he

17   decided he was going to stay in Veracruz.  Is that right?

18   A.    He told his children that he was going to stay there.  I believe he

19   was going to stay.  But when we got to the border, he didn't want to

20   see me leave, but I left.  I went home.

21   Q.    But your understanding was for everything he said he was going

22   to go back to Veracruz.  He was just going to accompany you to Agua

23   Prieta.  Is that correct?

24   A.    Yeah.

25   Q.    How come he didn't come through Nogales?  Wasn't that closer

1  from Veracruz to Nogales?

2  A.    My daughter's husband, but they weren't really married, the

3  father of her two children, his family lives in Agua Prieta.

4  Q.    You wanted to visit with them?

5  A.    No.  I just knew that if I went through Agua Prieta, I knew

6  somebody there if something happened.  I was just one white woman.

7  I didn't speak that much Spanish.  I mean, I didn't have money to fly

8  back.  Actually, I didn't even have my passport.  I got on a van -- I

9  don't remember the shuttle's name -- from Agua Prieta to Phoenix.

10 Q.    All right.  So you went to Agua Prieta because you felt safer that

11 way?

12 A.    Yes.

13 Q.    And when you got to Agua Prieta, he tried to talk you into

14 staying with him.  Is that right?

15 A.    No.  I didn't say that.

16 Q.    I'm asking you, ma'am.

17 A.    No.  He didn't want to see me leave.

18 Q.    Well, did he want you to stay?

19 A.    No.  He knew I was going home.  Yeah, apparently, yes, he

20 wanted me to stay.

21 Q.    He doesn't want to see you leave.  He wants you to stay, right?

22 A.    Right, right.

23 Q.    But you had to go?

24 A.    Yes.

25 Q.    You left.  Was it your understanding that he was going to come

1   follow you immediately afterwards?

2   A.      No.

3   Q.      At that time you had no plans of marrying him?

4   A.      We wanted to get legally married, but he didn't have the correct

5   documents.

6   Q.      This would have been in May of 2008 approximately, correct,

7   after spending five months --

8   A.      Yeah.  I got home -- let's see.  I don't remember what day.  The

9   end of May sometime.

10  Q.      And then he showed up in Mayer a few days later?

11  A.      I don't exactly know when.  No, not a few days later, huh-uh.

12  Q.      Did it take awhile?

13  A.      It was about a week.

14  Q.      And you two discussed how he got there, right?

15  A.      When he got home?

16  Q.      Yes.

17  A.      Yes.

18  Q.      It is fair to say that if he wanted you to live with him in Mexico,

19  you wouldn't?

20  A.      I medically cannot live in Mexico.  I would go live down there

21  with his family if I could, but I cannot.  I wouldn't live there forever,

22  but I would go visit.  But I just medically can't.

23  Q.      You cannot live down there.  And so if you two were to live as a

24  family, it would have to be in the United States?

25  A.      I would like to apply for a visa for his children for them to come

1    here.

2    Q.    So that they can come in and visit.  Is that what we are talking

3    about?

4    A.    Yeah.

5              MR. ROMO VEJAR:  May I have a second, Your Honor?

6              THE COURT:  Yes.

7              MR. ROMO VEJAR:  No other questions, Judge.  Thank

8    you.

9              THE COURT:  Any redirect, Mr. Evans?

10                        REDIRECT EXAMINATION

11   BY MR. EVANS:

12   Q.    Sometime after November of 2008 is when you got married in

13   the church?

14   A.    No.  The eyes of God, November, yes, 2008.

15   Q.    But it was always your plan to marry legally?

16   A.    Yes.

17   Q.    At no time when you met him in September was it your -- did

18   you think that he was going to attempt another -- attempt to come to

19   this side of the border without you getting married or doing it legally?

20   A.    I was thinking that I would go down to Mexico and just marry

21   him down there to be married somewhere legally.

22              MR. EVANS:  Thank you.  No further questions.

23              MR. ROMO VEJAR:  Your Honor, I have another

24   question.

25              THE COURT:  Was that something that was brought up

1    during the redirect?

2                    MR. ROMO VEJAR:  Yes, sir.

3                    THE COURT:  One question.

4                         RECROSS-EXAMINATION

5    BY MR. ROMO VEJAR:

6    Q.    Why didn't you marry while you were in Mexico?

7    A.    Pardon me?

8    Q.    Why didn't you marry him while you were in Mexico?

9    A.    I didn't have the money.  We didn't have the money.

10   Q.    So the only reason you didn't get married in Mexico was because

11   you had no funds.  Is that your testimony?

12   A.    Yes.  Well, yes.

13                   MR. ROMO VEJAR:  No other questions, Your Honor.

14   Thank you.

15                   THE COURT:  Anything further?

16                   MR. EVANS:  No, Your Honor.

17                   THE COURT:  Thank you, ma'am.  You may step down.

18   You are excused.

19                   Would you call your next witness.

20                   MS. KELLY:  Your Honor, may we approach a minute?

21                   THE COURT:  Yes.

22                   (At sidebar.)

23                   MS. KELLY:  Defense counsel indicated that their

24   cross-examination of Ms. Lopez was going to take all of the day.  So

25   we released all of our BORTAC agents to come back first thing in the

1    morning.

2              THE COURT:  Who have you got?

3              MS. KELLY:  We don't have -- we have BORTAC.  I

4    anticipate -- if there's a day-long cross, then obviously that's not

5    considered.  But I think we will finish up our case by noon tomorrow.

6              MR. ROMO VEJAR:  Your Honor, I don't have any

7    objection except that we shouldn't be blamed for lack of planning.

8              THE COURT:  Well, it doesn't matter at this point.  If the

9    witnesses are not here, they are not here.

10             (In open court.)

11             THE COURT:  Ladies and gentlemen of the jury, we have

12   run out of witnesses.  We have to take a recess this afternoon and

13   reconvene tomorrow morning at 9:30.  I have two hearings tomorrow.

14   I should be right on track tomorrow.

15             Have a good evening.  We'll see you tomorrow morning

16   at 9:30.

17             Remember the admonition of the court not to discuss the

18   case with anyone or allow anyone to discuss it with you.

19             You are excused at this time.

20             (The jury was excused at 4:12 p.m.)

21             THE COURT:  The record will reflect that the jury has

22   withdrawn, counsel and defendants are present.

23             Ms. Kelly, anything further from the government?

24             MS. KELLY:  No, Your Honor.

25             MR. EVANS:  Your Honor, we do.  We have this question

1   of them calling back Mr. Lopez and -- at this point the government was

2   going to allow him to go back to Mayer with Ms. Lopez.

3                   THE COURT:  Well, you say you are putting on your

4   agents tomorrow.

5                   MR. EVANS:  Yes.

6                   THE COURT:  You anticipate finishing by noon.

7                   How long is your case going to take tomorrow?

8                   MR. ROMO VEJAR:  Well, Judge, if we need him, we can

9   put him on tomorrow.

10                  THE COURT:  The question is -- he's here today.  If you

11  don't need him tomorrow, he can go and come back on Monday.

12                  MR. ROMO VEJAR:  We are going to start Monday?

13  That's another question I have.

14                  THE COURT:  We are going Monday.

15                  MR. ROMO VEJAR:  Monday would be good, Judge.

16                  THE COURT:  Do you anticipate that your case will take

17  -- if in fact you are at some point going to call Mr. Lopez, you are not

18  going to need him tomorrow afternoon, for instance?

19                  MR. ROMO VEJAR:  Well, Judge, I think we would take

20  tomorrow afternoon.  You know, I don't know the strength and timing

21  of the government's cross-examination.  I think I anticipate that we

22  will go through tomorrow afternoon.

23                  THE COURT:  Mr. Hormel?

24                  MR. HORMEL:  I anticipate calling between two and

25  three witnesses.  I don't predict my direct examination of them would

1    take longer than 20, 30 minutes each at most.  You know, it's hard.

2    I'm doing my best guess.  I'm going to call Ms. Rascon.  I'm going to

3    call Ms. Pina.

4              THE COURT:  The government still has two extra

5    witnesses you are going to put on, right?  You are putting on two

6    expert witnesses tomorrow?

7              MR. EVANS:  One.

8              MR. HORMEL:  That will take awhile, Your Honor.  That

9    will not be brief.

10              THE COURT:  All right.  If you want, then you can tell

11    Mr. Lopez that he can go back and be available to be back Monday

12    then, Monday morning.  We will reconvene Monday morning at 9:30.

13              MR. ROMO VEJAR:  Your Honor, just to be fair, I'm not

14    sure that we will need him.

15              THE COURT:  You have to tell us by the end of Friday

16    you are going to know if you will need him or not.  You have to tell us

17    at that point whether you will need him or not.  Then that's what we

18    will do.

19              Anything else, Mr. Hormel?

20              MR. HORMEL:  Yes, Your Honor.  I would ask if you

21    would authorize a transcript of Mr. Lopez' for today.

22              THE COURT:  Very well.

23              Mr. Romo?

24              MR. ROMO VEJAR:  Nothing else.

25              THE COURT:  Mr. Evans?

1        MR. EVANS:  No.

2        THE COURT:  Ms. Kelly?

3        MS. KELLY:  No.

4        THE COURT:  See you tomorrow morning at 9:30.

5        (The proceedings concluded at 4:15 p.m.)

1
2
3
4
5
6
7                           C E R T I F I C A T E
8
9
10
11          I, Dianne Davenport, certify that the foregoing is a correct
12    transcript from the record of proceedings in the above-entitled matter.
13
14
15
16
17    /s/  Dianne Davenport                    November 16, 2011
18
19
20
21
22
23
24
25