1

1

1            IN THE UNITED STATES DISTRICT COURT

2                 DISTRICT OF ARIZONA

3

4  UNITED STATES OF AMERICA,    )
                             )  CR 09-2343-TUC-FRZ

            Plaintiff,     )

5  vs.                      )
                             )  October 29, 2010

6  YURIS BONILLA-GUIZAR and   )  Tucson, Arizona
  CARLOS ARMANDO CALIXTRO-   )

7  BUSTAMANTE,            )
                             )

8           Defendants.    )

9

10               JURY TRIAL - DAY 4

11

12        BEFORE:  HONORABLE FRANK R. ZAPATA
            UNITED STATES DISTRICT JUDGE

13        405 W. CONGRESS, COURTROOM 5-A
              TUCSON, ARIZONA 85701

14

15            A P P E A R A N C E S

16     FOR THE GOVERNMENT:  MS. KRISTEN KELLY and MR. JOHN
  EVANS, ASSISTANT UNITED STATES ATTORNEYS.

17

18     FOR DEFENDANT BONILLA-GUIZAR:  MR. PETER HORMEL,
  ATTORNEY AT LAW.

19     FOR DEFENDANT CALIXTRO-BUSTAMANTE:  MR. JESUS ROMO
  VEJAR, ATTORNEY AT LAW.

20

21     THE INTERPRETERS:  MR. RON ZELLON, MR. DEREK SULLY and
  MR. JUAN RADILLO.

22

23               Dianne Davenport
           405 W. Congress, Suite 1500

24           Tucson, Arizona 85701
             (520)205-4266

25     Proceedings prepared by computerized realtime translation

1
                              WITNESS INDEX
2
WITNESS                                                    PAGE
3
SEAN COLDIRON
4
Direct Examination by Ms. Kelly                               5
Cross-Examination by Mr. Hormel                             35
5
Cross-Examination by Mr. Romo                               54
6
ROBERTO TERAN
7
Direct Examination by Ms. Kelly                              72
8
DAVID SLAGLE
9
Direct Examination by Ms. Kelly                              84
Cross-Examination by Mr. Hormel                            114
10
Cross-Examination by Mr. Romo                              128
Redirect Examination by Ms. Kelly                          144
11
Recross-Examination by Mr. Romo                            149
Further Redirect Examination by Ms. Kelly                  153
12
Further Recross-Examination by Mr. Romo                    154
13
JEFF ELLIS
14
Direct Examination by Ms. Kelly                            156
Cross-Examination by Mr. Hormel                            174
15
                              EXHIBIT INDEX
16
EXHIBIT                                       OFFERED RECEIVED
17
3                                                94        94
18
4                                                94        94
11                                               19        19
19
19                                              113       114
20                                               22        22
20
21                                               94        94
22                                               34        34
21
27                                               58        58
32                                               20        20
22
33                                               25        25
35                                               24        24
23
36                                               30        31
50                                              148       152
24
51                                              105       105
52                                               98        99
25

1      P R O C E E D I N G S

2           (Call to order of court, 9:30 a.m.)

3           THE COURT:  The record will reflect the presence of

4    counsel and the defendants and the absence of the jury.

5           Do we have an issue?

6           MR. HORMEL:  Yes, Your Honor.

7           Today my understanding is that Agent Slagle will testify.

8    And I have been going through -- there's a statement that the

9    government put in their list of exhibits, an interview given with Mr.

10   Calixtro prior to his arrest.

11          Now, I went through that and I couldn't find anything

12   admissible.  He didn't make any admission or statements against his

13   interest.  I'm not sure what the government intends to use, if

14   anything, out of that.

15          If they do I would obviously object based on Bruton

16   grounds and things like that.  There aren't really any admissions.  I

17   wanted to clear that up before we went forward.

18          MS. KELLY:  We are not intending to use it.

19          MR. HORMEL:  That's all, Your Honor.

20          THE COURT:  Call the jury.

21          MR. ROMO VEJAR:  Your Honor, I will not recall the

22   witness Lopez.

23          THE COURT:  Very well.  Then if he could be advised of

24   that.

25          (The jury was seated.)

1          THE COURT:  The record will reflect the presence of the

2   jury, counsel and the defendant.

3          Good morning, ladies and gentlemen of the jury.

4          We were trying to get our computer system working this

5   morning.  We have a lot of computers that operate everything we have

6   put in here at a very large cost which almost always break down when

7   we have a trial.  The reason they were put in is to make trials flow

8   easier.  Actually, it's been going pretty well this week.

9          This computer, as you see me looking in this direction,

10  as everybody is speaking, the court reporter takes down everything

11  that is being said.  She can take down 240-plus words per minute.

12  But it's in symbols so the computer translates those symbols into

13  English.  What I see is actual language up here of what people are

14  saying.  So every now and again you'll see me look over.  That's what

15  I'm looking at over there.  That is the reason we were still fiddling with

16  it when you came in.  We couldn't get it up.  So now it's up and

17  working.

18          Would you call your next witness, please.

19          MS. KELLY:  Thank you, Your Honor.  The government

20  calls Supervisory Border Patrol Agent Sean Coldiron.

21          SEAN COLDIRON, GOVERNMENT WITNESS, SWORN

22          THE COURT:  State your full name for the record and

23  spell your last name.

24          THE WITNESS:  Sean Coldiron.  C-o-l-d-i-r-o-n.

25                          / / /

1  DIRECT EXAMINATION

2  BY MS. KELLY:

3  Q.    Good morning, sir.

4  A.    Good morning.

5  Q.    Would you please introduce yourself to the ladies and gentlemen

6  of the jury.

7  A.    My name is Sean Coldiron.  I'm currently the deputy commander

8  of the Border Patrol Tactical Unit near Tucson.

9  Q.    How long have you been with border patrol?

10  A.    Since 1998.

11  Q.    Specifically what is your job with border patrol?

12  A.    The position I currently hold is I am the operational supervisor

13  for the Border Patrol Tactical Unit here in Tucson.

14  Q.    What's the Border Patrol Tactical Unit?

15  A.    It's a special operations unit that performs missions in support of

16  the Department of Homeland Security, CBP, and the border patrol

17  itself here targeting violent criminal organizations.

18  Q.    And did you have military training before you were part of the

19  border patrol?

20  A.    Yes, ma'am.  I served six years in Army Special Operations with

21  the Ranger Regiment.

22  Q.    Where were you deployed?

23  A.    I've been deployed all over the world, overseas, Haiti, South

24  America, Central America, Europe.

25  Q.    Your border patrol tactical team, does it work like a SWAT team?

1    A.    Yes and no.  It actually mirrors both military special operations

2    and typical -- we have two functions.  Part of our function is operating

3    as a typical SWAT team.

4    Q.    Okay.  And what type of violent criminal situations --

5                    MR. HORMEL:  Objection.

6    BY MS. KELLY:

7    Q.    -- do you respond to?

8                    THE COURT:  Sustained.

9    BY MS. KELLY:

10   Q.    What type of criminal situations do you respond to?

11   A.    For us we usually target certain organizations that are well

12   organized that perform armed trafficking --

13                    MR. HORMEL:  I will object, Your Honor.

14                    THE COURT:  Sustained.

15   BY MS. KELLY:

16   Q.    What type of crimes do you respond to?

17                    MR. HORMEL:  Objection, Your Honor.

18                    THE COURT:  No, overruled.  He may answer that.

19                    THE WITNESS:  We respond to barricade suspects,

20   persons who are being -- not complying with lawful orders inside of

21   structures.  We also try to interdict any individuals that are carrying

22   narcotics or performing alien smuggling that are either armed or

23   holding people against their will.

24   BY MS. KELLY:

25   Q.    Are you trained to respond to those particular situations?

1    A.    That is one of our top priorities, yes, ma'am.

2    Q.    Generally speaking are you the commander in your unit?

3    A.    I'm the deputy commander.  We have a commander that

4    oversees the administrative functions and liaisons with our

5    headquarters element.  Myself, I supervise all operations -- day-to-day

6    training and operations of the unit.

7    Q.    What is your role as the deputy commander in a hostage

8    situation?

9    A.    I'm the overall element leader.  I control the action on the

10   ground itself.

11   Q.    What do you mean, "element leader"?

12   A.    We actually are broken down into two different elements.  We

13   have an assault team which is part of the hostage rescue team that

14   actually makes the raid on the structure itself and make entry.  We

15   have a containment team.  Myself, as the deputy commander, I control

16   both elements and supervise the entire operation in and of itself.

17   Q.    Okay.  And, generally speaking, if your team is involved in a

18   hostage situation at a trailer compound, how does the team respond?

19   A.    If it's -- it responds in two different ways.  If it is already what

20   we call an established crisis site where an individual has already made

21   contact with law enforcement entities, what happens is they will

22   establish a perimeter containment and keep it from spilling over and

23   try to establish dialogue with the suspects inside.

24   Q.    Let me stop you for a second.  You're saying if it's an established

25   crisis site and there's already contact with law enforcement.

1    A.    Right.

2    Q.    What does that mean?

3    A.    It just means that there's been a 911 call or law enforcement

4    personnel have already responded to the scene based on intelligence

5    and confirmed it once they got on scene and established dialogue with

6    the suspects or the victims themselves.

7            And there's another type that we respond to in terms

8    where the suspects do not know that we actually have been informed

9    that they are holding people against their will.  And we will actually

10   work with the requesting agency developing a warrant, a search

11   warrant, and we will actually go exercise that search warrant as we did

12   in this situation.

13   Q.    So how does the hostage rescue change when the suspects or

14   the people holding the hostage don't know that you know what is

15   going on?

16           MR. HORMEL:  I will object as to the conclusions, Your

17   Honor.  There is a hostage taking situation.  All of that is assumed at

18   this point.

19           THE COURT:  Well, I think we need to get to the process

20   of what happened in this case rather than going on with hypotheticals.

21   You have established what this person's background is, expertise is.  I

22   think we need to get to this case.

23   BY MS. KELLY:

24   Q.    Were you on duty on September 24 of 2009?

25   A.    Yes, ma'am.

1   Q.      And what was your job that day?

2   A.      During that day I was actually conducting team training with a

3   portion of my unit in Three Points, Arizona.

4   Q.      Were you alerted to a hostage situation?

5   A.      Yes, ma'am.  My commander called me at approximately 12:00

6   p.m. and notified me that ICE had contacted him and that there was

7   an individual that was being held for ransom for approximately

8   $2,300.

9   Q.      What did you do next?

10  A.      At that point I notified the remainder of my unit and told them --

11  activated our emergency call-out procedures and we met at the Tucson

12  sector headquarters.

13  Q.      What happened next?

14  A.      The information we received at the time was still convoluted.

15  They were trying to pinpoint the exact location.  At approximately

16  3:00 we were notified that they had isolated the location and it was at

17  9950 South Oak Canyon Lane which is in southern Tucson.  And at

18  that point they had already secured a search warrant and we moved in

19  to the rapid planning process to execute that search warrant.

20  Q.      What's the rapid planning process?

21  A.      In situations like this many times we will actually take our time

22  planning every aspect of it.  In hostage situations we can't afford that

23  because there's a victim and there's a life in danger.  In these cases

24  we will actually develop an emergency plan and we will start work on

25  our deliberate action plan.  And in this case we started planning our

1    emergency plan.

2    Q.    What was the emergency plan?

3    A.    Just to arrive on site.  We had already isolated which building

4    that the victim was in.  So at this point we developed a plan on how to

5    secure that one structure, make entry into it, and then with the

6    other -- there was four other structures on the compound other than

7    just the one.  So that was a concern for us.

8                    So we just wanted to worry about the first structure,

9    safeguarding the victim, and then moving on to dealing with the other

10   structures because the search warrant outlined all five structures on

11   the compound.

12   Q.    How do you deal with a situation when there's not just one

13   structure but there's multiple structures?

14   A.    In a situation in this area, it's -- we have actually responded to

15   other call-outs in this area --

16                   MR. HORMEL:  I object.  It's irrelevant and foundation.

17                   THE COURT:  Sustained.  Let's stick to this case.

18                   THE WITNESS:  In this situation it's always a concern

19   when you have other structures on there.  I have to protect officer

20   safety.  And at the same time, I have to protect other third-party

21   victims.

22   Q.    Okay.  So how many people did you respond to 9950 South Oak

23   Canyon Lane with?

24   A.    I had 25 BORTAC agents.

25   Q.    And briefly describe for us what the role of the units were, what

1    the role of the people were when they got there?

2    A.     We had an eight-man hostage rescue team that went into the

3    main structure.  The remaining elements were broken down into what

4    we call perimeter containment; sections to cover the back side of the

5    structure and to cover down on the other structures and not allow

6    personnel to enter or leave the crime site scene.

7    Q.     I'm going to stop you there for a minute.  What time was it that

8    you got to this property?

9    A.     Approximately 7:40 p.m.

10              MS. KELLY:  At this point the government will move to

11   publish to the jury Exhibit 87.  It's a four-minute long interview.  What

12   we will do for clarity sake is play a section and stop and talk about

13   that and continue playing it after we finish talking.

14              THE COURT:  Play your video.

15              (Exhibit 87 is played.)

16   BY MS. KELLY:

17   Q.     Sir, what's happening?

18   A.     At this point right there, the entire hostage rescue element is

19   off-loaded from all of our vehicles because the original plan was for us

20   to actually turn down that road.  We missed the turn due to the

21   darkness and the fact that we did not want to drive into the center of

22   the compound itself due to officer safety.

23              Because the location -- if you look in about the center

24   frame -- in the upper left-hand side is the target structure where we

25   believed the victim was at.

1          MS. KELLY:  I don't know.  Does the touch screen work

2    on the video the same way it works on the ELMO?  No, probably not.

3    BY MS. KELLY:

4    Q.    Sir, if you can touch -- I don't know if you can see yet where the

5    general structure is.

6    A.    It would be in that general vicinity right here.

7    Q.    So what were the vehicles that we saw down the right-hand side

8    of the screen?

9    A.    One is an armored personnel carrier.  It's a BearCat.  It's a

10   specialized police law enforcement vehicle to protect us from people

11   with guns.  There were -- others are raid vehicles itself.  A couple of

12   vans.

13   Q.    Okay.  At this point are you guys still in your vehicles driving to

14   the scene?

15   A.    No.  We are actually on foot at that point.  You can see us there

16   in the right-hand side right there.

17          MS. KELLY:  At this point I will go ahead and clear the

18   blue and we will continue to play.

19          (Exhibit 87 is played.)

20   BY MS. KELLY:

21   Q.    Sir, we have paused the video again.  What's happening now?

22   A.    At this point we have located the correct structure that we were

23   looking for.  We have crossed over a fence.  There is -- we were

24   actually trying to locate a place to cross over the fence along that

25   road.  We were also verifying to make sure we had the correct

1   structure.

2   Q.    How did you go about verifying you had the right structure, the

3   right trailer?

4   A.    Because of -- on the search warrant, it only listed a grid

5   coordinate and general description of the location.  There was no

6   visible address.  We had three indicators.

7         Where we stopped the vehicles, there's a water tank

8   right there on the road.  That was confirmed through video.  And as

9   you got closer to the structure, we actually knew there was horse

10  corrals and horses there on the structure -- adjacent to the structure

11  to the west which you can see in the bottom left-hand picture.

12        And on top of that there was a -- on both sides of the

13  structure are half hexagon of security bars on both windows -- bay

14  windows on both sides.

15  Q.    What do you mean by that?

16  A.    What we call -- in this case -- a lot of the single wide trailers, in

17  our experience, they will -- to make more room for the bedrooms, they

18  will actually create like a half hexagon.  In this structure itself, there

19  was actually security bars on all the windows.

20  Q.    All the windows around the whole trailer?

21  A.    Correct.

22  Q.    So that we all see where you are, where are you and your men?

23  A.    I am actually in that picture right there.  The three guys you see

24  standing in the open, I'm the last guy out of those three right there.

25  Q.    And as you were walking coming through this property to where

1   you are right there, had you seen anybody other than you and your

2   team?

3   A.      No, ma'am.

4              MS. KELLY:  Let's go ahead and press play.

5              (Exhibit 87 is played)

6   BY MS. KELLY:

7   Q.      What's happening now?

8   A.      At this point I gave -- the point man, Agent O'Connor, was

9   waiting on confirmation from me.  I wanted to make sure we were at

10  the right structure.  We verified the color of the truck which was a

11  bluish green color.

12             At this point, what you see us doing right now, I told our

13  point man, "Go to the door.  Open the door now."  The primary teams

14  are already moving into their positions.  And at this point we are

15  getting ready to make entry into the structure.

16  Q.      Did you use what is called a flash bang?

17  A.      Correct, ma'am.  We used three.

18  Q.      What are those?

19  A.      Controlled noise and light distraction device.  They are a

20  specialty tool used by both law enforcement tactical teams and the

21  military special operations unit especially for situations like this.

22             What it does is it creates a loud -- or a bright flash and a

23  loud noise with a little bit of what we call overpressure.  It moves the

24  air a little bit for us to divert the attention of the suspect away from us

25  and to blind them a little bit to give us the upper edge as we make

1    entry.

2    Q.    So the purpose of it is what exactly?

3    A.    Officer safety.

4    Q.    And you said that you used three?

5    A.    Yes, ma'am.

6    Q.    Where did you use them?

7    A.    One at the primary breach point.  We dropped one right as the

8    door opened right at the doorstep.  We deployed two on the east and

9    west side of the structure outside the windows.

10   Q.    Okay.  Did you get them into the structure inside the windows?

11   A.    No, ma'am.  We do not put them inside as much -- as often as

12   possible because it will create a fire hazard.  We deploy.  We break out

13   the window and drop them outside the structure.

14   Q.    You had mentioned a moment ago that there were bars on all

15   the windows on this trailer?

16   A.    Correct.

17   Q.    How did you break the window with the bars then?

18   A.    We have specialty tools that will fit in between the security bars.

19   On top of that we actually had a plan to pull the bars off if we needed

20   if we could not get in to rescue the victim.

21   Q.    How would you pull the bars off?

22   A.    We have specialty hooks attached to a vehicle.

23                    MS. KELLY:  Go ahead and press play.

24                    (Exhibit 87 is played.)

25   BY MS. KELLY:

1   Q.    What did we just see?

2   A.    We saw us deploying both diversion devices, the flash bangs on

3   either side of the structure, to divert the attention of any suspects

4   inside or any subjects inside away from the breach point.  And we

5   went inside.

6                    Once inside the team split.  We have designated areas

7   they go to clear and secure all -- you know, secure, clear all rooms

8   and secure all personnel inside the structure.

9   Q.    I want to take a minute and go back for a second to right before

10  you went in that door.  If you can just point on your screen to the door

11  that you went in.

12  A.    That door right there.

13  Q.    And before you went in, I think we saw that there were men

14  outside that particular door?

15  A.    Yes.

16  Q.    Were you one of them?

17  A.    Yes, ma'am.

18  Q.    How many people did you have with you right outside that door

19  before you went in?

20  A.    A total of eight of us.

21  Q.    Did you hear anything?

22  A.    I did not hear anything.

23  Q.    So when you went in, you said that some people went to

24  different locations?

25  A.    Correct.

1   Q.   Were you in the front of the line or the back of the line or

2   somewhere else?

3   A.   I was the last two-man team that made entry into the structure.

4   Q.   Is that on purpose?

5   A.   Yes, ma'am.

6   Q.   Why is that?

7   A.   In order to control what is going on inside the structure.

8   Q.   And did you go inside?

9   A.   Yes, ma'am.

10   Q.   What did you see?

11   A.   As I came inside, I went left of that door that you see there to

12   the west portion of the structure.  As I made entry into the main room,

13   there was two small children and a female.  The female was laying

14   down on the floor.  The two young children were sitting on the couch

15   screaming their heads off.

16   Q.   Did you announce yourself?

17   A.   Yes.  We always announce by our standing operating procedure,

18   "Police, get down."

19   Q.   You are trained to do that?

20   A.   Yes.  We do that the entire way through the house.

21   Q.   What's the purpose of that?

22   A.   To keep people -- number one, to identify who we are.  And,

23   number two, to comply with us and get down on the ground so we can

24   identify any threats and to get everyone to comply.

25   Q.   What happened next?

1    A.    I went -- at this point when I saw the female and the two

2    children, I tasked Agent Vazquez to secure the woman.  I could not

3    see her hands.  They were underneath the couch.  And I had one of

4    the other operators grab the two kids and try to calm them down.

5                    I continued on to the bedroom at the far end there.  And

6    laying on the ground in just briefs and socks was the victim that ICE

7    had identified, Julio Cesar Trujillo.

8    Q.    Were you calling his name when you went in?

9    A.    No, we were not.

10   Q.    Did you ask for him?

11   A.    When I saw him, he fit the description -- the picture we were

12   provided and I asked him what his name was.

13                   MS. KELLY:  Let's go ahead and play the remainder of

14   the video.

15                   (Exhibit 87 is played.)

16   BY MS. KELLY:

17   Q.    The rest of the video, what did it show?

18   A.    The rest of the video showed us taking all the suspects we

19   encountered inside, the subject, and moving them to what we call the

20   personnel holding area where we designate as part of the plan and

21   based on our standard operating procedures away from the main

22   structure that we basically organize all the personnel that we

23   encounter inside of a structure.

24   Q.    Did you just go into that one trailer?

25   A.    No, ma'am.  I went into every structure on the compound.

1    Q.    How many were there?

2    A.    Five.

3    Q.    I'm going to show you Exhibit Number 11.  Do you recognize

4    this?

5    A.    Yes, ma'am.

6    Q.    And what is it?

7    A.    That is the overlay that we use for our after-action report.

8    Q.    And was it for this particular case?

9    A.    Yes, ma'am.

10   Q.    Does it show five separate trailers?

11   A.    Yes, ma'am.

12            MS. KELLY:  Your Honor, the government is going to

13   move Exhibit 11.

14            MR. HORMEL:  No objection.

15            MR. ROMO VEJAR:  No objection.

16            THE COURT:  11 shall be admitted and may be

17   published.

18   BY MS. KELLY:

19   Q.    So let's go back and talk about that first trailer for a minute.

20   And in looking at that particular overhead, where did you get this

21   map?

22   A.    This is using Google Earth.

23   Q.    Can you point to us -- show us where trailer number 1 is.

24   A.    Right there where it says, "Number 1."

25   Q.    And now I'm going to place on the overhead Exhibit 32 which

1    has already been admitted.  What's that?

2    A.    That would be trailer number 1.

3    Q.    And when you went in the door, is that the door you are talking

4    about?

5    A.    Yes, ma'am.

6    Q.    Now, I'm going to place on the overhead Exhibit Number 34 also

7    already admitted.  Do you recognize this?

8    A.    Yes.  The far room you see at the back of the picture, that's the

9    room that the victim was in.

10                   THE COURT:  Stop for a second, sir.  You just showed a

11   photograph you said was admitted, 32.

12                   MS. KELLY:  Yes.

13                   THE COURT:  32 is not admitted.

14                   MS. KELLY:  The government would move to admit 32.

15                   MR. HORMEL:  Which is 32?

16                   THE COURT:  32 is a photograph outside of the target

17   trailer.

18                   MR. ROMO VEJAR:  No objection.

19                   MR. HORMEL:  No objection.

20                   THE COURT:  32 shall be admitted and may be

21   published.

22   BY MS. KELLY:

23   Q.    Let me show 32.  This was the trailer -- the target trailer you

24   were talking about the door that you and the eight men went in?

25   A.    Yes, ma'am.

1    Q.    And then this, what was this?

2    A.    This is the actual inside of the target structure, structure number

3    1.

4    Q.    Can you see in this picture the door that you and the men came

5    in?

6    A.    No, you can't.  This is actually taken from just inside the

7    hallway.

8    Q.    Can you point to where that doorway would be?

9    A.    It would be behind.  If you were standing and looking this way,

10   it would be behind you.

11   Q.    Would it be in this particular area?

12   A.    No.  It would be behind you off to your left.  The way this picture

13   was taken, the door is actually behind you a little ways.

14   Q.    Behind the photograph in this picture?

15   A.    Yes.

16   Q.    So kind of over in this way?

17   A.    Correct.

18   Q.    Is that correct or no?

19   A.    Which way?  I'm sorry.

20   Q.    Sort of like this way?

21   A.    Yes, ma'am.

22   Q.    You said that Julio Cesar Lopez-Trujillo was found in this trailer?

23   A.    Correct.

24   Q.    And where was he found?

25   A.    That doorway you see just to the front, the center of the picture,

1    he was just inside the doorway laying down.

2    Q.    I'm going to place on the board Exhibit Number 20.  It has not

3    been admitted yet.  Do you recognize this individual?

4    A.    That would be the victim.

5    Q.    Is this how he appeared when you found him inside that room?

6    A.    That's exactly.  Minus the necklace that he is wearing.

7    Q.    Let's talk about that necklace for a second.  Where did that come

8    from?

9    A.    That originated from us.

10                    MS. KELLY:  Government is going to move to admit and

11   publish 20.

12                    THE COURT:  Any objection?

13                    MR. ROMO VEJAR:  May we approach, Your Honor?

14                    THE COURT:  Very well.

15                    (At sidebar.)

16                    MR. ROMO VEJAR:  Judge, I think this photograph may

17   be too prejudicial and I don't believe that it is admissible without

18   laying some kind of foundation exactly as to why he was like he was.

19   There are other explanations as to why he was.

20                    MR. HORMEL:  This witness can't give that foundation.

21                    THE COURT:  Objection is overruled.

22                    (In open court.)

23                    THE COURT:  20 is admitted and may be published.

24   BY MS. KELLY:

25   Q.    Tell me about the necklace he's wearing.

1    A.    That necklace is how at night we can -- without having to

2    communicate too much over the radio with our personnel holding area

3    commander, this is how they know who is in what priority, who are

4    victims, who are unknowns, which are people we don't know.  We

5    actually give them a red and green glow stick like that.

6                    And victims or women and children that we know are not

7    associated just get a green glow stick.  And any suspects that we know

8    for sure are given a red.  That's how they are actually organized inside

9    the personnel holding area.

10   Q.    So am I correct in understanding that you guys go in, you secure

11   the people inside and then you bring them out, and you make sure

12   everybody is secure?

13   A.    Correct.  We make sure they are secured beforehand.  Then we

14   hand them off to our -- an actual personnel holding area team that is

15   responsible for it.  It's part of the chain of custody.

16   Q.    Okay.  At some point after you get everybody out and make sure

17   everybody is safe, is that when ICE comes in and starts to do their

18   investigation?

19   A.    Correct.  Once we deem the structure or the compound safe and

20   secure.

21   Q.    How did Julio Cesar Lopez-Trujillo appear to you?

22   A.    He appeared in good health from the physical appearance.  He

23   looked shaken up though.

24                    MR. HORMEL:  Objection to speculation.

25                    THE COURT:  The last statement is stricken.  "He

1    appeared in good health from the physical appearance" shall remain.

2    The rest of the statement shall be stricken and the jury is to disregard

3    it.

4    BY MS. KELLY:

5    Q.    Did you take photos or were you there when photos were taken

6    of the outside of the windows of the trailer?

7    A.    I was present on the compound.  I had actually delegated that --

8    given that order to a couple guys on my team to take those photos.

9    Q.    We've talked about that room where Julio was found?

10   A.    Correct.

11   Q.    I will place on the overhead Exhibit Number 25.  Do you

12   recognize that?

13   A.    Yes.

14   Q.    And what is it?

15   A.    That is the security bars and the windows that were outside of

16   what we call the number 2 side which would be -- as is pictured from

17   the breach point we went in would be on the left-hand side.

18   Q.    So was that the room Julio was in?

19   A.    Correct.

20            MS. KELLY:  The government will move to admit and

21   publish 35.

22            MR. ROMO VEJAR:  No objection.

23            MR. HORMEL:  No objection.

24            THE COURT:  Shall be admitted and shall be published.

25   BY MS. KELLY:

1   Q.      What are we looking at?  What are those lines that are up and

2   down over the window?

3   A.      Those are actually wrought iron security bars.

4   Q.      Next I'm going to place Exhibit Number 19, not admitted yet.

5   Do you recognize this?

6   A.      I do not.

7   Q.      I will place Number 33.  Do you recognize this?

8   A.      That would be the room to the right.

9   Q.      And do you see a bed in there?

10  A.      Yes.

11              MS. KELLY:  Government would move to admit and

12  publish 33.

13              THE COURT:  Any objection?

14              MR. HORMEL:  Relevance.

15              THE COURT:  Overruled.  Shall be admitted.

16  BY MS. KELLY:

17  Q.      Which room is this?

18  A.      That would be the room to the right as you come in the breach

19  point where we made entry.  That's the room on the right.  That's

20  where the majority of the other subjects were located by one of my

21  teams.

22  Q.      Who was found there?

23  A.      As far as I know -- may I refer to my report here?

24  Q.      Please.

25  A.      There was two males and two females found in that room right

1    there.

2    Q.    In that particular room?

3    A.    Correct.

4    Q.    And was Agent Roberto Teran the agent that went in and found

5    them?

6    A.    Yes, ma'am.

7    Q.    Do you have the names of those four individuals that were found

8    in that room?

9    A.    I have the names of all the personnel that were secured on the

10    compound.  I don't know -- it's been a year.  I don't know exactly

11    which ones were found inside that room.

12    Q.    Do you have a list of who was found in which particular trailer?

13    A.    Correct.

14    Q.    We'll come back to that in a second.

15    A.    Okay.

16    Q.    What we are looking at in this particular picture of Exhibit 33,

17    what's on the windows?

18    A.    Those are wrought iron security bars again.

19    Q.    When you guys go in, as a matter of practice and protocol inside

20    structures like this, do you look through things?

21    A.    No.

22    Q.    Do you look through the structure?

23    A.    We only look where people might be hiding.  That's the only

24    place we look for.

25    Q.    Do you move things about?

1   A.      We may at times.  If we have to sit somebody down like on a

2   sofa or bed, we will actually search around the immediate area that

3   person is going to be sitting to make sure there is no weapons or

4   anything to cause harm to us.

5              Outside of that the only things we usually manipulate is

6   looking under beds, looking behind structures that -- or couches or

7   armoirs that may hide a person if there is a void back there that may

8   hide a person or inside closets.  That is pretty much it.

9   Q.      The windows that are broken here, were those the flash bangs?

10  A.      They were broken out with our specialty tools before we

11  deployed the flash bangs outside the structure.

12  Q.      I want to talk about the next structure.  Did you go to trailer 2?

13  A.      Yes, ma'am.

14  Q.      What did you find in trailer 2?

15  A.      We found -- we counted one female subject and one male

16  subject at trailer number 2.  And inside the structure we actually found

17  a large amount of food being cooked.

18  Q.      What do you mean, "a large amount of food"?

19  A.      It was more to sustain just two --

20              MR. HORMEL:  Object to relevance, Your Honor.

21              THE COURT:  Overruled.

22              THE WITNESS:  There was a large amount of food that

23  would be more than just for the two individuals we found in trailer

24  number 2.

25  BY MS. KELLY:

1  Q.     When you approached trailer number 2, did you announce

2  yourself?

3  A.     Yes.  We had been announcing the whole entire time we were

4  there.  Agent Robinson had actually reported, who was on our BearCat,

5  the armored vehicle and the turret covering on trailer number 2, had

6  actually announced, there was a female that came out and went back

7  inside the structure.

8  Q.     Had you asked that individual to come out?

9  A.     Yes.

10 Q.     And did she?

11 A.     She came out and then did not comply and went back inside the

12 structure.

13 Q.     What did you do?

14 A.     Well, when we actually went over to the structure, we found the

15 door was locked at that time.  We started to -- we actually had to

16 breach the door itself, physically breach the door.  When we

17 encountered her at the front door, she did not comply immediately.

18 She started being a little mouthy.  And so we actually had to

19 physically detain her to get her to comply.

20 Q.     What do you mean she was being mouthy?

21 A.     She just wouldn't comply with our commands.  She kept telling

22 us that -- you know, using profanity, telling us she has nothing to do

23 with anything we have going on, to go away.

24        MR. HORMEL:  Objection, Your Honor.

25        THE COURT:  Sustained.

BY MS. KELLY:

Q.     Who were the two people you found in that particular trailer?

A.     It would be Jose Jesus Rascon and Luz Rascon.

Q.     And how far was trailer 2 from trailer 1?

A.     Anywhere between 80 and 120 feet.

Q.     And in looking at this particular image, do you see trailer 2?

A.     Yes.  It's going to be right there.

Q.     Did you move on to trailer 3?

A.     Correct.

Q.     Where is that?

A.     That would be right here.

Q.     Approximately how far is trailer 3 from trailer 2?

A.     That would be about the same distance, about 100, 120 feet.

Q.     Did you find anything or anybody in trailer number 3?

A.     Yes.  We actually found two male subjects, one older gentleman and one younger gentleman.

Q.     Who were they?

A.     Armando Rascon and Francisco Rascon.

Q.     And did you find anything unusual inside that trailer?

A.     Yes.  Inside the structure there was two bedrooms that we encountered; one which was padlocked on the outside that we actually had to breach.

Q.     I will place on the overhead an exhibit that hasn't been admitted.  It is 36.  Do you recognize this photo?

A.     Yes.  That would be the bedroom that had the Master Lock that

1   we had -- actually had to cut to make entry into that room.

2   Q.    And that's in trailer?

3   A.    Number 3.

4              MS. KELLY:  The government will move to admit and

5   publish.

6              MR. HORMEL:  Object.

7              THE COURT:  What number are you moving to admit?

8              MS. KELLY:  36.

9              MR. ROMO VEJAR:  Your Honor, I will object as to

10  relevance.

11             THE COURT:  Overruled.

12             MR. ROMO VEJAR:  May I approach, Your Honor?

13             THE COURT:  You may approach, sir.

14             (At sidebar.)

15             MR. ROMO VEJAR:  Your Honor, there is no link between

16  trailer number 1, number 2 and number 3, and none that the

17  government will be able to make.

18             Now, we had listed the witnesses and we provided those

19  witnesses to Mr. Munish (sic) right at the inception of the case.  The

20  witnesses that were inside that trailer -- those two trailers, they

21  complained and said that we hadn't given them enough information

22  about it.

23             The only information that was relevant and we thought

24  was relevant is that there were -- their security was breached for no

25  reason whatever.  Nothing was found inside.  That was the testimony.

1    And Your Honor has excluded the testimony of those people.

2                    Now we are getting --

3                    THE COURT:  The reason is, Mr. Romo, because you

4    didn't comply with the discovery agreement.  Your objection is

5    overruled.

6                    MR. ROMO VEJAR:  Your Honor --

7                    THE COURT:  Your objection is overruled, sir.

8                    (In open court.)

9                    THE COURT:  Exhibit 36 shall be admitted.  It may be

10   published.

11   BY MS. KELLY:

12   Q.    What do we see?

13   A.    You see a door opening up into a bedroom.  And there's -- on the

14   left-hand side, you'll see the hasp and the lock itself that we had to

15   cut.

16   Q.    The what?

17   A.    The hasp.  The enclosure that actually connects to the door

18   itself.

19   Q.    And this -- so this particular thing that we are looking at here,

20   what is that?

21   A.    The hasp itself that will fold over and connect.  There's another

22   piece on the door that you can see torn out that the hasp covered and

23   then the lock went into.

24   Q.    And what's in here?

25   A.    There was a bed and some other miscellaneous items.

1    Q.    So when you say it locked on the outside, what's out here?  Is

2    that inside the trailer?

3    A.    Yeah.  This is inside the trailer.

4    Q.    Then that is a bedroom inside the trailer?

5    A.    Yes.

6    Q.    Did you find that noteworthy?

7    A.    Absolutely.

8               MR. HORMEL:  I will object, Your Honor.

9               THE COURT:  Sustained.  Strike that last statement by

10   the witness.  The jury is not to consider it.

11   BY MS. KELLY:

12   Q.    Let's go back to the overhead.  And did you go to trailer number

13   4?

14   A.    Yes.

15   Q.    Did you go to trailer number 5?

16   A.    Yes.

17   Q.    What did you find?

18   A.    Both abandoned.  There was nobody living inside of those two

19   trailers.

20   Q.    Again, approximately how far are those trailers away from --

21   A.    That one, I think it was approximately 150, 160 feet from trailer

22   number 3.  And 4 and 5 were pretty close to each other, within about

23   30 feet, 40 feet.

24   Q.    Let's go back to the individuals that you say were found -- the

25   individuals that were found in trailer number 1.  Can you give us their

1   names?

2   A.     Yes.  The first one would be Yuris Bonilla-Guizar.  It's hard.  It's

3   handwriting.  It's hard to read there.  Teodoro Pina Viras (sic), Maria

4   Pina Viras, Carlos Calixtro, Osvaldo Pina Viras, Yasmin Luna Castano

5   and Yasmin Rascon Espinoza.

6   Q.     One of those individuals, was that Yuris Bonilla?

7   A.     Yes.

8   Q.     And you had mentioned a Carlos Calixtro.  Do you know offhand

9   if that was a child, Carlos Calixtro, or an adult?

10  A.     I would have to -- I couldn't answer that.

11  Q.     And everybody that was found inside the trailer, were they taken

12  outside and brought into that PHA?

13  A.     Yes, everyone was.

14                    MS. KELLY:  May I have one moment?

15                    THE COURT:  Yes, you may.

16  BY MS. KELLY:

17  Q.     Did you get a good look at the people that were inside?

18  A.     In which -- in all the structures?

19  Q.     In trailer number 1.

20  A.     In trailer number 1, yes, ma'am.

21  Q.     Placing on the overhead Exhibit Number 25, do you recognize

22  this woman?

23  A.     Yes.

24  Q.     And was she one of the women found inside trailer number 1?

25  A.     Yes.

1    Q.    Placing on the overhead Exhibit Number 26 also admitted, do

2    you recognize this woman?

3    A.    Yes.  She was also in trailer number 1.

4    Q.    Placing on the overhead Exhibit Number 23, do you recognize

5    this individual?

6    A.    Yes.  He was in the bedroom to the right in trailer number 1.

7    Q.    Placing on the overhead -- did we publish that or no?  Yes.

8    Placing on the overhead Exhibit 24 and published, do you recognize

9    that individual?

10   A.    Yes.  She was actually -- she was the female we found inside the

11   living room -- the living area with the two children.

12   Q.    And I'm placing on the overhead what has not been admitted,

13   Exhibit Number 22.  Do you recognize that individual?

14   A.    Yes.  He was the one that was encountered in the room to the

15   right.

16              MS. KELLY:  Your Honor, the government will move to

17   publish and admit 22.

18              MR. HORMEL:  No objection.

19              MR. ROMO VEJAR:  No objection.

20              THE COURT:  Shall be admitted.  22 may be published.

21              MS. KELLY:  I don't have any other questions of this

22   witness.

23              THE COURT:  Mr. Hormel.

24              MR. ROMO VEJAR:  Your Honor, I'm going to take a look

25   at these exhibits, if I may?

1        THE COURT:  Very well.

2                 CROSS-EXAMINATION

3    BY MR. HORMEL:

4    Q.    Good morning, Agent Coldiron, is it?

5    A.    Yes, sir.

6    Q.    You mentioned you had some experience working in the Army?

7    A.    Yes, sir.

8    Q.    You were a Ranger?

9    A.    Yes, sir.

10   Q.    And you spent some time in war zones in other countries?

11   A.    Just in Haiti, sir.

12   Q.    So you did combat operations in Haiti?

13   A.    Correct.

14   Q.    And you did other kinds of military operations in South America?

15   A.    Yes.  Training, sir.

16   Q.    And also in Europe?

17   A.    Yes.

18   Q.    Did you end up in Kosovo or Bosnia or anything like that?

19   A.    No.

20   Q.    Okay.  But you did see combat in Haiti?

21   A.    Yes.

22   Q.    How long ago was that?

23   A.    1994, sir.

24   Q.    What was your role as a combat -- in combat in Haiti?

25   A.    During that time I was actually a machine gun team leader.

1    Q.    Machine gun team.  Okay.  So did you guys have any armored

2    vehicles at that time?

3    A.    No, sir, we did not.

4    Q.    As a machine gun team leader, I assume that means you guys

5    were in charge of some type of machine gun weapon of some kind?

6    A.    Yes, sir.

7    Q.    You set that up to deploy against human beings somewhere?

8    A.    It was in support of special operations, yes, sir.

9    Q.    And you actually used that in combat at the time?

10   A.    It was deployed during combat operations in support of the

11   government, yes, sir.

12   Q.    And how long were the combat operations that you were

13   involved in in Haiti?

14   A.    Anywhere from three hours, sir, to a day.

15   Q.    How often were those operations?

16   A.    Daily, sir.  I was on one rotation that we were there for seven

17   continuous days.

18   Q.    And you had more than one rotation I assume?

19   A.    No, sir.  Only one rotation for my unit.

20   Q.    And at some point you left the military, correct?

21   A.    Yes, sir.

22   Q.    When was that?

23   A.    It would be in 1998, sir.

24   Q.    At this point did you go straight to border patrol or ICE at that

25   point?

1   A.   It would be border patrol, yes, sir.

2   Q.   Border patrol.  And you parlayed your military experience into

3   working in a similar function for border patrol?

4   A.   Correct, sir.

5   Q.   And now you run this unit for BORTAC.  Is that the right name?

6   A.   Yes, sir.

7   Q.   BORTAC, does that stand for Border Patrol Tactical or something

8   like that?

9   A.   Border Patrol Tactical Unit, yes, sir.

10  Q.   And what you guys are is more or less a military unit that

11  operates here in the United States of America?

12  A.   No, sir.

13  Q.   Okay.  You mentioned when the government asked you

14  questions that you had a military function?

15  A.   No, sir.  I said it mirrors the military special operations functions

16  based on our rural environment, open-area type operations, how we

17  plan rural-type operations.  In terms of urban operations such as this,

18  it's identical to what typical law enforcement tactical teams do.

19  Q.   Now, you mentioned the use of a vehicle named a BearCat?

20  A.   Yes, sir.

21  Q.   A BearCat is not a typical paddy wagon, is it?

22  A.   No.  Define "paddy wagon."

23  Q.   Van where you put suspects.

24  A.   I'm not familiar with that.  I call that a transport vehicle.

25  Q.   Okay.  That's not what a BearCat is, is it?

1    A.    Yes.  The BearCat is a transport vehicle.

2    Q.    Okay.  A BearCat has a turret on it, does it not?

3    A.    A cupola, yes, sir.

4    Q.    It's not referred to as a turret in your report?

5    A.    It probably is, sir.

6    Q.    Okay.  And a turret is for what purpose?

7    A.    We actually put an individual up there to provide high cover for

8    us, whether it be one of our less lethal specialists or an actual

9    precision marksman up there depending on the situation.

10    Q.    You have a fellow sitting in the turret with a high-powered

11    weapon?

12    A.    No, not in this case, sir.

13    Q.    In this case what did you have up there?

14    A.    And individual with an M4 carbine.

15    Q.    Is that a low-powered weapon?

16    A.    Define "high-powered weapon," sir.

17    Q.    I don't know.  A gun that shoots things and kills people.

18    A.    All kinds shoot things, sir.  Pistols are high powered too.

19    Q.    Is this -- okay.  Maybe let's back up a little bit then.  Describe

20    the weapon that this individual had.

21    A.    It would be the M4 carbine you see any typical SWAT officer or

22    border patrol carrying in the field right now right this instant.

23    Q.    An automatic weapon?

24    A.    No.

25    Q.    Semiautomatic?

1    A.    Semiautomatic.

2    Q.    And this individual is armored in that turret?

3    A.    Yes, sir.  He's armored in that turret.

4    Q.    And this vehicle itself is armored all the way around?

5    A.    Correct, sir.

6    Q.    More or less a tank?

7    A.    No, sir.  It's not a tank.

8    Q.    Doesn't have tracks but it's armored?

9    A.    It's an armored vehicle, sir.

10   Q.    And now how many vehicles did you show up at the scene with?

11   A.    BORTAC itself showed up with four vehicles, sir.

12   Q.    I remember in the video there was a whole long line of vehicles.

13   There were many more than four.

14   A.    Immigration and Customs Enforcement.  You have to direct that

15   question to them, sir.

16   Q.    But you are aware they were present?

17   A.    Yes, sir.

18   Q.    And they followed you there I assume?

19   A.    Yes, sir.

20   Q.    So you don't know how many of them were there?

21   A.    It was not my concern.

22   Q.    It's your testimony today that there were only 25 of you?

23   A.    There was 25 of us, sir.

24   Q.    Let's talk about that.  You mentioned that you had what is called

25   an eight-man hostage rescue team?

1   A.   Correct.

2   Q.   You had a six-man perimeter team?

3   A.   There would be more than that on the perimeter team.

4   Q.   You wrote a report, did you not?

5   A.   Yes, sir.

6   Q.   And have you reviewed that report before you came to court

7   today?

8   A.   Yes, sir.

9   Q.   Do you have it in front of you there?

10   A.   No, I do not, sir.

11          MR. HORMEL:  You have Exhibit 10 available?  It's your

12   exhibit.

13          THE WITNESS:  He's referring to the after-action report.

14          MR. HORMEL:  May I approach the witness, Your Honor?

15          THE COURT:  Yes, you may.

16   BY MR. HORMEL:

17   Q.   Turn to page 2 of -- before we start, what is this document that I

18   have showed you?

19   A.   This document that you just handed me is our after-action

20   report.

21   Q.   On the top it gives a date on the first page?

22   A.   Yes, sir.

23   Q.   And that would be 9-24-09?

24   A.   Yes, sir.

25   Q.   On the second line it says, "From."  Can you say who it's from?

1   A.      Says, "SPBA Sean Coldiron HRT Team Leader."

2   Q.      Who is that?

3   A.      That would be me.

4   Q.      Is this report written by you?

5   A.      Yes, sir.

6   Q.      So would this report -- did you write it accurately at the time?

7   A.      Yes, sir.

8   Q.      Does it refresh your recollection where on page 2 it refers to a

9   six-man perimeter team?

10   A.      Okay.  Yes, sir.

11   Q.      So you had a six-man perimeter team?

12   A.      No, sir.  I had two tiers of perimeter.

13   Q.      So let's talk about how many tiers.  You had one six-man

14   perimeter team.  How many in the other perimeter team?

15   A.      What I have written down here would be five.

16   Q.      So you had eight in the hostage rescue team.  Six in tier one

17   perimeter?

18   A.      Correct.

19   Q.      And then five in the second tier perimeter team which you have

20   written down there?

21   A.      Correct.

22   Q.      Then you have what is called PMO team?

23   A.      Correct.

24   Q.      How many people on that team?

25   A.      Two.

1  Q.    Two.  In order to be on a team, you have to have at least two

2  people, right?

3  A.    Yes.

4  Q.    Otherwise it's not a team?

5  A.    Exactly.

6  Q.    So you've got two on the PMO.  You have a BearCat team which

7  is a driver and a senior operator in the turret.  We've already talked

8  about that?

9  A.    Correct.

10  Q.    All right.  Now, so there is two people in the BearCat team?

11  A.    Correct.

12  Q.    Then you have a PHA team?

13  A.    The PHA team.

14  Q.    How many people are in that?

15  A.    Two.

16  Q.    And what do they do?

17  A.    They're the ones who actually conduct all the organization of the

18  personnel and coordinate for us.  Anytime we have subjects that we

19  encounter inside the structure, they coordinate for us to hand them off

20  to them and safeguard them at the PHA.

21  Q.    "PHA" being what again?

22  A.    Personnel holding area.

23  Q.    Now, you guys don't go in there wearing suits and ties, do you?

24  A.    No, sir.

25  Q.    Can you please describe what all an individual wears who is on

1    your team?

2    A.    We wear what -- we have what we call an entry vest which has a

3    trauma plate in the front and back and soft body armor.  We have

4    different pouches that contain different tools for us to use.  We are

5    also wearing helmets.  And at that time we also wore night vision

6    goggles.

7    Q.    So the helmets you are wearing, those are sort of military-style

8    helmets?

9    A.    Ballistic helmets, sir.

10   Q.    Which means?

11   A.    They protect our heads from bullets.

12   Q.    Now, the armor that you wear covers the top half of the body?

13   A.    Correct, sir.

14   Q.    And then your wearing boots I assume?

15   A.    Correct sir.

16   Q.    Some sort of utility belt?

17   A.    Correct, sir.

18   Q.    There's a variety of tools in the belt?

19   A.    Yes, sir.

20   Q.    Including weapons?

21   A.    Handgun, yes, sir.

22   Q.    And then each guy is also carrying one of these M4s.  Is that

23   right?

24   A.    Yes, sir.

25   Q.    And night vision goggles?

1    A.    Yes, sir.

2    Q.    Each agent in the team?

3    A.    Yes, sir, all of us.  Every single one of us had night vision

4    goggles.

5    Q.    So what about on the legs?  What do you guys wear on the legs?

6    A.    Depends on each operator sir.

7    Q.    What are some of the options?

8    A.    Some guys will carry an actual pouch with tools that they need,

9    whether it be if they are carrying extra diversionary devices.  I also

10   make it mandatory a couple of my guys carry less than lethal -- less

11   lethal deployment systems we can mitigate any scenario.  And they

12   carry extra deployment munitions on themselves on a leg pouch.  For

13   the most part, it all depends on the individual.

14   Q.    Any kind of armor you can wear on your legs?

15   A.    We don't wear armor on our legs, sir.

16   Q.    The uniform itself is not a standard blue SWAT uniform, is it?

17   A.    It's a green uniform, sir.

18   Q.    Green.  Dark green or camouflage?

19   A.    Olive green.

20   Q.    Olive green.  Olive green for what reason?

21   A.    It's olive green because that's the uniform they tell me to wear,

22   sir.  It's a tactical uniform.  It's consistent with the rest of the

23   industry, sir.  It has all of our identification panels all over including

24   police panels on our vest.

25   Q.    Okay.  It also helps you to blend in, does it not?

1   A.      Not in this scenario, sir.  It's kind of hard to blend in.

2   Q.      You stated that this was an operation that you guys planned

3   based on some information you had received from other agencies,

4   correct?

5   A.      Correct, sir.

6   Q.      Your unit doesn't use -- doesn't have any investigative functions,

7   does it?

8   A.      No, sir.

9   Q.      So you guys don't have agents talking on the ground or looking

10  into the actual situation on the ground, do you?

11  A.      Actually, if you can define "investigator."  Because our

12  credentials say we have the ability to investigate crimes.  We actually

13  utilize ICE to investigate and conduct long-term investigations.  But

14  any border patrol can investigate any crime.

15  Q.      Yes, in general.  In this particular case, your unit didn't conduct

16  any investigation of this particular scene prior to executing your plan?

17  A.      No, sir.  That was not our job at the time.

18  Q.      That's fine.  I'm just asking to confirm that.

19  A.      Yes, sir.

20  Q.      You guys had no -- other than the information that you received

21  from ICE, you had no knowledge of what was going on in this house?

22  A.      No, sir.

23  Q.      And so you were completely dependent on the investigation that

24  they had done?

25  A.      Yes, sir.  In terms of BORTAC, we are also dependent on any

1    case agent.

2    Q.    When answering questions posed by the government, you

3    consistently referred to people as "victims" and "suspects" and things

4    like that.  Now, you were doing that based on the information that you

5    received from other agencies?

6    A.    Correct, sir.

7    Q.    Right.  Thank you.  And how they obtained that information

8    would be up to them, right, or you can't testify to that?

9    A.    I can't testify to that, sir.

10   Q.    Now, you guys went in.  You guys, according to a time line that

11   you had here -- if you look on page 3 of Exhibit 10, there you had a

12   whole time line of what went on.  And you mentioned this also when

13   the government asked you questions.  At some point you guys had

14   some sort of a navigational mistake?

15   A.    A navigational mistake, not -- our element did not, sir.  The lead

16   vehicle driven by ICE did.

17   Q.    Okay.  Somebody made a wrong turn?

18   A.    Correct.

19   Q.    So you have this column of vehicles plowing through a

20   neighborhood with an armored vehicle and you made a wrong turn?

21   A.    No, sir.  We were on the correct road.

22   Q.    Anyway, you end up there.  You have your 25 guys.  You fan out

23   over the area there that was shown on the video.  And it seems to me

24   that everybody -- this all happened extremely quickly.  By the time

25   you got there and -- from the time you arrived there to the time that

1    everything was secured was next to no time?

2    A.    Not really, sir.  From the time we deployed from the vehicles --

3    actually, from the time we crossed over the fence, you are

4    approximately at 30 to 45 seconds.  In most cases, by the time we

5    deploy from the vehicles, we are inside the house in under ten.  In this

6    event we had to make sure that we were at the right location.

7    Q.    Okay.  And in the last paragraph, number 4, you said, "The

8    primary target was cleared and secured in under ten seconds"?

9    A.    Correct.

10    Q.    Now, were you the one that opened the door in this case?

11    A.    No, sir.

12    Q.    In trailer number 1?

13    A.    No, sir.

14    Q.    Okay.  Now, you guys don't typically wait to see if that door is

15    opened.  You open it by force no matter what?

16    A.    We actually physically open the door with the door handle.

17    Q.    It was opened?

18    A.    We always check the door to see if it is locked or unlocked.

19    Q.    So you just walked right in?

20    A.    We didn't walk right in, sir.

21    Q.    Okay.  So how did you get in if you didn't walk in?

22    A.    We opened the door, sir, deployed a flash bang, then we went

23    inside the house.

24    Q.    Inside the house?

25    A.    Right in front of the doorstep.

1    Q.    And then you went in?

2    A.    Yes, sir.

3    Q.    And you found some folks in there.  In this kind of a report, you

4    would document, would you not, any threats that were posed to you,

5    wouldn't you?

6    A.    Define "threats," sir.  I define "threat" in different ways.  A guy

7    with a gun is a threat to me.  People complying with orders, they are

8    not an immediate threat to me.  They are all threats inside a structure.

9    If we go inside a structure, you have to understand that everybody is

10   a threat.

11   Q.    Fair enough.  I understand that from your specific perspective.

12   Let's ask this following question.  There was no resistance offered in

13   any of these trailers, was there?

14   A.    No, sir.

15   Q.    And --

16   A.    Not physical.

17   Q.    Okay.  In trailer number 1, did anyone say anything to you?

18   A.    No, sir.

19   Q.    In trailer number 1, did anyone have a weapon on their person?

20   A.    Not visibly, no, sir.

21   Q.    And you were never threatened by anybody physically at any

22   time during any of this operation?

23   A.    Everyone inside structure number 1 complied with our orders,

24   yes, sir.

25   Q.    And you had cleared -- you cleared it in less than ten seconds?

1    A.    We secured it in less than ten seconds.

2    Q.    That means at that point for all intents and purposes, the

3    beginning portion of the operation --

4    A.    For all intents and purposes, with this report, sir, what I'm

5    reporting, we had control of the inside of the structure in under ten

6    seconds.  That's what that report means.

7    Q.    Fair enough.  Now, you then corral everybody, take them over to

8    what you refer to as PHA?

9    A.    We didn't corral anybody, sir.

10   Q.    Okay.  You handcuff them and take them to PHA?

11   A.    We secure them physically, yes, sir, put their hands behind their

12   back, and hand them off in the chain of custody from the team that

13   went inside the structure to the personnel holding area team.

14   Q.    When you placed their hands behind their back, that is done with

15   a device that restrains the movement of their arms.  Is that right?

16   A.    Correct, sir.

17   Q.    And that would be handcuffs in other words?

18   A.    Handcuffs or flexicuffs, sir.

19   Q.    In other words, everyone that you run into gets handcuffed and

20   taken over there?

21   A.    With the exception of children and elderly.

22   Q.    Now, you mentioned that you had run into a couple of small

23   children in the living room of trailer number 1?

24   A.    Yes.

25   Q.    Those were also a threat pursuant to your definition then?

1  A.      No, sir.  When I encountered them, they were not a threat at
2  this point.
3  Q.      You said that anybody inside a trailer is a threat?
4  A.      Anybody -- any structure -- when you are going inside somebody
5  else's structure, that is their kingdom.  Everybody inside is a perceived
6  threat.  If they comply, they are no longer a threat.
7  Q.      Including a two-year-old?
8  A.      Including two young children, sir.
9  Q.      And it's not surprising that they were crying, is it?
10 A.      No, sir.
11 Q.      And you then sent one of your guys to -- you said you tasked
12 somebody to calm the children down?
13 A.      Correct.
14 Q.      Now, your word, when you say "tasked," means you told
15 somebody to do that?
16 A.      Yes, sir.
17 Q.      And this is one of your fellows who is dressed with the helmet on
18 and the night vision goggles and the armored vest and utility belt and
19 M4.  He went to go calm the children down?
20 A.      Absolutely, sir.
21 Q.      Now, you also tasked somebody to take photographs of the
22 persons that were involved?
23 A.      Yes, sir.
24 Q.      And how long do you keep the people over there in the holding
25 area while you guys are conducting your operation?

1   A.   Until the entire structure or compound is deemed safe.

2   Q.   And you provide clothing to people who don't have it?

3   A.   In terms of if the weather condition warrants it, yes, sir.

4   Q.   Otherwise, no?

5   A.   No.  If they don't require, no, they do not.

6              MR. ROMO VEJAR:  Your Honor, may I approach?

7              THE COURT:  Yes.

8              (At sidebar.)

9              MR. ROMO VEJAR:  Mr. Hormel gave a series of

10   photographs to counsel for the government and she informed me -- I

11   was making an objection about the way that Kristen was holding the

12   photographs and showing them to the jury.  I'm sure she did it

13   inadvertently.

14              I couldn't tell you from there what my objection was,

15   Your Honor.  I just don't want the jury to see photographs that are --

16   at least they are admitted.

17              THE COURT:  Keep the photographs down on your table.

18   Don't hold them up so they can be seen.

19              (In open court.)

20              THE COURT:  Do any of you need a break at this point?

21   BY MR. HORMEL:

22   Q.   Who was in charge of taking the photographs at that scene?

23   A.   I don't recall right now, sir.

24   Q.   Did you make that assignment at the time?

25   A.   In a broad general way, sir.  What I do is give a tasking and

1    then the senior guys will take care of it for me.

2    Q.    Okay.  Do you -- who decides how many photos to take of each

3    individual?  Is that you or somebody else?

4    A.    That's never -- it's up to the individual.

5    Q.    All right.  Would there be any reason to take 20 photographs of

6    one subject but only one photograph of each of the others?

7    A.    I'm not following you, sir.

8    Q.    Well, you guys took, did you not, a long series of photographs of

9    an individual that you have been referring to as a victim and only one

10   photograph of everybody else?

11   A.    I don't know, sir.  I don't recall 20 photographs being of one

12   individual.

13   Q.    Would you like me to show you a series of photographs?  Would

14   that refresh your recollection?

15   A.    Absolutely, sir.

16                 MR. HORMEL:  May I approach, Your Honor?

17                 THE COURT:  You may.

18   BY MR. HORMEL:

19   Q.    I don't believe there were 20 in that last because we got to the

20   end of the page.  There is 14 there, I believe.

21   A.    These photos didn't originate from my team.

22   Q.    They did not?

23   A.    No, sir.

24                 MR. HORMEL:  May I approach?

25                 THE COURT:  Yes, you may.

1   BY MR. HORMEL:

2   Q.    Now, you, in your report that we have been referring to, Exhibit

3   10, refer to -- it has a section C there, "Mission accomplishments."

4   Okay.  And it's correct, isn't it, that you wrote that you thought that

5   this was a very difficult and challenging target?

6   A.    Absolutely, sir.

7   Q.    You wrote that.  And then you said that the overlying principles

8   of your operation were surprise, speed and violence of action?

9   A.    Correct.

10  Q.    And you examined those things in this particular operation?

11  A.    Yes, sir.

12  Q.    And then in paragraph 3 you talk about the navigational

13  mistake, correct?  In 4 you mention that you secured the primary

14  target in under ten seconds?

15  A.    Correct.

16            MR. HORMEL:  May I have one moment, Your Honor?

17            THE COURT:  Yes, you may.

18            MR. HORMEL:  Your Honor, I don't have any further

19  questions.  Thank you.

20            THE COURT:  Mr. Romo, any questions?

21            MR. ROMO VEJAR:  I do have questions, Your Honor.  I

22  request a small break if I may?

23            THE COURT:  Ladies and gentlemen of the jury, let's

24  take a brief break of about ten minutes.  So we'll stand at recess.

25            (The jury was excused.)

1    THE COURT:  You may step down, sir.  We need you

2 back in ten minutes.

3    Court will stand at recess.

4    (A recess was taken.)

5    THE COURT:  The record will reflect the presence of

6 counsel, the defendants, ladies and gentlemen of the jury, and the

7 witness on the witness stand.

8    Mr. Romo, you may proceed.

9    CROSS-EXAMINATION

10 BY MR. ROMO VEJAR:

11 Q.    Good morning, sir.  How are you?

12 A.    Good morning, sir.  How are you?

13 Q.    My understanding is that on this operation in addition to

14 individuals who were with you, with your unit, BORTAC, there were

15 tens of other personnel from border patrol and other agencies at the

16 site.  Is that correct, sir?

17 A.    As far as I know, sir, there was only individuals from ICE.  But I

18 can't account for all personnel that were there.  I can account for the

19 BORTAC element that were there.

20 Q.    I'm not asking you to account for them, but I'm asking what you

21 observed.  You did observe tens of other individuals that belonged to

22 different agencies.  Is that correct?

23 A.    There was other law enforcement personnel present there, sir,

24 yes.

25 Q.    And we saw in the movie that was shown to us a line of cars that

1    lookd like a funeral line.  Do you recall that?

2    A.      Yes, sir.  There was a line of vehicles behind us.

3    Q.      And those vehicles, only some of them were yours.  Is that

4    correct?

5    A.      The ones at the front, yes, sir.

6    Q.      But you were in charge of the operation of going into the houses.

7    Is that correct?

8    A.      Just the portion going into the structures, yes, sir.

9    Q.      All right.  Now, you would agree with me, wouldn't you, sir, that

10   these were homes?  No matter what we call them, trailers or mobile

11   homes, they were actual homes.  Is that correct?

12   A.      I would define them as residences, yes, sir.

13   Q.      And each of the individuals in those residences are entitled to

14   the protection of the constitution.  Is that correct, sir?

15   A.      Everybody has constitutional rights, correct.

16   Q.      Including the right to be free from illegal search.  Is that correct?

17   A.      Everybody has Fourth Amendment rights, yes, sir.

18   Q.      And when you go into a neighborhood, God forbid you go into

19   my neighborhood, but if you were to go to my neighborhood, would

20   you go to my neighbors in the front and the neighbors on the side and

21   break into their homes as well?

22   A.      If it was listed on the search warrant, yes, sir.

23   Q.      And so what you've got listed in the search warrant was five

24   trailers?

25   A.      Yes, sir.

1    Q.    And so it is not your job to define the target.  Is that correct?

2    A.    No, it is my job, sir, at that time to make sure that the warrant

3    in hand is actually correct and legal.

4    Q.    And I understand, sir.  I'm not trying to be hostile to you.  I'm

5    trying to get the information.

6    A.    Yes, sir.

7    Q.    So it is not your job to pick the target.  Is that correct, sir?

8    A.    No, sir.  I do not pick the target.

9    Q.    Now, I'm going to show you what has been already admitted as

10   Exhibit 27.  Do you see that, sir?

11   A.    Yes, sir.

12   Q.    Now, this is what you refer to as a compound.  Is that right?

13   A.    What I'm looking at right now, sir, is the actual compound that

14   we were targeting, yes, sir.

15   Q.    It's actually just a block in a neighborhood, right?

16   A.    This would be the area in question, right here, sir.

17   Q.    A compound sounds like an area that is fortified and that has

18   shelters and things to receive the enemy or do things of that nature.

19   We are talking about a block in a neighborhood.  Is that correct, sir?

20   A.    No, sir.  Those structures would meet the definition of

21   compound.

22   Q.    Would you define for the jury what you mean by "compound"?

23   A.    Multiple structures in one general area.

24   Q.    So --

25   A.    In one area that are grouped together.

1  Q.    Again, any neighborhood in town like my neighborhood would be

2  a compound.  Is that correct, sir?

3  A.    No, sir.  Because usually you have fences that separate each

4  structure.

5  Q.    So you are saying that there is a fence right here, sir?

6  A.    There was a fence on the other side, sir, at the time.  There was

7  only one opening that went into the actual compound -- actually, two

8  openings, one here and one over here, sir.

9  Q.    You are saying, sir, there's a fence right here?

10  A.    No, sir.  That structure right there is part of the compound.

11  Q.    Is there a fence between this house and this house?

12  A.    No, sir.

13  Q.    Is there a fence between this house and this house?

14  A.    No, sir.

15  Q.    And did you also enter this house?

16  A.    No, sir.

17  Q.    You entered five homes altogether.  Is that correct, sir?

18  A.    Yes, sir.  There was five structures that we made entry into, yes,

19  sir.

20  Q.    You called them residences.  Are they residences or not?

21  A.    They can be defined as residences, sir.  But when people do not

22  live inside a structure, number 4 and 5 were abandoned, those are no

23  longer residences.  They are structures.

24  Q.    So you entered three homes and two structures.  Is that correct,

25  sir?

1   A.    We entered five structures, five residential-type structures, sir.

2   Q.    Is it fair to say that this one is a home?

3   A.    You can say that, yes, sir.

4   Q.    You can say it, sir?

5   A.    I can say it, sir.

6         MR. ROMO VEJAR:  Your Honor, may we have this

7   published to the jury so they can see what is going on?

8         THE COURT:  This is not admitted.

9         MR. ROMO VEJAR:  I beg your pardon.  We move for the

10  admission of Exhibit 27, Your Honor.

11        MR. EVANS:  No objection.

12        THE COURT:  27 may be admitted.

13  BY MR. ROMO VEJAR:

14  Q.    We have to go back a little bit.

15  A.    You asked me if I could define that as a home.  Yes, sir.

16  Q.    We were talking about this one, right?

17  A.    Yes, sir.

18  Q.    And we were talking about this entire place you called a

19  compound.  Is that right?

20  A.    No, sir.  I can't add -- those on the left-hand picture was not part

21  of the compound in question.

22  Q.    This one right here?

23  A.    Just from this fence here, sir, to there.  That would be the

24  compound itself.

25  Q.    There is no fence here, right?

1    A.    There was a fence there, yeah, when we were out there, sir, a

2    year ago.

3    Q.    Do you have a contemporaneous photograph that would show

4    that?

5    A.    What was that?

6    Q.    Do you have a contemporaneous photograph that would show

7    that?

8    A.    No, sir.  I'm not concerned with the fencing, sir, just the

9    structures themselves.

10   Q.    So you entered trailer number 1 which is this one.  Is that

11   correct, sir?

12   A.    Yes, sir.

13   Q.    And that is where you found a couple of women, I believe two

14   children and two adults, males.  Is that correct?

15   A.    We encountered three females, two children and three males

16   overall.

17   Q.    And you placed them where, sir?  If you'll point out to the jury

18   where they placed -- you placed these individuals.

19   A.    Right around this tree right here, sir.

20   Q.    So you went outside of what you call the compound.  Is that

21   right?

22   A.    Correct, sir.

23   Q.    Did you secure this area right here?

24   A.    Yes, I did, sir.

25   Q.    So tell the jury what you mean by securing.

1   A.    I just have people there that safeguard the individuals from any

2   people from the outside if there is any threats.

3   Q.    Now, this is a separate home.  Is that correct?

4   A.    Correct, sir.

5   Q.    Did you go in there?

6   A.    No, sir.  We actually made contact with the gentleman outside.

7   Q.    What happened there?

8   A.    He just asked what was going on.

9   Q.    All right.  So you brought these individuals and you crossed this

10  fence and put them over here.  Is that what you did?

11  A.    Yes, sir.

12  Q.    Then you went to -- well, you called this number 2.  Is that

13  correct?

14  A.    We entered structure number 2, yes, sir.

15  Q.    Which is also a residence.  Is that correct?

16  A.    Yes, sir.

17  Q.    Will you point to the jury which one that is.

18  A.    That one, sir.

19  Q.    There you found a woman and a gentleman.  Is that correct?

20  A.    Correct, sir.

21  Q.    You also dragged them and put them over here, correct?

22  A.    I'm sorry, sir.  Did you say "dragged"?

23  Q.    Yes, sir.  Did you grab them and then pull them over there?

24  A.    No, sir.  We escorted them.  They were walking on their own two

25  feet.

1   Q.   Did you say, sir, that this lady objected to you being there?

2   A.   Yes.  She was not being compliant with the lawful command, sir.

3   Q.   I don't know about lawful command.  She said, "I have nothing

4   to do with any unlawful thing and I don't want you here."  Is that what

5   she said?

6   A.   That does not matter, sir.

7   Q.   It doesn't matter to you.  Is that what she said?

8   A.   It does not matter, sir.

9   Q.   Sir --

10  A.   She was not complying.

11              THE COURT:  Wait a minute.  Stop, Mr. Romo.

12              THE WITNESS:  Yes, sir.

13              THE COURT:  He's asking a very specific question.  Is

14  that what the women said?  Respond to that.  Don't get into

15  arguments with counsel.

16              THE WITNESS:  Absolutely.

17              Specifically, sir, she said, "Get the fuck off my property."

18  BY MR. ROMO:

19  Q.   Exactly.

20  A.   Yes, sir.

21  Q.   She was well within her rights to say that?

22  A.   We had a search warrant to be there, sir.

23  Q.   Would you say the same if somebody came over to your door

24  and you didn't think you had done anything wrong?

25  A.   If they had a legal search warrant, no, sir.

1    Q.    At this point she didn't know anything.  She just said, "Get the

2    hell out of my property," and closed the door, correct?

3    A.    No, sir.

4                    MS. KELLY:  Speculation.

5    BY MR. ROMO:

6    Q.    Did she close the door?

7                    THE COURT:  Well, ask one question, Mr. Romo, not a

8    compound question.  Statement and question.  There you are talking

9    about what she said.  You are talking about she closed the door.

10                   MR. ROMO VEJAR:  I'll withdraw my question and will

11   restate again.

12   BY MR. ROMO VEJAR:

13   Q.    She closed the door.  Is that correct, sir?

14   A.    Not while we were out there.  When the announcements were

15   going, the lawful announcements for everybody to come outside the

16   structure and place their hands on top of their head, she went back

17   inside the structure and locked the door.

18   Q.    Those announcements were made with a loud speaker?

19   A.    Correct, sir.

20   Q.    And so those announcements applied to everybody because

21   nobody knew what you were talking about, right?

22   A.    No, sir.  We were -- actually, the armored vehicle was parked

23   right here with the spotlights on this structure right here.

24   Q.    And you also wanted these people to come out, right?

25   A.    In which structure, sir?  Can you point.  No.  We weren't there.

1   Q.   You wanted them to come out as well?

2   A.   Not at that time, no, sir.

3   Q.   When she finally came out, you placed her over here, right?

4   A.   Yes, sir.  We escorted her and the male subject over to the PHA.

5   Q.   And you made her kneel there.  Is that correct?

6   A.   I don't know, sir.  I wasn't there.

7   Q.   You know everything.  I mean, you are in charge of the

8   operation, right?

9   A.   I'm in charge of the operation, yes, sir.

10   Q.   Well, you know where she was brought to?

11   A.   I know where she was taken to, yes, sir.

12   Q.   Right.  And now you don't know whether or not she was made to

13   kneel?

14   A.   No, sir.  I'm at structure number 2.  I can't see that far.

15   Q.   Okay.  Now, she was kept there for more than 40 minutes.  Is

16   that correct, sir?

17   A.   She would be there for approximately one hour, yes, sir.

18   Q.   In that one hour did you ever come back and see whether or not

19   she was kneeling?

20   A.   No.  I have a team leader that is over there, sir.

21   Q.   Okay.  Then you went to structure number 3.  Is that correct,

22   sir?

23   A.   Yes, sir.

24   Q.   And there you found two gentlemen.  Is that correct?

25   A.   Correct, sir.

1  Q.   And you took them out and brought them over here as well,

2  right?

3  A.   We secured them, sir, and gave them over to the PHA team who

4  took them over there.

5  Q.   Then you went to two structures that were empty.  Is that

6  correct?

7  A.   Yes, sir, two structures off here.  There is only one right there.

8  There is actually two.

9  Q.   There was one right there at the time?

10 A.   Close enough, sir.

11 Q.   And then you said you brought everybody that was there,

12 including the people that you found in number 1, to this area next to

13 the tree.  Is that correct?

14 A.   Everybody that we encountered inside that compound there, sir,

15 encountered in every structure was taken to the personnel holding

16 area located adjacent to that tree, yes, sir.

17 Q.   And you said that you placed special collars on each of them.  Is

18 that correct?

19 A.   It would be a necklace, not a collar.

20 Q.   It looked like a collar to me, but I won't argue with you.  A

21 necklace.  Did you place one on each?

22 A.   Yes, sir, with the exception of the children.  I don't know if we

23 put one on the children or not.

24 Q.   And did you place a necklace on -- I suppose -- you say they

25 place a different color for each person.  A suspect would have one

1   color and the -- what you consider to be the victim another color.  Is

2   that correct?

3   A.     Every necklace that we have has two glow sticks, a green one

4   and red one.  Depending on how we classify them, as a victim or a

5   principle or an unknown, depends on which one we crack open to glow

6   that color.

7   Q.     So all the people in number 2, they had what color?

8   A.     They had red and green.

9   Q.     Red and green.  Both colors?

10  A.     Yes, sir.

11  Q.     Number 3?

12  A.     Red and green.

13  Q.     Number 1?

14  A.     The victim as we knew it, Cesar Trujillo, he had just a green

15  along with the children.  And what we believed was a mother also just

16  had a green.  The other persons encountered in the other room had

17  red and green.

18              MR. ROMO VEJAR:  Your Honor, I have a photograph

19  that has not been admitted.  That would be number 136 which I would

20  like to show to the witness.

21              THE COURT:  Very well.

22  BY MR. ROMO VEJAR:

23  Q.     Can you see the photograph, sir?

24  A.     Yes, sir.

25  Q.     Now you cannot see it?

1    A.    No, I cannot.

2    Q.    That's because I did something.  Now, do you recognize what

3    that photograph is?

4    A.    Looks like a floor, sir.

5    Q.    Do you recognize that floor?

6    A.    No, I do not, sir.

7    Q.    Now, do you recognize the marks that are on the floor?

8    A.    No, I do not, sir.

9    Q.    Well, let me ask you something.  When you throw those stun

10   bombs that you did in this case, do they leave marks on the floor?

11   A.    I'm sorry.  Did you say "stun bombs?"

12   Q.    Yes, sir.

13   A.    We don't deploy stun bombs.

14   Q.    You call them something different.  I think you call them --

15   A.    Are you referring to the flash bang?

16   Q.    Yes, sir.

17   A.    Yes.  It's a controlled noise and light distraction device.  We

18   don't throw them, sir.

19   Q.    You throw it inside the door?

20   A.    No, we did not.

21   Q.    What did you do?

22   A.    We placed it right inside the foothold right there, the threshold.

23   Q.    You placed it and then released something so it would explode?

24   A.    No, sir.  What it does is we pull the pin and we place it down on

25   the floor and then it goes off right there.

1    Q.    It goes off after how many seconds?

2    A.    2.5 seconds, sir.

3    Q.    And so you placed it and then you retrieved yourself?

4    A.    What was that?

5    Q.    You placed it and moved back?

6    A.    No, sir.  We did not, not at the breach point.

7    Q.    You did not move back.  Is that what you are saying?

8    A.    No.  We will turn away from it.

9    Q.    Well, are those signs common to the burning of that flash?

10   A.    No, sir.  Those look like water stains.

11   Q.    I will show you another photograph which is marked as 133.  Do

12   you recognize that photograph, sir?

13   A.    No, I do not, sir.

14   Q.    Now, you were there at the home, correct?

15   A.    Absolutely, sir.

16   Q.    You were inside that main bedroom?

17   A.    I was inside every structure, yes, sir.

18   Q.    Structure number 1 as you call it?

19   A.    Okay.

20   Q.    Were you inside the main bedroom of structure number 1?

21   A.    Which one are you calling the main bedroom, sir?  There was

22   two big bedrooms.

23   Q.    The one that had a door.

24   A.    The one that had a door?

25   Q.    Yes, sir.

1   A.    I was actually in the one that Mr. Trujillo was in.

2   Q.    You were not in the other one?

3   A.    No, sir.

4   Q.    I won't show you the rest of the photographs then.  Did you

5   deploy the same kind of device in the other residences?

6   A.    No, sir.

7   Q.    That's just in number 1?

8   A.    Just on number 1, sir.

9   Q.    Why did you not do the same for number 2 and 3?

10  A.    Because we actually called everybody out of those structures,

11  sir.

12  Q.    You knew, didn't you, that any suspect would be in structure

13  number 1 because you had been pinpointed to that structure?

14  A.    Correct, sir.

15  Q.    And so my question, I guess, and I don't know if you know the

16  answer, sir, because you didn't procure the warrant, why did they tell

17  you to go to the other structures?

18  A.    I'm sorry.  Can you repeat the question, please?

19  Q.    Why did they tell you to go to the other homes?

20  A.    Because the intelligence in the investigation that ICE had

21  conducted said that there was about a 95 to 98 possibility that he was

22  there based on communications inside the structure.

23  Q.    You mean that he was there, structure number 1?

24  A.    That this victim was inside structure number 1.

25  Q.    95 percent.  You wanted -- the other five percent was for the

1   other structures?

2   A.    It could.  There's a possibility that he could have been in one of

3   the other structures, yes, sir.

4   Q.    Did you ask that the warrant be obtained for all the structures?

5   A.    Yes, sir.

6   Q.    So you really were responsible for the warrant, weren't you, sir?

7   A.    No, sir.  I did not swear in the affidavit.

8   Q.    Well, but you did ask the officer and told him that you needed to

9   secure the entire area in order to accomplish your goal?

10  A.    No, sir.  My exact question was:  Which structures does the

11  warrant outline?  And when I reviewed it, it outlined every structure

12  on that compound on that one small, little block area with all five

13  structures.

14  Q.    But my follow-up question was whether or not you had asked

15  that those structures be included in the warrant and you said yes,

16  correct?  Did you hear me?

17  A.    I'm guess I'm not following your question.  Yes, I did ask if all

18  five structures were on the warrant and they were, sir.  I verified that.

19  Q.    My question is whether or not you petitioned --

20  A.    No, sir.  I did not swear in the affidavit.

21  Q.    I know that, sir.  Somebody asked for the affidavit, right?

22  A.    That would be ICE, sir.

23  Q.    And did you ask ICE to ask for an affidavit that would secure all

24  of those residences?

25  A.    No, sir.  That's not my concern.

1   Q.   Your concern is the safety of your men, isn't it?

2   A.   That's my number one concern.

3   Q.   And when you were talking about the safety of your men,

4   certainly you want to know exactly how that operation is going to be

5   carried out and what structures it would involve, correct?

6   A.   Yes, sir.  Once I know that warrant is in hand, that is what I

7   concern myself with.

8   Q.   Do you ever question whether or not there would be a violation

9   of people's rights if you are too broad in securing structures?

10  A.   Sir, that's always a concern.

11  Q.   Especially with the amount of force that you have?

12  A.   I'm not following -- I don't understand that question, sir.

13  Q.   You had 26 men.  You had large vehicles that were specially

14  designed to break into places.  You had a helicopter that was there.

15  Was that part of your operation, the helicopter?

16  A.   Yes, sir.

17  Q.   And then additionally you had a large number of individuals that

18  were coming over to go into these homes.  Is that correct, sir?

19  A.   Yes, sir.  We were conducting a hostage rescue.  That's also a

20  concern.  The number one priority is the hostage, the life of the

21  hostage.

22  Q.   Let me ask you something, sir.  Eventually you found out

23  whether or not structures number 3 and 4 had anything to do with the

24  suspicions that you had.  Is that correct?

25  A.   Sir, I did not have any suspicion.  Our job at BORTAC was to

1   secure and make safe the entire property.

2   Q.   Eventually you found out that structure numbers 2 and 3 had

3   nothing to do with this.  Is that correct?

4   A.   No, sir.  I never found that out.

5          MR. ROMO VEJAR:  Your Honor, may I have a second?

6          THE COURT:  Yes, you may.

7   BY MR. ROMO VEJAR:

8   Q.   Did you know, sir, that some of the women that you placed at

9   this area were made to kneel on an ant hill?

10  A.   Sir, I can't testify to that.

11  Q.   When they complained to your officers, were you advised that

12  they were complaining that the ants were biting them?

13  A.   I never received such a complaint, sir.

14         MR. ROMO VEJAR:  No further questions, Your Honor.

15         THE COURT:  Any redirect?

16         MS. KELLY:  I don't have any other questions for this

17  witness.

18         THE COURT:  Very well.  Thank you, sir.  You are

19  excused.  You may step down.

20         Would you call your next witness, please.

21         MS. KELLY:  We call Agent Roberto Teran.

22     ROBERTO TERAN, GOVERNMENT WITNESS, SWORN

23         THE COURT:  Please state your full name and spell your

24  last name for the record.

25         THE WITNESS:  My name is Roberto Teran.  Last name

1    is T-e-r-a-n.

2                        DIRECT EXAMINATION

3    BY MS. KELLY:

4    Q.    Good morning, sir.

5    A.    Good morning, ma'am.

6    Q.    Please introduce yourself to the ladies and gentlemen of the

7    jury.

8    A.    Good morning.  My name is Roberto Teran.  I am a supervisory

9    border patrol agent with Tucson sector Border Patrol Tactical Unit

10   which is equivalent to a local SWAT team.  I have been in the border

11   patrol a little bit over eight years; seven of those which I have been

12   with the border patrol tactical team.

13                  Prior to that I was in the military, the Marine Corps,

14   approximately just under five years.  I was an infantryman.

15   Q.    Sir, on September 24 of 2009, were you on duty?

16   A.    Yes, ma'am.

17   Q.    Were you still working at that point with BORTAC?

18   A.    Yes, ma'am.

19   Q.    Is that where you are still assigned?

20   A.    As of Monday I just transferred to the Tucson sector district unit

21   which is the investigative unit.  At that time, yes, ma'am, I was part of

22   the border patrol tactical team.

23   Q.    Did you get a chance to pick a new unit?

24   A.    This is a one-year detail for me.

25   Q.    So you said you were with BORTAC.  How many years were you

1    with BORTAC?

2    A.      Approximately seven years.

3    Q.      And on September 24 of 2009, were you called out with your

4    BORTAC team members to 9950 South Oak Canyon Lane?

5    A.      Yes, ma'am.

6    Q.      Were you working in a team with Sean Coldiron?

7    A.      Yes, ma'am.  He was the assigned team leader for the operation.

8    Q.      So was he your team leader?

9    A.      Yes, ma'am, at that time.

10   Q.      When you first arrived at that property, what did you do?

11   A.      When we first arrived at the property, we actually dismounted

12   our vehicle.  We approached which was the target residence.  The

13   residence was blue in color.  It had wrought iron on the windows.  And

14   I think it had a porch light that was on at that time.  We actually came

15   across the fence, moved, approached the primary entrance which was

16   the back door of the residence.

17   Q.      And when you approached the back door, were you by yourself

18   or others?

19   A.      No, ma'am.  I was assigned as the number 3 man in the entry

20   team.  And there was approximately -- I think there was eight total of

21   us approaching the residence at that time.

22   Q.      What does it mean to be the number 3 man?

23   A.      We numerically number our members.  You have the number 1

24   that is usually the point man.  Number 2 is usually his partner.

25   Number 3, which at that time I was.  Number 4 is my partner.  Then 5

1    and 6.  At this point number 6 was Sean Coldiron who was the team

2    leader.  Then we have the breaching element which are usually 7 and

3    8.

4    Q.    And you said that you approached the back door?

5    A.    Yes, ma'am.

6    Q.    What happened?

7    A.    On the approach we actually -- then it was a no knock warrant at

8    that point.  No need to knock on the actual residence.  They checked

9    to see if the door was actually opened.  The door came open.  Actually,

10   the breach was the open door.  We made entry into there.

11          Prior to that, the approach, I remember hearing

12   footsteps coming from like -- a loud pounding noise coming from left

13   to right as I was looking at the trailer.

14          We made entry.  I was number 3.  I immediately made

15   entry into the trailer, went to the right, and noticed a male -- younger

16   male sitting on the bed.  I immediately identified myself as police and

17   I ordered them to, "Get down, get down, get down."  Then I did that in

18   Spanish also.

19   Q.    So before you went in you mentioned that you heard footsteps?

20   A.    Yes, ma'am.

21   Q.    And you said that was from left to right?

22   A.    Yes, ma'am.

23   Q.    I'm going to place on the board what has already been admitted

24   and published to the jury as 34.  Do you recognize that?

25   A.    Yes, ma'am.

1   Q.    And what is it?

2   A.    It's the picture of the target residence where we were at.  That's

3   the living room, the kitchen area.

4   Q.    Can you kind of show us -- just point to the picture where

5   generally the door was that you went in.

6   A.    The way you are looking at this, this would be looking to the left.

7   I went immediately to the right.  The door would be located

8   somewhere back -- this was the kitchen area.  There was a wall.  It

9   would be kind of more of a center fed door into the main residence.

10  Q.    So would the door not be pictured?

11  A.    No, ma'am.

12  Q.    You said that you had heard footsteps from left to right.  Can

13  you sort of motion or show us on this particular picture where you

14  would have heard those footsteps coming from?

15  A.    There was actually a hallway before the table here that actually

16  feeds into the kitchen area and then the living room area.  It appeared

17  from what I -- what I heard it sounded like the footsteps came from

18  where the couch area is or this other door is moving towards -- coming

19  towards the picture.

20  Q.    So you went inside?

21  A.    Yes, ma'am.

22  Q.    What happened next?

23  A.    I went inside.  Once again I immediately went to the right.  I

24  identified myself as, "Police, get down, get down," which is the

25  verbiage we use.  There was, I recall, a younger male sitting on the

1   bed.  I made my way towards him.  He complied with my commands

2   and immediately went to the floor.

3                I made entry into the bedroom and I noticed a second

4   individual attempting to conceal himself underneath the bed.  He was

5   lying on the floor with part of his head sticking underneath the bed

6   and the rest of his body outside towards the wall.

7                I also noticed a female, she was trying to conceal herself

8   inside the closet.  And then another female, she was standing at the

9   corner of the bed on the far side closest to the window.

10  Q.    I'm going to show you what has been marked, not admitted yet,

11  as Exhibit Number 19.  Do you recognize that?

12  A.    No, ma'am.  I don't recall that.

13  Q.    Let me place what has been admitted and published as 303.  Do

14  you recognize that?

15  A.    It looks familiar.  It's a picture I've seen before, ma'am.

16  Q.    Is that the room you're talking about?

17  A.    I don't remember off the top of my head.  I do remember

18  seeing -- if there was a lamp on the left-hand side, it was probably the

19  room.

20  Q.    So you had said that there were two men and two women inside

21  the room that was to the right?

22  A.    Yes, ma'am.

23  Q.    And let's walk through one by one.  Where were the two women?

24  A.    The two women, one was attempting to conceal herself --

25                MR. HORMEL:  Object to the characterization.  That's

1    speculation.  He should testify as to what she was doing.

2                    THE COURT:  Sir, you can testify as to what the

3    person -- what you saw the person was doing or where you saw the

4    person.

5    BY MS. KELLY:

6    Q.    Where exactly was that woman in the room?

7    A.    She was in a closet.

8    Q.    And was the closet open or shut?

9    A.    It was open.  It was actually cluttered.  It had a lot of clothes.

10   She was trying to push herself --

11                   MR. HORMEL:  Objection.

12                   THE COURT:  Just tell us what you saw that she was

13   doing rather than saying she was trying to do something.

14                   THE WITNESS:  She was in the closet.

15   BY MS. KELLY:

16   Q.    You said there were clothes and clutter inside that closet?

17   A.    Yes, ma'am.

18   Q.    Were the clothes and clutter around her or near her or

19   somewhere else?

20   A.    It was just around her.

21   Q.    And the clothes -- was there clothing hanging?

22   A.    I don't recall that, ma'am.

23   Q.    Was there anything obstructing your clear view of her as you

24   looked at her in the closet?

25   A.    No, ma'am.  I could see her perfectly.  That's the reason I asked

1    to see her hands.  And she remained in that position until we actually

2    turned her over to the PHA.

3    Q.    Did she comply?

4    A.    Yes, ma'am.

5    Q.    So that was the first woman.  Was there another woman?

6    A.    Yes, ma'am.  There was a woman located to the right of her on

7    the side of the bed.  It would be -- if this is the picture of the room, it

8    would be where the agent is standing, in that general location there.

9    She was just standing on the bed.  I could see her hands.

10   Q.    I'm going to place on the board what has been admitted as 26.

11   Do you recognize that woman?

12   A.    That was the female in the closet.

13   Q.    And I'm going to place on the board 25 also already admitted.

14   A.    She was the actual female -- the second female inside the room.

15   Q.    And that was near where the agent was standing in Exhibit

16   Number 33?

17   A.    Yes, ma'am.

18   Q.    You said that there were also two males inside that room?

19   A.    Yes, ma'am.

20   Q.    Where were they?

21   A.    One male was actually sitting on the bed when we entered the

22   residence.  Immediately I had him lay down on the floor.  The second

23   male was on the corner of the bed actually underneath the floor.  He

24   was trying to conceal --

25                    MR. HORMEL:  Objection.

1        THE WITNESS:  He was hiding underneath the bed.

2    BY MS. KELLY:

3    Q.    And that particular person, did you get a look at what they were

4    wearing?

5    A.    Yes, ma'am.

6    Q.    What was that person wearing?

7    A.    He was wearing dark colored jeans and he had a striped shirt

8    which was maroon and brown.

9    Q.    And you said that he was under the bed?

10   A.    His head was under the bed.

11   Q.    Where was his body?

12   A.    It was hanging outside.  It was exposed.  It was exposed on the

13   floor there.

14   Q.    You mentioned that when you gave commands, you gave them

15   in Spanish and English?

16   A.    Both in Spanish and in English.

17   Q.    You also mentioned that there was another male in that room?

18   A.    The initial male, the younger male that was sitting on top of the

19   bed.

20   Q.    And how was he sitting?

21   A.    He was sitting leaning back against the headboard.  He was just

22   sitting on top of the bed.

23   Q.    I'm going to place on the board Exhibit 23 already admitted.  Do

24   you recognize that person?

25   A.    Yes, ma'am.

1    Q.    Who do you recognize that person as?

2    A.    He was the younger male sitting on top of the bed when I

3    entered the residence.

4    Q.    And I'm going to place on the board Exhibit Number 22 already

5    admitted -- not admitted.

6              THE COURT:  What number is that?

7              MS. KELLY:  22.

8              THE COURT:  22 is admitted now.

9    BY MS. KELLY:

10   Q.    Do you recognize that person?

11   A.    I don't recognize the face.  When I went into the room, the male

12   that was hiding underneath the bed was sideways and I had him show

13   me his hands because that was the threat for me, the hands.  He

14   complied at that time.

15   Q.    And you had spoken a moment ago about a striped shirt, a

16   maroon and brown striped shirt?

17   A.    Yes, ma'am.

18   Q.    Is that the shirt you recognize?

19   A.    Yes, ma'am.

20   Q.    In that room did you also find or see -- did you see a magazine?

21   A.    Yes, ma'am.  After all the people were taken out of the bedroom

22   there and transferred to the personnel holding area, on the way out I

23   noticed a magazine that was sitting on top of a -- say just the back

24   side of the bedroom.  It was just there on top.  I couldn't tell you if it

25   was loaded or not.

1    Q.    Magazine, are we talking about something we pick up at a

2    newsstand and read or something else?

3    A.    Let me clarify.  It was a magazine for a weapon, a pistol, pistol

4    magazine.

5    Q.    What does a magazine look like?

6    A.    It's a metal object usually with a plastic bottom.  May I draw

7    one?

8    Q.    Sure.

9                    MS. KELLY:  May I?

10                   THE COURT:  Sure.

11                   MR. HORMEL:  Your Honor, may we approach briefly?

12                   THE COURT:  Very well.

13                   (At sidebar.)

14                   MR. HORMEL:  We've been through in limine and with

15   significant pretrial litigation relating to the weapons.  The court has

16   forbid the government from using depictions of the weapons.  They are

17   trying to circumvent that by having him draw it.

18                   You stated -- and the court stated at that time the

19   government would be allowed to have testimony that weapons were

20   found.  We didn't go into anything about him drawing pictures.  The

21   government is pushing the envelope with the court's ruling.

22                   I ask that not be allowed.

23                   MR. ROMO VEJAR:  I join in that motion.

24                   MS. KELLY:  What he is trying to do is describe it.  It

25   seems like the drawing would aid him in describing it.  He can do it in

1    words or we can do it with him drawing it.

2                    MR. HORMEL:  He has done it already.

3                    THE COURT:  Why don't you have him describe it.

4                    MR. HORMEL:  He's already described it

5                    THE COURT:  Overruled.

6                    (In open court.)

7    BY MS. KELLY:

8    Q.    Let's go ahead and just describe it using words.  What did the

9    magazine that you saw look like?

10   A.    It was black in color.

11   Q.    And about how big is it?

12   A.    I would say on this particular one maybe about four inches in

13   length and about a inch in diameter.

14   Q.    And what kind of shape is it?

15   A.    It's a long rectangular shape with a round bottom.

16   Q.    And a magazine, for those of us that are not well versed with

17   guns, is it a part of a gun or something that relates to a gun?

18   A.    It's what actually you load the ammunition into and then you

19   place that inside the weapon and that's what actually feeds the

20   ammunition into the chamber of the gun.

21   Q.    Where exactly in the room did you see this particular black

22   rectangular magazine?

23   A.    It was near the door on top of, I want to say, a small bookcase.

24   It was in plain view.

25   Q.    And that was the door that you used to walk into the room?

1    A.    That's correct, ma'am.

2    Q.    You said it was on top of what?

3    A.    Looked like -- I'm trying to see -- remember if it was a bookcase

4    or something of that sort.  It was the backboard of the bed.

5    Q.    About how tall was that bookcase that it was on?

6    A.    My chest level.  I would say about four feet.

7              MS. KELLY:  I don't have any other questions.  Thank

8    you.

9              THE COURT:  Mr. Hormel.

10             MR. HORMEL:  Your Honor, I don't have any questions

11   for this witness.

12             THE COURT:  Mr. Romo?

13             MR. ROMO VEJAR:  Neither do I, sir.

14             THE COURT:  Thank you.  You are excused.

15             Rather than start on the next witness, ladies and

16   gentlemen, let's take our lunch recess at this time.  We'll reconvene at

17   1:15.

18             Remember the admonition not to discuss the case with

19   anyone or allow anyone to discuss it with you.  We'll stand at recess

20   until 1:15.

21             (The jury was excused.)

22             THE COURT:  The jury has withdrawn, counsel and

23   defendant are present.

24             Any record at this time, Ms. Kelly?

25             MS. KELLY:  No, Your Honor.  Thank you.

1          THE COURT:  Mr. Hormel?

2          MR. HORMEL:  Not at this time.

3          THE COURT:  Mr. Romo?

4          MR. ROMO VEJAR:  No, Your Honor.  Thank you.

5          THE COURT:  Thank you.  We will see you at 1:15.

6          (A recess was taken.)

7          THE COURT:  The record will reflect the presence of the

8   jury, counsel and the defendants.

9          Would you call your next witness, please.

10          MS. KELLY:  The government calls Special Agent David

11   Slagle.

12          DAVID SLAGLE, GOVERNMENT WITNESS, SWORN

13          THE COURT:  Please state your full name and spell your

14   last name for the record.

15          THE WITNESS:  My name is David Anthony Slagle.

16   S-l-a-g-l-e.

17                    DIRECT EXAMINATION

18   BY MS. KELLY:

19   Q.     Would you please introduce yourself to the jury.

20   A.     My name is David Slagle.  I work for Immigration and Customs

21   Enforcement.  My job is special agent for that agency.

22   Q.     How long have you been with ICE?

23   A.     I've been with ICE since February 2009.

24   Q.     And before you worked with ICE, who did you work for?

25   A.     I was a border patrol agent from July 2003 to February 2009.

1    Q.    So you were a border patrol for six years -- border patrol agent

2    for six years?

3    A.    Approximately.

4    Q.    Before that what did you do?

5    A.    I was in the United States Navy from March 1995 to July 2003.

6    Q.    You were a border patrol agent for six years and then you

7    became an ICE agent, correct?

8    A.    That's correct.

9    Q.    What's the difference between the two?

10   A.    Border patrol is an agency that has mainly patrol duties.  They

11   do not do long-term investigations or complex criminal investigations.

12   They mainly arrest people at the border, border area.  And long-term

13   investigations are generally turned on over to ICE.  As an ICE special

14   agent, I would complete -- I would perform complex criminal

15   investigations which can range from months to years.

16   Q.    So what sort of investigations do you do as a special agent with

17   ICE?

18   A.    Human smuggling, rollovers, hostage taking.

19   Q.    Throughout your years with ICE, has that been your focus,

20   human smuggling cases, hostage cases and you mentioned rollovers?

21   A.    Yes, ma'am.

22   Q.    Rollovers in what context?

23   A.    Rollovers are when there's a smuggling load involving illegal

24   aliens and the vehicle rolls over and there's casualties and all sorts of

25   other things associated with it.

1  Q.    When you signed on to become an ICE agent, did you go through
2  special training?
3  A.    I did.
4  Q.    What training did you get?
5  A.    I went to a training that is known as criminal investigative
6  training program and then I went to an advanced training that is
7  known as ICE special training program.
8  Q.    Did you spend time out in the field working with other agents?
9  A.    I did.
10 Q.    On September 24 of 2009, were you on duty?
11 A.    I was.
12 Q.    Where were you stationed?
13 A.    In Tucson, Arizona.
14 Q.    And how did you get involved in this particular case?
15 A.    A member of my group was notified of a hostage situation.  And
16 in ICE we're in groups of individuals generally involving about seven
17 special agents.  And we work large cases together as a group.  And
18 one member of our group, Special Agent Jeff Ellis, was notified of a
19 hostage situation.
20 Q.    What was the first thing you were asked to do?
21 A.    To assist Jeff Ellis in the hostage case in every component that
22 needed assistance.
23 Q.    Did you work with Sprint?
24 A.    I did not personally work with Sprint at that time.
25 Q.    So did you go out to 9950 South Oak Canyon Lane?

1   A.      I did.

2   Q.      When did you do that?

3   A.      I did it on the 24th.  And the purpose was to use the GPS to

4   verify GPS coordinates previously given to us by Sprint Nextel

5   Corporation.

6   Q.      When you went out to the property, what did you see?

7   A.      I saw a large lot that consisted of five structures.  An easily

8   identifiable item on that road was a type of tank or cylinder at the

9   entranceway or what I believed at the time was an entranceway into

10  the property.

11  Q.      So did you note certain things about the property?

12  A.      I did.  We noticed the amount of structures, the color of the

13  structures, how the structures were arranged.  And we took notes of

14  those and we provided them to the BORTAC members later that day.

15  Q.      We've talked a bit about 27 that was previously admitted.  We

16  talked about that photograph.  When was this particular photograph

17  taken?

18  A.      I don't know the exact date and time, but approximately about

19  three months ago.

20  Q.      So are there differences when we look at this photograph, the

21  aerial overhead of 9950 South Oak Canyon Lane, than how it appeared

22  on September 24th when you went out to the scene?

23  A.      Yes.  One of the main differences that I can see is one of the

24  trailers, which we previously identified as trailer number 5, has been

25  removed.

1   Q.     So I'm just going to go back and for our reference put on what

2   has been marked and admitted as Government's Exhibit Number 11.

3   This is the property that we are talking about and a map that was used

4   by BORTAC at the time of the event?

5   A.     Yes.  And this is the cylinder I was referring to from an overhead

6   view.

7   Q.     After you went out to the property and you said you looked at

8   certain landmarks, you mentioned that cylinder, what did you do next?

9   A.     Well, once the coordinates were verified -- we previously verified

10  the coordinates on an actual website for GPS.  Once I verified that the

11  coordinates were correct in the actual GPS device, and I've taken down

12  all the descriptions of the structures on the lot, we went back to the

13  station to -- or the office to plan further and to pass along that

14  information to BORTAC.

15  Q.     Did you meet with and have that information passed along to

16  BORTAC?

17  A.     I did.  I presented it to them.

18  Q.     So when BORTAC came back that evening at 7:30 in the

19  evening, were you with them?

20  A.     I was.

21  Q.     And were there other ICE agents along with you as well?

22  A.     There were.

23  Q.     And when BORTAC goes in to secure a scene, what did you do

24  during that time?

25  A.     Myself and the other ICE agents maintained the perimeter

1    around the property and we let BORTAC do their job.

2    Q.    So after BORTAC goes in and does what they are supposed to do,

3    did you go into trailer number 1?

4    A.    I did.

5    Q.    And how long after BORTAC had secured the scene was it that

6    you went in to trailer 1?

7    A.    I'd be guessing, but I would say about ten minutes.

8    Q.    We talked a bit about your experience when it comes to human

9    smuggling operations and hostage situations.  Approximately how

10   many cases have you worked on that are, you know, human

11   smuggling-type cases?

12   A.    With combined experience from the border patrol and

13   Immigration and Customs Enforcement, I couldn't give an exact

14   amount, but it's been more than ten.

15   Q.    And do you go to trainings and such related to human

16   smuggling?

17   A.    I do.

18   Q.    Based upon your training and experience in the field, is there --

19              MR. HORMEL:  May we approach, please?

20              (At sidebar.)

21              MR. HORMEL:  This is a fact witness.  We are heading

22   towards opinion testimony:  Based on your training and experience,

23   are there going to be factors showing what is a hostage taking

24   situation?

25              They already have a witness designated as an expert.

1    This man has never been proffered as a expert.  He's not subject to

2    opinion testimony.  He is to give only fact-based testimony.

3              Now, the question that she is already halfway through is

4    already stuff that is going to be leading to a generalized scope of

5    what's relative to hostage taking.  That's not permissible.  He's

6    allowed to give testimony as to the facts.

7              MS. KELLY:  I'm trying to establish that he collected the

8    notebook and why it was he collected that notebook.

9              MR. HORMEL:  He can collect the notebook all he wants.

10             MR. ROMO VEJAR:  They should have put Mr. Ellis before

11   to establish those things.  Now they have a problem with regard to

12   opinions.  And I don't think it is permissible, Judge.  You specifically

13   requested that all expert testimony be proffered before you so that

14   you could rule on whatever was admissible.  And that was done.  This

15   was not an expert, Judge.

16             MS. KELLY:  As with any type of case, you have

17   detectives.  You have investigators that come in and collect certain

18   evidence at a scene.  And that is what he did.

19             There's a reason why they collect certain pieces of

20   evidence based upon their training and experience as that type of an

21   investigator.  And that's all we are laying here is why he collected

22   what he did and what the nature of his investigation was at the scene.

23             Expert testimony is going to come from Jeff Ellis that we

24   already all well know because he's been asked all the questions.

25             THE COURT:  Objection is overruled.

1          MR. ROMO VEJAR:  There is one more thing.  Sir, we are

2     going to have Mr. Ellis right after this.  And we searched everywhere.

3     I searched my records and he searched his records.  We cannot find

4     the search warrant affidavit.  We requested that.  We don't have it.

5     We need it for cross-examination.

6          MR. EVANS:  We found out about this problem.

7     Obviously Kristen and I expected this to be done beforehand.  We are

8     having our legal assistant look for the files.  And, secondly, we are

9     getting the case agent's files.  And we will have all the search warrants

10    and affidavit.  I expect them to be here within the next ten minutes.

11         THE COURT:  Thank you.

12         (In open court.)

13    BY MS. KELLY:

14    Q.    We left off talking about things or items that you may collect in

15    investigations or situations such as this.  Based upon your training and

16    experience, how do human smuggling organizations keep track of the

17    money?

18         MR. HORMEL:  Objection, Your Honor.

19         THE COURT:  Well, I think you need some foundation to

20    ask that question.

21    BY MS. KELLY:

22    Q.    Based upon your training and experience, do human smuggling

23    organizations keep track of money?

24    A.    From what I've been trained, they do keep track --

25         MR. ROMO VEJAR:  Objection, Your Honor.  Same

1    objection as to foundation, Your Honor.

2              THE COURT:  I think that is where he's going.

3    Overruled.

4              You may finish your answer, sir.

5              THE WITNESS:  From what I've been trained, they keep

6    them in various items that are generally identified as ledgers.

7    BY MS. KELLY:

8    Q.   What do you mean by "ledger."

9    A.   A ledger is something that would keep the name, either the

10   name of the individual that's being smuggled or held, sometimes the

11   amount --

12             MR. ROMO VEJAR:  Your Honor, I object to this

13   testimony --

14             THE COURT:  I've ruled.  He is answering the question,

15   Mr. Romo.  Once I've ruled, he's allowed to answer the question.

16   Don't object in the middle --

17             MR. ROMO VEJAR:  I apologize.

18             THE COURT:  Your objection is made and recorded.  So it

19   is made.  The ruling has also been made.

20             MR. ROMO VEJAR:  Thank you, Your Honor.

21             THE WITNESS:  It's commonly -- the way I've been

22   trained, they generally have the name, generally an amount, could be

23   other information such as individuals that will be paying for them or

24   could be multiple numbers.  Generally it's a type of bookkeeping for

25   the organization to keep track of the individuals and the amount of

1    money.

2    BY MS. KELLY:

3    Q.    What about phone numbers?  Are those things that may be kept

4    in a ledger?

5    A.    Yes, they may.

6    Q.    When you went into trailer number 1, did you survey and look at

7    the inside of that trailer?

8    A.    I did.

9    Q.    I'm going to place on the board what has already been admitted

10   and published to the jury.  It's 34.  Is this the living room?

11   A.    It's the living room, dining room sort of combination.

12   Q.    And in looking at this photograph, did you see anything along

13   the line of a ledger that you collected from the scene?

14   A.    I did.  It would be right on that table.

15              MR. HORMEL:  Objection to the conclusion, Your Honor.

16              THE COURT:  He was going to identify some object he

17   found.  Describe the object.

18              THE WITNESS:  The objects were notebooks.  One spiral

19   bound, the other one was not spiral bound.  One was a single subject

20   notebook.  The other one was a three subject notebook.  One was

21   black in color, the spiral bound.  The nonspiral bound, the three

22   subject notebook, was red.

23   BY MS. KELLY:

24   Q.    I'm placing on the ELMO what has been marked and not

25   admitted yet as Exhibit 21.  Do you see those two notebooks you just

1    described in that photograph?

2    A.    I do.

3              MS. KELLY:  Government would move to admit and

4    publish 21.

5              MR. HORMEL:  No objection, Your Honor.

6              MR. ROMO VEJAR:  Likewise, Your Honor.

7              THE COURT:  Shall be published and admitted.  What

8    number is that?

9              MS. KELLY:  21.

10   BY MS. KELLY:

11   Q.    Can you go ahead and point to those notebooks so that we can

12   see it lit up in blue?

13   A.    Sure.

14             MS. KELLY:  The witness has pointed to the top left-hand

15   corner of the screen.  Your Honor, may I approach the witness?

16             THE COURT:  You may.

17   BY MS. KELLY:

18   Q.    I'm showing you what has been previously marked as Exhibit

19   Number 3 and 4.  What are those?

20   A.    These are the notebooks that we found that night.

21             MS. KELLY:  Government would move to admit those

22   two exhibits.

23             THE COURT:  Any objection other than previously made?

24             MR. HORMEL:  No additional objections.

25             MR. ROMO VEJAR:  None other than those made, Judge.

1    THE COURT:  Thank you.  They shall be admitted.

2    BY MS. KELLY:

3    Q.    In looking through those notebooks, what do you see?

4    A.    Well, I see writing on the cover of the black one.

5    Q.    Let me stop you for a second.  In looking at the cover of the

6    black one, do you see any names etched into it?

7    A.    I do.  I see the name Gordo written in -- actually etched inside

8    there using, looks like, some sort of pressure on the page, three times.

9    The name Carlos twice.

10   Q.    Go ahead and open it up.  What do you see?

11   A.    I see some writing on the opposite side of the cover page.  A

12   little doodle, that would be a flower, and then two names.

13   Q.    Inside either of those notebooks, did you see the amount of

14   $2,300 written?

15   A.    I did.  It would be in the notebook I'm currently looking at.

16   Q.    Which one is that?

17   A.    It would be the black notebook, spiral bound, one subject.

18   Q.    Inside of those notebooks did you see the word "bace," b-a-c-e

19   written?

20   A.    I did, but I can't recall which notebook so give me a second.  Let

21   me look through them.

22            MR. HORMEL:  Would you point us to the page number

23   here?  What page are we looking at?

24            THE WITNESS:  It's on the back page of this notebook.

25   BY MS. KELLY:

1  Q.   Is that the one that says, "70 Sheet" or "120 Sheet"?

2  A.   This is the one that says, "70 Sheet, Single Subject."

3  Q.   Did you also find the name Jose Venetos?

4  A.   I did.  That's on the very first paper page.

5  Q.   Was there a phone number with it?

6  A.   There is.

7  Q.   And what was the phone number?

8  A.   256-215-5393.

9  Q.   Did you also find the name Santos Rodolfo?

10  A.   I did.  It's below that first name.

11  Q.   Was there a phone number with that?

12           MR. ROMO VEJAR:  Santos what?

13           MS. KELLY:  Rodolfo.

14           MR. ROMO VEJAR:  What page would that be?

15           THE WITNESS:  The very first page of the single

16  subject.

17           THE COURT:  Sir, there should be an exhibit tag on

18  there.  It's either Exhibit 3 or 4.  If you could refer to them by exhibit

19  number.

20           THE WITNESS:  It's going to be Exhibit 3.  And it will be

21  the first page with a significant amount of writing on it.

22           THE COURT:  Thank you.

23  BY MS. KELLY:

24  Q.   Did you also find the name Orlando Gomez?

25  A.   I did.

1  Q.    Was there a phone number?

2  A.    There is.

3  Q.    Which one is that?

4  A.    323-220-8984.

5  Q.    And Juan Carlos?

6  A.    May I be given a second to look for that name?

7  Q.    Yeah.

8  A.    Juan Carlos is found in the three subject notebook.  It's marked

9  Exhibit Number 4.  It is on the first page.

10  Q.    Take a second and take a step away from the names and

11  numbers you found in the ledger.  Did you collect cell phones when

12  you were inside 9950 South Oak Canyon Lane in trailer number 1?

13  A.    I did.

14  Q.    Did you collect the two cell phone numbers we talked about on

15  the first day of trial which were 520-203-5831 --

16  A.    Are you asking me if I collected the cell phones connected to

17  those numbers?

18  Q.    Yes.

19  A.    That is correct.

20  Q.    It was in that trailer?

21  A.    That is correct.

22  Q.    Did you also collect the phone that we talked about

23  520-282-8698?

24  A.    I did.

25  Q.    That was also in that particular trailer?

1    A.    It was.

2    Q.    Did either -- did any of the phones that were collected in this

3    case, did they have direct connect capability?

4    A.    I know that some of them did.  I can't speak to everything.  I'm

5    not an expert in that area.  But the two phones that are in question

6    did have direct connect capabilities.

7    Q.    Based on your training and experience in border patrol and ICE,

8    what does direct connect enable somebody to do if they have it on

9    their phone?

10   A.    It allows them to use a feature that is like a walkie-talkie.

11   Without dialing the individual, they can locate them in the address

12   book or phone, press a button, and they can connect to them.

13   Q.    I want to put on the board what has been marked as 54.  Do you

14   recognize this?

15   A.    I do.

16   Q.    What is it?

17   A.    It's a sheet of a call history provided by Sprint for the phone

18   number 520-282-8698.

19   Q.    Please go ahead.

20   A.    The number being identified on the back of this notebook,

21   Exhibit 3.

22   Q.    Was that one of the two phones that were used to call Karen

23   Hayes?

24   A.    Yes, it was.

25            MS. KELLY:  Your Honor, the government will move to

1    admit this exhibit which is 52.

2            THE COURT:  Any objection to the admission of 52?

3             MR. HORMEL:  No objection.

4            MR. ROMO VEJAR:  No objection.

5            THE COURT:  52 shall be admitted and may be

6    published.

7    BY MS. KELLY:

8    Q.     Did you create this?

9    A.     I did not create the actual Excel sheet with the information.  All I

10   did was actually highlight the information that you see highlighted and

11   match it up alphanumerically with what is going on inside the

12   notebooks.

13   Q.     So first off we are talking about this phone number

14   520-282-8698, correct?

15   A.     Yes.

16   Q.     And we spoke about this number the other day.  I'm turning to

17   page 4 of this exhibit.  We spoke about this number as one of the

18   phones that called Karen Hayes.  Is that correct?

19   A.     That's correct.

20   Q.     Okay.  And I was asking you a moment ago about some of the

21   names you saw in the ledgers and the phone numbers that were linked

22   up to those names in the ledgers?

23   A.     Yes.

24   Q.     Did you go through the phone records for this particular phone,

25   the one found in the trailer, 282-8698, and see if the outgoing calls,

1    calls made from that phone, matched any of the names and phone

2    numbers in the ledger?

3    A.    I did.

4    Q.    What did you find?

5    A.    I found multiple names from the ledgers combined -- or actually

6    multiple numbers that were associated with names in the ledgers

7    shown on this limited call history.

8    Q.    So in particular on this page I had asked you about the name

9    Bace and the phone number that was associated with it?

10   A.    Yes.

11   Q.    Is that the name Bace and the phone number that was

12   associated with it?

13   A.    Yes.

14   Q.    And we asked about Jose Venetos or Venetos?

15   A.    Yes.

16   Q.    Was that phone number 256-215-5393?

17   A.    Yes.

18   Q.    And then we talked about Santos Rodolfo?

19   A.    Yes.

20   Q.    That was also a name you found in the notebook?

21   A.    Yes.

22   Q.    And the number?

23   A.    415-424-7552.

24   Q.    And there was a Julio Cesar with a 757 area code, correct?

25   A.    Give me one second, ma'am.

1    Q.    Yeah.

2    A.    There is.  757-469-2513.

3    Q.    And a Jose Alfonso from the notebook as well?

4    A.    There is.

5    Q.    And a number?

6    A.    347-891-2143.

7    Q.    With these names that we have been talking about, are there

8    also numerical amounts listed near their names in the ledgers?

9    A.    Some of them.  I wouldn't say exactly next to the name.  May I

10   describe how it's listed?

11   Q.    Please.

12   A.    May I show the jury how it's listed?

13   Q.    Why don't we do that.

14              MS. KELLY:  May I approach, Your Honor?

15              THE COURT:  You may.

16              MS. KELLY:  Would it be better for the witness to come

17   down to the ELMO or would the court permit me to do it?

18              THE COURT:  You can do that as long as -- he can point

19   to it on the ELMO if he wants to point at things.

20   BY MS. KELLY:

21   Q.    This is the red notebook we were talking about which is Exhibit

22   4.  And I had asked you about Jose Alfonso and numerical amounts

23   written on the page.  What do you see?

24   A.    I see Jose Alfonso and I see two amounts of -- I cannot say they

25   are amounts.  I see two sets of numbers, one showing 3,000 and the

1    other showing 2,500.

2    Q.     And we had also talked and you had talked about the black

3    notebook, the one with the name Carlos sketched on the front which

4    was Exhibit 3.  I had asked you about the Jose Venetos and some

5    other names listed on that page.  Describe for me what you see.

6    A.     Again, the numbers 3,000, numbers 3,000 and 2,500.  This time

7    circled.

8    Q.     Throughout each of these two notebooks, did you see some

9    different numerical amounts?

10   A.     Yes, I did.

11   Q.     What were some of the numerical amounts you saw?

12   A.     There is a lot of numerical amounts.  If I may look at the

13   notebook I can describe it.

14                 MR. HORMEL:  The notebooks have been admitted.

15   They speak for themselves.

16                 THE COURT:  He can describe what is in the notebooks.

17   Overruled.

18                 THE WITNESS:  In the single subject notebook marked

19   as Exhibit Number 3, I believe this would be the second piece of paper

20   in the notebook, I see different names.  One with the numbers of

21   2,500.  Another couple names.  Next to them are numbers of 33,000.

22                 MR. ROMO VEJAR:  Your Honor, can we have some

23   foundation?  I'm not sure what the witness is talking about.  What

24   page?

25                 THE COURT:  When you are looking at or reading from

1    some page, tell the court what page you are referring to and in which

2    notebook you are referring to.

3              MR. ROMO VEJAR:  And exhibit number.

4              THE WITNESS:  The notebook I'm looking at is Exhibit

5    Number 3.  And depending on your copies, it should be page number

6    2, easily identified by multiple flower drawings or doodles on the

7    bottom.  The very top it will have two Ns at the very top of the page.

8    Those clearly identify this page.

9              Under the names Luciana Vivana, Maria Antonia, I see

10   the numbers of 33,000 circled and the number 31,370 circled.

11   Q.   Those notebooks, do you also see the names of places?

12   A.   I do.

13   Q.   What sort of places do you see?

14   A.   On that same page I see Salinas, California; Los Angeles, San

15   Andres Tuxtla -- I can't say it -- Veracruz.

16   Q.   Is there also one in there that has Flagstaff?

17   A.   I'll need a second to look through it.

18   Q.   I'm talking about the red one, the 120 sheets, wide ruled.

19   A.   I'm looking in Exhibit Number 4 for that information.  There is.

20   Q.   In that same notebook, do you see a page where there are a

21   series of numerical amounts all added up, $1,500, $1,550 added with

22   some other figures?

23             MR. HORMEL:  Mischaracterizes the evidence.

24             THE WITNESS:  I do.

25             MR. ROMO VEJAR:  Objection, leading, Your Honor.

1    THE COURT:  Quite frankly the question is not very
2    clear.  I think you can restate your question.  Are you asking him to
3    make mathematical computations there of amounts?
4    MS. KELLY:  No.  Let me restate in a more clear fashion.
5    BY MS. KELLY:
6    Q.    Do you see one page in the red notebook where there are a
7    number of amounts that appear to be all added up?
8    A.    I do.
9    Q.    What are the amounts that appear -- is there like one number
10   repeated over and over and it's added?
11   A.    For the defense, it is on Exhibit 4 on page 4.  There is two
12   separate columns.  One is multiple -- six amounts of -- or six numbers
13   of $1,550 added up with an additional 1,550 added to 9,300 bringing a
14   total amount of 10,850.  And the column to the left, it's four sets of
15   2,500 added up to the total of 10,000.
16   Q.    I'm just going to place on that overhead board that page which
17   is of Exhibit Number 4 already admitted.  Is that the page you are
18   referring to?
19   A.    That is.
20   Q.    In the house did you also find the phone that relates to number
21   520-203-5831?
22   A.    Yes.
23   Q.    I'm going to place on the board Exhibit 51 which has not been
24   admitted yet.  Do you recognize this seven-page exhibit?
25   A.    I do.

1    Q.    How do you recognize it?

2    A.    It's a document by Sprint subsequent to -- and I've highlighted

3    them.

4                    MS. KELLY:  The government moves to admit Exhibit 51.

5                    MR. ROMO VEJAR:  No objection.

6                    MS. KELLY:  And publish it for the jury.

7                    MR. HORMEL:  I'm not sure the Sprint guy laid a

8    foundation for this particular one, whether that's kept in the normal

9    course of business or anything like that.  I don't think we have any

10   foundation for that.  I object on that basis.

11                   MS. KELLY:  My understanding is the phone text for both

12   phones were admitted.  This exhibit has been changed only that the

13   special agent has added the names and the highlighted columns.

14                   THE COURT:  This is a summary exhibit taken from

15   those exhibits' phone records that the individual from Sprint testified

16   to and were admitted?

17                   MS. KELLY:  Yes.

18                   THE COURT:  The objection is overruled.  Shall be

19   admitted as a summary exhibit of those other two exhibits previously

20   admitted.

21   BY MS. KELLY:

22   Q.    Did you identify the name Santos Rodolfo, also same phone we

23   have been talking about, as a number called from this particular phone

24   that you found in the trailer?

25   A.    I did.

1    Q.    And Bace as well?

2    A.    I did.

3    Q.    And Jose Venetos?

4    A.    I did.

5    Q.    And it goes on just as we talked about with the last exhibit,

6    correct?

7    A.    Correct.

8    Q.    You and ICE went through trailer number 1 and you searched it,

9    correct?

10   A.    I did.

11   Q.    In searching trailer number 1, did you find any guns?

12   A.    I did.

13   Q.    Where?

14   A.    I found two weapons.  The first weapon I found inside -- I'm

15   trying to explain -- the bedroom BORTAC previously identified as

16   finding four people in.  I found a weapon inside that one in the closet.

17   It was under a lot of clothes up on the shelving inside of the closet and

18   it is covered with clothes there and it was underneath of that.

19   Q.    I'm going to place on the overhead Exhibit 33 which has been

20   already admitted.  Is that the one you are speaking of?

21   A.    That is the bedroom.

22   Q.    Tell me where the gun was again so we can all visualize it.

23   A.    Where the agent is standing, it would be to his left.  There is a

24   closet that runs lengthwise along the length of the room.  And like any

25   other closet, there's a shelf up there that you can put folded clothes or

1   things like that.  There was a multitude of just clothes thrown in there

2   all over the place.  And when I was lifting up the clothes and looking

3   underneath of them and through them, I found the weapon on the

4   shelf.

5   Q.     How was it placed on the shelf?

6   A.     If I were to hold it in my hand and I put it inside there, that's

7   exactly how --

8                    MR. HORMEL:  Objection, Your Honor.  It's speculation.

9                    THE COURT:  Sustained.

10   BY MS. KELLY:

11   Q.     Let's just talk about the gun for a second.  What did the gun look

12   like?

13   A.     The gun was black in color.  It had a silver or a stainless steel

14   type slide on top with a black frame.  And down below was mounted

15   what I identified as a laser aiming module.  It was black in color

16   mounted to the light rail on the pistol.

17   Q.     And roughly how big was this gun?

18   A.     It was a regular-sized pistol.  I don't want to give you exact

19   inches.  Probably somewhere around that range.

20                    MS. KELLY:  The witness, for the record, is

21   demonstrating with his fingers --

22                    THE WITNESS:  About six and a half or so inches.

23                    MS. KELLY:  -- about six and a half inches.

24   BY MS. KELLY:

25   Q.     You mentioned a laser sight on it and you said that was black.

1   Describe the laser sight.

2   A.      It was actually a module that is attached to the gun.  It was -- I

3   didn't identify it as something that came with the gun.  It was

4   probably after market attached to the light rail.  I identified it as a

5   laser aiming module because of my experience with weapons and

6   there was a diode on the front of it that would be consistent with a

7   laser aiming module as opposed to a large flashlight-type opening.

8   Q.      If it was a large flashlight-type opening, what would that, based

9   on your training and experience, indicate?

10  A.      It would indicate it was a flashlight module.

11  Q.      So if the laser is different because of what, just --

12  A.      It has a very small diode where the laser shoots out of it.  The

13  light is projected.  The laser is projected.

14  Q.      And you had indicated that the attachment itself was black.  Did

15  that mean the light was black?

16  A.      Well, I don't know what color the light is.  I couldn't tell.  But the

17  actual module was black metal.

18  Q.      And you had indicated how it was situated on the shelf

19  underneath the clothes.  If you look at a gun -- and maybe you can

20  just demonstrate with us with your hands.  And perhaps you can use

21  the table or the railing right there.

22  A.      Can I use this to explain it?

23  Q.      Sure.  Even just your hands, whatever works for you.  Just

24  explain to us how it was placed on that shelf.

25              MR. HORMEL:  He has no idea how it was placed on the

1    shelf.

2            THE COURT:  He can explain how he found it on the

3    shelf, not how it was placed there.

4    BY MS. KELLY:

5    Q.    When you looked at the shelf and you saw the gun, what did you

6    see?

7    A.    When I found the weapon, this would be -- the front here would

8    be the actual shelving facing me on the closet.  However, it would be

9    at a higher level.  This would be the muzzle or barrel, the ending of

10   the barrel.  This would be the handle.  It was sitting here with the

11   handle towards me and the muzzle facing towards the wall.

12   Q.    So the handle was facing towards --

13   A.    Me.

14   Q.    You.  Okay.  In searching the rest of the trailer -- let me stop for

15   a second.  Did you find any magazine or ammunition for that particular

16   gun?

17   A.    I did.

18   Q.    What did you find?

19   A.    I found a magazine inside the weapon.  I found a round inside

20   the chamber of the weapon.  I found a magazine -- as the picture is

21   showing, right around here on the opposite side that you can't see in

22   the picture, there's shelving that is on the other side of the headboard.

23   There was a magazine sitting there that was loaded.  I did not know

24   how many rounds were in that.  That was found out at a later date.

25   Q.    Did you note the caliber of that handgun?

1    A.    I did.

2    Q.    What caliber?

3    A.    It was a .40 caliber handgun.

4    Q.    Did you find any other guns inside the house -- the trailer?

5    A.    I have an answer.  I forgot to add I also found .40 caliber

6    ammunition on top of the refrigerator in the kitchen.  Sorry.

7    Q.    Did you find any other guns inside the trailer?

8    A.    I did.

9    Q.    What did you find?

10   A.    Inside a room I would describe as a laundry room, it's attached

11   to the dining room kitchen area, it's a small type of laundry room, as

12   you go in there, there was just -- it wasn't really being used as a

13   laundry room.  It was a jumble of stuff through there mostly like bags

14   of clothes and things.

15          As I looked -- as I go in there and look to the right,

16   there's an opening that shows the water pipe hookups for like a

17   washer and dryer.  Inside there -- tucked inside there was a black

18   firearm, pistol, semiautomatic pistol.

19   Q.    Did you find out what caliber?

20   A.    That was a .22 long rifle.

21   Q.    What size is it?

22   A.    It was approximately the same size.  Actually, that one might be

23   a little longer.  It was about seven inches to seven and a half inches.

24   Q.    What color?

25   A.    Black.

1   Q.   Did you see any ammunition?

2   A.   I did.

3   Q.   What ammunition did you see?

4   A.   There was a box of ammunition marked .22 long rifle containing

5   several rounds.  And it was on top of the refrigerator as well near

6   the .40 caliber ammunition.

7   Q.   On the evening of September 24, 2009, did you arrest Yuris

8   Bonilla?

9   A.   I did not arrest him.  Special Agent Jeff Ellis arrested him.

10  Q.   Was he arrested that night?

11  A.   He was.

12  Q.   Do you recognize him?

13  A.   I do.

14  Q.   Do you see him here in the courtroom with us today?

15  A.   Yes.

16  Q.   Can you point to him and identify something that he's wearing?

17  A.   He's wearing sort of a darker colored shirt with stripes on it

18  sitting in between the two defense attorneys.

19                  MS. KELLY:  Your Honor, may the record reflect the

20  witness has identified the defendant?

21                  THE COURT:  It may.

22  BY MS. KELLY:

23  Q.   On that night was Carlos Calixtro arrested?

24  A.   I believe that there's two answers to that one.  There's a child

25  that carries the name of Carlos Calixtro that was present and was not

1    arrested but was present in the trailer.  But the elder Carlos Calixtro

2    was not there.

3    Q.    What date was Carlos Calixtro arrested?

4    A.    On October 15 pursuant to a federal arrest warrant.

5    Q.    Did you and your ICE team have an arrest warrant be issued for

6    Carlos Calixtro?

7    A.    On October 2nd we did.

8    Q.    Did you have an opportunity that evening, the next day to

9    interview Julio Cesar?

10   A.    I did.

11   Q.    And did you also see at the scene certain women that were

12   found inside the trailer?

13   A.    I did.

14   Q.    Did you see this woman, Exhibit 26 already admitted?

15   A.    I did.

16   Q.    And did you see this woman, 25 also admitted?

17   A.    I did.

18   Q.    Were they interviewed?

19   A.    They were not.

20   Q.    Were they released that night?

21   A.    They were.

22   Q.    We have talked about Exhibit Number 38, which is also

23   previously admitted, these two photographs of the room where Julio

24   testified he was held in.  Do you recognize that room?

25   A.    I recognize the room.  It looks a lot nicer than what we saw.  It

1    wasn't in that type of order.

2    Q.    Are you the one that took that photograph?

3    A.    No, I was not.  I don't have any idea the date and time those

4    photos were taken.

5    Q.    That room that Julio was held in, did you get a chance to go in

6    and look around?

7    A.    I did.

8    Q.    Was there a toilet in there?

9    A.    There is what is commonly known as a half bathroom containing

10   a sink and a toilet but no shower or bathtub.

11   Q.    9950 South Oak Canyon Lane, it's in the District of Arizona?

12   A.    I guess so, yes.

13   Q.    Lastly, I'm going to place on the overhead 19 that has not been

14   admitted yet.  Do you recognize that photo?

15   A.    I do.

16   Q.    What do you recognize it as?

17   A.    It's a photo I took that were some of the items of interest that

18   were found inside that room, the two cell phones and that type of whip

19   device.  I just took a photo of those to document them.

20   Q.    Does it show two cell phones?

21   A.    It does show two cell phones.

22              MS. KELLY:  The government would move to admit and

23   publish 19.

24              THE COURT:  Any objection?

25              MR. ROMO VEJAR:  No objection.

1    MR. HORMEL:  No objection.

2    THE COURT:   19 is admitted and may be published.

3  BY MS. KELLY:

4  Q.    I'm going to place on the board also 22.  Who is that a photo of?

5  A.    That's Yuris Bonilla-Guizar.

6  Q.    And when was that photo taken?

7  A.    That was taken the night of the search warrant where BORTAC

8  entered the residence and rescued Julio Cesar Lopez.

9  Q.    And was that the shirt he was wearing when BORTAC went in

10  and rescued Julio and arrested Yuris Bonilla?

11  A.    From the first time I saw him, that was the shirt.

12    MS. KELLY:  I don't have any other questions.

13    Were 51 and 52, both of the summaries, admitted?

14    THE COURT:  Yes.

15    Mr. Hormel.

16    MR. HORMEL:  Yeah.

17                    CROSS-EXAMINATION

18  BY MR. HORMEL:

19  Q.    Good afternoon, Agent Slagle.

20  A.    Good afternoon, sir.

21  Q.    The government just asked you some questions about your

22  training as an ICE agent?

23  A.    Yes, she did.

24  Q.    Now, you mentioned that you had gone -- or you had transferred

25  over to ICE as an investigative agent in February of '09?

1   A.    I did.

2   Q.    And at that time I assume you went to an academy?

3   A.    I did.

4   Q.    How long was the academy?

5   A.    Approximately five and a half months.

6   Q.    And in that academy I am going to assume, please correct me if

7   I'm wrong, that you learned about the collection of evidence?

8   A.    I did not learn about the collection of evidence just at that

9   academy.  I learned about it previously at the border patrol academy.

10  Q.    So you had two sections.  Once at the border patrol academy

11  and once at ICE?

12  A.    That is correct.

13  Q.    And so you were taught how to -- let's say you enter into a

14  residence that is of interest to you because you suspect a crime has

15  been committed.

16  A.    Correct.

17  Q.    You are then trained to search through that residence for items

18  that might be of use to you?

19  A.    Yes, sir.

20  Q.    Now, the government asked you some questions about what

21  might be useful to you as an investigator in alien smuggling cases?

22  A.    Yes.

23  Q.    And you testified, did you not, that you would be -- there are

24  certain things that you have been trained to identify as important in

25  those cases?

1   A.    That's correct.

2   Q.    And in this particular case, you and your team went through this

3   home and you searched it?

4   A.    We did.

5   Q.    You did?

6   A.    Yes.

7   Q.    Okay.  And the idea of that search was to locate items that

8   would be of use to the investigation?

9   A.    That's correct.

10  Q.    And such items would then be inventoried and processed for

11  evidence retention?

12  A.    That's correct.

13  Q.    Being that we are talking about an alien smuggling case,

14  evidence -- let's back up.  Do you know what alienage is?

15  A.    I do.

16  Q.    And can you tell us what that means?

17  A.    Yes.  Alienage is somebody who is present in the United States

18  that is not a citizen or national of the United States.

19  Q.    So important to an alien smuggling investigation -- I should back

20  up and say that more clearly.  Alienage is important to an alien

21  smuggling organization, is it not?

22  A.    It definitely is.

23  Q.    So if you found documentation of persons having been here who

24  are from other countries, you would likely preserve that evidence,

25  would you not?

1   A.    We would.

2   Q.    That is something you might have your eye out for should you

3   be looking through a residence?

4   A.    We would.

5   Q.    So if you found documentation of an individual's identity that

6   was of alien -- which might show alienage, you would probably be

7   likely to make sure you kept ahold of that?

8   A.    Yes, I believe we would.

9   Q.    In this case you found no documents relating to the identity of

10  anyone by the name of Julio Cesar Lopez-Trujillo?

11  A.    No, we did not.

12  Q.    And fair to say you turned that place upside down?

13  A.    I wouldn't say it like that.

14  Q.    Okay.  You carefully went through that residence?

15  A.    We went through that residence looking for items associated to

16  hostage taking.  At this point that investigation -- you keep referring

17  to it as alien smuggling.  That was a hostage situation for us which we

18  investigate different than alien smuggling.

19  Q.    Okay.  But you kept the notebooks?

20  A.    We did.

21  Q.    And so do you remember finding any documents relating to

22  Mr. Lopez?

23  A.    I do not.

24  Q.    If you had you would have kept them, wouldn't you?

25  A.    Most certainly.

1   Q.   You were careful in your search of the premises, were you not?

2   A.   Yes, sir.

3   Q.   You searched every room, did you not?

4   A.   We did.

5   Q.   You searched every cabinet, did you not?

6   A.   We did.

7   Q.   You searched every closet, did you not?

8   A.   Yes, we did.

9   Q.   And you searched -- all right.  Now, you found no documents

10  relating to Mr. Lopez?

11  A.   That is correct, sir.

12  Q.   You mentioned that there was a toilet in the half bathroom near

13  to the room that we have looked at many times, this room.

14               MR. HORMEL:  May we publish?

15               THE COURT:  Yes.

16  BY MR. HORMEL:

17  Q.   You mentioned there was a bathroom in there?

18  A.   Yes, I did.

19  Q.   You mentioned there was a toilet in that bathroom?

20  A.   I did.

21  Q.   Did you try it out?

22  A.   No.

23  Q.   I mean.  Did you try to flush it?

24  A.   No, I did not.

25  Q.   Sorry for the poorly phrased question.  Now, Agent Slagle, you

1   were not present for the events in the home that led you and ICE to

2   end up showing up there, were you?

3   A.   I was present for some of them, sir.

4   Q.   You were in the house when Mr. Lopez was there?

5   A.   No.  I thought you were talking about ICE's involvement.

6   Q.   No, no, no.  I'm talking about before ICE became involved.

7   A.   No.  I misunderstood you.

8   Q.   Before the BORTAC team drove up, you said you drove by there?

9   A.   I did earlier in the day.

10  Q.   You didn't go in the house?

11  A.   Of course not.

12  Q.   You didn't visit with Mr. Lopez?

13  A.   Of course not.

14  Q.   You didn't visit with Mr. Bonilla?

15  A.   No.

16  Q.   You didn't try to call them on the phone?

17  A.   No, I did not.

18  Q.   And so you -- basically at this point the information that you

19  guys had and you supplied to BORTAC and the information that you

20  were operating from came from Karen Hayes or Karen Lopez, correct?

21  A.   Correct.

22  Q.   And it came from one recorded phone conversation?

23  A.   I think there was more than that.

24  Q.   What else was there?

25  A.   There was the Sprint Nextel.

1   Q.   Which location?

2   A.   Location?  You are referring to the conversations that were

3   between Karen and Julio?  Is that what you are referring to?

4   Q.   Right.  The things Karen told you.

5   A.   Right.  That would have been correct.

6   Q.   It was Karen, Sprint and the recorded call?

7   A.   There were other things.  If you are talking about the whole

8   amount, there is other things, but, I guess, that's the large -- that's

9   the meat of it.

10  Q.   It was based on that, that you made decisions on how to proceed

11  in this case?

12  A.   Yes.

13  Q.   Were you the one who ordered the taking of photographs?

14  A.   I did not order it.  However, I did take some photographs.

15  Q.   Are you the one that took the series of photographs of

16  Mr. Lopez?

17  A.   I did.

18  Q.   So you took 20-something photographs of him?

19  A.   That would have been me.

20  Q.   And you had him sitting on the ground for this period of time?

21  A.   Well, I don't know if it was a big period of time.  I mean 20

22  photographs with a digital high speed camera is really not that long of

23  a time frame.

24  Q.   So you didn't have him sitting on the ground for an hour?

25  A.   No.

1    Q.    But you had the other people sitting on the ground for an hour?

2    A.    Well, we separated Mr. Lopez from the rest of the people.

3    Q.    Okay.

4    A.    And due to the fact that Mr. Lopez was unclothed, I think we had

5    to make certain accommodations for him.

6    Q.    So certain accommodations were made for him but not for the

7    other folks who were apprehended?

8    A.    Well, I don't think that we attempted to make the individuals

9    uncomfortable at all.  So if that's what you are referring to.

10   Q.    Are you aware that anybody complained about being placed on

11   an ant hill?

12   A.    I find that highly unlikely.  If they would have complained about

13   it, I don't know anybody that would not have moved them.

14   Q.    Do you speak Spanish, sir?

15   A.    Limited.

16   Q.    Do you know how to say the word "ant" in Spanish?

17   A.    I actually do not know how to say that.

18   Q.    So if someone told you that, you would have no idea what they

19   were talking about?

20   A.    There were multiple agents that did speak Spanish that could

21   understand that.

22   Q.    Agent Ellis doesn't speak Spanish?

23   A.    No, Agent Ellis does not.  Actually, I can't really speak to his

24   Spanish speaking ability.

25   Q.    Okay.  We will get to that.  And do you know whether Agent

1    Coldiron speaks any Spanish?

2    A.    All border patrol agents are trained to a limited amount of

3    Spanish, enough to converse, but generally "ant" isn't in the

4    vocabulary they focus on.

5    Q.    Okay.  Now, you gave or participated in an interview with

6    Mr. Lopez after this event took place?

7    A.    I did with the assistance of a native born Spanish speaking

8    agent.

9    Q.    And you asked Mr. Lopez a series of questions about what had

10   happened to him?

11   A.    I did.

12   Q.    And do you recall some of the responses that he gave?

13   A.    I recall them.  Some of them.  Probably not in exact detail that

14   you have in front of you.

15   Q.    I'm going --

16                  MR. HORMEL:  May I approach the witness, Your Honor,

17   with Exhibit 8?

18                  THE COURT:  Sure.

19   BY MR. HORMEL:

20   Q.    Now, I'd like you to turn to page 8.

21   A.    Okay.  I'm there.

22   Q.    If you're towards the bottom of the page there, that's where you

23   guys are discussing what arrangements had been made by Mr. Lopez

24   in the house down in Nogales, correct?

25   A.    That's correct.

1           MS. KELLY:  Your Honor, can we approach?

2           THE COURT:  That's fine.

3           (At sidebar.)

4           MS. KELLY:  I'm going to object to improper

5    impeachment.  He had an opportunity to discuss any of this with Julio.

6    There's no inconsistency that was stated on that.  He had the

7    opportunity to clear it up with Julio.  At this point it would be an

8    improper impeachment.

9           MR. HORMEL:  That is completely off base.  Mr. Lopez

10   upon repeated questioning about this refused to remember and did not

11   want to answer these questions.

12          This is an interview that was recorded.  We can bust out

13   the recording and ask if Mr. Slagle recognizes it.  We can do this.  I

14   don't have the equipment ready.  We can come back and do that if the

15   government wants.

16          When the witness -- and the government knows that I

17   attempted to clear this up with the witness.  He did not remember

18   what he stated during the interview.  He refused to give me any

19   ground on that.  I tried.  It took a long time.  It was not possible.

20          Now we have the witness who was there who heard him

21   say what he said.  We have a transcription and a translation that was

22   provided by the government.  This is absolutely proper impeachment.

23   This is a prior inconsistent statement.

24          He told the court that he was told in that house that

25   everything was fine and that whatever statements about paying in

1   Tucson were directed to other people.  This statement says exactly the

2   contrary.

3              The government asked him at that time -- the agents

4   asked him, "What did they tell you when you got to the house?"  He

5   said, "The boss came.  He told us he didn't give a crap.  We were to

6   pay 1,500 in Tucson."  It's a prior inconsistent statement.  It is

7   therefore admissible as proper impeachment.

8              MR. ROMO VEJAR:  I agree.

9              THE COURT:  Objection is overruled.  You may go

10   forward with it.

11              (In open court.)

12   BY MR. HORMEL:

13   Q.    All right.  Let's return to the exhibit we have there.  Do you

14   recognize that transcript there?

15   A.    I do.

16   Q.    And that is a transcript, is it not, of the interview that was done

17   with Mr. Lopez on the date in question?

18   A.    That's correct.

19   Q.    On the 24th.  It might have been --

20   A.    The 25th.

21   Q.    Right.  You participated in that interview, did you not?

22   A.    I did.

23   Q.    And you were trying to get Mr. Lopez to tell you about what had

24   happened regarding the arrangements he had made in Nogales with

25   the folks down there?

1  A.    That is correct.

2  Q.    And --

3            MR. HORMEL:  One moment, please.

4  BY MR. HORMEL:

5  Q.    If we focus then on line number 27 -- actually, let's back up.

6  Let's go to line 22 for absolute completeness here.  You have line 22?

7  Agent Sandoval is translating for you, correct?

8  A.    That is correct.

9  Q.    Can you read us what he says to you?

10  A.    On line 22 he states, "He says that he understands that you

11  didn't have any money.  That you had told them that you didn't have

12  money when you got to the two-story house.  How much did they tell

13  you that they were going to charge you to cross over to the United

14  States?"

15  Q.    Keep reading, please.  Then the next line is Lopez?

16  A.    "Lopez stated 1,015 -- 1,000 -- 1,500."

17  Q.    Then Sandoval asks another question.  And what does he say

18  there -- what does Sandoval ask?

19  A.    "And when you were there at that house and the boss got there,

20  what did he tell you?"

21  Q.    Can you please read Mr. Lopez' response to that question?

22  A.    "Lopez stated that he was going to charge us 1,500 and that he

23  wanted the money in Tucson.  That he didn't give a crap if we were

24  going further up.  He said, 'I don't care if you get up there.  I want

25  your money in Tucson.'".

1   Q.   Thank you.  Recently you were provided some names of some

2   potential defense witnesses, correct?

3   A.   That's correct.

4   Q.   And you ordered some payroll records for them through DES,

5   correct?

6   A.   I did.  I did through my criminal research specialist.

7   Q.   You were asked to do that by the prosecution?

8   A.   I was.

9   Q.   You never did anything like that for Mr. Lopez, did you?

10  A.   How could I?  I don't have a Social Security number.  They are

11  based off of valid Social Security numbers.  Knowing Mr. Lopez is an

12  illegal alien, he would not have one.

13  Q.   But he had used one and you knew that, did you not?

14  A.   From my understanding, DES records only utilize valid Social

15  Security numbers.  And I did not know Mr. Lopez to have one.

16  Q.   Let's back up here.  Now, when -- this case has been pending for

17  13 months, correct?

18  A.   I guess it could be around that time frame, yes.

19  Q.   Today is October 28th (sic)?

20  A.   Yeah.

21  Q.   This occurred on September 24th?

22  A.   We will go with yes.

23  Q.   During that time you have been the case agent for most of that

24  time?

25  A.   I guess so, yes.

1   Q.    And as a case agent, you are responsible for performing

2   whatever investigative tasks are required in the case?

3   A.    That's correct.

4   Q.    In fact as far as ICE is concerned, you are the point person for

5   this investigation?

6   A.    I don't know if they call me that.  I think they call me the case

7   agent.

8   Q.    Is there anybody in ICE who is telling you what to do?

9   A.    Well, there would always be my supervisor in the chain of

10  command.  I have to answer to somebody.

11  Q.    They are not assigned to this case?

12  A.    They are not, but they obviously oversee things like this.

13  Q.    Now, in none of the interviews you did with Mr. Lopez did it ever

14  become clear, correct me if I'm wrong, that he had previously used a

15  Social Security number, did it?

16  A.    No.

17  Q.    In fact you never asked him that question, did you?

18  A.    No.

19  Q.    In none of the interviews that you did with him did you ever ask

20  him whether or not he had used false names previously?

21  A.    No.

22  Q.    Therefore, you did not know whether or not he had previously

23  used Social Security numbers or false names or anything like that until

24  he testified yesterday, correct?

25  A.    That is correct.

1    Q.    And so the reason that you didn't actually do any investigation

2    under those Social Security numbers isn't because you couldn't.  It's

3    because you didn't know, correct?

4    A.    Yes, I guess that's fair.

5                MR. HORMEL:  I have nothing further.

6                THE COURT:  Mr. Romo.

7                MR. ROMO VEJAR:  Yes, sir.  I do have a few questions,

8    Your Honor.

9                          CROSS-EXAMINATION

10   BY MR. ROMO VEJAR:

11   Q.    Good afternoon, Agent Slagle.

12   A.    Good afternoon.

13   Q.    How are you, sir?

14   A.    I've been better.

15   Q.    Let me ask you, just to keep the train of thought of Mr. Hormel,

16   the Social Security numbers that you checked on the witnesses, you

17   did it overnight.  Is that correct?

18   A.    I did it what?

19   Q.    Overnight?

20   A.    I don't know what you mean by that.

21   Q.    You were provided with a list of witnesses.  And by the next

22   morning, you already had checked their records and you gave us a

23   copy of those records?

24   A.    It was overnight, but I didn't receive the results until midday the

25   next day.

1    Q.    It's a rather fast process that you all have, right?

2    A.    Well, it was pretty fast, I guess.

3    Q.    And once you found out that Mr. Lopez had false Social Security

4    numbers, did you try to procure those numbers?

5    A.    No, I did not.

6    Q.    And you were not asked by the government to do that?

7    A.    Not that I recall.

8    Q.    Now, the reason this is important because -- you were trained as

9    a border patrol agent, correct?

10   A.    I was.

11   Q.    And then you were trained also as an ICE agent.  Is that correct?

12   A.    That is correct.

13   Q.    And as a border patrol agent, your duties and responsibilities

14   include identifying aliens who are illegally within the United States,

15   so-called aliens.  Is that correct?

16   A.    Yes.

17   Q.    Foreigners?

18   A.    My duties are to identify whether the alien -- or whether the

19   individual is an alien and then if that alien is an illegal alien who does

20   not have permission to be in the United States.

21   Q.    That's as a border patrol agent?

22   A.    As an ICE agent as well.

23   Q.    As an ICE agent you are also asked to investigate those matters.

24   But as a border patrol agent, if you encounter someone at the border

25   or you have reason to believe that that person is illegally here, then

1   you can approach them and ask them.  Is that correct?

2   A.    As an ICE agent or a border patrol agent, you have that

3   authority.

4   Q.    Okay.  And that responsibility as well?

5   A.    Yes.

6   Q.    Okay.  And when you make a determination that someone is

7   illegally here, you have to make -- the first determination you have to

8   make is where they are from, right?

9   A.    Right.  You have to find out where they are at, where they are

10  from or what their status is in the United States probably most

11  importantly.

12  Q.    Once you determine that they are illegally here, that is what I

13  meant.  Once the status has been determined?

14  A.    Of course.

15  Q.    Then you need to find out what is the country of origin.  Is that

16  correct, sir?

17  A.    I guess that's probably an important thing to know.

18  Q.    Well, it's important if you get rid of them.  You want to send

19  them to the right country, correct?

20  A.    That's correct.

21  Q.    You don't want to send, for instance, someone from Spain to

22  Chile, correct?

23  A.    No.

24  Q.    Now, when you make that determination of the nationality of the

25  undocumented person, you have to make an investigation.  Is that

1   correct?

2   A.   I guess that's correct, yes.  We look into it.

3   Q.   All right.  And that was never done in the case of Mr. Lopez.  Is

4   that correct, sir?

5   A.   Actually, it's pretty common for us to have the alien call the

6   Mexican consulate.  The Mexican consulate talks to them and verifies

7   their -- whether they believe they are a Mexican citizen or not.

8   Mr. Lopez spoke to the Mexican consulate for an extended period of

9   time.

10  Q.   The Mexican consulate is notified about Central Americans

11  sometimes because you don't know what their nationality is, correct?

12  A.   That's correct, but in my experience --

13  Q.   Let me continue, sir.  I appreciate your eagerness to give us

14  some information.  You will have an opportunity to do so.

15        When the undocumented person -- you don't know what

16  the nationality is, sometimes the Mexican consul speaks with them.  Is

17  that correct?

18  A.   Yes.

19  Q.   Okay.  And a determination is made by the Mexican consul as to

20  their nationality.  Is that correct?

21  A.   Well, what they believe is the nationality from a series of

22  questions relating to the person's hometown, items of interest that

23  would be in that hometown, things that generally a person of Central

24  America would not know those intimate details.

25  Q.   For instance, what is the Declaration of Independence, who are

1   the heroes, national anthem?

2   A.      Political parties.

3   Q.      Sometimes people from other countries memorize those because

4   they want to be sent back to Mexico, correct?

5   A.      I imagine they do.

6   Q.      Because it's a lot easier to get back into the United States from

7   Mexico than from a country further away.  Is that correct?

8   A.      I couldn't tell you what their thinking is on that.

9   Q.      You could tell us, sir, certainly you have already, what your

10  experience is with respect to smuggling.

11  A.      I was talking about my experience earlier that you asked when

12  Central Americans would talk to the Mexican consulate.  In my

13  experience in every instance the Mexican consulate has quickly

14  identified that individual from not being a native of Mexico.

15  Q.      Well, I did check all my disclosure and I didn't find anything

16  from the Mexican consul.  Did you provide something from the

17  Mexican consul to the United States?

18  A.      No.  Generally it's an oral conversation.

19  Q.      Sir, I'm asking about this case.  Please do not give me

20  generalities.

21  A.      It's a telephonic conversation.

22  Q.      In this case did you provide anything to the United States that

23  identified that the Mexican consulate had spoken to Mr. Lopez?

24  A.      Yes.  It's an ROI number 2.

25  Q.      And did you give it to the government?  Was it a written

1    document?

2    A.    I believe it's disclosed to you, counsel.

3    Q.    Well, sir, I have checked, as I told you.  I have not found

4    anything that has to do with the Mexican consulate, but we'll get to

5    that.

6    A.    May I review my ROIs?  Maybe I can help you.

7    Q.    You can, sir.  We will proceed and then you can check it out.

8              Now, are you telling this court that you knew that this

9    gentleman was not -- was using a Social Security that were false --

10   Social Security numbers that were false?

11   A.    Like Mr. Hormel stated previously, I found out about the same

12   time you did.

13   Q.    And did you ever find out that he was using a false name?

14   A.    Yes.

15   Q.    And when was that, sir?

16   A.    When you were hearing the same information.

17   Q.    So it was yesterday?

18   A.    That's correct.

19   Q.    And did you check that false name since yesterday to today?  I

20   guess you have stated no, right?

21   A.    I don't believe he gave you a false name.  If you have one, you

22   can show it to me.  I don't remember one.

23   Q.    Well, did you check with the places that he said he went and

24   cashed the checks and did you do an investigation?

25   A.    Right now during trial, I didn't.

1    Q.    Yesterday?

2    A.    No.

3    Q.    Do you have other agents that can do that?

4    A.    No.  I do not have any other agents that are free right now to do

5    that for me.

6    Q.    Are you telling the court and the jury that there is nobody that

7    can investigate this case from the United States that you can ask?

8    A.    No.  I'm saying there is nobody in my group that I know of --

9         MS. KELLY:  I object to the relevance of this whole line

10   of questioning.

11        THE COURT:  I think we've gone as far as we need to go

12   on that line.

13        MR. ROMO VEJAR:  I think so, Judge, as well.

14        THE COURT:  Thank you.

15   BY MR. ROMO VEJAR:

16   Q.    Now, when Mr. Lopez was arrested, he was initially kept for

17   three days he said.  Is that correct?

18   A.    I believe that's correct.

19   Q.    Where was he kept?

20        MS. KELLY:  Object to relevance.

21        THE COURT:  Sorry?

22        MS. KELLY:  Object to relevance.

23        THE COURT:  Overruled.

24        You may answer if you know, sir.

25        THE WITNESS:  First he was kept at the ICE facility

1    where he slept on the floor while we interviewed him that night.  He

2    slept on the floor until the next day.  He went into a facility.  I can't

3    tell you exactly what facility where he was held by the marshals until

4    initial appearance.

5              After initial appearance he was released back to ICE and

6    ICE put him through our victim witness program.  We put him in a

7    hotel for a day or two.  Subsequently he was returned to his wife in

8    Mayer, Arizona.

9    Q.    And I'm assuming that he had permission to be in the United

10   States?

11   A.    He had agreed to be a material witness for the United States

12   government.

13   Q.    Did he have permission to be in the United States?

14   A.    The permission was given by the United States government

15   because he was a material witness.

16   Q.    It was done on the date that he was released?

17   A.    Yes, it would have been.

18   Q.    So that would have been back in September of last year?

19   A.    Yes, but I can't give you an exact date.

20   Q.    I'm just trying to determine because there was conflicting

21   testimony yesterday as to the date.

22   A.    I understand.  It's your job.

23   Q.    Eventually he also received a permit to work.  Is that correct?

24   A.    He did.

25   Q.    And that permit carries a photograph with sort of an ID.  Is that

1  correct?

2  A.     It's called an employment authorization document.

3  Q.     And it carries a photograph.  Is that correct?

4  A.     It does.

5  Q.     And it states there that he can procure a Social Security

6  number?

7  A.     Well, I don't know if it states on there.  When you have that

8  document, you can go in and obtain a Social Security card that's

9  limited during the time that's going to be clearly marked.  That is only

10  valid during the time that document is valid which is for one year.

11  Q.     The instructions to the document state they can go and get a

12  Social Security card?

13  A.     Well, the document specifically is given to him so they do not

14  become a public charge on the United States government.  They can

15  go out and get a job while they are ordered to stay here by the

16  government.

17  Q.     And when that permit was given to him, it was given effective

18  through, he testified, July of next year.  Is that correct?

19  A.     That is correct.  It's generally given in a longer time frame due

20  to the fact that trials can get continued, things like that.  It takes a

21  long time to acquire one of these cards.  It's standard practice to go

22  for a year's time frame from the date of issuance.

23  Q.     Now, on the date of this arrest, you were present there?

24  A.     I was.

25  Q.     And were you in charge?

1    A.    I was not.

2    Q.    You were one of the agents that was there?

3    A.    I was an agent in the original case agent's, Jeff Ellis, group.

4    Q.    So if the women had been placed some -- people had been

5    placed on an ant hill, it is likely they wouldn't have notified you but

6    the person in charge.  Is that correct?

7    A.    I'm sure I would have heard of it.

8    Q.    Maybe we will have occasion to find out about it but not at this

9    point.

10   A.    Okay.

11   Q.    Now, I want to talk a little bit about some of the other things

12   that you and counsel for the government were talking about, the

13   notebooks.  Now, you have those notebooks in front of you?

14   A.    I do not.  I believe they are in front of the prosecution.

15             MR. ROMO VEJAR:  Your Honor, may I have a second?

16             THE COURT:  Yes, you may.

17   BY MR. ROMO VEJAR:

18   Q.    Now, sir, the notebooks which are identified as Exhibit 3 and 4,

19   do you recall those?  That would be a notebook of 120 sheets and one

20   of 70 sheets.

21   A.    Yes.

22   Q.    Do you recall those?  They have multiple entries inside, correct?

23   A.    They do.

24   Q.    For instance, it's got telephone numbers.  It has, as you said,

25   the sum of 33,000 something.  We don't know what it is?

1  A.    I don't know if that's an actual money amount.  I just know it's a

2  number, a sequence of numbers.

3  Q.    There is 33,000, 31,370 number?

4  A.    That's correct.

5  Q.    There are a multiplicity of numbers, names and things of this

6  nature.  Is that correct, sir?

7  A.    That is correct.

8  Q.    And you have no idea why they were written or who wrote them.

9  Is that correct?

10  A.    That is correct.

11  Q.    And you don't know, for instance, Neftali Basila (phonetic), who

12  was there, whether that is a friend or a relative or a sick person or

13  whomever?

14  A.    No, I don't know that.

15  Q.    And the same is true with regard to any other information that is

16  found in there.  For instance, there is a list of names.

17          MR. ROMO VEJAR:  May I approach the witness, Your

18  Honor?

19          THE COURT:  Yes, you may.

20          MR. ROMO VEJAR:  This is in Exhibit Number 4.  If I may

21  have this published to the jury so they know what I am talking about

22          THE COURT:  It is admitted so you may publish.

23  BY MR. ROMO VEJAR:

24  Q.    This list appears to be names and telephone numbers that are

25  generally done by people who don't -- who need to remember

1    somebody.  Is that correct, sir?

2    A.    It appears to be some sort of phone list.

3    Q.    Okay.  You also received a document that Ms. Lopez --

4    Mrs. Lopez generated.  Do you recall that?

5    A.    I did.

6    Q.    It was the same thing.  Just telephone numbers and flowers and

7    different things written on it.  Is that correct?

8    A.    I don't recall if it had flowers, but if you say so.

9    Q.    You would agree with me there was something that was not

10   congruent with something else?

11   A.    I'll take you at your word that it had doodling on it.

12   Q.    And with regard to the names and telephone numbers that were

13   given to the jury, you were pointing out a name and then counsel was

14   pointing out a telephone number and it corresponded to the same

15   telephone number that was written in the notebook.  Do you recall

16   that from the Sprint accounts?

17   A.    Oh, yes, I remember that.

18   Q.    You don't know who they are, do you?

19   A.    No, I do not.

20   Q.    You don't know why they are there either?

21   A.    I do not know that either.

22   Q.    Now, you stated that there were two weapons found in the

23   house.  Is that correct, sir?

24   A.    That is correct, sir.

25   Q.    And one of them you said was a .22 caliber semiautomatic

1    pistol?

2    A.      That's correct.  Both pistols were semiautomatic.

3    Q.      And that semiautomatic was in what would otherwise be a

4    laundry room, right?

5    A.      That's what I would describe it as.

6    Q.      And in that laundry room, did you ever -- did you see if that

7    pistol was operational?

8    A.      No.  That's not my job.  I wouldn't check -- I would not function

9    test.

10   Q.      You all have different jobs.  I understand that.  My question is if

11   you saw if it was operational.

12   A.      No, I did not function test it.

13   Q.      And you already testified that the Carlos Calixtro that was found

14   at the trailer is a child who is a two-year-old child.  I believe he is

15   hugging one of the women.  This is Francisco right here, right?

16   A.      Identifying a baby by name would be very difficult for me.  If

17   you say that's Francisco --

18   Q.      Well, you can tell the jury that Carlos Calixtro was not there,

19   right?

20   A.      The Carlos Calixtro that is sitting next to you was not there.

21   Q.      The defendant was not there.  Carlos Calixtro, the son, I said

22   "Francisco," is this kid right here?

23   A.      I don't know if that one is or the other child is Carlos Calixtro,

24   the junior, or son.  One of them is.

25   Q.      Then there was a young lady whose photograph you see here.

1    Do you see her?

2    A.    I do.

3    Q.    And do you recall her name?

4    A.    I do.

5    Q.    What is her name?

6    A.    Jacinta Yasmin Luna -- Yasmin -- Jacinta Yasmin Luna Quintana

7    Fatima (phonetic).

8    Q.    Now, can we call her Ms. Luna?

9    A.    It's probably easier.

10   Q.    Ms. Luna is holding another child.  Is that correct?

11   A.    That is correct.

12   Q.    And she was not arrested, was she?

13   A.    What is that?

14   Q.    Ms. Luna was not arrested?

15   A.    The lady?  No, she was not arrested.

16   Q.    And then we have this gentleman.  Do you know who that is as

17   the case agent?

18   A.    I do.

19   Q.    Now, is that -- I think somebody was referring to El Zapo or El

20   Chapo.  Is that the one?

21   A.    That's his nickname, correct.

22   Q.    What is his name?

23   A.    German Gonzalez-Sandoval.

24   Q.    Now, you were here throughout the testimony.  Is that correct?

25   A.    I was.

1  Q.    And you heard Mr. Lopez refer to this gentleman.  Is that
2  correct?

3  A.    I did.

4  Q.    And he identified him as a possible person in the recording.  Do
5  you recall that?

6  A.    I do remember that.

7  Q.    Now, was he arrested?

8  A.    He was.

9  Q.    And where is he?

10  A.    He has served his time and gone back to Mexico.

11  Q.    He was not charged in this case, was he?

12  A.    Well, technically --

13            MS. KELLY:  I object to relevance.

14            THE COURT:  No.  He may answer that question if he
15  knows.

16            THE WITNESS:  Technically he was not charged in this
17  case.

18  BY MR. ROMO VEJAR:

19  Q.    If we go beyond the technicalities, we are getting into something
20  complicated?

21  A.    I'm trying to sort it out there for you.  Actually, can I clarify?

22  Q.    Certainly.

23  A.    Actually, he was charged in this case but a different charge, but
24  it was relating to this case.  I misstated.

25  Q.    He served his time and is gone?

1  A.    Yes, sir.

2                  MR. ROMO VEJAR:  May I have a second, Your Honor?

3                  THE COURT:  You may.

4                  MR. ROMO VEJAR:  Your Honor, may I have a second?  I

5  need to consult with government's attorney.

6                  THE COURT:  Yes, you may.

7                  MR. ROMO VEJAR:  I was trying to find out if they found

8  the disclosure.

9                  Your Honor, I have no other questions at this point.

10                  THE COURT:  Thank you.

11                  Ladies and gentlemen of the jury, would you like a break

12  at this time?

13                  Before we leave, Ms. Kelly, are you going to have some

14  redirect?

15                  MS. KELLY:  Briefly.

16                  THE COURT:  Then you are excused.  We'll see you in

17  about 15 minutes.

18                  (The jury was excused.)

19                  THE COURT:  We will need you back in a few minutes.

20  Court will stand at recess.

21                  (A recess was taken.)

22                  THE COURT:  The record will reflect the presence of the

23  jury, counsel and the defendants.

24                  Ms. Kelly.

25                                  / / /

1                       REDIRECT EXAMINATION

2    BY MS. KELLY:

3    Q.    I have a couple of quick questions.  I'm going to place on the

4    board Exhibit 61 which has been marked, not admitted.  Do you

5    recognize this?

6    A.    I do.

7    Q.    What do you recognize it as?

8    A.    ROI, the report of investigation, number 2.

9    Q.    Is that your report of investigation number 2?

10   A.    It is.

11   Q.    And I'm going to direct your attention to number 23 on that

12   report which is on page 7.  Defense counsel had asked you if Mr. Julio

13   Cesar Lopez-Trujillo had an opportunity to speak to the Mexican

14   consulate?

15   A.    That's correct.

16   Q.    Did you detail that in this report?

17   A.    Yes.  It is put on line number 23.

18   Q.    And did you note here in this report that on September 25th of

19   2009 that Mr. Julio Cesar had an opportunity to speak with Luis

20   Noriega, the Mexican consulate here in Tucson, Arizona?

21   A.    That is correct.

22   Q.    Did you also speak to the Mexican consulate?

23   A.    I can't recall exactly if I was the agent.  I most likely did.  I don't

24   recall exactly.

25   Q.    Now, placing on the board Exhibit Number 50, do you recognize

1    that?

2    A.     I do.

3    Q.     On August 5 of 2009, did you record a voice exemplar or a voice

4    recording from Carlos Calixtro?

5    A.     I did.

6    Q.     And that CD we are looking at there --

7                   MR. ROMO VEJAR:  Your Honor, may we approach?

8                   THE COURT:  Very well.

9                   (At sidebar.)

10                  MR. ROMO VEJAR:  Your Honor, we object to the voice

11   exemplar.  Nobody has identified that exemplar.  And in fact when the

12   witness testified about it, which was Mr. Lopez, he said that it probably

13   was El Zapo but he couldn't identify whether it was El Zapo or my

14   client.  And I think it would be unfair because we haven't had one

15   sample here to provide of a voice.  We don't have a sample of El Zapo,

16   Your Honor.

17                  THE COURT:  You know, this witness can't identify or

18   make any identification.  All you are doing is introducing the exemplar.

19   I previously ruled that was admissible and still continues to be

20   admissible.  The objection is overruled.

21                  MR. ROMO VEJAR:  He will not identify it as anyone?

22                  THE COURT:  No.  The thing is, on your CD thing make

23   sure it doesn't -- it isn't shown to the jury because it says "Calixtro" on

24   it.

25                  MS. KELLY:  Very well.  That is his voice -- it's Carlos

1  Calixtro's voice on the recording.  It's the exemplar.  It's for the jury to

2  make the analysis whether that voice is matching the monitored phone

3  call.  We will not have any expert testify to the analysis.  That is for

4  them.  He has identified that as his voice, his recording.  He was there

5  on August 5th when that was done.

6           MR. ROMO VEJAR:  I object to that.

7           THE COURT:  He was there when Calixtro made that

8  voice exemplar?

9           MR. ROMO VEJAR:  Right.

10          THE COURT:  He can do that.

11          MR. ROMO VEJAR:  But what I am saying, Judge, is the

12  actual recording contains the voice of Mr. Calixtro.  Okay, Judge.  I

13  guess we -- we can get into it on recross.

14          THE COURT:  It's admissible.  Overruled.

15          MR. ROMO VEJAR:  Your Honor, this goes beyond the

16  scope.  This was not brought up during the direct examination and I

17  never had a chance to cross-examine on this.  It has just been brought

18  up now on redirect.

19          MS. KELLY:  Mr. Romo brought it up during

20  cross-examination, the voice exemplar.  He brought up the analysis of

21  the monitored phone call and whether or not a determination was

22  made that was Calixtro's voice.  He made that line of questioning on

23  that.

24          MR. ROMO VEJAR:  I did not, Judge.

25          THE COURT:  You know, the resolution is to recall this

1    witness and go back over it again, the direct.  That is what we will do

2    here.  Let counsel ask -- I imagine all you are doing is identifying that

3    CD which will be played.

4              MS. KELLY:  I'm actually not going to play it.  I'm going

5    to admit it and let them play it, if they want to, back in the jury

6    deliberation room.

7              THE COURT:  No.  If you are going to play it, you will

8    have to play it.  You will not give it to the jury and let them play it.

9              MS. KELLY:  That's fine.

10             THE COURT:  Mr. Romo, at this point if you want to

11   cross-examine him as to that, then I will allow you to recross on that

12   because it is something new that is being brought up at this point.

13   You will get a full opportunity to cross-examine.

14             MR. ROMO VEJAR:  Thank you.

15             (In open court.)

16   BY MS. KELLY:

17   Q.    We left off talking about Exhibit 50.  I asked you what that was.

18   On August 5, 2009, did you record an audio recording of Carlos

19   Calixtro?

20   A.    I did.

21   Q.    And is that this recording?

22   A.    Yes, it is.

23   Q.    And so we all know, the Carlos Calixtro whose voice is on this

24   CD, do you see him here in the courtroom?

25   A.    I do.

1   Q.    Can you point to him and identify something he's wearing?

2   A.    He's in a maroon colored shirt, no hair.

3                MS. KELLY:  Your Honor, may the record reflect the

4   witness has identified the defendant, Mr. Calixtro?

5   BY MS. KELLY:

6   Q.    What did you have -- or what did you ask for Carlos Calixtro to

7   say in this recording, this exemplar?

8   A.    I don't have the exact outline of what we asked him.  There was

9   an outline of things that we asked him to specifically say.

10  Q.    Did you use the transcript from that monitored phone call from

11  September 24 of 2009, in particular the third party, the English

12  speaking party who got on the phone when Julio was on the phone

13  during that call?

14  A.    We did.

15  Q.    And were those the words that you asked to be repeated for this

16  particular recording?

17  A.    Yes.

18                MS. KELLY:  Your Honor, at this point the government

19  moves to admit and publish for the jury to hear Government's Exhibit

20  50.

21                THE COURT:  Do you wish to cross-examine, Mr. Romo?

22                MR. ROMO VEJAR:  Yes, I do.

23                THE COURT:  We will allow Mr. Romo to cross-examine

24  at this point.

25                One moment.  I'm sorry, ladies and gentlemen of the

1    jury.  It's a call I had to take.

2                    Mr. Romo, you may proceed.

3                    MR. ROMO VEJAR:  Absolutely.  Thank you.

4                           RECROSS-EXAMINATION

5    BY MR. ROMO VEJAR:

6    Q.    Sir, it is true, isn't it, that the only recording we have so far is

7    the recording of that telephone conversation between Mrs. Karen

8    Lopez and somebody?  We don't know who that is.  Is that correct?

9    A.    That is correct, sir.

10   Q.    And when the testimony was given by Mr. Lopez, he testified

11   that he didn't know if it was El Zapo or somebody else.  Do you recall

12   that?

13   A.    Are you speaking about the testimony in trial or the statement

14   he gave previously?

15   Q.    In trial.

16   A.    Yes, that's what he stated.

17   Q.    And, of course, Mrs. Lopez never testified about that

18   conversation regarding who that somebody else might have been.  Is

19   that correct?

20   A.    Mrs. Lopez?

21   Q.    Yes.

22   A.    No, she did not.

23   Q.    Now, this is Mr. German Gonzalez-Sandoval.  Is that correct?

24   A.    That is correct.

25   Q.    And you made a single recording.  Is that correct?

1       THE COURT:  That may be published.  Are you referring

2  to a single recording with your client?

3       MR. ROMO VEJAR:  Yes, Your Honor.  I think it is this

4  one right here.

5  BY MR. ROMO VEJAR:

6  Q.   You made a single recording of my client.  Is that correct?

7  A.   No.  I believe we made multiple recordings due to some audio

8  difficulties in the previous recording.

9  Q.   What I meant, it's a recording of one person only?

10  A.   Yes, that's correct.

11  Q.   That would have been of Mr. Calixtro, right?

12  A.   That's correct.

13  Q.   You did not make a recording of this gentleman here?

14  A.   No, I did not.

15  Q.   You didn't make a recording of any third party because voices

16  are sometimes very similar.  Is that correct?

17  A.   I did not.

18  Q.   And so what you are providing to the jury is this recording of my

19  client only, no other person.  Is that correct?

20  A.   That is correct, sir.

21       MR. ROMO VEJAR:  Your Honor, we object for the same

22  reasons we gave you before.

23       THE COURT:  Very well.  Thank you.  It's overruled.

24       MR. ROMO VEJAR:  Thank you, Your Honor.

25       THE COURT:  Ladies and gentlemen of the jury, this is

1    different from the recording you previously heard.  You previously

2    heard a recorded monitored conversation between Mrs. Lopez -- Hayes

3    Lopez and her husband and a third party.  This is a recording made

4    specifically of Mr. Calixtro by Agent Slagle with Agent Slagle telling Mr.

5    Calixtro what to say in English.  And so it's not a monitored recording

6    which we had before.

7              MR. HORMEL:  Your Honor, I apologize.  I need to

8    approach.

9              (At sidebar.)

10             MR. HORMEL:  I'm sorry.  This just occurred to me.  But

11   this is potentially prejudicial to my client in that there's an allegation

12   of conspiracy.  And now a recording is being played that I didn't open

13   the door to that I wasn't particularly interested in having played.  And

14   now it's potentially going to cause prejudice to my client.  So I think

15   on behalf of my client, I'm compelled to ask for a severance at this

16   point.

17             THE COURT:  No.  Your client is not mentioned in any

18   way as to that recording.

19             MR. HORMEL:  We are talking about a conspiracy charge,

20   Your Honor.  There's nothing --

21             THE COURT:  This has nothing to do with your client.

22   Your client is not mentioned in that recording in any way.  As I

23   explained to the jury, it's just a recording made by the officer of this

24   person's voice.  That is it.  There's no basis for that.

25             MR. ROMO VEJAR:  We didn't open the door.  We asked

1     a single question as to whether or not Mr. Lopez had identified --

2                    THE COURT:  No.  The thing is that I had ruled that

3     admissible to play to them without anybody making an identification

4     because there's nobody that could.  The fact is the government should

5     have put it in in their direct examination of this witness.  They didn't.

6                    But the way -- I already said that was admissible.  I

7     allowed her to put that in, with you to recross, and so that -- any

8     prejudice to you by not being able to cross-examine has been taken

9     care of by the fact that you were given that opportunity.

10                    But I don't think that this in any way implicates or

11    prejudices Mr. Bonilla.  The objection is noted and overruled.

12                    MS. KELLY:  Your Honor, we want to ask whether or not

13    we can play the monitored phone call first and then play the exemplar.

14                    THE COURT:  No.  You have already played the

15    monitored phone call.  Play your exemplar.  That's it.

16                    (In open court.)

17                    MS. KELLY:  This is Government's Exhibit Number 50.

18                    THE COURT:  50 has been admitted and may be

19    published.

20                    (Exhibit 50 is played.)

21                    THE COURT:  Is that the end?

22                    (Exhibit 50 is played.)

23                    MR. ROMO VEJAR:  Your Honor, may we approach again?

24    Sorry.

25                    (Exhibit 50 is played.)

1          THE COURT:  Ladies and gentlemen, again to caution

2     you, there was a phone ringing there, this was not a conversation

3     between Mr. Calixtro or anybody else.  This was a recording where the

4     agent was telling Mr. Calixtro what to say word for word in English.

5     He was repeating that into that recorder.  That's what that was.

6                    FURTHER REDIRECT EXAMINATION

7     BY MS. KELLY:

8     Q.     Just so we understand, we listened to two separate recordings.

9     The first one did you direct the defendant Calixtro to speak into a cell

10    phone and then it was projected through a call out to another cell

11    phone where you recorded it off that second phone?

12    A.     That is correct.  We used two cell phones of the same carriers

13    that were used in the original call.  Unfortunately, due to the area that

14    it was recorded, the cellular signal was very degraded and obviously

15    lending to the call quality.

16    Q.     So the second recording that we heard, did you just record the

17    defendant Calixtro's voice directly having him speak near a recorder

18    that recorded his voice?

19    A.     Yes.  It was not using cellular telephones.  It was just there with

20    the recorder.

21    Q.     And in each recording did you have him repeat a couple of times

22    the part of the transcript from that monitored call that relates to the

23    third party that picked up the phone during that monitored call?

24    A.     Each phone call -- or each time you listen to a recording, it

25    was -- I believe it was three times that he was instructed to go over

1   the line and then do it again and then do it again a third time.

2           MS. KELLY:  I don't have any other questions.

3           THE COURT:  Thank you.

4           Any recross, Mr. Romo?

5           MR. ROMO VEJAR:  Yes, Your Honor.

6                   FURTHER RECROSS-EXAMINATION

7   BY MR. ROMO VEJAR:

8   Q.    The telephone call that was being monitored was done here at

9   this facility, correct?

10  A.    Done here at what facility?

11  Q.    The courthouse.

12  A.    The monitored phone call?

13  Q.    The monitored phone call that we just heard.

14  A.    That was not a monitored phone call, sir.

15  Q.    It was being monitored by us, right?

16  A.    It was a recorded phone call.  That is what I would describe it as.

17  It was in a controlled environment.

18  Q.    I'll rephrase then.  The telephone recording that we just heard, it

19  was done here in this courthouse?

20  A.    It was, on the fourth floor.

21  Q.    And my client was sitting at a table with a few agents in front of

22  us.  Is that correct?

23  A.    That is correct.

24  Q.    And there were some other people in another room and the

25  phone calls were made to the other room?

1   A.    Yes.  That's correct.  So there was not a chance that you could

2   overhear or get confused as either party was on the telephone.

3   Q.    And you provided him with a paragraph or two that he needed to

4   read over and over again.  Is that correct?

5   A.    I don't recall if we had him read or we instructed him.  I believe

6   he did read the paragraph.  You are correct.

7   Q.    And that paragraph was read continuously because you claim

8   that there were problems with the recording.  Do you recall that?

9   There were more than three times he was made to read those

10  paragraphs.  Is that correct?

11  A.    In each recording it was the protocol that we were having him

12  read -- for each recording we had him read three times.  That was just

13  for making sure that we had enough information on there.  That was

14  not the reason why we had him record three times on one call wasn't

15  the call quality.  It was just to have sufficient data.

16  Q.    But you did claim that there was recording problems and that he

17  had to reread it more than three times.  Do you recall that?

18  A.    That's correct.

19  Q.    And instead of leaving three times, you left it there about ten

20  times each.  Do you recall that?

21  A.    Actually, we just heard it.  It's six in total.  It was three on each,

22  I believe.

23  Q.    Well, I heard it a lot more than.  I guess the jury can judge for

24  themselves.

25  A.    You would be correct.  I said I think it's three times.  But it could

1    be four times.  You are correct.

2    Q.    And it is true that on this occasion I objected to the way that this

3    was being conducted?

4    A.    You did.  You verbally objected to me.

5    Q.    And it is also true that you never, as testified before, brought

6    anybody else so that they can be recorded in the same manner?

7    A.    That is true.

8    Q.    And it is also true that when you have a single recording, it is

9    very suggestive?

10   A.    I cannot tell you if that's true or not.  You are the attorney.

11   Q.    All right.

12                 MR. ROMO VEJAR:  That is all, Your Honor.  Thank you.

13                 THE COURT:  Thank you.  May this witness step down?

14                 MS. KELLY:  Yes, Your Honor.

15                 THE COURT:  Would you call your next witness, please.

16                 MS. KELLY:  Thank you, Your Honor.  The government

17   calls Special Agent Jeff Ellis.

18                 JEFF ELLIS, GOVERNMENT WITNESS, SWORN

19                 THE COURT:  Please be seated.  State your full name for

20   the record and spell your last name.

21                 THE WITNESS:  My name is Jeffrey Edward Ellis.  My last

22   name is spelled E-l-l-i-s.

23                         DIRECT EXAMINATION

24   BY MS. KELLY

25   Q.    Would you please introduce yourself to the jury.

1    A.     Good afternoon.  My name is Jeffrey Ellis.  I am a supervisory

2    special agent with the United States Immigration and Customs

3    Enforcement.  I am currently permanently assigned to ICE

4    headquarters as the national program manager for the human

5    smuggling and trafficking unit at headquarters.

6    Q.     How many years have you been a special agent with ICE?

7    A.     I've been a special agent approximately 14.  I have been an

8    immigration officer for approximately 15, give or take a few months.

9    Q.     In your 14 years as a special agent with ICE, have you had an

10   occasion to supervise criminal investigations?

11   A.     Yes, ma'am.

12   Q.     Approximately how many?

13   A.     In a supervisory role?

14   Q.     Yes.

15   A.     Well, through the years I would have to say that it would

16   amount to probably upward of 100 different investigations.

17   Q.     You mentioned that currently you are stationed in Washington,

18   D.C.?

19   A.     Yes, ma'am.

20   Q.     You are the national program manager and you oversee human

21   smuggling and trafficking?

22   A.     I'm part of a team of national program managers and we have a

23   section chief and unit chief in my direct chain of command.  That is my

24   role as the national program manager, yes.

25   Q.     Do you do that at ICE headquarters in D.C.?

1   A.     Yes, ma'am.

2   Q.     As part of your job, who do you brief on issues of human

3   smuggling or human hostage situations?

4   A.     Well, we may brief a wide swath of individuals.  Of course, we

5   would brief our direct chain of command within Homeland Security

6   Investigations which up until recently was referred to as the Office of

7   Investigations which is where the special agents are housed at

8   headquarters.

9          It also includes briefings to members of Congress,

10  foreign delegations that may come to the United States that are

11  seeking information related to human smuggling and human

12  trafficking, and it also includes briefings that I may give outside of the

13  continental United States within foreign nations.

14         So, yes, there's a lot of outreach involved in my position.

15  Q.     As part of your job, do you prepare statistics on human

16  smuggling?

17  A.     We do.

18  Q.     And as part of your job, do you prepare case analysis on human

19  smuggling?

20  A.     We do.

21  Q.     From March of 2003 to March of 2010, what was your job?

22  A.     I was a senior special agent within Immigration and Customs

23  Enforcement, the birth of ICE being March 2003, which is the

24  journeyman or the highest rank of special agent within my agency.

25  Q.     And as part of being a special agent there with ICE for those

1   years, those several years, did you participate in criminal

2   investigations on human smuggling and hostage taking?

3   A.    Yes, ma'am.

4   Q.    Approximately how many of those investigations did you do?

5   A.    Well, that number is a little bit hard to answer because it

6   involves me being the direct case agent, the times, of course, that my

7   group or my investigative unit was investigating human smuggling and

8   the numbers of times that I would be supporting another group.  But if

9   I had to answer the question with a number, it would be in the order

10  of hundreds of investigations.

11  Q.    Did you investigate also human hostage situations?

12  A.    Yes.

13  Q.    And doing both the human hostage investigations as well as the

14  alien smuggling investigations, were you the lead investigator?

15  A.    On some occurrences, yes.

16  Q.    Throughout your time with ICE, have you attended professional

17  trainings on human smuggling?

18  A.    Yes, ma'am.

19  Q.    Have you attended professional trainings on hostage taking?

20  A.    Yes, ma'am.

21  Q.    Have you given professional trainings on human smuggling?

22  A.    Yes, ma'am.

23  Q.    Have you done the same for hostage taking?

24  A.    Yes, ma'am.

25  Q.    Based upon your training and experience both in the field and

1    what you do in D.C.,  the trainings you have given and gone to, give

2    us a thumbnail sketch -- explain to us how human smuggling

3    organizations operate.

4    A.    Well, I think for the context of this examination, I'm going to

5    discuss human smuggling in the context of the southwest border.

6              As defined human smuggling is the importation rather of

7    human beings towards and into the United States in direct violation of

8    immigration laws.

9              Human smuggling or alien smuggling throughout the

10   United States, depending on the geographic region that you are

11   discussing, might look a little bit different.

12             The southwest border alien smuggling looks dynamically

13   different than the alien smuggling we would find at the northern

14   border or through the Caribbean basin, for example.

15             But in the context of a typical southwest border alien

16   smuggling scheme, first and foremost I think the best definition is that

17   it's -- it operates as a loose but highly effective alliance of

18   transnational entities that operate as operators within an alien

19   smuggling organization.  I can elaborate on that a little bit.

20   Q.    You said, "Transinternational"?

21   A.    Transnational.

22   Q.    What do you mean by that?

23   A.    Well, I think it's important to remember that human smuggling,

24   alien smuggling, is first and foremost an international crime.  Alien

25   smuggling organizations, ASOs, if you will, as we commonly refer to

1   them at headquarters, and the criminal travel networks, the conduits

2   or the pipelines that they create, operate not only -- they operate by

3   definition outside of the United States and towards the United States.

4            The organization as a whole in terms of an alien

5   smuggling organization again looks different than if you were to

6   compare it to another criminal endeavor.  They certainly have the

7   same goal which is financial gain and for profit.  That of course is a

8   common factor in 99 percent of the criminal activity, you know, that

9   we investigate.

10            But when you look at the organization as a whole, it's

11  not pure middle as are other criminal organizations such as the

12  narcotics trafficking organization.

13            Alien smuggling relies on a loose confederation of

14  co-conspirators that operate within the greater scope of an alien

15  smuggling enterprise but in a way they somewhat resemble

16  subcontractors in comparison to a narcotics trafficking organization

17  that the lowest level person and the highest level person are within

18  the same organization.

19            That's not necessarily true in an alien smuggling

20  organization.

21  Q.    So let's break it down.  Do alien smuggling operations use

22  recruiters in Mexico?

23  A.    Yes.  They are often referred to as recruiters or solicitors.

24  Q.    What's the purpose of having a recruiter like that in Mexico?

25  A.    Well, to a degree the term is a bit self-explanatory.  They are

1   within the -- they operate within what we call source countries.  And

2   they are identifying the human element or the individuals that want to

3   be smuggled into the United States.  They're literally finding that

4   individual that wants to enter into an agreement with the organization

5   to be moved towards and eventually into the United States.

6   Q.   Based upon your training and experience, are there times when

7   those recruiters in Mexico negotiate price with the people that are

8   going to be smuggled?

9   A.   Yes, on occurrence that happens.  Of course it happens in

10   countries other than Mexico.  But in the context of this examination,

11   yes, there is often that discussion at that level.

12   Q.   And based upon your training and experience, are these

13   recruiters paid by the human smuggling organization for their job?

14   A.   Absolutely.

15   Q.   Based upon your training and experience, is there a central

16   organization in Mexico -- like is there somebody who may be a boss in

17   Mexico that sort of oversees operations there?

18   A.   Yes.

19   Q.   And what's the role of that person?

20   A.   Well, as you said, it's the operational control or the boss or the

21   "jefe," you know, if we want to use Spanish vernacular.  You raise a

22   good point.

23           We find throughout our investigations, alien smuggling

24   organizations, their head or their organizational boss is often outside

25   of the United States.  Of course, in an effort to, you know, utilize

1    the -- being outside the reach of American law enforcement works out

2    well for the organization.

3    Q.    And, again, is that individual paid by the proceeds or the money

4    made by human smuggling?

5    A.    Yes.  He is one more piece of the cog that gets a piece of the

6    pie.

7    Q.    Do human smuggling organizations employ guides?

8    A.    Yes.

9    Q.    What do guides do?

10   A.    Well, guides -- again, the term is a bit self-explanatory.  They

11   operate within three different geographical regions.  Guides operate

12   within source countries where the foreign national is actually coming

13   from.  They operate within what we refer to as transit countries that

14   the foreign national may have to transit or go through on their way to

15   the United States.  And guides are used within the United States to

16   further the travel along the criminal travel network.

17   Q.    Do these guides provide food and water to the individuals that

18   they are transporting?

19   A.    They may.  They may have to provide food, water, a mechanism

20   for, you know, going to the bathroom, medical attention if it's needed.

21   Yes, those are all roles that are inherent to the guide position.

22   Q.    And, again, are these individuals paid by the proceeds of this

23   human smuggling organization, by the --

24   A.    Yes, ma'am.

25   Q.    Do these smuggling organizations have transportation?  Do they

1   have cars that they use?

2   A.     Yes, ma'am.

3   Q.     How does that work?

4   A.     Well, there may be a transportation component again outside of

5   the United States as well as within the United States.  Transportation,

6   as you said, could be a car, a U-Haul truck, a modified horse trailer,

7   anything that can be utilized to move human contraband into and

8   throughout the United States.  But the transportation arm is a key

9   component of an alien smuggling organization.

10  Q.     How do the guides and the transportation or the cars, how do

11  they communicate with each other?

12  A.     In my experience, certainly within the last 15 years, it's

13  specifically cell phone traffic.  They have become more adept at

14  utilizing what we call drop phones or phones that don't have a specific

15  subscriber or history that we can develop through the investigation.

16  But usually through cell phones.

17  Q.     Is it typical that individuals who have been guided -- smuggled

18  people who have been guided through the mountains into the United

19  States meet up with transportation in remote places?

20  A.     Yeah, that's absolutely true.  Those spots are often referred to

21  as -- we call them layup locations where the -- after the alien or the

22  foreign national is guided into the United States to a certain point,

23  they lay up at a certain location before a transportation element can

24  pick them up.

25  Q.     And do alien smuggling operations, human smuggling

1   operations, do they typically have centers or home bases here in the

2   United States that they work out of?

3   A.     Well, by "home base" I think what you are probably referring to

4   is more along the line of a drop house or sometimes referred to as a

5   stash house.

6   Q.     What is that?

7   A.     These are -- again, they operate -- drop houses happen outside

8   the United States as well as inside the United States.  But a typical

9   drop house in the United States can be a single-family home, an

10  apartment, a hotel room, for example.  And this is, I think, more

11  appropriately described as a staging location.

12               The aliens are brought into the United States.  They are

13  guided to a layup location.  The transportation element picks them up

14  and they are taken to a drop house.

15  Q.     You had mentioned these stash houses, these drop houses.  At

16  these particular houses, based upon your training and experience, are

17  there people that live there?

18  A.     Yes, there may be.  There may be actual habitants of the

19  location that reside there full time.  Sometimes a drop house is more

20  of an auxiliary to a living location.  But, yes, there are occasions where

21  people do live there.

22  Q.     Is it helpful in these criminal enterprises that they have people

23  living there in those locations?

24  A.     Well, yes.  What often happens as, again, we further develop the

25  breakdown of the alien smuggling organization, we have people at

1   these locations that we would identify as, for example, a guard.

2           A guard is usually armed.  And their role is to basically --

3   it's a two-prong role.  One, make sure the aliens which are -- which

4   have a value to the organization, make sure they don't run away or

5   leave or escape.  And also protection from other alien smuggling

6   organizations that may want to basically rip off another organization.

7           There's a lot of conflict between alien smuggling

8   organizations.  So they are very savvy as to protecting themselves

9   from each other.

10  Q.    You mentioned that aliens in this context have a value to the

11  organization.  And while it might seem self-explanatory, can you

12  elaborate on that?  What do you mean, "they have a value"?

13  A.    As I stated earlier, alien smuggling, just like most criminal

14  enterprises within the United States, is for profit.  A typical number,

15  for example, in the southwest border is $1,500.  That has been kind of

16  a hallmark number --

17          MR. HORMEL:  Objection, Your Honor.  May we

18  approach?

19          (At sidebar.)

20          MR. HORMEL:  In his direct testimony last week, he

21  testified that the border patrol has no solid numbers on smuggling

22  fees.  And under cross-examination of Mr. Romo, he was not able to

23  lay any foundation.  There's no data to establish that.  I ask that be

24  stricken and not go into anything regarding fees.

25          MR. ROMO VEJAR:  Your Honor, also, he indicated no

1    testimony as to family members living in homes.  I think they are just

2    tailoring this to the specifics.

3                    THE COURT:  My recollection he wasn't asked that.

4    Obviously he can be asked that today.  You are not bound by what

5    they asked him last time.

6                    MR. ROMO VEJAR:  He was trying to qualify last time.

7                    THE COURT:  He's qualified as a general expert in these

8    things.  Testimony has changed.  You can cross-examine and impeach

9    him.  He is testifying under oath.  He may have testified one thing one

10   time and another time to another.  Those things happen.

11                   MR. HORMEL:  You better believe I'm going to

12   cross-examine him.

13                   THE COURT:  That's your right.  The objection is

14   overruled.

15                   MR. ROMO VEJAR:  Can you admonish the jury this is a

16   general witness and nothing -- nothing as to specifics as to this case

17   or something of that nature?

18                   THE COURT:  No, not at this point.

19                   (In open court.)

20   BY MS. KELLY:

21   Q.    Sir, we left off you said $1,500 is a typical amount?

22   A.    Yeah.  I think the term I used was it's kind of a landmark

23   amount that we have observed, you know, as a commodity value for a

24   number of years.

25                   When I say "commodity value," an individual alien that

1   has been smuggled into the United States that is going to have to

2   eventually pay an alien smuggling organization upwards of $1,500

3   which, as I said, is a good figure for southwest border alien smuggling

4   in comparison to, for example, a Chinese smuggling enterprise in the

5   American northeast, the smuggling fee may be, you know, $50,000,

6   $60,000, $70,000.

7           These bodies have value.  And if the money does not

8   come into the alien smuggling organization, the organization has lost

9   money.  They have lost profit margin and they are willing to protect

10  their endeavor.

11  Q.    Is it important that these organizations keep track of the money

12  that they make based on human smuggling?

13  A.    Yes, ma'am.

14  Q.    And why is it important?

15  A.    Well, as I think we were illustrating by my testimony, there's a

16  lot of hands in the pie, so to speak.  When I say $1,500 is paid to the

17  alien smuggling organization, I by no means mean to infer to the court

18  that one individual is getting $1,500.

19          That may in fact happen at the front end, but, as we

20  said, when we talk about the organizational head that may be outside

21  of the United States, the guides, the drop house operators that operate

22  abroad and within the United States, the transportation element, the

23  muscle or the guards of the organization, everybody needs to get paid.

24          So, yes, keeping some level of financial records I think is

25  almost a necessity.

1    Q.    Typically how do these organizations keep track of the money?

2    A.    Typically my experience has been in the form of what we would

3    call a ledger or a "pollo" list.

4    Q.    And what sort of things are in a ledger?

5    A.    A ledger would include -- they are often kind of a hybrid kind of

6    document.  They are often a bit of a combination of an address book

7    and the financial record keeping of the organization.

8              So we often find names and numbers of co-conspirators

9    and associates.  Of course, then in addition we find indicators of the

10   individual, the alien, that was smuggled.  They are often identified by

11   name.

12             In relation to that alien is often a number or a financial

13   figure for representing what the alien paid to be smuggled.  It will

14   often include their destination location within the United States.

15             It often includes or is attached in some way or

16   references a wire remittance number so that -- such as a Western

17   Union number so when the alien sponsor within the United States, say,

18   for example, in Raleigh, North Carolina, wires the money to the alien

19   smuggling organization, they have a wire number that they can easily

20   pick up the money.

21             All of these are more often than not reflected in a

22   ledger.

23             In addition we also find such things as expense notes,

24   how much money is given to a driver.  For example, let's say the

25   driver is tasked with taking a load of aliens to Seattle, Washington.

1    He or she is going to need expense money, money to buy the aliens

2    food, gasoline.  These figures are often represented in a ledger also.

3    Q.    Based upon your training and experience in hostage cases, alien

4    smuggling cases that turn into hostage cases, can the price change?

5    A.    Yes.

6    Q.    Explain that.

7    A.    Well, I think you alluded to it.  Smuggling can change.  Human

8    smuggling again by definition -- there's no level of coercion.  The alien

9    understands exactly what's going to happen to him or her and enters

10   into a financial agreement with the alien smuggling organization to be

11   smuggled into the United States.

12                  What sometimes can happen, though, however, is the

13   elements change and it becomes more of an extortion-type

14   environment where the alien smuggling organization for one reason or

15   another believes they can make more of a profit, earn additional

16   money for a specific individual, and will often, you know, threaten or

17   hold that person in an environment where they believe they can be

18   harmed which is what we would commonly refer to as a hostage

19   situation.

20   Q.    You said that they threatened them.  Based upon your training

21   and experience, in these hostage situations are guns used?

22   A.    Yes.

23   Q.    And while it may seem self-explanatory, what's the purpose of

24   that?

25   A.    Well, certainly as an intimidation factor.  You know, these

1   individuals often come from parts of the world where the only

2   individuals who have guns are the military, the police or bad guys.

3   They don't -- for the most part, they have never themselves touched a

4   gun in their life.  They are scared by guns.  They are intimidated by

5   guns.

6           So, yes, it's very easy for an organization within the

7   United States to use a firearm as a severe form of intimidation.

8   Q.    Do hostage smugglers take victims' clothes?

9   A.    In some cases, yes.

10  Q.    Why?

11  A.    My experience has shown in my dialogue with other case agents

12  and reading the case reports, it's intimidation.  Again, securing that

13  body.  A good example is the American southwest.

14          If you are out in the middle of a desert, you know, and

15  your property is surrounded by cactus, you probably aren't going to go

16  running off from your drop house location if you don't have the proper

17  clothing on.

18          And there's also a degradation factor that is at play here.

19  This idea of kind of breaking a person's will down to the point where,

20  when they reach out to their sponsor, they are -- they are scared.

21  They are scared for their well-being and they desperately want to get

22  out of that situation.

23  Q.    Do they also take a victim's identification?

24  A.    Yes.  Document control is a long-observed element of not only

25  alien smuggling but human trafficking and hostage taking and

1   extortion.  Controlling somebody's travel documents within the United

2   States is very effective at controlling an individual's movements.

3   Q.    We touched a couple moments ago on peripheral people or other

4   people that may reside in these stash houses or drop houses.  Based

5   upon your training and experience, do you find that they serve as a

6   front or a cover?

7   A.    In some occasions, yes.

8   Q.    How so?

9   A.    Well, again, I think the term you used is appropriate.

10  Sometimes they are there for appearances only to give the aura or the

11  appearance that this is just a legitimate house or a legitimate

12  storefront.  It could come in a variety of packages.  But, yes, that

13  clearly is part of the methodology of operating a drop house.

14  Q.    Who feeds these hostages -- the aliens that are held in the drop

15  houses or stash houses?

16  A.    My experience has shown at the drop house location that's

17  usually a specific tasking of a member of the organization.  My

18  experience has shown that it's often a friend or a family member of a

19  specific operator in the organization.

20            What I mean by that, it's often an associate or a friend

21  or a wife, for example, of a driver or a guard or somebody else with a

22  role within the alien smuggling organization.

23            And, of course, we have the occasion where the aliens

24  themselves are often tasked with cooking, with cleaning, with doing

25  laundry.  That also happens on a number of occasions.

1   Q.     What's the common goal of the recruiter, the Mexican boss,

2   guide, the person that drives the transportation, the person that

3   makes the food, the person that guards the house?

4   A.     It's a common goal to effectively and efficiently and in the

5   absence of law enforcement controls get that body to a staging

6   location within the United States, receive the money from the

7   American -- or the sponsor within the United States and deliver that

8   alien.  It's a financial goal.

9   Q.     When is it --

10              MR. ROMO VEJAR:  Your Honor, may we have counsel

11  speak to the microphone -- into the microphone because we cannot

12  hear.

13              THE COURT:  Counsel or the witness?

14              MR. ROMO VEJAR:  The attorney, Your Honor, attorney

15  for the government.

16              THE COURT:  Please speak right into the microphone.

17  BY MS. KELLY:

18  Q.     When is it that these people make money?  When are they paid?

19  A.     The bulk of the payment is at the drop house.  That's the most

20  effective and efficient location to control the alien, get the sponsor's

21  information, get the sponsor's name and phone number.  You want to

22  be in a position to effectively control the individual.

23              I mean, you don't -- the organization would not be very

24  efficient, for example, to use uncontrolled pay phones, for example.

25  You want to be controlled at the drop house.  So not to say that there

1   may be some front-end money paid to a recruiter or the initial contact

2   outside of the United States, but the overwhelming majority of the

3   financial payment is made at the drop house within the United States.

4             MS. KELLY:  I don't have any other questions.

5                      CROSS-EXAMINATION

6   BY MR. HORMEL:

7   Q.    Are you all right there, Mr. Ellis?

8   A.    I'm hanging in there, Counsel.

9   Q.    Do you need a minute?

10  A.    No, sir.

11  Q.    Do you need a glass of water?

12  A.    No, I'm fine.  Just a little newfound allergies.

13  Q.    Are you sure?

14  A.    I'm positive, sir.

15  Q.    Now, you mentioned a bit about your background and your

16  training.  And I don't think I heard you mention that you were actually

17  the case agent on this particular case when we first -- when it first

18  started?

19  A.    I was in fact the original case agent.

20  Q.    All right.  Now, we had a hearing last week at which you

21  testified.  I presume you remember that?

22  A.    I do, sir.

23  Q.    And in that testimony that you gave last week, you admitted to

24  a certain amount of bias on behalf of the government, correct?

25  A.    Yes.

1    Q.    So your being a federal agent, you would prefer to see the

2    government win?

3    A.    I would prefer that justice is done.

4    Q.    I see.  Now, you were the author of what is known as a search

5    warrant affidavit in this particular case, correct?

6    A.    Yes, sir.

7    Q.    And so you -- as the author of the search warrant affidavit, you

8    were the person who provided the justification to the court for the

9    actions of the BORTAC unit.  Isn't that right?

10   A.    Yes, sir.

11   Q.    And so you were the one that presented the facts to the court

12   that authorized the entry into five trailers down at 9950 South Oak

13   Canyon Lane, I believe it is called?

14   A.    Yes, sir, I believe so.

15   Q.    So you believed it was necessary to take down all five of those

16   trailers, correct?

17   A.    Yes, sir.

18   Q.    And that was -- so you provided under oath some materials to

19   the court that then -- upon which the court signed off on an affidavit

20   that unleashed BORTAC upon the neighborhood, correct?

21   A.    Yes, sir.

22   Q.    And now we are here in court 13 months later and we are

23   reviewing all the things that happened there.  And from the time that

24   this occurred, late September of 2009, through I believe it was March

25   2010, you testified you were the case agent on this particular case?

1   A.      Yes.  I would say probably more finitely I was probably finished

2   up being the case agent by the end of February.

3   Q.      All right, sir.  End of February 2009, that makes November,

4   December, January, February.  That is four months' worth, correct?

5   A.      Yes, sir.

6   Q.      That being said your name probably appears several hundred

7   times in the case materials up to that point, correct?

8   A.      I don't know how many times it appears, sir.  I mean, I'm sure it

9   appears a number of times.

10  Q.      Did you author reports?

11  A.      Yes.

12  Q.      You authored the search warrant affidavit?

13  A.      Yes, sir.

14  Q.      You conducted investigations?

15  A.      Yes, sir.

16  Q.      You participated in interviews?

17  A.      Yes, sir.

18  Q.      You met with the prosecutors?

19  A.      Yes, sir.

20  Q.      You participated in the case preparation for the grand jury?

21  A.      Yes, sir.

22  Q.      It's true you've got a vested interest this comes out right?  You

23  have a vested interest in that your point of view that was documented,

24  that your point of view that you put forward at the outset of this case,

25  you have a vested personal and professional interest in that point of

1   view being vindicated today.  Isn't that right?

2   A.    No, sir.  I would not use those words.  I certainly do not have a

3   personal investment in this.  My role as a special agent and the

4   original case officer are well documented and I think well observed by

5   the counselor and the prosecution.  My role today is to provide my

6   expertise and promote justice in this case.

7   Q.    So then there is another reason why you tailored your specific

8   testimony to the facts in this particular case.  Could you tell us what

9   that is?

10  A.    I'm not sure I understood the question, sir.

11  Q.    Well, you gave -- you attempted to in general terms describe

12  alien smuggling as more -- as you followed along with the government

13  and attempted to describe what appeared to be in general terms

14  exactly what happened in this particular case.  Isn't that right?

15  A.    I described alien smuggling in general terms.  And if in this

16  situation this case fits within that dynamic, then I guess the answer to

17  your question is yes.

18  Q.    Now, you speak no Spanish, correct, or little Spanish?

19  A.    I think more than a little, but certainly not fluent.

20  Q.    In your testimony last week, you conceded that you would not

21  be able to conduct any sort of meaningful investigatory interview in

22  Spanish?

23  A.    No, sir.  I think I can absolutely conduct a meaningful probative

24  interview.  Where I would admit to my shortfallings in the Spanish

25  language is what I would refer to as a formal interview that, for

1 example, we were recording for a criminal prosecution.  In that

2 situation I would need the assistance of a fluent speaker.

3 Q. So you are not fluent in other words?

4 A. That is absolutely correct.

5 Q. Can you tell me what the word "vernacular" means?

6 A. "Vernacular," I think it is slang, the language other than most

7 common.  I think the most appropriate synonym would be "slang."

8 Q. So in your opinion the word "jefe" is slang?

9 A. Yeah, I think so.

10 Q. So that's not a real word?

11 A. Your question:  Is it a real word?  No, I believe it's a real word.

12 I think in the context of alien smuggling, it's vernacular or slang.  I

13 think if you were to look at a Spanish dictionary, "hefe" is most

14 certainly a real word.

15 Q. So it's not really vernacular then.  It's a word.  No?

16 A. I was unsure if that was a statement or question, Counsel.

17 Q. Well, I'm asking to confirm that or not.

18 A. What's the question?

19 Q. Whether it's a vernacular or whether it's a regular word used in

20 the Spanish language or whether you know the difference?

21    MS. KELLY:  Your Honor, it has been asked and

22 answered.

23    THE COURT:  No, not asked and answered.  But it's a

24 compound question.

25    Ask one question at a time, Counsel.

BY MR. HORMEL:

Q.     Do you know whether or not "hefe," is a regularly used word in the Spanish language?

A.     I believe it is, Counselor.

Q.     All right.  Last week we talked about the basis -- the fund of knowledge that you used to generate the opinions that you give.  And do you remember that we talked about previous cases that you had been involved with?

A.     Yes, sir.

Q.     We talked about the TECS database?

A.     Yes, sir.

Q.     We talked about GAO reports?

A.     Yes, sir.

Q.     GAO reports are General Accounting Office reports generated by the federal government, correct?

A.     Correct, yes.

Q.     And they summarize various efforts undertaken by various portions of the federal government?

A.     As part of their role, yes.

Q.     Right.  That would include efforts to police the border, the federal border?

A.     Yes, sir.

Q.     And you at that time referred me to the website of the GAO because you said all those documents would be publicly available.  Do you remember doing that?

1    A.    Yes, sir.

2    Q.    So I did that.  I went there.  I put alien smuggling into the little

3    search engine they have.  Have you ever done that?

4    A.    Yes, sir.

5    Q.    How many results do you come up with?

6    A.    I wouldn't know.  I think there's a number of results.  I couldn't

7    give the court a figure.

8    Q.    Would you be surprised it would be 21?

9    A.    I'm surprised.  That number sounds low to me.

10   Q.    All manner of different aspects of immigration and the border

11   and interdiction and things and law enforcement responses to that are

12   described in the GAO reports, correct?

13   A.    Yes.

14   Q.    You mentioned at the time that you had read all of those reports

15   from beginning to end?

16   A.    I've read the reports that specifically refer to alien smuggling,

17   human smuggling, yes.

18   Q.    And you have read the reports that relate to illegal entry and

19   other sorts of border-related issues as relates to the southwest border?

20   A.    I would not testify to that, no.

21   Q.    You are aware, are you not, that there are a myriad ways the

22   immigration laws of the United States can be broken?

23   A.    Yes, sir.

24   Q.    Including having false documents?

25   A.    For one, sure.

1    Q.    Including entering into sham marriages?

2    A.    Absolutely.

3    Q.    And you are aware there are reports that detail how these sorts

4    of things impact the integrity of the nation's immigration laws,

5    correct?

6    A.    Yes, sir.

7    Q.    And you are aware those sorts of things have also been

8    identified as problematic within the context of preserving the integrity

9    of our nation's immigration laws, correct?

10             MS. KELLY:  I object to that.  Relevance as well as --

11   relevance.

12             THE COURT:  He may answer if he knows the answer.  If

13   he doesn't --

14   BY MR. HORMEL:

15   Q.    Has the GAO identified those things as problematic as issues

16   that need to be dealt with preserving the integrity of our immigration?

17   A.    Yes.

18   Q.    You have testified you have been involved with a lot of different

19   investigations, right?

20   A.    Yes, sir.

21   Q.    And the vast majority of smuggling organization are not coercive

22   or involve any kind of hostage taking, correct?

23   A.    Correct.

24   Q.    In fact the typical smuggling case doesn't involve any hostage

25   taking at all, correct?

1    A.    Correct.

2    Q.    However, as you mentioned before, hostage -- as you mentioned

3    before, smuggling necessarily involves some form of payment?

4    A.    Yes, sir.

5    Q.    Because you testified that people do this because they want to

6    get paid, right?

7    A.    Yes, sir.

8    Q.    And so in order to get paid, whether this be an alien smuggler or

9    a carpenter or a plumber, usually some sort of request for payment is

10   made, correct?

11   A.    Yes, sir.

12   Q.    You testified that the vast majority of payment situations occur

13   at the drop house?

14   A.    Yes.

15   Q.    Where, in the vast majority of cases, payment is expected in

16   full?

17   A.    Yes.

18   Q.    In fact the concept of a payment plan is more or less antithetical

19   to the entire setup of what you would term a criminal organization,

20   correct?

21   A.    Payment plans or protracted methods of payment are observed

22   in a small cadre of alien smuggling investigations, but in the alien

23   smuggling that we observe on the American southwest, the answer is

24   yes, it is anathema to the concept of the organization.

25   Q.    Because nobody wants the payment portion of this to be dragged

1    out.  It wants to be done with.  The people want to be delivered and

2    the thing wants to be over with, correct?

3    A.    I presume those are elements of why an organization wants their

4    money, yes.

5    Q.    In fact you can't point to a single case that you have heard of or

6    been involved with -- let's say that you have been involved with in the

7    southwest in which a payment plan was imposed?

8    A.    By "payment plan" you mean where the individual is making

9    payments to the organization after leaving the drop house?

10   Q.    Right.

11   A.    Yes, I've seen that -- I've never seen that.

12   Q.    Right.  You mentioned various factors that may be involved in a

13   more coercive situation, correct, when the government asked you

14   questions?

15   A.    Yes, sir.

16   Q.    Now, you have also mentioned that you investigated other cases

17   that involved coercive situations?

18   A.    Yes.

19   Q.    And it's true, is it not, that in those situations the door -- the

20   room that people are held in is -- let's put it that way.  There's a door

21   in which the people are being held.  That is something you have seen

22   more often than not, correct?

23   A.    Are you asking me within the interior of most drop houses are

24   there doors on the hinges?

25   Q.    I'm asking you whether in the majority of houses where you

1    have investigated coercive situations or extortive situations, the places

2    where the persons are being coerced, extorted or held, those places

3    have doors typically, correct?

4    A.    I would say probably in most of those situations.  I don't know

5    that I --

6    Q.    Can you point us to a case that you have dealt with where there

7    was an allegation that someone was being held prisoner where there

8    was no door on the room other than this one?

9    A.    Well, Counselor, as I testified, I mean, as an ICE agent in this

10   area with the operational tempo of this community in terms of alien

11   smuggling, I've gone in --

12   Q.    Sir, answer yes or no.

13   A.    The question being can I point you to a case where the answer

14   would be -- other than the instant case, no.

15   Q.    Thank you.  Now, you have been aware that you were going to

16   be testifying in this particular case since -- you know, in the current --

17   as your role -- as your current role, which is not as the case agent,

18   you've been aware of that for how many months now?

19   A.    Oh, I would say approximately three or four.

20   Q.    And now we talked about the TECS database a moment ago.

21   The TECS database is a computerized system whereby people --

22   whereby your investigations are sort of clearinghoused?

23   A.    I'm not sure what your definition of "clearinghouse" would be.  I

24   think I could just add to the testimony.  It's a two-prong database.

25   It's our case management system.  It's where we would enter our --

1    where we would open an investigation and enter reports of

2    investigation against the case.  And it is also the mechanism that

3    records the enforcement statistics that are associated with our

4    investigations.

5    Q.    So you have constant access to this particular database?

6    A.    Yes, sir.

7    Q.    Now, you were not present in this particular trailer that we have

8    been talking about all week at any time prior to the arrival of

9    BORTAC?

10   A.    No, sir.

11   Q.    In fact after BORTAC showed up, that was the first time you ever

12   got inside?

13   A.    Yes, sir.

14   Q.    So the sum total of the information that came out of there

15   before -- in fact the information that you synthesized to put into your

16   search warrant affidavit was gathered by agents who had heard from

17   Ms. Hayes and from the recorded phone call, correct, or I should say

18   maybe Ms. Lopez, Hayes Lopez?

19   A.    Counselor, you lost me.  Can you repeat the question, please?

20   Q.    The way that you obtained information about what was going on

21   in that house.

22   A.    I see.  Yes.  Prior to the --

23   Q.    Right.

24   A.    -- execution of the search warrant?

25   Q.    Was from Mr. Lopez, what he said to Ms. Hayes, what he said on

1    the tape, and then what Ms. Hayes related to you and what she has

2    related to the court, right?

3    A.    Correct.

4    Q.    Because you didn't have a bug in the house, right?

5    A.    No, sir.

6    Q.    You had no listening devices in the house?

7    A.    No.

8    Q.    You had no cameras in the house.  You had no ways of observing

9    what was going on in the house, right?

10   A.    Correct.

11   Q.    So you had to rely to a certain degree on information -- or to a

12   total degree on information provided to you by these people?

13   A.    Correct.

14   Q.    When the government asked you, you made some statements

15   about geography being perhaps a factor in coercion.  You mentioned

16   some other factors as well, correct?

17   A.    Yes.

18   Q.    Now, typically in an alien smuggling operation, persons will --

19   their overriding motivation is to arrive at a destination that is inside

20   the United States, correct?

21   A.    Absolutely.

22   Q.    So the reason people contract with these organizations is to be

23   taken somewhere in the United States?

24   A.    Yes, sir.

25   Q.    And the reason they pay this money is because if they don't --

1   let's say the reason they pay the money is they believe the

2   organization will be able to shield them from detection.

3                    THE COURT:  Turn that cell phone off, sir.

4                    MR. HORMEL:  I thought it was on silent.  I apologize.

5   That is very embarrassing.  I apologize.

6   BY MR. HORMEL:

7   Q.    The reason people contract with these organizations is to protect

8   them from detection from the authorities?

9   A.    I wouldn't boil it down to that one factor, but I'm sure they are

10  hoping that there is some level of shielding, yes.

11  Q.    If avoiding detection isn't the reason they are hiring them, why

12  don't they cross the border and get on a bus?

13  A.    Well, I think counselor's point is made in that the eventual

14  arrival at a destination point within the United States, I think -- my

15  point was there is other factors other than just being shielded from

16  detection.  But, yes, that is the primary role.

17  Q.    It's a lot cheaper to just get on a bus, isn't it?

18  A.    To get on a bus where?

19  Q.    To get on a Greyhound and just head up to wherever you are

20  going.

21  A.    After you have arrived in the United States?

22  Q.    Yeah.  Correct.  Let's say you are in Nogales and you want to go

23  to someplace in the United States.  I mean, it's going to be a lot

24  cheaper to get on transportation and pay for the trip that way, right?

25  A.    I'm not sure -- is counselor saying that an illegal alien in

1    Nogales, Arizona --

2    Q.    No.  An illegal alien -- look, the question is -- strike that.  I think

3    it's -- never mind.  I lost my place.  The phone call completely ruined

4    my train of thought.

5                    THE COURT:  Ladies and gentlemen, we will take our

6    afternoon recess.  We will reconvene Monday morning at 9:30.  Have a

7    good weekend.  Don't discuss the case with anyone or allow anyone to

8    discuss it with you.  Don't do any investigation or research on your

9    own.  We will see you at 9:30 on Monday.

10                   (The jury was excused at 4:55 p.m.)

11                   THE COURT:  You may step down, sir.  We need you

12   Monday at 9:30.

13                   Any record by the government, Ms. Kelly, Mr. Evans?

14                   MS. KELLY:  No, Your Honor.  Thank you.

15                   THE COURT:  Mr. Hormel?

16                   MR. HORMEL:  No, Your Honor.

17                   THE COURT:  Mr. Romo?

18                   MR. ROMO VEJAR:  No, Your Honor.

19                   THE COURT:  This is a copy of some draft instructions

20   and I'll give you these.  At some point we'll get a chance to settle

21   them.  This is my first-round draft instructions that I want you to look

22   at.  And we will have the clerk come in in just a minute.

23                   Thank you, counsel.  We will see you 9:30 Monday

24   morning.

25                   (The proceedings concluded at 5:00 p.m.)

1
2
3
4
5
6
7                              C E R T I F I C A T E
8
9
10
11          I, Dianne Davenport, certify that the foregoing is a correct
12    transcript from the record of proceedings in the above-entitled matter.
13
14
15
16
17    /s/  Dianne Davenport                         November 16, 2011
18
19
20
21
22
23
24
25