1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,          )
                                   )   CR 09-2343-TUC-FRZ
            Plaintiff,             )
vs.                                )
                                   )   November 2, 2010
YURIS BONILLA-GUIZAR and           )   Tucson, Arizona
CARLOS ARMANDO CALIXTRO-           )
BUSTAMANTE,                        )
                                   )
            Defendants.            )


JURY TRIAL - DAY 6


BEFORE:  HONORABLE FRANK R. ZAPATA
UNITED STATES DISTRICT JUDGE
405 W. CONGRESS, COURTROOM 5-A
TUCSON, ARIZONA 85701


A P P E A R A N C E S

    FOR THE GOVERNMENT:  MS. KRISTEN KELLY and MR. JOHN
EVANS, ASSISTANT UNITED STATES ATTORNEYS.

    FOR DEFENDANT BONILLA-GUIZAR:  MR. PETER HORMEL,
ATTORNEY AT LAW.

    FOR DEFENDANT CALIXTRO-BUSTAMANTE:  MR. JESUS ROMO
VEJAR, ATTORNEY AT LAW.

    THE INTERPRETERS:  MR. RON ZELLON and MR. DEREK SULLY.

Dianne Davenport
405 W. Congress, Suite 1500
Tucson, Arizona 85701
(520)205-4266

Proceedings prepared by computerized realtime translation

1                              WITNESS INDEX

2      WITNESS                                          PAGE

3      SEAN COLDIRON

4      Cross-Examination by Mr. Romo                      6
       Redirect Examination by Ms. Kelly                 16
5
       DAVID SLAGLE
6
       Direct Examination by Ms. Kelly                   20
7      Cross-Examination by Mr. Hormel                   29
       Cross-Examination by Mr. Romo                     32
8      Redirect Examination by Ms. Kelly                 40

9
                               MISCELLANEOUS
10
       PROCEEDING                                       PAGE
11
       Government's Closing                              42
12     Defendant Bonilla's Closing                       50
       Defendant Calixtro's Closing                      69
13     Government's Rebuttal Closing                     86
       Jury Instructed                                   99
14     Defense Motion to Dismiss Case                   116

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(Call to order of court, 9:35 a.m.)

THE CLERK:  Criminal case 09-2343, United States of America versus Yuris Bonilla-Guizar and Carlos Armando Calixtro-Bustamante, on for jury trial.

Counsel, please state your appearance.

MS. KELLY:  Good morning.  Kristen Kelly and John Evans on behalf of the United States.

THE COURT:  Good morning.

MR. HORMEL:  Good morning, Your Honor.  Peter Hormel on behalf of Yuris Bonilla-Guizar, who appears in custody, assisted by the court's interpreter, and also by my investigator, Mr. Alex Vazquez.

THE COURT:  Good morning.

MR. ROMO VEJAR:  Good morning.  Jesus Romo on behalf of Mr. Carlos Calixtro, who is present, in custody, and I apologize for being late.  I was in another court, Judge.

THE COURT:  Did we have an issue this morning?  The record will reflect the absence of the jury.  Do we have an issue?

MS. KELLY:  A quick point, Your Honor.

We intend to call ICE Agent David Slagle to talk about some of the issues that came up for rebuttal.  Yesterday defense counsel elicited from the civilian witnesses testimony regarding their status here in the country.  And then it was specifically established that they are LPRs.

The government intends to in rebuttal through the ICE

1    agent establish that any participation in alien smuggling would

2    negatively affect LPR status.  The witnesses testified upon direct with

3    defense counsel that they were in the process of working to gain

4    citizenship.  So obviously any participation in an alien smuggling ring

5    would negatively affect their attempt to gain citizenship.

6                THE COURT:  They are not charged here.  So what -- I

7    mean, that's --

8                MS. KELLY:  Correct, Your Honor.

9                THE COURT:  I can't see how that in any way is relevant

10    to what we are trying in this case, trying Mr. Bonilla and Mr. Calixtro.

11                MS. KELLY:  In terms of their positive active or bias to

12    not tell the truth about what they saw going on in the house where

13    they lived and were in and around.  It goes directly to their credibility;

14    the fact that they have a significant incentive to not be honest about

15    the fact that they were living in a place where the defendants were

16    running an alien smuggling ring.

17                THE COURT:  Why?  If these defendants are convicted, it

18    has absolutely nothing to do with those people that testified.  Their

19    status hasn't changed one iota.

20                I seriously doubt if you'll find an immigration judge, I

21    will be very surprised, to deny somebody permanent resident status or

22    deport them because their boyfriend and the boyfriend's friend

23    happened to be transporting or harboring aliens.

24                Mr. Hormel.

25                MR. HORMEL:  I would agree.  Just to add, if they want

1    to open the door to that, we can recall Mr. Lopez, get into all of that

2    that the court already precluded us from doing.  Call Mr. Goldman as

3    well.  That becomes fair game.

4                    THE COURT:  It would indeed.  We are not going there.

5    That will not -- that's -- the government is precluded from that

6    testimony from that witness.

7                    MS. KELLY:  Thank you, Your Honor.

8                    THE COURT:  Are we ready to go?

9                    MS. KELLY:  Yes, Your Honor.

10                   THE COURT:  Please get the jury.

11                   (The jury was seated.)

12                   THE COURT:  The record will reflect the presence of the

13   jury, counsel and the defendants.

14      SEAN COLDIRON, GOVERNMENT WITNESS, PREVIOUSLY SWORN

15                   THE COURT:  Would you please state your name for the

16   record.

17                   THE WITNESS:  Sean Coldiron, sir.

18                   THE COURT:  You were previously sworn to tell the

19   truth.

20                   Do you understand, sir, you are still under oath?

21                   THE WITNESS:  Yes, I do, sir.

22                   THE COURT:  Mr. Hormel.

23                   MR. HORMEL:  I had finished, actually, my

24   cross-examination yesterday.

25                   Mr. Romo.

1        CROSS-EXAMINATION

2    BY MR. ROMO VEJAR:

3    Q.    Mr. Coldiron, good morning, sir.

4    A.    Good morning, sir.

5    Q.    Should I use Agent Coldiron or Mr. Coldiron?

6    A.    It does not matter, sir.

7    Q.    Now, sir, you testified before in this court.  Is that correct?

8    A.    Yes, sir.

9    Q.    And you have told us yesterday that you are an expert on

10   explosives.  Is that correct, sir?

11   A.    Yes, sir.  I'm considered one of the subject matter experts with

12   my unit in terms of high explosives, sir.

13   Q.    And, of course, you are familiar with flash bangs.  Is that

14   correct, sir?

15   A.    Yes, I am, sir.

16   Q.    And as an expert do you know that the explosion of the canister

17   goes off with a pressure wave of 30,000 pounds per square inch?  Is

18   that correct, sir?

19   A.    No, that's not correct, sir.

20   Q.    You disagree with the experts on this matter with regard to

21   the --

22   A.    It depends on what it is rated at, sir.  If that explosion is

23   contained, it can actually be more than that.  A flash bang is actually

24   considered -- has special ports to release both the overpressures and

25   the gasses.

1  Q.    And it is true, isn't it, sir, that the flash bang, if it explodes

2  within five feet of initiation, has the possibility of severe injury to

3  innocent people.  Is that correct?

4  A.    That is correct, sir.

5  Q.    And that injury includes deafening.  Is that correct, sir?

6  A.    Correct, sir.

7  Q.    And that is because the flash bang has the capacity of 170

8  decibels.  Is that correct?

9  A.    At the point of detonation, yes, sir.

10  Q.    And 170 decibels is a lot more than the human body can

11  experience.  Is that correct, sir?

12  A.    Yes, sir.

13  Q.    And would you tell the jury what is a normal decibel for a human

14  body?

15  A.    At this time, sir, I do not have my reports and my records in

16  front of me to testify to this at this time, sir.

17  Q.    Would it be, sir, between 60 and 80 decibels?

18  A.    I can't testify to that at this time, sir.

19  Q.    Now, a jet engine at 100 feet and from gun blast is 140 decibels.

20  Is that correct?

21            MS. KELLY:  Object to foundation.

22            THE COURT:  You need to get foundation from this

23  witness before he can answer that question.

24  BY MR. ROMO VEJAR:

25  Q.    Now, you are familiar, sir, you stated yesterday, with the injuries

1    that a flash bang can cause as well as any explosive makeup of that

2    device.  Is that correct, sir?

3    A.    Sir, yes.  I am familiar with the types of injuries associated with

4    explosions, yes, sir.

5    Q.    One of the main injuries is the matter of the decibels and the

6    impact of the decibels on the human body.  Is that correct, sir?

7    A.    Correct, sir.

8    Q.    And you are familiar with the decibels and what the decibels are

9    within a normal conversation, for instance?

10   A.    We actually have charts for that, sir.

11                   MR. ROMO VEJAR:  Your Honor, may I approach the

12   witness?

13                   THE COURT:  Yes.

14   BY MR. ROMO VEJAR:

15   Q.    I will show you a decibel loudness comparison chart.  I want you

16   to take a look at it.

17                   MR. ROMO VEJAR:  May I approach, Judge?

18                   THE COURT:  You may.

19                   MR. ROMO VEJAR:  I want to mark this, Judge.

20   BY MR. ROMO VEJAR:

21   Q.    Take a look at those and see if that refreshes your recollection.

22                   THE COURT:  What has that been marked at this point?

23                   THE CLERK:  141.

24                   MR. ROMO VEJAR:  141.

25   BY MR. ROMO VEJAR:

1    Q.    Did you take a look at that, sir?

2    A.    Yes, sir.  I've taken a look at it, sir.

3    Q.    And is that similar to the one you have, the chart?

4    A.    No, sir.  We actually have charts that show the direct

5    overpressures and the actual -- the wave appreciates coming through

6    which will cause damage to the eardrums at certain decibels and the

7    overpressures.

8    Q.    Do you accept that one as being approximate?

9    A.    It's an approximate, sir.

10   Q.    All right.  And would you tell the jury normal conversation how

11   many decibels is it?

12   A.    60 to 70 decibels according to this report, sir.

13   Q.    All right.  And a jet engine, if you are within 100 feet, how many

14   decibels is it?

15   A.    140 decibels, sir.

16   Q.    That would be a loud blast, right?  What does it say you lose

17   your ear at, how many decibels?

18   A.    It shows loudest decibel of hearing is 180 decibels, sir.

19             MS. KELLY:  I object to foundation for this.  He's having

20   him read off some web page he printed up.

21             THE COURT:  I thought the question was did that refresh

22   his recollection as to the -- his information from his own charts

23   regarding these matters.

24             MR. ROMO VEJAR:  Yes, sir.

25             THE COURT:  So you are not to read from that, sir.  That

1    was only to refresh your recollection of your own information.  If that

2    doesn't do that, you can't just read from that document.

3              THE WITNESS:  I was just answering his question, sir.

4    It does not.  That's not the same chart we use at this time, sir.

5              THE COURT:  You need to go to some other line of

6    questioning, Mr. Romo, unless you can lay further foundation.

7              MR. ROMO VEJAR:  No problem, Your Honor.

8    BY MR. ROMO VEJAR:

9    Q.    Now, sir, the new -- the flash bang, I'm sorry, produces -- can

10   produce damage to the eyes as well, right?

11   A.    Yes, sir.

12   Q.    And that is why there has to be approved eye protection that you

13   must wear when deploying this.  Is that correct?

14   A.    We do have a policy to wear eye protection, yes, sir.

15   Q.    And also there is a policy to wear approved single hearing

16   protection.  Is that correct, sir?

17   A.    During training, yes, sir.

18   Q.    And you did not use that on the site?

19   A.    No, sir.

20   Q.    Hearing protection?

21   A.    No, we do not, sir.

22   Q.    Are you familiar, sir, with the several lawsuits that have been

23   initiated by the police departments regarding the use of these flash

24   bangs?

25              MS. KELLY:  Objection, Your Honor, relevance,

1 | foundation.

2 | THE COURT:  Sustained.

3 | MR. ROMO VEJAR:  Well, Your Honor --

4 | BY MR. ROMO VEJAR:

5 | Q.    You are an expert in this area of explosives?

6 | A.    Sir, I'm one of our subject matter experts in the use of high

7 | explosives, yes, sir.

8 | Q.    And do you know if the New York City Police Department has

9 | halted the use of flash bangs because of the injury that it can cause?

10 | MS. KELLY:  Your Honor, calls for hearsay, objection.

11 | THE COURT:  Sustained.

12 | MR. ROMO VEJAR:  I'm sorry.  What was the objection?

13 | THE COURT:  The objection was hearsay and relevance

14 | and the objection is sustained.

15 | BY MR. ROMO VEJAR:

16 | Q.    Well, on this particular date, there were -- you were shown some

17 | photographs of damage to what would appear to be damage to a floor.

18 | MR. ROMO VEJAR:  Your Honor, may I have the jury and

19 | the witness see Exhibit 136?

20 | THE COURT:  Very well.

21 | BY MR. ROMO VEJAR:

22 | Q.    Do you recall that, sir?

23 | A.    Yes, sir.

24 | Q.    And you stated that that would have been impossible with a

25 | flash bang?

1  A.    I did not say that was impossible, sir.  I said that is not

2  consistent with the detonation of a flash bang.

3  Q.    And are you familiar with the use of flash bangs that have

4  caused burns to agents in the field?

5  A.    I cannot testify to that, sir.

6  Q.    Are you familiar with the use of the same flash bangs that have

7  caused fires to buildings?

8  A.    I've read of cases like that, yes, sir.

9  Q.    And do you know, sir, that in this particular case there was a

10  child on a tricycle that was very close to this flash bang?

11  A.    We did not know there were children inside at the time, sir.

12  Q.    Now, sir, you have testified about the M4 carbine.  Is that

13  correct?

14  A.    About the what, sir?

15  Q.    I'm sorry?

16  A.    I'm sorry.  I did not hear your question.

17  Q.    You stated in your testimony that there was -- your officers were

18  using M4 carbines?

19  A.    Yes, sir.

20  Q.    Those are carbines used by BORTAC.  Is that correct?

21  A.    By the border patrol, yes, sir.

22  Q.    And those are designed similarly to the M16.  Is that correct?

23  A.    Correct, sir.

24  Q.    And they have a high velocity bullet.  Is that correct, sir?

25  A.    Correct, sir.

1   Q.     You stated during the last time that you were here that you had

2   received permission to be in the building next door, is that correct, sir,

3   the property next door?  I'm sorry.

4   A.     I'm sorry, sir.  Can you rephrase that question?

5   Q.     Certainly.

6                    MS. KELLY:  Your Honor, this goes beyond the scope of

7   direct.

8                    THE COURT:  It does go beyond direct, Mr. Romo.

9                    MR. ROMO VEJAR:  All right.  Then I won't ask that, Your

10  Honor.

11  BY MR. ROMO VEJAR:

12  Q.     Now, you're familiar with code red?

13  A.     No, sir.

14  Q.     All right.  You've never heard of that term?

15  A.     No, sir.

16  Q.     Do you know, sir -- you were there for approximately two hours.

17  Is that correct?

18  A.     No, sir.  It was approximately one hour 45 minutes.

19  Q.     Approximately two hours, one hour 45 minutes?

20  A.     When we were actually doing our portion of the operations, sir, it

21  was approximately 55 minutes.

22  Q.     But you didn't leave until an hour and 45 minutes later.  Is that

23  correct?

24  A.     Approximately, sir, yes.

25  Q.     And you saw how many people were there, correct, in addition to

1    your personnel?

2    A.    There was various law enforcement personnel there, yes, sir.

3    Q.    And you saw how many there were?

4    A.    I can't answer that, sir.

5    Q.    You cannot answer whether you saw or not?

6    A.    No, I can't answer the exact number and who exactly was there,

7    sir.

8    Q.    You knew that ICE agents were there?

9    A.    Yes, sir.

10   Q.    You knew the sheriff's department agents were there?

11   A.    I don't know about that, sir.

12   Q.    Did you see any police officers outside of the perimeter, the

13   immediate perimeter?

14   A.    Everyone there on the compound were wearing police placards,

15   sir.

16   Q.    After you left did you see any officers outside of the perimeter?

17   A.    There was police officers still -- there was officers and agents

18   still there when I departed, sir.

19             MR. ROMO VEJAR:  May I have a second, Your Honor?

20             THE COURT:  Yes, you may.

21             MR. ROMO VEJAR:  I'm almost finished here, Judge.

22   BY MR. ROMO VEJAR:

23   Q.    Now, sir, on this photograph we have here, do you see the area

24   where you placed the people that were in the mobile homes?  Is this

25   it?

1   A.   Right there by that tree, yes.

2   Q.   Was it under the tree?

3   A.   It was in close proximity of the tree.

4   Q.   Did you check that tree, the ground?

5   A.   I did not physically check it, no.

6   Q.   So if some of the people that were there testified that they were

7   bitten by ants at that tree, you are not saying that they are lying?

8   A.   No, sir.  The medics would report it.

9   Q.   Nobody reported it to you.  Is that correct, sir?

10   A.   All people were treated by the medics, sir.

11   Q.   I understand that, sir.  Nobody reported it to you?

12   A.   No, sir, there was no report of such, sir.

13   Q.   Did anybody report to you that a child was within the proximity

14   of the flash bang?

15   A.   No, sir.

16   Q.   You said in your testimony before that you had taken the

17   children there.  Is that correct?

18   A.   We had taken the children?  No, sir.

19   Q.   My recollection is that you stated that there were some children

20   that were terrified and crying.  Is that correct?

21   A.   Yes, sir.  They would be in the living room in a corner sitting on

22   the sofa, sir, which is far away from the flash bang.

23   Q.   Is there another child?

24   A.   No, sir.  It was two children, the only two children inside the

25   structure.

1  Q.    You took those children?

2  A.    No, sir.  They were carried out by one of the females inside the

3  structure, sir.

4  Q.    All right.

5             MR. ROMO VEJAR:  No further questions of this witness,

6  Your Honor.

7             THE COURT:  Any redirect?

8                    REDIRECT EXAMINATION

9  BY MS. KELLY:

10  Q.    When you and your men went into trailer number 1, did you

11  immediately see the children?

12  A.    No, ma'am.  They were already inside the living room.

13  Q.    Where were they inside the living room?

14  A.    On top of the sofas.

15  Q.    Both of them?

16  A.    Both of them.

17  Q.    And was there a TV on or off?

18  A.    There was a TV that was on, ma'am.

19  Q.    The lights, were they on or off?

20  A.    On.

21  Q.    Placing on the board Defense Exhibit 136, this is the photo we

22  have talked about Maria Pina took.  You said in looking at this photo

23  that the damage there is not consistent with detonation of flash

24  bangs?

25  A.    Correct.

1    Q.      And how do you know that?

2    A.      Just based on the explosives we work with and the fact I've

3    probably deployed 500, 600 of them in my experience.

4    Q.      And what does it look like when they've been deployed?

5    A.      You will actually see a black scar mark out of the bottom part of

6    it and it will look like a fan that comes out and it will -- it will look like

7    kind of like a black powder that is on the ground.

8    Q.      Do you see anything in this photo that resembles that?

9    A.      No, ma'am.  It is not consistent.

10   Q.      Did anybody at the scene report having hearing loss or

11   deafening?

12   A.      No, ma'am.

13   Q.      Did anybody report vision damage?

14   A.      No, ma'am.

15   Q.      Did anybody report any burns?

16   A.      No, ma'am.

17   Q.      Did the medics at all report any type of injury, ant bites or

18   anything?

19   A.      There was no premedical prehospital treatment forms turned in.

20              MS. KELLY:  I don't have any other questions.

21              THE COURT:  Thank you.

22              Thank you, sir.  You may step down.

23              THE WITNESS:  Thank you.

24              THE COURT:  Call your next witness, please.

25              MS. KELLY:  Thank you, Your Honor.  The government

1      calls Special Agent David Slagle.

2          DAVID SLAGLE, GOVERNMENT WITNESS, PREVIOUSLY SWORN

3              THE COURT:  State your full name for the record and

4      spell your last name.

5              Sorry?

6              MS. KELLY:  May we approach for a minute?

7              THE COURT:  Yes.

8              (At sidebar.)

9              MS. KELLY:  We just had brought to us the TECS

10     printout border crossing here of Maria Pina and Carlos Calixtro.

11     Yesterday Maria Pina testified that her and Carlos would cross every

12     month.  The last time they crossed together was in August of 2009.

13     This TECS history shows the last time Carlos Calixtro crossed the

14     border was June 18 of 2007.

15             MR. ROMO VEJAR:  Your Honor, first of all, I was just

16     given this.  We were just given this.  Number two, there are many

17     areas within the border where they don't have that thing to document

18     the entry.  I know because I have gone through many areas of the

19     border where that doesn't happen.

20             Here we show that's Arizona entries.  She testified as to

21     entries through Caborca which would be -- I forget the port of entry,

22     but it is not Nogales.  I think you are opening a can of worms here,

23     Judge, going into all of these kinds of things with immigration.  I don't

24     think that it is conclusive because the government doesn't have

25     records of the entries and exits that didn't happen.  That is what I am

1    saying, Judge.

2           MS. KELLY:  These are business records that are kept in

3    the regular course of conduct.  Agent Slagle is an agent so charged

4    with being able to access these records.  He did.  And they go to

5    directly impeach what their witness said yesterday regarding crossing

6    history.

7           MR. HORMEL:  Your Honor, these things have notes on

8    them.  I assume they are attempting to elicit testimony as to the

9    notes.  That is not regularly kept in the course of business.  They have

10   been altered.

11          They were just given to us now at the absolute last

12   second.  They were not given when counsel came into the room.  I

13   haven't had a chance to talk to the witnesses about these or to have

14   any other way to verify.

15          I agree with Mr. Romo.  They are not conclusive

16   evidence of anything.  They are just printouts.  Borders can be crossed

17   without people -- without records being made.  If Agent Slagle is

18   willing to acknowledge that, then maybe we are in business.  To show

19   conclusively this is evidence -- this is somehow valid impeachment

20   evidence, I think it is inappropriate.

21          MR. ROMO VEJAR:  Your Honor, we need to have time to

22   get another expert to testify that indeed if you go through these other

23   port of entries, you can pass through without checking in.

24          THE COURT:  Well, that's at the Nogales port of entry.

25          MS. KELLY:  Uh-huh.

1          THE COURT:  I don't recall she said Nogales, that they

2    were crossing through Nogales.

3          MS. KELLY:  Your Honor, it's all ports.  It's any time they

4    cross.  It's the TECS record that they create.  And so anytime they

5    cross --

6          MR. HORMEL:  The other problem is that Agent Slagle

7    cannot authenticate these.  He's not border patrol.  He's not a

8    maintenance of the TECS operator.  He requested these from

9    somebody else.  He has no idea how they are kept.

10         MS. KELLY:  He does.  He has access to these data

11   bases.  He regularly uses it.

12         MR. ROMO VEJAR:  Your Honor, Sasabe is a port of entry

13   that the witness testified to.

14         THE COURT:  I don't recall her mentioning any port of

15   entry, but she may have and I missed it.  We are getting into too

16   many problems.  He's not able to testify as to that.

17              (In open court.)

18                    DIRECT EXAMINATION

19   BY MS. KELLY:

20   Q.    Good morning, sir.  Please introduce yourself once again to the

21   ladies and gentlemen of the jury.

22   A.    I'm Special Agent David Slagle with Immigration and Customs

23   Enforcement.

24   Q.    Yesterday we all heard from Maria Pina that the only gun she

25   knew of in the trailer, the house where she was living, was one that

1    was found in pieces.  Did you find any guns in that trailer that were in

2    pieces?

3    A.    No, ma'am.

4    Q.    The .22 caliber gun you testified to earlier, the black

5    semiautomatic that was found in the laundry room, was that gun in

6    pieces?

7    A.    No, ma'am.

8    Q.    How did it look?

9    A.    It was -- looked like a weapon that was all put together, every

10   piece was put together.

11   Q.    And the .40 caliber black and silver semiautomatic handgun that

12   was fitted with that laser sight --

13   A.    Yes.

14   Q.    -- the one that was found in Maria Pina's bedroom, was that one

15   in pieces?

16   A.    No.  The laser was attached to the frame of the pistol and the

17   slide was attached to the frame.  So everything was together.  And in

18   fact there was a magazine and a round inside of it.

19   Q.    Yesterday Maria Pina also testified that Julio Cesar had

20   showered.  When you came into contact with Julio Cesar that evening

21   on September 29, did he appear as if he had showered?

22              MR. ROMO VEJAR:  Objection, foundation.

23              THE COURT:  You may lay more foundation about his

24   contact with the individual.

25   BY MS. KELLY:

1    Q.    Did you get close to him?

2    A.    I did.

3    Q.    And did you get a chance to look at both his hair, his skin and

4    his clothes?

5                   MR. ROMO VEJAR:  Objection.  Foundation again.  What

6    time did he get close to him, an hour later, two hours later?

7                   THE COURT:  Foundation as to time.

8    BY MS. KELLY:

9    Q.    What time did you first see Julio Cesar?

10   A.    Immediately after BORTAC had placed him in -- or brought him

11   outside the structure.

12   Q.    So approximately what time would that be?  If BORTAC arrived

13   at 7:30, when would it be that you would have come into contact with

14   Julio Cesar?

15   A.    7:40, 7:45.

16   Q.    When you saw him, how did he look?

17   A.    Well, he was in his underwear.  So there wasn't any clothes

18   really.  But his hair was dry.  I think 20 or so pictures that were taken

19   will reflect that.  And I also conducted an interview later on and I

20   remember the smell being a little overwhelming.

21   Q.    How do you mean?

22   A.    It smelled like he'd been sweating quite a bit for quite a few

23   days.

24   Q.    Did he smell like somebody who had just freshly showered?

25   A.    No.

1   Q.     How many hours were the police, including you with ICE, at the

2   trailer on that property?

3   A.     Total amount of time is around two and a half hours to three

4   hours.

5   Q.     Yesterday Maria Pina testified that she was held outside by

6   police -- by agents for six hours.  Is that true?

7   A.     That is not true.

8   Q.     Maria Pina and Yasmin testified they were made to kneel for

9   hours.  Is that true?

10  A.     That's not --

11              MR. HORMEL:  Objection.  Misstates the testimony.

12  Yasmin did not state that.

13              THE COURT:  Sustained.

14  BY MS. KELLY:

15  Q.     Was Maria Pina made to kneel for hours?

16  A.     That's not our protocol to make individuals kneel.

17  Q.     Why is it not protocol to have individuals kneel?

18              MR. HORMEL:  Objection.  That is not responsive.  She

19  didn't ask what the protocols were.

20              THE WITNESS:  No, we did not make her kneel.

21              MR. ROMO VEJAR:  Objection to foundation.

22              THE COURT:  We will strike that entire question and

23  answer, ladies and gentlemen of the jury.  Counsel for the government

24  will reask her question.

25  BY MS. KELLY:

1  Q.    Maria Pina, based upon the policies and protocols within ICE, did

2  she have to kneel outside in that PHA area?

3  A.    No.

4  Q.    How do you know that?

5  A.    When people kneel they become a risk of flight.  It's one step to

6  get up on their feet and start running away.  So we commonly sit

7  them down so that there's more steps involved to get up and escape.

8  So that is generally -- and it's also more comfortable for the

9  individual.

10  Q.    How long did the women spend outside?

11              MR. ROMO VEJAR:  Objection.  Foundation, Your Honor.

12              THE COURT:  Sustained.  Give us a time and what

13  women we are talking about.

14  BY MS. KELLY:

15  Q.    You said you came into contact with Maria Pina about 7:45

16  outside in that PHA area?

17  A.    I came in contact with Julio Cesar.  Maria Pina I did not come

18  into contact with until 10 or 15 minutes later.

19  Q.    Okay.  And approximately how long was she outside detained?

20              MR. ROMO VEJAR:  Objection.  Foundation, Your Honor.

21              THE COURT:  Overruled.  He may answer.

22              THE WITNESS:  She would have been kept outside the

23  structure until the search was completed.

24              MR. ROMO VEJAR:  Speculative, "She would have."

25              THE COURT:  Restate your question.

1          Sir, answer the question that is being asked of you.

2          Restate your question.

3    BY MS. KELLY:

4    Q.    How long was Maria Pina kept outside the structure detained?

5    A.    I cannot state to how long she was detained because I believe at

6    a certain point we established that she was not -- that -- when Julio

7    Cesar pointed her out -- or pointed out the individuals, he specifically

8    pointed out Mr. Bonilla and everybody else.  I think -- I don't think

9    they were physically detained at this point, but they were not allowed

10   inside the structure.

11          MR. HORMEL:  Misstates the testimony as well.

12          MR. ROMO VEJAR:  Objection, "I don't think."

13          THE COURT:  Well, the question was:  How long was

14   Maria Pina kept outside the structure detained?  And that's the

15   question you need to answer, sir.

16          The entire answer to that question is now stricken.  The

17   jury is to disregard it.

18          And, again, the witness is admonished to answer the

19   question that is asked of you by the lawyer without adding anything

20   beyond what is required to answer the question.

21          THE WITNESS:  Yes, Your Honor.

22   BY MS. KELLY:

23   Q.    How long was Maria Pina kept outside the structure detained?

24   A.    I do not know how long she was detained outside the structure.

25   Q.    What time did you guys leave?

1   A.   Two and a half to three hours after arriving.

2   Q.   At that point after you left, who did you turn the property over

3   to?

4   A.   To Maria Pina.

5   Q.   What does it mean when you turn the property over to

6   somebody?

7   A.   We have left the property.  We have completed our search.  And

8   they are able to utilize their property however they want.

9   Q.   At this point two and a half to three hours after everybody

10  arrived, when you left did all police and agents leave?

11  A.   Yes.  I was the last one.

12  Q.   I want to talk about defense admitted Exhibit 129.  Maria Pina

13  testified that these pictures on the ground were left -- were thrown on

14  the ground by agents.  When you left the structure and that trailer,

15  were these photos on the ground?

16  A.   No.

17  Q.   How do you know?

18  A.   Because I was the last one to leave the structure and those

19  photos were not on the ground.

20  Q.   Placing on the board already admitted Defense Exhibit 133,

21  Maria Pina testified she took this picture the evening of September 24.

22  Does that reflect how the master bedroom was left?

23  A.   No.

24  Q.   How do you know?

25  A.   Because I was one of the individuals that searched the master

1    bedroom and I left the master bedroom after it was done being

2    searched.  It was messy when we went in there to begin with.  We did

3    not leave it like that.

4    Q.    Placing on the board Defense Exhibit 128, another photo taken

5    by Maria Pina the evening of September 24.  Did ICE or the police do

6    that to the couch and the trailer?

7    A.    No.

8    Q.    Is that how the couch and the trailer looked when ICE and the

9    police left?

10   A.    No.

11   Q.    How do you know?

12   A.    We wouldn't have left it like that.

13              MR. HORMEL:  Objection, speculation.

14              THE COURT:  Overruled.

15   BY MS. KELLY:

16   Q.    At any part was the couch torn apart?

17   A.    No.  We lifted up the cushions and searched underneath and

18   looked underneath the couch and put the couch back together.

19   Q.    Defense admitted Exhibit 130, Maria Pina testified she took the

20   picture on the evening of September 24.  Is that how the kitchen in

21   trailer number 1 looked when you, ICE and the police left?

22   A.    No.

23   Q.    How does it look different?

24   A.    Well, the photo that I took of the kitchen area earlier shows that

25   cake was on the edge of the cabinet.  I actually took that photo.

1   There's not a board there.  These chairs were pulled apart.  There's a

2   lot of disarray that was not there as shown in the photo that I took.

3   Q.      Exhibit Number 114, admitted defense exhibit, another photo

4   Maria Pina took.  She testified that that is how the bathroom looked.

5   Is that how the bathroom looked when you were inside that trailer?

6   A.      No.

7   Q.      How did it look different?

8   A.      It wasn't that nice.

9   Q.      What do you mean?

10  A.      It was in a little -- it was a little messier.  I don't recall seeing

11  that shower curtain.

12  Q.      That night were you ever made aware that a woman by the

13  name of Luz had hit her head?

14  A.      No.

15  Q.      And as one of the members within the ICE team, if something

16  like that had happened, would you have learned about it?

17  A.      Of course.

18  Q.      That night when you were at the property until about 11:00 at

19  night, did you ever see the defendant Carlos Calixtro?

20  A.      No, I did not.

21  Q.      During the two and a half to three hours that you were at the

22  property, did he ever return?

23  A.      No, he did not.

24              MS. KELLY:  May I have one second?

25  BY MS. KELLY:

1    Q.    One last photo.  Defense admitted Exhibit 125, photo Maria Pina

2    testified she took on the evening -- I guess it was not the evening --

3    the next day or some other day.

4    A.    Right.

5    Q.    Does that reflect how that purple bedroom -- the bedroom that

6    Julio was kept in, is that how it looked when you were there?

7    A.    I don't recall it looking like that.  I remember the stove being in

8    the room, but the bed did not look like that.

9    Q.    How did the bed look different?

10   A.    I don't really remember that many blankets and things like that.

11   I seem to remember that the mattress was on the floor, but I can't

12   recall exactly.

13                  MS. KELLY:  I don't have any other questions.

14                  THE COURT:  Mr. Hormel.

15                          CROSS-EXAMINATION

16   BY MR. HORMEL:

17   Q.    Agent Slagle, your agency does not have a protocol of taking

18   photographs of a location you have just searched as the BORTAC

19   fellows do, do you?

20   A.    I don't know it's a protocol.

21   Q.    Do you have a protocol that requires you to take photos of a

22   place after you are done searching it?

23   A.    I don't know if we have a protocol.

24   Q.    You did not do that in this case, did you?

25   A.    No, we did not.

1   Q.     So unlike BORTAC you cannot come to this jury and show them a

2   series of photographs that show the place in the condition that it was

3   when you left?

4   A.     I do not have those photos.

5   Q.     Right.  And the photograph that you mentioned that you took of

6   the living room was prior to your search.  Isn't that right?

7   A.     That is correct.

8   Q.     So is it your testimony today that Maria Pina turned her house

9   upside down in order to take photographs for this jury?  Is that your

10  testimony today?

11  A.     No.  My testimony --

12                MR. HORMEL:  Thank you.

13                MS. KELLY:  Objection.

14  BY MR. HORMEL:

15  Q.     Did you at any time -- have you at any time in your life been

16  handcuffed and placed in a PHA?

17  A.     No, I cannot say I have.

18  Q.     Have you ever had your home taken down by BORTAC?

19                MS. KELLY:  Your Honor, I object to relevance.

20                THE COURT:  Sustained.

21  BY MR. HORMEL:

22  Q.     You searched the premises in question, correct?

23  A.     I did.

24  Q.     And you mentioned earlier in the case that you had done so

25  thoroughly?

1    A.    Yeah, I believe so.

2    Q.    And the reason that you did it thoroughly is because you are

3    looking for evidence.  Isn't that right?

4    A.    That is correct.

5    Q.    And you are -- for evidence -- your primary focus is to obtain

6    evidence that relates to the investigation that you conducted.  Isn't

7    that right?

8    A.    That is correct.

9                    MS. KELLY:  Beyond the scope.

10                   THE COURT:  I don't believe it is.

11   BY MR. HORMEL:

12   Q.    Therefore, you are going to try to look in every conceivable place

13   in the house.  Isn't that right?

14   A.    Yes, sir.

15   Q.    In order to do so, you will have to remove items from where

16   they are originally placed or stored, correct?

17   A.    That is correct.

18   Q.    People store all sorts of things in drawers and cabinets.  Isn't

19   that right?

20   A.    I suppose so.

21   Q.    In order to look in there, you would have to remove those items.

22   Isn't that right?

23   A.    That is correct.

24   Q.    So you mentioned that you guys had left within two and a half

25   hours of this operation beginning?

1    A.    Two and a half to three hours, that's correct.

2    Q.    That includes the BORTAC operations?

3    A.    From the point that BORTAC got there to the point we left.

4    Q.    So it's your testimony today that BORTAC conducted its

5    operations, PHA was established, the people were secured, you then --

6    BORTAC then took its photographs.  And then you and your team went

7    into the trailer, right, conducted your very thorough search and then

8    cleaned everything up so it was spotless when you left.  Is that your

9    testimony today?

10   A.    We don't clean it up.  We actually put everything back where we

11   found it.  So if it's messy, we put it right back where we found it.

12   Q.    And you did all of that in two and a half hours?

13   A.    We had multiple teams searching multiple residences.  And so

14   while the individuals were held in the PHA, we conducted our search.

15              MR. HORMEL:  Thank you very much.

16              THE COURT:  Mr. Romo.

17                    CROSS-EXAMINATION

18   BY MR. ROMO VEJAR:

19   Q.    Good morning, Mr. Slagle.

20   A.    Good morning, sir.

21   Q.    Sir, you were asked some questions about weapons.  Is that

22   correct?

23   A.    That is correct, sir.

24   Q.    They asked you about a .22 caliber.  Is that right?

25   A.    That is correct.

1   Q.   And it is true, isn't it, that you don't know whether that weapon

2   was a workable weapon?

3   A.   As I stated earlier, counsel, we did not test --

4   Q.   The question is yes or no.

5   A.   No, I do not know if it was workable.

6   Q.   All right.  Because that's not your field.  Is that correct?

7   A.   That's correct.

8   Q.   With regard to Mr. Lopez-Trujillo, you don't know if he was about

9   to shower or had already showered.  Is that correct?

10  A.   Can you rephrase the question?

11  Q.   You don't know if Mr. Lopez-Trujillo had taken a shower or was

12  about to shower?

13            MS. KELLY:  I object to vague question, compound

14  question.

15            THE COURT:  You better restate your question.

16  BY MR. ROMO VEJAR:

17  Q.   You testified that you didn't feel like Mr. Lopez-Trujillo was wet

18  from taking a shower.

19  A.   His hair was not wet.  He had very long hair.

20  Q.   And you don't know when he took a shower, washed his hair,

21  right?

22  A.   That's correct.  I do not know that.

23  Q.   Now, I want to show you what has been admitted as Exhibit 124

24  which is the bathroom.  Do you recall testifying about that bathroom?

25  A.   I do.

1  Q.   And you were here when Ms. Pina testified.  Is that correct?

2  A.   I was.

3  Q.   And she said that she had taken this picture a week or two after

4  the raid.  Is that correct?

5  A.   She did.

6  Q.   And you stated that on that day, which would be the 24th, the

7  bathroom looked different?

8  A.   Yes, I did.

9  Q.   It looked like people had used it?

10 A.   It looked like it had been used.

11 Q.   Right before you entered?

12 A.   No, not right before I entered.  It looks like it had been used.

13 Q.   And you said that curtain was not there?

14 A.   I didn't say that.  I said I don't recall the curtain being there.

15 Q.   Now, Ms. Pina testified that she was at this area, which I'm

16 going to show you right now, for a long period of time.  She thought it

17 was about six hours.  Do you recall that testimony?

18 A.   I do.

19 Q.   And you say it couldn't have been more than three hours.  Is

20 that correct?

21 A.   Not unless she stayed there, no.

22 Q.   And I'm assuming you know she was in a lot of distress?

23 A.   That was not reported to me, sir.

24 Q.   Well, if you have someone who has just experienced a BORTAC

25 invasion and then is taken and handcuffed and the child is crying and

1  she doesn't know what is going on, that would be someone who is in

2  distress, wouldn't it, sir?

3  A.   Well, I wouldn't describe it as an invasion.  I don't know how she

4  felt.

5  Q.   Fair enough.

6           THE COURT:  Mr. Romo, you just showed a photograph

7  of that bathroom and said that was 124.

8           MR. ROMO VEJAR:  It is 114.

9           THE COURT:  The record will be corrected.

10  BY MR. ROMO VEJAR:

11  Q.   You said, sir, that you were the last person to leave there.  It

12  was not Officer Ellis?

13  A.   No.  I was.

14  Q.   You were last in the detail?

15  A.   We all left together.  However, I was the last individual to leave

16  the trailer.

17  Q.   Now, it is true, isn't it, sir, that you were looking for certain

18  items that were small and you were looking everywhere within the

19  trailer, right?

20  A.   We were looking for items as it relates to hostage taking.

21  Q.   Actually, you were looking for items as it relates to the affidavit

22  in the warrant, correct?

23  A.   Correct.

24  Q.   And BORTAC was looking for human beings.  Is that correct?

25  A.   That's correct.

1   Q.    And human beings are not inside cushions.  Is that correct?

2   A.    No.

3   Q.    Or inside drawers, right?

4   A.    No, they are not.

5   Q.    But you were looking inside drawers and inside cushions, weren't

6   you?

7   A.    I don't know if we were looking inside cushions.  We were

8   looking inside cabinets and drawers, yes.

9   Q.    You were looking for bank accounts.  Is that correct?

10  A.    We were looking for bank accounts?

11  Q.    Yes, sir.

12  A.    We found evidence of bank accounts and we photographed them.

13  Q.    Were you looking for bank accounts?

14  A.    We looked at items of bank accounts, yes.  We photographed

15  them.  We did not take anything.

16  Q.    Were you looking for records and receipts of rental agreements?

17  A.    We were.

18  Q.    Were you looking for records of mail services for the years 2007

19  through 2009?

20  A.    If the affidavit on the warrant specified it, we were looking for

21  everything like that.

22            MS. KELLY:  Your Honor, I would object to this going

23  beyond the scope.

24            THE COURT:  No, it does not.

25  BY MR. ROMO VEJAR:

1    Q.    Were you looking for vehicle ownership documents, vehicle
2    insurance records?
3    A.    Could you provide me with items to search for on the attachment
4    from the search warrant, please, and I can answer your questions.
5    Q.    Well, you were very good at remembering things.  I'm just
6    asking if you remember.
7    A.    Well, you want me to go into specific detail.  I would prefer to
8    see the documents that you are referring to.
9    Q.    I understand.  I will show you the document if you don't
10   remember if you were looking for vehicle ownership.
11   A.    I can't recall.  I would prefer to look at the search warrant
12   attachment, please.
13              MR. ROMO VEJAR:  Your Honor, may I approach the
14   witness?
15              THE COURT:  You may.
16   BY MR. ROMO VEJAR:
17   Q.    I will show you what has been admitted as the search warrant.  I
18   don't know which one it is.  139.  This is a copy and it is attachment B.
19   A.    Thank you, sir.
20   Q.    When you are finished looking, would you give it back to me?
21   A.    I'm done.
22   Q.    Can you take a look at what has been marked and admitted as
23   139?
24   A.    I believe it's the same.
25   Q.    It's the same?

1  A.  I believe so.

2  Q.  Now, you testified that you were looking for those items which

3  were vehicle insurance, ownership documents for the years 2007

4  through 2009?

5  A.  That's correct.

6  Q.  Without looking at the exhibit, can you answer the questions or

7  not?

8  A.  Well, I can answer the questions, but I would like to be able to

9  refer back to the document if you ask me things in specific detail.

10  Q.  All right.  Were you looking for airline ticket receipts, bus ticket

11  receipts?

12  A.  We were.

13  Q.  Vehicle rental receipts, credit card receipts, hotel receipts, travel

14  agency vouchers?

15  A.  Yes.

16  Q.  Records of long distance telephone calls and other items relating

17  to domestic and foreign travel for the years 2007 through 2009?

18  A.  Yes.

19  Q.  You were looking for foreign fuel receipts.  Is that right, sir?

20  A.  That is correct.

21  Q.  Were you also looking for maps?

22  A.  Yes.  Yes, we were.

23  Q.  Were you looking for receipts showing travels to other countries?

24  A.  Yes.

25  Q.  Now, those require a very detailed search of an area.  Is that

1   correct, sir?

2   A.   That is correct.

3   Q.   Including opening drawers?

4   A.   That is correct.

5   Q.   Including looking under the beds?

6   A.   That is correct.

7   Q.   Under the mattresses?

8   A.   That is correct.

9   Q.   Including going into closets and taking everything out so you can

10  see whether or not there is a certain document there.  Is that correct,

11  sir?

12  A.   We didn't take everything out.

13  Q.   Did you hear my question, sir?

14  A.   You stated that if it included us taking everything out of the

15  closet.  And I stated, no, we did not take everything out of the closet.

16  Q.   Does it include taking a look inside the closet and removing

17  things and moving them around?

18  A.   It does include removing them.

19  Q.   And sometimes you think that someone has hidden documents

20  either behind the refrigerator or behind the counter or behind the

21  table.  Is that correct?

22  A.   That is correct.

23  Q.   Or under a couch?

24  A.   That is correct.

25  Q.   And that requires extreme movement of things.  Is that correct?

1    A.    Extreme movement?

2    Q.    Well, yes, sir.  If you are going to, for instance, search this

3    building, it requires that you move everything within the building -- I

4    mean within this room in order to find what you are looking for which

5    is small pieces of paper.

6    A.    I can't testify about extreme movement of things.  I can testify

7    that, yes, it requires you to move things.

8    Q.    And there were several of you who were doing the search.  Is

9    that correct?

10   A.    There were.

11   Q.    In fact there were more than five people who were doing the

12   search.  Isn't that true, sir?

13   A.    I can't testify to that.

14              MR. ROMO VEJAR:  May I have a second, Your Honor?

15              THE COURT:  You may.

16              MR. ROMO VEJAR:  No further questions, Your Honor.

17   Thank you so much.

18              THE COURT:  Any redirect?

19              MS. KELLY:  Briefly.

20                        REDIRECT EXAMINATION

21   BY MS. KELLY:

22   Q.    Special Agent, when you left, you and ICE and all the police left

23   this facility at approximately 10:30 p.m. on the evening of September

24   24, was everything put back the way it was when you folks arrived?

25   A.    Yes.

1          MS. KELLY:  I don't have any other questions.

2          THE COURT:  Thank you, sir.  You may step down.

3          Would you call your next witness.

4          MS. KELLY:  The government rests.

5          THE COURT:  Very well.

6          Ladies and gentlemen of the jury, both sides have rested

7    at this point.  That is all the evidence that we will be receiving in this

8    case.

9          The next thing will be for the lawyers to make their

10   closing arguments or closing summations to you.  That will probably

11   take -- it will take us to the noon hour, possibly into the noon hour.

12         Do any of you need a break before we start the

13   arguments?  Take a break now?  Very well.  We will take a brief break.

14   10 to 15 minutes.  We will reconvene and start with the arguments of

15   counsel.

16         (The jury was excused.)

17         THE COURT:  The record will reflect the jury has

18   withdrawn, counsel and defendants are present.

19         Ms. Kelly, any record the government wishes to make at

20   this time?

21         MS. KELLY:  No, Your Honor.  Thank you.

22         THE COURT:  Mr. Hormel, any record you wish to make

23   on behalf of Mr. Bonilla?

24         MR. HORMEL:  Not at this time, Your Honor.

25         THE COURT:  Mr. Romo, anything as to Mr. Calixtro?

1        MR. ROMO VEJAR:  No, sir.

2        THE COURT:  Thank you.  We will stand at recess for

3   about ten minutes.  When we come back, we'll start with the

4   government's closing statement.

5        (A recess was taken.)

6        THE COURT:  The record will reflect the presence of the

7   jury, counsel and the defendants.

8            Ladies and gentlemen of the jury, once counsel starts

9   their arguments, their closing arguments, do you wish to stop at 12:00

10  to take your break for lunch or do you wish to try to go until we get all

11  three of the lawyers' arguments?

12           Do any of you want to stop at 12:00?

13           My thought is this:  If we go beyond 12:00, we will not

14  go beyond 12:30.  At 12:30 we will stop and go to lunch regardless of

15  where we are.  I think that is pushing it aways.

16           We'll go past 12:00 if we have to.  We will not go past

17  12:30.

18           Mr. Evans, are you ready to proceed?

19           MR. EVANS:  Yes, Your Honor.  Thank you very much.

20           The case is about to be yours.  The first words you heard

21  about this case when Ms. Kelly quoted Julio when Calixtro told him,

22  "This is no joke.  We'll blow your head off if we don't get the money,"

23  that's what this case is about.  It's about money.  $2,300.  How do you

24  get that money?  And this question:  What if he never paid?

25           You have seen evidence.  The first type of evidence was

1   the testimony of Julio, Ms. Lopez, Dave Slagle, the BORTAC people,

2   direct evidence, people who were there.

3              Then you have the pieces.  The ledgers, the phone

4   records showing the phone calls, the summary exhibits showing how

5   the ledger fits to the phone calls that were made.

6              The law does not make a distinction.  You put together

7   the puzzle.

8              The first crime that we really want to talk about is

9   hostage taking, Count 3.  These are the elements of hostage taking.

10  Seizing, detained.  Did these defendants seize and detain the victim?

11             The court's going to give you a copy of these instructions

12  so you don't have to write them down.

13             Did they seize and detain the victim?  Did they threaten

14  to kill, injure or continue to detain the victim?  And did they do these

15  things with the intent to compel Karen Lopez to do what?  One, not to

16  report this to the police.  And, two, to come up with the money.  It's

17  all about the money.

18             There didn't have to be a raise in price.  El Pelon says,

19  "It's only $1,500.  You can do it on time payments."  The next man,

20  the boss at the house in Nogales, says, "$1,500 in Tucson."  But he

21  had a deal with El Pelon.  Payment schedule.  Then the monitored

22  phone call which you will hear.  "We'll send your husband after you

23  pay the money."

24             They have to be restrained for an appreciable time,

25  more than a moment, but September 22nd, 23rd, 24th, an appreciable

1    time.  So that's been proven.

2              Initially Julio did cooperate with these people.  He went

3    into that trailer.  He kept his head down.  He didn't look around.  He

4    went into that room.  But then the nightmare started.  He had no deal,

5    did he?

6              Did they seize and detain?

7              Well, you look at this evidence, ladies and gentlemen.

8    The monitored phone call.  You'll get the CD of that phone call.  You'll

9    be able to listen to it again.  You'll be able to listen to the voice

10   exemplar of Mr. Calixtro.

11             But you do not have to decide whether or not Mr.

12   Calixtro actually was part of that phone call.  All you have to decide is

13   that somebody associated with this conspiracy was talking to Karen

14   Hayes.  That's all you need to decide.

15             Ms. Hayes said -- Ms. Lopez said it was the same guy in

16   the monitored phone call that she spoke English to in all her other

17   phone calls.  All her other phone calls.

18             Someone who said, "You give us the money, we'll give

19   you your husband, but don't joke around."  Each one of those things

20   was said.  Seized and detained.

21             Can you get your transcripts?

22             (The monitored phone call is played.)

23             MR. EVANS:  You might find it easier if you would get

24   the copies of your transcripts.

25             (The monitored phone call is played.)

1           MR. EVANS:  Threaten to injure, to kill or continue to

2    detain.  You've got continue to detain right there.  And you've got this

3    statement by Julio who told you what Carlos told him.  "We'll blow

4    your head off."

5           He and Mr. Bonilla, isn't that his testimony, came in and

6    shined that laser sight on him to make it very real that money has to

7    be paid.  And the weapons were there.  Magazines loaded.  He saw the

8    laser.

9           What would that do to a person to have a stranger point

10   a laser at him and say, "Money or we're gonna blow your head off"?

11   What would you say over the phone to convince the people on the

12   other side if they didn't do it?

13          And Karen Lopez gave the same story.  When she tried

14   to set up the agent who was going to deliver the cash in Tucson,

15   "Don't try to be tricky," right?  "Carlos will be close.  And if something

16   goes wrong."

17          So all these phone calls starting on the 22nd of

18   September.  Enough to stress in her life.  And then this phone call.

19   "I'm in Tucson.  You have to get this money."

20          $2,300.  A woman on disability with a bad back with an

21   18-year-old car, a single wide in Mayer, Arizona.  $2,300 could have

22   been a million.  But each phone call came in and the desperation got

23   greater and greater.  What to do?

24          On the 22nd, the one that is highlighted, that is the

25   monitored phone call.  And you just heard it.  And the calls kept

1   coming and coming.  More and more they were strained.  You heard

2   Julio say the last man left of his group left just a few hours before

3   BORTAC got there.  He was the only one left.  And the threats kept

4   coming.

5            You have about 37 minutes of conversation between

6   Mrs. Lopez and Cesar.  For all she knew, at 5:44 on the 22nd -- 24th,

7   that was the last phone call she would ever have with him.  37

8   minutes is all she had.  And she waited.

9            Was he seized and detained?  We have proven that.

10           Was he threatened to be killed, injured or continued to

11   be detained until the money was paid?  That's been proven.

12           And was it all for the purpose of getting money, money

13   by Karen Lopez or anybody that would pay it?  They went to their

14   church.  And the church didn't have it.  Scrambling for anyone else in

15   their world who had this money.  But she went to the police.

16           And you remember what Julio -- what Carlos Calixtro

17   told Julio about the white people.  They go to the cops.  But he took

18   care of that, didn't he?  "You go to the cops and I'll have time to blow

19   his head off."  He didn't have time.

20           So Count 2, proven beyond a reasonable doubt.

21           The third count is harboring.  The government has to

22   prove these four elements:

23           Was he an alien;

24           Was he illegally in the country;

25           Did the defendants know or recklessly disregard the fact

1    that he was probably here illegally in the country;

2              And did they harbor, hide him from immigration

3    authorities.

4              If you find those four things, then you have to find that

5    the purpose of the hiding was for financial gain.

6              And his life was placed in jeopardy.  Let's talk about that

7    jeopardy first of all.

8              There are two locations when jeopardy is at stake.  The

9    trip.  Four days through the mountains of Mexico and the state of

10   Arizona.  Four days.  When he got to the freeway, he was bleeding

11   from his nose.  He was sick.

12             But there's another demonstration of how dangerous it

13   is; the man who didn't make it.  There is no one in this courtroom who

14   knows what happened to him.  What we know is a motorcycle and a

15   scream.  A dangerous trip.

16             And then you have the situation in the house with the

17   gun pointed at your head saying, "Money."  And there are the

18   weapons, the laser sight and the .22.  And this is what it's all about.

19             There's no dispute that he was an alien.  There's no

20   dispute he was illegally in the country.  It's been proven that these

21   defendants knew he was illegally here or were reckless in disregard of

22   the fact he was.  And the purpose was to hide him from immigration

23   authorities.

24             Where was he?  In the middle of nowhere.  Who

25   controlled the phones?  Despite what you might have heard from their

1   witnesses, Yuri controlled the phones.

2            Very interesting thing about that monitored phone call,

3   Ms. Lopez says, "Esposa," and like that they got Julio to the phone.  It

4   was time to call, wasn't it?  She had just received a call that she didn't

5   respond to.

6            Once again it's that confirmation of what Mr. Lopez said.

7   They would call in the morning and everyone would be called.  Yuri

8   would come into the room, say, "Okay, it's your turn to call."  The calls

9   would be made right in that little room.  Right in that little room.  "Ah,

10  it's your turn.  Convince them."

11           And if they didn't get paid because Julio went into

12  immigration services, the defendants wouldn't get paid.  And then this

13  whole group of people would not get their money; the cab driver, El

14  Pelon, the boss who consolidated the people to be sent over to cross,

15  the man who drove them to the mountains, the guides who brought

16  them into the United States on that four-day trip, the man who drove

17  them from where they were left off up to the trailer.

18           And then who paid for the food, the shelter, the rent for

19  the trailer, the water?  Who paid for all of these other things?  They

20  had invested in the victim, invested money.  If he went to

21  immigration, guess what?  There wouldn't be any money.

22           Count 3, harboring.  Proven beyond a reasonable doubt.

23           The first count is conspiracy.  These are the elements of

24  conspiracy:

25           Was there an agreement?

1          In addition, you have to answer these questions.  Excuse
2     me.  Each one of these questions you will be asked and they have
3     been proven.
4          Did each one of these defendants harbor Julio for
5     financial gain or commercial advantage?  You'll answer.  Each one of
6     these should be proven.
7          Also, was the life placed in jeopardy?  Proven.
8          It's all about money.  Mr. Hormel's question put it right
9     absolutely in focus.  It wasn't Mr. Lopez they saw there.  They saw
10    that as a commodity to extract money from.  The drop house is the
11    equivalent of the point of sale.
12         An you will also have this question.
13         So Count 1.  Is there an agreement?  Were the
14    defendants part of this conspiracy?  And to further the objects of the
15    conspiracy.  And was the conspiracy -- the intent of the conspiracy to
16    compel Karen Hayes Lopez to pay money?  Was there an agreement?
17         Each one of these people that are laid out here from the
18    cab driver to the man who was going to drive, if the money had been
19    paid, Julio got to his eventual destination, and the boss man are part
20    of the conspiracy.  They were each required to do their part to get the
21    money.
22         Were they part of this conspiracy?  Well, they were
23    operating the point of sale.  The extraction of the funds.  You heard in
24    the monitored phone call what Julio said.  The other people, their
25    families from Phoenix and California.  They paid the money to Nogales

1   and then they go.  They pay the money to Nogales and then they go.

2   The point of sale was operated by Yuris Bonilla and Carlos Calixtro.

3   And their purpose was to compel or attempt to compel Karen Hayes to

4   pay the money.

5              And you have that evidence, ladies and gentlemen.  You

6   have the sufficient evidence to prove that the government has proved

7   beyond a reasonable doubt that each one of these men is guilty of

8   conspiracy, hostage taking and harboring.

9              That's what it's about.  And this is the question that

10  must be present.

11             Thank you.

12             THE COURT:  Mr. Hormel.

13             MR. HORMEL:  Yes, Your Honor.

14             I would request access to the overhead and the

15  government's presentation be removed.

16             Just a moment.  I will put a picture on the overhead to

17  start.

18             Ladies and gentlemen, I'm going to put up a couple of

19  pictures in succession before I start.

20             I started by showing you a few of the pictures that were

21  taken that happened on the night of September 24th when BORTAC

22  showed up at the residence out there on Oak Canyon Lane.

23             Seems like an awfully long time when we started this

24  trial.  Six days.  I remember back when we started the trial, I

25  mentioned during my first statement we would spend the next few

1    days listening to the government justify what had occurred on that

2    night when they went into this place with 25-armed basically troops

3    and a huge contingent of backup officers from ICE that then went in

4    there.  Over 50 people that were there that night.

5              As you heard from the government just now, their

6    presentation really hasn't changed at all.  It doesn't really appear that

7    most of what was said during this trial has really entered into their

8    thinking at all.  Their justification for this massive law enforcement

9    effort remains the same.

10              And that information, all of it, comes from Mr. Lopez.

11   What we know about what went on in the house comes from

12   Mr. Lopez.  The phone calls that were made between him and his wife,

13   all of that information comes from Mr. Lopez.

14              And the government's presentation almost appears

15   that's his testimony.  And it took an awful long time.  I apologize.  It

16   was difficult.  We had a lot of things we had to get through during that

17   examination.  But we learned an awful lot during that time.

18              And I think it's very important because his testimony is

19   the entire basis.  It's the entire justification of the efforts that were

20   made on September 24th when BORTAC showed up and when they

21   broke down the doors and they threw the flash bang and did all of

22   those things.

23              Now, we know that the information about what occurred

24   came from Mr. Lopez.  And there are serious problems with what he's

25   telling you.  And in order to find Mr. Bonilla guilty of some kind of a

1    hostage taking or a conspiracy to commit hostage taking, you have to

2    believe what Mr. Lopez said because there is no other evidence of it.

3           This is all about all of the law enforcement that testified,

4    all of the things that came in.  At the end of the day, the person who

5    controlled the information, the person who controlled the information,

6    was Julio Cesar Lopez-Trujillo.

7           He testified here for a long time that he was the one

8    through whom all of the information was controlled at the outset of

9    this case upon which the efforts of law enforcement were based.

10           Now, let's talk about Mr. Lopez.

11           What we learned from him is that he grew up in

12    Veracruz.  Now, you might imagine he came across the border because

13    he came from a very poor background and things were difficult.  That

14    didn't turn out to be the case.  He testified that he had a supportive

15    intact family.  That want of money was not the reason that he left

16    school.  In fact his brother had completed school and stayed in Mexico

17    and has long-term viable employment.  So it wasn't that.

18           Now, he also said that he didn't finish school because he

19    didn't like it.  So he left school and worked a series of odd jobs in

20    Mexico, never staying anywhere more than a few months, earning

21    somewhere between 55 and 60 bucks a week.  Alternating with selling

22    marmelos with his mother.

23           Every time he would finish a stint, he would go back to

24    his mom and claims that he was working with her selling these food

25    items.  And he would go do another stint.  And then by 21 years old,

1    he decides, well, I'm going to the United States.

2              Okay.  He has no education.  He has no real job skills.

3    Let's go to the United States and try our luck there.

4              His first crossing all those years ago he obtained the

5    services of a coyote.  Remember he asked for somebody to take him

6    across.  The price was much lower back then.  But the $300 I believe

7    that he said it cost was paid by a friend of his upon arrival.

8              At that point he had some odd jobs in Phoenix working

9    this and that.  I'm not going to list them all for you.  The best job he

10   had was a construction job with the sewer pipes which he quit because

11   he says he was singled out for dangerous work.  Upon which starts a

12   long string of odd jobs in fencing and construction and in cleaning

13   yards and a variety of things.

14             Now, during cross-examination it became obvious that

15   during this time he used a false name.  He used a false Social Security

16   number.  He didn't tell the government this.  He didn't volunteer this.

17   That had to be really pushed out of him.  But he acknowledged it

18   finally.

19             But he also claimed, well, he didn't remember what

20   those things were.  Now, it stretches credulity.  It stretches the

21   bounds of what we can believe as human beings.  Someone says, "I

22   was using a false identity to work and I was responsible for that

23   identity as that employee, but I don't remember what it was.  I can't

24   tell you today what the name was I was using for that period of time."

25   Which was years.  We are not talking about a couple of weeks.  This

1    was years.  "I don't remember."

2          Now, his testimony was literally littered with the phrase

3    "I don't remember."  He didn't remember what the prosecution had

4    asked him two hours prior.  He didn't remember what he had stated to

5    the prosecution two hours prior.  He didn't remember what he told the

6    police when he had been arrested and interviewed.  And that went on

7    for hours and hours.  And we had to fight our way through that just to

8    get answers out of him.

9          Now, then at some point he works his way up to

10   Prescott, Prescott Valley, and Mayer, and finally meets Karen Hayes,

11   now Karen Lopez, who has become his wife.  They were introduced by

12   her daughter.  Karen Hayes being 21 years his senior, disabled and

13   living in her own home in Mayer.

14          Around this time at some point those several years ago,

15   three to four years ago, after returning from Mexico, he crosses the

16   border back from Mexico into the United States again.  Again, he uses

17   the coyote.  Again, there is an arrangement that he is supposed to pay

18   when he gets there.  Again, he's not the one who is going to pay the

19   bill.

20          He doesn't pay the bill.  Why?  Because he gets away

21   from the group because he realizes there is someone else there in the

22   group that knows a different way to go.  They leave the group and he

23   never pays the money.

24          He claims that it's because there were drug smugglers

25   and guns involved.  But that is up to you if you are going to believe

1    that.  Bottom line is he walks away and he doesn't pay.

2            Meanwhile, at some point now he's living in Mayer with

3    Karen Hayes.  They get married in the church.  And he claims a

4    long-term essentially unpaid work arrangement at a tire shop.  I'm not

5    sure what to make of that, but that is what he said.

6            I apologize.  I'm collecting my thoughts.

7            So it's important to note that during all of these years

8    he's been in the United States, 11 years, this man has never had his

9    own place to live, not one time did he ever get an apartment or trailer

10   or a house or even rented, nothing.  He's living at the grace of other

11   people the entire time.

12           Now, September of 2009 he ends up in immigration

13   custody and ends up down in Mexico and is returned due to lack of

14   immigration documentation.  And now we get into the period of time

15   where this case starts, the germs of this case are born, the seeds of

16   the case are planted.

17           He says that Karen Hayes brings him some documents

18   and Karen says she brings them down, but those documents are never

19   located.  He says he has them on him when he gets to the house.  The

20   house, as you heard from Agent Slagle, was thoroughly searched

21   specifically for documents of those kinds.  Nothing.

22           Anyway, now he makes a deal with Pelon, this recruiter

23   the government has talked about and he talked about.  He made

24   allegedly a deal for $1,500 to be transported back to the United

25   States.  He knew it was illegal.  He knew it was a coyote.  He's had

1    two rounds with the coyote previously he hasn't had to pay for.  Now

2    he's making another deal with a coyote to come across in this case.

3              Important, he doesn't tell his wife.  Okay.  He's a man

4    who is about to make a very important decision.  Allegedly they are

5    getting married.  Allegedly they have all of these things going on.

6    Most important person in his life.  He's going to undertake a journey of

7    this kind without telling her?

8              Okay.  Well, that's what he said.  That's what he said he

9    did.  He says he makes this deal.  And he told you under oath on the

10   stand that everybody knew down in Nogales that this was going to be

11   an arrangement by which he would pay in payments.

12             Now, you heard Agent Ellis testify that nobody ever pays

13   in payments.  He's been involved in this process a couple of times.

14   This business about payments, it's fiction.  It's absolute fiction.  You

15   know why we know it's fiction?  Because he told the police during this

16   interview the date when BORTAC came, the 24th, that night, the 25th.

17             And Agent Slagle read to you from the transcript of that

18   interview.  When he arrived at the house where the boss was putting

19   together the group, he was told in no uncertain terms payment was

20   expected in full in Tucson.  Those were out of his mouth at the time of

21   the interview.

22             What he told you here was something different.  These

23   are his words.  This is Lopez' words.  He changed his story between

24   now and then.  Why?  Because it supports the case and it justifies all

25   the things that have happened.  That statement was a lie.  It's a lie.

1          So they have a long walk.  He testifies that he never has

2    an opportunity to leave the group.  The government has tried to spin

3    this business about "la brecha" into some kind of a danger.

4          What it was, it was a period of time when he could have

5    walked away from the group no problem.  Somebody else did.  He

6    wasn't beaten up.  And he walked away.  Lopez could have walked

7    away at that point no problem.  He chose not to.  He didn't want to get

8    caught.  The whole point of this is to get him back into the United

9    States without being caught.

10          He doesn't walk away.  And eventually he gets to the

11   car.  He says he feels sick.  He gets into the car.  And they drive to

12   this trailer according to him.

13          Now, remember, Lopez says he's in the trailer for four

14   days.  He wasn't there for four days.  He was there for the end of the

15   22nd, the 23rd and part of the 24th.  You add it up.  It's 48 hours, not

16   four days.  He said he was there for four days which is not true.

17          Phone records show -- he says as soon as he got there,

18   shortly upon his arrival, he said he was asked to make a phone call.

19   First phone call the government shows records of are on the 22nd.  We

20   can start on the 22nd.

21          We have heard all kinds of things from Lopez what went

22   on in that house.  First thing he can't get right is the date of the

23   arrival.  That's wrong.  He says there are seven to nine people piled

24   into that room.  Some of whom are naked.  All of them are being

25   extorted.

1        What we do know is what BORTAC says.  He's the only

2    one.  So either it's not true that there were that many people there, or

3    if there were other people there, they moved along without really

4    much problem at all.

5        So one of those two things is true.  Either it's not true

6    there were all these people there or it's just that they were moved

7    along.  We don't know.  We weren't there.  Nobody was there.

8        You heard the testimony from the family that is living in

9    the house with a small child that there wasn't anybody else there.  His

10   story is that there are all these people piled into the room and that is

11   the way it was.  Okay.  That's his story.

12       He says that he is being threatened all the time and told

13   he can't leave.  Let's examine exactly what is going on here.

14       Okay.  He makes a call on the 22nd to Karen Hayes.

15   She doesn't know that he has come across the border.  She has no

16   idea he's contracted with the coyote to bring him across.  She didn't

17   know.  It was just something that was arranged all of a sudden.

18       He says, "Look, we owe money."  This is on the first day,

19   mind you.  Remember how he said, well, there weren't any threats on

20   the first day?  It was only later when they got angry, right?

21       When you think about it, what happened here?  Karen

22   Hayes never had any intention of paying any money to any coyote.

23   She said so on the stand.  She never considered taking out a loan

24   against her house, never considered taking out a loan against her car,

25   never considered putting any of her assets in jeopardy to pay this

1   money.  She never had any intention of paying the money.  She told

2   Julio Cesar that when he made the call on the 22nd.  She was not

3   going to pay.

4           Okay.  This puts a dent into his plans.  He wants to get

5   into the United States.  But now all of a sudden he has no way to pay.

6   Previously he's always managed to find a way.  He's always found a

7   way to get out of paying or get back into the United States.  He's

8   always managed it.

9           Okay.  How does he convince this lady to come up with

10  the money?  What does he tell her?  He says, "Oh, you know what,

11  they are threatening me.  You have to pay.  If you don't pay, they will

12  kill me."  Right?  Makes sense.  Something that popped into his head

13  maybe.  He's trying to get this arrangement taken care of.

14          And now the game is on.  Because the first thing that

15  she does, this is on the 22nd, mind you, because she on that very first

16  day went to the police.  You heard from her.  As soon as this phone

17  call came in, she went to the police.

18          Mind you, Lopez said he had been there for a couple of

19  days and everything was fine until later it became clear and they got

20  angry the money wasn't going to come.  We know it happened right

21  away.  We know that happened right away because Karen Hayes told it

22  happened right away.

23          She went to the police on this evening and she says,

24  "Look, my husband is being held.  He's being threatened."  And she

25  winds her way through the administrative forest to ICE where this

1    monitored phone call is then arranged.

2            Ladies and gentlemen, this monitored phone call

3    remains the only actual evidence that we have of things that occurred

4    in this house.  It's the only thing we know with any certainty of what

5    happened.

6            What we hear is Julio Cesar calmly telling her, "Oh,

7    yeah, they are going to kill me.  No, but yes, yes, they have guns and

8    they are going to hurt me."  Any information regarding hurting or

9    threatening or anything like that is coming from him.  It does not

10   come from the unknown voice that is on the tape.

11           That voice very calmly says, and in broken English,

12   "Look, send us some money and we'll send the guy up there."

13           The government hopefully in their presentation put this

14   thing on the board where they say what would happen next.  Now,

15   there is no suggestion by the voice on the tape whatsoever that there

16   will be a negative consequence to Mr. Lopez other than they are not

17   going to drive him to Mayer.

18           They beg this question:  What's going to happen?  Oh,

19   mysteriously he's going to end up in this patch of desert.  That's the

20   suggestion.  This anonymous thing that is going to happen.  They are

21   going to blow him away.

22           What's going to happen if they don't pay the money?  He

23   will get kicked out the door and he'll be on his own.  You are not going

24   to pay, we are not going to finish the deal.  See you later.  Good luck.

25   That is not kidnapping, holding hostage.

1          Ladies and gentlemen, that is not what that voice is

2 saying by any means, by any stretch of the imagination.  There are no

3 threats on that tape.

4          Ultimately, and you'll hear on this tape, it's towards -- is

5 on the 24th, shortly before he is supposed to leave, supposedly he's

6 very desperate by that point.  He didn't sound desperate.  He's trying

7 to talk her into paying the money.  He's not worried about being killed.

8 He's worried he will get turned out and caught by immigration and get

9 sent back.

10          You know what he will have to do if he gets sent back?

11 He will have to walk through the desert again.  And that walk was hard

12 for him.  He's not exactly a paragon of physical fitness if you recall the

13 photo.  And he doesn't want to go through that again.

14          He's going to persist with this business about that he is

15 being threatened because he wants Mrs. Hayes or Ms. Lopez, now Ms.

16 Lopez, he wants her to pay.

17          And he has no idea, because nobody has any idea, that

18 the cops have become involved and there is going to be this operation.

19 Nobody in the house knows this.  He doesn't know this.

20          He's going to persist in this effort to do what he has

21 always done which is come illegally into the United States one way or

22 the other.  He's going to figure out a way.  He's going to avoid paying.

23 He's going to continue to live rent free with Ms. Hayes in this

24 arrangement they have come up with.  And that is what he's going to

25 do.

1        Now, we get to his testimony here in court.  And what

2    motivation does he have to continue to tell these stories?  One, he's

3    locked in because he started this.  He unleashed BORTAC upon this

4    neighborhood.  And, okay, you really can't back away from that once

5    you've started something like that.

6        You know, this was a serious operation.  I mean, Staff

7    Sergeant Coldiron can come and tell you it's business as usual, but,

8    ladies and gentlemen, that was serious.  They show up there with an

9    armored car with a turret with 25-armored men in night vision goggles

10   and take this place down.

11       Kids are screaming, people are diving under beds, hiding

12   in closets.  It's an unbelievable operation.  I don't think any of you

13   have ever experienced something like that.  If you did you would

14   never forget it.

15       That is something that in this country to think that these

16   kinds -- this is a paramilitary operation.  This is a paramilitary

17   operation occurring right here in Tucson, Arizona.

18       You know, ladies and gentlemen, at some point you

19   either have to explain it away or somebody has to acknowledge what

20   actually happened here.

21       But that is the first motivation he has to continue to say

22   these things, that this is what happened, and he is responsible for it.

23       The other thing is, well, what is the situation now?  He's

24   been living in the United States illegally with work authorization for a

25   year as a ward of the government as a witness.  That's not a bad deal.

1    First time ever he's been legal.  Cool.

2              He's a guy who has been able to get into the country by

3    hook or by crook no matter over the years using whatever means he

4    has at his disposal.  Now he has one that is on paper legit.  And he, as

5    Ms. Hayes says, went to Catholic Social Services in Phoenix and they

6    are working on an I-130 marriage petition.  And they have it all going

7    on.  It's working out.

8              He has every incentive to come here and prop up this

9    story so that his life may continue along the plan that he has laid out.

10   He has every motivation to come here.

11             Ladies and gentlemen, please think back for a moment

12   to the cross-examination when I was trying to ask this individual

13   questions how many times he didn't remember something, how many

14   times he asked me to repeat a question, how many times he had to sit

15   there and think how he is going to answer this question because he

16   doesn't want to blow it.  He's on the hook for this story and he can't

17   afford to blow it.

18             All he has to do to finish his plan to immigrate now and

19   come to the United States is perpetuate the tale that he told to Karen

20   to begin with.  And, poor Karen, she's got police in it now and there

21   you go.

22             Now, the government has also gone to great lengths to

23   justify all this.  They put a photo on the stand by Jeffrey Ellis.  Jeffrey

24   Ellis was portrayed as an expert.  First time he has testified as an

25   expert.  They put him on the stand as an expert basically to justify

1    what is going on here, to tell you opinions and conclusions and things

2    about alien smuggling in general that would support this particular

3    conviction that the government is looking for.

4              First of all, Jeffrey Ellis was originally the case agent on

5    this very case.  He's the one who filled out the search warrant

6    affidavit.  He's the one who obtained the authorization to go in there

7    with BORTAC.  So he's on the hook.  He's on the hook for believing all

8    of this stuff, for not investigating it further, for deciding, okay, this

9    story is for real and we are going to send in BORTAC.

10             He's going to get up here and he's going to give you

11   some testimony and he's going to hope that convinces you that this

12   big operation is the way he says it is.

13             There was one thing, one little item that came up that I

14   found very interesting, and it came up during rebuttal when Ellis

15   testified for the second time.

16             It was a little piece where the government asked him

17   about the lack of a door on the room.  And, you know, it would seem

18   obvious that the lack of a door makes it easier to walk out of a room.

19             Agent Ellis testified, you know, you can actually see it as

20   an advantage.  He stated that in terms of some kind of a psychological

21   ploy that these people were allegedly using it to keep him in the room.

22             And the reason that's important is because -- I'm going

23   to show you a picture right now -- during their presentation of the

24   case, the government went to great lengths to show you a picture of a

25   room in one of the other trailers that had a lock on it.  Remember this

1    one?

2            You recall there was testimony from Coldiron about the

3    word "hasp."  A hasp is that lock thing that is on the door that holds it

4    together.  They went to great lengths to explain that to you.  Why?

5    Why would they do that?  They bothered because they wanted to show

6    you that there were places in this area that had doors with locks on

7    the interiors.

8            Why?  Because somehow they believed that supported

9    their theory that people were being held against their will.  As it turns

10   out, this is somebody's grandmother's bedroom.  She doesn't like

11   people going in.  The reason they put the picture up there is for that

12   reason.

13           That is important because it conflicts directly with what

14   Agent Ellis told you at the end of his rebuttal which is now so

15   obviously tailored to try to get you to believe that this is a situation of

16   kidnapping that it couldn't even be more obvious.

17           One, they show you the picture of the hasp on the door.

18   But on the other hand, it's a great advantage to the kidnappers that

19   they have no door on the room.  So, yeah.

20           Ladies and gentlemen, this case remains based on a

21   post hoc or after-the-fact justification of some things that went down

22   on the 24th of September in this trailer park desert area down just a

23   little bit south of Tucson which isn't really that far from town.  It's not

24   in the middle of nowhere which the government would suggest.

25           Now, you are being asked to return a conviction.  You

1   are being asked to return a serious conviction based on the testimony

2   of one individual and a little bit of testimony from his wife that is not

3   borne out either by his history and by his testimony, by the countless

4   problems that there are in his testimony, and they are asking you to --

5   and they are claiming it has proven beyond a reasonable doubt

6   somehow that this story as told by Mr. Lopez somehow amounts to a

7   hostage taking situation.

8           It is absolutely -- ladies and gentlemen of the jury, I

9   would suggest that, please, they can't prove this.  And so they are

10   asking you to take the final step for them and say, okay, well, we will

11   go ahead and finish it off.

12           Ladies and gentlemen, this story as told by Mr. Lopez is

13   just that.  It was something that was expedient at the time when he

14   first spoke to his wife.  It was something he used because he thought

15   maybe that way she would pay and he could get the whole thing

16   behind him.

17           We know that because it happened the first moment he

18   got there.  We know that because she went to the police the first

19   moment.  He told you on the stand under oath that the threats didn't

20   start until a couple of days later.

21           You have heard a lot of testimony from the folks that

22   were around that were terrorized on that evening or had to suffer

23   through BORTAC.  And that stuff is important for the -- just for the

24   flavor.  I think it's more important for the flavor of it.

25           Of the fellow, Agent Coldiron, who came on the stand

1   and chewed gum and told us in such -- with such certainty and such

2   aplomb that there is no way they would have been sitting there being

3   bitten by ants.  Who also, by the way, said that he had gotten

4   permission from the next-door neighbor.  That never happened.  The

5   next-door neighbor came in and testified.  They were just as terrified

6   as anybody else.  Nobody asked them.  That wasn't true.

7                    And it's part of their justification.  It's part of, okay, well,

8   we went in there with speed, violence of action.  Right?  But you can't

9   always justify everything after the fact.  It doesn't always turn out to

10  be that the foundation that they are building this on is solid because in

11  this case it's not.  And they can justify it all they want.  It's not -- they

12  can't do it.

13                   Ladies and gentlemen, please, I ask you do not buy into

14  that story.  Do not buy into the bill of goods Mrs. Lopez has had to sell

15  you this day or this week.

16                   MR. ROMO VEJAR:  Your Honor, may we approach?

17                   THE COURT:  Yes.

18                   (At sidebar.)

19                   MR. ROMO VEJAR:  Your Honor, this is Jesus Romo.

20  Your Honor, we have been talking to the jury for about an hour.  They

21  look tired, Judge.  To me they look tired.

22                   The second thing is I'm worried when we come back we

23  will have the government speak with them.  And I think that we

24  should have both defendants and the government speak to the jury.

25                   So I am requesting, Judge, that you give us a break now

1    so that we can talk to the jury and then the government can give the

2    final summation.

3            MR. HORMEL:  This is Peter Hormel.  I concur with that.

4            MS. KELLY:  That's fine.

5            THE COURT:  We will tell the jury.

6            (In open court.)

7            THE COURT:  Ladies and gentlemen, the lawyers have

8    pointed out to me Mr. Romo is next to speak and then the government

9    gets to speak again because they have the burden of proof.  That will

10   carry us beyond 12:30.  We will cut somebody off in the middle.

11           Probably the best thing to do is go ahead and take our

12   break now.  We'll take the recess for an hour, a little bit more than an

13   hour.  We will reconvene at 1:00.  We can hear Mr. Romo in the

14   entirety and the rest of the government's statement in the entirety.

15   Then I have to instruct you at that point.

16           That I think will work a little bit better for all of us.  Let's

17   take our noon recess.  Remember you haven't heard everything yet.

18   Do not discuss the case with anyone nor allow anyone to discuss it

19   with you.  Don't make any decisions until the case is delivered to you

20   for your deliberations.

21           Stand at recess until 1:00.

22           (The jury was excused.)

23           THE COURT:  The record will reflect the jury has

24   withdrawn, counsel and defendants are present.

25           Any record, Mr. Evans or Ms. Kelly?

1        MS. KELLY:  No, Your Honor.

2        THE COURT:  Mr. Hormel?

3        MR. HORMEL:  No, Your Honor.

4        THE COURT:  Mr. Romo?

5        MR. ROMO VEJAR:  No, Your Honor.

6        THE COURT:  Thank you.  We'll see you at 1:00.

7        (A recess was taken.)

8        THE COURT:  The record will reflect the presence of the

9  jury, counsel and the defendants.

10        Mr. Romo.

11        MR. ROMO VEJAR:  Your Honor, I wanted to play the

12  movie that was played.  I'm not sure how to operate this thing.

13        Ladies and gentlemen of the jury, good afternoon.  I

14  wanted to play a DVD for you.  It was the movie.  It was only a

15  four-minute movie, but it was interrupted when it was shown to you.

16  But it didn't work.

17        You all remember the movie.  There was people coming

18  in, a lot of officers, and then a procession of cars.  And just to show

19  that there was a lot of individuals and a lot of authorities involved in

20  this situation.

21        What I would like to do first of all is thank you on behalf

22  of my client for participating in this trial.  I know it has been taxing for

23  everyone.  It is very important as I told you at the very inception of

24  the case.

25        I told you as well at the inception of the case to give us

1    the benefit of the doubt.  I told you that my client was presumed to be

2    innocent and that it was the burden of the government to prove

3    beyond a reasonable doubt that my client had committed the crimes

4    he's accused of committing.

5            What I would like to do now is go through the evidence

6    with you.  I told you we needed to sort out the facts.  And now we

7    have heard all the facts.  And it just behooves us to examine those

8    facts and see whether or not the government has met its burden.

9            First of all, as Mr. Evans did tell you this morning, there

10   is direct and circumstantial evidence.  And direct evidence he told you

11   is, for instance, Mr. Lopez who testified.  In addition to Mr. Lopez, you

12   also heard from Maria Pina.  These are people who were directly in the

13   area both before and during the intervention of the government.

14           And you also heard from Yasmin who testified, Yasmin

15   Rascon, and Jesus Rascon and Beatriz Pina.

16           What I would like to do then is examine some of this

17   testimony with you and then go through some of the things that you

18   did not hear.

19           If you'll recall you need to keep in mind that it is not my

20   client's burden but rather the government who needs to show you that

21   my client is guilty.  That's the constitutional protections that we have

22   and those are the constitutional protections that we have to abide by.

23           Now, first of all, let us examine the testimony of

24   Mr. Lopez.

25           Now, Mr. Lopez testified for you for quite some time.  I'm

1    not going to recount all of the testimony, but I can tell you that in the

2    cross-examination, I counted the number of times that he said he did

3    not remember or could not recall.  And that was 103 times he couldn't

4    remember.

5             Now, for a person who claims that this was a pivotal

6    time of his life and who had a year to prepare for this trial and who

7    had been meeting with government attorneys, not to remember is

8    important because it goes to the very credibility of his testimony.

9             Now, he testified to you about many things.  He testified

10   that he was in Veracruz.  He had two children.  That's important why?

11   Because he had been in the United States 11 years.  He professed to

12   love the children very much.  I don't doubt that he does.  But he only

13   went to Mexico once during that period of time he claims.  And he

14   stayed there for five months.

15            Now, when he testified we didn't hear that he had gone

16   with Karen, his wife, to Mexico.  We only heard that he had gone down

17   there and that he had come back into the United States.  Why is that

18   important?

19            Well, again, because I think that it is important because

20   it shows that Mr. Lopez' primary purpose is to be in the United States.

21   For whatever reasons he wants to be in the United States.  That's what

22   he wants.  That's what he must attain.

23            Now, he is an intelligent man, a very intelligent man.  I

24   asked him a question at one point and he said, "I don't know."  And by

25   the time I come back, he had told me that he didn't know about

1    something, but he had managed to avoid my primary question.  So

2    he's a man who carefully analyzed each word and tried to convey upon

3    you his story the way that he looked at it.

4            I think that once we put all the testimony together, we

5    can see whether or not it is true because many things that appear to

6    be true at the end may or may not be true.

7            Now, he stated as well that he had come to the United

8    States on several occasions and that he crossed through Agua Prieta,

9    that he hired coyotes before when he came in, and that, as Mr. Hormel

10   has told you, he managed not to pay -- ever not to pay.

11           We heard testimony that he has been here with a permit

12   since September of last year and he's been residing in Yavapai County.

13           Now, he's not working.  He said he hasn't worked.  You

14   and I know there's a lot of work to do.  You can work cleaning yards.

15   You can work doing different things, but he doesn't work.  He's a man

16   that is accustomed to living off his wits.  And he's accustomed not to

17   pay and not do certain things.

18           I think he saw an opportunity, a great opportunity when

19   he was at the house and he began to talk to Karen.  The opportunity

20   was for Karen to pay.

21           Now, there were two people that were there at the

22   house.  If you'll recall there was Yasmin, who had been there for about

23   a month who was never presented here, and that would be the young

24   woman whose photograph you saw countless times, and Mr. Lopez.

25           Now, Yasmin apparently was in trouble because she had

1    come from Mexico, according to the testimony of Maria Pina.  She had

2    come from Mexico and she was running away from her husband, didn't

3    have a place to go, and she remained there for 30 days.  And then it

4    was Mr. Lopez who was there.

5            At some point he was given the opportunity to use the

6    telephone.  Now, you heard the testimony of Ms. Pina.  She said that

7    he had access to the telephones.  That it was not -- it was something

8    that was not prohibited to him.  That he was treated like a family

9    member.  He had access to the phones.

10           So he called his wife, told her that he needed to pay the

11   $2,300.  He was going over to Yavapai County.  His wife said, "I don't

12   have any money."  I think he knew that his wife didn't have any

13   money and that she couldn't pay.

14           Once before if you'll recall, they had gone to Mexico for

15   five months.  They had come over he said -- Ms. Lopez said that they

16   had come over to Agua Prieta and there he had asked her to remain

17   with him.  Do you recall that testimony?  And she said, "No, I'm

18   leaving.  I'm getting out of here and I'm going back to the United

19   States."  She wanted to be in the United States.  He wanted to be in

20   the United States.

21           And Mrs. Lopez was not going to pay for this.  But all of

22   a sudden unbeknown to him, Mrs. Lopez was going to call the police

23   immediately.  Why?  Because I think that's a reasonable thing to do.

24   If you feel your husband or your loved one or anyone has been taken

25   by someone, you call the police.

1    He didn't know that.  He knew that she might pay.  And

2  asking for payment of her, she responded positively.  She said, "Yes, I

3  will pay for you."  So that was a good thing.

4    How was it that she responded?  Well, because she kept

5  asking, "Are you okay?  Is everything fine?"  So he knew that she was

6  concerned.  So he talked about that concern.  He spoke about that

7  concern.  It was important to him to speak of that concern.

8    I think that's what happened, ladies and gentlemen of

9  the jury.  I think that he managed to find a way to come to the United

10  States, remain in the United States and get his wife to pay.  He

11  thought his wife was going to pay.  If only she felt that he was

12  sufficiently threatened, then she would pay.  That's what happened.

13    In fact what was going on inside that trailer?  You saw

14  the numbers of phone calls, because Mr. Evans showed them to you,

15  beginning at 7:45 in the morning and ending at 5:45 in the afternoon,

16  a series of phone calls.  Mr. Lopez is consistently and constantly

17  speaking with his wife.

18    I believe there were seven or eight telephone calls.  A

19  total of 37 minutes.  Eight telephone calls.  Eight telephone calls, 37

20  minutes, in which he consistently spoke of his danger.  Because if you

21  increase the danger, she'll get the money.  Maybe she'll get it from the

22  church or some other place.

23    So all the telephone calls.  You saw the list of telephone

24  calls.  And that telephone number that belonged to Mrs. Lopez was

25  there several times, eight, nine times.  And it began with a 928.  Now,

1    perhaps he called some other people.  We don't know.  But we do

2    know that he was calling her.  He was trying to get the money.

3              What was going on inside the home?

4              Well, Maria Pina says, "We were getting ready to go to a

5    party."  And there is evidence of that.  There are children in the home.

6    She's combing her hair.  Yasmin Rascon is coming over and combing

7    her hair as well.  Going through those things because there's going to

8    be a party tonight.  We are going to go eat.  We are going to go out.  A

9    simple thing for a humble family to go out and have some food.

10             Now, the time when the police came is 7:30.  My client

11   is not there.  He has gone out.  He's not there.  You heard testimony

12   that when people were trying to get back into the neighborhood, they

13   were stopped by the police.

14             Now, the fact is my client wasn't there.  And Maria Pina

15   says, "We were getting ready to party."  And all of a sudden at 7:30,

16   things exploded.  Where was he?  He was in another room.  They were

17   alt together in the main room and he was in that small room.  And

18   Maria says that he was about to take a shower or he had just taken a

19   shower.  They had all taken showers.  They were getting ready to go

20   out.

21             Now, there are two scenarios here.  Please logically,

22   reasonably let's think about them.

23             When Yasmin Rascon was asked who was going to go to

24   the party, because she was there, remember, she was the young

25   woman who was hiding in the closet when the bombs went off, when

1   she was asked who was going to go to the party, she mentioned

2   everybody except Cesar and Yasmin.  She said, "I don't know if they

3   were going to go."  Maria Pina said that they were both going to go to

4   the party.

5              So there are two scenarios.  Either they were going to go

6   to the party or they were not and they were going to be left alone

7   there.  Those are the only two scenarios.

8              If they were going to be left alone, certainly they could

9   have walked out anytime they wanted to.  Interestingly enough, in the

10  direct evidence that we have, Mr. Cesar Lopez, through Julio, tells us

11  that he was left alone.  And he says, "Well, I didn't want to leave

12  because I was waiting for the telephone calls from my wife."

13             Now, that reenforces the circumstances of his case.  And

14  that is that he wanted to be safe in the United States.  He wanted to

15  be here and be assured that he was going to remain in the United

16  States.

17             If he left there's no such safety because border patrol

18  can pick him up, because anything can happen to you.  You don't know

19  the streets.  You don't know what is going on.  It's difficult for him to

20  get around.

21             We know that.  We also know because Maria Pina told us

22  that he was left alone several times, several times.

23             Now, you all have seen the charts that Mr. Evans has

24  given you.  And he says that there has to be some sort of force or

25  some sort of way to keep him there.  There wasn't.  He could have left

1    whenever he wanted to.  He didn't want to.  He didn't want to because

2    he wanted to be assured that he would be safely placed in Yavapai

3    County.

4              He could have left, as Mr. Hormel told you, at "la

5    brecha," waited for border patrol.  But that means that he would have

6    to go back to Mexico or he could have left when they arrived in Pima

7    County.  But, no, that was not something that he was interested in.

8    He wanted to -- like I said he wanted to be in a safe place.

9              Maria Pina gave testimony to you for quite some time.

10   She gave you the rundown of the house.  She told you what was

11   operative.  She told you what doors were being used.  She told you

12   whether or not they were locked, when they were locked, whether or

13   not the gentleman, Mr. Lopez, spent time with them watching TV or

14   doing something, whether or not the child had access to Mr. Lopez.

15             She told you as well that Yasmin, the other lady that

16   was there, that she went with her shopping and to see the mom and to

17   do different things.

18             And Beatriz, her mom, you recall her mom, she was very

19   nervous.  It is very difficult to give testimony in a trial.  It seems like

20   an easy thing.  Once you get up there, it's nerve-racking.  They were

21   very nervous.  You could tell they were nervous.

22             Mr. Lopez didn't appear to be very nervous.  But these

23   people were.  He might have been very nervous as well.  He needed to

24   go to the bathroom several times.

25             The fact is they all corroborated the fact that these

1    people were free to come and go.

2              Yasmin, again, when she testified before you, Yasmin

3    Rascon, she told you that the doors could be opened and were open all

4    the time.  And both Yasmin and Maria told you, you couldn't lock the

5    doors.  They had these things you could open them from the inside.

6    You couldn't be locked in the house.  You couldn't be locked in.  You

7    could get out.

8              The fact is he didn't want to get out.  He didn't want to

9    get out.

10             Now, the telephone call that was recorded, it bothers me

11   tremendously, not because it was a telephone call, but because there

12   was testimony in the form of a recording of the telephone call that

13   specifically targeted my client.  The voice exemplars they call them.

14             I think if you were in the same position, it's not right

15   and it is not fair.  Voices change.  Even Mr. Slagle corroborated that.

16   He said, "Well, you are the lawyer."

17             "Is it fair?" I said.  "Is it fair that these telephone calls

18   should target my client by himself?  Is it fair that they be suggestive

19   that he's the one that made that telephone call?  Is it fair that you

20   would record him time and time and time and time and time and time

21   again?"  And you heard it and time again.  He said, "Well, you're the

22   lawyer."

23             Who else testified?  No one else testified that was in the

24   house.  No one.

25             At the time of this incident, when the police came, or

1   before the time of the incident, you heard the testimony of Jesus

2   Rascon.  He wasn't at the house.  He was outside.  He told you what

3   happened to his mom.  He was in another mobile home.  And also

4   Beatriz.  Nobody else testified.  Mr. Ellis wasn't there.  He told you that

5   some of the things that he was talking about were speculation.  He

6   admitted to that.

7           Mr. Coldiron.  Mr. Coldiron testified that he went there.

8   Mr. Coldiron is a man that was following his orders and he was going

9   to go in and take these people out.  And if he was told there were 16

10  houses, he would have gone to 16 houses.  He was told five houses.

11  So he went to five homes.  He follows orders.

12          You heard the testimony of Karen Lopez, of course.  She

13  told you again what Mr. Lopez was telling her which I think fits within

14  my theory that he was exacerbating the situation and trying to make

15  her be nervous so that she would pay.  Unbeknown to him she was

16  already calling the police.

17          Now, who did not testify?  You heard the testimony

18  about different people here.  You heard Pelon.  You recall Pelon, the

19  guy in Mexico that Mr. Lopez met and all of that.  We never saw him.

20  He wasn't here.

21          How about German Chapo?  We saw the photograph of

22  German.  He was identified by Mr. Lopez as the person who was

23  making the telephone call to his wife when the recording was made

24  when it was being monitored.  He wasn't here.  He didn't testify for

25  you.

1          Did you hear the testimony of any other victim who

2   could corroborate what happened?  He testified that there were a

3   bunch of people there, five one night, two the other, Yasmin.  Yasmin

4   never came.  That is telling.

5          It is telling because it is the government's burden to

6   show you that he's guilty.  If they don't bring them over, there must

7   be a reason for it.  It's because they don't have the evidence.

8          Now, there were, as I said, countless telephone numbers

9   that were given to you.  And they said those telephone numbers

10  corresponded to different people who had either left or who had been

11  agreed upon for payment of some sorts.

12         And they want you to take these books at face value and

13  say those are the records and the ledgers that you need to examine

14  because those are records of those bad acts.

15         But in fact if they had those telephone numbers, and we

16  are talking about the United States government, I mean, they can

17  come over.

18         We gave them a list of witnesses one night.  And you

19  heard Mr. Slagle.  By the next morning they have all this information,

20  Social Security, DES, everything else about them immediately.

21         They could have got on the phone.  They had a year and

22  one month to verify those phone records, find any of the victims,

23  supposed victims, and bring them over to you, not because it would

24  make their case better, because it was their duty to show that my

25  client is guilty beyond a reasonable doubt, and because it is their

1   burden, their duty.

2   They didn't bring anybody, not a single person.  And in

3   addition to my client -- there is Karen Lopez' telephone number.

4   There were countless other telephone numbers, not one person.  So

5   we didn't hear from Pelon.  We didn't hear from German.  We didn't

6   hear from any other victim.

7   He said he met with a friend in Nogales, Sonora and that

8   friend took him to Pelon.  Did we hear from that person?  No.  Does

9   the United States government have the resources to bring that person

10   here?  I assure you, ladies and gentlemen, they have that and a lot

11   more.

12   If they can bring more than 100 agents to a site

13   preparing one afternoon, a helicopter and countless weapons and

14   personnel, they can certainly find one single person in 13 months.  He

15   wasn't here.

16   Why is that important?  It is important because they

17   need to bring him to you.  We don't have to.  We don't have to show

18   that we are innocent.  That's the difference between the burdens.  We

19   don't have to come over here and tell you and show you this is why we

20   are innocent.

21   My client has a right to remain silent and not to testify.

22   He has exercised that right.  And Your Honor has already told you that

23   he is within his rights and that you are not to take it in any way

24   against him.

25   The government does have to.  They do have to.

1    Now, he said there were guides.  No guides.  We heard

2    from no guides.

3    Weapons.  They said that there were weapons.  We don't

4    know if they were workable.  We heard the testimony of Mr. Slagle

5    who said he's not an expert whether or not they are workable

6    weapons.  Maria testified that .22 was not workable.  We don't know

7    anything about the .40 caliber.

8    I want you to keep in mind, please, that there were

9    some people who testified before you who have nothing to gain.  Like

10   Yasmin Rascon.  She said that she saw Mr. Lopez-Trujillo several times

11   at the house and he was never naked, never, never naked.

12   And the only other evidence we have of why he was

13   naked is Maria Pina's and his telephone call.  That's all that we have,

14   ladies and gentlemen of the jury.

15   Why he was naked is something that we are not going to

16   be able to get to the bottom of it, but we do have controverted

17   evidence of why he was naked.

18   Now, I wanted to show you the movie because I believe

19   that it would have been important for you to see again and to be

20   reminded again -- perhaps you can see it in the back.  I don't know --

21   of the place where this raid took place.

22   It is on Summit Road and another road.  It's called Dog

23   Patch, if you recall.  Who lives there?  Poor people live there.  Very

24   poor people.  And they live -- sometimes they live within the same

25   one or two blocks.  The blocks are not well delineated because it is a

1    place that has not been properly taken care of by the authorities of

2    Pima County.

3                Agent Coldiron came and testified of that area and what

4    it looks like.  It is an ugly place perhaps to you.  Perhaps my client

5    looks kind of ugly to you.  We are not here to judge him on how he

6    looks but if what he did was criminal.  But this is not a nice place.

7                Mr. Coldiron, I have to tell you, he's a very good man, a

8    very good officer.  And were I in a place where I needed help in South

9    America, Central America, and he said that he had worked in those

10   areas, I would want him to be there.

11               He reminds me of some captain that said, "I love the

12   smell of napalm in the morning."  He's just ready.  Gung-ho.  Ready to

13   go.  The problem is that he is doing it here in this country.  He would

14   be good working against terrorists.  But to have him here, let's face it,

15   he's not protecting our constitutional rights.  That's not his job.

16               Mr. Ellis is the one that should have protected our

17   constitutional rights when he went and submitted an affidavit saying

18   where and what places needed to be searched.  He didn't.  He didn't.

19               Now, this is, like I said, an ugly neighborhood, a poor

20   neighborhood.  But they had gone to this neighborhood.  And it's not

21   the first time they had gone to this neighborhood.  One day they will

22   come to mine.  One day they will come to yours.  We need to be aware

23   of that.

24               Because Dog Patch, although it is a throwback to

25   another -- it's like a page from 1984, that book.  You remember that

1  book 1984?  It is a segregated, typical Mexican-American

2  neighborhood.  That is who lives there.

3          And the citizens, each of them, have to prove that they

4  have papers.  Even though they are citizens.  Children included.  And

5  my papers are good.  They have to show not only they have papers

6  but that they are good.  The lawyer has to certify that those papers

7  are good.  Some lawyer.  Were you deported?  Were you not deported?

8          And who is going to complain in that area?  If something

9  happens in that area, who is going to complain?  If they don't have

10  papers, are they going to complain?  If they have papers, do they have

11  time to complain?  They seem to survive, these people.

12          Now, much was made of the testimony that my client

13  was taking care of horses and that supposedly he had a lot of money.

14  Mr. Evans kept insinuating he had a lot of money.  And Beatriz, Maria's

15  mom, came over and said, "We don't have money."  Don't think like

16  that.  "I have to help them all the time."  They are not people of

17  money.  That's not true.

18          But we saw a lot of children.  All of those children, they

19  are citizens of the United States.  And what are we leaving for them?

20  A legacy of officially sanctioned home breaks.  Really, that's what we

21  are doing.

22          It is easy to speak of the constitution in the abstract, but

23  when police or government infringes upon your rights, especially your

24  right to be free from illegal search and seizures, it becomes a living

25  document, something that we need to protect us.  The founding

1   fathers were protecting us against something real, not imagined.

2           You heard testimony based on opinion and emotion.

3   Lots of testimony.  They came and spoke of the bombs that went in

4   and the things that might have happened and the things that could

5   have happened.  But you are here to concentrate on the facts, the real

6   facts that you heard.

7           Opinion and facts are very different.  As the late Senator

8   Pat Moynihan used to say, "Everyone is entitled to their own opinion

9   but not to their own facts."

10          So the opinions are one thing.  Facts are another.  If we

11  concentrate on the facts and on the direct evidence concerning those

12  facts, we see that indeed there are controverted facts.  Sufficient

13  perhaps to find my client -- because he was in reckless disregard of

14  the fact that there was someone there, guilty only of having someone

15  that was illegally in his home, but not of hostage taking.  Certainly not

16  of conspiracy of hostage taking.

17          I think that once you look at the entirety of the

18  testimony, you will find with a dispassionate mind that

19  Mr. Lopez-Trujillo is a con man.  He's a man that has managed to get

20  from the United States a permit to be here legally in the United

21  States.  And he has managed to get that by claiming that he was

22  threatened.

23          But the evidence, the independent evidence doesn't

24  support that.  If it supported it, Yasmin, the young woman that was

25  there for 30 days, she would have come and testified to you.

1   　　　　　Please look at this case dispassionately.  And at the end

2   I'm asking you to bring a verdict of not guilty of conspiracy to do

3   hostage taking, not guilty of hostage taking, and guilty only of

4   reckless disregard of having someone who is illegally at his home.

5   That would be the young man, Cesar Lopez-Trujillo.

6   　　　　　Again, on behalf of my client, I want to thank you for

7   your time.

8   　　　　　THE COURT:  Ms. Kelly.

9   　　　　　MS. KELLY:  Let's cut to the chase.

10   　　　　　The defendants are not disputing the fact that Julio

11   Cesar was illegally here present in the United States.  The defendants

12   are not disputing the fact that their clients knew that Julio Cesar was

13   illegally present here in the United States.  They are not disputing the

14   fact that they concealed him.  That's not in dispute.

15   　　　　　What they are disputing is that the defendants seized or

16   detained Julio Cesar, they threatened to kill him and they did it for the

17   purpose of having Karen pay.

18   　　　　　So defense counsel, both of them, stand before you and

19   they say that you cannot make a decision.  You cannot find the

20   defendants guilty beyond a reasonable doubt based upon the word of

21   one person.  They say that Julio's testimony alone is not sufficient for

22   you to find the defendants guilty.

23   　　　　　Ladies and gentlemen, make no mistake about it, one

24   person's testimony who you believe beyond a reasonable doubt is

25   sufficient to find the defendants guilty.

1          In this case you have far more than just Julio Cesar's

2     testimony.  You have many, many pieces of corroborating evidence.

3     What that corroborating evidence does is it substantiates.  It is

4     additional secondary evidence that proves what Julio testified to.

5          First, we have the call, the monitored call.  You heard it.

6     In that call you heard Julio ask Karen for $2,300.  He said that if he

7     didn't pay, he was going to be killed.  Yes, they have guns.

8          When Julio Cesar was found and freed at 7:30 p.m. on

9     September 24th, he was in his underwear.  7:30 p.m., the only person

10    in that trailer, in his underwear.

11         When he sat down and he testified, he explained that his

12    underwear were the only things that he was left with, the only clothes

13    he had because the defendants had taken his clothes.  They took his

14    clothes to keep him there to keep him from escaping in order so he

15    could keep calling Karen and they could get their money so they could

16    get paid, so the organization could get paid.

17         What else?  The guns.

18         Found in that trailer were the two guns that Julio Cesar

19    had testified about.  That black and silver semiautomatic that had the

20    laser sight just as he had explained.  Also, the other black

21    semiautomatic gun.  Both found in that small trailer.  More

22    corroborating evidence.

23         The notebooks, ledgers.

24         We have talked and explained what those ledgers are all

25    about.  The bookkeeping function they serve within these smuggling

1    operations.  I'm not going to go through them in detail.

2              When you go back to the jury deliberation room, you'll

3    have them and can look through them.  You can see the phone

4    numbers, the numerical amounts and the names.  You'll see Carlos'

5    name on the front.  Inside you will also see Yuris Bonilla-Guizar's full

6    name written inside that ledger.

7              Bars on the windows.

8              Julio explained that he was too frightened he didn't even

9    look out the window.  Had he?  Bars on the windows in order to keep

10   him from escaping, to keep him contained.

11             When BORTAC went in, where was Yuris Bonilla?  Hiding

12   under the bed.  Was there anybody else hiding under any beds?  He

13   was hiding under the bed.

14             The call logs.

15             You have them and you can match them.  You'll see they

16   are color coded.  They highlight the names from the ledger and the

17   calls -- the outgoing calls from the cell phone that were found inside

18   the trailer.

19             Pictures.

20             Maria Pina testified to the pictures that she took on the

21   evening of September 24th.  Staged pictures.  That too is

22   corroborating evidence.  We will get into it a little more in a minute.

23             Also, where were Julio's clothes?  At any point in any of

24   the pictures or in any of the testimony, did we see Julio's clothes?  The

25   testimony was they were taken from him.  They weren't found.

1              Defense counsel has made mention of people who --

2              MR. ROMO VEJAR:  Your Honor, we move to strike that

3    remark.  I don't believe there was any evidence regarding Julio's

4    clothes disappearing.  It was their burden to show that.

5              THE COURT:  It is argument.  The jury will rely upon

6    their own recollection of what the evidence is in this case.

7              If the evidence as stated by the lawyers is different from

8    what you recollect, it's your recollection that matters in this case.

9              MS. KELLY:  Defense counsel has made mention of

10   people who didn't testify, individuals who you didn't hear from.  Now,

11   let me make something absolutely clear.  The defendants have

12   absolutely no burden.  Let me say that again.  The defendants have

13   absolutely no burden of proof.  They don't even have to be here.  But

14   they do have subpoena power.  They have the ability to issue

15   subpoenas to force people to come before you and testify.

16              Defense counsel spoke for a fair bit of time about Maria

17   Pina, about Yasmin Rascon.  So the question is:  Who are these

18   women?

19              They both met in middle school.  They both came in here

20   yesterday and testified that they knew Julio Cesar, that they had met

21   him on the 22nd.  He was staying in Carlos and Maria's trailer.  They

22   said that he watched TV.  He ate cake, birthday cake, and that he was

23   going to go out with the clan.

24              Maria Pina said he would go out with the family for the

25   little two-year-old Carlos Calixtro's birthday.

1         When you gauge credibility, you apply the standards

2    that you would in your normal everyday life.  You look at motive,

3    motivations to lie, bias.  You look at inconsistencies.

4         In a couple of moments, the judge is going to read to

5    you the law.  In particular he's going to read you about how you can

6    gauge credibility.  Some of the things you can look at: memory,

7    manner while testifying, a witness' interest in the outcome of the case,

8    bias or prejudice, whether or not evidence is contradicted.

9         I ask you to think about those things because the

10   question that you have to determine is:  Who is telling the truth and

11   who is lying?

12        The evidence that has come from that witness stand has

13   had contradictions.  The evidence that came from Maria Pina and

14   Yasmin Rascon was different than the evidence you heard from Julio.

15   Julio testified for over a day and a half.  He was asked hundreds of

16   questions.

17        And defense counsel has suggested to you that you can't

18   believe him, that he is lying.  They have suggested to you that you

19   can't believe him because some point years ago he used somebody

20   else's Social Security number, somebody else's name in order to cash

21   a check.

22        They have suggested to you that you can't believe him

23   because he didn't know the date that he first arrived at the trailer.

24   They have also suggested to you you can't believe him because he

25   feels responsible for a BORTAC operation.

1           Ladies and gentlemen, what you have to ask yourself:

2    Is there a reason to disbelieve his testimony?  Does it surprise you

3    that an individual who is living here in the United States illegally for

4    11 years would have an occasion to use somebody else's Social

5    Security and name to cash a check?  Does that surprise you?  Does

6    that give you a reason to disbelieve his testimony?

7           Julio testified on that point.  He said that's what us

8    illegal people do when you have to cash a check.  Defense counsel has

9    suggested that he was given things.  Promised things for his

10   testimony.

11          What we know is that Julio was permitted to stay here to

12   testify.  He was given a work visa and able to stay until after the trial.

13   He testified to that.  Was there any other testimony about any

14   promises made or things given to him?  No.

15          Defense counsel suggested that somehow him going to

16   Catholic Social Services is some promise or benefit he's getting from

17   the government.  There is no evidence of that.  None at all.  Him going

18   to Catholic Social Services to see if they could fill out paperwork,

19   which hasn't resulted in anything, no evidence.

20          So now let's take a moment and talk about Maria Pina

21   and Yasmin Rascon and their bias.

22          Maria Pina testified she has been dating Carlos Calixtro

23   for five years.  They have been living together for three years.  She's

24   financially dependent.  She relies upon him for food, shelter, clothes.

25   She loves him.  She doesn't want to see anything happen to him.  In

1   fact they have a two-year-old together; a two-year-old she has named

2   after him, Carlos Calixtro.

3          All of those factors go to motive and bias, things that

4   you can gauge and look at in terms of whether or not you find them to

5   be credible.

6          Other things.  Contradictions.

7          Maria Pina, Yasmin Rascon, were they contradicted by

8   other evidence?

9          The ants.

10         Police testified that there was no -- nothing they heard

11   about ants being under a tree, nothing they saw.  EMTs, we heard

12   from Sean Coldiron, said nobody was treated.

13         And, ladies and gentlemen, when you go back into the

14   jury deliberation room, you also take back your common sense.

15         When was the last time based upon common sense that

16   you have seen an active anthill at night?

17         Kneeling.  The women testified they were made to kneel

18   for hours.  But we know, based on the testimony of all the police -- the

19   law enforcement that were there, that that didn't happen and wouldn't

20   happen.  And it wouldn't happen for a reason.  It wouldn't happen

21   because it's a security breach.  It's a concern.  It would make a scene

22   unsafe.  Therefore, it wouldn't happen and it didn't happen.

23         Maria Pina also testified that her child was riding a bike

24   near the entryway when the BORTAC team came in.  Was that

25   evidence contradicted?  Sean Coldiron came in this morning and

1   testified that in fact the minute they walked in, they could see the

2   children were seated on the couch and the TV was on.

3                    What other evidence of contradiction do we know about?

4                    The photos.  The photos that Maria Pina took in the

5   hours after BORTAC left.  She took the pictures of the purple room, the

6   master bedroom, the bathroom.  She took pictures of the entryway.

7   She took pictures of the children's pictures on the ground.

8                    So what do those pictures show?  Why did she do that?

9   What's the purpose of it?

10                   Even in the hours immediately after Julio Cesar was

11  freed, immediately after he was rescued, Maria Pina was acting to

12  protect her boyfriend, taking pictures of a scene that was fictionalized,

13  different than how the police left it.  But she came in here and

14  testified that is how the police left it.

15                   Based upon common sense, what is Maria Pina doing to

16  protect her boyfriend?

17                   Yasmin Rascon talked about her motive, her bias,

18  reasons to not tell the truth.

19                   Been best friends since they were in middle school

20  together.  She also said that she was in the trailer and she saw Julio

21  there for two days but she never spoke to him.

22                   Is that reasonable?  Reasonable given the

23  circumstances?  Reasonable if she knew that he was a person being

24  held, held hostage?  Would that be reasonable if that was a guest in a

25  home?  Reasonable if that was a social friend, somebody just there to

1   crash for a couple of days?  I suggest to you based on the evidence

2   that is not reasonable.

3                And it goes on.

4                Beatriz, Maria Pina's mom.  Obviously her daughter is in

5   love with Carlos Calixtro.  They have a child together.

6                One of the things that you also can take into

7   consideration when gauging somebody's credibility is how they

8   behaved when they testified.

9                Beatriz was asked, "What does Carlos do for a living?"

10  And she stopped.  She cried.  She testified that she had come over for

11  cake that day and she hadn't seen Julio, even though her daughter

12  had testified that Julio was there enjoying cake.

13                Inconsistencies.  Inconsistencies that are probative on

14  how you gauge the credibility and testimony of witnesses.

15                Then there was Jesus, the child that came in.  What he

16  testified to was he said his mom had her head hit.  We talked to the

17  agents and they said they didn't hear anything about that, but they

18  would have.  He said he had never been inside the trailer.  He didn't

19  know what was going on.

20                We heard from the neighbor.  Defense counsel called the

21  neighbor.  The neighbor really just testified to the ants.  He testified

22  that he himself didn't say anything, didn't give the police permission,

23  but there is no word about whether or not his daughter did.  The

24  question is:  Is that material or probative?

25                Let's talk about the ants.

1          I don't mean to diminish in any way the pain that a bite

2   from a red ant would cause.  But, ladies and gentlemen, if there were

3   bites on the ladies by red ants, don't you think Maria Pina would have

4   taken a picture of it?

5          Defense counsel has said a number of things about Julio.

6   Both of them have talked about the fact that he didn't like school so

7   he dropped out.  Mr. Romo talked about the fact that he has two kids

8   that he says he loves but he only visited them twice.  Mr. Hormel

9   talked about the fact that he has been here in the United States for 11

10   years but he has never owned a home.

11          So what is the purpose of bringing that up?  What's the

12   purpose of asking questions like that?

13          The reason the defense counsel is asking those

14   questions is to make you feel that Julio deserved what happened to

15   him.  Let me say that again.  The reason why defense counsel is

16   asking those questions is to make you feel that Julio Cesar deserved

17   what happened to him.

18          It's a principle called jury nullification.  And what it

19   means is when a jury decides not to follow the law because of some

20   personal bias.

21          What defense counsel is saying to you is who cares what

22   the defendants did to Julio because Julio is illegal.  They are hoping

23   against hope that you don't hold the defendants accountable because

24   you dislike who Julio is, an illegal alien.  They are hoping that you

25   dislike his position in our community so much that you refuse to follow

1     the law.

2              There are a lot of tragic figures in our community, a lot

3     of people from desperate circumstances.  Despite the defendants'

4     cruelty, they are still protected by our laws.

5              Ladies and gentlemen, when you came in, you took an

6     oath.  It's an oath to follow the law despite any bias.

7              The laws in this community protect equally victims of

8     crime regardless of whether or not the victim is a Hollywood actress or

9     corporate CEO or illegal alien.

10             Defense counsel also talked about the BORTAC

11    operation.  They said that should only happen in Third World countries,

12    other countries, not our country.  We shouldn't live in a country where

13    we need hostage rescue teams.  Well, based on the evidence, we do.

14             Even if you think that BORTAC went too far, that they

15    didn't do the right procedure or operation with how they acted when

16    they went to 9950 South Oak Canyon Lane, if you believe Julio beyond

17    a reasonable doubt, your remedy, if you dislike how BORTAC

18    conducted their operation, is not to find the defendants not guilty.

19             Your remedy, if you disagree with how BORTAC

20    conducted their operation, is to write a letter to the paper, write a

21    letter to law enforcement, write a letter to the attorney general or the

22    president and express your dislike with how they conducted the

23    operation.

24             It's not to find the defendants not guilty.

25             When you go back to the jury deliberation room --

1   defense counsel got up and conceded, Mr. Romo got up and conceded

2   that his client is guilty of harboring.  When you go back, you are given

3   jury forms.  They are verdict forms.

4        How they read is:  If you find the defendant guilty of

5   harboring, you go on to a part B.  It is a second question.  And it says:

6   Do you find proven to you beyond a reasonable doubt that the

7   defendant committed this crime for commercial advantage?

8        So after you decide whether they are guilty of harboring,

9   go on to the next step.  Do you find that it was done for the purpose of

10   commercial advantage?

11        Based upon the evidence that has come from the witness

12   stand, Julio's testimony, the monitored phone call, the operation of the

13   organization, they are in this to make money.

14        It is written in the ledgers.  The evidence has proven to

15   you beyond a reasonable doubt that indeed that was the purpose for

16   it, commercial advantage.

17        There is also another part of that verdict form.  And what

18   it says is:  If you find the defendants guilty of harboring, do you find

19   that they put Julio Cesar's life in jeopardy?  And do you find that

20   proven to you beyond a reasonable doubt?

21        Ladies and gentlemen, based on the evidence that came

22   from this witness stand, it is clear that when they held that gun to

23   him, they threatened to kill him, that's exactly what they did.

24        Julio came in here and he testified.  Defense counsel say

25   he's just one witness.  Make no mistake about it.  The defendants

1    designed this crime.  They designed this crime so that the only person

2    who could walk in here and testify and tell you what happened to him

3    was an illegal alien.

4              MR. ROMO VEJAR:  Objection, Your Honor.

5              THE COURT:  Overruled.  It's argument, Mr. Romo.

6              MS. KELLY:  A man who had snuck into this country

7    without proper identification.  The defendants picked him as their

8    victim for a reason.  They picked him because he's illegal.  He's not

9    going to tell.

10             They knew that if for some reason he did tell, if the

11   police showed up, they had set the scene.  They had the women.  The

12   women who they can parade in here and call him a liar.  The

13   defendants decided when and where and before whom this crime

14   would happen.

15             It's a hostage taking.  It didn't happen in a church.  It's

16   not that there were nuns or priests there to watch.  The defendants

17   designed this crime and they determined who the witnesses would be.

18   And they picked Julio to be that one voice hoping that if they ever

19   ended up in a place like this, in a courtroom like this, that they could

20   ask you to do just what Maria Pina and Yasmin Rascon had done, to

21   turn a blind eye and to walk away.

22             Ladies and gentlemen, based upon the evidence, we are

23   asking you to not do what Maria Pina and Yasmin Rascon did.  We are

24   asking you to tell the defendants no and to find them guilty.

25             Thank you.

1          MR. HORMEL:  Your Honor, I have a motion to strike the

2    portion of the argument that impugned my motivation --

3          THE COURT:  Thank you.  You may be seated, sir.

4          Members of the jury, now that you have heard all the

5    evidence, it is my duty to instruct you on the law that applies to this

6    case.  A copy of these instructions will be available in the jury room for

7    you to consult.

8          It is your duty to weigh and to evaluate all the evidence

9    received in the case and, in that process, to decide the facts.  It is also

10   your duty to apply the law as I give it to you to the facts as you find

11   them whether you agree with that law or not.

12         You must decide the case solely on the evidence and the

13   law and must not be influenced by any personal likes or dislikes,

14   opinions, prejudices or sympathy.  You will recall that you took an oath

15   promising to do so at the beginning of the case.

16         You must follow all these instructions and not single out

17   some and ignore others.  They are equally important.  Do not read into

18   these instructions or into anything I have said or done any suggestion

19   as to what verdict you should return.  That is a matter entirely up to

20   you.

21         The defendants are charged in Count 1 of the indictment

22   with conspiring to detain an alien who was here illegally in the United

23   States in violation of Section 1203(a) of Title 18 of the United States

24   Code.

25         In order for the defendants to be found guilty of that

charge, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning from a date unknown to on or about September 24, 2010 (sic), there was an agreement between two or more persons to commit the crime of hostage taking as charged in Count 2 of the indictment;

Second, the defendants became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it;

Third, the defendant willfully and knowingly became a member of the conspiracy whose purpose was to compel or attempt to compel a third person to act in some way or to refrain from acting in some way as an explicit or implicit condition for the release of the person detained.

A conspiracy is a kind of criminal partnership; an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful. It does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.

It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways or perhaps helped one another. You must find there was a plan to commit the crime alleged in Count 2 of the indictment as an object of

the conspiracy with all of you agreeing as to the particular crime which
the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully
participating in the unlawful plan with the intent to advance or further
some object or purpose of the conspiracy, even though the person
does not have full knowledge of all the details of the conspiracy.

Furthermore, one who willfully joins an existing
conspiracy is as responsible for it as the originators.  On the other
hand, one who has no knowledge of a conspiracy but happens to act in
a way which furthers some object or purpose of the conspiracy does
not thereby become a conspirator.

Similarly, a person does not become a conspirator
merely by associating with one or more persons who are conspirators
nor merely by knowing that a conspiracy exists.

A conspiracy may continue for a long period of time and
may include the performance of many transactions.  It is not
necessary that all members of the conspiracy joined it at the same
time, and one may become a member of a conspiracy without full
knowledge of all the details of the unlawful scheme or the names,
identities or locations of all the other members.

Even though a defendant did not directly conspire with
the other defendant in the overall scheme, the defendant has in effect
agreed to participate in the conspiracy if the government proves each
of the following beyond a reasonable doubt:

One, that the defendants directly conspired with one or

1  more conspirators to carry out at least one of the objects of the

2  conspiracy;

3  Two, the defendants knew or had reason to know that

4  other conspirators were involved with those with whom the defendant

5  directly conspired; and

6  Three, the defendant had reason to believe that

7  whatever benefits the defendant might get from the conspiracy were

8  probably dependent upon the success of the entire venture.

9  It is not a defense that a person's participation in a

10  conspiracy was minor or for a short period of time.

11  The defendants are charged in Count 2 of the indictment

12  with taking a person hostage in violation of Section 1203(a) of Title 18

13  of the United States Code.

14  In order for the defendants to be found guilty of that

15  charge, the government must prove each of the following elements

16  beyond a reasonable doubt:

17  First, the defendants intentionally seized or detained a

18  person;

19  Second, the defendants threatened to kill, injure or

20  continue to detain that person; and

21  Third, the defendants did so with the purpose and

22  intention of compelling a third person to act or refrain from acting in

23  some way as an explicit or implicit condition for the release of the

24  seized or detained person.

25  A person is "seized" or "detained" when the person is

held or confined against his or her will by physical restraint, fear or

deception for an appreciable period of time.

The fact that the person may initially agree to

accompany the hostage taker does not prevent a later "seizure" or

"detention."

The defendants are charged in Count 3 of the indictment

with harboring of an alien in violation of Section 1324(a)(1)(A)(iii) of

Title 8 of the United States Code.

In order for the defendants to be found guilty of that

charge, the government must prove each of the following elements

beyond a reasonable doubt:

First, Julio Cesar Lopez-Trujillo was an alien;

Second, Julio Cesar Lopez-Trujillo was not lawfully in the

United States;

Third, the defendants knew or acted in reckless

disregard of the fact that Julio Cesar Lopez-Trujillo was not lawfully in

the United States;

Fourth, the defendants harbored, concealed or shielded

from detection Julio Cesar Lopez-Trujillo for the purpose of avoiding

his detection by immigration authorities.

If you find the above elements are proven beyond a

reasonable doubt, then you must decide whether the government has

proven beyond a reasonable doubt that, one, the defendants

committed this offense for the purpose of private financial gain and,

two, the defendants, during the commission of this offense, did place

1  in jeopardy the life of Julio Cesar Lopez-Trujillo, an alien.

2       An alien is a person who is not a natural-born or

3  naturalized citizen of the United States.  An alien is not lawfully in this

4  country if the person was not duly admitted by an immigration officer.

5       A defendant may be found guilty of harboring an illegal

6  alien for profit even if the defendant personally did not commit the act

7  or acts constituting the crime but aided and abetted in its commission.

8       To prove a defendant guilty of aiding and abetting, the

9  government must be able to prove beyond a reasonable doubt:

10       First, harboring of an illegal alien for profit was

11  committed by someone;

12       Second, the defendant knowingly and intentionally

13  aided, counseled, commanded, induced or procured that person to

14  commit each element of harboring an illegal alien for profit; and

15       Third, the defendant acted before the crime was

16  completed.

17       It is not enough that the defendant merely associated

18  with the person committing the crime or unknowingly or intentionally

19  did things that were helpful to that person or was present at the scene

20  of the crime.

21       The evidence must show beyond a reasonable doubt that

22  the defendant acted with the knowledge and intention of helping that

23  person commit harboring of an illegal alien for profit.

24       The government is not required to prove precisely which

25  defendant actually committed the crime and which defendant aided

1    and abetted.

2              The indictment is not evidence.  The defendants have

3    pleaded not guilty to the charges.  The defendants are presumed to be

4    innocent unless and until the government proves the defendants guilty

5    beyond a reasonable doubt.

6              In addition the defendants do not have to testify or

7    present any evidence to prove innocence.  The government has the

8    burden of proving every element of the charges beyond a reasonable

9    doubt.

10             A defendant in a criminal case has a constitutional right

11   not to testify.  You may not draw any inference of any kind from the

12   fact that the defendant did not testify.

13             Proof beyond a reasonable doubt is proof that leaves you

14   firmly convinced the defendant is guilty.  It is not required that the

15   government prove guilt beyond all possible doubt.  A reasonable doubt

16   is a doubt based upon reason and common sense and is not based

17   purely on speculation.  It may arise from a careful and impartial

18   consideration of all the evidence or from lack of evidence.

19             If after a careful and impartial consideration of all the

20   evidence, you are not convinced beyond a reasonable doubt that the

21   defendant is guilty, it is your duty to find the defendant not guilty.

22             On the other hand, if after a careful and impartial

23   consideration of all the evidence, you are convinced beyond a

24   reasonable doubt that the defendant is guilty, it is your duty to find

25   the defendant guilty.

1    The evidence you are to consider in deciding what the
2 facts are consists of:
3    One, the sworn testimony of any witness;
4    Two, the exhibits received into evidence; and
5    Three, any facts to which the parties have agreed.
6    In reaching your verdict you may consider all the
7 testimony and exhibits received in evidence.  The following things are
8 not evidence and you may not consider them in deciding what the
9 facts are:
10    One, questions, statements, objections and arguments
11 by the lawyers are not evidence.  The lawyers are not witnesses.
12 Although you must consider a lawyer's question to understand the
13 answers of a witness, the lawyer's questions are not evidence.
14    Similarly, what the lawyers have said in their opening
15 statements, in their closing arguments and at other times is intended
16 to help you interpret the evidence but it is not evidence.  If the facts
17 as you remember them differ from the way the lawyers state them,
18 your memory of them controls.
19    Two, any testimony that I have excluded or stricken or
20 instructed you to disregard is not evidence.  In addition some evidence
21 was received only for a limited purpose.  When I have instructed you
22 to consider certain evidence in a limited way, you must do so.
23    Three, anything you have seen or heard when the court
24 was not in session is not evidence.  You are to decide the case solely
25 on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:

One, the witness' opportunity and ability to see or hear or know the things testified to;

Two, the witness' memory;

Three, the witness' manner while testifying;

Four, the witness' interest in the outcome of the case, if any;

Five, the witness' bias or prejudice, if any;

Six, whether other evidence contradicted the witness' testimony;

Seven, the reasonableness of the witness' testimony in

1   light of all the evidence; and

2            Eight, any other factors that bear on believability.

3        The weight of the evidence as to a fact does not

4   necessarily depend on the number of witnesses who testify.  What is

5   important is how believable the witnesses were and how much weight

6   you think their testimony deserves.

7            You are here only to determine whether the defendants

8   are guilty or not guilty of the charges in the indictment.  The

9   defendants are not on trial for any conduct or offense not charged in

10  the indictment.

11           You have heard testimony that the defendant made a

12  statement.  It is for you to decide whether the defendant made the

13  statement and, if so, how much weight to give to it.  In making those

14  decisions, you should consider all the evidence about the statement,

15  including the circumstances under which the defendant may have

16  made it.

17           An act is done knowingly if the defendant is aware of the

18  act and does not act or fails to act through ignorance, mistake or

19  accident.  The government is not required to prove that the defendant

20  knew that his acts or omissions were unlawful.  You may consider

21  evidence of the defendant's words, acts or omissions, along with all

22  the other evidence, in deciding whether the defendant acted

23  knowingly.

24           Mere presence at the scene of a crime or mere

25  knowledge that a crime is being commited is not sufficient to establish

that the defendant committed the crime of hostage taking and harboring of an illegal alien for profit.  The defendant must be a participant and not merely a knowing spectator.  The defendant's presence may be considered by the jury along with the other evidence in the case.

A separate crime is charged against one or more of the defendants in each count.  The charges have been joined for trial.  You must decide the case of each defendant on each crime charged against that defendant separately.  Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.

All the instructions apply to each defendant and to each count unless a specific instruction states that it applies only to a specific defendant or count.

The Spanish language has been used during this trial.  The evidence you are to consider is only that provided through the official court interpreters.  Although some of you may know the Spanish language, it is important that all jurors consider the same evidence.  Therefore, you must accept the evidence presented in the English interpretation and disregard any different meaning.

You have heard testimony of eyewitness identification.  In deciding how much weight to give to this testimony, you may consider the various factors mentioned in these instructions concerning credibility of witnesses.

In addition to those factors, in evaluating eyewitness

1    identification testimony, you may also consider:

2              One, the capacity and opportunity of the eyewitness to

3    observe the offender based upon the length of time for observation

4    and the conditions at the time of observation, including lighting and

5    distance;

6              Two, whether the identification was the product of the

7    eyewitness' own recollection or was the result of subsequent influence

8    or suggestiveness;

9              Three, any inconsistent identifications made by the

10   eyewitness;

11             Four, the witness' familiarity with the subject identified;

12             Five, the strength of earlier and later identifications;

13             Six, lapses of time between the event and the

14   identifications; and

15             Seven, the totality of the circumstances surrounding the

16   eyewitness' identification.

17             You have heard testimony from persons who because of

18   education or experience are permitted to state opinions and the

19   reasons for their opinions.

20             Such opinion testimony should be judged like any other

21   testimony.  You may accept it or reject it and give it as much weight

22   as you think it deserves considering the witness' education and

23   experience, the reasons given for the opinion and all the other

24   evidence in the case.

25             Now, there is 13 of you in the jury box and only 12 of

1    you can deliberate this case to a verdict.  So one of you is an alternate

2    juror.  That juror is Number -- am I correct?  That juror is Number 49.

3              Juror Number 49, you have completed your work at this

4    point.  You are going to be excused at this point.  Give your notebook

5    and your instructions to the clerk.

6              I want to thank you for your work here.  I realize we

7    took a lot of your time.  As I said it was a very important matter, a

8    jury trial.  I thank you for your service here.

9              MS. KELLY:  Judge, can we approach just for a second?

10             (At sidebar.)

11             MS. KELLY:  Do we want to give an instruction that she

12   can be called back in?

13             THE COURT:  No.

14             MS. KELLY:  On page 2 it said, "2010."  Page 2 line 8 of

15   the jury instructions is 2009.

16             THE COURT:  I'm sorry.  Let me look at that again.

17             (In open court.)

18             THE COURT:  Ladies and gentlemen, I made an error on

19   page 2 of your instructions.  If you would make that correction.  You

20   will get the correct information on the indictment.

21             But, nonetheless, on the second paragraph, it says,

22   "First beginning from a date unknown to on or about September 24,

23   2010."  That should be 2009, not 2010.  If you could change that to

24   2009.  That will also be consistent with the indictment which you will

25   receive and take with you into the jury room.

1     Now, when you retire you should elect one member of

2     the jury as your foreperson.  That person will preside over the

3     deliberations and speak for you here in court.

4     You will then discuss the case with your fellow jurors to

5     reach agreement if you can do so.  Your verdict, whether guilty or not

6     guilty, must be unanimous.

7     Each of you must decide the case for yourself, but you

8     should do so only after you have considered all the evidence,

9     discussed it fully with the other jurors and listened to the views of

10    your fellow jurors.

11    Do not be afraid to change your opinion if the discussion

12    persuades you that you should.  Do not come to a decision simply

13    because other jurors think it is right.

14    It is important that you attempt to reach a unanimous

15    verdict but, of course, only if each of you can do so after having made

16    your own conscientious decision.  Do not change an honest belief

17    about the weight and effect of the evidence simply to reach a verdict.

18    Your verdict must be based solely on the evidence and

19    the law as I have given it to you in these instructions.  However,

20    nothing I have said or done is intended to suggest what your verdict

21    should be.  That is entirely for you to decide.

22    Some of you have taken notes during the trial.  Such

23    notes are only for the personal use of the person who took them.

24    The punishment provided by law for this crime is for the

25    court to decide.  You may not consider punishment in deciding

1  whether the government has proved its case against the defendant

2  beyond a reasonable doubt.

3  After you have reached a unanimous agreement on a

4  verdict, your foreperson will fill in the form that has been given to you,

5  sign and date it and advise the bailiff outside your door you are ready

6  to return to the courtroom.

7  MR. HORMEL:  There were two separate ones.

8  THE COURT:  There should be two verdict forms,

9  separate verdict forms.  There are separate verdict forms as to each

10  individual here.  As to Mr. Bonilla there is a verdict form and Mr.

11  Calixtro there is a verdict form.  You have to decide their case

12  separately as you were told.

13  Now, the verdict forms will read as follows:

14  We, the jury, find the defendant, and then it will have

15  the name of one or the other either, Mr. Bonilla or Mr. Calixtro, and

16  then it says, Count 1, and it says -- it has a blank, of conspiracy to

17  commit hostage taking as charged in Count 1 of the superseding

18  indictment.

19  Then for that matter you would fill in either not guilty or

20  guilty into that line.

21  Count 2, as to each defendant.  We, the jury, find the

22  defendant, you fill in the blank line, whether guilty or not guilty, and

23  continue to detain Julio Cesar Lopez-Trujillo, an alien, as charged in

24  Count 2 of the superceding indictment.

25  Then go on to Count 3.  The same thing as to each

1  defendant.  And then in there, once you make your decision, you fill in

2  that line there either not guilty or guilty of knowingly harboring an

3  alien, Julio Cesar Lopez-Trujillo, as charged in Count 3 of the

4  superseding indictment.

5          That one has two questions after it asks you to make

6  your verdict.  It says, "If your verdict is guilty as to Count 3, please

7  answer the following questions.  If your verdict is not guilty as to

8  Count 3, please do not answer the following questions."

9          So you answer the questions only if you find the

10  defendant, whichever defendant you are dealing with, guilty.  And this

11  is what the questions are:

12          We, the jury, find the defendant, and it has the name of

13  the defendant, did commit the crime of harboring an alien, Julio Cesar

14  Lopez-Trujillo, for the purpose of commercial advantage or private

15  financial gain.  Then it says yes or no.

16          And if that was proven beyond a reasonable doubt, then

17  you put either yes or no whether that was proven beyond a reasonable

18  doubt if that is your finding.  If you don't find it was proven, then you

19  put no.

20          Then we go on to the next question.  It says, we, the

21  jury, find the defendant, it has the name of the defendant, during the

22  commission of this offense did place in jeopardy the life of Julio Cesar

23  Lopez-Trujillo, an alien.

24          If you find this has been proven beyond a reasonable

25  doubt, you mark yes.  If you do not find that it has been proven, then

1    you mark no.

2            Then your presiding juror will put your number.  You

3    don't have to sign.  It says signature or number.  But just put your

4    number on there.  And then date it and then let the bailiff know that

5    you are ready to come back into the courtroom.

6            Now, the bailiff has changed and will change again

7    probably by the end of the day.  It is Ms. Cathy Schwader, who is the

8    deputy courtroom clerk.  She will be acting as the bailiff for probably

9    the rest of the day.

10           Counsel, on your counsel table do you have the

11   superseding indictment?  That is going to the jury.

12           So, ladies and gentlemen, when you go to the jury room

13   to deliberate, you will have the following items with you:

14           You will have the verdict form which I just read to you --

15   verdict forms.  There is two of them.  You will have -- take your set of

16   instructions, your individual set of instructions, take that with you.

17   Take any notes that you took.  Take that with you.

18           And it will take us a little while to get all the exhibits

19   together.  Those will go into you once we get all the exhibits together.

20   Then you'll get a copy of the indictment.  That will also go into you.

21           If you have already started discussing this case,

22   deliberating this case when Ms. Schwader goes in there to take the

23   exhibits with you, stop until she leaves the room.  Only the 12 of you

24   should be together when you deliberate this case.

25           Also, if one of you takes a break to go to get a drink of

1    water or go to the bathroom, the rest of you stop until that person

2    comes back.  All of you need to hear each other's discussions in order

3    to reach a fair and just verdict in this case.

4              So at this time we will excuse you to begin your

5    deliberations.

6              (The jury was excused at 3:37 p.m.)

7              THE COURT:  The record will reflect the jury has

8    withdrawn, counsel and defendants are present.

9              Ms. Kelly, I made that correction as to the instructions.

10             Do you have any other record you wish to make at this

11   time?

12             MS. KELLY:  No, Your Honor.  Thank you.

13             THE COURT:  Mr. Hormel, you had started to make a

14   motion.  I stopped you because I felt that was a motion that needed to

15   be made outside the presence of the jury.

16             Do you wish to continue with your motion at this time?

17             MR. HORMEL:  Yes, I do.  It's a relatively serious matter.

18             Counsel for the government in rebuttal argument made

19   reference to motivations of defense counsel as a part of her argument.

20   She said that defense counsel engaged in jury nullification and that

21   defense counsel engaged in certain arguments in order to try to

22   convince the jury.

23             That is absolutely improper, Your Honor.  Impugning the

24   motivations of defense counsel is not proper argument.  It's

25   misconduct.

1          To suggest -- my argument in no way had anything to do

2   with jury nullification.  I stuck to the facts, the credibility of the

3   witnesses.  At no time did I ever suggest to the jury that they should

4   ignore the evidence or that they should make -- find -- make a finding

5   that is in spite of the evidence.

6          You know, to suggest to the jury that what I said and

7   what I did to that jury was jury nullification is absolutely improper,

8   Your Honor.

9          There is a lot of case law on improper argument, you

10  know, mostly focusing on prosecution argument.  This is improper

11  prosecution argument.

12         I'm going to make a motion at this point that the case

13  against my client be dismissed as a sanction for what is absolutely out

14  of bounds in terms of argument.

15         Your Honor, the reason I shot up and said that because

16  the jury was exposed to that and heard that and heard from

17  prosecution that my motivation and my argument and my attempts to

18  discuss the evidence with them in front of them in closing argument

19  was somehow out of bounds.  That, Your Honor, is improper and it is

20  misconduct.

21         MR. ROMO VEJAR:  Your Honor, may I be heard?

22         Your Honor, I do join in that motion.  Also, Judge, there

23  was argument made by Ms. Kelly that the crime was controlled by --

24  the defendants controlled the crime.  And the clear implication was the

25  burden was shifted, that we had the burden to bring forth the

1   witnesses that clearly they should have brought forth.

2              And the argument of jury nullification was an argument

3   that just come out of the blue.  I had never heard of jury nullification

4   be directed as such to the jury.  It might be an insinuation that might

5   be going on.  It was said that what we wanted of the jury was to

6   nullify the verdict because there were illegal aliens -- the victim was

7   an illegal alien.

8              That is frankly, Your Honor, an insult.  That is all, Your

9   Honor.  Thank you.

10             THE COURT:  Thank you.

11             Ms. Kelly.

12             MS. KELLY:  Your Honor, government in argument stated

13  that obviously defense counsel have subpoena power.  I was clear to

14  say, not once but twice before that, that the defendants have

15  absolutely no burden and they don't even have to be here.

16             But defense counsel were arguing that we should call

17  these witnesses and, you know, obviously they have subpoena power

18  too.

19             As to the other, it's the government's position that is not

20  improper argument and that was proper argument.

21             THE COURT:  Well, it seems to me that the individual

22  was questioned quite strenuously but seemed to me the questioning

23  always went to his motive and his credibility rather than to show that

24  because he was an illegal alien that there should be some verdict

25  against him because he's an illegal alien.  I didn't pick that up from

1   the questioning of counsel.

2          I mean, your statement was that counsel was asking the

3   jury to acquit their clients because this individual was an illegal alien.

4   I don't know where that -- what facts support making a statement like

5   that in closing argument.

6          MS. KELLY:  Your Honor, they have made a number of

7   statements about who the victim was, about the fact that he didn't

8   own a home here but was here for 11 years, about the different types

9   of jobs that he had.

10         Defense counsel asked him for hours in detail to describe

11   the type of jobs, to describe the type of labor, to describe where and

12   how he would live and who he lived with.  Then they highlighted the

13   fact he has two children who live in Mexico who he has only seen

14   twice.

15         There was a number of points that they elicited through

16   Julio that the purpose was to, in the government's mind, have them be

17   jaded or biased against that individual because he was an illegal alien.

18         THE COURT:  Well, that argument could be made about

19   any witness who has not held a job for any appreciable period of time,

20   who, you know, is involved in a relationship with an older woman who

21   is working and he's not.

22         That, I think, goes to the character and the credibility of

23   that witness rather than to the fact that he's here illegally.  I didn't --

24   it puzzled me that you would make that statement, that the argument

25   was one of jury nullification.  I didn't see that in the evidence.

1          Well, I think that argument -- to make that argument

2     about jury nullification certainly comes close to the line of what is

3     appropriate, may even have crossed that line.  But I don't find at this

4     point that it is so prejudicial to the defendants that it requires either a

5     dismissal of the case or a mistrial.

6          Obviously that will be judged by another court again, but

7     I do find that it -- given the testimony I just don't find that was a

8     proper argument.

9          I don't find that it's one that rises to the level of requiring

10    a mistrial because I don't find that it prejudiced the defendant, quite

11    frankly, given the overall evidence in this case and all that has gone

12    on in this case.  I just don't feel that's -- it was so prejudicial to

13    require either dismissal or a mistrial in this case.

14         So the motion for dismissal or mistrial is denied as to

15    each defendant.

16         As far as the comments on shifting the burden of proof, I

17    don't believe that statement regarding they controlled the crime is

18    sufficient to find that there was any shifting of the burden of proof in

19    this case.  There's no basis as to that.

20         MR. HORMEL:  For the record, I join that motion made

21    by Mr. Romo.

22         I would also ask at this point, perhaps we could have --

23    if the court doesn't feel that it is enough for a mistrial or a dismissal,

24    there should be a curative instruction.  There should be something told

25    to the jury because what happened is that the government suggested

1    we were doing something wrong.  They made an argument to the jury

2    that the defense counsel was acting out of bounds.  And now the jury

3    has gone back there thinking that, you know, somehow we have done

4    something wrong.  That is just not the case.  So something has to

5    happen.

6              THE COURT:  Well, I think the jury has already been

7    properly instructed as to how they are to make their decision and how

8    they are to view the statements and arguments of counsel as not

9    evidence and merely statements and arguments.  And I think that the

10   jury has already properly been told repeatedly as to what their role is

11   and on what they need to base their verdict.  I don't believe there is

12   any further need for any further instruction.

13             Keep the clerk informed as to where you are going to be

14   so you can be back here within a matter of ten minutes.  A case this

15   long there will undoubtedly be a number of questions here pretty

16   soon.

17             Check the exhibits to make sure that the proper exhibits

18   are going in before you leave, counsel.

19             Stand at recess.

20             (A recess was taken.)

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

122

1

2

3

4

5

6

7                          C E R T I F I C A T E

8

9

10

11          I, Dianne Davenport, certify that the foregoing is a correct

12    transcript from the record of proceedings in the above-entitled matter.

13

14

15

16

17    /s/  Dianne Davenport                    November 16, 2011

18

19

20

21

22

23

24

25