1           **UNITED STATES DISTRICT COURT**

2           **FOR THE DISTRICT OF ARIZONA**

3           _____

4

5    United States of America,      )
                                     )
6                   Plaintiff,       )  No. **CR 09-2343-TUC-FRZ**
     vs.                             )
7                                    )        **Tucson, Arizona**
     Yuris Bonilla-Guizar (1),      )     **November 1, 2010**
8    Carlos Armando                  )          **9:44 a.m.**
     Calixtro-Bustamante (2),        )
9                                    )
                    Defendants.      )
10                                   )
     _____

11

12           **BEFORE:  THE HONORABLE FRANK R. ZAPATA**
                  **UNITED STATES DISTRICT JUDGE**

13
                  (***Jury Trial - Day 5***)

14

15

16

17

18

19

20
     Official Court Reporter:
21   Laurie A. Adams, RMR CRR
     Sandra Day O'Connor U.S. Courthouse, Suite 312
22   401 West Washington Street, SPC 43
     Phoenix, Arizona 85003-2151
23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

November 1, 2010 - Jury Trial - Day 5

1                       A P P E A R A N C E S

2    For the Plaintiff:
                    United States Attorney's Office
3                   By:  **Kristin Kelly, Esq.**
                    By:  **John Evans, Esq.**
4                        405 W. Congress Street
                         Suite 4800
5                        Tucson, AZ 85701

6    For the Defendant Bonilla-Guizar:
                    LAW OFFICE OF PETER HORMEL
7                   By:  **Peter Hormel, Esq.**
                         PO Box 308
8                        Tucson, AZ 85702

9    For the Defendant Calixtro-Bustamante:
                    JESUS R. ROMO VEJAR PC
10                  By:  **Jesus R. Romo Vejar, Esq.**
                         177 N. Church Avenue
11                       Suite 200
                         Tucson, AZ 85701

12

13

14

15

16

17

18

19

20

21

22

23

24

25

November 1, 2010 - Jury Trial - Day 5

# I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEFFREY ELLIS | | | | |
| By Mr. Hormel | | 5 | | |
| By Mr. Romo | | 6 | | |
| By Ms. Kelly | | | 23 | |
| | | | | |
| MARCO PALOMARES | | | | |
| By Mr. Romo | 31 | | | |
| By Mr. Evans | | 34 | | |
| EDLIN YUCARI HERNANDEZ-TINOCO | | | | |
| By Mr. Hormel | 36 | | | |
| By Mr. Evans | | 42 | | |
| By Mr. Romo | | | 45 | |
| MARIA PINA | | | | |
| By Mr. Hormel | 47 | | | |
| By Mr. Romo | 49 | | | |
| By Ms. Kelly | | | | |
| By Mr. Hormel | | | 117 | |
| By Mr. Romo | | | 117 | |
| BEATRIZ PINA | | | | |
| By Mr. Romo | 121 | | | |
| By Mr. Evans | | 125 | | |
| By Mr. Romo | | | 132 | |
| JOSE RASCON | | | | |
| By Mr. Romo | 134 | | | |
| By Mr. Evans | | 138 | | |
| YASMIN RASCON | | | | |
| By Mr. Hormel | 142 | | | |
| By Mr. Romo | 150 | | | |
| By Mr. Evans | | 157 | | |
| SEAN COLDIRON | | | | |
| By Ms. Kelly | 163 | | | |
| By Mr. Hormel | | 172 | | |

1

**INDEX OF EXHIBITS**

**EXHIBIT**                                      **IDENT**    **RECEIVED**

2

| | | IDENT | RECEIVED |
|---|---|---|---|
| 100 | Photo of corral | 60 | 60 |
| 101 | Photo of corral | 60 | 61 |
| 106 | Photo of inside Bedroom 2 | 57 | 58 |
| 109 | Photo of Living Room to Bedroom 2 | 102 | 103 |
| 114 | Photo of Bathroom | 61 | 62 |
| 115 | Photo of Bedroom - Main | 62 | 62 |
| 125 | Photo of Main Bedroom | 118 | 118 |
| 126 | Photo of Main Bedroom | 118 | 117 |
| 127 | Photo of Living Room | 64 | 64 |
| 128 | Photo of Doorknob - Bathroom | 64 | 65 |
| 129 | Photo of Living Room Floor | 65 | 65 |
| 130 | Photo of Kitchen | 65 | 66 |
| 131 | Photo of Main Bedroom | 66 | 66 |
| 133 | Photo of Main Bedroom | 62 | 63 |
| 136 | Photo of Hallway Floor | 59 | 60 |
| 139 | Affidavit of Sr. S.A. Jeffrey Ellis | 11 | 22 |
| 140 | Warranty Deed - Maria Rascon | 13 | - |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—— November 1, 2010 - Jury Trial - Day 5 ——

```
 1                    P R O C E E D I N G S
 2              (The defendants were assisted during the following
 3    proceeding by the official court interpreter.)
 4              THE COURT:  Good morning.  Thank you.  Please be
 5    seated.
 6              The record will reflect the presence of counsel and
 7    defendants, presence of the jury, and presence of the witness
 8    on the witness stand.
 9              Good morning, Ladies and Gentlemen of the jury.
10              And are we ready to proceed?
11              MR. HORMEL:  Yes, sir.
12                          JEFFREY ELLIS,
13    a witness herein, having been previously duly sworn by the
14    clerk to speak the truth and nothing but the truth, was
15    examined and testified further as follows:
16                     CROSS-EXAMINATION (Resumed)
17    BY MR. HORMEL:
18    Q.  Good morning, Agent Ellis.
19    A.  Good morning.
20    Q.  Feeling better?
21    A.  Little bit.
22    Q.  Good.  Had one last minor topic to cover.  Back on Friday
23    before the cell phone went off and all that distraction
24    happened, you recall you answered some questions made by the
25    government regarding smuggling fees.
```

—————— November 1, 2010 - Jury Trial - Day 5 ——————

1           Do you remember that?

2   A.  Yes.

3   Q.  Now, last week you gave some testimony at a hearing at

4   which you acknowledged that ICE does not have any solid data on

5   smuggling fees.  Is that right?

6   A.  Yes, sir.

7   Q.  So there is no data set that could support any broad base

8   conclusion on what average smuggling fees are?

9   A.  Not that I know of.

10  Q.  Thank you.

11          MR. HORMEL:  Those are all the questions I have, Your

12  Honor.

13          THE COURT:  Thank you.

14          Mr. Romo?

15          MR. ROMO:  Yes.

16                          CROSS-EXAMINATION

17  BY MR. ROMO:

18  Q.  Good morning, Mr. Ellis.

19  A.  Good morning, Counsel.

20  Q.  How are you, sir?

21  A.  Good, sir.

22  Q.  You recall that there was a pretrial testimony that you

23  gave to this Court?

24  A.  Yes, sir.

25  Q.  And that was about a week ago?

—————— November 1, 2010 - Jury Trial - Day 5 ——————

1   A.  Yes, sir.

2   Q.  And at that time, you told us this would be the first time

3   you have testified as an expert witness.

4           Is that correct, sir?

5   A.  Yes, sir.

6   Q.  And during that testimony, you also told us about matters

7   having to do with, as you did today, with the broadly

8   structured organization.

9           Do you recall that?

10  A.  Yes, sir.

11  Q.  And you also stated that there were some things with

12  respect to the subcontractors and things of this nature that

13  you were surmising, essentially, because you didn't have the

14  exact information.

15          Is that correct?  Do you recall that?

16          MS. KELLY:  Objection.  Vague question.

17          THE COURT:  Restate your question, please.

18          MR. ROMO:  Certainly.

19  BY MR. ROMO:

20  Q.  With respect to the broadly-structured organization, you

21  stated, didn't you, sir, that there was some speculation that

22  had to take place with regard to those things?

23  A.  I don't know that I used the word "speculation" in my

24  testimony.  I believe I based my testimony on experience and

25  training.

————— November 1, 2010 - Jury Trial - Day 5 —————

1   Q.  All right.  I will get to that in a second, sir.

2        It is true, isn't it, that with regard to my client,

3   and my client specifically, you don't know exactly whether this

4   is an organization, broadly-structured organization or what

5   kind of organization it is?

6        Is that correct, sir?

7   A.  No.  I'm not involved in the investigation to that degree.

8        MR. ROMO:  May I have a second, Your Honor?

9        THE COURT:  Yes, you may.

10       MR. ROMO:  I'm just looking for the page, Your Honor,

11  with the -- all right.

12       May I approach the witness, Your Honor?

13       THE COURT:  You may.

14  BY MR. ROMO:

15  Q.  I'm going to show you a copy of your testimony, sir, that

16  was given on October 18th, specifically Pages 13 and 14.  And I

17  have underlined some things if you just look at the underlined

18  matter.

19  A.  Yes, sir.

20       MR. ROMO:  May I approach, Your Honor?

21       THE COURT:  Yes, sir.

22  BY MR. ROMO:

23  Q.  Did reading that refresh your recollection, sir?

24  A.  Yes, sir.

25  Q.  Okay.  Now, you were asked on Line 18, "Is there a reason

— November 1, 2010 - Jury Trial - Day 5 —

1   why all these individuals are kept separate, it's not the same

2   person who is doing the whole job?"

3       And then your response was, do you recall?  Do you recall

4   your response?  "Well, again, I think it would be theorizing at

5   that point.  There are some organizations that are

6   broadly-structured, have body all the way from the foreign

7   origination point to the ultimate point of destination, may

8   just not have the organizational strength to broaden the scope.

9   Like I say, I could not -- I think it would be conjecture for

10  me to figure out why they are conjectured that way."

11           I think you meant "organized that way," is that

12  correct, sir?

13  A.  Yes.

14  Q.  Now, sir, you recall participating in questioning my

15  client?  Do you recall that?

16  A.  Yes.

17           MS. KELLY:  May we approach?

18           (The following discussion was had at sidebar out of

19  the hearing of the jury:)

20           THE COURT:  Speak into microphone.

21           MS. KELLY:  Kristin Kelly speaking.

22           Obviously, the government did not elicit any testimony

23  or statements made by the defendant during any interview, and

24  any attempt to do so by defense counsel would be inappropriate

25  under the rules.  It's hearsay, and the government moves to

 1    strike this line of questioning.

 2              THE COURT:  Mr. Romo?

 3              MR. ROMO:  Well, Your Honor, this agent was the main

 4    questioner of my client back in October.  I believe it was

 5    October 26.  We can get it out of the record, and I will not

 6    ask any questions.  So I don't know what she's talking about

 7    with regard to hearsay.

 8              THE COURT:  If you are going to ask about statements

 9    by your client they are inadmissible.  It can only be offered

10    by the party opponent.  So if you are going to get into the

11    statements you can't because it's hearsay.

12              MR. ROMO:  All right.  I will just ask a few questions

13    about that, Judge.  There's another area I intend to cover as

14    well.

15              THE COURT:  You can ask any questions about your

16    client.  You can't get into anything about the statement your

17    client made.

18              MR. ROMO:  That's fair, Your Honor.

19              I intend to ask him if he denied any of the

20    allegations.  That is not a call for hearsay.

21              THE COURT:  It is.

22              MR. ROMO:  Well, calling for a yes or no, Your Honor,

23    that's all.

24              THE COURT:  That's hearsay.

25              MR. ROMO:  The other thing I need to ask, Your Honor,

November 1, 2010 - Jury Trial - Day 5

1    is with regard to the search warrant.

2             MR. EVANS:  With regard to what?

3             MR. ROMO:  The search warrant and the application of

4    the affidavit.  So I will intend to ask those questions.

5             THE COURT:  They have already been gone into.  I don't

6    see that -- he was the author of the affidavit, I take it?

7             MR. ROMO:  Yes, sir.

8             THE COURT:  All right.

9             MR. ROMO:  Thank you.

10            (In open court.)

11   BY MR. ROMO:

12   Q.  On September 4th, do you remember September 4th of 2009 --

13   September 24, I'm sorry.

14   A.  Yes.

15   Q.  On that date, you provided this court with an affidavit, is

16   that correct?

17   A.  Yes, sir.

18   Q.  For a search warrant?

19   A.  Yes, sir.

20            MR. ROMO:  May I approach, Your Honor?

21            THE COURT:  Yes, you may.

22            MR. ROMO:  Now, we have a copy of the affidavit.

23   That's been marked for identification as Exhibit 139.

24            May I approach the witness, Your Honor?

25            THE COURT:  You may.

——November 1, 2010 - Jury Trial - Day 5——

1   BY MR. ROMO:

2   Q.  Did you take a look at that, sir?

3   A.  Yes, sir.

4   Q.  Now, when you called the judge, you gave him particular

5   orders, is that correct, as to where the structure was that you

6   needed to search?

7           Do you recall that?

8   A.  When I contacted the judge?

9   Q.  Well, this affidavit, sir, would you explain to the jury to

10  whom you were making this affidavit?

11  A.  Well, correct.  I just wanted to clarify the question.

12  Q.  This affidavit was provided to the Court, is that correct?

13  A.  Correct.  Yes.

14  Q.  And when you gave the judge this affidavit, you provided

15  the coordinates where the structure was?

16  A.  Yes, sir.

17  Q.  And you told him that there were several residences within

18  that address, is that correct?

19  A.  Yes, sir.

20  Q.  And you told him that each of them was from 3 to 21 -- to 3

21  to 21 meters of each other, each structure.  Do you remember

22  that, sir?

23  A.  No.  The 3 to 21 meters, I believe, was an accuracy

24  measure.  It's not meant to indicate the exact distance of the

25  trailers from each other.

—— November 1, 2010 - Jury Trial - Day 5 ——

1   Q.  And then you told him that the angular radius falls within

2   the premises.  Each one was within eight meters of each other,

3   is that correct?

4   A.  Yes.

5           MR. ROMO:  And, Your Honor, may I approach again?

6           THE COURT:  Yes, you may.

7   BY MR. ROMO:

8   Q.  I will show you what has been marked as Exhibit 140.

9           Do you see that, sir?

10  A.  Yes.

11  Q.  The last page?

12  A.  Last page.  Yes, sir.

13  Q.  And that's a copy of the property that you submitted as

14  Attachment A in your affidavit?

15          Do you recall Attachment A, sir?

16  A.  Yes, I recall.

17  Q.  Do you need me to show it to you?

18          And that is two acres, is that correct?

19  A.  I'm -- Counsel, I'm not sure where it denotes two acres.

20  Q.  Well, you need to multiply, sir, the one size with the

21  other and it gives you the total, which is two acres.  Do you

22  want to multiply?  You go ahead and do it, sir.

23          For the record, an acre has 43,560 meters, is that

24  correct, sir?

25  A.  I have no idea, Counsel.

——November 1, 2010 - Jury Trial - Day 5——

1          MR. ROMO:  I mean feet.  43,560 feet.

2          THE COURT:  I don't know.

3          MR. ROMO:  Will Your Honor take judicial notice of the

4    size of an acre?

5          THE COURT:  I cannot take judicial notice.  I don't

6    know the size of an acre.

7    BY MR. ROMO:

8    Q.  Do you know how many meters are in an acre?

9          MS. KELLY:  Objection; relevance.

10          THE COURT:  Everybody speak at one time, please.  Not

11   all at once but separately.

12          And there's an objection before the Court based on

13   relevance.  The objection is overruled.

14          You may ask your question, Mr. Romo.

15          MS. KELLY:  As well as foundation, Your Honor.

16          THE COURT:  Thank you.

17   BY MR. ROMO:

18   Q.  Each acre has 4,046 meters, is that correct, square meters?

19   Do you know?

20   A.  No, sir.

21   Q.  Okay.  Well, if you read the property there, it does say

22   that it measures 306 square feet on one side, is that correct,

23   sir?  Do you see the legal description?

24   A.  One moment.  Did you say 316 or 360?

25   Q.  306.82.  Is that correct, sir?

1   A.  Yes.

2          MR. ROMO:  Your Honor, and I need the exhibits for the

3   property.  I don't know where the exhibits are.

4          THE COURT:  With the clerk.  What exhibit numbers?

5          MR. ROMO:  That would be -- no, no, the exhibits that

6   show the property boundaries that were shown before.

7          THE COURT:  What exhibit number is it?

8          MR. ROMO:  I don't have the exhibit number, but it was

9   a photograph of exhibits that was shown here.  I think it's

10  Exhibit 36, Your Honor.  Those exhibits were admitted, Your

11  Honor, should be.

12         THE COURT:  There were a lot of photographic exhibits

13  introduced, Mr. Romo.

14         MR. ROMO:  Yes, sir.

15         THE COURT:  I have no idea what exhibit you are

16  talking about.

17         MR. ROMO:  Does the clerk have any exhibits?

18         THE COURTROOM DEPUTY:  I don't have the government's

19  exhibits.

20         THE COURT:  You don't have the exhibits that were

21  admitted?

22         THE COURTROOM DEPUTY:  The government has the

23  exhibits.

24         MR. ROMO:  Does the government have Exhibit 27?

25         THE COURT:  I'm sorry.  What were you referring to?

———November 1, 2010 - Jury Trial - Day 5———

1        MR. ROMO:  Yes.

2        THE COURT:  Exhibit what?

3        MR. ROMO:  27, Your Honor.

4        THE COURT:  That's admitted.

5        MR. ROMO:  And we also had Exhibit 11.

6        THE COURT:  11?

7        MR. ROMO:  11, yes.

8        THE COURT:  11 is admitted.

9   BY MR. ROMO:

10  Q.  Now, sir, this is an exhibit that BORTAC, I guess, used to

11  identify the different mobile homes.  Do you recall that?

12  A.  Do I recall them using a --

13  Q.  No.  No.  No.

14  A.  Or the event?

15  Q.  Do you recall the layout of the property?

16  A.  Yes.  Yes.

17  Q.  That is an aerial photograph of the same site.

18        Now, would you agree with me, sir, that each of these

19  properties are not -- this is Property Number 1, which would be

20  the property where Mr. Lopez was.

21        Do you recall that?

22  A.  Yes, Counsel.

23  Q.  Would you agree with me that there are more than eight

24  meters between each of these properties?

25  A.  Yes.  I think from this photograph there are probably more

─────── November 1, 2010 - Jury Trial - Day 5 ───────

1   than eight meters.

2   Q.  And you were there, correct?

3   A.  Yes.  I was there after the service of the search warrant.

4   Q.  Now, this area of town is called the Dogpatch, is that

5   correct?

6   A.  I have heard that term, yes.

7   Q.  And it's over on Summit Road, is that right, close to

8   Summit Road?

9   A.  Yeah.  I mean, the streets over there are notoriously

10  unmarked.  But, yes, Summit, Wooden Bucket.

11  Q.  Okay.  And it is in an unincorporated area of Pima County,

12  is that correct?

13  A.  I'm not sure, Counselor.

14  Q.  So is it fair to say that when you gave the affidavit to

15  the judge, you were not correct with respect to the meters

16  between them?

17          MS. KELLY:  Your Honor, misstates testimony.

18          MR. ROMO:  I can --

19          THE COURT:  Clarify your question.

20          MR. ROMO:  -- re-ask.

21  BY MR. ROMO:

22  Q.  It is fair to say, isn't it, sir, that when you stated to

23  the judge that there was an eight meter radius within the

24  premises described in Attachment A, that that was not accurate?

25  A.  I'd like to refer to my notes or the affidavit on that

—— November 1, 2010 - Jury Trial - Day 5 ——

1    because --

2              MR. ROMO:  May I approach, Your Honor?

3              THE COURT:  Yes, sir.

4              MR. ROMO:  Thank you.

5              THE WITNESS:  Well, again, coming back to my

6    affidavit, I believe -- I think the body of the affidavit, it

7    is being taken out of context.  I'm saying that the eight meter

8    accuracy radius as provided to me by Nextel, when plotted

9    against the property, falls within the property.  I never made

10   any statements regarding the eight meters in the sense of

11   distance between the trailers.

12   BY MR. ROMO:

13   Q.  Well, you told the judge that there were five structures

14   within this place, is that correct?

15   A.  Well, I said the property has a main residence.  Also on

16   the property are two additional trailers located to the west,

17   one trailer to the northwest, a corral barn, and sheds.

18   Q.  So you told him there were four residences, is that

19   correct?

20   A.  A main residence and two trailers.

21   Q.  And an additional trailer?

22   A.  Right.  Three trailers in addition to the main residence.

23   Q.  All right.  And you call the main residence one of the

24   mobile homes, is that correct?

25   A.  I would suspect that I was referring to the structure that

———— November 1, 2010 - Jury Trial - Day 5 ————

1   appears to be more of a house link building.

2   Q.  You suspect that, or do you know that?

3   A.  I'm confident that when I refer to the main residence in my

4   affidavit I'm referring to that building.

5   Q.  And that would have been Structure No. 3?

6   A.  Yes, counsel.

7   Q.  Which was not the target, is that correct?

8   A.  It was not the target?

9   Q.  Yes, sir.

10  A.  Well, the buildings as specified in the affidavit and

11  subsequent to the warrant, I mean, the entire property was the

12  target.

13  Q.  Well, you told the judge that -- and if you didn't, just

14  please tell us.  You told the judge, didn't you, sir, that

15  there were certain coordinates that responded to the telephone,

16  is that correct?

17  A.  Yes.

18  Q.  In your affidavit?

19  A.  Yes.

20  Q.  And you also told him that those coordinates corresponded

21  to Structure No. 1, is that correct, sir?

22          MS. KELLY:  Objection, Your Honor.  Misstates

23  testimony.

24          THE COURT:  I think you have got the wrong structure.

25          MR. ROMO:  Let me put this one which is marked.

—————————— November 1, 2010 - Jury Trial - Day 5 ——————————

1   BY MR. ROMO:

2   Q.   You told him it corresponded to a Structure Number 1, is

3   that correct, sir?

4   A.   No.  I don't believe I did specify a specific structure.

5   Q.   Well, would you read in there?  Did you tell him these were

6   the coordinates and that there were -- the accuracy of the

7   coordinates was within so many meters?

8   A.   Yes.

9   Q.   And you told him that there were four other structures

10  there?

11  A.   Yes.

12  Q.   Okay.  Three other structures, I'm sorry.

13  A.   Yes.  Correct.

14  Q.   So there was a total of four structures, and you told him

15  that the coordinates that you had were up to -- the accuracy

16  was up to eight meters, is that correct?

17  A.   No.  The accuracy radius ranged from 3 meters to 21 meters.

18  Q.   And then you told him there was up to eight meters, is that

19  correct, the next paragraph?

20  A.   Well, yes, the -- as you are working with Nextel obtaining

21  this data, the accuracy ranges change.

22  Q.   So the accuracy range was from 3 to 21 meters, is that

23  correct?

24  A.   For a series of GPS coordinates that were taken that day,

25  yes.

─────November 1, 2010 - Jury Trial - Day 5─────

1   Q.  And did you inform the judge that these were -- that these

2   structures were separated by a fence and there was A and B?

3   The address was divided by A and B?

4            MS. KELLY:  Your Honor, again, I object.  Vague

5   question.

6            THE COURT:  Sustained.

7   BY MR. ROMO:

8   Q.  Did you inform the judge that this area, the entire area

9   which you mark there in the affidavit, that it was separated by

10  a fence?

11  A.  I believe I illustrated that the property, as a whole, was

12  separated from other properties by a fence, but I believe you

13  are saying that the property was further divided?

14  Q.  Right, by another fence.  And there was A and B.  Did you

15  tell him that?

16  A.  No.

17           MR. ROMO:  Your Honor, I move for the admission of

18  Exhibits 139 and 140.  That would be the affidavit and the

19  warranty deed.

20           THE COURT:  The affidavit you talked about, the

21  warranty, I don't believe you mentioned at all.

22           MR. ROMO:  That's the affidavit 139, Your Honor.

23           THE COURT:  139 is what you are offering?

24           MR. ROMO:  Yes, sir.

25           THE COURT:  Any objection?

─────November 1, 2010 - Jury Trial - Day 5─────

1          MR. ROMO:  And 140, Your Honor.

2          THE COURT:  What was 140?

3          MR. ROMO:  140 is the warranty deed and property

4    structure of the site.

5          THE COURT:  Was that part of 140 an attachment to 140?

6          MR. ROMO:  No, Your Honor.  139 has within it --

7          THE COURT:  I don't understand what foundation you

8    established for the introduction of the warranty deed.  You

9    hadn't mentioned a warranty deed in connection with this

10   witness.  You talked about the search warrant, but I don't

11   believe you have established any foundation for the admission.

12         MR. ROMO:  I did ask him questions regarding the

13   warranty deed.

14         I can establish foundation later on.  No problem,

15   Judge.

16         THE COURT:  Any objection to the admission of 139, the

17   affidavit?

18         MS. KELLY:  No, Your Honor.  No objection.

19         THE COURT:  Very well.  139 is admitted.  140 is not

20   admitted at this time.

21         MR. ROMO:  And I have no further questions of this

22   witness, Your Honor.

23         Thank you.

24         THE COURT:  Any redirect?

25         MS. KELLY:  Just a couple quick questions.

―――――November 1, 2010 - Jury Trial - Day 5―――――

1                        REDIRECT EXAMINATION

2    BY MS. KELLY:

3    Q.  Good morning.

4    A.  Good morning, ma'am.

5    Q.  Defense counsel had asked you a number of questions about

6    the affidavit, the search warrant affidavit in this particular

7    case.  And in particular, they directed you to Paragraph 12 of

8    the affidavit.

9           In that paragraph you state that the radius or, I

10   guess, the coordinates, the GPS coordinates that Sprint gave

11   you within an eight-meter radius were located on this property?

12   A.  Correct.

13   Q.  Is that what the affidavit sets forth?

14   A.  Yes, ma'am.

15   Q.  And does that just establish for the purpose of this

16   affidavit that we, indeed, are talking about this property that

17   needs to be searched?

18   A.  Yes, ma'am.

19   Q.  And then when you go out to the property --

20           MR. HORMEL:  Objection.  Leading.

21           THE COURT:  Sustained.

22   BY MS. KELLY:

23   Q.  When you went out to the property, actually when Agent

24   Slagle went out to the property and reported back to you, how

25   many trailers did you find that there were on that particular

———November 1, 2010 - Jury Trial - Day 5———

1   property?

2   A.  Yes, ma'am.  Well, it was described to me as I set forth in

3   the affidavit, the primary residence, or primary structure, and

4   the three associated trailers.

5   Q.  Was it important to you that all of those trailers be

6   searched?

7   A.  Very important.

8   Q.  Why?

9   A.  Well, it was clear, based on my experience with a compound

10  like this, although the Nextel coordinates were putting me on

11  the property as a whole, they were not putting me specifically

12  in a trailer.  So I know from my experience and training that

13  the victim could have been held in any one of these structures.

14  Q.  Defense counsel asked you questions -- I'm going to move to

15  another subject.

16        Defense counsel had asked you some questions about

17  what the average smuggling fee was.  You indicated in your

18  testimony on Friday that an average smuggling fee here in the

19  southwest would be about $1,500?

20  A.  That's been a good number for a number of years, I mean,

21  give or take, you know, a little bit depending on the

22  circumstances.  But that's a solid ballpark number.

23  Q.  And what do you base that on?

24  A.  Well, 15 years of experience and reading numerous reports

25  of investigations, reading thousands of I-213s, which are the

———— November 1, 2010 - Jury Trial - Day 5 ————

1    report that is done by Border Patrol or ICE when they arrest a

2    deportable alien.  In a number of those situations, especially

3    if the agent is squared away, they are going to put in their

4    narrative what the smuggling fee was.  So like I said, my

5    experience has shown that that's a very consistent number.

6    Q.   In human smuggling organizations when you have the

7    recruiter, you have the boss, you have the guides, you have the

8    transportation, you have the individuals that run the stash

9    houses, the drop houses, the human smuggling houses --

10          MR. HORMEL:  Object.  Testimony by counsel.

11          THE COURT:  Sustained.

12   BY MS. KELLY:

13   Q.   In human smuggling organizations when they are composed of

14   many people with different roles, how do these people get paid?

15   A.   Well, again, that's --

16          MR. ROMO:  Calls for speculation, Your Honor.  I think

17   we need more foundation and knowledge.

18          THE COURT:  You will need to establish foundation as

19   to that.

20   BY MS. KELLY:

21   Q.   In your 14 years of experience with ICE focusing on

22   investigations of human smuggling, have you come to learn about

23   how different parts, different people in these organizations

24   get paid?

25   A.   Yes, ma'am.

November 1, 2010 - Jury Trial - Day 5

1  Q.  How have you learned that?

2  A.  Through experience, through the investigation of hundreds

3  of alien smuggling investigations, corollary involvement with

4  hundreds of other investigations, the processing of thousands

5  of aliens in my career.

6  Q.  By "processing," do you mean interviews?

7  A.  Interviews, placing the alien in removal proceedings,

8  creating an administrative file, or an A-file, as we know it.

9  All of these things have contributed to my knowledge regarding

10  alien smuggling.

11  Q.  Based on your training and experience, how do the different

12  people within the organization get paid?

13        MR. HORMEL:  I'm going to object.  I don't think that

14  testimony provided the foundation she's looking for.

15        THE COURT:  Overruled.

16        THE WITNESS:  Again, I'm going to give basically the

17  southwest model, because I think it changes with geography and

18  the type of smuggling that we're talking about.  But the

19  typical alien smuggling that we see on the southwest border,

20  the money is wired to a specific location that is more and more

21  becoming a foreign location.  So we see a lot of the money

22  wired or transmitted, transferred, excuse me, into accounts

23  outside of the United States.

24        The organization will, in most cases, have a money

25  person, that that's their sole role, that they pick up that

———— November 1, 2010 - Jury Trial - Day 5 ————

1    money.  Again, it's often outside of the United States or most

2    certainly can be within the United States.  And that money is

3    then, of course, transferred to the person who is running the

4    operation.

5         MR. HORMEL:  Your Honor, I'm going to object as to

6    beyond the scope of cross.  I don't think we got into that.

7         THE COURT:  I believe that's correct, Counsel.  I

8    don't think there was any cross-examination about that part of

9    this process.  So the objection is sustained.

10   BY MS. KELLY:

11   Q.  Defense counsel asked you about the room in which Julio was

12   kept in, that room, that didn't have a door?

13   A.  Yes, ma'am.

14   Q.  Does it surprise you when hostage takers take a victim's

15   clothes, take a victim's identification, take a victim's shoes,

16   when hostage takers point a gun at a victim and threaten to

17   kill them?

18        MR. HORMEL:  Objection.  Testimony asks for a legal

19   conclusion.

20        THE COURT:  Sustained.  You need to break your

21   question down, Counsel, into each of those matters.

22   BY MS. KELLY:

23   Q.  Does it surprise you that there are certain situations that

24   hostage takers can create where they don't need a door to keep

25   a victim subjugated?

November 1, 2010 - Jury Trial - Day 5

1   A.  Not in the least, ma'am.

2   Q.  And can you explain that?

3   A.  Well, depending on the factors of the situation, it might

4   have been an advantage to the organizations or those that were

5   part and parcel of this hostage taking to not have a door.  I

6   don't -- I did not find that in the least bit unusual.  And

7   quite honestly, my experience has shown that a lot of these

8   trailers are, I think, old, run down, miskept, and the absence

9   of a door was not in any way, I think, germane to the hostage

10  taking.

11  Q.  You said that, in fact, it can be an advantage to the

12  organization.  What do you mean by that?

13  A.  Well, I think from --

14          MR. HORMEL:  Object to the scope of cross again.

15          THE COURT:  Overruled.

16          THE WITNESS:  Well, I have seen situations where the

17  hostage takers want to have direct vision on the victim.  The

18  absence of a door, you know, allows them to control the victim

19  in a much more efficient manner, and the victim can't be

20  promoting his escape behind a closed door.

21          MS. KELLY:  I don't have any other questions.

22          THE COURT:  Thank you.

23          THE WITNESS:  Thank you, sir.

24          THE COURT:  You may be seated.

25          Mr. Hormel.

—— November 1, 2010 - Jury Trial - Day 5 ——

1    MR. HORMEL:  Your Honor, I have a couple follow-up

2    questions.  I'm asking for an opportunity to just -- those

3    questions were not really brought up.  There's some new

4    testimony here, and I feel I should be given the opportunity to

5    ask a couple follow-up questions.

6    THE COURT:  Overruled.

7    You may step down, sir.

8    You may call your next witness, please.

9    MS. KELLY:  Your Honor, at this point, subject to the

10   review of exhibits, the government rests.

11   THE COURT:  Very well.  Counsel, Mr. Hormel, do you

12   wish to call any witnesses?

13   MR. ROMO:  Your Honor, there is one witness I'd like

14   to call out of order.  I asked him to be here at 10:30.  May I

15   ask if he's here?

16   THE COURT:  Very well.  Do you have any objection to

17   that, Mr. Hormel?

18   MR. HORMEL:  Absolutely not.

19   THE COURT:  Very well.

20   MR. ROMO:  Your Honor, this is Mr. Marcos Palomares.

21   We will need to approach.

22   THE COURT:  All right.  Counsel.

23   (The following discussion was had at sidebar out of

24   the hearing of the jury:)

25   MR. ROMO:  Mr. Palomares is the resident of the

─────────── November 1, 2010 - Jury Trial - Day 5 ───────────

1   adjacent property that we have here.  I went to the property

2   yesterday.  I spoke with Mr. Palomares.  I wasn't sure if he

3   was coming in this morning.  We had a subpoena for him.  I told

4   him that we would issue the subpoena this morning.  And I would

5   like to call him because he has limited time and it's relevant

6   to the testimony that was already given.

7           MS. KELLY:  This is Ms. Kelly, Your Honor.

8           This is an individual who was never disclosed by the

9   defense, obviously could have been and wasn't.  So for late

10  disclosure, noncompliance, the government moves to strike and

11  preclude this particular witness.

12          MR. ROMO:  Your Honor, it wasn't disclosed because we

13  had no idea that the government would testify that they went

14  into the different properties and had permission to be there.

15  That was not in any of the documents that we had.  And the

16  first opportunity I had was yesterday to go over to the site.

17          THE COURT:  Well, you may put him on.

18          MR. ROMO:  Thank you.

19          (In open court.)

20          MR. ROMO:  I would call Mr. Marco Palomares.

21          THE COURT:  Please come forward, sir.

22          MR. ROMO:  He is going to need the interpreter, Your

23  Honor.

24          THE COURT:  If we could have the interpreter.

25          THE COURTROOM DEPUTY:  Please raise your right hand.

1          (The witness, Marcos Palomares, was sworn.)

2          THE COURT:  State your full name for the record and

3     spell your last name.

4          THE WITNESS:  Marco Palomares.  Marco Palomares.

5     P-A-L-O-M-A-R-E-S.

6          (The witness, Marco Palomares, was sworn.)

7          THE COURT:  Mr. Palomares, you are going by way of an

8     interpreter, so you are going to have to wait until a question

9     is asked and the interpreter interprets the question for you

10    before you answer.

11         Do you understand that?

12         THE WITNESS:  Correct.

13         THE COURT:  You may proceed, Mr. Romo.

14                    MARCO PALOMARES,

15    a witness herein, having been first duly sworn by the clerk to

16    speak the truth and nothing but the truth, was examined and

17    testified through the interpreter as follows:

18                    DIRECT EXAMINATION

19    BY MR. ROMO:

20    Q.  Mr. Palomares, good morning, sir.

21    A.  Good morning.

22    Q.  Now, sir, you live in Pima County, is that correct?

23    A.  Yes.

24    Q.  And you have before you a photograph which is Exhibit 27.

25    Is this your property right here?  Do you recognize it?

———November 1, 2010 - Jury Trial - Day 5———

1  A.  Yes.

2  Q.  Okay.  And within that property there is a tree, is that

3  correct?

4  A.  Yes, a Mesquite.

5  Q.  Okay.  Now, on September 24th of last year, do you recall

6  that date?

7  A.  Yes.

8  Q.  Were you at home?

9  A.  No.

10  Q.  Was -- who was at home?

11  A.  14-year-old daughter.

12  Q.  Okay.  And where were you within the vicinity?

13  A.  I was driving.

14  Q.  Were you close to your property?

15  A.  Two blocks away.

16  Q.  Did you -- would you tell the jury what you heard then?

17  A.  I was -- as I was driving I received a phone call.  My

18  daughter was telling me that she heard bombs near the house.  I

19  saw a helicopter above the property and on the phone.  My

20  daughter, she was very frightened.  She said that there were

21  bombs going off, and there was a lot going on around the house.

22  So I sped up to get home faster.

23  Q.  And you were only two blocks from the property, is that

24  correct?

25  A.  Yes.

——— November 1, 2010 - Jury Trial - Day 5 ———

1  Q.  Did you call anybody?

2  A.  Well, I called -- well, first I answered my daughter's call

3  and I was near the property.  And before I got there a

4  policeman, he stopped me there in the street and he had a rifle

5  with him.

6  Q.  Did he point the rifle at you?

7  A.  Yes, to make me stop.  After that I told him that my

8  daughter was alone at home and she was 14 years old.  He told

9  me the situation was very dangerous, that I couldn't get close

10 to my home.  The officer told me for me to tell my daughter to

11 get under the bed.  That's what I did.

12         I don't know how much time went by.  I was very

13 desperate.  Finally, another officer came over and he asked me,

14 how many trailers are there at your place?  I told him only

15 one.  And so then he said, okay, then.  It's not you.

16         And after that, they let me go by.  When I got home,

17 my daughter was very distraught, all of the police cars, the

18 officers, the ones that I could see were there on my property.

19 They knocked down the metal fence that I had there along the

20 side.  They ordered me to go inside my home, that I couldn't be

21 outside.

22         I called a person, asking him, because I believed they

23 were trespassing on my property.  The person answered me,

24 telling me to let the officer do their job and for me not to

25 get into any kind of embarrassing situations.

UNITED STATES DISTRICT COURT

———— November 1, 2010 - Jury Trial - Day 5 ————

1  Q.  Were you afraid?

2  A.  Well, a situation like that, yes.

3  Q.  Did you ever give permission for the officers to be on your

4  property?

5  A.  No.

6  Q.  Excuse me.  Let the translation --

7  A.  No.

8  Q.  And with respect to the tree, there's some ant hills under

9  that tree?

10  A.  A large one.

11  Q.  What kind of ants are they?

12  A.  Some big red ants.  I don't know what they are.  I don't

13  know.  I don't know what they are.

14          MR. ROMO:  No other questions, Your Honor.  Thank you.

15          THE COURT:  Mr. Hormel?

16          MR. HORMEL:  I don't have any questions, no.

17          THE COURT:  Any questions from the government?  Ms.

18  Kelly?  Mr. Evans?

19          MR. EVANS:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. EVANS:

22  Q.  Thank you very much for coming in today.

23          Since September 24, 2009, you have rebuilt that fence

24  between you and your neighbors, correct?

25  A.  Yes.

—November 1, 2010 - Jury Trial - Day 5—

```
 1   Q.  So assuming the testimony we have is that this photograph

 2   was taken about three months ago, so the photograph of the

 3   fence that's shown here is the one -- your rebuilt fence,

 4   correct?

 5   A.  Yes.

 6   Q.  As a neighbor to this property, did you observe what was

 7   going on in that property?

 8           MR. ROMO:  Your Honor, I'm going to object beyond the

 9   scope and calls for speculation.

10           THE COURT:  What are you speaking of?  On that date?

11   On the date that this happened?

12           MR. EVANS:  Just generally, Your Honor, see if he

13   watches the property as a matter of course, sees what goes on

14   there and then we'll get down to September 22.

15           THE COURT:  That goes beyond the scope of direct

16   examination.

17   BY MR. EVANS:

18   Q.  How long have you lived in this property?

19   A.  Approximately 14 years.

20   Q.  Between September 22nd and September 24th, did you notice

21   some strangers on this property?

22   A.  No.

23   Q.  On the 24th of September, if the police told you that they

24   were trying to free a hostage, would you have said don't come

25   on to my property?
```

─── November 1, 2010 - Jury Trial - Day 5 ───

1          MR. HORMEL:  Objection; relevance.

2          THE COURT:  Calls for speculation.  Sustained.

3    BY MR. EVANS:

4    Q.  You understand a hostage situation might be dangerous?

5    A.  Well, of course.  Certainly I know it's dangerous.

6          MR. EVANS:  Thank you.  No further questions.

7          THE COURT:  Any redirect?

8          MR. ROMO:  No, Your Honor.

9          THE COURT:  Thank you, sir.  You are excused.

10          MR. ROMO:  Your Honor, Mr. Hormel is going next.

11          THE COURT:  Very well.  Mr. Hormel, do you wish to

12    call your first witness?

13          MR. HORMEL:  Yes, Your Honor.  I will call Yucari.

14          MR. ROMO:  I just gave the subpoena to Mr. Palomares.

15          THE COURT:  Very well.

16          Ma'am, come all the way to the front.  Step into the

17    witness box and remain standing, please.

18          Does Ms. Hernandez require the services of a court

19    interpreter?

20          MR. HORMEL:  Yes, Your Honor.

21          (The witness, Edlin Yucari Hernandez-Tinoco, was

22    sworn.)

23          THE COURT:  Please be seated, ma'am.  And state your

24    name for the record and spell your last name.

25          THE WITNESS:  Edlin Yucari Hernandez-Tinoco.

—November 1, 2010 - Jury Trial - Day 5—

1   H-E-R-N-A-N-D-E-Z.  Hernandez.

2          THE COURT:  Thank you.  You may proceed.

3          MR. ROMO:  Your Honor may I have a second?

4          THE COURT:  You may.

5               EDLIN YUCARI HERNANDEZ-TINOCO,

6   a witness herein, having been first duly sworn by the clerk to

7   speak the truth and nothing but the truth, was examined and

8   testified through the interpreter as follows:

9                    DIRECT EXAMINATION

10  BY MR. HORMEL:

11  Q.  Good morning.

12  A.  Good morning.

13  Q.  Could you tell the ladies and gentlemen of the jury what

14  relationship you have to Mr. Yuris Bonilla?

15  A.  Yes.  He's my relative.  He's my stepfather.

16  Q.  And how long have you known him?

17  A.  12 years.

18  Q.  And how old are you now?

19  A.  22 years old.

20  Q.  And is it fair to say that he has taken on the role as your

21  father?

22  A.  Yes.

23  Q.  Now, where do you live?

24  A.  In Nogales, Sonora, Mexico.

25  Q.  And were you recently studying?

─── November 1, 2010 - Jury Trial - Day 5 ───

1    A.  No.  Not recently.

2    Q.  But you had been at some point this year?

3    A.  Yes.  Not recently.  But yes, I have been studying.

4    Q.  And what was it that you were attempting to study?

5    A.  High school.

6    Q.  And do you work now?

7    A.  Yes.

8    Q.  And what sort of -- in what sort of field do you work?

9    A.  I work weekends at a clothes store.

10   Q.  Now, do you remember September of last year?

11   A.  Yes.

12   Q.  At some point in that month, did Yuris come up to Tucson?

13   A.  Yes.

14   Q.  About how long before the date of the arrest did he come up

15   to Tucson?

16   A.  A couple of weeks.

17   Q.  And during that time, did you come up and see him?

18   A.  Yes.

19   Q.  And --

20          MR. HORMEL:  One moment, please.

21   BY MR. HORMEL:

22   Q.  Now, I know this is an aerial photograph and you have

23   probably never seen it before.  But do you recognize that as

24   the area where the trailer was?

25   A.  Yes.

———November 1, 2010 - Jury Trial - Day 5———

1  Q.  Did you have occasion to visit there a couple of times?

2  A.  Yes, a couple of times.

3  Q.  And that was during the time period in the couple of weeks

4  prior to September 24th?

5  A.  Yes.

6  Q.  And why did you go there?

7  A.  To visit.  I went to visit, to see my dad.

8  Q.  All right.  And do you remember how many times it was that

9  you went?

10 A.  Three.  Three times.

11 Q.  And when you went there, can you tell us what typically

12 would happen?

13 A.  Nothing.  Everything was normal.  There was just the lady

14 of the house, my dad, the man of the house, everything was

15 normal.  Nothing other than the ordinary happened, everything

16 just like normal.

17 Q.  I want to show the Court what's marked as Exhibit 25,

18 already admitted.

19        Do you recognize that person?

20 A.  Yes.

21 Q.  And who is that?

22 A.  Maria, the lady of the house.

23 Q.  Did you have occasion to talk to her while you were there?

24 A.  Yes.

25 Q.  Do you remember whether she had children or not?

─── November 1, 2010 - Jury Trial - Day 5 ───

1   A.  Yes.  She had a baby.

2   Q.  And that little child in the photo, would that be that

3   baby?

4   A.  Yes.

5   Q.  Now, are you very close friends with Maria?

6   A.  No.  No.

7   Q.  Now, when you went to visit up -- when you went to visit in

8   Tucson, would you stay at the trailer?

9   A.  No.  No.

10  Q.  And where would you go?

11  A.  My uncle's home.

12  Q.  And would anyone go with you when you went to stay at your

13  uncle's home?

14  A.  Yes.  Yes.  Yes.  My dad.  He would stay with me.

15  Q.  And how many days at a time would you stay over there at

16  your uncle's?

17  A.  The whole week that I was here I stayed there with him.

18  Q.  Now, when was the last time -- or let's have this.  How

19  many days before your dad was arrested did you go to that

20  trailer for the last time?

21  A.  Three days.

22  Q.  Now, do you remember the layout of the inside of the

23  trailer?

24  A.  What it looked like inside?

25  Q.  Yes, where the different rooms were.

—November 1, 2010 - Jury Trial - Day 5—

1    A.   Yes.  Yes.  Yes.

2    Q.   Does that -- I'm showing what's been marked and already

3    admitted as Exhibit 34.  Does that look familiar to you?

4    A.   Yes.

5    Q.   And what is that?

6    A.   It's the house inside.  It's the dining room, the living

7    room, the kitchen.

8    Q.   Now, do you see a door towards the top of that picture

9    there?

10   A.   Yes.

11   Q.   Did you ever remember there being people sleeping or

12   staying there?

13   A.   No.

14   Q.   Do you ever remember someone being held at gunpoint in

15   there?

16   A.   No.  No one.

17   Q.   Do you ever remember there being someone living in that

18   trailer who was not allowed to leave?

19   A.   No.  No one.  The people that came and went there, they

20   came and went.  No one didn't let them come in or leave.

21   Q.   And just to sum up, each time that you went to the trailer,

22   how long, more or less, would you stay there?

23   A.   Two hours, that's all.  Two hours.

24   Q.   And then you would leave with your dad?

25   A.   Yes.

─────────── November 1, 2010 - Jury Trial - Day 5 ───────────

1   Q.  Would you describe your relationship with your dad as a

2   good relationship or a poor relationship?

3   A.  No.  Of course.  A very good relationship.

4   Q.  Thank you.

5           MR. HORMEL:  I have no further questions.

6           THE COURT:  Mr. Romo, any questions of this witness?

7           MR. ROMO:  No, Judge.

8           THE COURT:  And Mr. Evans.

9           MR. EVANS:  Thank you very much, Your Honor.

10                         CROSS-EXAMINATION

11  BY MR. EVANS:

12  Q.  Good morning.

13  A.  Good morning.

14  Q.  Do you live in Nogales, Sonora?

15  A.  Yes.  Nogales, Sonora.

16  Q.  And you are able to cross the border?

17  A.  Yes.

18  Q.  And you have a visa?

19  A.  Yes.

20  Q.  Does your father have a visa?

21  A.  No.

22  Q.  So when he comes to the United States, he can't cross the

23  border like you can, correct?

24          MR. ROMO:  Objection.  Goes beyond the scope.

25          THE COURT:  Overruled.

November 1, 2010 - Jury Trial - Day 5

1          THE WITNESS:  No.

2    BY MR. EVANS:

3    Q.  In fact, he's in the United States illegally, correct?

4    A.  Yes.

5    Q.  Does he help support you?

6    A.  Yes.

7    Q.  And how much does he give you?

8    A.  He doesn't give me any cash, just normally like a dad.

9    Q.  He gives you moral support, right?

10   A.  Yes.

11   Q.  You never -- we're showing you what has been marked as an

12   exhibit, Exhibit Number 34.  In this room where I'm pointing

13   with the end of my pen, you never saw anybody in that room,

14   correct?

15   A.  No.  There was never anybody.

16   Q.  When your father was in the United States he wasn't

17   working, was he?

18   A.  United States?  No.  He took care of some horses that were

19   there at the house.

20   Q.  Do you know who paid for his food?

21   A.  No.

22   Q.  Do you know who paid for him to stay, well, the gasoline

23   for his vehicle that he drove when you went over to your

24   uncle's house?

25   A.  No.

--- November 1, 2010 - Jury Trial - Day 5 ---

1   Q.  Now, you talked to him -- he would call you and you would

2   talk to him when you were in Sonora, correct?

3   A.  Yes.

4   Q.  What's your phone number?

5   A.  It's 631-11-342-95.  It's a Mexican phone.

6   Q.  Did your father ever ask you to go to the Western Union

7   store to pick up money for him?

8   A.  No.

9   Q.  Did your father ever ask you to pick up some money for him

10  and deliver it to him in the United States?

11  A.  No.

12  Q.  You don't know how he's supporting himself, do you?

13  A.  Yes.  He worked at Nogales at a food business.

14  Q.  But when he was in Tucson, he wasn't working in the food

15  business, was he?

16  A.  No.  No.  When he was here he would take care of the horses

17  over there.

18  Q.  And that's all he would do as far as you know, isn't that

19  right?

20  A.  Yes.

21  Q.  So --

22  A.  That's all.

23  Q.  So you never saw people who had been brought into the

24  United States illegally, did you?

25          MR. ROMO:  Objection.  Foundation, Your Honor.

—November 1, 2010 - Jury Trial - Day 5—

1          THE COURT:  Overruled.  She may answer.

2          THE WITNESS:  No.  Never.

3   BY MR. EVANS:

4   Q.  You never saw your father aim a gun at these people, did

5   you?

6   A.  No.

7   Q.  You never saw your father demand $2,300 from these people,

8   did you?

9   A.  No.  Not at all.

10  Q.  You love your stepfather, don't you?

11  A.  Of course.  Yes.

12          MR. EVANS:  No further questions.

13          THE COURT:  Any redirect, Mr. Hormel?

14          MR. HORMEL:  I have no further questions, Your Honor.

15  Thank you.

16          MR. ROMO:  I have one quick question, Your Honor.  May

17  I.

18          THE COURT:  Yes.  You may ask her.

19                      CROSS-EXAMINATION

20  BY MR. ROMO:

21  Q.  Ma'am, you are telling the truth here to this jury, is that

22  correct?

23  A.  Certainly.  Yes.

24  Q.  No matter what the relationship is between you and your

25  stepfather?

———November 1, 2010 - Jury Trial - Day 5———

1  A.  Okay.  Yes.  Yes.  It's the truth.

2          MR. ROMO:  Okay.  No further questions, Your Honor.

3          THE COURT:  Thank you, ma'am.  You may step down.  You

4  are excused.

5          THE WITNESS:  Thank you.

6          THE COURT:  Ladies and gentlemen, before we call the

7  next witness do you need a break?

8          We'll take about a 10, 15-minute break.  We'll stand

9  at recess.

10          (Recess taken.)

11          THE COURT:  The record will reflect the presence of

12  counsel, the defendants, and the jury.  Would you please call

13  your next witness, Mr. Hormel?

14          MR. HORMEL:  Yes.  I will get Maria Pina.

15          THE COURT:  Come forward, ma'am, all the way to the

16  front.

17          Please remain standing until you are sworn.

18          (The witness, Maria Pina, was sworn.)

19          (The witness was assisted by the court interpreter.)

20          THE COURT:  Please be seated and state your full name

21  and spell your last name for the record.

22          THE WITNESS:  Maria Pina, P-I-N-A.

23          THE COURT:  You may proceed.

24

25

—November 1, 2010 - Jury Trial - Day 5—

1                                MARIA PINA,

2    a witness herein, having been first duly sworn by the clerk to

3    speak the truth and nothing but the truth, was examined and

4    testified through the interpreter as follows:

5                          DIRECT EXAMINATION

6    BY MR. HORMEL:

7    Q.  Good morning, ma'am.  How are you?

8    A.  Very well.  Thank you.

9    Q.  I'm going to ask you just a few questions leave the bulk of

10   the questions to the other attorney.  But I'm going to start

11   just by asking you whether or not you recognize this.

12   A.  Yes.

13   Q.  And does that show a residence where you at one point

14   lived?

15   A.  Yes.

16   Q.  And I'm not sure if you have never seen this photo before,

17   but is the trailer that you lived in shown on that photo?

18   A.  Yes.

19   Q.  And I'm guessing that you remember an incident on September

20   24 of 2009 when some -- a large amount of police showed up at

21   your house?  Do you remember that?

22   A.  Yes, sir.

23   Q.  Now, do you recognize this picture?

24   A.  Yes, sir.

25   Q.  And is that the living room in the trailer that you lived

———— November 1, 2010 - Jury Trial - Day 5 ————

1  in?

2  A.  Yes, sir.

3  Q.  And what is that item there on the counter?

4  A.  It is a birthday cake for my son's birthday.

5  Q.  And who is the father of your son?

6  A.  Carlos Armando Calixtro.

7  Q.  And how long had you guys lived at this trailer prior to

8  the police arriving?

9  A.  One month, 15 days.

10  Q.  And, now, do you see a door -- or I mean a doorway, I

11  should say, located up here in the picture?

12  A.  Yes, but it doesn't have a door.

13  Q.  Now, is there a bathroom in there somewhere, a

14  half-bathroom?

15  A.  Yes, sir, but it doesn't work.

16  Q.  Did it ever work during the six weeks that you lived at the

17  trailer?

18  A.  No.

19  Q.  Now, there's some security bars on the windows of that

20  trailer, is that right?

21  A.  Yes.

22  Q.  Were those there when you moved in?

23  A.  Yes, sir.

24        MR. HORMEL:  One moment.  I have -- I'm going to leave

25  the rest of the questions to the other attorney.

—November 1, 2010 - Jury Trial - Day 5—

1          THE COURT:  Mr. Romo.

2                    DIRECT EXAMINATION

3     BY MR. ROMO:

4     Q.  Good morning, Maria.

5     A.  Good morning.

6     Q.  Now, I know you don't -- you understand English, but you

7     feel more comfortable with an interpreter so what I want you to

8     do is wait until the interpreter gives you the translation

9     before you answer any of my questions, please.

10    A.  Yes.

11    Q.  Now, how old are you?

12    A.  21.

13    Q.  And you live here in Pima County?

14    A.  Yes.

15    Q.  And you are a legal resident of the United States?

16    A.  Yes, sir.

17    Q.  And where did you go to school?

18    A.  Desert View High School.

19    Q.  Now, when did you meet Mr. Calixtro, sitting there in the

20    corner?

21    A.  Five years ago.

22    Q.  And how long have you lived with him?

23    A.  Three years.

24    Q.  And during those three years, where have you resided?

25    A.  First time we lived in a house that I had rented over on

—— November 1, 2010 - Jury Trial - Day 5 ——

1   Lincoln and 6th.

2   Q.  And how long did you live there?

3   A.  A few months.

4   Q.  And that was three years ago?

5   A.  Yes, sir.

6   Q.  And then after that, where did you live?

7   A.  And from there we moved in with my mom.

8   Q.  And where does she live?

9   A.  She lives -- should I give the full address?

10  Q.  Yes.  No problem.

11  A.  1630 East Breeze Lane.

12  Q.  And how long did you live there?

13  A.  About two years.

14  Q.  And after that, where did you live?

15  A.  Well, from there, that's when I started renting the trailer

16  from Mercedes Rascon.

17  Q.  And that would be this mobile home right here, is that

18  right?

19  A.  Yes, sir.

20  Q.  And where did Mercedes live when she rented you that

21  property?

22  A.  She was renting some apartments up the mountain.  The

23  apartments were called Les Montagnes.

24  Q.  And where did Mercedes' mother live?

25  A.  Across from the trailer that I was renting.

—November 1, 2010 - Jury Trial - Day 5—

1   Q.  And that would be here?

2   A.  Yes, sir.

3   Q.  And when Mercedes -- do you know how she acquired that

4   trailer mobile home?

5   A.  No.

6   Q.  But when she rented it to you, it already came with all the

7   structure as it was on the 24th of September, 2009, is that

8   correct?

9   A.  Yes, sir.

10  Q.  Now, when you say you lived with Carlos Calixtro, did you

11  live with him all the time or did he -- or what?

12  A.  Well, he would come and go.

13  Q.  All right.  Now, what was his job?

14  A.  He takes care of horses.

15  Q.  And what do you mean by that?  What does he do with horses?

16  A.  He had race horses, and he would take care of them so that

17  -- to race them.

18  Q.  And then did he get some money as a result of that?

19  A.  Yes, sir.

20  Q.  And did you know the other gentleman by the name of Yuris?

21  A.  Yes.

22  Q.  And to your knowledge -- first of all, when did you meet

23  him?

24  A.  I met him in Nogales.

25  Q.  Was he a friend of your husband's, or boyfriend?

1    A.  Yes, sir.

2    Q.  And when did he come to stay -- well, did he ever come to

3    stay with you?

4    A.  Yes, sir.

5    Q.  And when was that?

6    A.  About a week, about two weeks after I had moved into the

7    trailer.

8    Q.  So he was there about a month before September 24th?

9    A.  Yes, sir.

10   Q.  And what did he do?

11   A.  He would help Carlos with the horses.

12   Q.  Did he get some money from Carlos?

13   A.  Well, if they won a race, yes, but if he didn't, he didn't.

14   But he stayed at the house.

15   Q.  Now, Carlos, to your knowledge, is he married?

16   A.  No.

17   Q.  Does he have other children?

18   A.  Yes, sir.

19   Q.  Now, you two have one child, is that correct?

20   A.  Yes, sir.

21   Q.  And what is his name?

22   A.  Carlos Armando Calixtro.

23   Q.  And is this Carlos Armando in the photograph?

24   A.  Yes, sir.

25   Q.  And when Carlos left, where would he go?

———— November 1, 2010 - Jury Trial - Day 5 ————

```
 1   A.   Casa Grande.

 2   Q.   Would that be in Arizona?

 3   A.   Yes, sir.

 4   Q.   Is that a town between Phoenix and Tucson?

 5   A.   Yes, sir.

 6   Q.   And to your knowledge, who lives there?

 7   A.   His mom and his dad.  Well, his mom passed away but his dad

 8   lives there.

 9   Q.   And when did Carlos's mother die?

10   A.   About two years ago.

11   Q.   Now, is Carlos a legal resident of the United States, if

12   you know?

13   A.   Yes, sir.

14   Q.   Does he have a lawyer, do you know, that handles his

15   immigration matters?

16   A.   Yes, sir.

17   Q.   Do you know his name?

18   A.   Baleno (phonetic).

19   Q.   Mr. Baleno (phonetic)?

20   A.   Yes.

21   Q.   Now, during the period of time that you lived at this

22   mobile home, where did Carlos keep his horses?

23   A.   Before we moved into the trailer home, he kept the horses

24   with my mom's place.  And then after, when we moved in, he had

25   them there at the trailer.
```

1   Q.   And would that be right here on the back?

2   A.   Yes, sir.

3   Q.   And how many horses were there?

4   A.   Four.

5   Q.   And how often would he race those horses?

6   A.   Well, not very often.  But all the time that they were

7   there, he would be taking care of them.  And about a month

8   before the race, that's when he would prepare them for the

9   race.  He would take care of them and get them ready for the

10  race and then they would race and after that he would take care

11  of them.

12  Q.   And when Carlos would leave, did you go with him?

13  A.   Yes, sir.

14  Q.   And did you go with him to Casa Grande sometimes?

15  A.   Yes, sir.

16  Q.   So you were in and out of the mobile home, is that correct?

17  A.   Yes, sir.

18  Q.   Now, did you meet a young lady by the name of Yasmin?

19  A.   Yes, sir.

20  Q.   And I'm talking Yasmin Luna.

21  A.   Yes, sir.

22  Q.   Do you know another young woman named Yasmin?  Is that

23  correct?

24  A.   Yes, sir.

25  Q.   And she is your friend?

—— November 1, 2010 - Jury Trial - Day 5 ——

1   A.  Yes, sir.

2   Q.  And during the time that you were residing at this mobile

3   home, your friend, Yasmin, used to live right over here, is

4   that correct?

5   A.  Yes, sir.

6   Q.  Now, this other Yasmin, Yasmin Luna, when did you meet her?

7   A.  About 15 days after I moved into the trailer.

8   Q.  And was she staying there at the mobile home?

9   A.  Yes, sir.

10  Q.  And what was she doing there?  How did she get there?

11  A.  Well, she showed up.  Yuris brought her.  She was there and

12  she asked me if she could stay there at the trailer with me

13  because she had problems back in Mexico.  She was from Mexico

14  City, and she was having a lot of problems with her husband.

15  And so she would cry to me and ask me if she could please stay

16  with me.

17  Q.  And did she stay there?

18  A.  Yes, sir.

19  Q.  Did she help you?

20  A.  Yes, sir.

21  Q.  Did she used to go out with you?

22  A.  Yes, sir.

23  Q.  Would she go over to your mom's?

24  A.  Yes, sir.

25  Q.  Would she go over to the stores?

─── November 1, 2010 - Jury Trial - Day 5 ───

1   A.  Yes.

2   Q.  Was she free to use the telephone?

3   A.  Yes, sir.

4   Q.  In addition, was there someone named Cesar who also came to

5   the house?

6   A.  Yes.

7   Q.  Now, Cesar, when did he arrive there?  Was it two days

8   before the 24th?

9   A.  Yes, sir.

10  Q.  And how did he get there, if you know?

11  A.  Well, when I arrived he was already there.

12  Q.  All right.  And you arrived, what was that, on the 22nd?

13  Did you get home?

14  A.  Yes, sir.

15  Q.  What time did you get home?

16  A.  I got there in the afternoon.

17  Q.  About what time?

18  A.  Around 5:00.

19  Q.  And at that hour, where was he?

20  A.  He was in the living room.

21  Q.  What was he doing?

22  A.  He was sitting there with Carlos and Yuris.

23  Q.  Were they talking or what were they doing?

24  A.  They were talking.

25  Q.  And when you talk about the living room, you talk about

———November 1, 2010 - Jury Trial - Day 5———

1  this area right here?

2  A.  Yes, sir.

3  Q.  Now, how long -- he arrived there on the 22nd, and he was

4  there until the 24th, is that correct?

5  A.  Yes, sir.

6  Q.  And was he staying in this room in the back?

7  A.  Yes, sir.

8  Q.  And in that room, I'm going to show you a photograph.

9        MR. ROMO:  Your Honor, this has not been admitted,

10  this picture.  And it is Exhibit 170 -- it's Exhibit 106, Your

11  Honor, that picture.

12  BY MR. ROMO:

13  Q.  Do you recognize that photograph?

14  A.  Yes, sir.

15  Q.  Now, there are some toys in that -- on that bed.  Do you

16  see that?

17  A.  Yes, sir.

18  Q.  Would you explain to the jury about those toys?

19  A.  Yes.  That room is where I kept my son's toys, because with

20  time I was going to fix it up for him to be his room.

21  Q.  So that room was unoccupied when you were there?

22  A.  No, sir.

23  Q.  And Yasmin Luna, where was she staying?

24  A.  Yasmin slept in the living room.

25        MR. ROMO:  Your Honor, move for the admission of

November 1, 2010 - Jury Trial - Day 5

1    Exhibit 106.

2              THE COURT:  Any objection?

3              MS. KELLY:  No.

4              THE COURT:  106 is admitted.

5    BY MR. ROMO:

6    Q.  Now, as you can see on Exhibit 34 -- and that is admitted,

7    so could it be published, please?

8              Exhibit Number 34, there is the back there, that's the

9    area where -- right over here, is that the area of where you

10   said Cesar was staying?

11   A.  Yes, sir.

12   Q.  And there is a door next to it.  Do you see that door

13   there?

14   A.  Yes, sir.

15   Q.  Now, is that the back door?

16   A.  No.  It's the main entrance.

17   Q.  Now, that door, did it have a handle?

18   A.  Yes.

19   Q.  Was it locked?

20   A.  Well, when -- it had to be locked, like, at nighttime, but

21   all day long it was open.  It didn't have any lock on.

22   Q.  Was there any door at that mobile home?

23   A.  Yes.  The back door.

24   Q.  And on the 24th, the officers came in through the front

25   door or the back door?

—November 1, 2010 - Jury Trial - Day 5—

1  A.  Through the back door.

2  Q.  The back door, was that locked or was it unlocked,

3  generally speaking?

4  A.  Well, the same thing.  At night we would lock it, and

5  during the day it would remain open without a lock.

6  Q.  I'm going to show you Exhibit 136, which has not been

7  admitted, Your Honor.

8          Do you see that photograph, Maria?

9  A.  Yes, sir.

10  Q.  Is that -- well, first of all, who took that photograph?

11  A.  I did.

12  Q.  And when did you take that?

13  A.  The day when the SWAT team showed up, I took it that night.

14  Q.  And do you see, is that the floor of the mobile home?

15  A.  Yes, sir.

16  Q.  And I see something on the floor.  Would you tell the jury

17  what that is?

18  A.  Yes.  It's burned there because that's where they threw the

19  bomb inside.

20  Q.  Now, is that the door next to it?

21  A.  Yes.  That's the back door.

22  Q.  And was that door locked when the officers came?

23  A.  No, sir.

24  Q.  It was unlocked?

25  A.  Yes, sir.

─────── November 1, 2010 - Jury Trial - Day 5 ───────

1        MR. ROMO:  Your Honor, we move for the admission of

2   Exhibit 136.

3        THE COURT:  Any objection?

4        MS. KELLY:  No objection.

5        THE COURT:  136 is admitted.  It may be published.

6   BY MR. ROMO:

7   Q.  Now, I'm going to show you Exhibit 101 and 100.  And these

8   have not been admitted.

9        Do you recognize that?

10  A.  Yes, sir.

11  Q.  And what is that?  Could you describe it for the jury?

12  A.  Yes.  Those are the horse corrals.

13       MR. ROMO:  Your Honor, we move for the admission of

14  Exhibit 100.

15       THE COURT:  Any objection?

16       MS. KELLY:  No objection.

17       THE COURT:  Shall be admitted.  It may be published.

18  That's 100?

19       MR. ROMO:  Yes, sir.  Yes, Your Honor.

20  BY MR. ROMO:

21  Q.  And this has not been admitted.  It's 101.  Is that a

22  photograph of the same place?

23  A.  Yes, sir.

24  Q.  And this -- all those photos you took the same night,

25  right?

——— November 1, 2010 - Jury Trial - Day 5 ———

1   A.  Yes, sir.

2   Q.  And that would be the 9th of April -- of September 24th of

3   2009, correct?

4   A.  Yes, sir.

5           MR. ROMO:  Your Honor, we move for the admission of

6   101.

7           THE COURT:  Any objection?

8           MS. KELLY:  No objection.

9           THE COURT:  101 is admitted.

10          MR. ROMO:  And again, Your Honor, we have Exhibit 114

11  which has not been admitted.

12  BY MR. ROMO:

13  Q.  Do you recognize that photograph?

14  A.  Yes, sir.

15  Q.  And what is that?

16  A.  It's the large bathroom.

17          THE COURT:  Is that sitting on top of another

18  photograph?

19          MR. ROMO:  Yes, Judge.

20  BY MR. ROMO:

21  Q.  Now, was that the only workable bathroom?

22  A.  Yes, sir.

23  Q.  Now, you testified that there was another bathroom and that

24  bathroom was in the small room with no door, is that correct?

25  A.  Yes, sir.

————November 1, 2010 - Jury Trial - Day 5————

1   Q.  And that didn't work, is that correct?

2   A.  Yes, sir.

3         MR. ROMO:  I would move for the admission of Exhibit

4   114.

5         THE COURT:  Any objection?

6         MS. KELLY:  No objection, Your Honor.

7         THE COURT:  114 is admitted.  It may be published.

8         MR. ROMO:  Now, I'm going to show the witness Exhibit

9   115, Your Honor.  It has not been admitted.

10  BY MR. ROMO:

11  Q.  Now, do you recognize that?

12  A.  Yes, sir.

13  Q.  Would you tell the jury what that is?

14  A.  That's the room where Carlos, my son, and I slept.

15  Q.  All right.  Then is that the main bedroom?

16  A.  Yes, sir.

17        MR. ROMO:  Now I would move for the admission of 115.

18        MS. KELLY:  No objection.

19        THE COURT:  115 may be admitted, be published.

20        MR. ROMO:  I'm going to show 133, Your Honor, which

21  has not been admitted.

22  BY MR. ROMO:

23  Q.  Do you see that photograph?

24  A.  Yes, sir.

25  Q.  And is that the same bedroom?

─────────────── November 1, 2010 - Jury Trial - Day 5 ───────────────

1   A.  Yes, sir.

2   Q.  And is that the way it was left by BORTAC?

3   A.  Yes, sir.

4           MR. ROMO:  Your Honor, we would move for the admission

5   of Exhibit 133.

6           MS. KELLY:  No objection.

7           THE COURT:  133 shall be admitted.  May be published.

8   BY MR. ROMO:

9   Q.  Now, I'm going to show you -- again, this has been

10  admitted, Your Honor, Exhibit 34.

11          This is the living room, is that correct?

12  A.  Yes, sir.

13  Q.  And the other bedroom is not seen in this photograph, is

14  that correct?

15  A.  Yes, sir.

16  Q.  And the main door also is not seen in this photograph, is

17  that correct?

18  A.  Yes.

19  Q.  And the bathroom that was working, where was it located in

20  relation to this photograph?

21  A.  Over here on this side, over by the area where they threw

22  the bomb and it was burned.

23  Q.  So it was located pretty close to the entry door, is that

24  correct, the back door?

25  A.  Yes, sir.

—— November 1, 2010 - Jury Trial - Day 5 ——

1   Q.  And that's the same hallway that led to your bedroom?

2   A.  Yes, sir.

3         MR. ROMO:  Your Honor, I'm going to show 127 which has

4   not been admitted.

5   BY MR. ROMO:

6   Q.  Do you recognize that photograph?

7   A.  Yes, sir.

8   Q.  And is that the same living room we just saw?

9   A.  Yes, sir.

10  Q.  And that was after the officers came in, is that correct?

11  A.  Yes.

12        MR. ROMO:  Your Honor, we would move for the admission

13  of 127.

14        MS. KELLY:  No objection.

15        THE COURT:  Exhibit 127 is admitted; may be published.

16        MR. ROMO:  Now, this is another photograph, Your

17  Honor, that has not been admitted.  That would be 128.

18  BY MR. ROMO:

19  Q.  Do you recognize that?

20  A.  Yes, sir.

21  Q.  And is that the same living room?

22  A.  Yes, sir.

23  Q.  Part of the kitchen?

24  A.  Yes, sir.

25  Q.  And that was after the officers came in?

—— November 1, 2010 - Jury Trial - Day 5 ——

1    A.  Yes, sir.

2         MR. ROMO:  Your Honor, we move for the admission of

3    128.

4         MS. KELLY:  No objection.

5         THE COURT:  128 is admitted; may be published.

6         MR. ROMO:  Your Honor, I have about three more photos.

7         THE COURT:  I'm sorry?

8         MR. ROMO:  I have about three more photos.

9    BY MR. ROMO:

10   Q.  So this is Exhibit 129, and it has not been published.  Do

11   you recognize that?

12   A.  Yes, sir.

13   Q.  What is it?

14   A.  It's my son's pictures.

15   Q.  And it was after the officers came in?

16   A.  Yes, sir.

17        MR. ROMO:  Your Honor, I would move for the admission

18   of Exhibit 129.

19        MS. KELLY:  No objection.

20        THE COURT:  Shall be admitted; may be published.

21   BY MR. ROMO:

22   Q.  I'm going to show you another photograph which is Exhibit

23   130.

24        Do you recognize that?

25   A.  Yes, sir.

November 1, 2010 - Jury Trial - Day 5

1   Q.  Would you tell the jury what that is?

2   A.  It's the kitchen there in the trailer.

3   Q.  And does that show the cake as well that you had that day?

4   A.  Yes, sir.

5   Q.  And is that the way it was left after the officers left?

6   A.  Yes, sir.

7   Q.  Finally, I want to show you --

8           MR. ROMO:  Your Honor, move for the admission of this

9   exhibit, which is Exhibit 130.  Request it be published.

10          MS. KELLY:  No objection.

11          THE COURT:  Shall be admitted; may be published.

12  BY MR. ROMO:

13  Q.  Finally, I will show you Exhibit 131, which has not been

14  admitted.

15          Now, is that the same bedroom as your bedroom?

16  A.  Yes, sir.

17  Q.  And this is the way it was left after the officers left?

18  A.  Yes, sir.

19  Q.  Now, September 24th is a very special day for you.

20          MR. ROMO:  Your Honor, we move for the admission of

21  Exhibit 131.

22          THE COURT:  131.  Any objection?

23          MS. KELLY:  No objection, Your Honor.

24          THE COURT:  131 is admitted.  Mr. Romo, I'm going to

25  stop here.  We'll take our noontime break.

——— November 1, 2010 - Jury Trial - Day 5 ———

1         At this time, Ladies and Gentlemen, I'm going to take

2    our lunch break.  We have a legal matter we need to deal with.

3    I'm going to take an hour off and meet with the lawyers at

4    1:00.  I will ask you to be here at 1:30.  That matter

5    shouldn't take more than a half hour.  So we'll reconvene at

6    1:30.

7         You are excused for lunch.  Thank you.

8         Record will reflect that the jury has gone.

9         Counsel and the defendants are present.  Counsel,

10   we'll reconvene at 1:00.  At that point, if there's any legal

11   motions that counsel wishes to make at the close of the

12   government's case, they may make it at that time in full force

13   and effect.

14        Also, we'll -- if we have time, we'll go make a

15   preview of the instructions that I had submitted to you on

16   Friday.

17        MR. ROMO:  Your Honor?

18        THE COURT:  Yes.

19        MR. ROMO:  Requesting that the exhibits be kept by the

20   Court so we don't have to be looking after the government's

21   documents for them.

22        THE COURT:  Very well.

23        Anything else?  See you at 1:00.

24        MS. KELLY:  Your Honor, we may just want to admonish

25   the defense witnesses since they are present and that the Rule

———— November 1, 2010 - Jury Trial - Day 5 ————

1    has been invoked.

2            THE COURT:  All right.  Did you get your last witness

3    here?  And counsel, those that aren't here you need to tell the

4    witnesses that the Rule is invoked.

5            MR. ROMO:  Yes, sir.  No witnesses present.

6            THE COURT:  Call your last witness forward again.

7            Ma'am, what's called the Rule has been invoked in this

8    case.  As a witness, you cannot discuss your testimony with

9    anyone nor allow anybody to discuss your testimony with you

10   other than the lawyers in this case.

11           Do you understand?

12           THE WITNESS:  Yes, sir.

13           THE COURT:  Thank you.  Counsel, we'll see you at

14   1:00.

15           (Noon recess.)

16           THE COURT:  Good afternoon.  Thank you.  Please be

17   seated.

18           The record will reflect the presence of counsel and

19   the defendants and the absence of the jury.

20           Before the noon recess, the government had rested and

21   counsel was called upon to present their witnesses, but at this

22   time, counsel do you wish to make your Rule 29 motions?  And

23   you may do so with the same full force and effect.

24           Mr. Hormel.

25           MR. HORMEL:  Thank you, Your Honor.  I would primarily

—November 1, 2010 - Jury Trial - Day 5—

1    focus on the conspiracy to commit hostage taking.  I don't

2    think the government presented even one scintilla of evidence

3    there has been a conspiracy against anyone in this case.  I

4    don't know how that charge could really go to the jury.  They

5    haven't presented even one -- even the expert didn't attempt to

6    conclude or opine that there was -- the only thing he could say

7    was these are how organizations operate in loose conjunction

8    with one another.  But he wasn't able to say anything about

9    what went on in that house because he doesn't have any

10   information about it.  I don't think there was other testimony

11   presented that showed there was some sort of agreement from

12   which the jury could infer that there had been a conspiracy.

13        And therefore, I would move, Your Honor, based on the

14   total lack of evidence of a conspiracy that that charge be

15   dismissed.

16        THE COURT:  Thank you.

17        Mr. Romo.

18        MR. ROMO:  And, Your Honor, I do join in that motion,

19   Your Honor.  I don't believe, and I don't recall, any testimony

20   that there was with regard to a conspiracy.  What there was was

21   Mr. Ellis's testimony, and that's not testimony as to any of

22   the facts here.  So I join in that, Your Honor.

23        THE COURT:  Thank you.

24        Mr. Evans.

25        MR. EVANS:  Thank you, Your Honor.

—————— November 1, 2010 - Jury Trial - Day 5 ——————

1          Addressing the conspiracy, as the Court, in ruling on

2     the co-conspirator statements noted, the conspiracy like this

3     starts when solicitors out there puts the man in the pipeline.

4     Everyone wants to be smuggled in, and everyone along the line

5     has their role.  They all know the role is there for the

6     purposes of them getting money.  That commodity, that illegal

7     alien, is the money.

8          So that, Your Honor, we don't -- obviously,

9     conspiracies are not contracts that are legally filed but

10    they're borne of agreements with a voice or through action that

11    two people agree they are going to commit the crime of hostage

12    taking wherein the defendants are members of the conspiracy.

13    They are there to receive the people who have been through the

14    pipeline.  They are there to make sure that those people, those

15    illegal aliens, do not leave until the money is paid which is

16    the core of the charge of hostage taking.

17         And three, the third element, which will be added to

18    the jury -- Court's jury instructions, is that the intent of

19    this conspiracy was these people being detained until the money

20    is released.  When you monitor a phone call it says it all.

21    Doesn't matter whether or not we prove Mr. Calixtro was the man

22    on the phone.  This statement by itself says you will not get

23    your person who has been smuggled into the United States until

24    you pay us the money.  When you pay us the money, we'll deliver

25    the guy.

—November 1, 2010 - Jury Trial - Day 5—

1           Therefore, Your Honor, we have more than enough

2    evidence to go to the jury on conspiracy to commit hostage

3    taking.

4           THE COURT:  Mr. Hormel, anything further?

5           MR. HORMEL:  Briefly, Your Honor.  On the phone call,

6    the phone call doesn't establish anything, monitored phone

7    call.  All it states is that suggests the completion of a

8    contract pursuant to payment.  It makes no threat whatsoever.

9    There is nothing in there stated about whether or not someone

10   will either be detained longer or whether they will be hurt or

11   harmed or anything that follow the elements of the conspiracy

12   of the hostage taking statute.

13          The only thing, the only plausible corollary to the

14   statement that was made by the person on the tape as well, if

15   you don't pay the money, well, we're not going to drive him up

16   there.  That doesn't mean he's going to stay there.  It just

17   means the agreed upon work will not be done.  It has nothing to

18   do with hostage taking, Your Honor.  There are no threats made.

19   There's no statement regarding continued detention.

20          And so that in this tape recording, it's just not

21   there.  In fact, it's not there in anywhere.

22          THE COURT:  Thank you.

23          Mr. Romo, anything further?

24          MR. ROMO:  Yes.  I wanted to emphasize, Judge, the

25   phone call apparently was made by someone who is not a party to

--- November 1, 2010 - Jury Trial - Day 5 ---

1    this charge, Herman Gonzales, I believe.  And that was the

2    testimony that was given by the witness, Judge.

3         That's all, Your Honor.

4         THE COURT:  Thank you.  Well, this -- as to this

5    charge, to the conspiracy charge, I think that the government's

6    evidence primarily is based upon the testimony of Mr.

7    Lopez-Trujillo, to some extent his wife, regarding the phone

8    call.  But if his testimony is to be believed, which, of

9    course, falls within the purview of the jury, then we have a

10   situation where he is contacted by a recruiter in Nogales.

11   He's referred to a Pelon in Nogales, Pelon presumably with

12   somebody in that home and negotiates a price of $1,500.

13        He is then turned over to the guides and Flaco and the

14   other unknown guide, Flaco being the name that Mr.

15   Lopez-Trujillo gave him, who then take him and the other

16   individuals, according to Mr. Lopez-Trujillo, through the

17   desert on a very long walk, ending somewhere near a freeway

18   frontage road where they are picked up in a vehicle, and the

19   same guides drive them on into Tucson and to the trailer that

20   according to Mr. Lopez-Trujillo, the stash house operators

21   where Mr. Bonilla and Mr. Calixtro.  Both Mr. Bonilla Mr.

22   Calixtro, from time to time, threatened them by firearm that

23   had a laser sight and they would place that laser sight on them

24   to intimidate them.

25        Further, it appears that from this information alone,

November 1, 2010 - Jury Trial - Day 5

1  a jury could find that there was a conspiracy ongoing starting

2  with the recruiter all the way through to the stash house where

3  they were eventually found.  And the evidence is sufficient for

4  viewing in the light most favorable to a jury -- for a

5  rational, reasonable jury to find all the elements here.  The

6  majority of the people here are unknown people but, of course,

7  the conspiracy law provides for any agreement between known and

8  unknown co-conspirators being involved in an undertaking.

9        And I know that Mr. Hormel had a different take on

10 this saying that there was -- this was not a conspiracy but

11 several small, independent operating conspiracies.  But the

12 Court finds that, as the court found then, that there is a

13 conspiracy from the day the person is recruited until the day

14 that person is delivered to his home after having paid the sum

15 of money.

16       Also supported by this is the testimony of Ms.

17 Hayes-Lopez who testified that -- Hayes-Lopez, I'm sorry, Ms.

18 Hayes-Lopez that she received phone calls, spoke to people who

19 explained to her that she had to pay a certain amount of money

20 to get her husband back, where, and how to deposit the money in

21 order for her husband to be delivered to her home.  And that

22 those conversations -- and you tie that in to Mr.

23 Lopez-Trujillo's statement that, in fact, he was taken out and

24 viewed the defendant may have been those phone calls passing

25 the phone on to him to converse with his wife and the

——————— November 1, 2010 - Jury Trial - Day 5 ———————

1    discussions of how much money should be paid and when and to

2    whom.

3            So based on all that evidence the Court finds there is

4    sufficient evidence, viewing the evidence in the light most

5    favorable to the jury -- for a rational jury to find all the

6    elements as to the Count 1, the conspiracy count.

7            As to the other counts there have been no motions

8    regarding that.  The Court finds there is sufficient evidence

9    to prove each of the elements beyond a reasonable doubt as to

10   Counts 2 and Counts 3.

11           MR. HORMEL:  Your Honor.

12           THE COURT:  Yes.

13           MR. HORMEL:  I would just, for the purpose of making a

14   record point out that the conspiracy is to commit hostage

15   taking.  The conspiracy is not to commit alien smuggling.  So

16   while the Court's recitation of the various stages of the

17   conspiracy as presented by Mr. Lopez or whatever that testimony

18   is worth may result in a rational jury being able to infer that

19   there's a conspiracy to commit hostage taking.  However, there

20   is no way that they have proved in any way, especially

21   considering Mr. Ellis's testimony, that the primary object of

22   the vast majority of these enterprises is simply to commit

23   alien smuggling, not commit hostage taking.

24           What the government has undertaken to prove is there's

25   a conspiracy to commit hostage taking, not that there's a

————November 1, 2010 - Jury Trial - Day 5————

1  conspiracy to commit alien smuggling.  Those are very different

2  charges with different elements.  Though there may well be

3  evidence to support a conspiracy to commit a more generic

4  offense of alien smuggling as represented by the recruiter, as

5  represented by the guides, as represented by people arriving at

6  the home at a drop house and all the things Agent Ellis

7  described.

8       However, none of those things actually pertain

9  specifically to the conspiracy to commit hostage taking, Your

10  Honor.  I would ask the Court to consider that because that I

11  don't believe there was any testimony that supported that.

12       THE COURT:  Well, again, we go back to the testimony

13  of Mr. Lopez-Trujillo.  Did he bargain for -- to be brought in,

14  to be part of this alien smuggling conspiracy?  He was told the

15  sum of money would be $1,500.  This is, again, this is his

16  testimony.  It's up to the jury whether to believe that

17  testimony or not.  The Court can't make any rulings as to the

18  believability of the testimony.

19       Once he arrives and he is brought to this house there,

20  once he arrives at the house, then the amount of money changes,

21  according to him, to $2,300.  He never, according to him, had

22  any intention to pay anybody any money in Tucson because not

23  only was it $1,500 but it was also $1,500 a payment, whereupon

24  he now owes $2,300.  And according to him, Bonilla and Calixtro

25  are holding him there.  First, he claims that they took all of

——— November 1, 2010 - Jury Trial - Day 5 ———

1    his clothes and shoes and everything else, and he was in his

2    underwear sitting in a room there in that house, that as again,

3    repeating the statement that both of these individuals would,

4    from time to time, come in and point a weapon at him and the

5    others there and threaten.  And those threats were communicated

6    to his wife, who also said that there were threats

7    communicated.  But the threats were being communicated to Mr.

8    Trujillo.  The question, of course, is for the jury to decide

9    were those threats actually made or are those threats Mr.

10   Trujillo's interpretation of what went on there.

11           But at this point that I'm looking at this case, I

12   have to accept that testimony of Mr. Trujillo, Lopez-Trujillo

13   that, in fact, once arriving at the home, he was being held

14   against his will by Mr. Bonilla and Mr. Calixtro and possibly a

15   third person all acting in concert, and that the sum of money

16   went up, and that he was told that if he didn't pay that money

17   he would be killed or injured in some way.  And further, that

18   he was repeatedly menaced by the pointing of a firearm with a

19   laser sight.

20           And so therefore, there's clearly within the

21   underlying overall alien smuggling conspiracy, there's clearly

22   also, if that can be proven, a conspiracy to hold him hostage

23   after he arrived there at the home.

24           So based on that, the Court finds that there is a

25   basis for the Count 1 with the added elements or added issues

─────── November 1, 2010 - Jury Trial - Day 5 ───────

1    regarding hostage taking.  But again, those are matters of

2    witness credibility that the jury will have to decide.  Even in

3    the light most favorable to the government there is sufficient

4    evidence for this case to go to the jury at this point.

5            So the motions for Rule 29 are denied.

6            We move on now, Counsel, to the issue regarding the

7    instructions.  First, there was a correction to Page 2 to the

8    instructions as pointed out by Mr. Evans that the Court had

9    left out the third element there, that third -- the way it

10   reads now, there's a first beginning from the date unknown to

11   or about September 24th, 2010 (sic) there was an agreement

12   between two or more persons to commit the crime of hostage

13   taking as charged in Count 2 of the indictment, and second, the

14   defendants became a member of the conspiracy knowing of at

15   least one of its objects and helping to accomplish it, and

16   third, the defendants willfully and knowingly became a member

17   of the conspiracy whose purpose was to compel or attempt to

18   compel a third person to act in some way or to refrain from

19   acting in some way as an explicit or implicit condition for the

20   release of the person contained.  That was the third prong of

21   the conspiracy left out in my first set of instructions I gave

22   you.  That has now been inserted.

23           Mr. Evans or Ms. Kelly, are there any other objections

24   or corrections to the instructions that the Court has proposed?

25           MR. EVANS:  There's --

—————November 1, 2010 - Jury Trial - Day 5—————

1          THE COURT:  Mr. Evans, I'm sorry.

2          MR. EVANS:  Your Honor, the *Pinkerton* instruction

3   based on the way the facts have come out, we would like to

4   withdraw that.

5          THE COURT:  All right.  So we're talking about Number

6   5.  Instruction 5 is *Pinkerton*, I believe.  Is that correct?

7          MR. EVANS:  Yes, Your Honor.

8          THE COURT:  Is there any objection by counsel for the

9   defendants if this *Pinkerton* instruction, Instruction Number 5,

10  is withdrawn?

11         MR. HORMEL:  No, Your Honor.

12         MR. ROMO:  No objection.

13         THE COURT:  Very well.  Number 5 will be removed.

14         MR. EVANS:  Also, Your Honor, the only other, Page 20

15  is a mere presence defense.

16         THE COURT:  Yes.

17         MR. EVANS:  We believe based on the record as of this

18  moment that there's no evidence to support that either

19  defendant would have a mere presence defense to these

20  particular charges.

21         THE COURT:  I see mere presence will also misstate the

22  offense.  The offense is harboring, and it says transportation

23  of illegal aliens for profit.

24         So that has to change.

25         Well, if we go back to the testimony of Mr.

——— November 1, 2010 - Jury Trial - Day 5 ———

1   Lopez-Trujillo, he is the tie that binds this entire case

2   together here.  If the jury chose not to believe that about Mr.

3   Calixtro and Mr. Bonilla then, yeah, mere presence would come

4   into play.  So I think it has to remain there, because if, in

5   fact, they weren't the ones making the threats, they weren't

6   the ones changing the amounts, they weren't the ones holding

7   these people, and they are there at the trailer, their presence

8   does -- that's a jury question that needs to be decided.  And I

9   think that, therefore, I would leave the mere presence in with

10  the correction that it address the proper offense rather than

11  transportation of illegal --

12          MR. EVANS:  Sorry.  We didn't note that.  We got to

13  mere presence and had our objection.

14          Your Honor, also, we provided the Court with four

15  interrogatories.

16          THE COURT:  Yes.  We're going to work those into the

17  end of the verdicts as we did last time.  I don't know if you

18  remember the last time we did that where they had to find --

19  the jury had to find the elements of the offense and then tell

20  us whether they found the elements of either the violence or

21  the for profit.  Okay.

22          MR. EVANS:  It is all part of the -- they are not

23  going to -- it's all part of the same instruction rather than

24  coming and deliberating, coming to a decision here and going

25  back in for the special interrogatories?

November 1, 2010 - Jury Trial - Day 5

```
 1          THE COURT:  It's all going to be on one verdict form.
 2   But it is in there and it should be in there.
 3          MR. EVANS:  We don't have the forms of verdict, Your
 4   Honor.
 5          THE COURT:  Okay.  Those two apply only to the
 6   harboring.
 7          MR. EVANS:  Yes, Your Honor.
 8          THE COURT:  So if you look at Page 7 as part of the
 9   harboring instruction, after the fourth element stating
10   harboring, it says, if you find the above elements are proven
11   beyond a reasonable doubt, you must then decide whether the
12   government has proven beyond a reasonable doubt that, one, the
13   defendants committed this offense for the purpose of private
14   financial gain; and two, the defendants, during the commission
15   of this offense, did place in jeopardy the life of Julio Cesar
16   Lopez-Trujillo and name them.  That's in the instruction.  When
17   we get to the actual jury verdict form that will be separated
18   out where they will have to make findings.
19          MR. EVANS:  Thank you very much.
20          THE COURT:  Anything else?
21          MR. EVANS:  No, Your Honor.  We're done.
22          THE COURT:  Okay.  Are there any -- were there any
23   instructions that you propose that were not included that you
24   wish to make a record on and file an objection as to those?
25          MR. EVANS:  No, Your Honor.
```

————November 1, 2010 - Jury Trial - Day 5————

1           THE COURT:  Thank you.

2           MR. EVANS:  Thank you, Your Honor.

3           THE COURT:  In this case, Counsel, Mr. Hormel and Mr.

4    Romo, do you believe that your clients will testify in this

5    case?  Because we've got -- only reason I ask you is, if you

6    don't wish to answer, that's fine, but at Number 10 we've got

7    an instruction if he does not testify and Number 11 an

8    instruction if he does testify.

9           MR. HORMEL:  Your Honor, at this time, we are -- Mr.

10   Bonilla is not planning to testify.  That obviously could

11   change.  I can't make that guarantee.  Obviously that's up to

12   him and he has until a certain period of time to decide.  Right

13   now, for the Court's ease of preparing the instructions for our

14   benefit, we don't need -- we would prefer if he hasn't

15   testified you can't take that into consideration.

16          THE COURT:  Very well.

17          Mr. Romo.

18          MR. ROMO:  Your Honor, as for my client, we still

19   haven't decided yet.  And when I was thinking about it

20   yesterday I was approached by counsel for the government, and I

21   was asked if I was going to have him testify.  And they said if

22   I did have him testify they would bring up some sort of a

23   charge that my client supposedly has.  I don't have a copy of

24   that, haven't been given a copy of that.  But I did ask my

25   client.  He was given probation 11 years ago, 11, 12 years ago

1    for a charge.  I believe it was solicitation.  I don't have

2    that.

3              THE COURT:  Well, if he -- Mr. Evans.

4              MR. EVANS:  Yes, Your Honor.  He has a 2002 conviction

5    for solicitation to possess marijuana for sale, and he was

6    given probation for that out of Pinal County.  And what I told

7    Mr. Romo was that if he took the stand, he would at least have

8    to acknowledge that he's been convicted of a felony.

9              THE COURT:  And generally, Mr. Romo, given the date of

10   that felony that counsel has just restated, there would be --

11   that would be allowed for purposes of impeachment.  And the way

12   that would go is that he would be asked, has he been convicted

13   of a felony without naming the felony, and that that would be

14   pretty much the result of that.

15             MR. ROMO:  All right.  I might, Judge.

16             THE COURT:  So it will be admitted.  You understand?

17   He will be impeached.

18             MR. ROMO:  He will be impeached.  And I might present

19   him.

20             MR. EVANS:  Your Honor, also, he will be impeached by

21   the fact he no longer has legal residence, legal status in the

22   United States.

23             MR. ROMO:  Well, I'm not sure about that.

24             THE COURT:  I'm not entirely clear that that's -- is

25   that a prior bad act, or -- I don't know where you are going

──────── November 1, 2010 - Jury Trial - Day 5 ────────

1    with it.

2          MR. ROMO:  Your Honor, my client had his mother die.

3    He went to Mexico because of the death of his mother.  While he

4    was there, there was an immigration hearing that was pending.

5    He missed that immigration hearing and there was a finding made

6    by the immigration judge.  That has not gone back because he

7    might have been -- I believe he asked permission to go to

8    Mexico in advance and it was denied.  Might have been it was an

9    excusable -- that he left the country for a valid reason, in

10   which case he still has the permanent resident alien card.

11   That is in the air right now, Your Honor.

12         THE COURT:  Well, it wouldn't even be a question but

13   the fact for you or Mr. Hormel asked one of the witnesses if he

14   was here legally.

15         MR. ROMO:  I asked the wife.

16         THE COURT:  She said yes.

17         MR. ROMO:  She said yes.

18         THE COURT:  Obviously, if he no longer -- if there's

19   been an order that he -- or a judgment that he's no longer here

20   legally then that wasn't exactly -- she may not know the

21   difference.  She may think he's still here legally because he

22   still has his card.  But obviously --

23         MR. ROMO:  Well, he is legally here, Your Honor.  If

24   my client still has a card and he left for a valid reason, I

25   think if he gets picked up by immigration he certainly has a

November 1, 2010 - Jury Trial - Day 5

1    right to a hearing and a right on those matters.  So the --

2           THE COURT:  He may have a right to a hearing, but the

3    fact he has his card is of no moment.  Many people are deported

4    and leave with their cards.  That doesn't entitle them to

5    re-enter with those cards.  So it's an issue that's up in the

6    air.  I don't know if it's worth the hearing on that to go to

7    that, Mr. Evans, truthfully.  We'll see once he gets there.  If

8    he testifies we'll have to discuss that to see whether or not

9    that -- we'll have to further discuss this matter to see

10   whether or not it's reasonable to impeach him with that.

11          It seems to me that it's more problematic than it is

12   probative of anything, because then we'll get into the story

13   about his mother and all that to explain it.

14          But at any rate, at this point, he is impeachable at

15   this point by his prior conviction, and the government will be

16   allowed to impeach him on that and I will take it under

17   advisement at this point of whether or not they will also be

18   able to bring in as the fact that he's not here legally.  I

19   don't know how that plays out, to tell you the truth.  But for

20   the fact of that statement by his common law wife it wouldn't

21   be an issue.

22          MR. ROMO:  Yes, sir.

23          THE COURT:  But that's -- that I will take under

24   advisement and we'll decide that when the time comes.

25          MR. EVANS:  Nothing further.

———November 1, 2010 - Jury Trial - Day 5———

1          THE COURT:  Thank you.

2          Mr. Hormel, are there any objections or corrections to

3    any of the instructions the Court has provided in the draft

4    instructions I have provided you?

5          MR. HORMEL:  Not as amended, Your Honor.

6          THE COURT:  Thank you.  And Mr. Romo, any objections

7    or corrections to any of those instructions?

8          MR. ROMO:  No, sir.

9          THE COURT:  As to either counsel, Mr. Hormel, were

10   there any instructions you submitted or that were not covered

11   or included that you wish to make a record on?

12         MR. HORMEL:  No, Your Honor.

13         THE COURT:  Mr. Romo.

14         MR. ROMO:  As well, none.

15         THE COURT:  I'm sorry.

16         MR. ROMO:  I anticipated you wanted to call the jury

17   back but I needed a small break.

18         THE COURT:  We'll take a brief break and we'll get the

19   jury back in and we'll move on with the witnesses.

20         So we'll stand in recess.

21         (Recess taken.)

22         THE COURT:  Good afternoon.  Thank you.  Please be

23   seated.

24         The record will reflect the presence of the jury,

25   counsel, defendants, and the witness on the witness stand.

─── November 1, 2010 - Jury Trial - Day 5 ───

1    Counsel, could I see you at sidebar one minute?

2            (The following discussion was had at sidebar out of

3    the hearing of the jury:)

4            THE COURT:  I forgot to ask you about instruction

5    Number 18 regarding the statement made by counsel about

6    defendants -- says, "You have heard testimony that a defendant

7    made a statement.  It is for you to decide whether, one, the

8    defendant made the statement, and if so, how much weight to

9    give to it."

10           That's the instruction.  Do you wish that instruction

11   to stay in?  There were no statements from the police in this

12   case that they made any statements.  There were statements by

13   Mr. Lopez-Trujillo about statements.

14           MR. HORMEL:  Right.  And I thought about that, to be

15   honest with you, Judge, and as I was going back and forth

16   typically that instruction refers to -- a police statement

17   refers to the voluntariness.

18           THE COURT:  Right.

19           MR. HORMEL:  I don't have any objection to it staying.

20           MR. ROMO:  No objection.  But, Judge, I do have a

21   question with regard to the -- this is Jesus Romo -- with

22   regard to the recording, Judge.  Do we have anything that would

23   cover the recording?

24           THE COURT:  Which recording?

25           MR. ROMO:  That would be the recording of my client.

─── November 1, 2010 - Jury Trial - Day 5 ───

1          THE COURT:  The exemplar?

2          MR. ROMO:  Yes.

3          THE COURT:  There's nothing about exemplars.  They

4    just remain as evidence, and it's going to the jury and that's

5    how it goes.

6          MR. ROMO:  I'm concerned about that.

7          THE COURT:  It was pretty well explained to them how

8    that went about.  Actually, I explained to them I didn't

9    realize he had read it because I could hear the agent speaking.

10   I think it must have been dealing with your client, with Mr.

11   Bonilla.  And I assume the same procedure was followed with

12   both, although I couldn't hear the agent in the other one.  I

13   thought maybe the phone connection was different.  But I have

14   admitted that.  It's going to the jury.  I don't think there's

15   any instruction.  It's no other instruction to be given at this

16   point as to that, none that I know of at least.

17          So what's your position on the statement,

18   instructional statement?

19          MR. EVANS:  We have no objection, Your Honor.  If they

20   want to leave it in, they can.

21          THE COURT:  All right.  Thank you.

22          (Open court.)

23          THE COURT:  You may proceed, Mr. Romo.

24          MR. ROMO:  Thank you, Your Honor.

25                DIRECT EXAMINATION (Resumed)

—— November 1, 2010 - Jury Trial - Day 5 ——

```
1   BY MR. ROMO:

2   Q.  Mr. Evans asked you if you met Cesar Lopez-Trujillo.  Did

3   you know him by his full name or just Cesar?

4   A.  Only Cesar.

5   Q.  And do you recall for how long you saw him at your home?

6   A.  Well, the day they arrived there, that was going to be the

7   third day.

8   Q.  When was going to be the third day?

9   A.  September 24th.

10  Q.  All right.  So they had arrived on the 22nd, is that

11  correct?

12  A.  Yes.

13  Q.  Now, and he was staying in that small room in the back, is

14  that correct?

15  A.  Yes, sir.

16  Q.  And was there anyone else staying there?

17  A.  No.

18  Q.  Did you ever see anybody else staying in that place?

19  A.  No, sir.

20  Q.  I'm going to show you what has been admitted as Exhibit 38.

21  A.  Okay.

22  Q.  Is that the same room?

23  A.  Yes, sir.

24  Q.  Now, those toys that are on the bed, are they toys that

25  were in that room already?
```

───── November 1, 2010 - Jury Trial - Day 5 ─────

1    A.  Yes, sir.

2    Q.  Okay.  Now, did you ever see any pistols inside the house?

3    A.  I saw one that didn't work.  It was like broken into

4    pieces.

5    Q.  Where was it?

6    A.  It was in the laundry room.

7    Q.  And whose pistol was it?

8    A.  My brother's.

9    Q.  Do you know anything about pistols?

10   A.  No, sir.

11   Q.  Now, did you ever see anyone threaten Cesar?

12   A.  No, sir.

13   Q.  Did you see anyone asking him to -- asking him for money?

14   A.  No, sir.

15   Q.  Did you see anybody ever put a pistol to his head?

16   A.  No, sir.

17   Q.  I want to show you what has been admitted as Exhibit 16.

18          Do you see that notebook?

19   A.  Yes, sir.

20   Q.  Did you ever make any notations in that notebook?

21   A.  No, sir.

22   Q.  Did you ever see anybody make notations in that notebook?

23   A.  No, sir.

24   Q.  I'm going to show you what has been admitted as Exhibit 17.

25   Do you recognize that notebook?

November 1, 2010 - Jury Trial - Day 5

1    A.  No, sir.

2    Q.  Did you ever see anybody make notations in that notebook?

3    A.  No, sir.

4    Q.  Did you ever go to Nogales, Sonora?

5    A.  Yes.

6    Q.  Did you ever meet a person named Pelon?

7    A.  No, sir.

8    Q.  Forgive me.  I don't know if I have asked you this:  But

9    did you ever see anyone place a pistol at Cesar's head and

10   threaten to kill him?

11   A.  No, sir.

12   Q.  Did you ever watch television with Cesar?

13   A.  Yes.

14   Q.  And did you watch television in the living room, main

15   living room?

16   A.  Yes, sir.

17   Q.  Was -- to your knowledge, was Cesar free to come and go in

18   the house?

19   A.  Yes, sir.

20   Q.  And did he have access to the telephone?

21   A.  Yes, sir.

22   Q.  Do you recall if at any time he was left alone?

23   A.  Yes, sir.

24   Q.  And when he was left alone, could he open and close the

25   doors?

1          MS. KELLY:  Objection; speculation.

2          THE COURT:  Sustained.

3   BY MR. ROMO:

4   Q.  Did the doors -- there were two doors to go outside, is

5   that correct?

6   A.  Yes.

7   Q.  And this is one of them, is that right?

8   A.  Yes, sir.

9   Q.  Could you open that door from the inside?

10  A.  Yes, sir.

11  Q.  And the door, the main -- I mean the back door, could that

12  be opened also from the inside?

13  A.  Yes, sir.

14  Q.  So if anyone was left alone, they could open the door and

15  go out if they so desired?

16  A.  Yes, sir.

17  Q.  Did you ever hear Cesar complain that he wanted to leave

18  and he couldn't leave?

19  A.  No, sir.

20  Q.  Now, do you recognize -- Your Honor, we're talking about

21  Exhibit 5 that's already been admitted.

22          Do you recognize this gentleman?

23  A.  Yes, sir.

24  Q.  His name is German, is that correct?

25  A.  Yes, sir.

————— November 1, 2010 - Jury Trial - Day 5 —————

1  Q.  Do you know his last name?

2  A.  No, sir.

3  Q.  Was he someone who used to come in and out of the house?

4  A.  Yes, sir.

5  Q.  Was he staying at the house?

6  A.  No, sir.

7  Q.  To your knowledge, did German speak English?

8  A.  I think he only understood it, but he didn't speak it.

9  Q.  He spoke broken English?

10        MS. KELLY:  Objection.  Misstates testimony.

11        MR. ROMO:  I'm asking, Your Honor.

12        THE COURT:  You can ask that.  Restate it.

13  BY MR. ROMO:

14  Q.  Did he speak broken English?

15  A.  Yes.

16  Q.  Now, on the 24th of September, it is a date that is special

17  to you aside from what happened on that date, is that correct?

18  A.  Yes, sir.

19  Q.  And tell the jury why.

20  A.  Because it was my son's birthday.

21  Q.  And on that date, had you intentions of celebrating your

22  son's birthday?

23  A.  Yes, sir.

24  Q.  And is that the reason there is a cake there on the table,

25  on the counter?

———November 1, 2010 - Jury Trial - Day 5———

1   A.  Yes, sir.

2   Q.  And what were you going to do that was special?

3   A.  We were going to go out to dinner.

4   Q.  And when you say "we," who was it that was going to go?

5   A.  Carlos, Yuris, Yasmin, myself, my brother, Cesar, and the

6   boy.

7   Q.  And, of course, the boy.  He was the reason you were all

8   going out, right?

9   A.  (No oral response.)

10  Q.  And in preparation for going out, what did you do that

11  afternoon?

12  A.  All day long or just in the morning?

13  Q.  No, just in the afternoon.

14  A.  Well, in the afternoon we were getting ready to go out.

15  Q.  Well, when BORTAC came, where were you?

16  A.  What's BORTAC?

17  Q.  That's the police that came with the bombs?

18  A.  I was in the room.  I was brushing my hair.

19  Q.  And who was with you?

20  A.  Yasmin, Yuris, my brother.

21  Q.  And when we are talking about the room, this is the room,

22  is that right?

23  A.  Yes.

24  Q.  All right.  Now, you see that room.  Is that the room?

25  A.  Yes, sir.

——————November 1, 2010 - Jury Trial - Day 5——————

1    Q.  And that's, Your Honor, Exhibit 33.

2         This is Exhibit 36.  Are those the windows outside the

3    room?

4    A.  Yes, sir.

5    Q.  And, again, you didn't place -- you and your family did not

6    place those rails in the window, is that right, those bars?

7    A.  No, sir.

8    Q.  And so it was you and who else that was in the room?

9    A.  Yasmin, Yuris, and my brother.

10   Q.  Yasmin, which Yasmin?

11   A.  Yasmin Rascon.

12   Q.  And that would be your neighbor, right?

13   A.  Yes, sir.

14   Q.  Now, was she combing your hair or were you combing her

15   hair?  What was going on?

16   A.  She was combing me, my hair.

17   Q.  And where was the other Yasmin?  Do you know?

18   A.  Yes.  She was in the living room with my little brother.

19   Q.  And Yasmin spells her name Y-A-Z-M-I-N, is that correct?

20   A.  Y-A-S-I-N.

21   Q.  M-I-N?

22        And she was in the living room?  Is that what you

23   said?

24   A.  Yes, sir.

25   Q.  And where was Cesar?

———November 1, 2010 - Jury Trial - Day 5———

1   A.  Cesar was taking a shower.

2   Q.  All right.  And he was taking a shower or he had just taken

3   a shower?  Do you know?

4   A.  I don't know exactly because I was doing my hair.

5   Q.  And the door was closed?

6   A.  No.  The door to my room was open.

7   Q.  Okay.  And there's been testimony that Cesar was kept in

8   underwear in that room, in this room.  Is that something that

9   you recall?

10  A.  No, sir.

11  Q.  The reason -- why was he in underwear?

12  A.  I really don't know.  Perhaps because he just finished

13  bathing.

14  Q.  He was going to go with you to dinner?

15  A.  Yes, sir.

16  Q.  And he knew that?

17  A.  Yes, sir.

18  Q.  So suddenly, the police arrive, is that correct?

19  A.  Yes, sir.

20  Q.  And did they go into the room?

21          MS. KELLY:  Your Honor, I'm going to object to

22  leading.

23          THE COURT:  Sustained.

24          MR. ROMO:  What was the objection, Your Honor?  I'm

25  sorry.

─────── November 1, 2010 - Jury Trial - Day 5 ───────

1          THE COURT:  Leading.

2          MR. ROMO:  Oh.

3   BY MR. ROMO:

4   Q.  What happened?  What did you see?

5   A.  Well, I was doing my hair, and all of a sudden, I heard

6   that they exploded a bomb behind me.  And I thought it was

7   shooting, right.  And then I was afraid.  I was frightened for

8   my son because I thought it was shooting.  So we got down on

9   the floor, all of us.  We got down on the floor because we

10  didn't know what to do.

11  Q.  And where was Yasmin?

12  A.  Yasmin Luna or Yasmin Rascon?

13  Q.  Yasmin Rascon?

14  A.  Yasmin Rascon was the one that was doing my hair.

15  Q.  Did she also hit the floor or did she do something else?

16  A.  No, there was a little closet there, and she went inside

17  because she was scared.

18  Q.  Were you scared as well?

19  A.  Yes, sir.

20  Q.  Were you scared for your son?

21  A.  Yes, sir, because my son was going down the hall, the hall

22  that was near there.  And just then at that moment, that's when

23  they threw the bomb.  And my son, he was riding his bike.

24  Q.  So he was real, real close to the explosion, is that

25  correct?

—— November 1, 2010 - Jury Trial - Day 5 ——

1  A.  Yes, sir.

2  Q.  Were you shaking?

3  A.  Yes, sir.

4  Q.  Were you crying?

5  A.  Yes, because I was asking them to give me my son and they

6  wouldn't.  They didn't want to give him to me, not until 10

7  minutes later.

8  Q.  All right.  And then what happens after these explosions

9  and things?

10  A.  Well, that's when I asked them to give me my son back and

11  they wouldn't give him to me.  And then 10 minutes later they

12  took me to where they had him.  And then they took us back to

13  the living room, and there Yasmin Luna was there, my little

14  brother, and my son.

15  Q.  All right.  And where was your child in the meantime?

16  A.  They told me that he was in the living room and that they

17  were pointing a gun at him.

18  Q.  Was it a gun or a rifle?

19  A.  A rifle, like with a red light.

20  Q.  Now, is that Yasmin --

21  A.  That's Yasmin Luna.

22  Q.  And is that your little brother?

23  A.  Yes, sir.

24  Q.  And this is Yasmin Rascon, is that correct?

25  A.  Yes, sir.

—— November 1, 2010 - Jury Trial - Day 5 ——

1  Q.  Exhibit 26, Your Honor.

2        So after that, what happened after you were in the

3  living room?

4  A.  After that they gave me my boy, and then they put some

5  necklaces on us.

6  Q.  Excuse me.  Could we have that translated entirely?  What

7  kind of necklaces?

8  A.  They were like string, like that, and then they had these

9  things on them, these long things that were different colors.

10 Q.  And where did they take you?

11 A.  They took us -- they grabbed us.  They took us and they sat

12 us down underneath a tree that had a lot of ants.

13 Q.  Did they make you kneel down?

14 A.  Yes, sir.

15 Q.  And did you complain about the ants?

16        MS. KELLY:  Objection; leading.

17        THE COURT:  Sustained.  Leading, Mr. Romo.

18 BY MR. ROMO:

19 Q.  What did you do then?

20 A.  I asked them, I asked the ICE people whether I could stand

21 up and go over to where the children were, but they wouldn't

22 let me.  And I wanted to because the ants were biting me and

23 they were biting the children, too.

24 Q.  All right.  And did you ask them in Spanish or in English?

25 A.  I asked them in Spanish, and they said they didn't speak

——— November 1, 2010 - Jury Trial - Day 5 ———

1    Spanish.   And then all of a sudden everybody was speaking

2    Spanish.

3    Q.   Did you ask them in English?

4    A.   Yes, sir.

5    Q.   And did they do anything to move you from that site?

6    A.   No, sir.   They left us there.

7    Q.   Was -- who was there at the site where the ants were?

8    A.   It was Yasmin Luna, Yasmin Rascon, me, and the two

9    children.

10   Q.   And do you remember Luz Rascon?

11   A.   Yes, sir.

12   Q.   Was she close by?

13   A.   Yes, sir.

14   Q.   And what did you observe with respect to her?

15   A.   She was there and they made her kneel, kneel down, but

16   she's got a bad knee and so she was crying.   And she was

17   pleading with them and asking them to let her get up and move

18   and they wouldn't pay any attention to her because they said

19   they didn't speak any Spanish.   So I asked them to please, that

20   she was hurting, and to please move and they didn't pay any

21   attention.   They didn't do anything.

22   Q.   Did you ask her in English?   Did you ask them in English?

23   A.   Yes, sir.

24   Q.   Was it already night?

25   A.   Yes, sir.

———— November 1, 2010 - Jury Trial - Day 5 ————

1  Q.  And how long did you -- were you made to stay there?

2  A.  Hours, like six hours.  Five.

3  Q.  I just have one more question.

4      You stated that your child was on the bicycle, the

5  little tricycle, I imagine, correct?

6  A.  Yes, sir.

7  Q.  And was he allowed to go into every room in the house?

8  A.  Yes, sir.

9  Q.  Could he enter into this room?

10 A.  Yes, sir.  That's where his toys were.

11     MR. ROMO:  May I have a second, Your Honor?

12     THE COURT:  Yes, you may.

13     MR. ROMO:  One more question.

14 BY MR. ROMO:

15 Q.  You testified that Cesar sometimes would stay by himself,

16 is that correct?

17 A.  Yes, sir.

18 Q.  And when he was alone, what were you doing and everybody

19 else, if you recall?

20 A.  Well, he was in the living room or I was in the bedroom

21 with Carlos and he was there in the living room, or sometimes I

22 was outside and he would be eating in the kitchen.

23 Q.  All right.  And sometimes he was left alone in the house

24 while you went out, is that correct?

25 A.  Yes, sir.  When I would go to my mom 's or to the store.

——— November 1, 2010 - Jury Trial - Day 5 ———

1   Q.  And Carlos would not be there?

2   A.  No.

3   Q.  And Yuris would not be there?

4           MS. KELLY:  I object to speculation.

5   BY MR. ROMO:

6   Q.  Well, if you know.  Do you know if he was left alone when

7   you left the house?

8   A.  Yes, sir.

9           MR. ROMO:  I don't think I have any other questions,

10  Your Honor.  Thank you.

11          THE COURT:  Mr. Hormel, any questions?

12          MR. HORMEL:  No, Your Honor.

13          THE COURT:  Thank you.  Ms. Kelly?  Mr. Evans?

14                      CROSS-EXAMINATION

15  BY MS. KELLY:

16  Q.  Good afternoon, Ms. Pina.

17  A.  Good afternoon, ma'am.

18  Q.  Ms. Pina, Carlos Calixtro is your boyfriend, correct?

19  A.  Yes, ma'am.

20  Q.  You have been together for five years?

21  A.  Yes.  That's right.

22  Q.  He's the father of your child, also named Carlos Calixtro.

23  True?

24  A.  Yes, ma'am.

25  Q.  You love him?

———November 1, 2010 - Jury Trial - Day 5———

1   A.  Yes, ma'am.

2   Q.  And, in fact, you are still together today, correct?

3   A.  Yes, ma'am.

4   Q.  You are still boyfriend and girlfriend?

5   A.  Yes, ma'am.

6   Q.  And you don't want to see him be in any trouble, right?

7   A.  Yes, ma'am.

8   Q.  Ms. Pina, you testified that you took a number of

9   photographs on the evening of September 24th of 2009, correct?

10  A.  Yes, ma'am.

11  Q.  I'm placing on the board 109.  I'm going to zoom in so we

12  can see it.

13        And that's one of the photos that you took, correct?

14  A.  Yes, ma'am.

15  Q.  You took that on the evening of September 24th?

16  A.  No.  Not that picture.

17  Q.  The other ones you took on the 24th?

18  A.  Yes, ma'am.

19  Q.  And when did you take this photo?

20  A.  That picture, I took it days later, about a week.

21  Q.  And you gave that photo to Mr. Romo, correct, Carlos's

22  defense attorney?

23  A.  Yes, ma'am.

24        MS. KELLY:  Your Honor, the government's going to move

25  to admit and publish 109.

———— November 1, 2010 - Jury Trial - Day 5 ————

1          MR. ROMO:  No objection.

2          MR. HORMEL:  No objection, Your Honor.

3          THE COURT:  109 may be admitted; shall be published.

4   BY MS. KELLY:

5   Q.  You testified Julio Cesar, whom you refer to as Cesar, was

6   in the trailer in the living room, this room that we're looking

7   at here in this exhibit, when you came home on the 22nd.

8          Is that correct?

9   A.  Exactly.  Yes.

10  Q.  Isn't it true that, in fact, you were seated on the couch

11  in the living room when Julio Cesar and three other men who

12  were marched through the living room with wet shoes?

13  A.  No, ma'am.

14  Q.  So you are telling this jury that on the 22nd you came home

15  and you found Julio Cesar in the living room?

16         MR. HORMEL:  Objection; asked and answered.

17         THE COURT:  Overruled.

18         THE WITNESS:  Yes, ma'am.

19  BY MS. KELLY:

20  Q.  And it's your testimony that he was in the living room

21  talking to Yuris and Carlos, correct?

22  A.  Yes, sir -- yes, ma'am.

23  Q.  And did you talk to him?

24  A.  They introduced him to me.

25  Q.  So you knew that he was an illegal alien, correct?

November 1, 2010 - Jury Trial - Day 5

1   A.  No, ma'am.

2   Q.  He then, according to your testimony, stayed in the house

3   for the next two days, is that correct?

4   A.  Yes, ma'am.

5   Q.  And you had never met him before the 22nd, correct?

6   A.  No, ma'am.

7   Q.  Is it typical that Yuris and Carlos bring strangers into

8   your home and have them stay in your house for multiple days?

9   A.  No, ma'am.

10  Q.  But it certainly happened on this occasion, correct?

11  A.  Only -- well, only with Cesar and Yasmin.

12  Q.  And as you testified earlier, you stated that Yuris brought

13  Yasmin, another stranger, into the trailer as well, correct?

14  A.  Yes, ma'am.

15  Q.  And she would help you clean the trailer, correct?

16  A.  Yes, to wash also.

17  Q.  You also testified that she would sleep on the couch in the

18  living room, right?

19  A.  Yes, ma'am.

20  Q.  And Yasmin slept on the couch in the living room on the

21  22nd and 23rd of September, correct?

22  A.  Well she slept the whole time there in the living room.

23  Q.  Julio Cesar, you testified earlier that he showered on the

24  24th?

25  A.  I don't know whether he was leaving the bathroom, but he

November 1, 2010 - Jury Trial - Day 5

1    was going to take a shower.

2    Q.  And you say that because he was naked?

3    A.  Well, I'm saying so because he said that he was going to

4    take a bath.

5    Q.  You talked to him about it?

6    A.  Yes, ma'am.

7    Q.  And you opened up the bathroom for him so he could go in

8    and shower?

9    A.  No, ma'am.  He opened the door by himself.

10   Q.  And he had an opportunity to go in and shower?

11   A.  Well, he bathed whenever he wanted to.  He was at liberty

12   to be there at the house.

13   Q.  And you also provided him food, correct?

14   A.  Yes, ma'am.

15   Q.  And you would cook that food there in the house?

16   A.  Yes, ma'am.

17   Q.  Are you in the habit of cooking for the strangers that

18   Yuris and Carlos bring into the home?

19   A.  Well, they are not strangers because they are friends.

20   Q.  You testified already that Yasmin and also Julio Cesar

21   were, in fact, strangers.

22   A.  I never said they were strangers.  I said that Yuris took

23   Cesar and Yasmin to the house, but I never said they were

24   strangers.

25   Q.  So you knew them before?

November 1, 2010 - Jury Trial - Day 5

1   A.  No, I didn't know them, but they got there.

2   Q.  You also testified that you are a legal resident here in

3   the US?

4   A.  Yes, ma'am.

5   Q.  You have what's called legal permanent resident status,

6   correct, what's called an LPR?

7   A.  Yes, ma'am.

8   Q.  And you were an LPR, legal permanent resident, back in

9   September of 2009, correct?

10  A.  I don't understand.

11  Q.  You have been a legal permanent resident for a number of

12  years, correct?

13  A.  Yes, ma'am.

14  Q.  And you were a legal permanent resident back in September

15  of 2009, during this incident?

16  A.  Yes, ma'am.

17  Q.  You also testified that your boyfriend, Carlos Calixtro, is

18  a legal resident as well?

19          MR. ROMO:  Your Honor, may we approach before we go to

20  the next question?

21          THE COURT:  Go ahead.

22          (The following discussion was had at sidebar out of

23  the hearing of the jury:)

24          MR. ROMO:  Your Honor, I don't know what Ms. Kelly

25  intends to do, but if she's going to bring out the previous

———— November 1, 2010 - Jury Trial - Day 5 ————

1   conviction or anything of that nature, I'm asking that she be

2   precluded from doing that.

3          THE COURT:  I assumed what she was doing is going back

4   to the questions -- to the testimony he was here legally.

5          MR. HORMEL:  I would agree that the government ought

6   to be cautioned not to bring -- Peter Hormel.  I would ask that

7   the Court caution the government not to bring out any prior

8   criminal conviction.

9          THE COURT:  So far the questions haven't gone that

10  way, and they best not.

11         (In open court.)

12  BY MS. KELLY:

13  Q.  Ms. Pina, you testified earlier that Carlos Calixtro, your

14  boyfriend, is legally here in the United States?

15  A.  Yes, ma'am.

16  Q.  Do you say that because he told you he was legally here in

17  the United States?

18  A.  Yes.

19  Q.  Would it surprise you to know he does not have legal status

20  here in the United States?

21  A.  No, because we would travel to Nogales, Sonora, and we

22  would go to a town and I saw him.  He showed his resident card,

23  resident alien card.

24  Q.  So he had a card that he showed you that said he was

25  legally here?

—November 1, 2010 - Jury Trial - Day 5—

1  A.  Yes, ma'am.

2  Q.  Would it surprise you to know that he's not?

3          MR. ROMO:  Objection.  Argumentative, Your Honor.

4          THE COURT:  I'm sorry.  What's your objection?

5          MR. ROMO:  Argumentative.

6          MR. HORMEL:  Also asked and answered, Your Honor.

7          THE COURT:  Overruled.  She can answer.

8          THE WITNESS:  Why would that surprise me?

9  BY MS. KELLY:

10 Q.  Would it surprise you to know that, in fact, he's not here

11 legally?

12 A.  No, because when we would come through the port of entry

13 when we were coming back to Tucson, I would see him show his

14 card.  So why would I be surprised?

15 Q.  How often did you see that card?

16 A.  Many times.

17 Q.  How often would you travel back and forth using that card?

18 A.  Every -- once a month.  Once a month.

19 Q.  You testified that Carlos Calixtro makes money racing

20 horses, correct?

21 A.  Yes, ma'am.

22 Q.  And that's how he makes his money?

23 A.  Yes, ma'am.

24 Q.  The horses that you spoke about that were on the property

25 in September of 2009, did he own those horses?

———November 1, 2010 - Jury Trial - Day 5———

1  A.  Yes, ma'am.

2  Q.  And in September of 2009, you were working at the Pacific

3  Maintenance Company, correct?

4  A.  Yes, ma'am.

5  Q.  And you weren't working full time; you were only working

6  occasionally, correct?

7  A.  Yes, because they didn't have any space to give me full

8  time employment.  That's why I was part-time.  But now I am

9  working eight hours.

10  Q.  So Carlos at that time was helping to provide for you?

11  A.  Yes, ma'am.

12  Q.  With your food, clothes, shelter?

13  A.  Yes, ma'am.

14  Q.  Ma'am, you know that Carlos carries a gun?

15  A.  No, ma'am.

16  Q.  You are certainly aware that the police found a gun in your

17  bedroom on September 24th, correct?

18  A.  No.  I didn't know that.

19  Q.  You would agree with me that the bedroom in that trailer

20  certainly is pretty small, correct?

21  A.  Yes, ma'am, but my room was fairly large.

22  Q.  And it's your testimony to this jury that you never saw

23  your boyfriend, Carlos, carrying a gun?

24  A.  Yes, ma'am.

25  Q.  You are aware that Yuris carried a gun?

————— November 1, 2010 - Jury Trial - Day 5 —————

1   A.  No, ma'am.

2   Q.  So it's your testimony to this jury that you never saw

3   Yuris with a gun?

4   A.  No, ma'am.

5   Q.  But you do agree with me that two guns were found in your

6   trailer on September 24th of 2009?

7           MR. HORMEL:  Objection; asked and answered.

8           THE COURT:  Overruled.  She may answer.

9           THE WITNESS:  I did know because they left behind a

10  sheet of paper when they left.  But the only one that I had

11  seen was the one that was in pieces.

12  BY MS. KELLY:

13  Q.  You testified previously -- and I'm placing on the board

14  what's already been admitted as Number 16.

15          Ms. Pina, you testified previously that you had never

16  seen this notebook before, correct?

17  A.  Yes, ma'am.

18  Q.  Placing on the board what's already been marked and

19  admitted as Exhibit 21.

20          How about that notebook, the red one?

21  A.  No, ma'am.

22  Q.  Placing on the board what's already been marked and

23  admitted as 34.

24          Ms. Pina, do you agree with me that this is your

25  trailer, the trailer that you lived in, in September of 2009,

———November 1, 2010 - Jury Trial - Day 5———

1  correct?

2  A.  Yes, ma'am.

3  Q.  And you also agree with me that you can clearly see those

4  notebooks right here on this table located in the middle of

5  your living room, correct?

6  A.  Yes, ma'am.

7  Q.  You testified previously about a number of photographs that

8  you took on the evening of September 24th.  Correct?

9  A.  Yes, ma'am.

10  Q.  And you testified about Exhibit 127, which was admitted and

11  published?

12  A.  Yes, ma'am.

13  Q.  And you testified to this jury that this was the couch in

14  your living room.  Correct?

15  A.  Yes, ma'am.

16  Q.  And that this was a photo that you took that evening after

17  the police had left, correct?

18  A.  Yes, ma'am.

19  Q.  And you also testified the same about 128, which is another

20  angle of the same couch, correct?

21  A.  Yes, ma'am.

22  Q.  And that evening you took these pictures?

23  A.  Yes, ma'am.

24  Q.  And you took them so that you could help the defense in

25  this case, correct?

───── November 1, 2010 - Jury Trial - Day 5 ─────

1   A.  No.  I took them because it seemed to me like they had made

2   a very big mess of things, and they had messed up things,

3   broken things that belonged to me and my son that had been

4   obtained with a lot of sacrifices.

5   Q.  So it's your testimony to this jury that the police did

6   this?

7   A.  Yes, ma'am.  The SWAT team.

8   Q.  And you also testified regarding these photos in Exhibit

9   129 that you took a picture of on the evening of September

10  24th?

11  A.  Yes, ma'am.

12  Q.  And it's your testimony that the police threw -- or somehow

13  through the police, those photos of your son were broken and

14  ended up on the ground?

15  A.  That and much more.

16  Q.  You also took, on that evening, Exhibit 106, correct?

17  A.  That picture, I took it.  I took that after a week had gone

18  by after the SWAT team showed up when I took that picture.

19  Q.  And you took that picture, and you gave it to Carlos's

20  attorney, correct?

21  A.  Yes, ma'am.

22  Q.  And you made the bed and you put those toys on the bed,

23  correct?

24  A.  Yes, ma'am.

25  Q.  I will place on the board what's been admitted as 114,

1   admitted and published.

2          You took this photo on September 24th?

3   A.  No.  Not that one.

4   Q.  When did you take it?

5   A.  A week later.

6   Q.  And you tidied up the bathroom, had the curtain hanging,

7   put the towel up, correct?

8   A.  Yes, ma'am.

9   Q.  And you took that photo and you gave it to Carlos's

10  attorney, correct?

11  A.  Yes, ma'am.

12  Q.  I'm going to place on the board Exhibit 115.

13         Do you recognize that photo?

14  A.  Yes, ma'am.

15  Q.  What do you recognize it as?

16  A.  It's my bedroom.

17  Q.  And you took that on September 24th?

18  A.  No, ma'am.

19  Q.  When did you take it?

20  A.  A week later.

21  Q.  And you tidied up the room?

22  A.  Yes, ma'am.

23  Q.  Made the bed?

24  A.  Yes, ma'am.

25  Q.  You agree with me that night when BORTAC came into the home

───── November 1, 2010 - Jury Trial - Day 5 ─────

1    that that bed was not made and did not look like that, correct?

2    A.  No.  It was a mess.

3    Q.  The room itself was a mess when BORTAC came in?

4    A.  Oh.  No.  When SWAT showed up they made the mess.

5    Q.  But it's your testimony to this jury that previously it

6    wasn't a mess?

7    A.  It's because I hadn't understood -- I didn't understand

8    your question.

9    Q.  It's your testimony to this jury here today that before

10   SWAT came in the room looked like this?

11   A.  Yes, ma'am.

12   Q.  You had testified that you lived with your boyfriend,

13   Carlos Calixtro, on and off for three years, right?

14   A.  Yes.

15   Q.  You stated that there were times that you didn't sleep in

16   the same home, correct, during those three years?

17   A.  In this same house?

18   Q.  Well, in this home or at your mother's home or at the first

19   home you lived at during those three years, there were times

20   when he didn't stay with you?

21   A.  Yes, ma'am.

22   Q.  You testified that Carlos Calixtro is unmarried?

23   A.  Yes, ma'am.

24   Q.  Did he tell you that he's not married?

25   A.  Yes, ma'am.

———— November 1, 2010 - Jury Trial - Day 5 ————

1   Q.  Would it surprise you to know that he's been married to a

2   woman by the name of Patricia Rodriguez for the last 10 years?

3   A.  No, because I knew that he had children with her.

4   Q.  Okay.  But had he told you that he was not married to her?

5   A.  No.  He never told me he was married.

6   Q.  I'm going to put on the board Exhibit Number 34 that we

7   have been talking about.

8           You testified that this cake right here in this

9   photograph was a cake designed for your son's birthday,

10  correct?

11  A.  Yes, ma'am.

12  Q.  Were you going to enjoy that cake at the house?

13  A.  We had already cut it.

14  Q.  We what?

15  A.  We had already cut it.

16  Q.  So you were about to eat it?

17  A.  No, we had already eaten.

18  Q.  Julio Cesar, right?

19  A.  Yes, ma'am.

20  Q.  He was found just like this at 7:30 p.m. on the evening of

21  September 24th in your trailer, correct?

22  A.  Yes, ma'am.

23  Q.  Do you typically have your birthday celebrations with men

24  that are naked and being held in your home?

25  A.  No, ma'am.

1  Q.  Was Carlos headed home to have cake?

2          MR. HORMEL:  Objection; speculation.

3          MS. KELLY:  If you know, was Carlos headed home to

4  have cake?

5          MR. HORMEL:  Your Honor, if the Court would rule on

6  the objection.

7          THE COURT:  Sustained as to speculation.

8  BY MS. KELLY:

9  Q.  You mentioned that you speak English, correct?

10 A.  Yes, ma'am.

11 Q.  And you stated that you said to the officers when you were

12 under the tree on the evening of September 24th, you expressed

13 something about wanting to be with your children, isn't that

14 correct?

15 A.  I asked them to take me off of the ant hill because they

16 had me kneeling with my boy in my arms.

17 Q.  And you mentioned that you said that in English?

18 A.  Yes, ma'am.

19 Q.  Tell us in English, if you can, what exactly you said.

20 A.  (In English) Can you please remove me from this.  There's a

21 lot of ants.  They are biting the baby and they are biting me.

22         MS. KELLY:  I don't have any other questions.

23         THE COURT:  Any redirect?

24         MR. HORMEL:  I have one question, Your Honor.

25                    REDIRECT EXAMINATION

November 1, 2010 - Jury Trial - Day 5

1   BY MR. HORMEL:

2   Q.  After the 24th of September, did you mess up your house on

3   purpose so that you could take pictures of it?

4   A.  No, sir, because if I had done that the pictures would look

5   very different from the way they do.  SWAT knows.  They went to

6   my house and they know what they did.

7   Q.  And after you put the house back together, after SWAT had

8   left, did you change the side of the room that they kept the TV

9   on?

10  A.  Yes, sir, because I lived there about another 15 days more.

11  Q.  Okay.  Thank you.

12          THE COURT:  Mr. Romo?

13          MR. ROMO:  Yes, sir.

14          Your Honor, may I have a second?

15          THE COURT:  You may.

16          MR. ROMO:  I'm going to show a photograph to the

17  witness, Your Honor, that has not been admitted.

18          THE COURT:  Very well.

19          MR. ROMO:  Actually two photos, Your Honor.  125 and

20  126.

21                  REDIRECT EXAMINATION

22  BY MR. ROMO:

23  Q.  125.  Do you recognize this photograph, ma'am?

24  A.  Yes, sir.

25  Q.  And when was that photograph taken?

November 1, 2010 - Jury Trial - Day 5

```
 1   A.   I took that picture the following day in the morning.

 2   Q.   That would be on the 25th of September?

 3   A.   Yes, sir.

 4   Q.   And did you move anything before you took this photograph?

 5   A.   No, sir.

 6   Q.   Is it -- why is it like this?

 7   A.   Because the SWAT team moved everything, and I took that

 8   picture the following day because the guy from ICE told me that

 9   I couldn't stay in the trailer any longer.

10   Q.   And is that the room where Cesar was staying?

11   A.   Yes, sir.

12   Q.   But you were able to stay two more weeks?

13   A.   Yes, sir.

14           MR. ROMO:  Your Honor, I ask for the admission of

15   Exhibit 125.

16           THE COURT:  Any objection?

17           MS. KELLY:  No objection.

18           THE COURT:  Shall be admitted; may be published.

19           MR. ROMO:  Your Honor, I want to show the witness

20   Exhibit 126, Your Honor, which has not been admitted.

21           THE COURT:  Very well.

22   BY MR. ROMO:

23   Q.   Is that photograph the same room from a different angle?

24   A.   Yes, sir.

25   Q.   It was taken on the same day, the 25th?
```

———— November 1, 2010 - Jury Trial - Day 5 ————

1    A.  Yes, sir.

2             MR. ROMO:  Your Honor, I move for the admission of

3    Exhibit 126.

4             THE COURT:  Any objection?

5             MS. KELLY:  No objection.

6             THE COURT:  It shall be admitted; may be published.

7    BY MR. ROMO:

8    Q.  One last question, Maria:  You have been in the United

9    States as a permanent resident since you were a child, is that

10   correct?

11   A.  No.  I didn't have any papers when I arrived here and it

12   was years later that my dad got them for me.

13   Q.  And how long have you been a permanent resident alien?

14   A.  About seven years.

15   Q.  And now you are going to apply for citizenship, is that

16   correct?

17   A.  Yes, sir.

18   Q.  And your intention is to do that, is that correct?

19   A.  Yes, sir.

20             MR. ROMO:  No further questions, Your Honor.  Thank

21   you.

22             THE COURT:  Thank you, ma'am.  You may be excused.

23             Ladies and Gentlemen of the jury, before we call the

24   next witness do you need a break?

25             Okay.  Call your next witness.

 1          MR. HORMEL:  Defense will call Yasmin Rascon.

 2          Actually, Your Honor, we're going to call Beatriz

 3   Pina.

 4          MS. KELLY:  Your Honor, may we approach?

 5          THE COURT:  Very well.

 6          (The following discussion was had at sidebar out of

 7   the hearing of the jury:)

 8          MS. KELLY:  The government would just ask that -- the

 9   Rule has been invoked.  Apparently the witnesses, after they

10   testified, are sitting in the back.  Given the fact that the

11   Rule has been invoked and the case isn't over, we would ask

12   them to be excused.

13          THE COURT:  The witness was excused without objection

14   so they are excused.  They are excused.  They are done and if

15   they are done they can sit in the courtroom.

16          MS. KELLY:  Okay.

17          (In open court.)

18          MR. HORMEL:  Your Honor, Mr. Romo is going to examine

19   this witness.

20          THE COURT:  Very well.  If you will come forward

21   please, ma'am.

22          THE COURTROOM DEPUTY:  Please raise your right hand.

23          (The witness, Beatriz Pina, was sworn.)

24          (The witness was assisted by the court interpreter.)

25          THE COURT:  Please be seated, ma'am.

November 1, 2010 - Jury Trial - Day 5

1          Would you state your full name for the record and

2     spell your last name.

3          THE WITNESS:  Beatriz El Pena (phonetic), Pina,

4     P-I-N-A.

5          THE COURT:  You may proceed.

6                    BEATRIZ PINA,

7     a witness herein, having been first duly sworn by the clerk to

8     speak the truth and nothing but the truth, was examined and

9     testified through the interpreter as follows:

10                  DIRECT EXAMINATION

11    BY MR. ROMO:

12    Q.  Good afternoon, Ms. Pina.

13    A.  Good afternoon.

14    Q.  Ma'am, you are related to Maria, is that correct?

15    A.  Yes.

16    Q.  And what is she to you?

17    A.  My daughter.

18    Q.  And you live here in Tucson, is that correct?

19    A.  Yes.

20    Q.  And you have lived here for how long?

21    A.  18 -- 18.

22    Q.  18 years?

23    A.  I don't know if it's 18 or 19.  I don't know exactly.

24    Q.  All right.  And you are legally residing in the United

25    States, is that correct?

1   A.   Yes.

2   Q.   And you know Mr. Carlos Calixtro, is that correct?

3   A.   Yes.

4   Q.   And would you tell the jury if and when Mr. Calixtro and

5   Maria lived in your home?

6   A.   I don't know specifically when, but he lived there for

7   approximately two years.

8   Q.   And in September of 2009, did you know that he lived at a

9   mobile home?

10   A.   Yes.

11   Q.   And did you ever visit him there?

12   A.   Yes.

13   Q.   Did you visit your daughter as well?

14   A.   Yes.

15   Q.   And while they lived there, did they also visit you at

16   home?

17   A.   Yes.

18   Q.   And did -- when Maria came to see you, did she use any of

19   the facilities in your home?

20   A.   The facility?

21   Q.   Well, like the washroom and washing machine, dryer, things

22   of that nature?  That's what I meant.

23   A.   Oh, yes.

24   Q.   Was she ever accompanied by Yasmin?

25   A.   Yes.

— November 1, 2010 - Jury Trial - Day 5 —

1   Q.  Now, would that be Yasmin Luna?

2   A.  Yes.

3   Q.  This lady here, is that correct?

4   A.  Yes.

5   Q.  Did you ever see -- do you know what Carlos does for a

6   living?

7           MR. ROMO:  May I have a second, Your Honor?

8           THE COURT:  Yes.

9           THE WITNESS:  Excuse me.

10          MR. ROMO:  No problem.

11          THE WITNESS:  It's because the baby is there.

12  BY MR. ROMO:

13  Q.  That baby, is that your son?  Is that your son?

14  A.  Yes.

15  Q.  And he was at the mobile home the night of the 24th?

16  A.  Yes.

17  Q.  And how old was he at the time?

18  A.  Two.  A little bit more.

19  Q.  When did you pick him up?

20  A.  That night.

21  Q.  Was he okay or not?

22  A.  He was crying.

23  Q.  I'm sorry about what happened, but I need to ask you if on

24  that particular day or two days before, did you go to the

25  mobile home?

———— November 1, 2010 - Jury Trial - Day 5 ————

1    A.  Yes.

2    Q.  Did you bring your son there that night?

3    A.  Yes, because we were celebrating there with my daughter

4    because of my grandson.

5    Q.  But you were not there when the police arrived?

6    A.  No.

7    Q.  Why not?

8    A.  I was working.

9    Q.  All right.  Were you there when the cake was given to

10   everyone, when it was cut?

11   A.  No.

12   Q.  And the day before, the 24th, did you go there?

13   A.  Yes.

14   Q.  And did you ever see Yasmin at the house?

15   A.  On the 24th?

16   Q.  Or any other day.

17   A.  Yes.

18   Q.  And did you ever see a guy named Cesar?

19   A.  I don't know who that is.

20   Q.  Did you see a man with a ponytail?

21   A.  No.

22   Q.  You don't remember?

23   A.  No.

24   Q.  Did you ever see your son-in-law, Carlos, threaten anybody?

25   A.  No.

——————— November 1, 2010 - Jury Trial - Day 5 ———————

1   Q.  Did you ever see him with pistols?

2   A.  No.

3   Q.  Did you see him taking care of horses?

4   A.  Yes.

5   Q.  And did you know whether or not he raced those horses?

6   A.  He raced horses.  He would ride horses.

7   Q.  Did he ever -- do you know if those horses were

8   participants in races?

9   A.  Yes.

10  Q.  And to your knowledge, those horses belonged to him?

11  A.  Yes.

12          MR. ROMO:  No further questions, Your Honor.  Thank

13  you.

14          THE COURT:  Mr. Hormel.

15          MR. HORMEL:  I don't have any questions for this

16  witness, Your Honor.

17          THE COURT:  Mr. Evans.

18                        CROSS-EXAMINATION

19  BY MR. EVANS:

20  Q.  Your daughter went to what high school?

21  A.  How's that?  What?

22  Q.  Your daughter went to what high school in Tucson Unified

23  School District?

24  A.  Well, she went to Summit and then Challenger, and then she

25  went to Desert View.

November 1, 2010 - Jury Trial - Day 5

1   Q.  And she didn't graduate from high school, did she?

2   A.  No.

3   Q.  She has been with Carlos Calixtro since she was 16, is that

4   right?

5   A.  16?  I don't know exactly how old she was.

6   Q.  And you have had conversations with Carlos Calixtro about

7   his other children besides your grandchild, haven't you?

8   A.  Well, yes.

9   Q.  And you know he has four other children, correct?

10  A.  Yes.

11  Q.  So he has five children in total that he must support,

12  correct?

13  A.  Yes.

14  Q.  And he must support your daughter, too, at one point,

15  correct?

16  A.  My daughter, yes.

17  Q.  So he helped her pay her rent, correct?

18  A.  Well, I don't know.  I don't know the specifics.

19  Q.  Your daughter didn't work until you got her a job at

20  Pacific Maintenance, is that right?

21  A.  Yes.

22  Q.  And you have worked with Pacific Maintenance for several

23  years, correct?

24  A.  Well, I don't know how long it's been, but yes, I have

25  been.

─── November 1, 2010 - Jury Trial - Day 5 ───

1    Q.  And you got your daughter a job there?

2    A.  Yes.

3    Q.  Until your daughter got a job there, she was not working,

4    correct?

5    A.  No.

6    Q.  So if she was buying any clothes, buying any food, buying

7    anything, she would have to get her money from Carlos, isn't

8    that right?

9    A.  Yes, and sometimes I helped her out, too.

10   Q.  Let's talk about how Carlos makes his money.  You said he

11   races horses, correct?

12   A.  Yes.

13   Q.  You say he owns horses.  Isn't that right?

14   A.  Yes.

15   Q.  And he has to feed those horses.  Isn't that right?

16   A.  Well, yes.

17   Q.  And he must transport those horses to wherever these races

18   are.  Isn't that right?

19   A.  Well, yes.

20   Q.  And he has a very nice truck, doesn't he?

21   A.  Well, he used to.  But now --

22   Q.  He used to have a very nice truck, correct?

23   A.  Yes.

24   Q.  And the only way you knew he made money was racing horses,

25   is that right?

November 1, 2010 - Jury Trial - Day 5

1   A.  Well, yes.

2   Q.  And these horse races, they are not at Rillito Downs, are

3   they?

4   A.  Well, no.  I don't know exactly.  I know that he races

5   horses, but I don't know.

6   Q.  You don't know where he races these horses, do you?

7   A.  Well, I know they have horse races, but I'm not involved.

8   I don't go to the horse races or anything.

9   Q.  You have never seen Carlos at the horse races, have you?

10  A.  No.

11  Q.  And the only reason you know that he races horses is that

12  he has told you that he races horses.  Isn't that right?

13  A.  Because he had a horse there at the house and he would take

14  care of it.

15  Q.  And to the extent you know, you saw him ride that horse,

16  didn't you?

17  A.  Yes.

18  Q.  And you saw in the trailer that he had a very fancy saddle,

19  didn't you?

20  A.  Yes.

21  Q.  So by racing horses, he supports your daughter and your

22  grandchild, correct?

23  A.  Well, yes.

24  Q.  And he must support his four children by his other wife,

25  correct?

————— November 1, 2010 - Jury Trial - Day 5 —————

1          MR. ROMO:  Asked and answered, Your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.  Well, I believe so.  Well, from

4   his work.  I don't know how he supports them.

5   BY MR. EVANS:

6   Q.  His work.  Does he have any work besides racing horses that

7   you know of?

8          MR. ROMO:  Objection.  Argumentative, Your Honor.

9          THE COURT:  Overruled.

10         THE WITNESS:  Well, no.

11  BY MR. EVANS:

12  Q.  Did he ever show you a bunch of cash that he said, hey, I

13  won this at the races?

14  A.  No.

15  Q.  So you really don't know where Carlos Calixtro gets his

16  money to support your daughter and your grandchild, do you?

17  A.  Well, from the horses.

18  Q.  Now, Ms. Pina, you knew that Yasmin Luna was illegally in

19  the United States, didn't you?

20         MR. ROMO:  Objection.  Relevance, Your Honor.

21         THE COURT:  Overruled.

22         THE WITNESS:  No.

23  BY MR. EVANS:

24  Q.  And you never met a man -- show you what's marked and

25  admitted as Exhibit 20.

November 1, 2010 - Jury Trial - Day 5

1          You testified you have never met this man, correct?

2   A.  No.

3   Q.  Would it surprise you to know that this man was living in

4   the same house as your grandchild for over two days?

5   A.  Well, of course I would be surprised.

6   Q.  Carlos Calixtro supported your daughter very nicely, didn't

7   he?

8   A.  Well, he shouldn't -- he shouldn't believe that.

9   Q.  He paid for her food, correct?

10  A.  Yes, but there were times when I would help her out also.

11  Q.  He was a father to your grandchild, correct?

12  A.  Of course.  Certainly.

13  Q.  And he was living with your daughter on and off and

14  supporting her, correct?

15  A.  Yes.

16  Q.  And you are telling this Court and this jury that you

17  didn't know that he was making his money by operating a

18  smuggling operation for illegal aliens.  Is that correct?

19  A.  No.

20  Q.  You are telling this Court that you -- and this jury --

21  that you didn't know that your son-in-law, or the father of

22  your grandchild, pointed a gun at the man's face that is in

23  Exhibit 20 and said that he had to pay $2,300.  You didn't know

24  that, did you?

25  A.  No, sir.

———November 1, 2010 - Jury Trial - Day 5———

1   Q.  Now, you knew Yuris Bonilla, didn't you?

2   A.  Yuris Bonilla?

3   Q.  Do you see him in the Court today?

4   A.  Yes.

5   Q.  And you saw him at the trailer with your daughter, correct?

6   A.  Yes.

7   Q.  And he was staying at that trailer, wasn't he?

8   A.  Yes.

9   Q.  And he was sleeping somewhere in that trailer?

10  A.  I don't know.

11  Q.  But Yasmin Luna was also staying in that trailer, wasn't

12  she?

13  A.  Yes.

14  Q.  Did you know Yuris Bonilla was here illegally in the United

15  States?

16  A.  No.

17  Q.  Did you know that Yuris Bonilla also pointed a gun at the

18  man in Exhibit 20 and demanded money from him?

19        MR. HORMEL:  I'm going to object to facts not in

20  evidence.  That's what the government is trying to prove.  He's

21  stating things that weren't fact.

22        THE COURT:  Sustained.

23  BY MR. EVANS:

24  Q.  You want your daughter to be happy, don't you?

25  A.  Well, of course.  Certainly.

──────── November 1, 2010 - Jury Trial - Day 5 ────────

1   Q.  And you want Carlos Calixtro to be able to support your

2   grandchild, don't you?

3   A.  Well, yes.

4   Q.  And you think he makes his money by racing horses, don't

5   you?

6   A.  Well, yes.  I already told you.

7           MR. EVANS:  No further questions.

8           THE COURT:  Any redirect, counsel?

9           MR. HORMEL:  Not from me, Your Honor.

10                  REDIRECT EXAMINATION

11  By MR. ROMO:

12  Q.  Ms. Pina, you were questioned by the government regarding

13  Mr. Carlos Calixtro and you were asked questions about your

14  relationship with him, correct?

15  A.  Yes.

16  Q.  And you were asked about whether or not you come over here

17  and give your testimony because you want Mr. Calixtro to

18  support your daughter?

19  A.  Yes.

20  Q.  But you are here to tell the jury the truth.  Is that

21  correct?

22  A.  Yes.

23  Q.  And that's what you have done today.  Is that correct?

24  A.  Yes.

25          MR. ROMO:  No further questions, Your Honor.

—November 1, 2010 - Jury Trial - Day 5—

1           THE COURT:  Thank you.  Thank you, ma'am.

2           Mr. Hormel.

3           MR. HORMEL:  I don't have any further questions, Your

4    Honor.

5           THE COURT:  Thank you.  You may be excused.

6           Any jury members wish a break?  Yes?

7           Okay.  We'll take a break.  Stand in recess for the

8    afternoon, 10 to 15 minutes.

9           (Recess taken.)

10          THE COURT:  Thank you.  Please be seated.

11          Record will reflect the presence of the jury, counsel,

12   and the defendants.

13          Would you call your next witness, counsel.

14          MR. HORMEL:  The defense will call Jesus Rascon.  And

15   I will, again, give it to Mr. Romo.

16          THE COURT:  Very well.

17          THE COURTROOM DEPUTY:  Please raise your right hand.

18          (The witness, Jesus Rascon, was sworn.)

19          THE COURT:  Be seated, sir.

20          Would you please state your full name for the record

21   and spell your last name?

22          THE WITNESS:  Jose Jesus Rascon.  R-A-S-C-O-N.

23          THE COURT:  You may proceed.

24

25                         JESUS RASCON,

—— November 1, 2010 - Jury Trial - Day 5 ——

1   a witness herein, having been first duly sworn by the clerk to

2   speak the truth and nothing but the truth, was examined and

3   testified through the interpreter as follows:

4                          DIRECT EXAMINATION

5   BY MR. ROMO:

6   Q.  Mr. Rascon, how old are you, sir?

7   A.  22.

8   Q.  And where do you live?

9   A.  With my mom.

10  Q.  You live here in Pima County?

11  A.  Yes.

12  Q.  How long have you lived in Pima County?

13  A.  My whole life.

14  Q.  Are you legally in the United States?

15  A.  Yes.

16  Q.  On September 24th, were you at home?

17  A.  Yes.

18  Q.  Showing you what has been admitted as Exhibit Number 27, at

19  that time were you living at this house, or did you live at

20  this house?

21  A.  That one.

22  Q.  That house?

23  A.  That one.

24  Q.  Who did you live there with?

25  A.  My mother.

—————— November 1, 2010 - Jury Trial - Day 5 ——————

1  Q.  Anybody else live there?

2  A.  My sister.

3  Q.  And what is your sister's name?

4  A.  Yasmin Rascon.

5  Q.  And were you at home about 7, 7:30 at night on the 24th of

6  September?

7  A.  Yes.

8  Q.  Was your mom with you?

9  A.  Yes.

10  Q.  And Yasmin, was she there or was she someplace else?

11  A.  She was there but with her girlfriend.

12  Q.  She was in another home?

13  A.  Yes.

14  Q.  Was she in this home?

15  A.  Yes.

16  Q.  And at that hour, did you see the police?

17  A.  Yes.

18  Q.  Would you tell the jury what happened?

19  A.  They went into the house and they took my mom out by force

20  and me too.

21  Q.  Did you see them take your mom out?

22  A.  Yes.

23  Q.  What did they do?

24  A.  They picked her up and they took her out.

25  Q.  Did they do anything to her?

1   A.  They hit her head against the car.

2   Q.  What car was that?

3   A.  A Jeep.

4   Q.  Did you see how they hit your mom's head against the Jeep?

5   A.  I heard her yell, and then I looked and I could see she had

6   her head down at the front of the vehicle.

7   Q.  Did you hear the impact of her head against the Jeep?

8   A.  Yes.

9   Q.  Were you and your mom taken to this area right here where

10   this tree is?

11   A.  Yes.

12   Q.  And were you made to kneel under the tree?

13   A.  Yes.

14   Q.  Was there any particular thing under the tree that bothered

15   you?

16   A.  No.  Ants.

17   Q.  And did you complain about the ants?

18   A.  No, but my mom and my sister did.

19   Q.  Did they complain to the officers?

20   A.  Yes, sir.

21   Q.  Did they remove you as a result of the complaint?

22   A.  No.

23   Q.  Now, at your home, an officer who came over from BORTAC

24   said that your mom had a lot of food that she was cooking.  Do

25   you recall that day if she cooked more food than she ordinarily

—— November 1, 2010 - Jury Trial - Day 5 ——

1   cooks?

2   A.   Yes, because I told her I was hungry.

3   Q.   And was she cooking more food than she ordinarily cooks?

4   A.   No.

5   Q.   Now, who lives in this mobile home here?

6   A.   A cousin.

7   Q.   What's his name?

8   A.   Mario Padilla (phonetic).

9   Q.   And was he there that evening?

10  A.   No.

11  Q.   And who lives at this home right here?

12  A.   My grandma.

13  Q.   Does she live with anybody?

14  A.   With my aunt and uncle.

15  Q.   And anybody else?

16  A.   No.

17  Q.   And on that particular night -- well, the officers from

18  BORTAC testified that they found a room under lock and key.  Do

19  you know if your grandmother has a room that has a lock?

20  A.   Yes.

21  Q.   And what is that room?

22  A.   It's her room.

23  Q.   Is that her bedroom?

24  A.   Yes, her bedroom.

25  Q.   Now, I want to show the jury Exhibit Number 26, or the

1   witness.  Do you recognize that room, that lock on the room?

2   A.  Yes.

3   Q.  Is that your grandma's bedroom?

4   A.  Yes.

5   Q.  And do you know why she keeps it locked like that?

6   A.  It's her room.

7   Q.  That's just the way she keeps it?

8   A.  Yes.

9          MR. ROMO:  No other questions, Your Honor.  Thank you.

10         MR. HORMEL:  I don't have any questions from this

11  witness, Your Honor.

12         THE COURT:  Mr. Evans.

13         MR. EVANS:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15  By MR. EVANS:

16  Q.  Good afternoon.

17  A.  Good afternoon.

18  Q.  You are 22 years old.  Where were you born?

19  A.  In Mexico.

20  Q.  Where in Mexico?

21  A.  Navojoa, Sonora.

22  Q.  And when did you come to the United States?

23  A.  My parents brought me here when I was two years old.

24  Q.  And at what point did you go through the process of getting

25  legal authorization to come to the United States?

November 1, 2010 - Jury Trial - Day 5

1   A.   I don't remember.  My dad did it.

2   Q.   You think you are a legal permanent resident, correct?

3   A.   No.  I'm going through the process with my attorney.

4   Q.   So there's an issue that's pending and you have to get an

5   attorney.  Is that right?

6   A.   Yes.

7   Q.   You are 22 years old.  Do you work right now?

8   A.   No.

9   Q.   When was the last time you had a job?

10  A.   No, I don't remember.

11  Q.   When did -- did you go to a local high school?

12  A.   Desert View.

13  Q.   You went to Desert View High School?

14  A.   Yes.

15  Q.   And did you graduate from Desert View High School?

16  A.   No.

17  Q.   And when did you drop out?

18  A.   When my father passed away.

19  Q.   How many years ago?

20  A.   Five.

21  Q.   So you dropped out of high school in your junior year?

22  A.   Yes.  I think I was a sophomore.

23  Q.   Do you know Carlos Calixtro?

24  A.   I used to see him.

25  Q.   You used to see him where?

————— November 1, 2010 - Jury Trial - Day 5 —————

1    A.  At Maria's house.

2    Q.  And you know Yuris Bonilla?

3    A.  No.

4    Q.  Do you recognize him as someone being in Maria's trailer?

5    A.  No.

6    Q.  You never saw him in Maria's trailer, Yuris Bonilla?

7    A.  Who is he?

8    Q.  Did you spend much time in Maria's trailer?

9    A.  No.

10   Q.  Between September 22nd and September 24, 2009, do you think

11   you went to Maria's trailer at all?

12   A.  Yes.  I used to go, but not a lot.

13   Q.  Between September 22nd and 24th, just a few days before the

14   police came, do you think you were at Maria's trailer?

15   A.  I was there with some horses, I remember.

16   Q.  So, well, the horses were outside the trailer, correct?

17   Were you inside the trailer?

18   A.  No.

19   Q.  And the horses, were they racing horses?

20   A.  Yes.

21          MR. ROMO:  Foundation.

22          THE COURT:  I'm sorry?

23          MR. ROMO:  He already answered.

24   BY MR. EVANS:

25   Q.  Who told you they were racing horses?

—November 1, 2010 - Jury Trial - Day 5—

1   A.  You could see they were very nice looking.

2   Q.  Have you ever gone to the races with Carlos Calixtro?

3   A.  No.

4   Q.  Have you ever talked to Carlos Calixtro about how he makes

5   his money?

6   A.  No.

7   Q.  Have you ever seen Carlos drive up to Maria's trailer and a

8   number of people get out and go into the trailer?

9   A.  No.

10  Q.  You are not surprised that Maria's trailer was used to

11  house illegal aliens, are you?

12          MR. HORMEL:  Objection.  Misstates facts in evidence

13  that are sought to be proven by the government.

14          THE COURT:  Sustained.

15  By MR. EVANS:

16  Q.  Just one final thing.  Mr. Romo talked about all the food

17  that your mother was cooking.  That was all for you?

18  A.  No, for her, for my sister, and for me.

19          MR. EVANS:  No further questions.

20          THE COURT:  Any redirect?

21          MR. ROMO:  No, Judge.

22          MR. HORMEL:  No, Judge.

23          THE COURT:  Thank you, sir.  You are excused.

24          Call your next witness, please.

25          MR. HORMEL:  Yasmin Rascon.

—November 1, 2010 - Jury Trial - Day 5—

1          THE COURTROOM DEPUTY:  Please raise your right hand.

2          (The witness, Yasmin Rascon, was sworn.)

3          (The witness was assisted by the court interpreter.)

4          THE COURT:  Would you please state your full name for

5   the record and spell your last name.

6          THE WITNESS:  Yasmin Rascon.  Yasmin Judith Rascon.

7   R-A-S-C-O-N.

8                          YASMIN RASCON,

9   a witness herein, having been first duly sworn by the clerk to

10  speak the truth and nothing but the truth, was examined and

11  testified through the interpreter as follows:

12                      DIRECT EXAMINATION

13  BY MR. HORMEL:

14  Q.  Good afternoon, Ms. Rascon.

15          How old are you?

16  A.  23.

17  Q.  And could you tell us a little bit about your educational

18  background?

19  A.  Well, I went to college.  Tucson College.

20  Q.  And what did you study there?

21  A.  Medical assistant.

22  Q.  And did you recently complete that program?

23  A.  I have already finished my school but I have to do my

24  externship.

25  Q.  And are you expecting that you will receive an externship

November 1, 2010 - Jury Trial - Day 5

1  soon?

2  A.  Yes.

3  Q.  And after that, once you have done your externship, what

4  will you be able to do?

5  A.  Well, to work as a medical assistant.

6  Q.  And did you finish high school?

7  A.  No.

8  Q.  Did you go to Desert View?

9  A.  Yes.

10  Q.  Now, I'm going to show you a photograph.  This is Exhibit

11  27 already admitted.

12         Do you recognize -- you may not have seen this from

13  above before, but do you happen to recognize this area?

14  A.  Yes.

15  Q.  And did you live at one point in one of those trailers?

16  A.  Yes.

17  Q.  Which one was that?

18  A.  This one.

19  Q.  Is there any way we can have that activated so she can make

20  a dot?

21         THE COURTROOM DEPUTY:  Touch the screen.

22  BY MR. HORMEL:

23  Q.  Okay.  And this trailer down here that we can see, this

24  one, do you know who lived there?

25  A.  Yes.

—————— November 1, 2010 - Jury Trial - Day 5 ——————

1    Q.  And who was that?

2    A.  Well, my sister used to live there and then my friend

3    Maria.

4    Q.  So after your sister moved out Maria moved in?

5    A.  Yes.

6    Q.  Now, do you remember last year in September there was a day

7    when the police came?

8    A.  Yes.

9    Q.  Do you remember, was it -- had Maria been living there a

10   long time when the police came?

11   A.  She was going on a month.

12   Q.  And would you go visit her at the house?

13   A.  Yes.

14   Q.  Oh.  One question:  So you were familiar with that trailer

15   before Maria moved in?

16   A.  Yes.

17   Q.  And do you see the bars on those windows there?

18   A.  Yes.

19   Q.  Were those there before Maria moved in?

20   A.  Yes.

21   Q.  Okay.  Now, if you wanted to go visit Maria would you just

22   walk over?

23   A.  Yes.

24   Q.  Do you recognize -- I'm going to put on what's been

25   admitted as Exhibit 34.

———— November 1, 2010 - Jury Trial - Day 5 ————

1          Do you recognize that room?

2   A.  Yes.

3   Q.  And do you see a door there where you would come in

4   sometimes?

5   A.  Where?

6   Q.  Would you come in through the door there or through the

7   other door?

8   A.  Through that door.

9   Q.  Can you point out to the jury which door that is?

10  A.  This one.

11  Q.  Okay.  And typically when you went to go visit them, would

12  that door be locked?

13  A.  No.

14  Q.  I'm going to show what's marked and already admitted as 24.

15          Do you recognize this young lady?

16  A.  Yes.

17  Q.  What is her name?

18  A.  Yasmin.

19  Q.  And who is she with there?

20  A.  With little Carlos, I think.

21  Q.  Okay.  So do you recall that she had been living at the

22  place there, that other trailer where Maria was living?

23  A.  Yes.

24  Q.  Now, during the time that Maria lived in the trailer, would

25  you ever go places with her?

———— November 1, 2010 - Jury Trial - Day 5 ————

1   A.  No.

2   Q.  You never went to the store with her or anything like that?

3   A.  No.

4   Q.  Did you ever see her leave, leaving Yasmin alone at the

5   house?

6   A.  See who leave?

7   Q.  Maria.

8   A.  Yes.

9   Q.  So there were times when this young lady was left alone in

10  the house?

11  A.  Yes.

12  Q.  Now, you probably remember the 24th of September of last

13  year?

14  A.  Yes.

15  Q.  Where were you when the bomb went off?

16  A.  In Maria's room.

17  Q.  And what were you doing in Maria's room?

18  A.  She was fixing my hair.

19  Q.  Were you helping each other out with that?

20  A.  Yes.  Well, first, I was going to fix my hair and then I

21  was going to fix her hair.

22  Q.  And why were you fixing her hair?

23  A.  Because we were going out to dinner.

24  Q.  And what was the occasion?

25  A.  Her son's birthday.

—— November 1, 2010 - Jury Trial - Day 5 ——

1    Q.  Now, were you surprised when the bomb went off?

2    A.  Yes.

3    Q.  And tell the jury what you felt, how you felt when the bomb

4    went off.

5    A.  I was frightened.  I thought I was going to die.

6    Q.  Did you have any idea what was going on?

7    A.  No.

8    Q.  What did you do?

9    A.  I went into the closet.

10   Q.  And then what happened?

11   A.  They pulled me out of there, pointing a rifle at me.

12   Q.  Who did?

13   A.  I believe it was the SWAT team.

14   Q.  I'm showing you a photograph again.

15          Do you see this tree over here?

16   A.  Yes.

17   Q.  Is that where the SWAT team took everybody?

18   A.  Yes.

19   Q.  Do you remember whether they handcuffed you or not?

20   A.  Yes.

21   Q.  How did they make you -- what position did they make you

22   take to wait there by the tree?

23   A.  They sat me down.

24   Q.  On your knees?

25   A.  No.

1   Q.  I'm showing what's been marked as 26 and already admitted.

2       Do you recognize that person?

3   A.  Yes.

4   Q.  Who is that?

5   A.  Me.

6   Q.  And is that what you were wearing the night that the SWAT

7   team came?

8   A.  Yes.

9   Q.  And are your hands tied behind your back at that time?

10  A.  Yes.

11  Q.  And was there anything that was bothering you as you were

12  waiting there under the tree or by the tree?

13  A.  Yes.

14  Q.  And what was that?

15  A.  Ant hill.

16  Q.  Did you tell anybody about that?

17  A.  Yes.

18  Q.  Did -- do you speak enough English to be able to tell a

19  police officer that the ants are bothering you?

20  A.  Yes.

21  Q.  I know this probably might seem a little silly.  Do you

22  think you might, for the jury's benefit, say -- pretend that

23  the police officer is there and tell him in English the ants

24  are bothering you?

25      MR. EVANS:  Objection, Your Honor.  She can say what

─── November 1, 2010 - Jury Trial - Day 5 ───

1   she said that night but not what Mr. Hormel said.

2          THE COURT:  She can state what she told the officers

3   that night.

4   BY MR. HORMEL:

5   Q.  Would you do that for me?

6   A.  Yes.

7   Q.  Go ahead.

8   A.  That -- whether they could move us because the ants were

9   biting us.

10  Q.  Could you say it in English for us?

11  A.  I'm ashamed.

12  Q.  Okay.  Now, you went back and forth to this house several

13  times during the days before the police came?

14  A.  Yes.

15  Q.  Did you ever see anybody threaten an individual who was

16  staying in the small bedroom in that house?

17  A.  No.

18  Q.  Did you ever see anybody not allow that individual to

19  leave?

20  A.  No.

21  Q.  Did you ever see between seven or nine people piled up in

22  that room?

23  A.  No.

24  Q.  And the room I'm referring to is here in this picture.

25  A.  No.

November 1, 2010 - Jury Trial - Day 5

1          MR. HORMEL:  I don't have any further questions.

2          THE COURT:  Mr. Romo.

3                    DIRECT EXAMINATION

4  BY MR. ROMO:

5  Q.  Good afternoon, Yasmin.

6          The mobile home that Maria had rented, from whom did

7  she rent it?

8  A.  Who rented it to her?  My sister.

9  Q.  And what is your sister's name?

10  A.  Mercedes Rascon.

11  Q.  And how long did Mercedes have the mobile home before she

12  rented it?

13  A.  I don't remember.  Years.

14  Q.  And when -- did you see when Mercedes purchased that mobile

15  home?

16  A.  Yes.

17  Q.  And was it as it was when she rented it to Maria, the same

18  condition?

19  A.  No, she fixed it up.

20  Q.  But the bars that were on the windows, they were already

21  there, correct?

22  A.  Yes.

23  Q.  When she purchased -- when Mercedes purchased the mobile

24  home, right?

25  A.  Yes.

— November 1, 2010 - Jury Trial - Day 5 —

1  Q.  On the 24th of September, you visited with Maria, is that
2  correct?
3  A.  Yes.
4  Q.  And you visited her in this mobile home, right?
5  A.  Yes.
6  Q.  And did you enter through this room?
7  A.  Yes.
8  Q.  And that would be the front room?
9  A.  Yes.
10  Q.  And was the door unlocked?
11  A.  Yes.
12  Q.  And that was generally the case, is that correct, the door
13  was unlocked?
14  A.  Yes.
15  Q.  Now, there's been some questions regarding your mother's
16  home related to how much she cooked.  Would you tell the jury
17  when your mom cooks, generally how much does she cook?
18  A.  Yes.
19  Q.  Go ahead and tell.
20  A.  In English?
21  Q.  No.  No.  Spanish.
22  A.  She would make a lot of food.
23  Q.  Does she still make a lot of food?
24  A.  Yes.
25  Q.  Why is that?

——November 1, 2010 - Jury Trial - Day 5——

1          MR. EVANS:  Objection.  Calls for speculation.

2          THE COURT:  She may answer if she knows.

3          THE WITNESS:  Ever since she was real young, ever

4   since she got married she's been cooking a lot.

5   BY MR. ROMO:

6   Q.  And generally, the food that is left over, you eat it later

7   or throw it away.  Is that correct?

8   A.  Yes.

9   Q.  Okay.  You also testified that you knew Yasmin Luna.  Is

10  that correct?

11  A.  Yes.

12  Q.  And this is she, right?

13  A.  Yes.

14  Q.  And did you ever see Yasmin Luna go with Maria to Maria's

15  mom's?

16          MR. EVANS:  Objection, Your Honor.  Leading, calls for

17  speculation.

18          THE COURT:  Leading.  If she knows, it's not

19  speculation, if she's seen her going to her mom's.

20          MR. ROMO:  I will rephrase, Your Honor.

21  BY MR. ROMO:

22  Q.  Did you ever see Yasmin leave with Maria, the mobile home?

23  A.  Yes.

24  Q.  And do you know where she was going, Maria was going?

25  A.  To her mom's house.

—November 1, 2010 - Jury Trial - Day 5—

1   Q.  Now, you are very close to Maria.  Is that right?

2   A.  Yes.

3   Q.  She's your best friend?

4   A.  Yes.

5   Q.  On the 24th, 9/24, you were going to celebrate with her, is

6   that correct?

7   A.  Yes.

8   Q.  And tell the jury why -- what was going on then.

9   A.  It was her son's birthday.

10  Q.  And what happened when the police came?  You already told

11  us that you were in the room.  Did the police scream at you?

12  A.  Yes.

13  Q.  Did you understand what they were screaming about?

14  A.  No.

15  Q.  Were you afraid?

16  A.  Yes.

17  Q.  Were you crying?

18  A.  Yes.

19  Q.  Were you shaking?

20  A.  Yes.

21  Q.  Now, this is a photo of you outside the home.  Do you

22  recall that?

23  A.  Yes.

24  Q.  And you had your hands behind your back.  Is that right?

25  A.  Yes.

1   Q.  And they were handcuffed, right?

2   A.  Yes.

3   Q.  And you were kneeling, correct?

4   A.  I was sitting down.

5   Q.  Was your mother kneeling?

6   A.  Yes.

7   Q.  Was she kneeling because she was told to be kneeling?

8           MR. EVANS:  Objection.  Calls for speculation.

9           THE COURT:  I'm sorry?

10          MR. EVANS:  Calls for speculation as to her motive and

11  why.

12          THE COURT:  Well --

13          MR. ROMO:  I can rephrase, Your Honor.

14          THE COURT:  I will let you rephrase it.

15  BY MR. ROMO:

16  Q.  Do you know why she was kneeling?

17  A.  No.

18  Q.  Did she complain about kneeling?

19  A.  Yes.

20  Q.  Did she do that in Spanish?

21  A.  Yes.

22  Q.  Did you translate her complaint to the officers?

23  A.  No.

24  Q.  Who did?

25  A.  I don't remember.

—November 1, 2010 - Jury Trial - Day 5—

1  Q.  Did you tell the officers anything about your mom's leg and

2  that she was hurting?

3  A.  No.  I think it was Maria.

4  Q.  All right.  Now, Mr. Hormel asked you to repeat in English

5  about the ant hill, about being on the ant hill and complaining

6  about it.

7        Do you remember that?

8  A.  Yes.

9  Q.  And on that particular night, on the 24th, did you tell the

10  officers in English?

11  A.  Yes.

12  Q.  I know it is embarrassing for you, but it is important as

13  well.  Would you please repeat what you told the officers in

14  English?

15  A.  (In English) Can you please move us because there's ants

16  and they are biting us.

17  Q.  I'm sorry.  Would you get closer to the -- now, would you

18  repeat it?

19  A.  (In English) Can you please move us because there's ants

20  and they are biting us.

21  Q.  And did you say it loud enough so that they could hear you?

22  A.  Yes.

23  Q.  Did they respond to your request?

24  A.  No.

25  Q.  Did they move you?

November 1, 2010 - Jury Trial - Day 5

1   A.  No.

2   Q.  Did they allow your mother to stand up?

3   A.  I don't recall.

4          MR. ROMO:  I have no other questions, Your Honor.

5          THE COURT:  Mr. Evans.

6          MR. EVANS:  Thank you.

7          MR. ROMO:  Your Honor, I'm sorry.  I do have one more

8   question, if I may.

9          THE COURT:  Go ahead.

10         MR. ROMO:  Thank you.

11  BY MR. ROMO:

12  Q.  On the 24th, you told us you were going out to dinner,

13  right?

14  A.  Yes.

15  Q.  And would you tell the jury who was going out to dinner?

16  A.  From what I knew, Maria, Carlos, Yuris, me, Carlitos, the

17  two boys, and the other boy.

18  Q.  And you didn't know if Yasmin was going, right?

19  A.  No.

20  Q.  And you didn't know if Cesar was going?

21  A.  No, not either.

22  Q.  You didn't talk about that, right?

23  A.  No.

24         MR. ROMO:  Thank you, Your Honor.

25         THE COURT:  Mr. Evans.

November 1, 2010 - Jury Trial - Day 5

1                        CROSS-EXAMINATION

2    BY MR. EVANS:

3    Q.  Let's first talk about horses, okay?  There were three

4    horses at Maria's trailer, correct?

5    A.  Yes.

6    Q.  And had you ever talked to Carlos about -- Carlos Calixtro

7    about what he did with those horses?

8    A.  No.

9    Q.  You never heard -- you never talked to Maria about the fact

10   that those horses were used for horse races?

11   A.  Yes.

12   Q.  So you knew that those horses were used for horse races,

13   correct?

14   A.  Yes.

15   Q.  Now, showing you what has been marked and published in

16   front of you is Exhibit 24.  You see a saddle there, don't you?

17   A.  Yes.

18   Q.  And is that one of the saddles that Carlos used on his

19   horses?

20   A.  Yes.

21   Q.  Did you ever go to the horse races with Carlos and Maria?

22   A.  Yes.

23   Q.  And where were those horse races?  Out in the desert?

24   A.  In Sahuarita.

25   Q.  And when Carlos raced those horses, he rode on the saddle

November 1, 2010 - Jury Trial - Day 5

1   like the one we see in the living room, correct?

2   A.  No, he didn't ride them.

3   Q.  He didn't ride his horses.  Someone else rode them for him,

4   is that correct?

5   A.  For races they did.

6   Q.  And when you went with Maria and Carlos, did Carlos's

7   horses win any of the races?

8   A.  Not the time that I went.

9   Q.  Did you understand that the sole means that Carlos had of

10  earning a living was racing his horses and winning the races?

11  A.  Yes.

12  Q.  And you knew that Maria depended upon him for payment of

13  the rent to your sister, correct?

14  A.  Yes.

15  Q.  You knew that she depended upon Carlos for buying clothes

16  that she wanted, correct?

17  A.  I don't know.

18  Q.  She depended upon Carlos to buy the food that was in the

19  house, correct?

20  A.  I don't know.

21  Q.  Now, when Maria moved in, was that the first time you had

22  met her?

23  A.  No.

24  Q.  So when had you first met Maria?

25  A.  Middle school.

———— November 1, 2010 - Jury Trial - Day 5 ————

1   Q.  Were you the one who told Maria that this trailer was for

2   rent and she could come and live there?

3   A.  Yes.

4   Q.  And do you live together now?

5          THE INTERPRETER:  Excuse me?

6   BY MR. EVANS:

7   Q.  Do you and Maria live together now?

8   A.  No.

9   Q.  Have you and Maria talked about your testimony that you

10  were going to give here today?

11  A.  No.

12  Q.  Have you talked about the events of September 24th with the

13  police?

14  A.  No.

15  Q.  You and Maria never talked about your experiences when the

16  SWAT team entered Maria's trailer on the 24th of September?

17  A.  No, only with the attorney.

18  Q.  You were going to go to dinner with three small children to

19  celebrate this birthday, isn't that right?

20  A.  Yes, two children and Maria's younger brother.  But he's

21  not a child.  He's 16, 16 or 17.

22  Q.  How old is Carlos, Jr.?

23  A.  Right now or when?

24  Q.  On September 24th, 2009?

25  A.  He was turning two.

─ November 1, 2010 - Jury Trial - Day 5 ─

1  Q.  And this was 7:30 at night.  You were waiting for Carlos to

2  come back so you could all go to dinner?

3  A.  Yes.

4  Q.  Carlos had the only truck that could take this big a group,

5  is that right?

6  A.  Well, I don't know how we were going to go.  We were just

7  getting ready.

8  Q.  Now, you say that you have been in and spent a lot of time

9  in this trailer in September of 2009.  You have met Yuris

10  Bonilla, correct?

11  A.  Yes.

12  Q.  And he's been living there about a month, correct?

13  A.  Yes.

14  Q.  And Yasmin Luna also has been there about a month, is that

15  correct?

16  A.  Yes.

17  Q.  Where did they all sleep?

18  A.  I don't know.

19  Q.  You recognize Cesar, correct?

20  A.  Yes.

21  Q.  Now, you knew that Cesar was sleeping in that room that had

22  no door, correct?

23  A.  Yes.

24  Q.  And you knew that earlier that day, a man he had been

25  sharing that room with had left, correct?

———— November 1, 2010 - Jury Trial - Day 5 ————

```
1         MR. HORMEL:  Objection, Your Honor.  Again, it states

2    facts that are not in evidence and states conclusions sought by

3    the government.

4         THE COURT:  Sustained.

5    BY MR. EVANS:

6    Q.  Did you ever see Cesar take a shower -- well, let's say go

7    into the bathroom, have the shower run, and then come out with

8    his hair all wet?  How is that?

9    A.  No.

10   Q.  Did you ever talk to Cesar?

11   A.  No.

12   Q.  But you saw him several times between September 22nd and

13   September 24th, didn't you?

14   A.  Yes.

15   Q.  And you never talked to him at all?

16   A.  No.

17   Q.  Did Maria tell you that he was an illegal alien?

18         MR. ROMO:  Objection.  Relevance, Your Honor.

19         THE COURT:  She may answer.

20         THE WITNESS:  No.

21   BY MR. EVANS:

22   Q.  Did Maria ever tell you why he was there?

23   A.  No.

24   Q.  Did you think it was strange?

25   A.  No.
```

—— November 1, 2010 - Jury Trial - Day 5 ——

1        MR. EVANS:  No further questions.

2        THE COURT:  Mr. Hormel?  Mr. Romo?

3        MR. HORMEL:  Your Honor, I don't have any further

4   questions.  I would agree to her stepping down.

5        THE COURT:  Mr. Romo?

6        MR. ROMO:  No questions.

7        THE COURT:  Very well.  Thank you, ma'am.  You are

8   excused.

9        Would you call your next witness.

10        MR. HORMEL:  Your Honor, the defense for Mr. Yuris

11   Bonilla rests at this time.

12        THE COURT:  All right.  Thank you.

13        Mr. Romo.

14        MR. ROMO:  Your Honor, we rest as well.

15        THE COURT:  Very well.  Thank you.

16        Mr. Evans or Ms. Kelly, does the government wish to

17   call any rebuttal witnesses?

18        MS. KELLY:  Yes, Your Honor.  Thank you.  At this

19   point the government recalls Sean Coldiron.

20        THE COURT:  Come forward, please, sir.  Please step

21   onto the witness stand.

22        (The witness, Sean Coldiron, was sworn.)

23        THE COURT:  Please be seated.  And state your full

24   name for the record.

25        THE WITNESS:  Sean Coldiron.

November 1, 2010 - Jury Trial - Day 5

1    THE COURT:  You may proceed.

2    MS. KELLY:  Thank you, Your Honor.

3                    SEAN COLDIRON,

4    a witness herein, having been first duly sworn by the clerk to

5    speak the truth and nothing but the truth, was examined and

6    testified as follows:

7                    DIRECT EXAMINATION ON REBUTTAL

8    BY MS. KELLY:

9    Q.  Good afternoon, sir.

10   A.  Good afternoon.

11   Q.  Would you please reintroduce yourself to the Ladies and

12   Gentlemen of the Grand (sic) Jury?

13   A.  My name is Shawn Coldiron.  I'm the deputy commander of the

14   Border Patrol Tactical Unit here in Tucson, Arizona with the

15   Border Patrol.

16   Q.  Sir, I want to talk about the trailer and rooms on the

17   property on 9950 South Oak Canyon Lane when you and your team

18   were there on September 24th of 2009.

19            At any point when you or your men were inside Trailer

20   Number 1, did you disturb or have photos that were in frames

21   thrown down to the ground?

22   A.  No, ma'am.

23   Q.  And in particular, I'm going to show you two photos.  The

24   first is admitted as defense Exhibit 129.

25            Do you recognize that?

November 1, 2010 - Jury Trial - Day 5

1   A.  No, ma'am.

2   Q.  And I'm going to show you another photo.  Defense Exhibit

3   128.

4              Do you see those pictures?

5   A.  I see the pictures on the ground.  Yes, ma'am.

6   Q.  At any point did you or your team cause them to be on the

7   ground?

8   A.  No.

9   Q.  Can you explain how you know that?

10  A.  Because of two things.  Number one is that for us -- for

11  any pictures to be knocked down, we have to actually hit the

12  walls.  We don't hit the walls.  It's not part of our tactics.

13  Number two is that we actually go through -- part of our

14  standard operating procedures after the mission is complete is

15  we go through every single structure and take pictures of any

16  damage that we, as a unit, have done.

17  Q.  And did you do that in this case?

18  A.  Yes, ma'am.

19  Q.  And those photographs, we have talked about them here.

20  Correct?

21  A.  Correct.

22  Q.  Were any photos disturbed or taken from shelves and thrown

23  down on the ground and broken?

24  A.  No.

25  Q.  I'm going to talk about defense Exhibit 127.

───────── November 1, 2010 - Jury Trial - Day 5 ─────────

1          Do you recognize that couch?

2    A.   That would be the couch that's in Structure Number 1.

3    Q.   And is that how you left the couch when you and your team

4    left Trailer Number 1 on the evening of September 24th?

5    A.   No, ma'am.

6    Q.   How do you know?

7    A.   Because we actually took pictures of the structure when we

8    got done clearing and securing all the structures on the

9    compound.  And that picture shows that couch is still in place

10   with the kid's shoes in front of it.

11   Q.   And I'm going to place on the overhead, already admitted,

12   Exhibit 24.  I'm sorry 34.

13          Do you recognize this photo?

14   A.   Yes, ma'am.

15   Q.   And what is that?

16   A.   That's one of our post-mission pictures.

17   Q.   Does that show the room as you left it?

18   A.   Correct.

19   Q.   And the couch's alignment, is that how it was?

20   A.   Correct.  Because we had actually had the kids and the

21   woman with the kids when we come inside to clear that room, we

22   had them actually sitting on the couch.

23   Q.   So you had the women and children sitting on the couch?

24   A.   Yes.  We already cleared it.  Make sure there's no weapons

25   inside there.

—November 1, 2010 - Jury Trial - Day 5—

1    Q.  How do you do that?

2    A.  Remove the cushions, make sure there's no weapons or

3    anything there.  We put the cushions back and have any of the

4    subjects sitting on there or if we plan on having them sit on

5    there.

6    Q.  At any point did you or your men do that to the couch?

7    A.  No, ma'am.

8    Q.  I'm going to place on the overhead defense Exhibit Number

9    125.

10             Do you recognize that photo?

11   A.  That would be the room that the victim was located in.

12   Q.  And how it appears, is that how it was when you saw it?

13   A.  No, ma'am.

14   Q.  How was it?

15   A.  If I remember, the bed was kind of in the same place.

16   There was something else on top of the bed but it wasn't in

17   disarray like that.

18   Q.  So you said the bed was in the same place as that, pushed

19   up against that window?

20   A.  Somewhere -- I think it was just a little closer towards

21   the entrance.  Because Mr. Trujillo was in between the doorway

22   and the bed, and Agent Bartlett and Mr. O'Connor were over

23   there to the left hand-side of that photo when I came in that

24   room.

25   Q.  And there's been some confusion about where exactly these

1    bars were in already admitted government's Exhibit Number 135.

2    Were these the bars on the outside of the bedroom in the master

3    bedroom or were these the bars on the outside of the bedroom in

4    the room where you found Julio?

5    A.   There were bars on both sides.

6    Q.   And looking at that room, do the curtains --

7    A.   Yes.

8    Q.   -- look similar?

9    A.   Appears that they match.

10   Q.   I'm going to place on the overhead already admitted defense

11   Exhibit 133.

12        Do you recognize what's in that photo?

13   A.   No.  I was not -- I have not seen that photo right there.

14   Q.   At any point was that how the master bedroom looked when

15   you and your men either entered or left on the evening of the

16   24th?

17   A.   I can't testify to that.  I was never in that room, ma'am.

18   Q.   I'm going to place Exhibit 136.  We talked about this

19   before.  You had mentioned that a flash bang was deployed

20   either in the entryway or right outside the entryway.  Which

21   was it?

22   A.   It would be right at the threshold.  It would be inside the

23   structure right at the doorstep.

24   Q.   Did you note any damage on the inside of the entryway based

25   on the flash bang being deployed?

---November 1, 2010 - Jury Trial - Day 5---

1   A.  I didn't notate any damage.  There might be times in our

2   experience it will leave like a little carbon score on tile.

3   That can be easily wiped up.  But what you are looking at here

4   is not consistent with that of a flash bang.

5   Q.  Explain to us how you know that.

6   A.  Well, I am a high explosives expert with our unit.

7   Q.  I'm going to show you what's been marked and admitted as

8   defense Exhibit 130.

9        Do you recognize what's in that photo?

10  A.  It appears to be the kitchen of Structure Number 1.

11  Q.  You said "appears."  Does it look like it did when your men

12  entered or left?

13  A.  No, ma'am.

14  Q.  How is it different?

15  A.  None of that stuff was on the counters that I can see.

16  None of the doors were open, nor that -- it appears to be a

17  shelf.  The birthday cake was actually towards the end of the

18  island right there.

19  Q.  Are things -- the shelves, were they open or shut when you

20  left?

21  A.  Everything appeared to be shut, closed, when we left.

22  Q.  And --

23  A.  We only opened stuff that a person could be hiding in.

24  That's the only stuff that we'll open.

25  Q.  Exhibit 23, already admitted, do you recognize the

November 1, 2010 - Jury Trial - Day 5

1   individual in that photo?

2   A.  She was one of the females that was found in Structure

3   Number 1.

4   Q.  And were you alerted to any individual that was found in

5   the structure that was then taken out by the tree, were you

6   alerted that anybody underneath the tree had been bitten by

7   ants?

8   A.  No, ma'am.  No such complaint.  Whenever we do these

9   operations, I have a PHA team, senior operating that's there.

10  Once the scene is secure we have two medics with our search and

11  rescue unit that goes over there and evaluates every single

12  subject.  That is part of our standard operating procedure.

13  Q.  Goes over where and evaluates the individual?

14  A.  To the PHA.  They are assigned to the part of the PHA

15  element.

16  Q.  And the PHA, as we talked about before --

17  A.  Personal holding area.

18        This is government's Exhibit Number 29.

19  Q.  Do you see where the PHA was here?

20  A.  You cannot see it on that picture, ma'am.

21  Q.  Let me find a better one of the -- let's go to 27.  Do you

22  see where the PHA was there?

23  A.  Yes, ma'am.  It would be approximately right here.

24  Q.  So underneath that tree?

25  A.  Correct.

—November 1, 2010 - Jury Trial - Day 5—

1  Q.  So an EMT or a medic would personally attend to every

2  person that was positioned underneath that tree in the PHA?

3  A.  Absolutely.

4  Q.  And is that a matter of protocol?

5  A.  That is a matter of protocol.

6  Q.  Does that happen every time?

7  A.  Every time.

8  Q.  What's the purpose of them talking to the individuals?

9  A.  In order to be evaluated about any further medical

10  conditions.

11  Q.  If somebody was found to be injured or hurt or be bitten by

12  ants what would you do as a matter of protocol?

13  A.  The EMTs would treat them, make sure they were not allergic

14  to insect bites or anything like that, treat them as such.  But

15  that's normal protocol.  There was no medical -- any

16  significant medical or any medical reports given to me made by

17  anyone in need.

18  Q.  And would the reports be given to you?

19  A.  Yes.

20  Q.  Were you ever notified that somebody said, "I'm being

21  bitten by ants.  Can you please move me"?

22  A.  No.

23  Q.  Did you ever -- well, during this particular operation, at

24  any point, was a woman hit in the head?

25  A.  During the operation?

November 1, 2010 - Jury Trial - Day 5

1   Q.   Yeah.

2   A.   Not that I know of, ma'am.

3   Q.   At any point was a woman who was taken out of one of the

4   trailers, did somebody have her head strike against a Jeep?

5   A.   No, ma'am, not that I know of.

6   Q.   If that would have happened, would you be notified?

7   A.   Yes.

8   Q.   And why?

9   A.   Because I'm the overall tactical commander at that point.

10  Q.   And what would have happened?

11  A.   We would have -- a report would have been filled out

12  accordingly, a use of force report.

13  Q.   And again, in this case, was anybody treated?

14  A.   No.

15  Q.   Was anybody treated by EMTs or anyone else?

16  A.   No, ma'am.  Not after that.

17  Q.   In the PHA, I'm going to place on the board exhibit already

18  admitted Number 25, the individuals that are there, are they

19  forced to kneel or how are they allowed to be when they are in

20  the PHA?

21  A.   Everyone was seated down on their buttocks, every single

22  one of them.  That is a matter of protocol.

23  Q.   So that's something that by training happens every time?

24  A.   Yes.  We -- it's -- we typically seat everyone on their

25  butts and have them cross their legs because if somebody --

—November 1, 2010 - Jury Trial - Day 5—

1  even with somebody being restrained, if we have them kneel on

2  their knees they can actually get up and run away quicker.  If

3  they are seated on their buttocks they have to actually make an

4  overt move and to get up and run away.

5          MS. KELLY:  I don't have any other questions.

6          THE COURT:  Mr. Hormel.

7                      CROSS-EXAMINATION

8  By MR. HORMEL:

9  Q.  Agent Coldiron, what is the highest rank you achieved in

10  the military?

11  A.  Staff sergeant, sir.

12  Q.  As a staff sergeant, you are responsible for discipline

13  amongst your men, is that right?

14  A.  Yes, sir.

15  Q.  You wouldn't have acquired a reputation as a disciplinarian

16  during your time in the military, would you?

17  A.  I'm sorry.  Can you repeat that question?

18  Q.  You wouldn't have acquired a reputation as a disciplinarian

19  during your time in the military, would you?

20  A.  I enforced all discipline according to the UCMJ, sir.

21  Q.  That wasn't really my question.  Were you known as the hard

22  edged disciplinarian?

23  A.  No, sir.

24  Q.  Now, you guys went in to these trailers with the specific

25  objective of securing them.  Isn't that right?

November 1, 2010 - Jury Trial - Day 5

1    A.   Yes, sir.

2    Q.   Your functions are not investigative, correct?

3    A.   No, sir.

4    Q.   In fact, do you recall the other day when you were here, we

5    saw a video where there was a long line of vehicles?

6    A.   Correct, sir.

7    Q.   And you mentioned that only a few of those were yours?

8    A.   Correct, sir.

9    Q.   The other ones belonged to other law enforcement agencies?

10   A.   Correct, sir.

11   Q.   And your job is to secure these premises so that those

12   other law enforcement agencies can take over from you, correct?

13   A.   Correct, sir.

14   Q.   And, in fact, when you took those photographs, you, after

15   taking those photographs, then turned your -- the scene over to

16   other agents?

17   A.   Correct, sir.

18   Q.   So whatever happened after that, you don't know?

19   A.   That is correct, sir.

20   Q.   Is it your testimony today that the people who lived in

21   that house wrecked it for the purposes of taking those

22   photographs?  Is that your testimony today?

23   A.   No, that is not my testimony.

24   Q.   I didn't think so.

25            Now, you mentioned that you're a high explosives

1  expert.  You didn't mention that before.  Was that something

2  you have become since you testified last?

3  A.  No, sir.

4  Q.  Do you have a college degree in that?

5  A.  No, I do not have a college degree in that, sir.

6  Q.  So what college level classes did you take in explosives

7  and chemistry?

8  A.  My experience with explosive -- high explosives, sir,

9  actually come from the civilian certification with the two

10 different courses along with the military.

11 Q.  Basically blowing stuff up?

12 A.  No, sir.

13 Q.  But you cannot today, as we speak, give us a chemical or

14 biochemical reason why that sort of scoring on the floor could

15 not have been done by the flash bang device that you set off on

16 that evening?

17 A.  I'm sorry, their chemical compounds?  I can't give you what

18 the chemical compounds will do in regards to that photograph,

19 sir.  I can tell you what the consistent chemical compounds

20 will do on any surface, sir, because it's typically a black

21 powder ignition that's inside that flash bang, sir.

22 Q.  So you can't deny, however, that you set the device off.

23 A.  No.  We deployed that device inside that structure, yes, we

24 did, sir.

25 Q.  And you can't testify as to what that floor looked like the

———— November 1, 2010 - Jury Trial - Day 5 ————

1   day before because you weren't there?

2   A.  That is correct, sir.

3   Q.  Now, you mentioned that you were the person that determines

4   when something -- some medical issue is reported, whether or

5   not that is significant, right?

6   A.  That is not what I said, sir.

7   Q.  It's not?  Is there any way we could run that back and have

8   a look at that?

9          THE COURT:  No.

10         MR. HORMEL:  Okay.

11  BY MR. HORMEL:

12  Q.  So who makes that determination?  Is that somebody else on

13  your staff?

14  A.  The actual trained medical personnel makes the

15  determination.  They report it to me.

16  Q.  What is your decision making at that point?

17  A.  It's not.  It's just a matter of reporting up the chain,

18  sir.

19  Q.  So is it possible it didn't get reported up the chain?

20  A.  Negative, sir.

21  Q.  It's absolutely impossible?

22  A.  No, sir.  It is impossible, sir.

23  Q.  Okay.  And I think I remember.  The words that you used to

24  describe the sort of -- the objectives in your operation were

25  speed, there was a third one and then violence of action.

———— November 1, 2010 - Jury Trial - Day 5 ————

1    A.   Surprise, speed, and violence of action, sir.

2    Q.   And I recall that you guys all had night vision goggles on?

3    A.   Yes, sir.

4    Q.   And that you were sort of sneaking up on this place through

5    the darkness?

6    A.   Correct, sir.

7    Q.   Because you want to surprise them?

8         MS. KELLY:  Your Honor, this is beyond the scope of

9    direct.

10        THE COURT:  We do seem to have gone quite a ways from

11   the direct testimony in this case, Mr. Hormel.  You need to

12   bring it back.

13        MR. HORMEL:  I'm trying to bring it back, Your Honor.

14   And this is the last piece of -- this is the last piece of

15   this.  So with just a couple more questions, you will find that

16   I'm going to bring it right back.

17   BY MR. HORMEL:

18   Q.   True, is it not, that in such an operation where the stated

19   goals are speed, surprise, and violence of action there's a

20   certain amount of adrenaline that goes into performing those

21   kinds of operations?

22        MS. KELLY:  Same objection, Your Honor.

23        THE COURT:  Overruled.

24        THE WITNESS:  There's always adrenaline involved in

25   any type of law enforcement action, sir.

UNITED STATES DISTRICT COURT

——————— November 1, 2010 - Jury Trial - Day 5 ———————

1  BY MR. HORMEL:

2  Q.  Well, would you say that the level of adrenaline in this

3  operation is going to be the same as the guy who pulls somebody

4  over for speeding?

5  A.  No, sir.  Actually there's more adrenaline in pulling

6  somebody over for speeding than there is in this operation.

7  Q.  So when these eight fully armed night vision goggle wearing

8  folks burst into a place that has just been -- where a couple

9  of flash bangs have just been deployed and everybody is

10  screaming and the children are screaming and people are hiding

11  and there's smoke and noise and all of this stuff going on,

12  that's just business as usual?

13  A.  Sir, I have over 200 live operations under my belt.  It's

14  controlled.  That's why the personnel that are on that

15  operation, the eight that went inside that structure are very

16  experienced and have well over 100 plus operations per man

17  doing operations such as this.  That's why I pick them for this

18  job.

19  Q.  Okay.  So it's business as usual?

20  A.  Correct, sir.

21  Q.  All right.  Thank you.

22           THE COURT:  We'll have to stop here, Ladies and

23  Gentlemen of the jury.  It's a little bit after 5:00 already.

24  So we'll reconvene tomorrow morning at 9:30.  Remember the

25  admonition of the Court not to discuss the case with anyone or

———— November 1, 2010 - Jury Trial - Day 5 ————

1    allow them to discuss it with you.

2            We'll see you tomorrow morning at 9:30.

3            THE COURT:  You may step down, sir.  We will need you

4    at 9:30.

5            THE WITNESS:  Thank you, sir.

6            THE COURT:  The record will reflect the jury having

7    gone.  Counsel and the defendants are present.

8            Counsel, on those instructions I had failed to include

9    an expert witness instruction for the testimony of Mr. Ellis.

10   So that has now been put into the other instructions as

11   Instruction Number 22.  And that's a standard stock instruction

12   from our Ninth Circuit Jury Instructions.  The clerk -- there's

13   a copy of the revamped instructions on the table there for each

14   of you and if you take that and look it over tonight.

15           Ms. Kelly, anything for the record at this time?

16           MS. KELLY:  No, Your Honor.  Thank you.

17           THE COURT:  Mr. Hormel?

18           MR. HORMEL:  No, Your Honor.

19           By the way, we accept the instructions subject to all

20   prior objections.

21           THE COURT:  Mr. Romo.

22           MR. ROMO:  Tomorrow morning we're going to start again

23   with Mr. Calderon, right?

24           THE COURT:  Coldiron.

25           MR. ROMO:  Coldiron.

—— November 1, 2010 - Jury Trial - Day 5 ——

1          Now, Judge, Mr. Coldiron, he is chewing gum.  Is that

2     something we can point that out?

3          THE COURT:  We can point that out to him.  I didn't

4     notice that.  Counsel, tell Mr. Coldiron not to chew gum when

5     he's testifying.

6          So we'll take our break.  See you tomorrow morning at

7     9:30.

8          (Proceeding concluded at 5:03 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—November 1, 2010 - Jury Trial - Day 5—

```
 1

 2

 3

 4

 5                        C E R T I F I C A T E

 6

 7            I, LAURIE A. ADAMS, do hereby certify that I

 8    am duly appointed and qualified to act as Official Court

 9    Reporter for the United States District Court for the District

10    of Arizona.

11            I FURTHER CERTIFY that the foregoing pages constitute

12    a full, true, and accurate transcript of all of that portion of

13    the proceedings contained herein, had in the above-entitled

14    cause on the date specified therein, and that said transcript

15    was prepared under my direction and control.

16            DATED at Phoenix, Arizona, this 15th day of November,

17    2011.

18

19                            s/Laurie A. Adams

20                            _____
                              Laurie A. Adams, RMR, CRR

21

22

23

24

25
```