1

1     IN THE UNITED STATES DISTRICT COURT

2     DISTRICT OF ARIZONA

3

4     UNITED STATES OF AMERICA,        )
                                       )   CR 09-2343-TUC-FRZ
          Plaintiff,                   )
5     vs.                              )
                                       )   August 23, 2011
6     YURIS BONILLA-GUIZAR and         )   Tucson, Arizona
      CARLOS ARMANDO CALIXTRO-         )
7     BUSTAMANTE,                      )
                                       )
8         Defendants.                  )

9

10                      SENTENCING

11

12     BEFORE:  HONORABLE FRANK R. ZAPATA
            UNITED STATES DISTRICT JUDGE
            405 W. CONGRESS, COURTROOM 5-A
13            TUCSON, ARIZONA 85701

14

15              A P P E A R A N C E S

16         FOR THE GOVERNMENT:  MR. JOHN EVANS, ASSISTANT UNITED
       STATES ATTORNEY.
17
           FOR DEFENDANT BONILLA-GUIZAR:  MR. PETER HORMEL,
18     ATTORNEY AT LAW.

19         THE INTERPRETER:  MS. JOYCE GARCIA.

20

21
                     Dianne Davenport
22               405 W. Congress, Suite 1500
                   Tucson, Arizona 85701
23                   (520)205-4266

24
       Proceedings prepared by computerized realtime translation
25

2

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (Call to order of court, 9:00 a.m.) |
| 3 | THE CLERK:  Criminal case 09-2343, United States of |
| 4 | America versus Yuris Bonilla-Guizar, on for sentencing. |
| 5 | MR. EVANS:  Good morning.  John Evans, Assistant |
| 6 | United States Attorney, for the government.  Good morning, Your |
| 7 | Honor. |
| 8 | THE COURT:  Good morning, Mr. Evans. |
| 9 | MR. HORMEL:  Good morning, Your Honor.  Peter Hormel |
| 10 | for Mr. Bonilla-Guizar.  He's present, in custody, assisted by the |
| 11 | interpreter. |
| 12 | THE COURT:  Good morning, Mr. Hormel. |
| 13 | This is the time set for sentencing in this matter. |
| 14 | Yuris Bonilla-Guizar was found guilty following a jury |
| 15 | trial of Count 1 of the third superseding indictment, conspiracy to |
| 16 | commit hostage taking. |
| 17 | He was also found guilty by the jury of Count 3 of the |
| 18 | third superseding indictment, harboring an alien for the purpose of |
| 19 | commercial advantage or private financial gain. |
| 20 | As to Count 2 of that indictment, there was no verdict |
| 21 | returned by the jury. |
| 22 | The court will enter judgment today on Count 1 and |
| 23 | Count 3 on which there has been a conviction by the jury.  So today |
| 24 | the court will enter judgment on that verdict and will proceed to |
| 25 | sentencing. |

1        Mr. Hormel, did you have the opportunity to review the

2   presentence report and the advisory guideline calculations with

3   Mr. Bonilla-Guizar?

4        MR. HORMEL:  I did, Your Honor.  I went over it with

5   him in Spanish.  We spoke about it on a number of occasions.

6        THE COURT:  Very well.  Mr. Hormel, you have raised

7   certain objections in your filings, your objection to the presentence

8   report to which -- document number 201 to which the government has

9   responded to those objections in document number 202.

10        And do you wish to address your objections?

11        You raise first an objection that deals with the credibility

12   of witnesses; that being the person who was the victim in the actual

13   offense conduct charged here and also a person who was apparently

14   arrested at the house but charges as to her were not prosecuted by

15   the government.  In other words, there were allegations made by that

16   witness that were not prosecuted.

17        The other witness is Jesus Cesar Lopez-Trujillo who was

18   the harbored alien.  And the other person was Jacinta Jazmin Fatima

19   Luna Catano.

20        You have also raised specific objections to certain

21   enhancements that were made as part of the presentence report.

22        And beginning with paragraph 33, that was an

23   enhancement proposed in the presentence report stating a two-level

24   enhancement for possessing a firearm under 2A4.1(b)(3).

25        And also an objection to paragraph 34 which was the fact

1   that one of the witnesses and victims was held more than seven days

2   giving rise to a one-level enhancement under 2A4.1(b)(4)(B).  That

3   person -- the person that is the subject of that is Ms. Luna Catano.

4               You also filed objections to paragraph 36 which raises a

5   two-level enhancement based on unusually vulnerable victims in this

6   case under Section 3A1.1B1.

7               And also you raise an objection to paragraph 38 which is

8   a three-level enhancement alleging the defendant is a manager in a

9   criminal activity involving five or more participants under Section

10  3B1.1(b) of the advisory guidelines.

11              As I understand your filings, those are the actual

12  objections to the guidelines.

13              Do you wish to address those issues at this time?

14              MR. HORMEL:  Yes, Your Honor.

15              As we take them in order --

16              THE COURT:  If you would come to the podium, please.

17              MR. HORMEL:  Would you like my client to accompany

18  me?

19              THE COURT:  No, just you.

20              MR. HORMEL:  Your Honor, if it please the court, I'll just

21  take them in order then.

22              THE COURT:  Very well.

23              MR. HORMEL:  Starting with the enhancement that is the

24  first one that is suggested by the probation office in paragraph 33,

25  which is the firearm enhancement, there are various problems with

1   imposing an enhancement for firearms in this case.

2          One is just on the factual level.  As the court noted,

3   there was no verdict returned by the jury on the hostage taking count

4   that was filed against my client.  He was found guilty only of the

5   conspiracy.

6          So even though Mr. Lopez-Trujillo had given testimony

7   that Mr. Bonilla used a gun, which would suggest that he had -- and

8   the government tried very hard to prove that my client had been

9   involved in some kind of hostage taking, they were not able to convict

10  him on that.

11         Then the second problem is that these weapons were

12  destroyed prior to trial resulting in a due process violation and

13  dismissal of several counts in the indictment.  The intent now is to

14  resurrect the firearms by a sentencing enhancement.

15         I wasn't able to find any case law directly on point.

16  Perhaps this is unusual for weapons to be destroyed in the middle of

17  the course of a trial.  This issue does not appear to have made it to

18  the appeals court on point.

19         There are other somewhat analogous cases that I cited

20  in my memorandum in which the government violated a defendant's

21  Fourth Amendment rights in obtaining weapons.  And it was held --

22  different circuits have different rulings regarding whether or not a

23  weapon can be used in sentencing under those circumstances.

24         Now, I don't think that that's a directly analogous

25  situation because in this case it was -- the violation is a little more

1    egregious.

2              At this point, Your Honor, it's not the officers acting in

3    the heat of an investigation attempting to obtain evidence.  This is

4    evidence that the government already had safe and secure in its

5    evidence room.  There was no exigency, no decision making that

6    needed to be made on the spur of the moment to determine how to

7    obtain this evidence.  They already had it.  And they made what is in

8    my view a rather strange decision to destroy the evidence.  And once

9    they willfully and purposely destroyed that evidence, they created a

10   problem for themselves.

11             Now, after doing that the government now still asks for a

12   weapons enhancement.  And the court noted at the time that we

13   litigated these problems pretrial that the problem is that the guns and

14   the laser sight and all of those issues that went into assessing the

15   credibility of the witness were basically nullified by the destruction of

16   that evidence and precluded the defendant from attacking those.

17             So now we are again in the situation where they are

18   resurrecting these issues and attempting to give my client additional

19   time based on a violation that they themselves through their own --

20   this is their own decision making.  We had nothing to do with this at

21   all.  This had nothing to do with my client's activities.  This was long

22   after the arrest had taken place.

23             Now, back to the case law, in the Sixth Circuit there is a

24   hard and fast exclusionary rule when illegally seized evidence is

25   proposed for a sentencing enhancement.  Now, the Ninth Circuit

1    obviously has a different rule.

2            Again, I don't think that that rule directly applies

3    because we're not talking about a Fourth Amendment right violation.  I

4    think we're talking about a due process violation that took place

5    posttrial -- excuse me -- postarrest, postinvestigation, and that under

6    those circumstances, the government should not be permitted to

7    request a sentencing enhancement.

8            I would again just bolster that argument with a

9    reference to the weakness of the government's testimony regarding

10   my client's use of a weapon.

11           Now, the next objection we come to is the proposed

12   enhancement because one of the victims had not been released before

13   seven days had elapsed.

14           Now, this all depends on the pretrial interviews done

15   with Jazmin Luna, who was the person found and arrested at the scene

16   during the investigation of this matter at the outset.

17           This individual was never made available to the defense,

18   neither in a deposition nor at trial.  She, upon motion of the defense,

19   was made -- an order of the court was made available for handwriting

20   analysis because, as it turned out, her handwriting appeared in the

21   ledger.

22           Okay.  The government contends this lady was just a

23   long-term hostage and was just trying to, quote-unquote, work her

24   way out of her debt.

25           The problem is that if the government didn't trust her

1   credibility enough to propose her as -- or to bring her forth as a

2   witness, not even in the deposition, we can't really believe anything

3   she says.  Especially when you consider the absolutely wild allegations

4   that she made regarding sexual assaults at the beginning of the case.

5            These things were so outrageous that once we looked

6   into them and once the rape kit came back from the hospital with no

7   evidence of sexual assault or, let alone, DNA, it became -- the notion

8   of her -- what she was trying to say became absolutely fantastic, Your

9   Honor.

10            Combine that with the impression of the witness who

11   testified at trial that she was simply working there.  He viewed her as

12   a member of the group that was there in the house.  And that was the

13   way he portrayed it to the court, the problems with his testimony

14   notwithstanding.

15            I would urge the court as strongly as I possibly can not

16   to take into consideration anything that this lady had to say.  There

17   was no -- considering that this case did go to trial and there was every

18   opportunity to subject her to cross-examination and that the

19   government made a decision based on her lack of credibility not to

20   present her at trial, nothing she says passes -- doesn't pass the

21   straight face test let alone preponderance of the evidence.

22            There is no evidence that was presented that she had

23   been there longer than seven days even if she was a -- even if she

24   was, quote-unquote, a victim or a smugglee.

25            Mr. Lopez had not been there seven days.  And he was

1   not able to give any testimony as to when she arrived.  So there is

2   no -- there is no way to verify her statements and there is really no

3   way to believe them.

4               And considering the procedural backdrop of this case and

5   where it came from and what is proposed here, I strongly urge the

6   court not to take what she says into consideration.  It didn't meet the

7   government's very own standards for presenting her at trial.  It

8   certainly should not be let in through the back door without any sort of

9   verification.  I think that is extremely prejudicial to my client and not

10  fair.  And it's most likely inaccurate.

11              I would submit as a closing point with Ms. Luna a lot of

12  what she said, the motivation for that, was to screen her own

13  culpability, Your Honor.  She made wild allegations that took the

14  spotlight off of her and put it on other persons.  That was a strategy

15  that she employed to escape criminal responsibility in this case.

16              There is no independent corroboration of anything that

17  she said and she was shown to have lied in other areas.

18              Again, I would urge the court not to take that into

19  consideration.

20              Now, the third objection gets us to the unusual

21  vulnerability of the testifying victim.

22              Mr. Lopez it is suggested, was unusually vulnerable because

23  of his undocumented status and that therefore a two-level

24  enhancement should be assessed against my client.

25              Now, there is one case on point in the Ninth Circuit, the

1   Sierra case, which I did cite.  It is adverse to our position in the sense

2   that it affirmed a trial court enhancement based on membership in a

3   group, okay, the group being undocumented persons.

4           I don't think that Sierra says -- I don't think it requires

5   the trial court in this circuit to apply an enhancement only because the

6   person is undocumented.

7           I think it affirmed the trial court imposition of that

8   enhancement based on membership of the class, but I do not think --

9   Your Honor, there is nothing in that decision that says that, okay, once

10  somebody is undocumented they are automatically and as a matter of

11  course an unusually susceptible victim.

12          I don't think -- the court -- that decision is very brief on

13  that matter.  There's just a few lines that mention it.  There's really no

14  analysis of it at all.  And I think to accept that position would be to rob

15  this court of its discretion.  This court has discretion as to when to

16  impose an enhancement and when not.

17          And it has to take into account the specific

18  characteristics of every victim and every person involved and it

19  cannot -- if the Ninth Circuit decision is to stand, then what that would

20  mean is that the court can never look at the specific circumstances of

21  any victim and it can never make an independent determination on

22  the vulnerability of any specific individual.  And that as soon as that

23  person is undocmented, then they must be vulnerable.

24          I don't think that's what the court -- what that case

25  says, Your Honor.  I think that it affirmed a decision in which the judge

1    held that, but I don't think it requires it.

2          And I think that once you do take a look at the

3    individual that testified here, Your Honor, you have a person who is as

4    savvy and unvulnerable as one can possibly imagine.  This is an

5    individual who had spent many years in the United States.

6          We cross-examined him for a long time.  I remember

7    that was an issue at the time.  But the purpose of that

8    cross-examination ultimately -- or the cross-examination ultimately

9    revealed a rather large amount of information about this individual.

10          He had used fake IDs.  He had used fake Social Security

11    numbers.  He had used false names.  He had come into the country

12    illegally on numerous occasions.  He had used the services of alien

13    smugglers on previous occasions; to the point where he had used alien

14    smugglers and then left the group prior to arrival at the destination in

15    order to avoid paying them.

16          This is a person who is as savvy as you can possibly

17    imagine in how to deal with the border, how to deal with life in the

18    United States without documents.

19          Now, as the court knows, he has married the lady who

20    testified here and is pursuing his legalization of his status with her

21    help.

22          I cannot imagine a person who less fits the rubric of an

23    unusually susceptible victim than Mr. Lopez-Trujillo.  This is an

24    individual who knew everything there was to know, who had

25    experienced everything there was to experience, and who had

1 | certainly went into this with his eyes wide open.

2 |        Based on that, Your Honor, I think that the court can

3 | look at Mr. Lopez as an individual, not as a member of a class.  I think

4 | the Ninth Circuit case permits that.  I don't think that there is any

5 | requirement in the Sierra-Velasquez case that requires the court to

6 | ignore all this information that we got from Mr. Lopez and simply rely

7 | on the fact that he lacked immigration documentation to make this

8 | determination.

9 |        Now, the government may then also argue, well, Ms.

10 | Luna was also unusually susceptible because she was undocumented.

11 |        Again, I object to Ms. Luna, A, being a victim; B, that

12 | her statements are not credible, that she doesn't even meet the

13 | evidentiary standard necessary for anything in this case, and that the

14 | court not consider evidence from somebody who was withheld

15 | intentionally by the government from testifying because she's not

16 | credible.

17 |        This is somebody who should not be considered a victim

18 | and is somebody who should not be used as the basis of a sentencing

19 | enhancement in this case.

20 |        Your Honor, level 32 is already high enough.  That is

21 | going to result in an extremely severe sentence in this case no matter

22 | how we slice it.  Piling on an enhancement based on really wobbly,

23 | thin theories is not, I don't believe, appropriate in this matter,

24 | especially when we spent so much time developing the actual

25 | evidence in the case and we know exactly what it was.

1       So that's the argument that I would present regarding

2  the vulnerability of the victims.

3       Instructive in that is the way the Fifth Circuit, next door

4  in Texas, analyzes this matter.  They've gone into a lot more detail in

5  the way they analyze the susceptibility portion of the guidelines.

6  Rather than having just a three-line mention in one case, they actually

7  have a method of determining this which obviously focuses on the

8  individual smuggled alien.

9       And I think if the Ninth Circuit were faced with such a

10  determination and used -- and was confronted with a district court that

11  made the determination based on an individualized assessment, I

12  believe that would be affirmed and I don't think it would contradict

13  Sierra-Velasquez at all.

14       And I would urge the court to take a close look at the

15  Angeles-Mendoza case in the Fifth Circuit I cited in my memorandum.

16       The last enhancement the government and the probation

17  office have proposed is the managerial role that my client allegedly

18  participated in.  They want three levels for that.

19       The first thing is that those three levels require proof of

20  five or more participants.  We don't have that.  In fact the

21  government's own witness went to great lengths to talk about the

22  compartmentalization and the use of different organizations and no

23  way to prove it was one organization anyway.

24       So you don't get five participants.  I don't think they've

25  established that in any way.  I don't think that was ever proven by

1   anybody.

2              The other thing is the evidence that was given.

3              You have two folks living in a trailer on the deep south

4   side in this town that really appear to be as foot soldiery as you can

5   possibly be.

6              They are living on couches in this place, as the court saw

7   pictures of it.  It was a pretty ramshackle operation, Your Honor.

8   These people were on the ground level of it.

9              To make my client a manager is really to stretch the

10  concept of manager to the breaking point.

11             Again, a lot of it is based on what Luna said.  And her

12  testimony, as I cannot repeat enough, is not credible and I hope not

13  accepted by the court.  But in this case I don't see anything

14  managerial about Mr. Bonilla's activity.

15             If anything, the jury did find him guilty of conspiring to

16  keep Mr. Lopez a hostage.  But that doesn't make him a manager.

17  That in and of itself does not make him a manager.  There has to be

18  some sort of intrinsic evidence that elevates him beyond the other

19  folks that were living in this situation.  I don't think that's there.

20             I would urge the court that on a variety of levels, from

21  the number of participants, down to the evidence that was given,

22  down to the way that they are trying to approach this enhancement,

23  that those simply aren't there.

24             So, Your Honor, I don't think any of those enhancements

25  are appropriate in this case.

1              And if the court has questions?

2              THE COURT:  Thank you.

3              Mr. Evans.

4              MR. EVANS:  Thank you very much, Your Honor.  I'll be

5   brief.

6              Just to supplement the government's response, what

7   can't be ignored is the fact that under the statute this court is

8   sentencing the crime as a whole.  And the statutes are very clear that

9   you should get all the information to be able to make a judgment that

10   is solely in your discretion as to what would be appropriate based upon

11   your years of experience, the statutes and the guidelines.

12             THE COURT:  Well, it's true.  The court does consider all

13   the information before it.  But enhancements under the guidelines, the

14   government has a very specific burden of proving each enhancement

15   by a preponderance of the evidence.

16             MR. EVANS:  Yes, Your Honor.

17             THE COURT:  I'll tell you from the start, there's a

18   problem with Ms. Luna.  I never heard Ms. Luna.  She never presented

19   one word of testimony under oath.

20             MR. EVANS:  Right.

21             THE COURT:  Her statements were made to border

22   patrol agents, to whomever.  So the statements that I've heard about

23   Ms. Luna are second and thirdhand hearsay statements.

24             And I don't know how we can reach by a preponderance

25   of the evidence that her statements are correct if I've never seen her,

1  never heard her.  She has never been before the defendant with an

2  opportunity for the defendant to cross-examine her about the

3  statements that she made.

4              And so I understand that everything comes in basically,

5  and I heard a lot of statements at trial, a lot of statements that came

6  in in the process of this case, motions, so forth, but I think that you

7  have a very specific burden of proving each of these enhancements by

8  a preponderance of the evidence, and it has to be by a preponderance

9  of the evidence.

10             I don't think that the statements that she made to

11  agencies outside of this courtroom would carry the day as to

12  preponderance of the evidence at this point.

13             But that's an argument you can address.  As to her, I

14  definitely see a problem.

15             MR. EVANS:  I understand that, Your Honor.

16             The evidence is what it is.  The information you've

17  gotten is what it is.  We are not going to put her on the stand.

18             Dealing with paragraph 33, this court in finding that the

19  guns were destroyed didn't find that they were willfully destroyed.

20  You found that it was based upon negligence.  It was not done

21  intentionally to interfere with the rights of the defendants.  It was pure

22  snafu.

23             Therefore, the existence of the gun which was usual to

24  operating this point of sale, that enhancement I believe is an

25  appropriate enhancement.

1        The issue regarding paragraph 36, he's

2   mischaracterized -- the defense has mischaracterized the case law.

3   The class is of all hostages.  Of these particular people, Mr. Lopez is a

4   particularly vulnerable person in that class of hostages given his

5   circumstances of having no support, given his dependence upon the

6   smugglers.  And given the existing case law of the Ninth Circuit, we

7   believe that enhancement is appropriate.

8        Finally, as to number 38, five or more participants, once

9   again we had a whole chain and we discussed that with the jury and it

10   was very well documented by Mr. Lopez; the recruiter, the taxicab

11   driver, the two people who consolidated them and then transported

12   them to the mountains outside Nogales, the two guides.  So we are up

13   to five right there.

14        Then we have the two people in the trailer.  Then we

15   have the person who this defendant allegedly called and said, "The

16   boss says your price has gone up to this," and then we have the

17   person who was going to -- as we knew from the testimony of Mr.

18   Lopez' wife, the person who was going to receive the money in

19   Nogales and then communicate with the people in Tucson.

20        So we have more than five participants.

21        And then the management.  He was running the point of

22   sale.  He was responsible for extracting as much money as quickly as

23   he could to move these people on.

24        Obviously they did based upon the exhibits.  They had

25   moved a number of people on prior to Mr. Lopez coming into this

1  situation.

2  We believe the enhancements as set forth by the

3  probation office are justified and it is something for the court to

4  consider.

5  Thank you very much.

6  THE COURT:  Thank you.

7  Well, the enhancement for the gun, this enhancement is

8  problematic because of the way it is stated here by probation.  That

9  firearm was pointed at the material witnesses on multiple occasions,

10  conduct which constitutes more than brandishing, displaying or

11  possessing a firearm.

12  I don't think that -- we had the testimony of Mr.

13  Lopez-Trujillo about that.  The defense, by the destruction of that

14  firearm, was to some degree denied the opportunity to cross-examine

15  him as to whether or not -- and the reason he said it was pointed, he

16  stated seeing that dot from the laser sight being on his person and so

17  forth.

18  So my thought is, if the standard that we're looking at is

19  it was more than brandishing, displaying or possessing a firearm, then

20  we're probably not going to be able to get there because the firearm

21  was destroyed.  The defendant's ability to cross-examine on that issue

22  was curtailed to a large degree.

23  But in reading the guidelines, that doesn't seem to be

24  the standard.  The standard is if a dangerous weapon was used.  A

25  firearm is a dangerous weapon.  There's no question about that.

1    We've got testimony from a witness under oath under

2    cross-examination that a firearm was used.

3    Then we go on -- this is under Section 2A4.1(3) Under

4    this enhancement under 2A4.1(3), the only statement there is if a

5    dangerous weapon was used.  And then it goes on to define that "a

6    dangerous weapon was used" means a firearm was discharged or a

7    firearm or dangerous weapon was otherwise used.

8    Obviously the firearm was never discharged.  There was

9    no testimony about that.  And so then that sends us back to section

10   1B1.1 of the advisory guidelines.

11   And when you get to Section 1B1.1, note C says,

12   "'Brandished' with reference to a dangerous weapon (including a

13   firearm) means that all or part of the weapon was displayed, or the

14   presence of the weapon was otherwise made known to another person,

15   in order to intimidate that person, regardless of whether the weapon

16   was directly visible to that person.  Accordingly, although the

17   dangerous weapon does not have to be directly visible, the weapon

18   must be present."

19   That is substantially less of a burden than is created by

20   probation's statement that the firearm was pointed at the material

21   witness on multiple occasions, conduct which constitutes more than

22   brandishing, displaying or possessing a firearm.

23   All that enhancement requires is that a firearm be

24   present and that it be used for the purpose of intimidating the witness.

25   That it was displayed, that can also be found within the facts of this

1   case.

2        So although that firearm was suppressed at -- because

3   of the destruction of that firearm, and although there may be some

4   issue about the defendant's ability to cross-examine on the issue of

5   the laser sight, whether or not it was actually pointed directly at the

6   victim, under the guidelines that does not appear to be necessary;

7   only that the weapon was possessed and that the weapon was

8   displayed.  Clearly the testimony supports that.

9        So the objection as to the two-level enhancement for the

10  use of a dangerous weapon is denied under 2A4.1(3) based on the

11  statements and the findings the court has just made.  So that will

12  remain.

13       As to paragraph 34, the statement that a person had

14  been kept longer than seven days, the court finds that there is no

15  evidence to prove by a preponderance that there was in fact a person

16  kept longer than seven days.

17       That person kept hostage longer than seven days, that

18  person is addressed as Ms. Luna, a witness that the court never saw,

19  never heard, was not presented here today, was not presented at trial.

20       So there is nothing that we can base by a preponderance

21  of the evidence that she was kept as a victim there longer.

22       And also comes in the situation from the arguments from

23  counsel back and forth the court doesn't know at this point whether in

24  fact she was a victim, whether she started as a victim and morphed

25  into one of the people assisting in the operation, which often happens

1   in these types of cases.

2   So there's no basis -- the court does not find there is

3   sufficient evidence by a preponderance to prove the specific offense

4   characteristic at paragraph 34 under Section 2A4.1(b)(4)(B).  So that

5   one-point enhancement is deleted.

6   Next we get to the adjustment for -- victim-related

7   adjustments, paragraph 36, a two-level enhancement under

8   3A1.1(b)(1).

9   In this case, regardless of the case cited by defense

10  counsel from the Ninth Circuit, the court cannot find at this point that

11  this victim was an unusually vulnerable victim.

12  He was a hostage, but not all hostages are found to be

13  unusually vulnerable victims.  He was an alien, but not all aliens are

14  unusually vulnerable victims.  He was being held in isolation as every

15  hostage is held, but not every hostage is an unusually vulnerable

16  victim.

17  Going back over the history of this individual, this is not

18  a person who was new to this country, had previous entries, numerous

19  of them.  He had previously used the services of smugglers.  He was

20  aware of the modus operandi of smugglers.  He had procured and used

21  false documents.

22  He stated that at some point he had been brought in by

23  a smuggler.  He cheated the smuggler by running away, escaping from

24  him before payment could be collected.

25  This gentleman was not an unusually vulnerable victim.

1    He was a victim and he was a hostage, but based on his background,

2    the years that he has spent in the United States, the fact that either

3    his wife or common-law wife is a U.S. citizen, that he was established

4    within the United States, had worked within the United States, he is

5    not the person who enters for the first time and becomes ensnared by

6    people like these alien smugglers.

7              He knew quite well what he was doing.  He knew the

8    method of operation.  He knew how these things went.

9              And the court does not find, based on the evidence

10   presented, that there is sufficient evidence to find by a preponderance

11   that he is an unusually vulnerable victim based -- especially not just

12   based on his illegal status.

13             So based on that the objection to paragraph 36 is

14   granted.  The two-level enhancement is removed.

15             The last objection deals with the role of this defendant,

16   whether he served as a leader, organizer, and that there were five

17   people involved in this.  The question becomes what evidence supports

18   that he was a leader, organizer in this specific operation that he was

19   involved in.

20             He was basically a house sitter, stash house sitter, that

21   takes control in this case apparently by use of a firearm of people who

22   are there.  They then collect money from the families before these

23   people are released.  That was his job there.  And to some degree I

24   think you can probably find that he was a manager of some sort of the

25   people in the house.

1    The court could not find he was a manager or supervisor

2    in criminal activity involving five or more participants because as

3    the -- my recollection, the expert witness testified there was -- there's

4    a compartmentalization in these cases in which one compartment

5    doesn't know what the other compartment is doing; or one

6    compartment is dealing with a totally different organization dealing,

7    one, with the recruiting of the individuals that they are going to

8    smuggle into the country; two, the transportation of those people;

9    three, the guides that bring them across the border; four, the ones

10   that move them to the stash houses.  So there's all sorts of

11   compartments that go on here.

12        I can't find by the evidence presented this person

13   specifically was a manager or supervisor in a criminal activity

14   involving five or more people.

15        I can find without much effort he was in fact some sort

16   of -- certainly he was managing the house there where he was and

17   also supervising whatever went on in that house.

18        So based on that I think the proper aggravating role is

19   under 3B1.1(c) rather than 3B1.1(b).  So there would be a two-level

20   enhancement rather than a three for that.

21        Those are the findings of the court based on the

22   objections filed by counsel based on the evidence presented in this

23   case.

24        In view of that, then we end up at a base offense level

25   of 32.  Two are added for the specific offense characteristic dealing

1    with the firearm.  That puts us at 34.  Two are added for the specific

2    offense characteristic based on his role under what the court finds to

3    be appropriate, 3B1.1(c).  That has been proven by a preponderance.

4    So there's a two-level enhancement there.  So the total offense level

5    is 36.

6            At 36, criminal history category 1, the advisory

7    guidelines provide for a range of incarceration of 188 to 235 months of

8    incarceration; supervised release of three to five years; probation is

9    not authorized; the fine is $20,000 to $250,000; restitution is

10   mandatory but none has been determined at this point.

11           The government has 90 days from today's date to

12   present any evidence regarding restitution.  That matter would have to

13   be decided between now and 90 days.

14           But there is -- although it is authorized, none has been

15   identified and none has been requested at this point.

16           There's a $100 per count assessment for a total of $200.

17           Those will be the guideline calculations found by the

18   court.

19           The court will consult those guidelines.  The court will

20   also consult the provisions of Title 18, United States Code, Section

21   3553(a)(1) and other subsections.

22           The court has received the sentencing memorandum

23   filed on behalf of the defendant and the court has reviewed that

24   memorandum.

25           The court has reviewed the addendum to the

1    presentence report dealing with the issues we have just been

2    discussing.

3                    The court also received a number of letters on behalf of

4    the defendant and those letters -- if I can find my notes on those.  I

5    read each one of those letters and noted who had written it.

6                    Generally the letters were from his family, from his

7    daughter or stepdaughter.  She wrote a letter on his behalf.

8                    Also, I received a letter from I believe a person to be a

9    neighbor or friend.  I received a letter from another person who

10   appears to be a friend.  I received a letter from a friend who appears

11   to have some relationship with the family.  I received a letter from his

12   uncle.  Another letter from his friend.  I received a letter from his

13   niece.  I believe those were the letters that I received on behalf of the

14   defendant.  I also read all of those letters.

15                   Mr. Hormel, is there anything further you wish to state

16   on behalf of Mr. Bonilla before he is sentenced this morning?

17                   MR. HORMEL:  Would you like us to approach the

18   podium?

19                   THE COURT:  Yes, please, if you would come forward.

20                   MR. HORMEL:  Your Honor, I appreciate the care the

21   court took with the guideline calculations.

22                   You know, once we have done that, that is only one

23   portion of the sentencing.  Since Booker the guidelines obviously are

24   advisory and the court is not obligated to follow them.

25                   Under 3553(a) the court is required to determine what

1    the guidelines are and then look at the factors to see what in general

2    terms is a fair sentence.  Factors to be considered are the history and

3    characteristics of the defendant, the deterrent effect, punishment,

4    things like that.

5               I'll begin with the character and the history of the

6    defendant.

7               I think the letters show and the history provided in the

8    presentence report show that this is an individual who is now 42 years

9    old who has never been -- there's no suggestion that he's ever been

10   involved with anything like this before.  And that is why I brought up

11   the idea of aberrant conduct in my memorandum.

12              It is -- you know, the jury found him guilty of the two

13   offenses that they found him guilty of.  And that finding of guilt is the

14   first suggestion in his life that he has been involved in something like

15   this.

16              What I find -- and I mentioned this in my memorandum.

17   The thing I found most interesting about Mr. Bonilla was the

18   relationship he has with his stepdaughter.  I spoke with his

19   stepdaughter on numerous occasions.  She was extremely helpful to

20   me in the preparation of this case for trial.  She was also instrumental

21   in the collecting of the letters that were provided to the court.

22              This is an individual who -- you know, in many families,

23   Your Honor, a stepchild is a difficult place to be in.  A lot of times

24   stepparents and stepchildren don't have a particularly strong

25   relationship.

1    I think it speaks extremely well of Mr. Bonilla that this
2 young lady, when the chips were down, rallied to his defense in the
3 way she did.

4    I think it shows that over the years he really did provide
5 for her and demonstrated a character to her that is noteworthy.  And
6 that's why I brought that up, Your Honor.

7    I think it shows an individual far different from the way
8 the government has portrayed him.

9    The government will portray him as a rapacious person
10 involved in a rapacious business that is a danger to the community.

11    I cannot comment on certain things due to the
12 procedural posture of this case.  But I think it is clear from my client's
13 lack of history, there is no suggestion of any real criminal activity.

14    He's been in the country before without documentation.
15 He's never been, in 42 years, arrested for anything of substance.
16 Therefore, he's a criminal history category 1.

17    Then suddenly to be thrust into this position.  Perhaps
18 the way this entire situation went down reveals a certain naivete on
19 the part of the people participating in this and a certain inexperience.

20    I would like to emphasize that as much as I can, Your
21 Honor.

22    I'd like to mention also disparity in sentencing.

23    As the guidelines stand, at 188 months we are looking at
24 15 years 8 months for the minimum sentence.  That is 15.66 years.  It
25 is 188 months.  That is substantially more than most folks receive who

1    have been found guilty of Mr. Bonilla's offense.

2            I cited an example that came from my own caseload,

3    Your Honor, a couple years ago.  There are folks in superior court

4    convicted of second degree homicide that receive similar sentences.

5    Nobody was injured in this case.

6            There was -- obviously it was a difficult case and the

7    court heard a lot of testimony from the family of Mr. Lopez and the

8    situation that went down, but ultimately the government hasn't even

9    requested restitution.

10           Now, Mr. Bonilla will be going to prison for a substantial

11   amount of time.  That much is obvious.  That much is something that I

12   am sure the court is weighing at this time.

13           However, when crafting a sentence in this particular case

14   with this particular defendant, Your Honor, this is somebody who I can

15   guarantee had no knowledge of what the potential consequences were.

16           What is enough to punish him and what is enough to

17   deter him from committing this sort of an offense in the future?  I

18   would suggest that not much.

19           Obviously a substantial sentence is coming his way.

20   But, Your Honor, how many years do we need to impose to accomplish

21   the goals of 3553(a) even when seen from the perspective purely of

22   the government.

23           The government is going to say we need to deter people

24   from doing this in the future.  We need to punish this individual for the

25   things that happened.  But, Your Honor, I don't think there is any

1    suggestion being made anywhere that the federal court in Tucson is

2    somehow lenient or an easy place to wander through as a defendant.

3              No matter what sentence the court imposes today, it's

4    not going to be sending a message of being lenient anywhere to

5    anyone.  I think 15 years is grossly in excess of what needs to be

6    imposed here.

7              I think a sentence -- if the court will not depart from the

8    guidelines downward for the aberrant conduct, a sentence outside of

9    the guidelines is appropriate.

10             In order to punish him not greater but sufficient to

11   punish and to deter, anything in excess of ten years, Your Honor, I

12   would say is grossly in excess of what is required.

13             This is not an individual with a history of wrongdoing.

14   This is not an individual with a history of victimization of other

15   persons.

16             To the contrary, this is a person who, when the chips

17   were down, stuck up for his stepdaughter.

18             This is an individual who, when the chips were down, his

19   stepdaughter made the difficult drive from Nogales to Tucson every

20   time that she was asked to obtain clothing, every time she was asked

21   to, you know, and was devastated when the result in this case was

22   read.

23             Never mind her devastation, at the outset of the case,

24   she set to work in providing the letters she provided to me in

25   preparing the case for sentencing, Your Honor.

1    I think that those things must be taken into

2 consideration when judging this individual as an individual.

3    He is no longer a defendant sitting before a jury accused

4 of various crimes.  He is now an individual, Your Honor.  He is now a

5 man who has spent his life attempting to do the best he could by his

6 family and has found himself in this situation.

7    This is a difficult point to be at, Your Honor, I think for

8 you and for me as the defense attorney being at this point and for Mr.

9 Bonilla especially.

10    This is his life.  He's no longer a young man.  If the

11 court imposes a lot of time, he will either be old or infirmed when he

12 emerges.  And it's just very, very difficult, Your Honor.

13    I would hope the court takes those things into

14 consideration.

15    THE COURT:  Thank you.

16    Mr. Bonilla-Guizar is there anything that you want to say

17 this morning before I sentence you?

18    THE DEFENDANT:  First of all, I would like to apologize

19 for my mistake.  I've never been in a criminal situation before.  I do

20 not know what affects me and what doesn't.

21    I didn't come to this country to do harm to anyone.  The

22 thing was that my life was in danger in Mexico and that was the

23 reason that I came because I was witness to --

24    THE INTERPRETER:  The interpreter would like to ask for

25 a clarification if I could, Your Honor?

1      THE COURT:  Yes.

2      THE DEFENDANT:  Because I was a witness to a

3  homicide.  I wasn't aware at that place where I was.  The person

4  allowed me to be there when I got here.  I needed someone that

5  would orient me, that would help me, because there wasn't a lot of

6  communication between Mr. Peter and myself.

7      As you well know, I never received a phone call nor any

8  phone call to my family.  My brothers and sisters have been calling

9  and he has never answered the calls.  My parents are quite old now.

10  They are 80 years old and they are ill.  I was pretty much the only one

11  that helped them with their medications.

12      It's only been about two weeks that I heard from my

13  family because, as you know, my name over there at the prison is

14  incorrect and --

15      THE INTERPRETER:  If the interpreter understood the

16  pronunciation.

17      THE DEFENDANT:  My name over there is "Barilla," not

18  "Bonilla."

19      I would like to ask if you could, and I ask with all due

20  respect and humility, if you could give me a person that could really

21  help me because there are many things that you still don't know.

22      I don't know what's going on.  This is the first time I've

23  had a chance to speak because, as you know, I did not speak at the

24  time of the trial because I was told that if I did it would be -- it

25  wouldn't be wise for me to do so.

1          I was told that I wouldn't be able to get any less than 15

2    years.  And I'm really very scared because I'm already older now.

3          THE INTERPRETER:  The interpreter asks for a

4    clarification, Your Honor?

5          THE COURT:  Yes.

6          THE DEFENDANT:  I have a daughter -- well, I brought

7    her up, but she's not my daughter by birth.  Now that I've been

8    arrested, her grades went down.  There was an attempt to take her to

9    a psychologist.  She slept with me every day.  I still talk to her, but

10   she still is not doing well.

11         I would ask you to please consider my problem.  I don't

12   know what to say, Your Honor, because I've never been in a criminal

13   situation.  And I want to apologize to all the people that I have

14   offended because if I did so I wasn't aware of the consequences.

15         That's all, Your Honor.  Thank you.

16         THE COURT:  Well, Mr. Bonilla-Guizar, I can accept from

17   your statement and from the letters that you were a law-abiding

18   citizen of Mexico and that you were a person who supported your

19   family, who did things that you needed to do there to take care of your

20   family.

21         But when you came into this country, regardless of why

22   you came here, if you were fleeing because you were afraid of

23   somebody, because you had become a witness to a murder, or if you

24   were coming here to make money to work, whatever your reason was,

25   once you got here, you became involved with an alien smuggling

1    organization.  You became involved with a violent alien smuggling

2    organization that was using firearms to keep people hostage at this

3    home where they found you.

4             A person that testified here -- I didn't even credit the

5    testimony of the woman who claims that you raped her, which is such

6    an egregious and terrible thing.  I'm not even considering that in your

7    sentencing because she didn't testify before me.

8             But the man Lopez-Trujillo who did testify here before

9    me and before you and under oath clearly showed that you were a

10   person involved in this, asking for money from these people, holding

11   them hostage, using a firearm to threaten them, to intimidate them.

12   You did those things.

13            The jury that sat in that box heard that testimony.  Your

14   lawyer did everything he could to try to show that this man was

15   untruthful, that he didn't recollect properly, whatever.  But the jury

16   nonetheless believed that testimony and found you guilty.

17            I now have to impose a sentence based on that jury's

18   verdict.

19            You said something about your lawyer that bothers me,

20   the fact that you are claiming your lawyer did not see you.

21            When you came to this case initially, and I just looked

22   back at the indictment, you were facing three firearms charges.  You

23   would have gotten today, if you had been convicted of those --

24   because of what your lawyer did, those charges were dismissed.  They

25   were taken off, the charges against you, because of motions he filed.

1          If that had not happened, you would have received

2    seven years in prison for the first charge of the firearm, 25 years in

3    prison for the second charge, running one after the other, and then 25

4    more years in prison for the third charge of the use of the firearm.

5          So today you would have been facing 57 years in prison

6    plus what you are facing here today.  So basically you would have

7    gotten life imprisonment.

8          Not too long ago I had the displeasure of having to

9    sentence an individual just like that.  His job was to call the families

10   and ask for money in this smuggling operation.  He went to trial.  He

11   was found guilty.  He carried a gun in his waistband.  He never showed

12   it to anybody.  He never pulled it on anybody.  But under the law I

13   was obligated to sentence him to no less than 57 years in prison which

14   I did.

15         So when you talk about what your lawyer did,

16   understand where you started when this case started.  Once you

17   involve guns in these acts, the sentences are outrageously high,

18   outrageously strict, and that was what your lawyer was able to save

19   you from.

20         He couldn't save you from the entire case from being

21   sentenced.  You were convicted of that.  You were fairly convicted of

22   that.

23         You're going to get a chance to appeal that conviction.

24   You get to take your case up to a higher court.  And from what you

25   told me, probably another lawyer will come in and represent you on

1    that case.

2              That court will review what happened in that trial.  That

3    court will review what I did in sentencing here and determine whether

4    any error was made.  That will be a three-judge -- three judges are

5    going to review what happened here in the trial and the sentencing.

6              But when you start talking to people out there at the

7    prison, understand that there has been a person who went through

8    there and got 57 years for less than what you did, a person that never

9    intimidated anybody, never pulled a gun on anybody, never

10   threatened anybody, just walked around with a gun in his waistband

11   calling the families of these individuals who were being held hostage.

12             Hostage taking is a serious offense.  You throw guns in

13   there, you've got one of the worst offenses possible.  To hold human

14   beings hostage by the use of a firearm is a terrible crime.  That's what

15   you're convicted of today.  The sentence, of course, is going to be

16   harsh because of that.

17             Mr. Evans.

18             MR. EVANS:  Thank you, Your Honor.  Just two

19   comments.

20             One is the defense has argued that no one was injured in

21   this case.  I would strongly disagree.  If you look at the statement of

22   Mr. Lopez, he still suffers the trauma from being held as a hostage and

23   threatened with a firearm.

24             Secondly, the guidelines set out the range.  It is a

25   determination based upon a nationwide process.  And the guidelines

1   are appropriate.  We ask you to sentence within the guidelines.

2   THE COURT:  Thank you.

3   The court in reviewing the facts in this case has heard

4   and considered the motion for downward departure under Section

5   5K2.20 for aberrant behavior.  The court finds there is no basis for the

6   court to depart; although the court has the authority to do so based on

7   the facts in this case.

8   These facts were egregious enough to call for a sentence

9   within the advisory guidelines range.

10   Similarly, the court has reviewed the provisions of Title

11   18, United States Code, Section 3553(a)(1) and other subsections and

12   finds no basis for a variance in this case.

13   The court finds that the guideline range is an appropriate

14   range of sentencing in this case.  The court is going to sentence at the

15   bottom of that range and finds that to be an appropriate sentence

16   given the facts in this case.

17   It is the judgment and sentence of the court that Yuris

18   Bonilla-Guizar is committed to the custody of the Bureau of Prisons for

19   a period of 188 months.

20   That will be 188 months on Count 1, 188 months on

21   Count 3 to be served concurrently.

22   He shall pay a special assessment of $200; $100 for

23   each count, which shall be due and payable immediately.  Payment

24   shall be made under the Bureau of Prisons Inmate Financial

25   Responsibility Program.

1          The court finds he does not have the ability to pay a fine

2     and orders the fine waived.

3          Upon release from imprisonment, he shall be placed on

4     supervised release for five years on Count 1 and three years on Count

5     3 to run concurrently.

6          While on supervised release, he shall comply with the

7     standard conditions of supervision adopted by the court in General

8     Order 05-36, including the conditions:

9          That he shall not commit another federal, state or local

10    crime during the term of supervision;

11         That he shall abstain from the use of illicit substances;

12    and

13         That he shall not reenter the United States without legal

14    authorization.

15         Mr. Bonilla, your sentence is 188 months.  That is 15

16    years and 8 months in prison.

17         That will be followed by a five-year term of supervised

18    release once you are released from custody.

19         You will receive credit for the time you have spent in

20    custody up until today's date.

21         And if you behave in prison, you will receive some small

22    amount of reduction in your sentence based on that.

23         Did you understand the sentence that I have imposed on

24    you?

25              THE DEFENDANT:  Yes.

1      THE COURT:  You have the right to appeal this -- the

2  judgment of the jury and this sentence.  You have 14 days in which to

3  file your notice of appeal.  Your appeal would be at no cost to you.

4  Your attorney or another attorney would continue to represent you at

5  no cost to you.

6           That's a matter you need to discuss with your attorney.

7           If you do not file your notice of appeal within 14 days,

8  you lose your right to appeal.

9           Do you understand your right to appeal?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Count 2 of the third superseding

12  indictment is ordered dismissed.  There was no jury verdict by the jury

13  on that count.  And there's been no further prosecution.  That count is

14  ordered dismissed.

15          Mr. Evans, is there anything further at this time?

16          MR. EVANS:  No, Your Honor.  Thank you very much.

17          THE COURT:  Mr. Hormel, any requests for designation?

18          MR. HORMEL:  Your Honor, we would request that he

19  remain in Arizona because his family is in Nogales, even though they

20  are having problems crossing right now.

21          THE COURT:  It's the recommendation of the court to

22  the Bureau of Prisons that Mr. Bonilla-Guizar be designated to a

23  federal institution within the state of Arizona.

24          Mr. Bonilla-Guizar, if there's room for you here in one of

25  the three prisons, there is only three prisons in Arizona, one is in

1    Phoenix, one is in Tucson and one is in Safford, they'll put you there.

2              If there is no room, you might be moved to a different

3    prison outside the state, usually in California.  Once there's room, you

4    may be brought back to the prison here in Arizona.

5              Other than going over the conditions of supervised

6    release, is there anything further?

7              MR. HORMEL:  No, Your Honor.

8              THE COURT:  This is a document -- Mr. Bonilla-Guizar, I

9    explained to you the conditions of your supervised release.  You stated

10   you understand them.  I ask you to sign that document indicating you

11   do understand.

12             Mr. Evans, anything further at this time?

13             MR. EVANS:  No, Your Honor.  Thank you very much.

14             THE COURT:  Thank you.  You may be excused.

15             You may take that, Mr. Hormel.

16             (The proceedings concluded at 10:20 a.m.)

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7                           C E R T I F I C A T E
8
9
10
11          I, Dianne Davenport, certify that the foregoing is a correct
12   transcript from the record of proceedings in the above-entitled matter.
13
14
15
16
17   /s/  Dianne Davenport                    November 16, 2011
18
19
20
21
22
23
24
25